IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


NATIONAL CREDIT UNION
ADMINISTRATION BOARD,

        Plaintiff,

    vs.                  **Case No. 11-2340-RDR**

RBS SECURITIES, INC.
formerly known as Greenwich
Capital Markets, Inc., et al.,

        Defendants.
_____


NATIONAL CREDIT UNION
ADMINISTRATION BOARD,

        Plaintiff,

    vs.                  **Case No. 11-2649-RDR**

WACHOVIA CAPITAL MARKETS,
LLC, now known as Wells
Fargo Securities, LLC,

        Defendant.
_____


## <u>**MEMORANDUM AND ORDER**</u>

This order decides motions to dismiss filed in two cases which have been consolidated and assigned to this court. Both cases are brought by the National Credit Union Administration Board and assert violations of federal and state securities statutes involving the sale of residential mortgage-backed securities certificates.

I. <u>NCUAB v. RBS Securities, et al., Case No. 11-2340</u>

    A. <u>Introduction</u>

The complaint in this case involves 29 residential mortgage-backed securities ("MBS") certificates. Doc. No. 1, ¶ 8 and Table 1 at pp.3-6. It alleges violations of § 11 and § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77l(a)(2), and Article 5 of the Kansas Uniform Securities Act, K.S.A. 17-12a509. Plaintiff is suing in its capacity as the liquidating agent of the U.S. Central Federal Credit Union ("U.S. Central"). Plaintiff is the managing authority of the National Credit Union Administration ("NCUA") which is an independent agency of the United States Government charged with regulating federal credit unions.

According to the complaint, U.S. Central was a federally-chartered corporate credit union. Doc. No. 1, ¶ 12. Prior to being placed into conservatorship by plaintiff on March 20, 2009, U.S. Central was the largest corporate credit union in the United States. Id. at ¶¶ 13-14. On October 1, 2010 plaintiff placed U.S. Central into involuntary liquidation. Id. at ¶ 14. As liquidating agent, plaintiff succeeded to the rights, titles, powers and privileges of U.S. Central and may sue on its behalf. 12 U.S.C. §§ 1786(h)(8), 1787(b)(2)(A), 1766(b)(3)(A), 1789(a)(2).

B. Mortgage securitization

This case involves the business of mortgage securitization which was described in In re Lehman Brothers Securities and ERISA Litigation, 800 F.Supp.2d 477, 479 (S.D.N.Y. 2011) as follows:

> In a mortgage securitization, mortgage loans are acquired, pooled together, and then sold to a trust which

2

in turn issues certificates to purchasers who become the beneficiaries of the trust and who then receive distributions from the trustee from the cash flow generated by the pool of mortgages and in accordance with the specifications of the rights of the respective classes of certificate holders set out in the trust instrument.

The following terms have been used by the parties and are used in this opinion. An "originator" is an entity that processes the borrower's loan application and makes the loan in exchange for a mortgage. The entity that purchases a pool of mortgage loans is the "depositor." The entity, often referred to as a "trust," which securitizes the loans and issues securities backed by the loan pools is the "issuer." The issuer establishes classes of certificates, referred to as "tranches," which are portions of a MBS which may have different levels of credit protection and, therefore, different credit ratings. Credit protection may be accomplished by subordination where, for instance, one tranche will be paid before the other tranches. Over-collateralization is another form of credit enhancement, where the pool of loans serving as collateral for a tranche has a principal balance which exceeds the principal balance of the tranche security issued by the trust. A tranche may also be designed so that the interest income exceeds the monthly liabilities owed to the certificate purchasers.

Each tranche receives a credit rating from a rating agency before it is sold. This process is explained in a report by the Office of the Inspector General for the NCUA:

3

> A key step in the process of creating and ultimately selling [a MBS] is the issuance of a credit rating for each of the tranches issued by a trust. The arranger of the [MBS] initiates the ratings process by sending the credit rating agency a range of data on each of the loans to be held by the trust (e.g., principal amount, geographic location of the property, credit history and FICO score of the borrower, ratio of the loan amount to the value of the property and type of loan: first lien, second lien, primary residence, secondary residence), the proposed capital structure of the trust and the proposed levels of credit enhancement to be provided to each [MBS] tranche issued by the trust. A lead analyst at the rating agency is assigned responsibility for analyzing the loan pool, proposed capital structure, and proposed credit enhancement levels, and for ultimately formulating a ratings recommendation for a rating committee. The credit rating for each rated tranche indicates the credit rating agency's view as to the creditworthiness of the debt instrument. Creditworthiness is assessed in terms of the likelihood that the issuer would default on its obligations to make interest and principal payments on the debt instrument.

Doc. No. 67, Exhibit 44 at p. 6.

A corporate credit union, such as U.S. Central, is restricted by regulation to acquiring only highly rated securities. Id.

Depositors must file registration statements with the Securities and Exchange Commission regarding the sale of the certificates. The registration statements are accompanied by prospectus and prospectus supplements (referred to as "offering documents"). These documents explain the details of the offerings for each trust and describe the characteristics of the mortgages that supply the income for the certificates. Federal securities laws provide for liability when there are false and misleading statements in these documents.

C.  <u>MBS offerings involved in this case</u>

U.S. Central is alleged to have purchased MBS certificates

from the following offerings:

First Franklin Mortgage Loan Trust 2006-FF16 (3 certificates);
Fremont Home Loan Trust 2006-3 (1 certificate);
Fremont Home Loan Trust 2006-D (2 certificates);
Harbor View 2006-10 (2 certificates);
Harbor View 2006-11 (1 certificate);
Harbor View 2006-12 (2 certificates);
Harbor View 2006-14 (1 certificate);
Harbor View 2006-SB1 (1 certificate);
Home Equity Loan Trust 2007-HSA2 (1 certificate);
IndyMac INDX Mortgage Loan Trust 2006-AR35 (1 certificate);
IndyMac INDX Mortgage Loan Trust 2006-AR6 (1 certificate);
Luminent Mortgage Trust 2006-2 (1 certificate);
Luminent Mortgage Trust 2007-1 (1 certificate);
Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 (1 certificate);
NovaStar Mortgage Funding Trust, Series 2006-5 (3 certificates);
Soundview Home Loan Trust 2006-WF2 (1 certificate);
Soundview Home Loan Trust 2007-OPT1 (1 certificate);
Harbor View 2006-6 (2 certificates);
Saxon Asset Securities Trust 2006-3 (1 certificate);
Wachovia Mortgage Loan Trust, Series 2006-ALT1 (1 certificate).

D.  <u>Identification and status of the defendants</u>

There are eleven defendants listed in the complaint.  One

defendant, RBS Securities, Inc. ("RBS"), formerly known as

Greenwich Capital Markets, Inc., allegedly acted as a seller and/or

underwriter of MBS certificates purchased by U.S. Central.  The

other ten defendants have been labeled "issuer defendants" because

they allegedly issued certain MBS purchased by U.S. Central.  These

defendants are:  Greenwich Capital Acceptance, Inc.; Financial

Asset Securities Corp.; Fremont Mortgage Securities Corp.; Residential Funding Mortgage Securities II, Inc.; IndyMac MBS, Inc.; NovaStar Mortgage Funding Corp.; Nomura Home Equity Loan, Inc.; Lares Asset Securitization, Inc.; Saxon Asset Securities Co.; and Wachovia Mortgage Loan Trust, LLC.   Defendant Saxon has been voluntarily dismissed from this case.   Doc. No. 43.   Defendant Residential Funding Mortgage Securities II, Inc. filed a motion to dismiss, but has since filed for bankruptcy and proceedings against it are subject to a bankruptcy stay.   Defendant Lares has not filed an answer or a motion to dismiss as of this time.

     E.  <u>Counts of the complaint</u>

    There are twelve counts in the complaint.   The first ten counts of the complaint allege violations of § 11.   Count 11 alleges violations of § 12(a)(2).   Count 12 alleges violations of the Kansas Uniform Securities Act, K.S.A. 17-12a509.   Defendant RBS is sued in each count of the complaint.   The other defendants are charged in single counts with violations of § 11.

     F.  <u>Pending motions</u>

    This case is before the court upon motions to dismiss for failure to state a claim under FED.R.CIV.P. 12(b)(6) filed on behalf of or joined in by all named defendants, except: defendant Residential Funding Mortgage Securities II, Inc.; defendant Saxon (now dismissed) and defendant Lares.   These are:   Doc. No. 53 - Motion to dismiss by defendant Nomura Home Equity Loan Inc.; Doc.

No. 58 - Motion to dismiss count ten by defendant Wachovia Mortgage Loan and Trust; Doc No. 59 - Motion to dismiss count two by defendant Fremont Securities Corporation; Doc. No. 63 - Motion to dismiss and motion to strike by defendant NovaStar Mortgage Funding Corporation; and Doc. No. 66 - Motion to dismiss by defendants RBS Securities, Inc., Financial Asset Securities Corporation, and Greenwich Capital Acceptance, Inc. - joined in by defendant IndyMac MBS, Inc. (Doc. No. 70). There is a motion to strike which is part of the motion to dismiss filed by defendant NovaStar. Doc. No. 63. That motion shall be discussed and decided in the context of the motions to dismiss. The docket also shows requests to take judicial notice of various materials. Doc. Nos. 65 and 68. These requests shall be granted.

      G. Elements of plaintiff's claims

     As explained in In re Morgan Stanley Information Fund Securities Litigation, 592 F.3d 347, 358 (2nd Cir. 2010), § 11 and § 12(a)(2) "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions." Section 11 applies to registration statements, and § 12(a)(2) applies to prospectus materials and oral communications. Id.

     The elements of a § 11 claim are: 1) purchase of a registered security either directly from the issuer or in the aftermarket; 2)

defendant's participation in the offering as set forth in § 11; and 3) the registration statement contained an untrue statement of material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Id. at 358-59.

The elements of a § 12(a)(2) claim are quite similar. These elements are: 1) purchase of a registered security from a "statutory seller"; 2) the sale was effectuated by means of a prospectus or oral communication; and 3) the prospectus or oral communication included an untrue statement of material fact or omitted a material fact required to be stated therein or necessary to make the statements therein not misleading. Id. at 359.

"[P]laintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation." Id. "Materiality" depends upon "whether the defendants' representations, taken together and in context, would have misled a reasonable investor." Id. at 360 (interior quotations and citations omitted). Materiality is considered a mixed question of law and fact which is rarely decided upon a motion to dismiss. Id.

As mentioned, plaintiff alleges a violation of K.S.A. 17-12a509 by defendant RBS. This statute makes a person liable to the purchaser of a security if that person sold the security "by means of an untrue statement of a material fact or an omission . . . [of] a material fact necessary in order to make a statement made, in

8

light of the circumstances under which it is made, not misleading, the purchaser not knowing the untruth or omission and the seller not sustaining the burden of proof that the seller did not know and, in the exercise of reasonable care, could not have known of the untruth or omission." K.S.A. 17-12a509(b). This language is essentially the same as that in § 11 and § 12(a)(2). Cf., 15 U.S.C. §§ 77k, 77l(a)(2).

H.  12(b)(6) standards

"The legal sufficiency of a complaint is a question of law." Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009) cert. denied, 130 S.Ct. 1142 (2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotation omitted). The court must not "weigh potential evidence that the parties might present at trial, but . . . assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." Cohon v. New Mexico Dept. of Health, 646 F.3d 717, 724 (10th Cir. 2011) (interior quotations omitted).

The motions to dismiss in this case challenge whether plaintiff has stated a timely claim and a plausible claim. If plaintiff has stated a timely claim, then the court must consider what "plausible" means for the purposes of this case. The Supreme Court has stated that plausibility requires that the allegations of

a complaint should "raise a reasonable expectation that discovery will reveal evidence" supporting the elements of the claims, <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 556 (2007), and "allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," <u>Iqbal</u>, 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."   <u>Id.</u> (internal quotations and citations omitted).

The Tenth Circuit has recently commented:

> plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting <u>Twombly</u>, 550 U.S. at 570, 127 S.Ct. 1955). Further, we have noted that "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context." <u>Kansas Penn</u>, 656 F.3d at 1215; <u>see also</u> <u>Iqbal</u>, 129 S.Ct. at 1950 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). Thus, we have concluded the <u>Twombly/Iqbal</u> standard is "a middle ground between heightened fact pleading, which is expressly rejected, and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action, which the Court stated will not do." <u>Robbins</u>, 519 F.3d at 1247 (internal quotation marks and citations omitted).

<u>Khalik v. United Air Lines</u>, 671 F.3d 1188, 1191 (10th Cir. 2012). Along with these comments, the Tenth Circuit stated that Rule 8(a)(2)'s requirement of a short and plain statement of the claim

showing that the pleader is entitled to relief, is still alive and that special pleading rules are not required for specific types of cases unless they are expressly set forth in the Federal Rules. Id. at 1191-92.

The Second Circuit has commented that there may be more than one plausible interpretation from a set of allegations and that, at the 12(b)(6) stage of a case, the court is not allowed to pick one plausible interpretation over another even if the court believes actual proof of the facts alleged may be improbable.  Anderson News, L.L.C. v. American Media, Inc., 680 F.3d 162, 184-85 (2d Cir. 2012).

As mentioned, defendants raise a statute of limitations challenge in this case.  This is appropriate for consideration upon a Rule 12(b)(6) motion.  Jones v. Bock, 549 U.S. 199, 215 (2007). The court's focus, however, should be upon whether the allegations in the complaint show that relief is barred by the statute of limitations, not whether there is an absence of allegations showing compliance with the statute of limitations.  See id. (complaint need not include facts defeating affirmative defense of administrative exhaustion).

When deciding a motion to dismiss, the court may consider documents referred to in the complaint if there is no dispute as to the documents' authenticity.  Smith, 561 F.3d at 1098.  The court may also consider any matter subject to judicial notice without

converting the motion to a motion for summary judgment.  See <u>Staehr</u>
<u>v. Hartford Financial Services Group, Inc.</u>, 547 F.3d 406, 424-25
(2d Cir. 2008); <u>Pace v. Swerdlow</u>, 519 F.3d 1067, 1072 (10th Cir.
2008).

