# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent for U.S. Central Federal Credit Union, | |
| Plaintiff, | |
| v. | Case No. 11-cv-2340-JWL |
| RBS SECURITIES, INC., f/k/a GREENWICH CAPITAL MARKETS, INC., RBS ACCEPTANCE, INC., f/k/a GREENWICH CAPITAL ACCEPTANCE, INC., FINANCIAL ASSET SECURITIES CORP., NOVASTAR MORTGAGE FUNDING CORP., and NOMURA HOME EQUITY LOAN, INC., | **FILED UNDER SEAL** |
| Defendants. | |

# MEMORANDUM IN SUPPORT OF NCUA'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF WALTER TOROUS, PH.D.

# TABLE OF CONTENTS

BACKGROUND ...................................................................................................... 4

    1.   Torous's initial expert report on loss causation. ............................................... 4

    2.   NCUA's expert report on the re-underwriting of Sampled Loans. ..................... 7

    3.   Torous's rebuttal report on re-underwriting and damages. ............................... 9

LEGAL STANDARD ............................................................................................. 14

ARGUMENT ......................................................................................................... 15

    1.   The Court should exclude as irrelevant and unreliable the opinions
        proffered in Torous's initial report on loss causation. ...................................... 15

        A.   Torous cannot establish that his benchmarks are free of the
            misrepresentations and omissions alleged ............................................ 16

        B.   Torous unjustifiably assumes that changes in housing prices were
            completely unrelated to Defendants' misrepresentations and omissions ..... 19

    2.   The Court should also exclude the opinions proffered in Torous's
        rebuttal report on re-underwriting and damages. .......................................... 21

        A.   Torous has not established that the Butler Benchmark is not
            tainted by misrepresentations or omissions ........................................... 21

        B.   ADCo Model ....................................................................................... 23

        C.   DTI Models ........................................................................................ 25

CONCLUSION ..................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Astra Aktiebolag v. Andrx Pharm., Inc.,*
  22 F. Supp.2d 423 (S.D.N.Y. 2002) ........................................................................... 23

*Bickerstaff v. Vassar College,*
  196 F.3d 435 (2d Cir. 1999) ...................................................................................... 21

*Bitler v. A.O. Smith Corp.,*
  400 F.3d 1227 (10th Cir. 2004) ........................................................................... 14, 18

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579 (1993) ........................................................................................ 14, 15, 21

*Dodge v. Cotter Corp.,*
  328 F.3d 1212 (10th Cir. 2003) ................................................................................. 14

*Fanning v. Sitton Motor Lines, Inc.,*
  2010 WL 4261476 (D. Kan. Mar. 10, 2010) .............................................................. 23

*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.,*
  2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) ............................................... 16, 18, 22, 23

*Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.,*
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ................................................................... 15, 19

*First Specialty Ins. Corp. v. Ward N. Am. Holding, Inc.,*
  2006 WL 6225115 (D. Kan. 2006) ............................................................................ 14

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ............................................................................................. 15, 18

*Hildes v. Arthur Anderson LLP,*
  734 F.3d 854 (9th Cir. 2013) ..................................................................................... 15

*In re Flag Telecomm. Holdings, Ltd. Sec. Litig.,*
  574 F.3d 29 (2d Cir. 2009) ........................................................................................ 15

*In re Initial Public Offering Sec. Litig.,*
  544 F. Supp. 2d 277 (S.D.N.Y. 2008) ....................................................................... 15

*In re Rezulin Products Liab. Litig.*,
   369 F. Supp. 2d 398 (S.D.N.Y. 2005) ................................................................ 20

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ........................................................................................ 23

*Lattanzio v. Deloitte & Touche*,
   476 F.3d 147 (2d Cir. 2007) ............................................................................ 15

*Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*,
   408 F.3d 410 (8th Cir. 2005) ........................................................................... 20

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
   427 F. Supp. 2d 1022 (D. Kan. 2006) .............................................................. 14

*United States v. Nacchio*,
   555 F.3d 1234 (10th Cir. 2009) ....................................................................... 14

## Statutes

15 U.S.C. § 77k(e) ................................................................................................. 15

15 U.S.C. § 77*l*(b) ................................................................................................. 15

## Other Authorities

29 Wright & Gold § 6268 ...................................................................................... 20

Federal Judicial Center, *Reference Manual on Scientific Evidence* 314 (3d ed. 2011) ................................ 20

Fed. R. Evid. 401 ................................................................................................. 15

Fed. R. Evid. 702 ................................................................................................. 16

## INDEX OF EXHIBITS

**Exhibit 1:** Expert Report of Walter Torous, PH.D. and Appendix D (August 14, 2015).

**Exhibit 2:** Deposition of Walter Torous which was taken on February 11, 2016 (excerpts).

**Exhibit 3:** Expert Report of Steven I. Butler on the Re-Underwriting of Sampled Loans (August  14, 2015).

**Exhibit 4:** Third Amended Rebuttal Report of Walter Torous, PH.D. (January 26, 2016).

**Exhibit 5:** Reply Report of Anthony Saunders (November 20, 2015).

**Exhibit 6:** Rebuttal Expert Report of John D. Finnerty & Exhibits G1-G3 (December 4, 2015).

**Exhibit 7:** Amended Reply Expert Report of Walter Torous, PH.D. (January 26, 2016).

**Exhibit 8:** Amended Rebuttal Report of Anthony Saunders (December 4, 2015).

**Exhibit 9:** Rebuttal Report of James R. Barth (October 16, 2015).

**Exhibit 10:** Article "Asset Quality Misrepresentation by Financial Intermediaries:  Evidence from RMBS Market"  (February 2013) (excerpts).

**Exhibit 11:** Article "Understanding the Subprime Mortgage Crisis" (excerpts).

**Exhibit 12:** Article "Who Facilitated Misreporting in Securitized Loans?" (December 2013) (excerpts).

**Exhibit 13:** "Residential Mortgage Default:  The Roles of House Price Volatility, Euphoria and the Borrower's Put Option" (February 2010) (excerpts).

## INTRODUCTION

NCUA alleges that the offering documents for the RMBS at issue contained material misrepresentations and failed to disclose material facts about the loans backing the RMBS certificates purchased by U.S. Central (the "Certificates"). The various undisclosed defects in the loans are detailed in the Appendix to NCUA's Second Amended Complaint. Moreover, NCUA has quantified the incidence of defective loans among the loan pools backing each Certificate through an expert re-underwriting review of statistically representative loan samples (the "Sampled Loans").