> I.   <u>Allegations in the complaint</u>

The   complaint   alleges   that   in   2006   and   2007   U.S.   Central
purchased 29 MBS certificates issued by defendants and underwritten
and sold by defendant RBS in reliance upon offering documents which
contained  untrue  statements  of  material  fact  or  omitted  material
facts.   These alleged untrue statements or omissions largely relate
to  conformity  with  the  mortgage  underwriting  standards  by  the
originators  of  the  mortgages  which  were  pooled  and  served  as
collateral  for  the  MBS  purchased  by  U.S.  Central.    Plaintiff
alleges    that    the    originators    systematically    disregarded
underwriting  standards  for  the  loans  underlying  the  MBS  in  this
case.   It  should  be  noted  that  the  originators  either  are  not
defendants in this case or, if they are defendants, it is not for
their actions as loan originators.

As   just   mentioned,   the   complaint   alleges   that   while   the
offering documents represented that certain underwriting guidelines
were  followed,  in  fact  the  mortgage  originators  "systematically
abandoned  the  stated  underwriting  guidelines."   Doc. No. 1, ¶ 6.
This  is  alleged  to  have  made  the  MBS  "significantly  riskier  than
represented in the [o]ffering [d]ocuments."  <u>Id</u>.  According to the

12

complaint, "a material percentage of the borrowers whose mortgages comprised the [MBS] were all but certain to become delinquent or [in] default shortly after origination." <u>Id</u>.   The alleged result was a loss of cash flow from the principal and interest payments which were the collateral for the MBS and a loss of value in the MBS purchased by U.S. Central.   The complaint quotes a report from the Office of the Comptroller of the Currency ("OCC") as stating that "[t]he quality of the underwriting process . . . is a major determinant of subsequent loan performance."   Doc. No. 1, ¶ 95.

All but six of the MBS identified in the complaint were rated triple-A at the time of purchase by U.S. Central.   Five were rated double-A-plus.   One was rated double-A.   According to the complaint, by 2009 and 2010, most of the securities' ratings had dropped to below investment grade.   Doc. No. 1, Table 4 at pp. 17-18.

The complaint alleges that at the time U.S. Central purchased the MBS, it was not aware of the untrue statements or omissions of material facts in the offering documents.   Doc. No. 1, ¶ 56.   The complaint further alleges that if U.S. Central "had known about the Originators' pervasive disregard of underwriting standards – contrary to the representations in the Offering Documents - U.S. Central would not have purchased" the MBS.   <u>Id</u>.

According to the complaint, the offering documents reported zero or near zero delinquencies and defaults at the time of the

offerings (Doc. No. 1, ¶ 64), but default and delinquency rates surged in the months after the MBS were offered.  "As of May 2011, nearly half (45.73%) of the mortgage collateral across all of the [MBS] that U.S. Central purchased was in delinquency, bankruptcy, foreclosure, or was [real estate owned], which means that a bank or lending institution own[ed] the property after a failed sale at a foreclosure auction."  Doc. No. 1, ¶ 66,  see also Table 5 at pp. 21-29.

Plaintiff asserts that these rates of early payment default evidence "borrower misrepresentations and other misinformation in the origination process, resulting from the systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents."  Doc. No. 1, ¶ 69.  Plaintiff cites a November 2008 Federal Reserve Board study which "attributed the rise in defaults, in part, to '[d]eteriorating lending standards,' and posits that 'the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors.'"  Doc. No. 1, ¶ 70.  This link is suggested in the OCC report referenced earlier which observed that: "The quality of underwriting varies across lenders, a factor that is evidenced through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators."  Doc. No. 1, ¶ 95.

Plaintiff further alleges that many loan originators for the

14

MBS at issue in this case had high "originate-to-distribute" or "OTD" percentages (Doc. No. 1, Table 6 at p. 31) and that this meant they were more likely to disregard underwriting standards because they profited from selling (or "distributing") the loans and after selling the loans did not bear the risk of borrower default. Doc. No. 1, ¶¶ 73-74. The link between the OTD mode of mortgage lending and the disregard of underwriting standards is discussed elsewhere in the complaint. Benjamin Bernanke, Chairman of the Federal Reserve Board, is quoted as stating: "In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model . . . created for the originators." Doc. No. 1, ¶ 103. In addition, a report of the Financial Stability Oversight Council ("FSOC") is quoted as linking the OTD model to weakening underwriting standards "particularly . . . with respect to the verification of the borrower's income, assets, and employment for residential real estate loans . . ." Doc. No. 1, ¶ 107.

According to the complaint, the alleged systematic disregard of underwriting standards is shown by the actual loss records of the MBS. Plaintiff asserts: "[t]he actual losses to the mortgage pools underlying the [MBS] U.S. Central purchased have exceeded expected losses so quickly and by so wide a margin that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents." Doc. No.

15

1, ¶ 76.  The complaint explains that "[e]xpected loss is a statistical estimate of the total cumulative shortfall in principal payments on a mortgage pool over its 30-year life, expressed as a percentage of the original principal balance of the pool . . . based on historical data for similar mortgage pools."  Doc. No. 1, ¶ 79.  It is a factor used to determine the amount of credit enhancement needed to attain a desired credit rating.  Doc. No. 1, ¶ 80.  The complaint reasons that the actual loss rate of the MBS certificates U.S. Central purchased, which led to the failure of credit enhancement methods to ensure triple-A performance of triple-A MBS, substantiates the alleged abandonment of underwriting standards.  Doc. No. 1, ¶ 89.

The complaint further contends that the collapse of the credit ratings for the MBS U.S. Central purchased is evidence of the originators' "systematic disregard of underwriting guidelines."  Doc. No. 1, ¶ 92.  Virtually all of the MBS certificates were triple-A at issuance; they have since been downgraded to well below investment grade.  Doc. No. 1, ¶¶ 90-91 and Table 4.

The complaint buttresses its allegations of shoddy underwriting practices by the originators of the mortgages for the MBS in this case with statements from various authorities:

> "a host of financial institutions . . . knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans.  These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis."  Doc. No. 1, ¶ 96 (quoting a Senate

16

staff report on "Wall Street and the Financial Crisis").

"mortgage fraud 'flourished in an environment of collapsing lending standards.'" Doc. No. 1, ¶ 99, (quoting the Financial Crisis Inquiry Commission ("FCIC") report).

"Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." Doc. No. 1, ¶ 101 (quoting FCIC report).

"at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay." Doc. No. 1, ¶ 103 (quoting Benjamin Bernanke).

In addition to these general comments regarding the subprime mortgage industry, the complaint includes allegations regarding ten individual mortgage originators who contributed mortgages to some, but not all, of the MBS at issue in this case. Doc. No. 1, ¶¶ 110-234. These originators are: American Home Mortgage Investment Corporation; Countrywide Home Loans, Inc.; First National Bank of Nevada; Fremont Investment & Loan; Homecomings Financial Network, Inc.; IndyMac Bank; Option One Mortgage Corporation; NovaStar Mortgage, Inc.; Silver State Mortgage Company; and Washington Mutual Bank ("WaMu"). By the court's count, these entities originated mortgages for 20 of the 29 certificates alleged in this complaint.

The complaint draws statements from prospectus supplements for the MBS offerings at issue in this case and alleges that they are

examples of material untrue statements.  Doc. No. 1, ¶¶ 257-316. The following is a representative sample:

> "American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present . . ."  Doc. No. 1, ¶ 271 (quoting HarborView 2006-6 Prospectus Supplement at S-96).

> "In determining the adequacy of the mortgaged property as collateral for a mortgage loan, an appraisal is made of each property considered for financing or, if permitted by the underwriting standards, the value of the related mortgaged property will be determined by the purchase price of the mortgaged property, a statistical valuation, or the stated value.  In most cases, the underwriting standards of Residential Funding as to the mortgage loans originated or purchased by it place a greater emphasis on the creditworthiness and debt service capacity of the borrower than on the underlying collateral in evaluating the likelihood that a borrower will be able to repay the related mortgage loan."  Doc. No. 1, ¶ 281 (quoting Home Equity Loan Trust 2007-HSA2 Prospectus Supplement at S-38).

> "Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate [his] . . . 'debt-to-income' ratios are within acceptable limits."  Doc. No. 1, ¶ 289 (quoting Luminent Mortgage Trust 2006-2 Prospectus Supplement at S-39-40).

> "The mortgage loans have been originated generally in accordance with the following underwriting standards established by WMMSC or underwriting guidelines established by WaMu.  The following is a summary of the underwriting standards or guidelines generally applied by WMMSC or WaMu and does not purport to be a complete

18

description of the underwriting standards of WMMSC or WaMu. Such underwriting standards or guidelines generally are intended to evaluate the prospective borrowers credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." Doc. No. 1, ¶ 292 (quoting Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-32).

"Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer." Doc. No. 1, ¶ 286 (quoting IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-69).

"Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed." Doc. No. 1, ¶ 310 (quoting Soundview 2007-OPT1 Prospectus Supplement at S-73).

"All of the Mortgage Loans have been purchased by the sponsor from various banks, savings and loan associations, mortgage bankers and other mortgage loan originators and purchasers of mortgage loans in the secondary market, and were originated generally in accordance with the underwriting criteria described in this section." Doc. No. 1, ¶ 295 (quoting Nomura HELT, Series 2007-1 Prospectus Supplement at S-108).

Plaintiff also alleges that some defendants are liable for material false statements regarding the operation of reduced documentation programs, loan-to-value ratios, and credit enhancement policies. These allegations, however, are linked to plaintiff's claim that the originators systematically disregarded

underwriting standards.[1]

J.  Judicial notice materials

This section of the opinion describes or takes quotations from some of the material submitted for judicial notice.  Most of the material noted in this section relates to the statute of limitations question of whether a reasonably diligent investor should have been put on notice in 2006 and 2007 of facts which would lead to the discovery of a plausible claim.  As explained in more detail later in this opinion, defendants contend that this case was untimely filed because a reasonable investor would have had knowledge of facts sufficient to file a claim before March 20, 2008, which is a critical date for determining the timeliness of

---

[1]

At p. 121 of the complaint, plaintiff states:  "The statements [regarding the reduced documentation programs] were untrue at the time they were made because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines in order to increase the volume of mortgages originated, emphasizing quantity of loans rather than the quality of those loans."  At pp. 123-24 of the complaint, plaintiff states: "The preceding statements [regarding loan-to-value ratios] were untrue at the time they were made because the Originators did not adhere to the maximum loan-to-value ratios as represented in the Offering Documents, encouraged inflated appraisals and frequently granted loans with high loan-to-value ratios with no meaningful assessment of the borrower's ability to repay the loan based on the borrower's credit profile."  At pp. 127-28 of the complaint, plaintiff states: "The preceding statements [regarding credit enhancement] were untrue at the time they were made, because due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail.  This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory."

plaintiff's federal claims.

Trading in mortgage-backed securities halted in mid-2007. Doc. No. 67, Ex. 1, Report of the Office of Inspector General of the NCUA, at p.1 n.2. As of December 31, 2007, many of U.S. Central's securities had lost money, particularly the investments in MBS. Id. at p. 14. In July 2008, U.S. Central's external auditor required an additional adjustment to "Other Comprehensive Income (loss)" as of December 31, 2007, increasing the number from $1.1 billion to $1.5 billion. Id. at p. 3. A May 2007 examination was the first time Office of Corporate Credit Unions examiners commented on the subprime MBS held by U.S. Central. Id. at p. 25. The report noted that the subprime mortgage sector had begun experiencing deterioration. Id. U.S. Central enhanced its monitoring procedures to identify problem securities. Id.

> The examination report further noted that management's monitoring efforts became more significant in July 2007 as rating agencies downgraded or issued a negative outlook on one thousand structured securities with sub-prime collateral. We determined U.S. Central did not own any of these specific securities but did own 10 senior tranches of securities where subordinate tranches were downgraded. . . . The examination report concluded that: "U.S. Central's investment function remains conservative with the portfolio consisting primarily of the highest rated marketable securities."

Id.

An FBI report on financial crimes in May 2005 and numerous reports in the press from 2006 documented increasing risk in the subprime mortgage market because of pervasive and growing mortgage

fraud, widespread inflated valuations, loose underwriting standards, and growth of atypical mortgages including risky ones that did not require down payments or income documentation. Doc. No. 67, Ex. Nos. 22, 23, 24. A <u>Wall Street Journal</u> article dated October 9, 2006 noted that some loan originators were "tightening their underwriting standards" and that companies were suing lenders that they claimed passed on bad mortgages that quickly defaulted. Doc. No. 67, Ex. 25. The article stated that it was unclear whether the recent downturn in the mortgage market was "finetuning" or the "beginning of a more serious shakeout." <u>Id</u>. In late 2006 and early 2007, press reports documented a surge in foreclosures and mortgage delinquencies. Doc. No. 67, Ex. Nos. 27, 28, 29. This reflected loans made under lowered standards. Doc. No. 67, Ex. 29 at p.2. It was reported that: "In many cases these loans are 'so bad right off the bat' and so far beyond the borrower's ability to pay that giving the borrower more time to pay or restructuring the loan wouldn't help." <u>Id</u>. at p. 3. It was also reported in December 2006 that Standard & Poor's Corporation put one deal backed by loans issued by Fremont General Corporation's mortgage unit on credit watch for possible downgrade and said it could take similar action on deals from several other issuers. <u>Id</u>. A Standard & Poor's representative was quoted as stating: "We are monitoring very, very closely the portfolios of all the subprime issuers . . . It's an industrywide trend." <u>Id</u>. But, readers were

22

told that some investors were more at risk than others.

> Because of the way mortgage-backed securities are
> structured, investors who buy investment-grade securities
> aren't likely to be hurt if losses are close to
> expectations.  But if losses on the underlying mortgages
> substantially exceed expectations, some investors who buy
> the riskiest slices of subprime securities are likely to
> rack up losses. . . . Because the underlying loans have
> gotten riskier, credit-rating agencies are telling
> issuers of mortgage-backed bonds to set aside more money
> to cover losses than they did three years ago in order to
> get a AAA rating for their bonds.

Id.

A January 26, 2007 New York Times article, as well as other press reports in 2006, documented the collapse of several mortgage lenders and the lowering of lending standards by subprime lenders, drawing the concern of banking regulators.  Doc. No. 67, Ex. Nos. 30, 31, 32, 33, 34.  According to a December 2006 article in The Economist, sometimes the underwriting standards were "waived altogether."  Doc. No. 67, Ex. 34, p. 2.  The article estimated that 40% of the MBS issued in the first half of 2006 were linked to subprime loans.  Id.  Some mortgage lenders failed in 2006 and others were being sold, including Option One Mortgage (a loan originator for an offering in this case).  Id.  On the other hand, in the last half of the year, Morgan Stanley, Merrill Lynch and Bear Stearns had all bought mortgage lenders, and Lehman Brothers had purchased several in the previous three years.  Id.