Defendants have an affirmative defense of negative loss causation to NCUA's claims under Sections 11 and 12 of the Securities Act of 1933. To succeed on that defense, Defendants have the burden of proving that factors unrelated to NCUA's alleged misrepresentations and omissions caused the Certificates' value to decline. To the extent there were multiple contributing causes to this decline in value, Defendants must affirmatively disaggregate their impact by establishing the ascertainable portion of the decline caused by factors other than the misrepresentations and omissions at issue.

In support of their loss causation defense, the RBS, Nomura, and NovaStar Defendants disclosed the expert report of Dr. Walter Torous. In his affirmative report dated August 14, 2016, Torous purportedly compares the expected performance of the loans backing the Certificates had there been no misrepresentations – which he calculates using benchmarks of loans that he implicitly assumes have no misrepresentations – to the actual performance of the loans backing the Certificates. Torous then opines that "either the purported misrepresentations NCUA alleges concerning the At-Issue Certificates did not exist, or did not affect the performance of the At-Issue Loans and, therefore, the performance of the At-Issue Certificates was due to factors unrelated to

any alleged misrepresentations."[1]

The Court should exclude Torous's proffered testimony based on his August 14, 2016 report as irrelevant and unreliable for two reasons. First, Torous uses tainted control groups. His benchmarks consist of loans backing non-agency RMBS during the relevant time period that are likely to contain a substantial number of loans with the same types of alleged misrepresentations that NCUA has identified in this case. Despite the possibility of tainted control groups, Torous performed no analysis to ensure that these benchmark were free of defective loans. Comparing the tainted pools backing the Certificates to other tainted pools does not allow Torous to reliably conclude that factors other than NCUA's alleged misrepresentations and omissions caused the decline in the value of the Certificates. Second, Torous treats the misrepresentations and omissions alleged as completely unrelated to the macroeconomic factors on which he blames NCUA's losses, ignoring substantial uncontradicted evidence that there is likely a relationship between the misrepresentations and omissions at issue and the macroeconomic factors on which he relies.

After NCUA disclosed its expert reports on re-underwriting and damages on August 14, 2016, Torous submitted a rebuttal report on October 16, 2016 that presents new analyses. First, Torous attempts to correct for his previously tainted control groups by creating a new benchmark based on the loans that NCUA's re-underwriting expert purportedly found to be free of defects. That effort relies on a mistaken premise. NCUA's reunderwriting expert did not find that group of loans to be free from defects. Therefore, Torous again has not established that he has used a "clean" benchmark. His new analysis should be excluded for that reason.

Second, Torous attempted to recalculate NCUA's damages by subtracting losses supposedly caused by factors other than defective loans. To make those calculations, Torous "calibrated" a commercial valuation model without providing any authority to support his calibration and without

---

[1] **Exhibit 1**, Expert Report of Walter Torous, Ph.D. (RBS) ("Torous Report"), ¶ 20.

validating the reliability of the altered product. Not only is Torous's method of "calibrating" the commercial valuation model untested, Torous's "calibrated" model is unreliable. Torous "tunes" the model so that the forecasted performance the model provides for the at-issue SLGs and Certificates reflects the historical performance of the at-issue SLGs and Certificates, but the results of Torous's "tuned" model in actuality forecast performance for the at-issue SLGs and Certificates markedly different than their actual performance, with the model's errors exceeding 100% in some instances.

Third, Torous purported to calculate whether any losses were caused by the DTI misrepresentations identified by NCUA's reunderwriting expert. This analysis is again flawed because it relies on tainted benchmarks. In addition, Torous does not reliably extrapolate the DTI misrepresentations that Butler found in a sample of loans to the entire SLG. Rather Torous "smoothes" or "averages" the defects identified in the sample over the entire SLG, which has the effect or minimizing their effect on the performance of the loans.

## BACKGROUND

### 1.    Torous's initial expert report on loss causation.

On August 14, 2015, the RBS, Nomura, and NovaStar Defendants disclosed Torous's initial expert report on loss causation.[2] There, Torous purports to use two benchmarks – the "Industry Benchmark" and "Reduced Industry Benchmark" – to compare (1) the expected performance of the loans backing the Certificates had there been no defective loans, to (2) the actual performance of the loans backing the Certificates.[3] Torous calculates the expected performance using a regression

---

[2] Torous issued separate reports on August 14, 2015 on behalf of RBS, Nomura and NovaStar, which differ only as to the particular SLGs analyzed. The reports on behalf of Nomura and NovaStar analyze only the subset of the SLGs analyzed in the report on behalf of RBS for which Nomura or NovaStar are defendants. All references in this memorandum to the Torous Report are to the report issued on behalf of RBS.

[3] **Exhibit 1**, Torous Report, ¶¶ 115-17.

analysis (the "Torous Default Model," or, the "Model") that purports to quantify how variations in borrower and loan characteristics and macroeconomic conditions affect the likelihood of serious delinquency and default ("DASD") in the benchmark loans.[4] Torous's Model did not include a variable for whether a loan had been found to be defective by NCUA's re-underwriting expert.[5]

Torous's Industry Benchmark is comprised of approximately 8.4 million loans from approximately 2,600 non-agency securitizations issued between 2005 and 2007 (it excludes the RMBS at issue).[6] Torous's Reduced Industry Benchmark subtracts from the Industry Benchmark approximately 7.3 million loans backing securitizations "that are or were subject to known MBS litigation," and is thus comprised of approximately 1.1 million loans from 330 securitizations.[7] Torous did not test whether his benchmarks contained defective loans.[8] Nor did he perform any analysis to determine "whether a lack of litigation is a reliable indicator that a pool of loans does not contain materially misrepresented loans."[9] Thus, Torous cannot say how many loans backing either of his benchmarks contain the types of defects alleged by NCUA. As he testified at deposition: "There may be a few, there may be more than a few"; "I don't know" and "have no idea"; "I cannot assert which [loans] were clean or not in the industry as a whole."[10]

Torous uses his Model to calculate the expected DASD for the loans backing the

---

[4] *Id.*, ¶¶ 16, 116, 119 & 129.

[5] *Id.*, Torous Report, ¶¶ 120-121 (listing variables in regression analysis).