According to testimony given to the Senate Committee on Banking on February 7, 2007, the subprime mortgage market was "a

23

quiet but devastating disaster" because it was "widely recognized" that lenders had become too lax in qualifying applicants for subprime loans.  Doc. No. 67, Ex. 35, pp. 1-2.  The following comments were also part of the testimony:

> "Especially troubling is the practice of qualifying borrowers without any verification of income, not escrowing property taxes and hazard insurance, and failing to account for how borrowers will be able to pay their loan once the payment adjusts after the teaser period expires." Id. at p. 2.

> "Subprime lenders have virtually guaranteed rampant foreclosures by approving risky loans for families while knowing that these families will not be able to pay the loans back." Id.

> "[M]any subprime lenders have been routinely abdicating the responsibility of underwriting loans in any meaningful way." Id. at p. 14.

> "[U]nderwriting standards in the subprime market have become extremely loose in recent years, and analysts have cited this laxness as a key driver in foreclosures." Id.

> "Fitch recently noted that 'loans underwritten using less than full documentation standards comprise more than 50% of the subprime sector....''Loc-doc' and 'no-doc' loans originally were intended for use with the limited category of borrowers who are self-employed or whose income are otherwise legitimately not reported on a W-2 tax form, but lenders have increasingly used these loans to obscure violations of sound underwriting practices." Id. at p. 15.

With more specific reference to entities identified in the complaint in this case, the FDIC issued a press release on March 7, 2007 announcing that it had issued a cease and desist order against Fremont Investment and Loan.  Doc. No. 67, Ex. 42.  According to the press release, the FDIC found:

> "that the bank was operating without effective risk
> management policies and procedures in place in relation
> to its subprime mortgage and commercial real estate
> lending operations.  The FDIC determined, among other
> things, that the bank had been operating without adequate
> subprime mortgage loan underwriting criteria, and that it
> was marketing and extending subprime mortgage loans in a
> way that substantially increased the likelihood of
> borrower default or other loss to the bank."

Id.  When this cease and desist order was proposed, Fremont announced that it intended to exit its subprime residential mortgage business.  Doc. No. 67, Ex. 41.  The Wall Street Journal reported in January 2007 that IndyMac Bancorp, Inc. had been hit by rising delinquencies in its main Alt-A mortgage portfolio.  Doc. No. 67, Ex. 27, p. 2.  The same article reported that NovaStar stock had dropped more than 30%.  Id.  The Wall Street Journal also reported in October 2006 that Option One Mortgage Corp. had to repurchase bad loans causing its parent, H&R Block, Inc., to record a loss.  Doc. No. 67, Ex. 26.

The parties have submitted other materials for judicial notice by the court.  These include:  complaints containing allegedly similar allegations in lawsuits filed in 2007 and 2008; prospectuses and prospectus supplements; and financial data regarding defendant NovaStar.

K.  Statute of limitations/repose - the positions of the parties and the rulings of the court

There are two deadlines for filing Securities Act claims under § 11 and § 12(a)(2).  Both deadlines must be satisfied.  These deadlines are set forth in 15 U.S.C. § 77m, which is Section 13 of

25

the Securities Act.  The first deadline mentioned in § 13 is <u>one</u> <u>year</u> after the date of discovery or after the date when discovery should have been made by the exercise of reasonable diligence.  The second deadline, which is considered a statute of repose, requires that "[i]n no event" shall a § 11 action be brought "more than <u>three years</u> after the security was bona fide offered to the public," or a § 12(a)(2) action be brought "more than <u>three years</u> after the sale."  There is a two-year limitations period and a five-year period of repose for the claims plaintiff alleges under Kansas law.  K.S.A. 17-12a509(j)(2).  The parties' arguments in this matter focus almost completely upon the timeliness of plaintiff's federal law claims.

Plaintiff filed this case on June 20, 2011.  The certificates in question in this case were offered and sold to U.S. Central in 2006 and 2007 – well more than three years before this case was filed.  But plaintiff was not appointed conservator or liquidator of U.S. Central until March 20, 2009 and, therefore, had little or, as defendants allege, no time to assess whether to bring the claims it brings here, unless the time to do so was extended.

Plaintiff contends that its time to bring the claims in this case was extended under 12 U.S.C. § 1787(b)(14)(A) ("the extender statute").  Defendants claim that the federal claims are untimely filed:  1) as a matter of statutory construction of § 13 and the extender statute; and 2) as a failure of pleading as regards the

26

one-year limitations period.  Plaintiff argues that the extender statute provides the statutory basis for avoiding defendants' limitations and repose arguments and that plaintiff has pled sufficient facts to survive a timeliness challenge under Rule 12(b)(6).

      1.  <u>Dismissal is not warranted as a matter of statutory construction</u>

      a.  <u>The extender statute applies to the federal and state statutory claims advanced by plaintiff</u>

The extender statute reads as follows:

(14) Statute of limitations for actions brought by [the National Credit Union Administration Board as] conservator or liquidating agent
(A) In general.
  Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Board as conservator or liquidating agent shall be - -
    (i) in the case of any contract claim, the longer of - (I) the 6-year period beginning on the date the claim accrues; or (II) the period applicable under State law; and

    (ii) in the case of any tort claim, the longer of - (I) the 3-year period beginning on the date the claim accrues; or (II) the period applicable under State law.

(B) Determination of the date on which a claim accrues
for purposes of subparagraph (A), the date on which the statute of limitations begins to run on any claim described in [§ 1787(b)(14)(A)] shall be the later of -
(i) the date of the appointment of the Board as conservator or liquidating agent; or (ii) the date on which the cause of action accrues.

12 U.S.C. § 1787(b)(14).

Defendants contend that the extender statute only lengthens

27

the time for filing state tort and contract claims, not federal and state statutory actions such as plaintiff's claims in this case. The court believes, however, that the extender statute applies to the claims raised by plaintiff for the followings reasons.

First, the statutory language is broad. "In general," it states, "any action" brought by plaintiff is covered by the provisions of the extender statute. The term "any action" should be read to include statutory claims, not just the tort and contract claims mentioned later. The Supreme Court has stated that "'[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" Ali v. Federal Bureau of Prisons, 552 U.S. 214, 219 (2008) (quoting U.S. v. Gonzales, 520 U.S. 1, 5 (1997)). In various cases, the Court has followed an expansive construction even though the context or legislative history of the statute was cited in favor of a narrower meaning. For example, in Ali, the Court construed a statutory exception to the general waiver of sovereign immunity which applied to:

> claim[s] arising in respect of the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer.

The Court found that "any other law enforcement officer" included Bureau of Prisons officers, even though such officers are not involved in the collection of tax or customs duties and are not considered customs or excise officers. Similarly, in Harrison v.

28

PPG Industries, Inc., 446 U.S. 578, 588-89 (1980), the Court held that the Clean Air Act provision authorizing direct Court of Appeals review of "any other final action" by the EPA reached any action by the EPA Administrator and not just final actions for which there had been notice and hearing as reflected in specifically enumerated provisions that preceded the language "any other final action."  Also, in Gonzales, 520 U.S. at 5, the Court held that a provision prohibiting sentencing a defendant who used or carried a firearm in relation to a drug trafficking crime to a term concurrent to "any other term of imprisonment" meant any other state or federal term of imprisonment, not any "federal" term of imprisonment.

It should be noted further that the introductory language of the extender statute does not limit its scope to certain claims, rather it states that the statute relates to the limitations period for "actions" brought by plaintiff.  Nor does the statute ever refer to "state tort claims" or "state contract claims."

The second reason to apply the extender statute to plaintiff's statutory claims is that analogous statutes have been applied to statutory claims.  A similar extender statute covering actions brought by the conservator for Fannie Mae and Freddie Mac was held to apply to Securities Act claims in Federal Housing Finance Agency v. UBS Americas, Inc., 2012 WL 1570856 *6 (S.D.N.Y. 5/4/2012).  The extender statute for the FDIC, 12 U.S.C. § 1821(d)(14), was held to

29

apply to a state statutory fraudulent transfer action brought by the agency as a receiver for a bank. FDIC v. Zibolis, 856 F.Supp. 57, 61 (D.N.H. 1994). Before that extender statute was passed, the statute of limitations governing claims by federal liquidation agencies like plaintiff was 28 U.S.C. § 2415. See FDIC v. Hudson, 673 F.Supp. 1039, 1041 (D.Kan. 1987). Section 2415 is somewhat similar to the extender statute in this case in that it refers expressly to contract and tort actions, but does not mention actions pursuant to statute. Nevertheless, § 2415 has been applied to statutory claims. E.g., U.S. v. Deluxe Cleaners & Laundry, Inc., 511 F.2d 926, 929 (4th Cir. 1975) (claim brought by United States pursuant to the Service Act of 1965); United States v. P/B STCO 213, 756 F.2d 364, 375 (5th Cir. 1985) (action to recover pollution clean-up costs under Federal Water Pollution Control Act, 33 U.S.C. § 1321); U.S. v. Sunoco, Inc., 501 F.Supp.2d 641, 648-50 (E.D.Pa. 2007) (action brought under Pennsylvania Storage Tank and Spill Prevention Act).

Defendants argue for a contrary result on the basis of Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163 (1993) and the doctrine of *expressio unis est exclisio alterius*. We disagree. Leatherman concerned the pleading requirements of FED.R.CIV.P. 8(a) and 9(b). The Court held that Rule 9(b)'s requirement that fraud and mistake be pleaded with particularity meant that other subjects did not need to be pleaded

with particularity, but could be pleaded in accordance with Rule
8(a)'s requirement of a short and plain statement.  We believe the
extender statute presents a different situation because it states
"in general" that "any action brought by the Board as conservator
or liquidating agent" is covered by two categories of limitations
periods – not that the extender statute applies to tort and
contract claims and, by *expressio unis est exclisio alterius,* no
other claim.

Defendants also argue, in effect, that construing the term
"any action" to include not just tort and contract claims, but also
state and federal statutory claims, is contrary to the maxim of
statutory construction which disfavors repeals or amendments by
implication.  See <u>National Association of Home Builders v.
Defenders of Wildlife</u>, 551 U.S. 644, 663–64 (2007).  Defendants
assert that conformity with the plain language of the extender
statute does not require its application to federal and state
statutory claims brought by plaintiff as a conservator, so such a
construction should be avoided since it contradicts the limitations
periods set forth in § 13.  This contention leads back to the
language and the purpose of the extender statute.  Congress
provided that the statute applies to "any action" brought by
plaintiff as conservator.  Consistent with this language and the
purpose of the statute (as discussed later in this opinion), the
court believes that the limitations periods set forth in § 13 are

31

extended under the restricted circumstances present in this case.

If this construction has the effect of shortening the limitations period for some federal statutory actions brought by plaintiff, it should be remembered that the apparent role of the extender statute is to permit plaintiff, operating in the capacity as a conservator, a practical but fixed amount of time to bring an action. If this result varies in some instances from the limitations provisions governing most parties, it does not seem like a "perverse" or "absurd" result as argued by some defendants. Doc. No. 62, p. 16; Doc. No. 111, p. 10 (originally Doc. No. 27 in Case No. 11-2649); Doc. No. 88, p. 12.

Defendants also assert that if Congress intended federal law claims to be covered by the extender statute, then it would have said so. The court's position is that Congress did say so when it stated that "in general" the "statute of limitations for any action brought by" plaintiff as a conservator or liquidating agent is that set forth in the provisions of the extender statute.

b. <u>The extender statute applies to the "statute of repose" provisions of § 13 of the Securities Act</u>

Defendants also contend that the extender statute does not impact statutes of repose, as opposed to statutes of limitations. The three-year deadline in § 13 should be considered a statute of repose since it operates without regard to the date of injury or date of discovery. See, <u>e.g.</u>, <u>McDonald v. Sun Oil Co.</u>, 548 F.3d

32

774, 779-80 (9th Cir. 2008) <u>cert. denied</u>, 129 S.Ct. 2825 (2009) (citing cases which distinguish statutes of limitations and repose).  The statute of repose in § 13 states that "in no event" shall an action be brought more than three years after the security was bona fide offered to the public for purposes of § 11 or for purposes of § 12(a)(2) more than <u>three years</u> after the sale.  15 U.S.C. § 77m.

The court believes this is a question of statutory construction.  It is not clear that Congress meant to exclude the three-year deadline from the operation of the extender statute.  In the face of this ambiguity, the extender statute should be construed in favor of the government and in conformity with its apparent purpose.

The extender statute states that it applies to "the applicable statute of limitations with regard to any action."  It is not clear whether Congress meant "statute of limitations" to include "statute of repose."  The terms "statute of limitations" and "statute of repose" are often conflated.  E.g., <u>U.S. v. Kubrick</u>, 444 U.S. 111, 117 (1979) (statutes of limitations are statutes of repose); <u>Guaranty Trust Co. v. United States</u>, 304 U.S. 126, 136 (1938) ("the statute of limitations is a statute of repose"); <u>McCann v. Hy-Vee, Inc.</u>, 663 F.3d 926, 932 (7th Cir. 2011) (referring to the Supreme Court in <u>Merck & Co., Inc. v. Reynolds</u>, 130 S.Ct. 1784 (2010) using the term "statute of limitations" generically to include statutes

of repose); <u>Anixter v. Home-Stake Production Co.</u>, 939 F.2d 1420, 1434 n.17 (10th Cir. 1991) ("[a]lthough the two concepts differ, the terminology has become interchangeable"); <u>Lopardo v. Lehman Bros., Inc.</u>, 548 F.Supp.2d 450, 459-61 (N.D.Ohio 2008) (historically under federal law statutes of limitations were considered to be a subset of or alternative term for statutes of repose - the divergence in the definitions of the terms appears to have originated in state law); see also, <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 187 (1997) ("repose" is a "basic objective . . . that underlies limitations periods"); <u>Wilson v. Garcia</u>, 471 U.S. 261, 270 (1985) ("the application of <u>any</u> statute of limitations would promote repose"). The Supreme Court combined the same terms in its discussion of the Securities Exchange Act of 1934 in <u>Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson</u>, 501 U.S. 350, 362 (1991). The Court in one paragraph refers to the "3-year period of repose" in § 9(e) of the 1934 Act and § 13 of the 1933 Act and in the next paragraph refers to the 1- and 3-year structure in those sections as the "more appropriate statute of limitations" for a § 10(b) claim. <u>Id</u>.