[6] *Id.*, Torous Report, ¶¶ 21-22, 134 & 136.

[7] *Id.*, Torous Report, ¶ 141. Counsel for RBS provided the list of loans subject to MBS litigation. *Id.*, App'x D, n. 29.

[8] **Exhibit 2**, February 11, 2016 Deposition of Walter Torous ("Torous Dep.") at 107:13-110:21; 111:4-22; 111:25-112:17.

[9] *Id.* at 139:9-14.

[10] *Id.* at 137:10-17; 138:15-22; 111:25-112:17.

Certificates, which according to Torous, "represents the performance of the At-Issue loans underlying the Benchmark *assuming that they performed like the loans underlying the benchmark* after controlling for the disclosed loan and borrower characteristics and changes in macroeconomic circumstances."[11] He then compares these expected DASD to the actual DASD "to evaluate the relative performance of each [SLG]."[12] If the actual DASD in an SLG are not statistically significantly higher than the expected DASD, Torous concludes that the "the Supporting Loan Group performed *in line* with expectations," and thus, that "either the purported misrepresentations NCUA alleges to have existed did not exist, or did not affect the performance of the At-Issue loans."[13]

Although Torous found that 23 of the 41 SLGs[14] had higher than expected DASD based on his Industry Benchmark, he found a statistically significant difference for only 2 of 41 SLGs.[15] Similarly, although Torous found that 21 of the 41 SLGs had higher than expected DASD based on his Reduced Industry Benchmark, he found a statistically significant difference for only 4 of 41 SLGs.[16] Torous thus concluded that "the performance of the At-Issue Loans is consistent with expected performance as calculated using the disclosed loan and borrower characteristics and changes in macroeconomic conditions," and that "either the purported misrepresentations NCUA alleges concerning the At-Issue Certificates did not exist, or did not affect the performance of the

---

[11] **Exhibit 1**, Torous Report, ¶ 126 (emphasis added).

[12] *Id.*, ¶ 127.

[13] *Id.*

[14] The number of SLGs is greater than the number of At-Issue SLGs in this case because the Torous Report covered both this case and another case pending in the U.S. District Court for the Central District of California.

[15] *Id.*, ¶ 139.

[16] *Id.*, ¶ 142.

At-Issue Loans and, therefore, the performance of the At-Issue Certificates was due to factors unrelated to any alleged misrepresentations."[17]

## 2.    NCUA's expert report on the re-underwriting of Sampled Loans.

On August 14, 2015, NCUA disclosed the report of Steven I. Butler on the re-underwriting of Sampled Loans.[18] In the Appendices to that report, Butler detailed his re-underwriting findings for Sampled Loans that he believed were "Materially Misrepresented"—i.e., loans that "fell into one or both of the following categories: (1) the loan violated the applicable underwriting guidelines in a way that had a material and adverse effect on the credit risk of the loan; and (2) the loan's actual quantitative characteristics—as opposed to those listed in the Offering Documents, such as in the Prospectus Supplement or the corresponding Mortgage Loan Schedule ("MLS")—meant that the loan had a materially greater credit risk than represented."[19] Butler found that for every SLG backing the Certificates, a significant percentage of the Sampled Loans was Materially Misrepresented.[20]

Butler's report did not catalog every materially defective loan in the supporting loan groups. *First*, Butler did not test for all of the ways in which a loan could be defective. He "did not separately verify compliance with legal requirements (e.g., anti-predatory lending laws, Truth in Lending Act, etc.) or compliance with the Uniform Standards of Professional Appraisal Practice ("USPAP"), and did not obtain retrospective valuations of the collateral."[21]

*Second*, he took a conservative approach and did not find that every loan for which he found

---

[17] *Id.*, ¶ 20.

[18] **Exhibit 3**, Expert Report of Steven I. Butler on the Reunderwriting of Sampled Loans ("Butler Report").

[19] *Id.*, ¶ 4.

[20] *Id.,* ¶ 178 and Table 1, pp. 3-4.

[21] *Id.*, ¶ 80.

a defect was "materially defective." "[V]irtually all of the loan files that [Butler and his team] reviewed contained some evidence of a guideline violation, underwriter negligence, deviation from reasonable underwriting practice, or misrepresentation of a loan characteristic in the prospectus supplement/MLS", but Butler offered opinions only on "those Sampled Loans that [he] believe[d] to be Materially Misrepresented."[22] For example, if a loan's reported characteristics were not disclosed accurately, but it was still within the underwriting guidelines, Butler deemed it to be Materially Misrepresented only if, as a rough guide, the DTI or LTV was 10% higher than disclosed, or the FICO score was roughly 25 points lower than disclosed.[23] For stated income loans requiring a reasonableness test of the borrower's income, Butler found a loan to be Materially Misrepresented *only if* (1) the borrower was not self-employed, *and* (2) there was no reasonableness test documented in the loan file, *and* (3) the borrower's stated income was above the 90th percentile provided by the Bureau of Labor Statistics for the borrower's occupation, position and geographic location.[24]

Because Butler does not treat every loan that had a guideline violation or a misrepresented characteristic to be a Materially Misrepresented loan, Butler "offer[s] no opinion on the other Sampled Loans other than to say that [he] could not conclude, based on a totality of the circumstances, that the findings associated with those loans establish a materially increased credit risk above what was represented."[25]

In the 2,559 (out of 4,413) loans that Butler found to have been Materially Misrepresented across all SLGs at issue in this case and the related California and New York cases, Butler found more than 8,700 separate breaches (an average of approximately 3.4 breaches per loan), comprising

---

[22] *Id.*, ¶¶ 174 & 177.

[23] *Id.*, ¶ 90.

[24] *Id.*, ¶ 95.

[25] *Id.,* ¶ 177.