Congress has referred to statutes of repose as statutes of limitations. Titles and headings of statutes may be consulted to clarify the meaning of statutes. <u>Almendarez-Torres v. U.S.</u>, 523 U.S. 224, 234 (1998). Here, it is noteworthy that the title of § 13 of the Securities Act is "Limitations of actions" even though its provisions set forth (in the same paragraph) a one-year

"statute of limitations" and a three-year "statute of repose." Another example comes from the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) of 1980 where, according to the Ninth Circuit, the term "statute of limitations" in § 309 also means "statute of repose." McDonald, 548 F.3d at 780-81.

In cases involving ambiguous limitations provisions impacting actions brought by the government, courts generally construe those provisions in favor of the government. FDIC v. Former Officers and Directors of Metropolitan Bank, 884 F.2d 1304, 1309 (9th Cir. 1989) (citing Badaracco v. Commissioner, 464 U.S. 386, 391 (1984)). This long-established principle was reiterated in BP America Production Co. v. Burton, 549 U.S. 84, 95-96 (2006): "when the sovereign elects to subject itself to a statute of limitations, the sovereign is given the benefit of the doubt if the scope of the statute is ambiguous." This maxim supports the application of the extender statute to the repose period in § 13.

Defendants argue that the reference in the extender statute to the "date the claim accrues" indicates that the statute only applies to the statute of limitations, not the statute of repose, because the term "accrual" or "accrues" characterizes a statute of limitations as opposed to a statute of repose. See McCann, 663 F.3d at 932 (observing that the starting gate in statutes of limitations is usually expressed as the date on which such claim

accrues).  This argument does not outweigh the other reasons to hold that the extender statute applies to the statute of repose provisions in § 13.  Further, as Judge Posner notes in McCann, Congress may not necessarily be relied upon to use consistent terminology.  Other statutes of repose have been construed as being subject to supposedly incompatible concepts of notice and equitable tolling.  See SEC v. Wyly, 788 F.Supp.2d 92, 114-15 (S.D.N.Y. 2011) (holding that section 21A of the Exchange Act barring SEC actions against insider trading more than five years "after the date of purchase or sale" is subject to the discovery rule); U.S. v. Uzzell, 648 F.Supp. 1362, 1366-68 (D.D.C. 1986) (False Claims Act's provision requiring suit within 6 years "from the date of violation" is subject to equitable tolling).  Also, it seems consistent with the purpose of the extender statute (as discussed below) and the language used in § 13 (which refers to limitations periods, not repose) that the extender statute extend both time limitations stated in § 13, instead of just one.

Defendants also argue that statutes of repose are "substantive" not procedural devices which should be "tolled" or extended by the extender statute.  We do not accept this analysis.  As the Court recognized in Burnett v. New York Central Railroad Co., 380 U.S. 424, 426-27 (1965): "The basic question to be answered in determining whether . . . a statute of limitations is to be tolled, is one of legislative intent whether the right shall

be enforceable after the prescribed time.  Classification of such a provision as 'substantive' rather than 'procedural' does not determine whether or under what circumstances the limitation period may be extended." (Interior quotation and citation omitted).  This point was reiterated in American Pipe & Construction Co. v. Utah, 414 U.S. 538, 559 (1974): "the mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose."

We acknowledge that in Resolution Trust Corp. v. Olson, 768 F.Supp. 283 (D.Ariz. 1991) the court held that an analogous extender statute did not apply to a state statute of repose governing the time to file deficiency actions.  The court held that the statutory repose period was a "[s]ubstantive time limit" that was "binding on the federal government."  Id. at 285.  Because the court did not discuss and may not have considered whether Congress intended the extender statute to apply to statutes of repose, the court chooses not to follow the conclusion stated in Olson.

> c.  The court's construction of the extender statute is consistent with the general purpose of the legislation

When this court engages in statutory construction, we may consider the overriding goals Congress sought to achieve through

the legislation.  See Wright v. Federal Bureau of Prisons, 451 F.3d 1231, 1234 (10th Cir. 2006) (the task of statutory construction is to interpret the words of the statute in light of the purposes Congress sought to serve).  "In order to determine congressional intent, we must examine the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act." Burnett, 380 U.S. at 427.  Obviously, a construction of the extender statute which increases the opportunity of plaintiff to bring actions to recover money on behalf of the government would be consistent with the general purposes of the Congress in establishing the powers of the NCUA. See 12 U.S.C. § 1766 (listing powers of the NCUA Board); see also SMS Financial v. ABCO Homes, Inc., 167 F.3d 235, 242 n.21 (5th Cir. 1999) (addressing Congress' resolve with the Federal Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) to strengthen enforcement powers of Federal regulators of depository institutions and citing the Congressional Record for the proposition that extending the limitations periods will "significantly increase the amount of money that can be recovered by the Federal Government through litigation" and "preserv[e] to the greatest extent permissible by law claims that would otherwise have been lost due to the expiration of hitherto applicable limitations periods"); cf. UBS, 2012 WL 1570856 at *5 (addressing the purposes of act establishing

the regulator and conservator of Freddie Mac and Fannie Mae in construing the extender provisions which are part of that act); but see, <u>Anister</u>, 939 F.2d at 1435 (discussing the legislative history of § 13 and noting it was understood that the three-year repose period was absolute).

d.   <u>Effect of the extender statute</u>

Plaintiff filed the complaint in this case on June 20, 2011. The three-year repose period does not bar plaintiff's claims because the MBS certificates in this case were sold within three years of March 20, 2009, when plaintiff became the conservator of U.S. Central.   The extender statute gives plaintiff three more years from March 20, 2009 to file suit.   There is a five-year statute of repose under K.S.A. 17-12a509(j).   Defendant RBS is the only defendant alleged to have violated this Kansas statute.   There is no argument by defendant RBS that the five-year period of repose bars plaintiff's state law claims.

2.   <u>Dismissal on statute of limitations grounds is not warranted on the basis of the pleadings before the court except for plaintiff's claims as to the Fremont certificates</u>

If the one-year statute of limitation period in § 13 or the two-year statute of limitation period in K.S.A. 17-12a509(j) expired prior to March 20, 2009, then plaintiff's federal claims, governed by the one-year period, and plaintiff's state claims, governed by the two-year period, are barred.   On the other hand,

39

plaintiff's claims are not barred unless it is clear on the record that a reasonable investor would have discovered sufficient evidence to bring the state claims no later than March 20, 2007 and the federal claims no later than March 20, 2008.

Defendants contend that the allegations in the complaint are insufficient to establish a plausibly timely claim.  The court finds that defendants' contention mistakenly shifts the burden of pleading.   Nevertheless,   defendants'   argument   deserves consideration upon an examination of the complaint and the materials of which the court has taken judicial notice.

> a.  <u>Plaintiff should not be required</u>
> <u>to plead compliance with the statute</u>
> <u>of limitations</u>

The court acknowledges that there is Tenth Circuit case law which requires a plaintiff bringing a claim under the Securities Act to "'plead and prove facts showing that his claim was timely.'" <u>Anixter</u>, 939 F.2d at 1434 (quoting J.Hicks, <u>Civil Liabilities: Enforcement & Litigation Under the 1933 Act</u> § 6.10[1], at 6-274 (1989)); see also, <u>Genesee County Employees' Retirement System v. Thornburg Mortgage Securities Trust 2006-3</u>, 825 F.Supp.2d 1082, 1136 (D.N.M. 2011) (citing <u>Anixter</u>; <u>Woods v. Homes and Structures of Pittsburg, Kansas, Inc.</u>, 489 F.Supp. 1270, 1289 (D.Kan. 1980). This requirement appears contrary to more recent Supreme Court cases which generally hold against special pleading rules for particular types of cases and that do not require that plaintiffs

40

plead facts to negate affirmative defenses, such as the statute of limitations.   This was discussed in <u>Jones</u>, where the court determined that the exhaustion of administrative remedies, like the statute of limitations, is an affirmative defense which does not need to be pleaded specifically in a complaint.   549 U.S. at 214-16.   The Court concluded in <u>Jones</u> that "adopting different and more onerous pleading rules to deal with particular categories of cases should be done through established rulemaking procedures, and not on a case-by-case basis by the courts."   <u>Id</u>. at 224.

The requirement to plead and prove facts relating to timeliness has been criticized by other circuit courts in securities law actions.   <u>Johnson v. Aljian</u>, 490 F.3d 778, 782 n.13 (9th Cir. 2007); <u>Tregenza v. Great American Communications Co.</u>, 12 F.3d 717, 719 (7th Cir. 1993); see also <u>Tello v. Dean Witter Reynolds, Inc.</u>, 410 F.3d 1275, 1292 (11th Cir. 2005) (stating that it is beyond dispute that defendants have the burden of proving the affirmative defense of statute of limitations).   As noted in a well-known treatise:   "The better approach is to permit the defendant to raise the defense of statute of limitations on a motion to dismiss when the complaint reveals on its face that the suit is time-barred, and on a summary judgment motion when it does not."   Wright & Miller FEDERAL PRACTICE & PROCEDURE 3d § 1276 (2004).   Indeed, this is the approach which the Tenth Circuit suggested it favored in one securities fraud case:   <u>Olcott v.</u>

<u>Delaware Flood Co.</u>, 76 F.3d 1538, 1549 (10th Cir. 1996) (determination of when plaintiff had notice of facts constituting the violation requires an evidentiary finding).

> b.  <u>The test for determining timeliness upon a 12(b)(6) motion is whether upon the facts alleged in the complaint and "judicial notice" materials it is clear that the claim is untimely</u>

Defendants have not asked for summary judgment. But they have asked the court to consider materials outside of the pleadings. These are documents of which the court can take judicial notice such as, in this case, court documents, offering documents, press reports, government documents, Congressional testimony, and MBS performance data.  There has been no objection to the court's taking judicial notice of this material or to the court considering the material in deciding the statute of limitations arguments upon defendants' motions to dismiss.  This procedure was sanctioned by the Second Circuit in <u>Staehr</u>, 547 F.3d at 424-26 when the materials are considered not for the truth of the statements made, but for whether a reasonable investor had such notice as to make inquiry or investigation regarding a legal violation.

While courts may dismiss an action pursuant to a 12(b)(6) motion on the basis of an affirmative defense such as the statute of limitations, it must be "clear" from the dates given in the complaint "that the right sued upon has been extinguished." <u>Aldrich v. McColloch Properties, Inc.</u>, 627 F.2d 1036, 1041 n. 4

(10th Cir. 1980); see also, <u>Solomon v. HSBC Mortgage Co.</u>, 395 Fed.Appx. 494, 497 (10th Cir. 2010) (following <u>Aldrich</u>); <u>Staehr</u>, 547 F.3d at 425 (also declaring that dismissal is proper upon an affirmative defense if it is "clear" from the face of the complaint and matters accepted under judicial notice).

Thus, there is a difference in the burden facing plaintiff and defendants in this matter.  Plaintiff must merely allege a plausible claim.  Defendants must demonstrate that it is clear from the face of the complaint and the matters considered via judicial notice that the plaintiff's claim is barred by the statute of limitations.  This is often a matter best reserved for summary judgment.  See <u>LC Capital Partners, LP v. Frontier Ins. Group, Inc.</u>, 318 F.3d 148, 156 (2d Cir. 2003) (often inappropriate to decide inquiry notice on a motion to dismiss); <u>In re Bear Stearns Mortgage Pass-Through Certificates Litigation</u>, 2012 WL 1076216 * 13 (S.D.N.Y. 3/30/12) (the issue of constructive knowledge and inquiry notice under § 13 is generally ill-suited for resolution at the motion to dismiss stage); <u>Plumbers' & Pipefitters' Local #562 v. J.P. Morgan Acceptance Corp.</u>, 2012 WL 601448 *11 (E.D.N.Y. 2/23/2012)(same); but see <u>Dodds v. Cigna Securities, Inc.</u>, 12 F.3d 346, 352 n.3 (2d Cir. 1993) (suggesting that there have been a "vast number of cases" resolving issues of constructive notice at the pleading stage).

> c.  <u>Standard for when the limitations period begins to run</u>

under § 13

The one-year limitations period in § 13 begins to run upon "the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The clock is not triggered by "inquiry notice" – – when public information would lead a reasonable investor to investigate the possibility of a violation; instead the time period begins to run when a reasonably diligent plaintiff would have actually discovered the facts constituting the violation such that he could adequately plead it in a complaint. In re Wachovia Equity Securities Litigation, 753 F.Supp.2d 326, 370-71 (S.D.N.Y. 2011). This standard is consistent with the standard applied by the Supreme Court (Merck, 130 S.Ct. at 1798) and the Tenth Circuit (Sterlin v. Biomune Systems, 154 F.3d 1191, 1201 (10th Cir. 1998)) to actions alleging securities fraud brought under § 10(b) of the Securities Exchange Act of 1934. In Sterlin, the court held that "inquiry notice" triggers an investor's duty to exercise reasonable diligence, not that it triggers the running of the limitations period. Id. The Tenth Circuit further held that a plaintiff need not actually exercise due diligence to toll the running of the limitations period. 154 F.3d at 1202 n.20. The limitations period starts running "once the investor, in the exercise of due diligence, should have discovered the facts underlying the alleged fraud." 154 F.3d at 1201. The court does

44

not believe the Tenth Circuit or the Kansas Supreme Court would hold that the standard is different for plaintiff's claims under §§ 11 and 12(a)(2) of the Securities Act or the Kansas Uniform Securities Act.   In an unpublished decision, <u>Caprin v. Simon Transportation Services, Inc.</u>, 99 Fed.Appx. 150, 2004 WL 326995 *3 (10th Cir. 2004), the Tenth Circuit applied the standard announced in <u>Sterlin</u> to claims under §§ 11 and 12(a)(2).   See also, <u>In re Bear Stearns</u>, 2012 WL 1076216 at *12 (citing a majority of cases from the Southern District of New York holding that the <u>Merck</u> approach to inquiry notice extends to claims brought under §§ 11 and 12(a)(2)).[2]   Under this standard, defendants' arguments that the one-year statute of limitations period has expired should be

_____

[2]     Defendants have cited to a concurring opinion in <u>Merck</u> authored by Justice Scalia for the position that the fraud claims under the Securities Act should have a different limitations standard than claims under §§ 11 and 12(a)(2).   While the concurring opinion referred to differences in the statutory limitations provisions governing § 10(b)(5) actions and actions under §§ 11 and 12(a)(2), the differences concerned the constructive discovery language in § 13 and the provisions in 28 U.S.C. § 1658(b)(1) which contain no constructive discovery language.   The differences did not concern the <u>effect</u> of "inquiry notice" upon the running of the statute of limitations. Therefore, the concurring opinion is not authority for holding that, contrary to <u>Sterlin</u>, inquiry notice starts the running of the limitations period.   But the observation that uncovering "an untrue assertion in a registration statement or prospectus is much simpler than assessing when a plaintiff should have learned that defendant deliberately misled him" (<u>Merck</u>, 130 S.Ct. at 1801), may suggest that less time is required after inquiry notice for a reasonable person to discover an untrue statement or omission in violation of §§ 11 and 12(a)(2) than to discover an act of fraud in violation of § 10(b)(5).

granted (given the operation of the extender statute) only where uncontroverted evidence irrefutably demonstrates that the plaintiff discovered or should have discovered facts sufficient to adequately plead a plausible claim before March 20, 2008, for plaintiff's federal claims, and before March 20, 2007 for plaintiff's state claims. Newman v. Warnaco Group, Inc., 335 F.3d 187, 195 (2d Cir. 2003) (a fraud case, quoting Nivram Corp. v. Harcourt Brace Jovanovich, Inc., 840 F.Supp. 243, 249 (S.D.N.Y. 1993)); In re Bear Stearns, at *13; Stichting Pensioenfonds ABP v. Countrywide Financial Corp., 802 F.Supp.2d 1125, 1136 (C.D.Cal. 2011) (as to a fraud claim, motion to dismiss is appropriate when there is no other plausible inference than that a reasonably diligent plaintiff should have discovered facts sufficient to state a claim and waited too long to file the action).