"approximately 120 different kinds of guideline breaches, violations of industry-standard underwriting practices, and misrepresentations of loan characteristics." The most common defects he found included the following:

> [U]nderwriter error or negligence (1,331 findings); failure to determine reasonable ability to repay on stated income or no-ratio loans (821 findings); misrepresentation of debt (605 findings); excessive DTI (597 findings); failure to verify employment (520 findings); improper calculation of debts or income (454 findings); failure to verify assets (221 findings); excessive LTV or CLTV (220 findings); misrepresentation of income (214 findings); incomplete income documentation (111 findings); and misrepresentation of owner-occupancy status (100 findings).[26]

Butler also found that the Mortgage Loan Schedules—which contained the detailed loan-level data for the loans backing the Certificates—were "riddled with inaccurate data" such as debt-to-income ("DTI") ratios; loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratio; owner-occupancy status; documentation type; property type; and loan purpose (the "MLS Misrepresentations").[27]

### 3.      Torous's rebuttal report on re-underwriting and damages.

On October 16, 2015, Defendants disclosed another expert report from Torous in rebuttal to NCUA's re-underwriting and the calculation of damages by NCUA's expert Dr. John Finnerty.[28] Torous's rebuttal report offers new opinions on loss causation not disclosed in his initial report under the guise of rebutting NCUA's calculation of damages in light of NCUA's reunderwriting

---

[26] *Id.*, ¶ 180 and App'x 1.

[27] *Id.,* ¶¶ 181, 183 and App'x 1.

[28] **Exhibit 4**, Third Amended Rebuttal Report of Walter Torous, Ph.D. (RBS) ("Torous Rebuttal Report"). Torous issued separate rebuttal reports on behalf of Nomura and NovaStar, which differ substantively from the Torous Rebuttal Report only as to the particular SLGs analyzed (the rebuttal reports on behalf of Nomura and NovaStar analyze a subset of the SLGs analyzed in the report on behalf of RBS). All references in this memorandum to the Torous Rebuttal Report are to the report issued on behalf of RBS. Torous subsequently amended his rebuttal reports several times, most recently on January 26, 2016. The amendments do not impact this motion.

results.[29]

     *First*, Torous created a new benchmark – the "Butler Benchmark" – consisting of Sampled Loans that Butler did not deem Materially Misrepresented.[30] That benchmark presumed that such loans did not contain the types of defects that Butler identified in his re-underwriting findings.[31] Torous then compared the expected performance of Materially Misrepresented loans calculated using the Butler Benchmark to the actual performance of the Materially Misrepresented loans, and he used the same statistical significance test that he used in his initial report.[32]

     *Second*, Torous purports to analyze the effect of Butler's findings of misrepresented DTI ratios on DASD.[33] Torous re-estimates his Industry Benchmark incorporating DTI as an explanatory variable in the regression, and concludes that incorporating DTI did not have any meaningful effect on his analysis based on the Industry Benchmark from his affirmative report.[34] Torous purports to incorporate Butler's DTI findings into the SLGs, and then purports to calculate the expected performance based on his Industry Benchmark. To extrapolate Butler's DTI finding as to a sample of loans to the entire SLG, Torous calculates the average DTI misrepresentation in the sample and applies that average misrepresentation to each loan in the SLG.[35] So if Butler's review of

---

[29] *Id.* at ¶ 7.

[30] *Id.* at ¶ 47.

[31] *Id.*; *see also* **Exhibit 2**, Torous Dep. at 47:12-20 ("Again, look at the – what I refer to as the Butler benchmark, which is composed of the loans that your re-underwriting expert, Mr. Butler, designates as not having material misrepresentations.").

[32] *See* **Exhibit 5**, Reply Report of Anthony Saunders, ¶ 10 ("Dr. Torous's rebuttal reports do not explicitly describe the purported test that he used. However, my team reviewed Dr. Torous's backup materials and determined that he used the same purported test that he used in his initial reports.")

[33] *Id.* at 65:6-11; **Exhibit 4**, Torous Rebuttal Report, at ¶¶ 38-46.

[34] **Exhibit 4**, Torous Rebuttal Report, ¶¶ 44-46.

[35] *Id.* ("I therefore calculate the difference between Mr. Butler's alleged DTI value (the recalculated

100 Sampled Loans yielded 10 findings of DTI with an average discrepancy of 50% (e.g., 5 findings of 25%, and 5 findings of 75%), Torous treated them as findings that each Sampled Loan had a DTI discrepancy of 5%. Torous then added 5% to the DTI ratio of every loan backing the relevant Certificate and ran those loans through his Model. Based on this analysis, Torous concludes that Butler's DTI findings did not have a significant impact on DASD when compared with the Industry Benchmark.

*Third*, Torous purports to calculate the portion of NCUA's damages caused by Materially Misrepresented loans, which he describes as "Damages Net of Loss Causation."[36] Torous separately calculates damages for (1) the "as disclosed" scenario, which "is based on the actual prices and performance" of the SLGs; and (2) the "as alleged" scenario, for which the "performance is assumed to be the same as the expected performance under the benchmark based on the disclosed loan and borrower characteristics and changes in macroeconomic conditions."[37] Torous claims the "as alleged" scenario is "how the At-Issue Certificates would have performed if they had been free from the alleged misrepresentations."[38] Thus, Torous asserts "[l]oss causation-adjusted damages are then equal to the differences between the damages under the 'as alleged' scenario and the 'as disclosed' scenario."[39]

Torous states he uses the "performance vectors" approach to calculating loss-causation

---

value reported in his Appendix 1) and the disclosed DTI value (the value reported in the Mortgage Loan Schedules) for each loan with a recalculated DTI…. I then calculate the average difference in DTI across all re-underwritten loans for the each Supporting Loan Group, and use this average to increase the reported DTI ratios for all loans in that Supporting Loan Group.").

[36] *Id.*, Torous Rebuttal Report, ¶¶ 56-57 and 62.

[37] *Id.*, ¶¶ 57-58. Torous calculates damages for the "as-disclosed" scenario using both his Industry Benchmark and the Butler Benchmark. *Id.*, ¶ 60.

[38] *Id.* at ¶ 55.

[39] *Id.* ¶ 55.

adjusted damages. This approach "combines information from [his] loan benchmarking analysis with the [Andrew Davidson & Company ("ADCo")] valuation model."[40] Torous "uses the results of [his] loan-level benchmarking models to generate performance vectors for default, prepayment, and loss severity for those certificates where the actual default performance of a supporting loan group is worse than the expected performance based on borrower and loan characteristics and macroeconomic conditions."[41]

According to Torous, the first step is to "calibrate" or "tune" the ADCo model, but he does not explain precisely his method for doing so, nor does he explain how his method of calibrating the ADCo model can be tested or is reliable.  It appears that Torous "tunes" the ADCo model so that the ADCo model's output is "calibrate[d]" to match the "At-Issue Certificate's historical performance."[42]  It is unclear, however, if Torous tuned the ADCo model so that its forecasted performance matched the historical performance at the SLG-level or the Certificate-level.  It is also unclear if Torous tuned the ADCo model based on the remaining SLG pool balance and cumulative realized losses, or the Certificate balance and cumulative realized losses, or some combination of the above.