> d.  Evaluation of the complaint and the "judicial notice" exhibits
>
>> i.  U.S. Central had notice of general, industry-wide problems in the subprime mortgage market but this is not sufficient to state a claim raised in this case

As described in a prior section of this opinion summarizing some of the material in exhibits submitted for judicial notice, U.S. Central had notification of trouble in the MBS market well prior to March 2008.  There was an FBI report in May 2005 and there were numerous press reports in 2006 which documented pervasive

mortgage fraud, loose underwriting standards, and mortgage originators who were passing along bad mortgages that quickly defaulted. The value of MBS took a sharp downturn in 2007 as there were reports of a surge in foreclosures and mortgage delinquencies which were linked to loans made under relaxed standards. These problems were considered an industry-wide trend. In 2007 several mortgage lenders failed and banking regulators were concerned. The market was termed "a disaster" in February 2007 Congressional testimony which called the abdication of underwriting standards by subprime lenders "routine." A December 2006 article in the Economist stated that sometimes underwriting standards were waived altogether. In addition, lawsuits were filed in 2007 and 2008 alleging the abandonment of underwriting standards.

On the other hand, the credit ratings for almost all of the certificates purchased by U.S. Central were not downgraded until some time after March 20, 2008. Mortgage lenders were also being purchased by large banks in 2006 and 2007. And, U.S. Central had purchased investment-grade securities which were supposedly protected by credit enhancement measures.

The court finds that the general information regarding troubling issues in the MBS market is insufficient to state a claim under § 11 or § 12(a)(2). In re Bear Stearns, at *14 (citing Freidus v. ING Group N.V., 736 F.Supp.2d 816, 831 (S.D.N.Y. 2010); see also, In re Wells Fargo Mortgage-Back Certificates Litigation,

712 F.Supp.2d 958, 966-68 (N.D.Cal. 2010) (publicly available information regarding problems in the MBS market not sufficient to establish on a motion to dismiss that investor was on notice of claims); <u>Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co.</u>, 714 F.Supp.2d 475, 480 (S.D.N.Y. 2010) (same).

> ii.  <u>U.S. Central had notice that its MBS investments were not performing well, but again this was not sufficient information upon which to base a claim</u>

U.S. Central suffered from the impact of the mortgage market downturn during this period.  It reported an income loss of more than $1 billion in 2007 and examiners in May 2007 expressed concern regarding the MBS held by U.S. Central, although the examination report concluded that its investments remained "conservative" as its portfolio consisted primarily of "the highest rated marketable securities."  Doc. No. 67, Ex. 1 at p. 25.  Defendants do not claim that this information would provide a sufficient basis upon which to bring this lawsuit.  Again, it is too general and not linked to the specific claims which are the subject of this action.

> iii.  <u>There was an early spike in the default and delinquency rates for loans supplying the income for MBS purchased by U.S. Central, but it is not clear that a reasonable person could have used this</u>

48

<u>information to file a
plausible claim prior to
March 20, 2008</u>

There was a spike in defaults and delinquencies in the loans supplying the income for the majority of the MBS certificates purchased by U.S. Central.  Plaintiff has alleged in the complaint that:

> actual losses spiked almost immediately after issuance of the [MBS].  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the [MBS'] credit enhancement.  For example, in the Nomura Home Equity Loan Trust 2007-1 offering . . . , actual losses at month 12 exceeded $105 million, 23 times the expected losses of approximately $4.5 million.
>     This immediate increase in actual losses - - at a rate far greater than expected losses - - is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

Doc. No. 1 at ¶¶ 87-88.  Figure 2 in the complaint lists 20 trust offerings from which U.S. Central purchased 29 MBS certificates. Of those offerings 11 had actual loss rates which in the first 12 months exceeded expected loss rates by 5 times or 500%.  Several exceeded expected loss rates by ten times or more.

Plaintiff further explains in the complaint how credit ratings are based upon the amount of credit enhancement over expected loss. Doc. No. 1 at ¶ 80.  The complaint states:  "Each credit rating has a 'rating factor' which can be expressed in multiples of the amount of credit enhancement over expected loss. . . . A triple-A rated security would have a rating factor of '5,' so it would require credit enhancement of five times the expected loss."  <u>Id</u>.  The

49

complaint elaborates: "[I]f the analysis of expected loss is flawed, so too is the calculation of the amount of credit enhancement. For instance, on a triple-A rated security, if actual cumulative losses exceed five times expected losses, the credit enhancement will be insufficient, and the principal of the senior tranche will be impaired." Doc. No. 1 at ¶ 82. Plaintiff reasserts the links between these losses, credit enhancement failure, reduction in credit ratings and the abandonment of underwriting guidelines in ¶ 89 of the complaint:

> Because credit enhancement is designed to ensure triple-A performance of triple-A-rated [MBS], the evidence that credit enhancement failed (*i.e.*, actual losses swiftly surged past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

Plaintiff asserts in the complaint, however, that it was only "later discovered" that the "early spike in delinquencies and defaults" was "indicative of the Originators' systematic disregard of their stated underwriting guidelines." Doc. No. 1 at ¶ 68. Plaintiff does not explain in much detail in the complaint the reasons for the lateness of the discovery, although plaintiff does quote the Federal Reserve Board as saying in November 2008, [that] the 'deteriorating lending standards' and 'the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors.'" Doc. No. 1 at ¶ 358. Also, in the consolidated response to the motions

to dismiss, plaintiff asserts that:

> [the loan-level analysis of the securities U.S. Central
> purchased required] an outside expert, [engaged] at
> considerable cost, to conduct a time-intensive forensic
> analysis of the amount of expected losses and the amount
> by which actual losses exceeded expected losses for each
> Certificate.  If U.S. Central had attempted to obtain the
> same sort of forensic analysis for every security in its
> portfolio, the expense and effort involved would have
> gone far beyond the due diligence that any "*reasonably*
> diligent plaintiff*" would have undertaken.

Doc. No. 78 at p. 53.  Plaintiff asserts that this distinguishes

the case at bar from <u>Allstate Ins. Co. v. Countrywide Financial</u>

<u>Corp.</u>, 824 F.Supp.2d 1164, 1180-81 (C.D.Cal. 2011), where the court

held that the facts needed for a "loan-level" analysis were

sufficiently available to a reasonable investor well before 2008.

On the other hand, some defendants have asserted that loan default

and delinquency rates were available on websites where they could

be checked by U.S. Central.  <u>E.g.</u>, Doc. 64 at pp. 7, 24; Doc. No.

62 at p. 17.

In spite of the link between credit ratings, credit

enhancement, and default rates, plaintiff has alleged information

showing that defendants were selling and issuing MBS with triple-A

credit ratings as late as May 2007.  Doc. No. 1 at ¶¶ 8-9, 55 &

tables 1-2,4.  In addition, according to information supplied by

plaintiff, one of the certificates purchased by U.S. Central was

first downgraded in October 2007 and the other certificates were

not downgraded by a credit rating agency until March 27, 2008 or

later.  Doc. No. 78, Exhibit D.  Most certificates retained a

double or triple-A rating until late 2008 or early 2009, according
to plaintiff.  Plaintiff has also referred to a report documenting
the disadvantageous position of MBS investors in developing
"critical information regarding the quality and performance" of
loans underlying the securities.  Doc. No. 1 at ¶ 105.  According
to this report from the Financial Stability Oversight Council
(FSOC):

> An originator has more information about the ability of
> a borrower to repay than an investor, because the
> originator is the party making the loan.  Because the
> investor is several steps removed from the borrower, the
> investor may receive less robust loan performance
> information.  Additionally, the large number of assets
> and the disclosure provided to investors may not include
> sufficient information on the quality of the underlying
> financial assets for investors to undertake full due
> diligence on each asset that backs the security.

Id.

Given the time it apparently took rating agencies to react to
the delinquency and default data and the dispute between the
parties concerning the time and ease of performing loan-level
analysis, the court cannot say that it is irrefutably clear from
this data that a reasonably diligent investor would have sufficient
notice to file a plausible claim by March 2008.  See Massachusetts
Mutual Life Ins. Co. v. Residential Funding Co., LLC, 2012 WL
479106 *11 (D.Mass. 2/14/2012) (for purposes of deciding a motion
to dismiss, access to monthly loan data reports through trust
administrators and other data showing poor loan performance did not
put plaintiff on notice of abandonment of underwriting standards in

case alleging state securities law violations).

> iv.  <u>Risk disclosures in offering documents did not provide sufficient notice of the misrepresentations and omissions alleged in the complaint</u>

Defendants allege that risk disclosures in the offering documents should have alerted U.S. Central to develop the information needed to state a plausible claim.[3]  These risk

---

[3] For instance, in Doc. No. 64 at pp. 4-5 defendant NovaStar lists risk disclosures which include:

- if the limited assets in the trust fund become insufficient to service the securities, losses may result;
- the types of mortgages included in the trust fund may be especially prone to defaults, exposing the securities to greater losses;
- in the event of foreclosure, the value of property securing loans with high loan-to-value ("LTV") ratios may be insufficient to cover the loans and result in losses to the securities;
- the limited scope and amount of credit enhancement may be insufficient to cover all losses or risks on investments in the securities;
- a decline in property values could cause delinquencies and foreclosures to rise and lead to higher losses;
- initial ratings of the securities are not recommendations to buy them and could be lowered or withdrawn at any time;
- most of the loans in the mortgage pool were written to non-conforming standards, i.e., for borrowers who may have a record of credit write-offs, outstanding judgments, prior bankruptcies and other negative terms that could affect creditworthiness and repayment ability leading to higher delinquency and loss rates;
- the mortgage pool contains high original LTV loans that could cause losses to holders of Class A and Mezzanine Certificates, which could lead to higher rates of

disclosures warn of potential areas for trouble. They warn that some or most of the loans and some of the borrowers may have a higher risk of default for various reasons and that there may be

---

    delinquencies, foreclosures and losses if the residential real estate market should experience an overall decline in property values;

- the limited credit enhancement and mortgage insurance applicable to the particular offering could be insufficient to protect investors against losses;

- a significant percentage of the loans in the mortgage pool are "balloon loans" that, because they leave a substantial portion of the principal due on the scheduled maturity date, entail a greater degree of risk to prospective investors if borrowers are unable to sell or refinance their property in light of prevailing mortgage rates, economic conditions and borrower finances;

- the mortgage pool contains high-LTV loans secured by second liens, making them particularly vulnerable if the residential real estate market declines;

- the mortgage pool contains interest-only loans, which may have an increased risk of loss for a variety of reasons, including defaults caused by inability to make higher monthly payments when the interest-only period ends;

- a significant percentage of loans in the pool may be "seasoned" by more than 12 months, may represent borrowers in or recently emerged from bankruptcy proceedings, and may have prepayment and default experiences different from other loans in the pool;

- the geographic concentration of loans in the mortgage pool, especially in Florida, California and Maryland, could cause greater losses if states with large numbers of loans experience a decline in real estate values;

- the rate and timing of principal prepayments, the pre-funding feature of the Series that could result in subsequent loans having different characteristics being included in the pool, and the effect of mortgage rates on the pass-through rates applicable to the Certificates could adversely affect the yield on Class A and Mezzanine Certificates;

- the Mezzanine Certificates are particularly sensitive to the timing and amount of losses and prepayments on the mortgage loans because they absorb realized losses before Class A Certificates and receive distributions of principal and interest after them.

limited credit enhancement protection as to particular offerings. The risk disclosures do not warn investors that underwriting standards had been abandoned or virtually abandoned as is alleged in the complaint.  The court has reviewed the risk disclosures and the court concludes that it is not irrefutably clear that these disclosures would lead a reasonably diligent investor to find the information needed to file a plausible claim prior to March 20, 2008.

v.  <u>It is not irrefutably<br>clear that lawsuits filed<br>by others provided timely<br>constructive  notice  to<br>U.S. Central</u>

Defendant RBS, along with the defendants joining in its motion to dismiss, has argued that five lawsuits - - one against IndyMac Finance, Inc. and four against Countrywide Finance Corporation - - illustrate that reasonable investors would have had sufficient notice to file plaintiff's claims prior to the deadlines in this case.  Four of these lawsuits were filed prior to March 20, 2008 and one (against Countrywide) was filed on April 11, 2008.

The lawsuit against IndyMac Finance, Inc. does not contain an allegation of abandonment of underwriting standards, although it does allege problems with loan delinquency.  The other four lawsuits do contain allegations that underwriting standards were abandoned or ignored.  The earliest lawsuit against Countrywide listed by defendant RBS was filed on November 26, 2007.  Of course,

55

plaintiff is not suing Countrywide in this case, but Countrywide is alleged to have originated some or all of the mortgages pooled together for six MBS certificates purchased by U.S. Central. After consideration, the court believes that it is not irrefutably clear that notice in late November 2007 that a mortgage originator has been sued for abandoning underwriting standards would lead a reasonable investor to discover by March 20, 2008 that he or she has a plausible claim under § 11 or § 12(a)(2) against the defendant MBS issuers and sellers in this case. This is a close question. The court acknowledges that in <u>Stichting</u>, the court found that lawsuits against Countrywide and press reports made clear that a reasonable investor would have been aware of underwriting problems at Countrywide "by early 2008." 802 F.Supp.2d at 1136. "Early 2008" could be before or after March 20, 2008. Again, it is also important to note that the suit in <u>Stichting</u> was against Countrywide and that the court must consider the time required for a reasonable investor to link Countrywide's alleged problems to the some of the certificates offered and issued by the defendants in this case. The court cannot say, with regard to most of the certificates in this case, that there is no other plausible inference on this record than that a reasonably diligent investor should have discovered facts sufficient to state a plausible claim prior to March 20, 2008.