Torous then uses the ratio between the "as alleged" and "as disclosed" performance vectors to recalibrate the ADCo model, and in turn to generate the values and cash flows for the Certificates under the "as disclosed" scenario.[43] This ratio of "as disclosed" to "as alleged" performance vectors "is a *key input* for [Torous's] modeling of the At-Issue Certificates."[44]  The difference in values and

---

[40] *Id.* at ¶ 57.

[41] *Id.*

[42] *Id.* at B-6

[43] *Id.*, ¶¶ 63-64

[44] *Id.*, ¶ 63.

cash flows between the "as alleged" scenario and the "as disclosed" scenario based on the Torous's tuned ADCo model constitute Torous's purported loss-causation adjusted damages.

Torous does not cite any ADCo document or publication that recommends or approves his process of "tuning" the ADCo model. Torous also does not explain whether the method he used to tune the ADCo model is testable or has been tested; whether there exist standards for how the ADCo model should be tuned; or whether the method he uses to tune the model is generally accepted (or accepted at all) by mortgage-market professionals, regulators, academics, or any other professionals in his field of expertise.

As NCUA's damages expert John Finnerty demonstrates in his reply report, Torous's "tuning" of the ADCo model, which purportedly is calibrated such that the historical actual performance of the SLG and the Certificate is the same as the ADCo model's forecasted performance at the time the security was issued, the "tuned" model in fact provides substantial deviations in both outstanding balances and cumulative realized losses at both the SLG-level and the Certificate-level than is predicted by the "tuned" model.[45] At the Certificate level, Torous's "tuned" model of forecasted Certificate balances and realized losses deviates from actual Certificate balances and realized losses significantly, with errors reaching a magnitude exceeding 100%.[46] At the SLG level, Torous's "tuned" ADCo model deviates from SLG balances and realized losses by as much as 17%.[47] Thus, Torous's "tuned" ADCo model in fact contains significant forecast error in the actual performance of an SLG or Certificate that reveals inherent limitations in its predictive value.

---

[45] **Exhibit 6**, Expert Rebuttal Report of John D. Finnerty ("Finnerty Rebuttal"), ¶¶ 90-94, Exhibit G1.

[46] *Id.*

[47] *Id.*

## LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Under Rule 702, expert testimony is admissible only if it (1) "will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "is based on sufficient facts or data"; (3) "is the product of reliable principles and methods"; and (4) "reliably applie[s] the principles and methods to the facts of the case." "The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

To be admissible, expert testimony must be "relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). The Supreme Court has described the relevance consideration as one of "fit." *Id.* at 591. "A trial court must look at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it advances the purpose of aiding the trier of fact." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2004); *see also Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006) ("The touchstone of admissibility is helpfulness to the trier of fact."). "Even if an expert's proffered evidence is scientifically valid and follows appropriately reliable methodologies, it might not have sufficient bearing on the issue at hand to warrant a determination that it has relevant 'fit.'" *Bitler,* 400 F.3d at 1234.

Proffered expert testimony must also "rest[] on a reliable foundation." *Daubert*, 509 U.S. at 597. "Th[e] gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003). "All proffered expert testimony must be properly grounded, well-reasoned, and not speculative before it may be admitted." *First Specialty Ins. Corp. v. Ward N. Am. Holding, Inc.,* 2006 WL 6225115, at *1 (D. Kan. 2006). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to

14

admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

## ARGUMENT

1.   **The Court should exclude as irrelevant and unreliable the opinions proffered in Torous's initial report on loss causation.**

To establish a loss causation defense under Sections 11 and 12 of the Securities Act,[48] Defendants bear the "heavy burden" of demonstrating that "the depreciation in value of a plaintiff's [RMBS] resulted from factors other than the alleged material misstatement." *Hildes v. Arthur Anderson LLP*, 734 F.3d 854, 860 (9th Cir. 2013). The loss causation defenses under Sections 11 and 12 are "related to the tort law concept of proximate cause," and "are mirror images" of the loss causation showing required of plaintiffs in Section 10(b) cases. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 585-86 n.194 (S.D.N.Y. 2015). It is not enough for Defendants to merely point to other contributing causes; they must affirmatively establish that these other causes, and *not* anything related to the misrepresented or omitted facts, led to NCUA's losses. *Id.* at 585-86. To the extent there are multiple contributing causes, Defendants must disaggregate their impact by establishing the "ascertainable portion" of NCUA's losses caused by the misrepresented or omitted facts versus other factors. *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008); *In re Flag Telecomm. Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009); *Lattanzio v. Deloitte & Touche*, 476 F.3d 147, 158 (2d Cir. 2007).

Torous's proffered testimony does not "fit" the applicable loss causation standard and thus will not help the jury to assess the viability of the defense. *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.");

---

[48] The statutory language requires Defendants to prove that some portion of NCUA's recovery "represents other than the depreciation in value of the subject security resulting from" the misrepresentations or omissions. *See* 15 U.S.C. § 77*l*(b); 15 U.S.C. § 77k(e).

Fed. R. Evid. 401 (evidence is relevant only if "it has any tendency to make a fact more or less probable than it would be without the evidence"). At trial, NCUA will present its evidence on the re-underwriting of Sampled Loans to prove that its alleged material misrepresentations and omissions in fact existed. NCUA will also present expert testimony establishing the damages it is entitled to recover under Sections 11 and 12. Defendants propose to then present Torous's testimony on their affirmative defense of loss causation, where they must establish that all or some identified portion of NCUA's losses was caused specifically by something other than the alleged misrepresentations and omissions. The testimony proffered in Torous's initial report does not reliably speak to loss causation for two independent reasons.

### A. Torous cannot establish that his benchmarks are free of the misrepresentations and omissions alleged.

*First*, Torous's comparative analyses are based on tainted benchmarks. The lynchpin of Torous's analysis is that the benchmarks do not contain defective loans. "It is axiomatic that, when designing an experiment to test whether an observed result was caused by a given variable, the control or benchmark group must lack that variable. That is the whole point of a control group." *Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489, at *5 (S.D.N.Y. Feb. 10, 2015). "The idea is so fundamental that, unsurprisingly, there are few cases in which a court has been forced to exclude an expert study because the expert was unable to demonstrate that the control group lacked the very variable requiring isolation." *Id.* (collecting cases).