As part of its constructive notice argument, defendant

56

NovaStar relies upon a lawsuit filed against it on February 23, 2007. Doc. No. 64, Ex. 3, <u>Boyd v. NovaStar Financial, Inc.</u>, Case No. 07-0139-CV-W-HFS (W.D.Mo.).   As with the <u>IndyMac</u> lawsuit mentioned in the previous paragraph, the allegations in the complaint supplied to the court do not allege an abandonment of underwriting standards.   In addition, defendant NovaStar refers to <u>New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc.</u>, No. 08-cv-5310 filed in the Southern District of New York.   This lawsuit, however, was filed <u>after</u> March 20, 2008.   Defendant NovaStar argues that the complaint in <u>NJC</u> involved certificates offered several months <u>after</u> the certificates purchased in this case.   This fact, however, does not demonstrate that it is clear beyond doubt that a reasonable investor would have discovered the facts to make a plausible claim before March 20, 2008.[4]

Defendant Nomura also refers to other litigation - <u>Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.</u>, Case No. 1:08-cv-10446-RGS in the District of Massachusetts - to

---

[4]    Defendant NovaStar also argues that constructive notice was provided by publicly available information of financial problems at NovaStar.   Its stock price fell 42% in February 2007.   It announced a plan to reduce its workforce by 350 employees in March 2007.   It reported a sharp reduction in loan production and that it was tightening underwriting guidelines.   The court does not believe this information is sufficient to lead a reasonable investor to discover facts by March 20, 2008 supporting a plausible claim that NovaStar made the alleged misrepresentations and omissions in this case.

argue constructive notice. Plaintiff cites materials from the complaint in this litigation to allege that the First National Bank of Nevada systematically disregarded its underwriting guidelines in originating mortgages which were securitized for the MBS offering by defendant Nomura that was purchased by U.S. Central. Doc. No. 1 at ¶¶ 149-154. Defendant Nomura notes that the complaint was originally filed in state court in January 31, 2008 and then removed to federal court on March 18, 2008. Again, the court cannot conclude that a state court complaint filed at the end of January provided sufficient notice to a reasonable investor to make it irrefutably clear that the facts supporting a plausible claim should have been discovered by March 20, 2008. See <u>Staehr</u>, 547 F.3d at 435-36 (without knowing press coverage given to lawsuits, plaintiffs cannot be charged with knowledge of every suit filed against an originator); <u>In re Bear Stearns</u>, at *15 n.16 (same).

> vi.   <u>U.S. Central did
> have constructive notice
> of the claims relating to
> the Fremont certificates
> prior to March 20, 2008</u>

Defendant Fremont or an affiliate "was the primary originator of the loans" for three certificates purchased by U.S. Central from the Fremont Home Loan Trust 2006-3 and Fremont Home Loan Trust 2006-D offerings. Doc. No. 1 at ¶ 240. These purchases were made in September and October 2006. As set forth previously in this opinion, in December 2006 it was reported that Standard & Poor's

had put an offering connected to Fremont on watch for a credit
downgrade. More significantly, on March 7, 2007, the FDIC issued
a cease and desist order against Fremont Investment and Loan, and
its parent corporations, which stated that:

> the FDIC found that the bank was operating without
> effective risk management policies and procedures in
> place in relation to its subprime mortgage and commercial
> real estate lending operations. The FDIC determined,
> among other things, that the bank had been operating
> without adequate subprime mortgage loan underwriting
> criteria, and that it was marketing and extending
> subprime mortgage loans in a way that substantially
> increased the likelihood of borrower default or other
> loss to the bank.

Doc. No. 67, Ex. 42. Fremont responded to the order (even before
it was officially issued to the press) by announcing that it was
leaving the subprime residential mortgage business. Plaintiff
asserts that the cease and desist order did not provide
constructive notice because the FDIC only found that Fremont was
operating without "adequate" underwriting standards, not that
Fremont had systematically abandoned any standards as alleged in
the complaint. This tries to draw too fine of a distinction. A
reasonably diligent investor who was aware of this cease and desist
order and the other reports and financial data discussed previously
in this order would have been alerted to discover facts prior to
March 20, 2008 which would support a plausible claim against the
issuers, underwriters and sellers of the Fremont certificates.

The critical date of the state claims in this case is March
20, 2007. The court does not find it clear that plaintiff had

constructive notice of the state claims relating to the Fremont certificates prior to that date.

        3.  <u>Underview and summary</u>

      The court believes the statute of limitations issues raised in this case provide several very close questions.  Under the court's construction of § 13 and the extender statute, plaintiff's claims are not barred by the three-year statute of repose provisions.  As for the one-year statute of limitations in § 13 and the two-year state statute of limitations, plaintiff's claims are not barred unless it is clear on the record that a reasonable investor would have had discovered sufficient evidence to bring the state claims no later than March 20, 2007 and the federal claims no later than March 20, 2008.  Looking at <u>all</u> the information alleged by defendants to be available to U.S. Central and considering that information <u>as a whole</u>, the court concludes that it is <u>not</u> clear that before March 20, 2008 a reasonable investor should have discovered facts supporting a plausible claim against all the defendants whose motions are before the court, with the exception of plaintiff's federal claims relating to the Fremont certificates.[5]

_____

[5]

     Plaintiff makes a further argument in support of the timeliness of its claims relating to 11 certificates.  This argument is based on the <u>American Pipe</u> tolling doctrine which provides generally that the filing of a class action complaint tolls the statute of limitations for all putative class members until class certification is denied.  See <u>Joseph v. Wiles</u>, 223 F.3d

L.   Plaintiff's allegations state a plausible claim for relief as to most of the certificates in this case, but claims as to some certificates and plaintiff's claims as to credit enhancement shall be dismissed

    1.   Plaintiff's claim that defendants misrepresented the originators' conformance with underwriting standards is not too conclusory for most, but not all, of the certificates in this case

Plaintiff's central contention is that defendants misrepresented that the originators of the mortgages for the MBS certificates followed underwriting standards (or rules setting forth exceptions to those standards) and that defendants omitted saying that the originators systematically abandoned or pervasively disregarded underwriting guidelines.[6]   Specific citations to statements in prospectus supplements for each certificate in this case are set forth in ¶¶ 257-315 of the complaint to support this general claim.   These are factual allegations, not legal conclusions.

Defendants argue that plaintiff's allegations that

_____

1155, 1167-68 (10th Cir. 2000).   None of the 11 certificates are Fremont certificates.   Defendants object to the application of the American Pipe doctrine in this case.   But, because of the above-stated rulings, it is not necessary for the court to decide this issue.

[6]

This claim branches out to support or connect with the associated assertions that misrepresentations were made regarding reduced documentation programs (¶¶ 317-333), loan-to-value ratios (¶¶ 335-341), and credit enhancement protections (¶¶ 343-352). Plaintiff alleges that representations regarding these subjects were false in part because they were dependent upon adherence to underwriting standards.

underwriting standards were repeatedly or systematically ignored is a conclusory factual allegation, and that plaintiff has failed to adequately assert specific facts for a plausible claim that the originators for the loans which supplied the income for the MBS certificates <u>in this case</u> abandoned the underwriting criteria <u>for those loans</u>.   In other words, defendants are asserting that plaintiff paints a broad picture of misbehavior in the mortgage lending industry and of a financial breakdown in that industry, but fails to link that misbehavior to the loans which supplied the income stream to the particular certificates at issue in this case.

Of course, the court does not require proof of factual allegations upon a Rule 12(b)(6) motion, so defendants' claim that plaintiff has not alleged sufficient facts to plausibly claim that the originators of the loans for the MBS certificates in this case abandoned the underwriting criteria for those loans is arguably improper.   The court, however, is not asserting that defendants' approach is invalid in the post-<u>Twombly/Iqbal</u> world.   It may be analogous to an argument that an employment discrimination complaint requires allegations of specific facts beyond a general assertion of harassment or unequal treatment.   See <u>Khalik</u>, 671 F.3d at 1194 (affirming dismissal of employment discrimination claim on the grounds that plaintiff's claim requires more than allegation of protected status, good job performance, prior complaints of discrimination, and termination to support claims of illegal

discrimination and retaliation).  As the First Circuit acknowledged in an analogous case, Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 773 (1st Cir. 2011): "Despite the familiar generalization that evidence need not be pled at the complaint stage . . . courts increasingly insist that more specific facts be alleged where an allegation is conclusory . . . and the same is true for implausibility, at least where the claim is considered as a whole."

Plaintiff contends that it has asserted facts which raise a reasonable expectation that discovery will reveal evidence to support a claim that the originators abandoned underwriting standards for the loans underlying the MBS certificates in this case.  These facts are:  1) observations from governmental sources and press reports of such behavior by originators in general during the time in question; 2) specific reports that originators who supplied the loans for most, but not all, of the certificates in this case disregarded underwriting criteria; 3) evidence that the "originate-to-distribute" model of loan production encouraged the neglect of underwriting standards and that the originators in this case had high "originate-to-distribute" percentages during the relevant time period;[7] 4) claims that almost immediately after

---

[7]

To reiterate, the "originate-to-distribute" mode of loan production refers to the practice of underwriting mortgages and then selling the mortgages to another holder so that the original underwriter may not be at risk if the borrower defaults.

issuance the loans supplying the income for the certificates in question had high delinquency and default rates; 5) data showing that the certificates had losses which exceeded the expected losses for the certificates a short time after the certificates were purchased; and 6) information demonstrating that the certificates in this case which were rated triple-A or close to that rating, suffered a decline to junk status within a few years.

For those MBS certificates involving originators who have been alleged to have abandoned underwriting standards or recklessly deviated from underwriting standards without compensating factors, the court finds that the claims in the complaint are not too conclusory. But the complaint either does not identify the originators or does not make any allegations (except for general "originate-to-distribute percentages") which specifically address the underwriting practices of the loan originators for the certificates from the following offerings: First Franklin Mortgage Loan Trust 2006-FF16 (originator - "First Franklin" - ¶ 239 of the complaint); HarborView 2006-10 (originators - "Bank United, Paul Financial and Residential Mortgage Capital" - ¶ 243 of the complaint); HarborView-SB1 (originator - "Secured Bankers Mortgage Co." - ¶ 244 of the complaint); Soundview Home Loan Trust 2006-WF2 (originator - "Wells Fargo" - ¶ 254 of the complaint); Saxon Asset Securities Trust 2006-3 (originator - "Saxon Mortgage" - ¶ 252 of the complaint); and Wachovia Mortgage Loan Trust, Series 2006-ALT1

(originators - "National City", "Accredited Home Lenders", and "WMC" - ¶ 255 of the complaint).[8]   With regard to these certificates the court finds that it is implausible for the court to infer that the originators of the loans must have systematically abandoned the underwriting standards or that there is a reasonable expectation that discovery would prove this allegation.   See Plumbers' & Pipefitters', 2012 WL 601448 at *12 (finding claims regarding certain MBS certificates to be implausible because the complaint lacked allegations regarding the originators of the loans for those certificates).

Proof that other originators deviated from underwriting guidelines or that it was a general problem within the industry is not sufficient by itself.   This appears undisputed.   Plaintiff contends that the surge in delinquencies and defaults upon the loans and the downgraded credit ratings for the certificates provide a specific link to the abandonment of underwriting standards for the loans underlying the certificates.   This statistical evidence is consistent with plaintiff's claim, but plaintiff admits that the defaults and delinquencies alone are not

---

[8]   The complaint does allege "originate-to-distribute" percentages for 2005, 2006 and 2007 for some of the originators who may have supplied loans underlying these certificates.   See Doc. No. 1 at p. 164, Table 6.   These percentages are not provided for the originators of the loans for the Wachovia certificate.

sufficient to state a claim.[9]  We do not believe that evidence of
defaults and delinquencies and the evidence of later credit rating
downgrades, in combination with the general observations of the
mortgage industry at the time, is adequate to state a plausible
claim absent specific allegations against the loan originators for
the MBS certificates.  This is recognized in Plumbers' Union, 632
F.3d at 773-74 where the court found that a "sharp drop in credit
ratings" after the sale of certificates and "the specific
allegations" as to an originator (First National Bank of Nevada or
"FNBN") provided "enough basis to warrant some initial discovery"
as to claim that underwriting standards were abandoned.

As for those certificates backed by loans from originators who
plaintiff specifically alleges have loosened and ignored
underwriting standards, it may be plausible to postulate, as
defendants have done, that general conditions in the real estate
market and the economy caused the increases in defaults and
decreases in ratings cited by plaintiff.  But the court finds that
plaintiff's allegations are also plausible as to those certificates
backed by loans whose originators have been identified as engaging
in misconduct comparable to the claimed pervasive disregard of

---

[9]

Doc. No. 78 at p.52 ("no court has held, and no party in this
case argues, that allegations of surges in delinquencies and
defaults alone state a claim of systematic disregard of
underwriting standards").  Plaintiff makes the same statement in
Case No. 11-2649, Doc. No. 110 at p. 27 (originally filed as Doc.
No. 26 in Case No. 11-2649).

underwriting standards.  See New Jersey Carpenters Vacation Fund v.
Royal Bank of Scotland Group, 720 F.Supp.2d 254, 270 (S.D.N.Y.
2010) (plausible to infer that underwriting guidelines were
disregarded by mortgage originators where complaint cites press
reports and government hearing testimony that originators ignored
guidelines as well as wholesale downgrade of credit ratings for the
certificate offerings and high rates of delinquency and default in
the loan collateral that underlay the certificates).

     In Twombly, the Court held in an antitrust case that
allegations of parallel conduct did not plausibly suggest an
illegal conspiracy because the conduct was not only compatible
with, but was more likely explained by, lawful free-market
behavior.  Iqbal, 556 U.S. at 680 (describing Twombly holding).
Here, the court cannot say that the financial performance data
cited by plaintiff has a more likely innocent explanation as to
those certificates where plaintiff, in addition to the general
information regarding the mortgage industry, has alleged
information indicating that specific loan originators engaged in
poor underwriting practices.