Here, as Judge Cote noted in excluding a materially similar expert analysis on loss causation, "it is difficult to feel confident about the cleanliness of any untested group of loans" because "the problems that allegedly plagued the loans in the SLGs at issue—such as noncompliance with underwriting guidelines and inflated appraisals—seem to have been widespread in the residential lending market during the relevant period." *Nomura*, 2015 WL 539489, at *6. And litigation regarding

16

these defects has been so prevalent that Torous removed approximately 90% of the loans in Torous's Industry Benchmark to create his Reduced Industry Benchmark.[49] That litigation has resulted in settlements or judgments totaling at least $89 billion.[50]

Indeed, academic studies establish that loans in the Industry Benchmark and Reduced Industry Benchmark contain underwriting defects and other misrepresentations about the credit risk of the loans.[51] For example, Piskorski, Seru & Witkin (2013) found "a significant degree of misrepresentation of collateral quality across non-agency RMBS pools," and concluded that "a significant degree of misrepresentation exists across all" underwriters in their sample.[52] Similarly, Demyank & Van Hemert (2011) analyzed subprime first-lien mortgages and adjusted their performance for differences in loan characteristics and macroeconomic conditions, finding that "these characteristics … cannot explain the unusually weak performance of the vintage 2006 and 2007 loans," and that "the poor performance of the vintage 2006 and 2007 loans was not confined to a particular segment of the subprime market."[53] Likewise, Griffin & Maturana (2013) studied misrepresentations in securitized non-agency loans from 2002 to 2007 and concluded that there were significant misreporting with respect to second liens (10.2%), owner-occupied status (7.7%), and inflated appraisals (17.8%).[54]

---

[49] **Exhibit 8**, Saunders Report, ¶ 41.

[50] *Id.*

[51] *Id.*, ¶¶ 33-40.

[52] **Exhibit 10**, Tomasz Piskorski, Amit Seru and James Witkin, "Asset Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market," Columbia Business School Research Paper No. 13-7, at 3 (February 12, 2013).

[53] **Exhibit 11**, Yuliya Demyanyk & Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," 24 The Review of Financial Studies (2011) 1848-1880.

[54] **Exhibit 12**, John M. Griffin and Gonzalo Maturana, "Who Facilitated Misreporting in Securitized Loans?" (December 20, 2013).

Despite the plain risk of using tainted control groups, Torous made no effort to test (*e.g.*, by re-underwriting loans) whether his Industry Benchmark or Reduced Industry Benchmark are tainted. Torous admits that he "ha[s] no idea" how many defective loans there are in his benchmarks. "There may be a few, there may be more than a few."[55] Rather, Torous's sole effort to remove defective loans was to create the Reduced Industry Benchmark by removing loans from the Industry Benchmark that had been the subject of litigation. However, "[e]xcluding loans that have been the subject of lawsuits may be a good start for creating a clean benchmark, but it does little to ensure the quality of the loans remaining in the group." *Nomura*, 2015 WL 539489, at *7. Torous presents no reason to believe that the fact an RMBS has not been the subject of a lawsuit means the underlying loans were clean as opposed to a countervailing consideration against bringing suit (*e.g.*, the statute of limitations). Indeed, there is ample reason to suspect the loans in the Reduced Industry Benchmark are not clean. Approximately 99% of the loans in the Reduced Industry Benchmark came from the same originators that originated loans in RMBS that have been subject to litigation.[56]

Absent untainted control groups, Torous can draw no reliable conclusions that factors unrelated to defective loans caused the losses suffered by U.S. Central. *See Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2004) ("[W]hen the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion."); *c.f. Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

---

[55] **Exhibit 2**, Torous Dep. at 137:10-17; 138:15-22; 139:9-14.

[56] **Exhibit 8**, Saunders Rebuttal, ¶ 43.

**B. Torous unjustifiably assumes that changes in housing prices were completely unrelated to Defendants' misrepresentations and omissions.**

Torous's regression analyses assumed that changes in macroeconomic factors (such as housing prices) were "exogenous" to his model – that is, completely unrelated to Defendants' misrepresentations and omissions.[57] But there is substantial evidence that the securitization of loans to unqualified borrowers contributed to both the housing bubble and the ensuing housing price declines that occurred after the Certificates were issued. For example, the Financial Crisis Inquiry Report published by the U.S. Financial Crisis Inquiry Commission[58] "notes links between the shoddy origination practices concealed by the misrepresentations in the Prospectus Supplements and the market-wide factors on which defendants blame the losses." *Fed. Housing Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 586-87 (S.D.N.Y. 2015). According to the Report:

> As defaults and losses on the insured mortgages have been increasing, the [private mortgage insurance ("PMI")] companies have seen a spike in claims. As of October 2010, the seven largest PMI companies, which share 98% of the market, had rejected about 25% of the claims (or $6 billion of $24 billion) brought to them, because of *violations of origination guidelines, improper employment and income reporting, and issues with property valuation.*

*Id.* (emphasis in original). As Judge Cote has explained, "shoddy origination practices contributed to the housing bubble, and were among the factors that contributed to the economic collapse that followed when that bubble burst." *Id.* NCUA's expert Dr. James Barth explains that:

> [T]he decline in housing prices, the financial crisis, the recession, and the subsequent increases in unemployment rates were not exogenous causes of the increases in defaults and delinquencies that occurred after the At-Issue Certificates were issued. Rather, the Alleged Underwriting and Disclosure Defects facilitated an increase in the supply of credit to unqualified borrowers, which contributed to an unsustainable housing price bubble, and exacerbated the magnitude of the housing price declines

---

[57] **Exhibit 1**, Torous Report, ¶¶ 115-120 (treating both macroeconomic conditions and loan characteristics as independent variables and no description of attempting to isolate or test the effect of the misrepresentations on his other independent variables).