          2.  Defendants' arguments challenging the
          materiality of the alleged misrepresentations
          regarding underwriting standards are better
          left for summary judgment.

     Defendants argue that any alleged misrepresentations or
omissions regarding the systematic disregard of underwriting
standards could not be material to a reasonable investor in light

of publicly available information regarding the MBS market and the extensive risk disclosures set forth in the offering documents. The publicly available information includes some of the "judicial notice" materials summarized previously in this order, including statistics indicating the percentage of borrowers who defaulted on their mortgages within a matter of months after taking a loan nearly doubled between 2006 and 2007. According to defendant RBS, with respect to each certificate defendants disclosed: "1) the metrics used in the underwriting process; 2) that the underwriting standards were generally, but not always, followed; and 3) the characteristics for the pools of mortgages." Doc. No. 67 at p. 22. The metrics included: credit scores (where available); LTV ratios; calculation of debt service-to-income ratios; the types and intended uses of the properties being financed; and verification or evaluation of income. <u>Id</u>. at pp. 22-23; see also, e.g., Doc. No. 64 at pp. 21-22 (detailing similar disclosures in the offering documents for the NovaStar certificates).  The offering documents also disclosed that originators made exceptions to their underwriting standards.  There were warnings in the offering documents, such as:

> Loans to lower credit quality borrowers are more likely to experience late payments and defaults and increase . . . risk of loss.  Prospectus, Soundview Home Loan Trust 2007-OPT1 (Doc. No. 67, Ex. 20 at p. 27).

> Recent economic developments (such as declining home values, increasing rate of delinquencies and defaults on adjustable rate loans, and the bankruptcy and serious

financial difficulties faced by numerous MBS originators) could decrease the likelihood of repayment and cause significant losses. Doc. No. 67, p. 25 (citing Ex. 5 at p. 16, Prospectus, HarborView 2006-6).

Substantially all of the Mortgage Loans in the trust are loans that do not meet the customary credit standards of Fannie Mae or Freddie Mac.  As a result, delinquencies and liquidations proceedings are more likely with these Mortgage Loans than with mortgage loans that satisfy such credit standards. Doc. No. 67, p. 25 n.50 (citing Ex. 20 at S-38, Prospectus Supplement Soundview Home Loan Trust 2007-OPT1).

The Supreme Court has stated that the materiality requirement for purposes of a § 10(b) claim is satisfied when there is a substantial likelihood that a misrepresentation or omission would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.  Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1318 (2011).  The Second Circuit has stated that the test for deciding whether a prospectus contained a material misstatement or omission is whether the representations in the prospectus, taken together and in context would have misled a reasonable investor.  Okley v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996).

The court does not believe that the warnings and public information cited by defendants are sufficient for the court to find that plaintiff has failed to state a plausible claim. Arguments similar to those made by defendants here were discussed and rejected in a comparable case, Genesee County, 825 F.Supp.2d at 1173-1177, where the court cites the Plumbers' Union opinion from

the First Circuit and cases from three district courts.[10]  General warnings about the type of borrowers, the type of loans, the use of exceptions to underwriting guidelines when there are compensating factors, as well as the risks of investment in MBS, do not clearly suffice at this stage in the case to persuade the court that an investor was adequately warned that the underwriting standards for the loans underlying the MBS certificates were systematically abandoned.  We further agree with the court in In re Lehman Brothers Securities and Erisa Litigation, 684 F.Supp.2d 485, 494 (S.D.N.Y. 2010) that the disclosure of an "ocean's worth" of specific data about the loan pools does not permit the court to determine upon a motion to dismiss that the alleged misrepresentations regarding conformity to underwriting standards

---

[10]

New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland, 720 F.Supp.2d 254, 270 (S.D.N.Y. 2010); Tsereteli v. Residential Asset Securitization Trust 2006-A8, 692 F.Supp.2d 387, 392 (S.D.N.Y. 2010); and In re IndyMac Mortgage-Backed Securities Litigation, 718 F.Supp.2d 495, 509 (S.D.N.Y. 2010); see also, Plumbers' & Pipefitters', 2012 WL 601448 at *17 (warnings of exceptions to underwriting guidelines not sufficient to warn of systematic deviation from underwriting standards); In re Morgan Stanley Mortgage Pass-Through Certificates Litigation, 810 F.Supp.2d 650, 672 (S.D.N.Y. 2011)(boilerplate disclaimers and disclosures do not disclose the risk of systematic disregard for underwriting standards); In re Wells Fargo Mortgage-Backed Certificates Litigation, 712 F.Supp.2d 958, 971 (N.D.Cal. 2010)(disclosure of variance from underwriting standards is not disclosure that variance was the norm); New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc., 2010 WL 1473288 *6-7 (S.D.N.Y. 3/29/2010)(in spite of cautionary language, offering documents left overall impression contrary to claim that underwriting standards were abandoned).

were immaterial as a matter of law.  See also, <u>In re Sprint Corp.</u>
<u>Securities Litigation</u>, 232 F.Supp.2d 1193, 1215-16 (D.Kan. 2002)
(materiality is ordinarily reserved for the trier of fact); <u>Maine</u>
<u>State Retirement System v. Countrywide Financial Corp.</u>, 2011 WL
4389689 *18 (C.D.Cal. 5/5/2011) (argument that disclosures in
offering documents rendered alleged misrepresentations immaterial
is best raised at summary judgment).

> 3.   <u>The Lone Star and Footbridge cases do not</u>
> <u>warrant dismissal of plaintiff's claims</u>

Defendants rely upon the decision in <u>Lone Star Fund V (U.S.)</u>
<u>L.P. v. Barclays Bank PLC</u>, 594 F.3d 383 (5th Cir. 2010) to argue for
dismissal of plaintiff's underwriting standards claim.  In <u>Lone</u>
<u>Star</u>, the plaintiff alleged that the defendant misrepresented that
the loan pool for an MBS offering did not contain delinquent
mortgages.  The court held that, read as a whole, the prospectus
supplement did not make that representation because it provided
that if there were delinquent mortgages the defendant would either
repurchase the delinquent mortgages or substitute performing
mortgages into the loan pools for the offering.

Plaintiff is not claiming in this case that the offering
documents represented that there were no delinquent mortgages in
the loan pools.  Plaintiff is claiming (in general) that the
offering documents misrepresented that underwriting guidelines were
normally followed and that, when exceptions were made, it was
because there were compensating factors.  Any language in the

71

offering documents that set forth repurchase or substitute provisions for delinquent mortgages does not clearly show that the misrepresentations alleged by plaintiff failed to exist. The holding in Lone Star was distinguished on these grounds in: In re Bear Stearns, 2012 WL 1076216 at *22; Plumbers' & Pipefitters', 2012 WL 601448 at *19; Employees' Retirement System of the Government of the Virgin Islands v. J.P. Morgan Chase & Co., 804 F.Supp.2d 141, 155 (S.D.N.Y. 2011); Boilermakers Nat'l Annunity Trust v. WaMu Mortgage Pass Through Certificates, Series ARI, 748 F.Supp.2d 1246, 1256 (W.D.Wash. 2010); and City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan Trust, Inc., 2010 WL 6617866 *7 (E.D.N.Y. 12/23/2010).

Defendants also make reference to Footbridge Ltd v. Countrywide Home Loans, Inc., 2010 WL 3790810 *16 (S.D.N.Y. 9/28/2010) in support of their argument from the Lone Star case. The court, however, believes that Footbridge may be distinguished on the same grounds as Lone Star and, in addition, may be distinguished as a securities fraud action which required more specific allegations pursuant to Fed.R.Civ.P. 9(b). Plaintiff is not making a fraud claim in this case.

> ### 4.   Plaintiff's claims as to reduced documentation programs shall not be dismissed

The complaint alleges that statements made in the prospectus supplements for 14 offerings misrepresented the reduced documentation programs used by originators of the loans for those

72

certificates.  Doc. No. 1, ¶¶ 317-334.  In essence, this is a subspecies of plaintiff's contention that the originators abandoned underwriting criteria when producing loans for the certificates in this case.  Plaintiff states that the alleged misrepresentations "were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines in order to increase the volume of mortgages originated, emphasizing quantity of loans rather than the quality of those loans."  Doc. No. 1 at ¶ 334.  Defendants contend that there was no material misrepresentation because the offering documents set forth the existence of the reduced documentation programs and the extent to which they were used for the offerings.  The court rejects defendants' argument because it is not clear the disclosures alleged by defendants would prevent a reasonable investor from being misled if the criteria for using the reduced documentation programs were not followed, as plaintiff alleges.

> 5.  <u>Plaintiff's claims as to loan to value (LTV) ratios representations and omissions shall not be dismissed</u>

The complaint sets forth language from the prospectus supplements of 7 MBS offerings regarding LTV ratios.  Doc. No. 1, ¶¶ 335-341.  Plaintiff alleges that these statements were material and untrue misrepresentations "because the Originators did not adhere to the maximum loan-to-value ratios as represented in the

Offering Documents, encouraged inflated appraisals and frequently granted loans with high loan-to-value ratios with no meaningful assessment of the borrower's ability to repay the loan based on the borrower's credit profile."  Doc. No. 1, ¶ 342.

Again, this appears to be a part of plaintiff's central claim that underwriting standards were abandoned by loan originators contrary to the representations in the certificates' offering documents.  The court's rulings upon defendants' objections to that central claim should be considered applicable here.  Thus, the court denies defendants' contention that plaintiff's claim is too conclusory and not supported with sufficient well-pled facts.  As further support for this holding, we note that the complaint includes allegations that certain originators (IndyMac, WaMu and Countrywide) inflated home appraisals which in turn would impact LTV ratios.

Defendants also argue that the LTV ratios are non-actionable third-party statements of opinion unless the speaker did not have the opinion at the time it was made public.  Doc. No. 67 at p.26 (citing New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc., 2011 WL 1338195 *11 n. 9 (S.D.N.Y. 3/31/2011)).  This argument, however, would not apply to intentionally exceeding the limit on LTV ratios for approved loans or intentionally inflating an appraisal.  It also would not apply if the originator did not consider the LTV ratio of the proposed loan.  These are plausible

74

scenarios from the materials set forth in the complaint. Therefore, the court shall not grant a motion to dismiss on that basis.

Defendants also argue that the offering documents warn that appraisals may differ and fluctuate, and that LTV ratios may not be reliable indicators of delinquency rates. At the 12(b)(6) stage of the case, the court cannot find that these warnings clearly reach the issue of intentional malfeasance with regard to LTV limits and property appraisals. Defendants further contend that there could be no material misrepresentation because the offering documents disclose the LTV ratios for the underlying mortgage pools. This argument may meet the claim that LTV limits were exceeded without notice to investors -- a claim which plaintiff appears to make only as to two offerings, First Franklin Mortgage Loan Trust 2006-FF16 (¶ 335 of the complaint) and Wachovia LMTS 2006-ALT1 (¶ 341 of the complaint).[11] Defendant RBS, however, only supports this contention with a citation to the prospectus supplement of a different offering, Soundview Home Loan Trust 2007-OPT1.[12] Doc. No. 67 at pp.

---

[11]

The court has ordered judgment as to the certificates from these offerings for different reasons previously described. Therefore, the argument may be moot.

[12]

Defendant NovaStar also notes that detailed disclosures regarding the loan pool, including LTV ratios, were made. Doc. No. 64 at pp. 6-7, 21-22. But plaintiff does not advance a LTV ratio claim against NovaStar.

27-28. While defendant's argument implies that the Soundview prospectus supplement is a representative example, the court cannot conclude upon the arguments and citations made by defendants that this information was supplied as to the First Franklin and Wachovia certificates.

In conclusion, the court shall not dismiss plaintiff's claim with regard to LTV ratios which shall be considered part of plaintiff's central claim alleging the abandonment of underwriting standards.

### 6. Plaintiff's claims regarding credit enhancement misrepresentations shall be dismissed

The complaint sets out language discussing credit enhancement from the prospectus supplements of 10 MBS offerings. Doc. No. 1, ¶¶ 342-352. In general, the language states that credit enhancement is intended to protect investors from income shortfalls caused by losses on the mortgage loans, but that the protection is limited and may be insufficient. Plaintiff asserts that the statements are untrue:

> because, due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail. This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory.

Doc No. 1, ¶ 353. In other words, plaintiff claims that the credit enhancement language led reasonable investors to believe there would be some meaningful protection against loss, when in fact

76

there was not.  Doc. No. 78, p. 38.

The court shall dismiss this claim.  The court agrees with defendants that plaintiff does not allege how the descriptions of the credit enhancement features and the "intention" of those features were material and untrue representations.  See Plumbers' & Pipefitters', 2012 WL 601448 at *14 (dismissing a similar claim regarding credit enhancement provisions).  The credit enhancement provisions may not, in fact, have been adequate to protect even the investors in triple-A tranches from the effects of mortgage loan losses because of poor loan underwriting compliance.  But, this does not mean that the description of the credit enhancement provisions and the described intention of those provisions were false at the time they were made.  Whether "meaningful" protection was provided is a matter of degree and opinion which is not generally a target for making a claim under § 11 and § 12(a)(2).  New Jersey Carpenters Vacation Fund, 720 F.Supp.2d at 271-72.  Plaintiff does not make a plausible claim that the defendants did not intend that the credit enhancement provisions offer "meaningful" protection when the statements were made.

      7.   The court shall not dismiss plaintiff's claims against defendant Nomura

Most of the arguments raised by defendant Nomura are discussed and decided in the prior portions of this opinion.  Nomura asserts that the complaint fails to make specific factual allegations against it.  As for plaintiff's central claim, Nomura concedes that

77

the prospectus supplement for the certificate issued by Nomura and purchased by U.S. Central stated that the underlying mortgage loans were originated generally in accordance with the underwriting criteria described in the prospectus supplement.  Doc. No. 55, p. 21.  Plaintiff asserts that this representation was false because two originators responsible for approximately one-third of the loan pool systematically disregarded the underwriting criteria.  These originators, Silver State Mortgage Company and the First National Bank of Nevada (FNBN), both failed – Silver State in February 2007 and FNBN in July 2008.  The complaint cites a May 2008 report quoting a former Silver State loan officer as indicating there was little concern for checking the income and assets of borrowers and that the main focus was upon producing mortgages and increasing market share.  Doc. No. 1, ¶¶ 207-209.  The complaint also cites information taken from a class action lawsuit filed against Nomura where it was alleged that FNBN employees engaged in "loan scrubbing" to remove information from loan applications which would disqualify a borrower from receiving a loan and that employees were fired for failing to eliminate disqualifying information.  Doc. No. 1, ¶¶ 149-153.  This information, together with the other allegations in the complaint, including the statistics regarding delinquency and default rate (see Table 5 of the complaint) and actual losses versus expected losses (Doc. No. 1, p. 41), are sufficient in the court's opinion to state a claim against Nomura

for misrepresenting conformity to underwriting standards.  Contrary to Nomura's characterization of plaintiff's claim (Doc. No. 55 at p. 21), we do not construe the complaint as alleging that defendants represented that the originators would strictly adhere to underwriting guidelines with respect to each and every mortgage. Instead, plaintiff claims that defendants represented that underwriting standards would generally be followed and that exceptions would be made when compensating factors were present, but that this was untrue.  The complaint adequately states this claim against defendant Nomura.