[58] Available at http://fcic-static.law.stanford.edu/cdn_media/fcic-reports/fcic_final_report_full.pdf (last visited March 21, 2016).

that occurred when the bubble burst.[59]

Moreover, quoting academic research, Barth explains that a securitization-fueled expansion of

subprime credit can accelerate both housing price increases and housing price declines:

> "a credit expansion [can] amplify the price cycle, initially increasing prices from the positive demand shock as the pool of potential buyers grows," but "the decrease in average borrower quality from the credit expansion could eventually lead to an increase in defaults, accelerating price declines." In other words, "the expansion of subprime credit may be an omitted variable that directly affects both defaults (by decreasing the quality of the marginal subprime borrower) and prices, potentially leading to a spurious estimated relationship between prices and defaults." Palmer performs an empirical analysis and a statistical test "confirming that price changes are endogenous."[60]

Torous's failure to even test, much less account for, the effect of NCUA's alleged

misrepresentations or omissions on the macroeconomic variables included in his analyses renders

his analyses unreliable and inadmissible. *See* 29 Wright & Gold § 6268 ("Included in the analysis

under Rule 702(b) should be whether the expert ignored a significant portion of seemingly

important data."); *Nebraska Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir.

2005) (holding that "an expert opinion that fails to consider the relevant facts of the case is

fundamentally unsupported" and excluding expert opinion where the expert's "calculation of future

damages failed to take into account a plethora of specific facts."); *In re Rezulin Products Liab. Litig.*,

369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) (excluding experts' opinions where the experts ignored

information contrary to their theory and collecting other cases where courts have excluded expert

opinions "where the expert selectively chose his support from the scientific landscape"). *See also*

Federal Judicial Center, *Reference Manual on Scientific Evidence* 314 (3d ed. 2011) ("Failure to include a

---

[59] **Exhibit 9**, Rebuttal Report of James Barth ("Barth Rebuttal"), ¶ 40.

[60] *Id.* at ¶ 30. For further detail, *see Id.* at ¶¶ 14-27 (the alleged underwriting and disclosure defects contributed to the housing price bubble and the housing price decline that occurred when the bubble burst), ¶¶ 28-30 (the alleged underwriting and disclosure defects facilitated loans to unqualified borrowers who were more likely to default when housing prices declined), and ¶¶ 31-40 (the housing crisis triggered a financial crisis and a severe recession).

major explanatory variable that is correlated with the variable of interest in a regression model may cause an included variable to be credited with an effect that actually is caused by the excluded variable."); *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999) (regression analyses are inadmissible where they omit major variables).

*          *          *

Torous is a well-credentialed witness who intends to present a highly complex econometric analysis based on unreliable methods and assumptions. *C.f. Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."). As the gate-keeper charged with keeping unreliable—but nevertheless potentially influential—expert testimony away from the jury, the Court should exclude Torous's loss causation analysis in its entirety. *See id.* (in "assessing the proffer of expert testimony under Rule 702," judges "should also be mindful" of Rule 403, which "permits the exclusion of relevant evidence 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury'").

## 2.    The Court should also exclude the opinions proffered in Torous's rebuttal report on re-underwriting and damages.

The opinions Torous offers in his rebuttal report are also unreliable and should be excluded.

### A.    Torous has not established that the Butler Benchmark is not tainted by misrepresentations or omissions.

As with his other benchmarks, Torous cannot establish that the loans in the Butler Benchmark are free from the types of defects NCUA alleges. Torous implicitly assumes that, if Butler determined a loan is not Materially Misrepresented, it is free from defects.[61] That assumption

---

[61] **Exhibit** 4, Torous Rebuttal Report, ¶ 48 ("I accept Mr. Butler's conclusion that any alleged misrepresentations in these loans are not material and therefore assume they will not bias the results of my loan benchmarking analysis.").

is unwarranted for three reasons. *First*, Butler offered an opinion that certain loans were Materially Misrepresented solely based on the documents available to him, and he "offered no opinion on the other Sampled Loans other than to say that [he] could not conclude, based on a totality of the circumstances, that the findings associated with those loans establish a materially increased credit risk above what was represented."[62] *Second*, as Butler explained in his report, he did not attempt to find all types of defects in his analysis. For example, he generally did not search for defects relating to faulty appraisals of the property or to non-compliance with lending laws.[63] *Third*, Butler took a conservative approach to his re-underwriting and did not classify many loans as Materially Misrepresented despite defects for those loans. Indeed, Butler found evidence of underwriting defects and misrepresented loan characteristics in "virtually all of the loan files" he reviewed.[64] For these reasons, "the fact that a loan was not placed by a reunderwriting expert into the 'materially noncompliant' category does not, of necessity, mean that the reunderwriting expert concluded that the loan was 'materially compliant.'" *Nomura*, 2015 WL 539489, at *9 (excluding expert loss causation analysis in part on the same grounds).

Torous could have resolved this fundamental problem with his analysis by engaging – either himself or through RBS, Nomura, or NovaStar – reunderwriters to establish a clean set of benchmark loans for his analyses. These reunderwriters "may have been able to make the affirmative representations that [NCUA's] experts are unwilling to make about the positive quality of a subset of [loans]. Had [Torous, RBS, Nomura, or NovaStar] done so, the reliability of the conclusions drawn by [those reunderwriters] on the absence of reunderwriting defects, and the admissibility of their testimony generally under Rule 702, could have been tested." But Torous and Defendants chose not

---

[62] **Exhibit 2**, Butler Report, ¶ 177.

[63] *Id.*, ¶¶ 96-97.

[64] *Id.*, ¶ 174.

to do so, and that dooms Torous's analysis. *Nomura*, 2015 WL 539489, at *11; *see Fanning v. Sitton Motor Lines, Inc.*, 2010 WL 4261476, at *7 (D. Kan. Mar. 10, 2010) ("[T]o satisfy the strictures of *Daubert,* an expert may not base his or her testimony upon assumptions that are not supported by the evidence."); *Astra Aktiebolag v. Andrx Pharm., Inc.,* 222 F. Supp.2d 423, 488 (S.D.N.Y. 2002) (expert "analysis … premised upon a faulty assumption … may be excluded for lack of probative value").

### B.  ADCo Model

Equally unvalidated is Torous's trial-and-error method of fine-tuning the ADCo model, which is a "key input" of Torous's loss-causation adjusted damages. Torous describes the "tuning parameters [that] are used to calibrate" the ADCo model as an "iterative" trial-and-error process.[65] But Torous wholly fails to establish that his "tuning" process is reliable—a pre-requisite to the altered model being reliable. Although Torous provides a variety of citations to ADCo documents and other sources of information about the ADCo model, he cites no ADCo document or publication that approves or validates his tuning process.[66] Torous likewise cannot establish that his tuning method is testable or has been tested; whether there are standards for how the ADCo model should be tuned; or whether his method has gained any acceptance among other professionals in his field of expertise. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("The objective of [these] requirement[s] . . . is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field."). Absent this foundation, it would be unreasonable to assume that Torous's manipulation of a commercial valuation model for litigation purposes produces reliable results.