As for plaintiff's claims regarding reduced-documentation programs, LTV ratios and credit enhancement, the court's rulings shall be the same as described previously in this opinion.  The court believes plaintiff's claims against Nomura as to the representations regarding reduced-documentation programs and LTV ratios should be considered a part of plaintiff's general claim regarding underwriting standards.

      8.  <u>Plaintiff's claims against defendant NovaStar shall not be dismissed</u>

The arguments made by NovaStar have been considered by the court.  The arguments are the same or quite similar to the arguments already discussed.  The court shall apply the same holdings.  That is, the court shall not dismiss plaintiff's claim as regards to the abandonment of underwriting standards and reduced documentation programs.  The court does not interpret the complaint

79

as making an LTV ratio claim as to NovaStar.

The court believes the complaint's allegations are not too conclusory to state a plausible claim as to NovaStar. The prospectus supplement for the NovaStar offering is alleged to state that underwriting standards were used which were intended to evaluate the credit history of the borrower and the capacity of willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan, and that exceptions to the underwriting guidelines were made when there were compensating factors. Doc. No. 1, ¶¶ 301 & 303. It was further represented that each loan applicant completed an application which supplied information covering income, liabilities, and employment history, and that an independent credit verification was accomplished. Doc. No. 1, ¶ 302. The complaint further cites allegations from New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc., Case No. 08-CIV-5310-DAB where former NovaStar employees reported that underwriting standards were disregarded routinely. Doc. No. 1, ¶¶ 199-205. In addition, the complaint contains information from news articles which generally link NovaStar to pushing the envelope to increase loan production, engaging in "goofy lending practices" and pushing borrowers into predatory loans. Doc. No. 1, ¶¶ 196-198.

Defendant NovaStar has argued that the court should strike the allegations drawn from the New Jersey Carpenters court complaint and from the press reports. Defendant has supplied the court with

case authority from New York and California federal courts. Some New York courts have relied upon Rule 12(f)[13] to strike material taken from other court complaints on the grounds that it is immaterial. E.g., RSM Production Corp. v. Fridman, 643 F.Supp.2d 382, 403-04 (S.D.N.Y. 2009). Some California courts have relied upon FED.R.CIV.P. 11(b)[14] to strike material taken from other court complaints on the grounds that there is no indication that counsel has engaged in a reasonable inquiry to determine whether there is evidentiary support for the allegations. E.g., In re Connetics Corp. Securities Litigation, 542 F.Supp.2d 996, 1005-06 (N.D. Cal. 2008).

There is a case from New York which holds that the application of Rule 12(f) supported by defendant NovaStar is too big of a stretch and that "[n]either [Second] Circuit precedent nor logic supports such a rule." In re Bear Stearns, 20012 WL 1076216 at *16 n.24. There are also cases from California which hold that Rule 11(b) is satisfied when an attorney represents that he or she has

---

[13]

Rule 12(f) states in part that the court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."

[14]

Rule 11(b) provides in part: "By presenting to the court a pleading . . . an attorney . . . certifies that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances: . . . 3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery ..."

investigated the allegations drawn from other court complaints and
when the allegations draw support from other sources.  See <u>Maine</u>
<u>State Retirement System</u>, 2011 WL 4389689 at *20; <u>Johns v. Bayer</u>
<u>Corp.</u>, 2010 WL 2573493 *2 (S.D.Cal. 6/24/2010).  In the case at
bar, plaintiff's counsel has stated that the allegations from the
<u>New Jersey Carpenters</u> case have been "verified" through contact
with counsel for plaintiff in the <u>New Jersey Carpenters</u> litigation.
Doc. No. 81, p. 8.

Kansas courts have held that motions to strike are a drastic
remedy which should be granted "only when the material may be
prejudicial to a party and lacks any possible relation to the
controversy." <u>Sawo v. Drury Hotels Co., LLC</u>, 2011 WL 3611400 at *2
(D.Kan. 8/15/2011) (interior quotations and citations omitted).
"Any doubt as to the utility of the material to be stricken should
be resolved against the motion to strike." <u>Rubio ex rel. Z.R. v.</u>
<u>Turner Unified School Dist. No. 202</u>, 475 F.Supp.2d 1092, 1101
(D.Kan. 2007).

In the court's opinion, material taken from other court
complaints or newspaper articles or press reports, while hearsay,
provide some context for the court to consider in determining
whether a plausible claim has been stated.  These materials have a
relation to the controversy alleged in the complaint and,
therefore, the court shall not order that they be stricken as
impertinent.    Further, based upon plaintiff's counsel's

82

representation and the other material presented to the court at this time, the court finds that Rule 11(b) does not provide grounds to strike the allegations made against NovaStar in the complaint.

The court recognizes that the court in <u>New Jersey Carpenters Health Fund v. NovaStar Mortgage, Inc.</u>, 2012 WL 1076143 (S.D.N.Y. 3/29/2012) sustained a motion to dismiss finding that the allegations were not sufficiently tied to the specific loans in the loan pool for the offering at issue. But, in our judgment, the allegations within the complaint in this case are sufficient to establish a reasonable expectation that discovery will reveal evidence to support a claim that the loan originators for the NovaStar offering abandoned underwriting standards for the loans underlying the MBS certificates in this case.

In summary, the court believes plaintiff's allegations with regard to loan underwriting guidelines and reduced documentation programs present a viable claim as to defendant NovaStar. The court shall dismiss plaintiff's claim as to the credit enhancement representation. The court does not interpret the complaint as making an LTV ratio claim as to NovaStar.

M.   <u>The court rejects defendants' Hobson's choice argument</u>

The court has considered the Hobson's choice arguments made by defendants. These arguments derive from <u>Allstate Insurance Co.</u>, 824 F.Supp.2d at 1179-80, where the court held that the plaintiff could not argue that broad information regarding Countrywide's

83

underwriting practices was sufficient to support a finding that there were fraudulent misrepresentations regarding the specific MBS certificates alleged in the case, and argue simultaneously that the plaintiff's claims were timely, since the plaintiff failed to timely file its § 10(b) claim after the date of constructive notice of the information.

Defendants in this case claim that if the financial information alleged by plaintiff is sufficient to tie plaintiff's misrepresentation claims to the certificates purchased by U.S. Central, then plaintiff's claims are untimely because the delinquency and default information, for example, was available to U.S. Central prior to March 20, 2008.  The court holds here that in addition to the general information regarding the mortgage industry and the delinquency and default data regarding the loan pools for the offerings in this case, the specific information regarding the underwriting practices of the originators and the credit rating downgrade information was critical to tying the certificates purchased by U.S. Central to the misrepresentations and omissions claimed by plaintiff.  Except as to Fremont certificates, the court finds that the record is not sufficiently clear that a reasonable investor had notice of the information regarding the underwriting practices of the originators and the credit rating information prior to March 20, 2008, although the court has considered that the delinquency and default data could be linked to the eventual

decline in the credit ratings.  This is a matter which could be reviewed again, of course, upon a summary judgment motion.

    N. Conclusion

    The court shall grant defendants' motions to dismiss only as they pertain to the state and federal claims involving the certificates purchased from the following offerings:  First Franklin Mortgage Loan Trust 2006-FF16; HarborView 2006-10; HarborView-SB1; Soundview Home Loan Trust 2006-WF2; Saxon Asset Securities Trust 2006-3; and Wachovia Mortgage Loan Trust, Series 2006-ALT1.  Plaintiff's federal claims involving the certificates purchased from Fremont Home Loan Trust 2006-3 and Fremont Home Loan Trust 2006-D shall also be dismissed.  The court shall further grant defendants' motions to dismiss as they relate to the credit enhancement provisions described in the complaint.  These claims are dismissed without prejudice.  Accordingly, the motion to dismiss of defendant Nomura (Doc. No. 53) is granted in part and denied in part; the motion to dismiss of defendant Wachovia (Doc. No. 58) is granted; the motion to dismiss (Doc. No. 59) of defendant Fremont is granted; the motion to dismiss of defendant NovaStar (Doc. No. 63) is granted in part and denied in part, but the motion to strike is denied; and the motion to dismiss of defendants RBS Securities, Greenwich Capital Markets, Financial Asset Securities, and IndyMac (Doc. No. 66) is granted in part and denied in part.  Plaintiff shall be granted leave to file an

amended complaint within 30 days of the date of this order.

II.  NCUAB v. Wachovia Capital Markets, LLC, Case No. - 11-2649

A.  Introduction

In this case, plaintiff NCUAB, in its capacity as liquidating agent of U.S. Central and Western Corporate Federal Credit Union ("WesCorp"), sues defendant Wachovia Capital Markets LLC as underwriter and seller of five MBS certificates from two offerings: Wachovia Mortgage Loan Trust, Series 2006-ALT1; and NovaStar Mortgage Funding Trust, Series 2006-5.  The certificates were purchased in September and November of 2006.  The certificates were rated triple-A or double-A prior at the time of purchase.  Doc. No. 1, ¶ 82.

Plaintiff sues under § 11 and § 12(a)(2) of the Securities Act of 1933, the California Corporate Securities Law of 1968, Cal.Corp. Code §§ 25401, 25501 and the Kansas Uniform Securities Act, K.S.A. 17-12a509.

Defendant Wachovia has filed a motion to dismiss (Doc. No. 108) which raises basically the same arguments that are made by defendants in Case No. 11-2340.

B.  Plaintiff's allegations

Plaintiff alleges that the loan pools for the certificates were characterized by:  a surge in borrower delinquencies and defaults; actual losses which exceeded expected losses within the first 12 months; and a high percentage of loans which were

originated for distribution. Doc. No. 1, ¶ 51. Also, the credit ratings for the certificates collapsed, although none were downgraded below investment rate more than one year prior to the date U.S. Central and WesCorp were placed into conservatorship. Doc. No. 1, ¶ 83. Plaintiff asserts that these facts support an inference that the originators for the loans systematically disregarded underwriting standards.

Plaintiff also alleges that the disregard of underwriting standards was pervasive among mortgage originators. Doc. No. 1, ¶¶ 86-99. Plaintiff quotes an FCIC report as stating: "Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world." Doc. No. 1, ¶ 90.

With specific regard to NovaStar Mortgage, Inc., the complaint contains the same allegations from press reports and from the complaint in N.J. Carpenters Health Fund v. NovaStar Mortgage, Inc., No. 08-cv-5310 (S.D.N.Y. 2011) as are described earlier in this opinion as to Case No. 11-2340. NovaStar Mortgage, Inc. allegedly contributed 100% of the loans in the mortgage pool underlying the NovaStar Mortgage Funding Trust, Series 2006-5 offering. Doc. No. 1, ¶ 114.

Plaintiff alleges that four originators contributed loans to the Wachovia Mortgage Loan Trust, Series 2006-ALT1 offering. These

originators are:  National City Mortgage (65.93%), Accredited Home Lenders, Inc. (18.88%), Wachovia Mortgage Corp. (12.44%) and American Mortgage Network, Inc. (2.75%).  Doc. No. 1, ¶ 116.  The complaint contains no specific allegations regarding those companies' mortgage underwriting practices other than high OTD percentages for all the companies except American Mortgage Network. But, the complaint cites statistical evidence from an analysis of some of the loans in the loan pool for the Wachovia certificates which indicate that statements in offering documents regarding the owner/occupancy status for some mortgaged properties falsely inflated the number of owner-occupied properties and that LTV weighted averages listed for the loan pools were false.  Doc. No. 1, ¶¶ 141-47.

C.  <u>Statute of limitations</u>

The arguments made by defendant with regard to the statute of limitations are discussed and ruled upon in the section of this opinion concerning the timeliness of the complaint in Case No. 11-2340.  The court shall make the same rulings here.

D.  <u>Failure to state a claim</u>

The complaint alleges that false representations were made regarding the following subjects:  the loan originators' evaluation of the borrower's capacity and likelihood to repay the mortgage loan; the reduced documentation programs; LTV ratios; credit enhancement; occupancy type of the properties securing mortgages in

88

the loan pool (for the Wachovia certificates); and the weighted
average of the LTV ratios for the pool (for the Wachovia
certificates).  Doc. No. 1, pp. 35-50.

Defendant's arguments that the complaint fails to state a
plausible claim are about the same as those arguments by defendants
in Case No. 11-2340.  The court's rulings shall be as follows.

Except as to the allegations regarding credit enhancement, the
court shall deny defendant's arguments to dismiss as they relate to
the NovaStar certificates for the same reasons explained in
relation to Case No. 11-2340.

As for the Wachovia certificates, the complaint contains no
specific allegations from press reports or former employees
regarding the loan underwriting practices of the loan originators.
But, unlike the complaint in Case No. 11-2340, the complaint in
Case No. 11-2649 does include a statistical analysis of some of the
loans in the loan pools for the certificates.  This analysis
suggests that misrepresentations were made regarding
owner/occupancy status and the weighted averages of LTV ratios.
Defendant's motion to dismiss does not address these allegations.
The general information supplied in the complaint together with
this information which makes a direct connection to the loan pools
for the Wachovia certificates, states a plausible claim for relief
in the court's opinion.  But, the court shall dismiss plaintiff's
claim with regard to the credit enhancement language set forth in

¶ 138 of the complaint.  The court does not believe the allegations in the complaint state a plausible claim that the alleged credit enhancement language was untrue and material.

　　E.  <u>Conclusion</u>

　　In conclusion, defendant's motion to dismiss (Doc. No. 108) is denied except as to claims relating to the credit enhancement language cited in ¶¶ 137-39 of the complaint.

　　**IT IS SO ORDERED.**

Dated this 25th day of July, 2012 at Topeka, Kansas.

　　　　　　　　　　　　s/Richard D. Rogers
　　　　　　　　　　　　United States District Judge