---

[65] **Exhibit 4**, Torus Rebuttal Report, ¶ 63.

[66] *Id.*, footnotes to App'x B.

Moreover, the predictive value of Torous's "tuned" ADCo model is low. Torous purports to "tune" the ADCo model so that forecasted cash flows prior to the valuation date are representative of historical cash flows, and he appears to do so at both the SLG level and the Certificate level.[67] Dr. Finnerty demonstrates, however, that the resulting "tuned" ADCo model contains predictive errors when one compares the "calibrated" ADCo model forecast with the historical performance of either the SLG or the Certificate. That is, the calibrated ADCo model does not appear to actually do what Torous purports to use it for: forecast performance using the ADCo model that is (or would be) consistent with the SLG's and Certificate's actual performance.  For example, at the Certificate level, Torous's "tuned" ADCo model forecast Certificate balances and realized losses with deviations from the Certificates' actual balances and cumulative realized losses, with some deviations exceeding a magnitude of 100%.[68] At the SLG level, Torous's "tuned" ADCo model forecast pool balances and cumulative realized losses with deviations from the SLGs' actual pool balances and cumulative realized losses, with some differences as high as 17%.[69]

Therefore, Torous's "calibrated" ADCo model does not appear to do what he actually claims it does: reliably forecast at a point in time a Certificate's or SLG's outstanding balances and cumulative realized losses as a result of various factors. Because Torous's "tuned" ADCo model is incapable of reliably forecasting actual cash flows, it likewise is incapable of reliably forecasting the effect of other factors on the SLG's or Certificate's performance that are completely independent of the misrepresentations and omissions alleged completely independent.

---

[67] *Id.*, App'x B, Sec. D.

[68] **Exhibit 6**, Finnerty Rebuttal, ¶¶ 90-94, Exhibit G1.

[69] *Id.*

## C. DTI Models

Torous's opinion that the DTI misrepresentations found by Butler did not impact loan performance should be excluded for the same reasons as his other analyses. The DTI models rely on tainted benchmarks.

In addition, Torous's DTI models are independently unreliable because they misapply Butler's DTI findings to the SLGs. Because Butler reviewed only a sample of loans, Torous did not – and could not – test the impact of Butler's *actual* DTI's findings. Instead, Torous "averaged" or "smoothed" the DTI misrepresentations in the sample of loans to the entire SLG. That is, he computed the average DTI misrepresentation for the sample of loans and applied that average misrepresentation to each loan in the SLG.

That distorts Butler's DTI findings. There is a substantial difference between a relatively small number of loans with extremely high DTI ratios, and a much larger number of loans with only slightly higher DTI ratios. The relationship between an increase in DTI ratio and the probability of default is not linear: the higher the overall DTI ratio, the greater the impact of a particular percentage point increase in the DTI ratio. *See, e.g.,* **Exhibit 13**, W. Archer and B. Smith, Residential Mortgage Default: The Roles of House Price Volatility, Euphoria and the Borrower's Put Option, Fed. Reserve Bank of Richmond Working Paper No. 10-02, at 10 (Feb. 2010) ("Residential Mortgage Default") ("The DTI is likely to be nonlinear in relation to default. Specifically, we would expect its effect to be nil at low levels, and to be increasingly significantly as the ratio rises above some threshold."). Put another way, Butler's findings showed that a certain percentage of loans had their DTI drastically misrepresented and were almost certain to default. Torous, however, did not model a similar percentage of loans in the SLG with drastic DTI misrepresentations and a high likelihood of default; he "smoothed" those discrepancies over the entire SLG, making each loan only slightly more likely to default. Torous offers no justification for this approach. Because Torous

25

did not apply his Model "to the facts of the case" (i.e., Butler's *actual* DTI findings) his analysis cannot possibly "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

## CONCLUSION

The Court should exclude as irrelevant and unreliable Torous's opinions proffered in both his initial and rebuttal expert reports. Torous's opinions on loss causation fail to control for the variable most critical to the defense: NCUA's alleged misrepresentations and omissions. Torous's opinions are thus irrevocably tainted by his use of polluted benchmarks that cannot act as reliable control groups, and his "calibrated" ADCo model is unproven and unreliable. Allowing Torous to testify on these subjects would not help the jury to evaluate reliably whether Defendants have met their burden of proof on the loss causation defense.

Dated:  March 22, 2016

Respectfully Submitted,

By:   /s/ /Steven M. Berezney

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone:  (312) 641-9760
Fax:  (312) 641-9751
gzelcs@koreintillery.com

Stephen M. Tillery
Steven M. Berezney (D. Kan. #78424)
Michael E. Klenov
John C. Craig
Randall P. Ewing, Jr.
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Telephone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com
sberezney@koreintillery.com
mklenov@koreintillery.com
jcraig@koreintillery.com
rewing@koreintillery.com

Greg G. Gutzler (D. Kan. # 78425)
Tamara M. Spicer (D. Kan. # 78426)
ELIAS GUTZLER SPICER LLC
1924 Chouteau Ave., Suite W
St. Louis, MO 63103
Phone: (314) 833-6645
Fax: (314) 621-7607
ggutzler@egslitigation.com
tspicer@egslitigation.com

Norman E. Siegel (D. Kan. #70354)
Rachel E. Schwartz (Kan. #21782)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:  (816) 714-7100
Fax:  (816) 714-7101
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

David C. Frederick
Wan J. Kim
Mark C. Hansen
Joseph S. Hall
Scott K. Attaway
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD,
   EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone:  (202) 326-7900
Fax:  (202) 326-7999
dfrederick@khhte.com
wkim@khhte.com
mhansen@khhte.com
jhall@khhte.com
sattaway@khhte.com
ashen@khhte.com

*Counsel for the National Credit Union Administration Board*

27

## CERTIFICATE OF SERVICE

I hereby certify that, on March 22, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record. I also certify that a copy of the foregoing is being delivered on today's date to all counsel of record via electronic mail.

/s/ Steven M. Berezney

*Attorney for Plaintiff*

28