# FILED UNDER SEAL

# Exhibit 1

CONFIDENTIAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | Case No. 11-cv-5887 GW (JEM) |
| Plaintiff, | Judge George H. Wu |
| v. | |
| RBS SECURITIES INC., *et al.,* | |
| Defendants. | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | Case No. 11-cv-2340 JWL (JPO) |
| Plaintiff, | Judge John W. Lungstrum |
| v. | |
| RBS SECURITIES INC., *et al.,* | |
| Defendants. | |

## EXPERT REPORT OF WALTER TOROUS, PH.D.

### August 14, 2015

CONFIDENTIAL

# TABLE OF CONTENTS

I.    Qualifications .................................................................................................................. 1

II.   Background Information and Assignment ...................................................................... 2

    A.    Case Background ..................................................................................................... 2

    B.    Assignment .............................................................................................................. 4

III.  Summary of Opinions ................................................................................................... 5

    A.    Macroeconomic Environment ................................................................................. 5

    B.    Factors Impacting the Performance of At-Issue Loans ......................................... 7

        1.    Loan-level Benchmarking ............................................................................. 8

        2.    Impact of Declining Macroeconomic Conditions ....................................... 12

IV.   Overview of the Securitization Process ...................................................................... 14

    A.    Structure of Mortgage-Backed Securities ............................................................ 14

    B.    Overview of At-Issue Certificates and Supporting Loan Groups ......................... 16

V.    Overview of the U.S. Housing Market and Mortgage Industry .................................. 18

    A.    Growth in U.S. Home Prices, Housing Starts, and Home Ownership Rates ......... 18

    B.    Factors Contributing to the Growth in the Housing Market ................................. 19

        1.    Housing Policies .......................................................................................... 19

        2.    Monetary Policy ........................................................................................... 23

        3.    New Mortgage Products ............................................................................... 24

    C.    Decline in the Housing Market and the Economy ................................................ 28

VI.   Overview of the Factors that May Affect the Value of MBS Such as the At-Issue
      Certificates ................................................................................................................. 33

    A.    Loan Performance .................................................................................................. 34

        1.    Default and Recovery Rates ......................................................................... 34

        2.    Prepayments ................................................................................................. 48

    B.    Credit Enhancement .............................................................................................. 50

    C.    Market, Liquidity, and Other Risks ...................................................................... 52

        1.    Market Risk .................................................................................................. 52

        2.    Illiquidity ..................................................................................................... 53

VII.  Evaluation of the Performance of the Supporting Loan Groups Relative to
      Benchmarks ................................................................................................................ 56

    A.    Analysis of Actual and Expected DASD Using the Default Model ...................... 58

    B.    Analysis of Actual and Expected Losses Using the Loss Severity Model ............ 63

CONFIDENTIAL

C.    Results of Analysis of Actual and Expected Performance Using the Default Model ........................................................................................................... 66

    1.    Industry Benchmark........................................................................................ 66

    2.    Reduced Industry Benchmark........................................................................ 68

VIII. Evaluation of the Impact of Macroeconomic Conditions on the Supporting Loan Groups ........................................................................................................................ 70

IX.   Conclusions .................................................................................................................. 72

Appendix A: Curriculum Vitae ................................................................................... A-1

Appendix B: List of Testimony in the Last Four Years ............................................ B-1

Appendix C: Documents and Data Considered ......................................................... C-1

Appendix D: Default Model ........................................................................................ D-1

Appendix E: Loss Severity Model .............................................................................. E-1

Appendix F: List of Offerings Subject to Litigation ................................................. F-1

CONFIDENTIAL

## I.    QUALIFICATIONS

1.    I, Walter Torous, am a Senior Lecturer at the Massachusetts Institute of Technology with a joint position at the Center for Real Estate and the Sloan School of Management.  I am also a Professor Emeritus and the former Lee and Seymour Graff Endowed Professor at the John E. Anderson School of Management at the University of California at Los Angeles.  I previously served as the Director of the Richard S. Ziman Real Estate Center at the Anderson School.  I received my Ph.D. degree in economics from the University of Pennsylvania in 1981.  I have taught courses in securitization and managerial finance at the master's level and empirical methods in finance at the doctoral level.

2.    My areas of research include real estate markets, mortgage financing generally, and mortgage-backed securities ("MBS").  I have published a number of articles and book chapters on the valuation and pricing of MBS and interest rate behavior, including articles on the effects of homeowner prepayment and default decisions on the valuation of residential mortgages and residential MBS ("RMBS").  I have also published articles investigating the valuation of commercial mortgages and the risk and return tradeoffs prevailing in the commercial real estate market.  My paper, "Commercial Office Space: Testing the Implications of Real Options Models with Competitive Interactions," which investigates the real options approach to valuing commercial real estate, was awarded the American Real Estate and Urban Economics Association's 2007 Edwin S. Mills Prize for Best Paper.  I am currently, or have been, the editor or associate editor of a number of finance and real estate finance journals, including the *Journal of Housing Economics*, the *Journal of Real Estate Finance and Economics*, and *Real Estate Economics*, the official publication of the American Real Estate and Urban Economics Association.

CONFIDENTIAL

3.   My complete curriculum vitae, which includes a list of my publications, is attached as **Appendix A** to this report.  **Appendix B** lists my testimony in the past four years.

## II.   BACKGROUND INFORMATION AND ASSIGNMENT

### A.    Case Background

4.   In its most recent complaint filed in the United States District Court for the Central District of California, the National Credit Union Administration Board ("NCUA" or "Plaintiff") as liquidating agent of Western Corporate Federal Credit Union ("WesCorp") claims that RBS Securities Inc., as underwriter, and RBS Acceptance Inc., as depositor (collectively, "RBS"), made "untrue statements of material fact or omitted to state material facts" in offering materials for 19 RMBS offerings in which WesCorp purchased 28 certificates (the "WesCorp At-Issue Certificates").[1]

5.   Likewise, in its most recent complaint filed in the United States District Court for the District of Kansas, the NCUA as liquidating agent of U.S. Central Federal Credit Union ("U.S. Central," and collectively with WesCorp, the "Credit Unions") claims that RBS Securities Inc., as underwriter, and RBS Acceptance Inc. and Financial Asset Securities Corporation, as depositors, made "untrue statements of material fact or omitted to state material facts" in offering materials for 20 RMBS offerings in which U.S. Central

---

[1]    Second Amended Complaint, *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, November 14, 2014 ("Second Amended California Complaint"), ¶3, Tables 1, 2.  I understand that two of these 28 certificates—WMLT 2006-ALT1 A3 (CUSIP 92978GAC3) and LUM 2007-1 II-A-3 (CUSIP 55028CAE5)—were dismissed with prejudice.  For purposes of this report, I include these dismissed certificates within the definition of the "WesCorp At-Issue Certificates," and include them where appropriate in the appendices and exhibits pertaining to the California Securitizations, as (a) another certificate issued as part of the WMLT 2006-ALT1 offering is at issue in the Kansas action and (b) two other certificates from the LUM 2007–1 offering (although backed by a separate Supporting Loan Group) are at issue in the California and Kansas actions.

CONFIDENTIAL

purchased 28 certificates (the "U.S. Central At-Issue Certificates," and collectively with the WesCorp At-Issue Certificates, the "At-Issue Certificates").[2]

6.   Specifically, NCUA alleges that "the Originators [of the mortgage loans underlying the At-Issue Certificates] had systematically abandoned the stated underwriting guidelines in the Offering Documents" and this led to the At-Issue Certificates being "significantly riskier than represented in the Offering Documents."[3]   In addition to statements concerning underwriting guidelines, the allegedly material misrepresentations also included information about the characteristics of the loans supporting the WesCorp At-Issue Certificates (the "WesCorp At-Issue Loans") and supporting the U.S. Central At-Issue Certificates (the "U.S. Central At-Issue Loans" and, collectively with the WesCorp At-Issue Loans, the "At-Issue Loans"), such as their loan-to-value ratios ("LTV"), and occupancy status.[4]   NCUA claims that "these untrue statements and omissions were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS. Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan."[5] NCUA is claiming damages under Sections 11 and Section 12(a)(2) of the Securities Act of 1933, the Kansas Blue Sky law, and/or the California Corporate Securities Law.[6]

---

[2]   Second Amended Complaint, *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, November 17, 2014 ("Second Amended Kansas Complaint"), ¶3, Tables 1, 2.

[3]   Second Amended Kansas Complaint, ¶7.

[4]   Second Amended Kansas Complaint, ¶¶7-8.

[5]   Second Amended Kansas Complaint, ¶8.

[6]   Second Amended Kansas Complaint, ¶9; Second Amended California Complaint, ¶12.

CONFIDENTIAL

### B.   Assignment

7.    I have been retained by RBS through Kirkland & Ellis LLP (RBS' counsel) in connection with these actions to:

- Provide an overview of the conditions in the U.S. residential real estate market, and the factors that contributed to the "housing boom" between 2000 and 2006 and the ensuing "housing bust";

- Provide an overview of the securitization process of MBS;

- Discuss factors that may affect the value of residential MBS;

- Describe the At-Issue Certificates, including the types of mortgage loans backing them;

- Assess the impact, if any, of declining macroeconomic conditions on the At-Issue Loans;

- Assess the impact, if any, that the allegedly misrepresented loan characteristics would have had on the performance of the At-Issue Loans; and

- Analyze the extent, if any, to which losses experienced on the Supporting Loan Groups were caused by factors other than the alleged misrepresentations.

8.    In working on this assignment, I have considered the documents and data listed in **Appendix C**.  I am being compensated in this matter at a rate of $800 per hour.  I have been assisted by others working under my direction and supervision.  I receive additional compensation based on their professional fees associated with my work on this matter. My compensation is not contingent upon the content of the opinions I form or the outcome of this case.

CONFIDENTIAL

III.   **SUMMARY OF OPINIONS**

   A.   **Macroeconomic Environment**

9.   Home prices in the United States, as measured by the REdex U.S. home price index,[7] rose substantially in the early- to mid-2000s, nearly doubling in value from January 2000 to July 2006, when prices peaked.  The "housing boom" was primarily driven by federal government policies and macroeconomic conditions that began before home prices peaked, including government policies designed to encourage homeownership and low interest rates.   Low unemployment, increased consumer confidence caused by macroeconomic growth, and the availability of new loan products to a wider spectrum of borrowers also prevailed during this time period.   Together, these factors led to a substantial increase in the demand for housing from 2000 to mid-2006, which, in turn, led to higher home prices.  This increase in housing demand fueled an unprecedented growth in the mortgage market.

10.   Beginning in mid-2006 and accelerating in 2007 and 2008, U.S. home prices experienced a substantial decline, falling over 25 percent nationwide from July 2006 to February 2012, with greater declines in some states such as California (where 52.8 percent of the properties securing the WesCorp At-Issue Loans and 41.7 percent of the properties securing the U.S. Central At-Issue Loans, weighted by original loan balance, were located), which experienced a nearly 42 percent decline in home prices during this period.  These declines were exacerbated by a variety of factors, including interest rate increases, and a near doubling of unemployment.

---

[7]   I rely on the REdex Square Index Library, which is a combination of the Case-Shiller and FHFA home price indices.  This dataset includes Home Price Indexes for all Metropolitan Statistical Areas (MSAs), states, and U.S. Census Divisions, plus the National Index.  FHFA indices are included for metro areas, states and U.S. Census Divisions that do not have available Case-Shiller Repeat Sale indices.

CONFIDENTIAL

11.     As home prices declined and macroeconomic conditions worsened, the number of mortgage loan defaults increased.  For many homeowners, declining home prices caused mortgage balances to exceed home values.  Such homeowners often were unable to, or chose not to, continue to make mortgage payments, and/or were unable to refinance their loans, resulting in higher-than-expected rates of default.

12.     According to the Complaints, WesCorp purchased the WesCorp At-Issue Certificates between November 22, 2005 and June 26, 2007, and U.S. Central purchased the U.S. Central At-Issue Certificates between February 14, 2006 and May 16, 2007, a span of time that includes the nationwide peak and start of the decline in home prices.  The ensuing deterioration of macroeconomic factors that left many borrowers across the country unable or unwilling to make payments on their mortgage debts was reflected in the performance of loans backing the At-Issue Certificates, as well as loans backing other certificates securitized at about the same time.  **Exhibits 15A to 15K** illustrate this point by showing the default percentages of the At-Issue Loans by state compared to that state's change in home prices between July 2006 and February 2012, the peak and trough of national home prices, respectively.  As the charts show, a clear correlation exists between the home price decline experienced in a state and the performance of the At-Issue Loans secured by properties in that state: the greater the decline in home prices experienced in a given state, the greater the weighted average default and serious delinquency rate (or "DASD")[8] of the At-Issue Loans located in that state.  For example, using the At-Issue Loans across all originators (*see* **Exhibit 15A**), Nevada home prices

---

[8]     In my report, I use "DASD" to refer to default and serious delinquency rates at the loan group level, and "likelihood of default and serious delinquency" to refer to the likelihood of default and serious delinquency at the loan level (*i.e.*, for At-Issue Loans and comparable loans).  Both DASD and the likelihood of default and serious delinquency include written-off loans, loans in bankruptcy, foreclosure, or real estate owned ("REO"), and loans that have been delinquent for more than 90 days as of the end of my analysis period (Jan. 2015).

CONFIDENTIAL

experienced the greatest state-wide decline between July 2006 and February 2012 (declining by 58.6 percent), while the weighted average DASD for all At-Issue Loans in Nevada was the highest among the At-Issue Loans (74.7 percent). Furthermore, **Exhibits 15B to 15K** show the results of this analysis for each of the top 10 originators of the At-Issue Loans. These results show that even among At-Issue Loans with the same originator, which would presumably have been originated according to similar underwriting practices, the performance of an At-Issue Loan is correlated with its corresponding state-wide declines in home prices.

### B. Factors Impacting the Performance of At-Issue Loans

13. Factors including *borrower characteristics* (*e.g.,* FICO score and whether or not the borrower occupies the subject property as his or her primary residence), *loan characteristics* (*e.g.,* loan type, documentation type, and loan purpose), and most importantly, *macroeconomic conditions* (*e.g.,* housing prices and unemployment), may affect mortgage loan performance. The value of MBS is affected not only by the performance of the underlying mortgage loans, but also by structural characteristics of the securities, such as credit enhancement, and market factors such as liquidity and market risk.

14. Beginning in late 2006 and throughout 2007, the risks associated with overall economic conditions, and with the unprecedented growth in the mortgage market, began to materialize. Home prices fell, unemployment rose, and defaults and serious delinquencies increased. While these risks were well understood in the marketplace, the severity of the financial crisis that ensued was unprecedented. The materialization of these risks, among others, significantly contributed to the defaults, and ultimately any losses, on the At-Issue Loans and the At-Issue Certificates.

CONFIDENTIAL

15.     I evaluate the factors impacting the performance of the At-Issue Loans in a number of ways.  First, I evaluate the extent, if any, to which the performance of the At-Issue Loans was potentially impacted by alleged misrepresentations of loan and borrower characteristics.  I then further examine the extent to which declining macroeconomic conditions explain the losses experienced by the At-Issue Loans.  I conduct these analyses to determine the extent to which the performance of the At-Issue Loans was due to factors unrelated to misrepresentations alleged by NCUA.  I was unable to conduct an analysis limited or related to the specific loans that NCUA may allege were not originated in accordance with originators' underwriting guidelines, as I understand that NCUA will not identify its determinations as to such loans until the date of the submission of this report.  I reserve the right to amend this report to conduct such analysis.

### 1.     Loan-level Benchmarking

16.     I evaluate NCUA's allegations regarding the impact of alleged misrepresentations of loan characteristics on the performance of the At-Issue Loans by comparing the actual performance of the At-Issue Loans to the performance of two groups of comparable loans (the "Benchmarks"), after controlling for differences in borrower and loan characteristics and changes in macroeconomic conditions.  Controlling for these differences allows me to establish a baseline level of loan performance that I use to evaluate the performance of the At-Issue Loans.

17.     Specifically, using the Benchmarks, I perform regression analyses to estimate the relation between loan performance (*e.g.,* the event of default and serious delinquency) and (a) loan and borrower characteristics at origination, and (b) changes in macroeconomic conditions.  Using the relations estimated from the Benchmarks, I determine how each

CONFIDENTIAL

At-Issue Loan should have performed (*i.e.,* its "expected performance") based on its original disclosed loan and borrower characteristics and changes in macroeconomic conditions.  I then compare this expected performance of the At-Issue Loans (the DASD) to the actual performance of the At-Issue Loans to assess whether the performance of the At-Issue Loans varied from the Benchmarks.

18.    I conduct this analysis because if the misrepresentations alleged by NCUA do exist and are material as NCUA claims, the actual performance of the At-Issue Loans should be statistically significantly worse than their expected performance based on the Benchmarks.  If the At-Issue Loans perform in line with the Benchmarks, however, I am able to conclude that the alleged misrepresentations either do not exist or did not affect the performance of the At-Issue Loans and, therefore, the performance of the At-Issue Certificates was due to macroeconomic conditions and loan and borrower characteristics that were disclosed to investors and unrelated to any alleged misrepresentations.

19.    For those Supporting Loan Groups whose actual performance is statistically significantly worse than their expected performance using the Benchmarks, I further evaluate the potential impact of NCUA's allegations by using an additional performance metric: loss severity (*i.e.,* the percentage of the original loan balance that is lost when loans are liquidated).    As with the evaluation of DASD, I use the Benchmarks to perform regression analyses to estimate the relation between loss severity, loan and borrower characteristics, and changes in macroeconomic conditions.  Using the relations estimated from the Benchmarks, I determine the expected loss severity for each At-Issue Loan underlying the underperforming Supporting Loan Groups based on its original disclosed loan and borrower characteristics and changes in macroeconomic conditions.  I calculate the dollar amount of expected losses by multiplying each At-Issue Loan's expected

CONFIDENTIAL

DASD with both its expected loss severity and original principal balance.  The expected losses for each At-Issue Loan are, in turn, used to calculate the expected total losses of the Supporting Loan Groups.  I then compare the expected total losses of each Supporting Loan Group (the product of expected DASD and expected loss severity) to its actual total losses.  Using this comparison, I am able to analyze the extent to which total losses experienced by the Supporting Loan Groups were explained by disclosed loan and borrower characteristics and macroeconomic conditions.

20.   My overall finding from these Benchmark analyses is that the performance of the At-Issue Loans is consistent with expected performance as calculated using the disclosed loan and borrower characteristics and changes in macroeconomic conditions.  Therefore, either the purported misrepresentations NCUA alleges concerning the At-Issue Certificates did not exist, or did not affect the performance of the At-Issue Loans and, therefore, the performance of the At-Issue Certificates was due to factors unrelated to any alleged misrepresentations.

21.   My first benchmark, the "**Industry Benchmark**," comprises comparable loans backing MBS that were securitized between 2005 and 2007.[9]  I find that 39 out of 41 Supporting Loan Groups[10] (associated with 96.3 percent of the original principal balance of all the Supporting Loan Groups) performed in line with the Industry Benchmark (*see* **Exhibit 19B**).  That is, for these Supporting Loan Groups, the actual DASD is not statistically significantly different from the expected DASD based on the Industry Benchmark.[11]

---

[9]   The Industry Benchmark is used to evaluate the performance of the At-Issue Loans relative to similar loans in the industry.  I rely on its results in conjunction with my other benchmark to evaluate NCUA's claims.

[10]   In my report, I define "Supporting Loan Groups" as the loan groups backing the At-Issue Certificates issued by the At-Issue Trusts.

[11]   Statistical significance is a commonly used and widely accepted statistical measure for determining whether a particular finding (e.g., whether actual DASD is higher than expected DASD) is likely or

Only two Supporting Loan Groups (associated with 3.7 percent of the original principal balance of all the Supporting Loan Groups) had actual DASD that were statistically significantly higher than expected. If the misrepresentations alleged by NCUA existed or had a significant impact on loan performance, one would expect to observe the actual performance of most or all of the Supporting Loan Groups to be statistically significantly worse than their expected performance. Furthermore, of those statistically significantly underperforming Supporting Loan Groups, the losses that are not explained by disclosed loan and borrower characteristics and macroeconomic conditions are relatively limited, and comprise just 7.4 percent of the original loan balance (*see* **Exhibit 19D**).

22.     My second benchmark, the "**Reduced Industry Benchmark**," comprises loans backing the Industry Benchmark but excluding all loans in offerings that are or were subject to known MBS litigation. I find that 37 out of 41 Supporting Loan Groups (associated with 93.5 percent of the original principal balance of all the Supporting Loan Groups) performed in line with the Reduced Industry Benchmark (*see* **Exhibit 20B**). That is, for these Supporting Loan Groups, the actual DASD is not statistically significantly different from the expected DASD based on the Reduced Industry Benchmark. Only four Supporting Loan Groups (associated with 6.5 percent of the original principal balance of all the Supporting Loan Groups) had actual DASD that were statistically significantly higher than expected. Furthermore, of those statistically significantly underperforming Supporting Loan Groups, the losses that are not explained by disclosed loan and borrower

---

unlikely to have occurred by chance. If the absolute value of the difference between actual and expected DASD is less than 1.96 standard deviations, I find that the difference is not statistically significant and that the Supporting Loan Groups did not under- or over-perform the Benchmarks in a meaningful way. 1.96 standard deviations is the threshold used to determine statistical significance at a 95 percent confidence level, which is the most commonly used level of statistical significance. *See e.g.,* Roy J. Epstein, "An Econometrics Primer for Lawyers," *Antitrust*, Vol. 25, No. 3 (Summer 2011), pp. 29-30. *See* **Appendix D**.

CONFIDENTIAL

characteristics and macroeconomic conditions are relatively limited and comprise just 7.1 percent of the original loan balance (*see* **Exhibit 20D**).

23.     In sum, the results of my two benchmarking analyses are consistent and support the overarching conclusion that the defaults and serious delinquencies experienced by the Supporting Loan Groups are explained by disclosed loan and borrower characteristics and macroeconomic conditions, and not alleged misstatements.

### 2.     Impact of Declining Macroeconomic Conditions

24.     I analyze the impact of declining macroeconomic conditions on the At-Issue Loans in two ways.  First, I use my Industry Benchmark to isolate and quantify the impact of the decline in home prices since 2007.  In this analysis, when calculating the expected performance of the At-Issue Loans, I replace the actual home price experience of each At-Issue Loan with the home price experience it would have had, had it been originated in the same month in 2002.  In other words, I use the period starting in 2002, which includes approximately four years of home price appreciation before the steep decline that began in 2006.  I leave all other characteristics of the loan and macroeconomic conditions, including interest rates, unemployment rates, and disclosed loan and borrower characteristics, unchanged.  I then apply the coefficients from my Industry Benchmark to calculate default rates that I would expect the Supporting Loan Groups to experience under these conditions.  By comparing this expected DASD calculated using the home price experience starting in 2002 against the expected DASD calculated using the actual home price experience, I am able to compare the impacts of the decline in home prices based on the timing of the decline.  **Exhibit 21** compares these two expected performances.  As shown in **Exhibit 21**, the expected DASD across all Supporting Loan Groups using the home price experience starting in 2002 is 57.6 percent lower than the

CONFIDENTIAL

expected DASD using actual housing prices.  This shows that if the At-Issue Loans had experienced a few years of housing price growth prior to the housing market decline, rather than experiencing a price decline relatively shortly after origination, the expected DASD would be reduced by 57.6 percent.  That is, the timing of the decline in home prices alone explains 57.6 percent of expected DASD.

25.    Second, I examine the impact that declining home prices had on the At-Issue Loans' LTV ratios.[12]  Specifically, I estimate the LTV ratio of the At-Issue Loans in default/serious delinquency in each month by adjusting the LTV ratio at origination by the change in home prices in that loan's Metropolitan Statistical Area ("MSA") (or state, if MSA information is unavailable) from the month of origination to the month the loan enters default/serious delinquency.  By doing so, I am able to measure the impact of declining macroeconomic conditions subsequent to securitization on the stated LTV at origination. **Exhibit 22** shows this weighted average home price-adjusted LTV for the At-Issue Loans in each month compared with their weighted average LTV at origination.  The weighted average home price-adjusted LTV exceeds the weighted average origination LTV by as much as 48.8 percentage points, and exceeded 100 percent (indicating the borrowers were underwater) for 64 months between November 2005 (date of the first default/serious delinquency) and January 2015.  These results illustrate the overwhelming impact of declining home prices on the LTV of the At-Issue Loans.

* * * * *

26.    My work in this matter is ongoing and I reserve the right to supplement my analysis should more information become available to me.  In the remainder of the report, I expand upon the summary of opinions above and provide the bases for them.

---

[12]    *See* **Appendix D** and the results of my benchmark regressions.

CONFIDENTIAL

## IV.   OVERVIEW OF THE SECURITIZATION PROCESS

### A.   Structure of Mortgage-Backed Securities

27.   "Securitization" refers to transactions in which assets that produce an income stream are pooled together and interests in those assets are sold to investors.[13]   Generally, income-producing financial assets are placed into a special-purpose vehicle, such as a trust, and the trust issues certificates to investors representing, among other things, interests in the payments received by the trust.   The underlying pool of assets for a residential MBS offering may include any number of first- or second-lien mortgage loans.[14]

28.   The earliest securitization transactions were structured as simple securities in which the payments from the underlying financial assets, in this case residential mortgages, were passed through the trust to the investors in the securities *pro rata* and no security holder had a superior claim on any of the payments relative to that of any other investor.   This simple structure had limitations.   For example, it did not provide securities that segregated risks (*e.g.,* prepayment or credit risks), and did not allow investors to select between principal and interest payments.   Therefore, new securitization structures, such as the senior-subordinate structure, were introduced to meet investor demand for distinct securities with different characteristics.   Further, in some cases, issuers created custom securities that met a specific investor's unique investment objectives, in collaboration with that investor (referred to as "reverse inquiry").[15]

---

[13]   Examples of other types of financial assets that are securitized include, among others, auto loans, student loans, and equipment leases.

[14]   First-lien mortgages provide the lender with the first claim on the proceeds of liquidation and second-lien mortgages provide the lender with the proceeds of liquidation only after the first-lien balance is paid. Anand K. Bhattacharya, Frank J. Fabozzi, and William S. Berliner, "An Overview of Mortgages and the Mortgage Market," *The Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed. (2006), p. 4.

[15]   Frank J. Fabozzi and Frank J. Jones, "The Primary and Secondary Bond Markets," *The Handbook of Fixed Income Securities*, McGraw-Hill 7th ed. (2005), p. 37; and Sunil Gangwani, "MBS Structuring: Concepts and Techniques," *The Securitization Conduit*, Vol. 1, No. 3 (1998), p. 26.

CONFIDENTIAL

29.    MBS offerings often include credit enhancements, which alter the credit profiles of the certificates in the offering.   Credit enhancements in residential MBS offerings are generally divided into two categories: internal credit enhancements and external credit enhancements.    Internal credit enhancements operate within the trust, typically determining the prioritization of cash flows and losses among the certificates.   Examples include the senior-subordinate structure itself, overcollateralization (where the amount of the collateral held by the trust exceeds the face value of the certificates), cross-collateralization (where cash flows from one group of loans supporting particular certificates can be used to enhance the cash flows to other certificates supported by another group of loans in the same offering), and excess spread (where excess cash after paying interest to investors and all other fees and expenses is allocated to a separate reserve account).[16]

30.    External credit enhancements originate outside of the trust and are typically agreements with third parties that provide additional protection for the certificates against losses. Examples include letters of credit (where a trust obtains a guarantee from a bank to reimburse losses up to a predetermined amount) and insurance on the underlying loans (where an insurer provides coverage for losses resulting from defaults and foreclosures, and which may also include "special-hazard" losses like earthquakes).[17]

---

[16]    Frank J. Fabozzi, "Credit Enhancements for Nonagency MBS Products," *The Handbook of Mortgage-Backed Securities*, McGraw Hill 6th ed. (2006), pp. 113-122.

[17]    Frank J. Fabozzi, "Credit Enhancements for Nonagency MBS Products," *The Handbook of Mortgage-Backed Securities*, McGraw Hill 6th ed. (2006), pp. 113-116.

CONFIDENTIAL

### B.   Overview of At-Issue Certificates and Supporting Loan Groups

31.   The 53 At-Issue Certificates are collectively backed by 41 Supporting Loan Groups of various types of mortgage loans.[18]  The earliest of the At-Issue Certificates (SVHE 2005-OPT4, Certificate M-2) was purchased (according to the Complaints) on November 22, 2005, while the latest of the At-Issue Certificates (HVMLT 2007-5, Certificates A-1B and A-1C) were purchased (according to the Complaints) on June 26, 2007.  The At-Issue Certificates (purchased by WesCorp and U.S. Central) had a combined original balance of $3.3 billion supported by approximately 46,000 Alt-A mortgage loans and approximately 86,000 Subprime loans.  **Exhibits 1A to 1C** describe the At-Issue Certificates, while **Exhibits 2A to 2C** provide the Supporting Loan Groups' average characteristics:

- The weighted average FICO score associated with the loans underlying each Supporting Loan Group ranges from 601 (NHEL 2006-5, Loan Group I) to 722 (LUM 2007-1, Loan Group I).

- The weighted average LTV ratio associated with the loans underlying each Supporting Loan Group ranges from 18.5 percent (RFMS2 2007-HSA2, Total Group) to 99.9 percent (FFML 2005-FFH4, Loan Group II).

- The majority of the loans in all 41 Supporting Loan Groups were made under some form of "limited documentation" program, including documentation programs called "no ratio," "stated income," "no income/no asset documentation," and "no documentation."

---

[18]   This includes WesCorp's purchase of 28 certificates collectively backed by 23 Supporting Loan Groups and U.S. Central's purchase of 28 certificates collectively backed by 25 Supporting Loan Groups. WesCorp and U.S. Central purchased securities associated with three common At-Issue Certificates and seven common Supporting Loan Groups.

CONFIDENTIAL

- The Prospectus Supplements for 14 of the Securitizations disclose that the Supporting Loan Groups consist primarily of adjustable rate mortgages that allow for negative amortization ("NEG AM") (*i.e.,* a loan principal balance that increases over time).

- 32 Supporting Loan Groups contain interest-only loans (ranging from two percent to 100 percent as a percentage of the original principal balance), which do not require the borrower to make monthly payments of principal for at least the first five years.

32.    As discussed in Section V below, U.S. home prices peaked in July 2006.  The loans across the 41 Supporting Loan Groups were primarily made to borrowers between 2005 and 2007.  More specifically, 13.0 percent, 75.8 percent, and 10.7 percent of loans by original loan balance were originated in 2005, 2006, and 2007 respectively.  The loans originated in these years were collateralized by homes either purchased or refinanced around the peak of home prices, and there was no significant opportunity for the properties to appreciate in value before price declines started.  Loans originated in prior years, by contrast, had experienced several years of double-digit home price growth, making them less vulnerable to home price declines.

33.    In addition, the Supporting Loan Groups were especially susceptible to negative macroeconomic changes because many of the At-Issue Loans were originated in states that ultimately experienced dramatic declines in their economies.  As seen in **Exhibit 2A**, approximately 60 percent of the loans weighted by original principal balance within the Supporting Loan Groups were originated in California, Florida, Arizona, or Nevada. These states suffered particularly steep declines in home prices and increases in unemployment.  For example, in California, the state with the highest concentration of

CONFIDENTIAL

loans within the Supporting Loan Groups,[19] home prices fell approximately 42 percent between July 2006 and February 2012.  The precipitous fall in home prices resulted in the weighted average DASD for all At-Issue Loans in California being among the highest of any state (53.6 percent).

34.  I describe these macroeconomic developments and their impact on the broader economy in greater depth in Section V.


## V.   OVERVIEW OF THE U.S. HOUSING MARKET AND MORTGAGE INDUSTRY

35.  In this section, I provide an overview of the evolution of the housing and mortgage market from the early 1990s.  The growth in the housing market from 2000 to mid-2006 was unprecedented, as was the subsequent decline, which was more severe than any decline in home prices since at least 1890.[20]  Below I describe the macroeconomic conditions at the time the At-Issue Certificates were created.

### A.   Growth in U.S. Home Prices, Housing Starts, and Home Ownership Rates

36.  As shown in **Exhibit 3**, U.S. home prices, as measured by the REdex U.S. home price index, increased steadily from 1990 through 2000.[21]  Starting around 2000, home prices began to increase at an accelerated rate.  Home prices nearly doubled in value from January 2000 to July 2006, when prices peaked.  As home prices increased, so too did annualized housing starts (*i.e.*, the number of single family residential properties on which construction has begun) in the United States, increasing by 60 percent from July 2000 to January 2006, as shown in **Exhibit 4**.

---

[19]   *See* **Exhibit 18**.

[20]   Robert J. Shiller, *Fig. 2.1*, http://www.econ.yale.edu/~shiller/data/Fig2-1.xls.

[21]   REdex home price index, available from CoreLogic.  The U.S. home price index I report here is the single-family index for the United States (index code USMD_0P).  These values are not seasonally adjusted.

CONFIDENTIAL

37.     Home ownership rates in the United States, which had been relatively flat at approximately 64 percent in the early 1990s, peaked at approximately 69 percent by late 2004 and early 2005, and remained above 67 percent through late 2007.[22]

**B.      Factors Contributing to the Growth in the Housing Market**

38.     A variety of policy and macroeconomic factors led to the unprecedented growth in demand for housing between 2000 and mid-2006.  Among these factors were government policies, low mortgage rates, low unemployment, high consumer confidence, popularity of new mortgage products, and increased consumer willingness to spend and take on debt (including mortgage debt).  I describe these factors below.

**1.      Housing Policies**

39.     In the United States, home ownership has traditionally been viewed as a good long-term private and societal investment, and increasing home ownership has long been a national priority.  For example, Congress passed two acts in the 1970s designed to encourage banks to lend to low-income and minority households—the Community Reinvestment Act ("CRA") and the Home Mortgage Disclosure Act ("HMDA")—both of which remain in effect today.[23]  Such government actions are based on the belief that there is a national interest in promoting home ownership.  Home ownership is thought to encourage socially responsible behavior.  It is also considered part of the social safety net as it provides a means by which low-income households can build their wealth.

---

[22]    U.S. Census Bureau, Housing Vacancies and Homeownership (CPS/HVS), Table 14, Quarterly Homeownership Rates for the US and Regions: 1965 to Present, http://www.census.gov/housing/hvs/data/histtabs.html.

[23]    Board of Governors of the Federal Reserve System, "Community Reinvestment Act (CRA)," http://www.federalreserve.gov/communitydev/cra_about.htm; and Board of Governors of the Federal Reserve System, "The Home Mortgage Disclosure Act," http://www.federalreserve.gov/communitydev/hmda.htm.

CONFIDENTIAL

40.     Government policies designed to encourage home ownership continued into the 1990s and 2000s.   President Bill Clinton announced a National Homeownership Strategy in 1995 with the goal of increasing the home ownership rate to 67.5 percent by 2000.   In announcing the strategy, President Clinton noted that it was consistent with his overall "economic strategy," which "include[d] a commitment to work to provide decent, safe, affordable homes to all Americans and to do it with an alliance of the public and private sector."[24]   President Clinton also began a "Passport to Homeownership" project in 1999 with the goal of promoting homeownership through educating consumers about mortgage lending and "how to successfully navigate through the entire home loan process."[25]

41.     The George W. Bush administration continued to promote homeownership.   In 2002, President Bush announced a goal to increase the number of minority homeowners.[26]   In 2003, the American Dream Downpayment Initiative was enacted, which authorized down-payment and closing-cost assistance to low-income first-time homebuyers of up to $200 million each year from 2004 and 2008.[27]   The Bush Administration also proposed

---

[24]     William J. Clinton, "Remarks on the National Homeownership Strategy," The American Presidency Project. (June 5, 1995), http://www.presidency.ucsb.edu/ws/index.php?pid=51448.

[25]     Press Release, U.S. Department of Housing and Urban Development. "HUD and MBA Announce Passport to Homeownership Initiative to Educate Consumers about the Mortgage Lending Process," (Nov. 12, 1999), http://archives.hud.gov/news/1999/pr99-231.html.

[26]     Press Release, The White House. "President Hosts Conference on Minority Homeownership," (Oct. 15, 2002), http://georgewbush-whitehouse.archives.gov/news/releases/2002/10/20021015-7.html.

[27]     Press Release, The White House, "President Focuses on Home-Ownership in Radio Address," (June 15, 2002), http://georgewbush-whitehouse.archives.gov/news/releases/2002/06/20020615.html; American Dream Downpayment Act, U.S. Congress Report 108-164, (June 19, 2003), https://www.congress.gov/108/crpt/hrpt164/CRPT-108hrpt164.pdf.  According to the Joint Center for Political and Economic Studies, the Initiative "provided more than $98 million in assistance to 13,300 households" through the end of 2005.  Wilhelmina A. Leigh and Danielle Huff, "African Americans and Homeownership: Separate and Unequal, 1940 to 2006," *Joint Center for Political and Economic Studies*, (Nov. 2007), p. 6.

CONFIDENTIAL

the Single Family Affordable Housing Tax Credit, which provided funds to encourage the construction of affordable homes in areas where such housing was scarce.[28]

42.     Several features of federal tax policy also have encouraged homeownership.  By providing financial incentives to purchase a home, these tax benefits increase the demand for homes.  First, the Tax Reform Act of 1986 permitted taxpayers to continue to deduct interest on up to $1 million of primary mortgage debt and up to $100,000 of home equity debt on their tax returns each year but eliminated interest deductions on other types of consumer loans.  Second, whereas capital gains from the sale of other types of assets are taxable, up to $250,000 ($500,000 for married taxpayers filing jointly) of capital gains from the sale of a principal residence are not taxable.  Third, state and local property taxes are deductible from federal taxable income.  Fourth, homeowners are not required to pay taxes on the "imputed rent" they pay themselves, whereas landlords are required to treat rent as income.[29]

43.     In addition, government-sponsored enterprises ("GSEs") (*e.g.,* Fannie Mae and Freddie Mac), and the Federal Housing Administration ("FHA"), were established to, among other goals, channel capital into home mortgages, including by establishing specific

---

[28]     Press Release, U.S. Department of Housing and Urban Development, "HUD Announces Initiative to Focus on Reducing Regulatory Barriers," (June 10, 2003), http://archives.hud.gov/news/2003/pr03-069.cfm; Press Release, The White House, "President Hosts Conference on Minority Homeownership," (Oct. 15, 2002), http://georgewbush-whitehouse.archives.gov/news/releases/2002/10/20021015-7.html; Jo Becker, Sheryl Gay Stolberg, and Stephen Labaton, "White House Philosophy Stoked Mortgage Bonfire," *The New York Times*, (Dec. 21, 2008); Edwin Chen and James Gerstenzang, "Bush Campaign Promotes Great American Dream," *Los Angeles Times*, (June 16, 2002).

[29]     Tax Policy Center, "Home Ownership: What Are the Tax Benefits?" http://www.taxpolicycenter.org/briefing-book/key-elements/homeownership/encourage.cfm; Internal Revenue Service, Department of the Treasury, "Publication 936: Home Mortgage Interest Deduction," (Nov. 13, 2013); Souphala Chomsisengphet and Anthony Pennington-Cross, "The Evolution of the Subprime Mortgage Market," *Federal Reserve Bank of St. Louis Review*. 88(1) (2006), pp. 31, 38; Internal Revenue Service, "Publication 523: Selling Your Home," (Feb. 9, 2015); Gerald E. Auten, "Capital Gains Taxation," *NTA Encyclopedia of Taxation and Tax Policy*, Urban Institute Press, 2d ed., http://www.taxpolicycenter.org/taxtopics/encyclopedia/Capital-Gains-Taxation.cfm.

CONFIDENTIAL

targets for purchases of loans made to low- and moderate-income households.[30]   In particular, starting in 1993 and continuing through 2007, the Department of Housing and Urban Development ("HUD") set and increased specific targets for Fannie Mae and Freddie Mac to finance affordable housing.[31]   Between 1993 and 1995, Congress in the GSE Act set a goal for Fannie Mae and Freddie Mac to ensure that 30 percent of the mortgages they purchased each year were mortgages for low- and moderate-income families.[32]   In 1997, HUD increased the target to 42 percent, to 50 percent in 2001, and to 55 percent in 2007.[33]   As shown in **Exhibit 5**, Fannie Mae and Freddie Mac met or exceeded these targets through 2007.[34]   Fannie Mae's and Freddie Mac's pursuit of these

---

[30]   Federal Home Loan Banks ("FHLB") are also government-sponsored banks that provide funding for U.S. institutions to finance, among other things, home mortgage loans.  The FHLB system was started in 1932 and includes 11 cooperative banks responsible for select U.S. states and territories.  These institutions provide additional liquidity to the U.S. mortgage market through the purchase and sale of MBS. *See* Federal Home Loan Banks, "The FHLBanks: The Basics," http://www.fhlbanks.com/assets/june-0115-fhlbanks-the-basics.pdf; *see also* John L. von Seggern, "Proposed Rule—Liquidity Coverage Ratio: Liquidity Risk Measurement, Standards, and Monitoring," Letter to Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, and Board of Governors of the Federal Reserve System, (Jan. 31, 2014), http://www.federalreserve.gov/SECRS/2014/April/20140424/R-1466/R-1466_013114_111921_581554461007_1.pdf.

[31]   Affordable housing and other goals were mandated by the Federal Housing Enterprises Financial Safety and Soundness Act ("FHEFSSA"), signed by President George H. W. Bush in 1992.  12 U.S.C. § 4501 *et seq*.  In addition, as part of their dual charter, Fannie Mae and Freddie Mac were mandated to provide a secondary market for mortgages.

[32]   Ira G. Peppercorn, General Deputy Assistant Secretary for Housing, U.S. Department of Housing and Urban Development, Statement Before the House Subcommittee on Capital Markets, Securities and Government Sponsored Enterprises, Committee on Banking and Financial Services (July 30, 1998), http://archives.financialservices.house.gov/banking/73098hud.shtml.

[33]   Ira G. Peppercorn, General Deputy Assistant Secretary for Housing, U.S. Department of Housing and Urban Development, Statement Before the House Subcommittee on Capital Markets, Securities and Government Sponsored Enterprises, Committee on Banking and Financial Services (July 30, 1998), http://archives.financialservices.house.gov/banking/73098hud.shtml; U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "Overview of the GSEs' Housing Goal Performance, 1993-2001," (July, 2002); U.S. Department of Housing and Urban Development, Office of Policy Development and Research, "Overview of the GSEs' Housing Goal Performance, 2000-2007," (Nov., 2008).

[34]   Fannie Mae and Freddie Mac fell short of their low- and moderate-income housing goals for the first time in 2008.  The goal for 2008 was 56 percent.  Fannie Mae achieved 53.67 percent, and Freddie Mac achieved 51.48 percent.  FHFA, which was appointed as conservator of Fannie Mae and Freddie Mac, found that the low- and moderate-income housing goals for 2008 were "infeasible."  *See* Federal Housing Finance Agency, "2008 Housing Goal Performance for Fannie Mae and Freddie Mac,"

CONFIDENTIAL

targets was cited as a contributing factor to the gains that lower-income and minority families achieved in home ownership.[35]   Furthermore, Fannie Mae and Freddie Mac guaranteed securities collateralized by loans that conformed to their lending limits, which enabled the rapid expansion of the mortgage-backed securities market.

44.   Further, the FHA, a government agency established as part of the National Housing Act of 1934, insured loans with reduced down payment requirements.  During the 2000s, a borrower was allowed to obtain an FHA-insured mortgage loan of up to 97 percent of the appraised value of the home, and in certain circumstances, was able to finance up to 98.15 percent of the property's appraised value.[36]

### 2.   Monetary Policy

45.   In addition to these government initiatives, monetary policy also played a role in the housing boom beginning in the early 2000s.  Following the bursting of the Internet bubble and the attacks on September 11, 2001, the Federal Reserve dropped the federal funds rate to record lows.  The federal funds rate is a baseline interest rate that influences most lending activity, including mortgage lending.[37]   Both the federal funds rate and the interest rate on 30-year conventional fixed rate mortgages fell to then-historic lows in the early 2000s (see **Exhibit 6**), which encouraged refinancing and lending to all types of

---

http://www.fhfa.gov/PolicyProgramsResearch/Programs/AffordableHousing/Documents/Historical_Perf/2008_ENTERPRISE_HOUSING_GOAL_PERFORMANCE.pdf.

[35]   U.S. Department of Housing and Urban Development, "HUD's Affordable Lending Goals for Fannie Mae and Freddie Mac," Office of Policy Development and Research, Issue Brief No. V (Jan. 2001), pp. 5-6.

[36]   U.S. Department of Housing and Urban Development, "FHA Single-Family Mutual Mortgage Insurance Fund Programs," Quarterly Report to Congress, FY 2012 Q4 (2013), p. 21 and Ex. A-6.

[37]   "Changes in the federal funds rate trigger a chain of events that affect other short-term interest rates, foreign exchange rates, long-term interest rates, the amount of money and credit, and, ultimately, a range of economic variables, including employment, output, and prices of goods and services." Board of Governors of the Federal Reserve System, *Federal Open Market Committee*, http://www.federalreserve.gov/monetarypolicy/fomc.htm.

CONFIDENTIAL

borrowers.  In particular, these lower rates led to a significant increase in the amount of refinancing, particularly between Q4 2002 and Q3 2003 (*see* **Exhibit 7**).

46.    In this low interest rate environment, the economy began to expand.  The economy expanded at an annualized rate of about two percent in 2002 and continued to expand at an average of three percent annually through 2007, as shown in **Exhibit 8**.  As also shown in the exhibit, unemployment fell by nearly a third from a near-term peak of 6.3 percent in June 2003 to 4.4 percent in May 2007.[38]

47.    With the expanding economy and increasing value of homes, consumer confidence improved beginning in 2003.  The Consumer Confidence Index increased by almost 60 percent from March 2003 to July 2007, as shown in **Exhibit 9**.[39]  While consumer confidence did not return to its high levels of the late 1990s and 2000, its substantial improvement reflected consumers' willingness to spend and take on more debt.[40]

### 3.    New Mortgage Products

48.    **Exhibit 10** illustrates both the increase in residential mortgage originations from 1990 through 2003, when originations peaked at approximately $3.9 trillion, as well as changes in the composition of mortgage loan types.  Mortgage products can be distinguished broadly as traditional (also called conventional or conforming)[41] and non-traditional

---

[38]    Bureau of Labor Statistics, Labor Force Statistics including the National Unemployment Rate, http://www.bls.gov/data/#unemployment.

[39]    The Consumer Confidence Index ("CCI") is a monthly release from The Conference Board, a non-profit business group that is highly regarded by investors and the Federal Reserve.  CCI is a unique indicator, formed from survey results of more than 3,000 households and designed to gauge the relative financial health, spending power and confidence of the average consumer.  *See* The Conference Board, Consumer Confidence Survey, http://www.conference-board.org/data/consumerConfidence.cfm.

[40]    This increased willingness to spend may itself have been fueled by home price increases.  Belsky (2008) discusses the "wealth effects" of homeownership in detail.  Eric S. Belsky, "Housing Wealth Effects and the Course of the US Economy: Theory, Evidence, and Policy Implications," *Joint Center for Housing Studies, Harvard University*, Working Paper W08-7, (Nov. 2008).

[41]    "[C]onventional loans have no explicit guaranty from the federal government.  [They] can be securitized either as 'private label' structures or as pools guaranteed by the two government sponsored enterprises."

CONFIDENTIAL

products.  Non-traditional products include Home Equity Lines of Credit ("HELOCs"),[42]
Closed-End Second Liens ("CESL"),[43] Jumbo loans,[44] Alt-A products, Hybrid ARMs,[45]
Pay-Option ARMs,[46] and Subprime products.

49.    As shown in **Exhibit 10**, from 2000 to 2006, mortgage volume increased at a faster rate
for non-traditional products  (*e.g.,* subprime, Alt-A, Jumbo) than for traditional products;
the total value of Alt-A loans alone increased by 1,500 percent from 2000 to their peak in
2006, when they accounted for $400 billion in loans.

---

Frank J. Fabozzi, Anand K. Bhattacharya, and William S. Berliner, "Overview of Mortgages and the
Consumer Mortgage Market," *Mortgage-Backed Securities: Products, Structuring and Analytical
Techniques.* John Wiley & Sons, Inc. (2007), p. 10.  A conforming loan is one that adheres to the maximum
loan sizes for a 1-4 family home imposed by the Federal Housing Finance Board.  Anand K. Bhattacharya,
Frank J. Fabozzi, and William S. Berliner, "An Overview of Mortgages and the Mortgage Market," *The
Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed. (2006), pp. 7-8.

[42]    A HELOC is a revolving credit account similar to a credit card account.  These loans typically have a draw
period and a repayment period.  Borrowers do not necessarily draw down the entire available amount when
the line of credit is extended.  There may be a fixed period (*e.g.,* 10 years) over which borrowers pay back
both the principal balance and the interest.  Anand K. Bhattacharya, Frank J. Fabozzi, and William S.
Berliner, "An Overview of Mortgages and the Mortgage Market," *The Handbook of Mortgage-Backed
Securities*, McGraw-Hill 6th ed. (2006), p. 4; Federal Reserve Board, "What You Should Know About
Home Equity Lines of Credit," pp. 3-4.

[43]    Closed-End Second Liens are loans whose creditor has access to the proceeds of liquidation only when the
first-lien balance is extinguished, and whose proceeds are disbursed at origination and amortize over a
given term.   Anand K. Bhattacharya, Frank J. Fabozzi, and William S. Berliner, "An Overview of
Mortgages and the Mortgage Market," *The Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed.
(2006), p. 4.

[44]    Jumbo loans exceed the conforming size limit allowed by Fannie Mae and Freddie Mac but are considered
high credit quality. Frank J. Fabozzi, Anand K. Bhattacharya, and William S. Berliner, "Overview of
Mortgages and the Consumer Mortgage Market," *Mortgage-Backed Securities: Products, Structuring and
Analytical Techniques.* John Wiley & Sons, Inc. (2007), p. 11; Andrew Davidson, et al., "Non-Agency
Mortgage-Backed Securities," *Securitization: Structuring and Investment Analysis*, John Wiley & Sons,
Inc. (2003), p. 300.

[45]    ARM stands for adjustable rate mortgage, meaning a mortgage in which the interest rate may adjust at
certain points during the life of the loan.  Hybrid ARM loans have fixed initial interest rates that are
effective for a relatively long period (typically three to 10 years after funding).  After the initial fixed rate
period expires, the rate resets, bound by maximum change limits and a maximum rate.  Anand K.
Bhattacharya, Frank J. Fabozzi, and William S. Berliner, "An Overview of Mortgages and the Mortgage
Market," *The Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed. (2006), p. 8.

[46]    Also referred to as negative amortization loans, Pay-Option ARM loans allow borrowers to make payments
of less than the accrued interest, allowing the loan balance to increase over the term of the loan.  Frank J.
Fabozzi, Anand K. Bhattacharya, and William S. Berliner, "Prepayment Behavior and Performance,"
*Mortgage-Backed Securities: Products, Structuring and Analytical Techniques.* John Wiley & Sons, Inc.
(2007), p. 82.

CONFIDENTIAL

50.     While some of these non-traditional products, such as ARMs, jumbo loans, and HELOCs, were not new, they formed an increasingly large percentage of total originations. Moreover, lenders began designing and offering a number of variations of ARMs, including Hybrid ARMs, which fixed an introductory rate for a limited period of time, and Pay-Option ARMs, in which borrowers could choose how much to pay each month, and could potentially pay less than the accrued interest.  ARMs increased from eight percent of loan applications in 1998 to 36 percent in 2004 and remained at 28 percent or higher until mid-2006.[47]  Also, interest-only loans were created to allow borrowers to pay only the interest on a loan for a period of time, leaving the outstanding principal unchanged.    According to the Joint Center for Housing Studies, "nontraditional [mortgage] products saw meteoric growth . . . prime and non-prime loans with interest-only and payment-option features went from serving a fringe market to over 32 percent of all originations in 2006."[48]

51.     Among the changes that facilitated the increase in mortgage originations and the variety of product offerings was an industry-wide expansion of underwriting guidelines[49] and increased automation of the underwriting process.[50]  The principal drivers of the change in underwriting standards were: (1) a decline in lenders' perception of risk following an extended period of economic growth, home price appreciation, and historically low

---

[47]     Freddie Mac, Monthly Refi & ARM Shares, http://www.freddiemac.com/finance/refi_and_arm_monthly.html.

[48]     Joint Center for Housing Studies of Harvard University, "The State of the Nation's Housing: 2007," (2007), p. 16.

[49]     This expansion of underwriting guidelines refers to changing industry-wide underwriting standards that were disclosed to industry participants and investors in prospectuses and differs in nature from the alleged failure to follow stated underwriting guidelines that NCUA has articulated.

[50]     Mortgage Bankers Association, "Housing and Mortgage Markets: An Analysis," MBA Research Monograph Series No. 1 (Sept. 6, 2005), pp. 72-73; and Sumit Agarwal and Calvin Ho, "Comparing the Prime and Subprime Mortgage Markets," Chicago Fed Letter, Number 241, Federal Reserve Bank of Chicago, (Aug. 2007).

CONFIDENTIAL

default rates;[51] (2) RMBS investors' risk appetites; and (3) government initiatives encouraging home ownership which increased lenders' incentives to make riskier loans to previously underserved borrowers.[52]   Each year between 2005 and 2007, approximately one-quarter of the banks surveyed by the Office of the Comptroller of the Currency indicated that they had eased underwriting standards for residential mortgage lending,[53] at least in part to meet federally-mandated affordable lending goals.[54]

52.     The change in underwriting guidelines and proliferation of non-traditional products was pervasive and well-known.   A 2007 audit of FDIC-supervised lending institutions identified 30 institutions with "significant" involvement in non-traditional mortgage originations.[55]   The growth of non-traditional loans relative to conventional/conforming loans is illustrated in **Exhibit 10**, and has been documented in a number of sources.   A presentation to the Mortgage Bankers Association in May 2007 referred to the

---

[51]     Danielle DiMartino, et al., "From Complacency to Crisis: Financial Risk Taking in the Early 21st Century," *EconomicLetter: Insights from the Federal Reserve Bank of Dallas*, Vol. 2, No. 12 (Dec. 2007), pp. 2-3; Christopher L. Foote, et al., "Why Did So Many People Make So Many Ex Post Bad Decisions? The Causes of the Foreclosure Crisis," Federal Reserve Bank of Boston, Public Policy Discussion Papers, No. 12-2, (July 20, 2012), p. 18; Jan K. Brueckner, Paul S. Calem, and Leonard I. Nakamura, "Subprime mortgages and the housing bubble," *Journal of Urban Economics*, 71(2), (2012), pp. 230-231.

[52]     *See* Alan Greenspan, Chairman, Federal Reserve Board, Remarks before the Independent Community Bankers of America National Convention, San Antonio, Texas: Bank Regulation (March 11, 2005), http://www.federalreserve.gov/boarddocs/speeches/2005/20050311/default.htm; *see also* Joint Center for Housing Studies of Harvard University, "The State of the Nation's Housing: 2007," (2007), p. 16; Joint Center for Housing Studies of Harvard University, "The State of the Nation's Housing: 2005," (2005), pp. 16-17; Joint Center for Housing Studies of Harvard University, "The State of the Nation's Housing: 2006," (2006), p. 18.

[53]     The percentage of respondents that eased residential mortgage underwriting standards was 22 percent in 2005, 26 percent in 2006, and 19 percent in 2007.  Office of the Comptroller of the Currency, "Survey of Credit Underwriting Practices 2007," (Oct. 2007), p. 42.

[54]     *See* Office of the Comptroller of the Currency, "Survey of Credit Underwriting Practices 2005," (2005), p. 5; Office of the Comptroller of the Currency, "Survey of Credit Underwriting Practices 2006," (2006), p. 6; Office of the Comptroller of the Currency, "Survey of Credit Underwriting Practices 2007," (2007), p.5.

[55]     The FDIC audit describes these firms as large firms with high origination volumes, significant balance sheet exposure to non-traditional mortgage products, and significant levels of non-traditional mortgage loan origination and holdings relative to their Tier 1 Capital.  Office of the Inspector General, "Implementation of FDIC's Supervisory Guidance for Nontraditional Mortgage Products," Report No. AUD-08-009 (March 2008), http://www.fdicoig.gov/reports08/08-009-508.shtml.

"deteriorat[ion]" of collateral, including increased LTV ratios for adjustable- and fixed-rate loans over the previous five years.[56] Goldman Sachs also cited the increase in LTV ratios for subprime loans in a comparison of 1998 and 2005 vintage loans.[57] The data required to identify these trends were publicly available from various sources, such as Bloomberg, EDGAR, and LoanPerformance.[58]

### C.      Decline in the Housing Market and the Economy

53.     As mentioned above, U.S. home prices, as measured by the REdex U.S. home price index, peaked in July 2006.  With the increase in home prices throughout the United States, however, many potential buyers could no longer afford homes.  In fact, by July 2006, home affordability reached its lowest level since at least 1990 (*see* **Exhibit 11**).

54.     Increased interest rates also lowered affordability.  As shown in **Exhibit 6**, the Federal Reserve steadily increased the federal funds rate starting in 2004 to its highest level in over five years by mid-2006.  Given the influence of the federal funds rate on all lending activity, including mortgage lending and refinancing, the conventional 30-year mortgage rate reached its highest level in four years in mid-2006.

55.     Because it takes time to build homes, new homes continued to come on to the market.  As noted earlier (*see* **Exhibit 4**), annualized housing starts increased steadily from 1991

---

[56]     Laurie Goodman, "The Changing Face of the Mortgage Market, MBA National Secondary Conference," UBS, (May 22, 2007), p. 4.

[57]     Goldman Sachs, "A Primer on the Sub-Prime Market," Goldman Sachs Structured Products Strategy (Feb. 2006), p. 5.

[58]     The Bond Market Association and the American Securitization Forum, "An Analysis and Description of Pricing and Information Sources in the Securitized and Structured Finance Markets," (Oct. 2006), p. 5 (discussing the availability of "non-agency data … at the individual loan level" through tools such as LoanPerformance).

CONFIDENTIAL

through early 2006 and peaked in January 2006, tripling from approximately 600,000 starts per year in January 1991 to approximately 1.8 million.[59]

56.     Consistent with basic economic principles, declining demand and an excess supply of homes in mid-2006 caused home prices to flatten and then decline.  More importantly, declining home prices, even modest ones, increased the risk of default for most borrowers.[60]  Recent empirical studies have shown that the decline in home prices was the most significant factor in the increase in mortgage defaults that began in 2007.  Many economists have found that the decline in home prices was the primary driver of defaults, and that changes to underwriting standards would not have increased the default rate absent a decline in home prices.[61]  For example, Gerardi et al. find that "[home] prices have primacy" over changes in underwriting standards in explaining the increase in foreclosures.[62]

57.     Homeowners who had "cashed out" large sums from the equity in their homes to finance other purchases faced particular difficulty when home prices declined.[63,64]  By taking on

---

[59]     From its peak in January 2006, the number of housing starts dropped dramatically throughout the next few years, and by March 2009 annualized housing starts were at their lowest levels at 353,000 per year.

[60]     Kristopher Gerardi, et al., "Subprime Outcomes: Risky Mortgages, Homeownership Experiences, and Foreclosures," Federal Reserve Bank of Boston, Working Papers, No. 07-15, (May 4, 2008), p. 35 ("[T]he probability of default [for prime and subprime borrowers] increases significantly in periods with low or negative house price appreciation."); Christopher Foote, et al., "Reducing Foreclosures," Federal Reserve Bank of Boston, Public Policy Discussion Papers, No. 09-2, (April 8, 2009), p. 15 ("[A] 10-percentage-point increase in housing prices shifts the hazard down by about 44 percent."); Joint Center for Housing Studies of Harvard University, "The State of the Nation's Housing: 2007," (2007), p. 3 ("In the absence of rapid house price appreciation, the risks imposed by subprime adjustable-rate products are much greater.").

[61]     Kristopher Gerardi, et al., "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," Federal Reserve Bank of Atlanta, Working Paper 2009-25 (Sept. 2009), p. 1; Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2, (Feb. 2009), p. 1; Ronel Elul, et al., "What 'Triggers' Mortgage Default?" *American Economic Review*, (2010), pp. 490, 493; Christopher Palmer, "Why Did So Many Subprime Borrowers Default During the Crisis: Loose Credit or Plummeting Prices?" MIT Job Market Paper (Nov. 2013), p. 40-41.

[62]     Kristopher Gerardi, et al., "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," Federal Reserve Bank of Atlanta, Working Paper 2009-25, (Sept. 2009), p. 1.

[63]     From Q1 2003 to Q2 2006, more than $710 billion was cashed out through refinancing of prime first lien conventional mortgage loans alone.  Alan Greenspan and James Kennedy, "Sources and Uses of Equity

CONFIDENTIAL

more debt, these homeowners had less equity in their homes to begin with and therefore became underwater with small home price declines.  Had home prices continued to rise, these homeowners would have had an equity "cushion" in case of default.  But, when home prices declined substantially, these homeowners (particularly those that had extracted equity from their homes at the peak of the housing bubble) found themselves underwater without the ability to refinance.

58.     In addition, starting in early 2007, the U.S. unemployment rate began to increase.  As shown in **Exhibit 12**, the increase in unemployment, particularly the long-term unemployment rate – a component that has a direct economic impact on many borrowers' ability to continue making mortgage payments – moved in tandem with the mortgage delinquency rates.[65]  As borrowers lost jobs, they were less able to make payments on their mortgages.  The dramatic increase in the long-term unemployment rate indicates that an increasing number of people were remaining out of work for a longer period of time, which only exacerbated their inability to make mortgage payments.[66]

---

Extracted from Homes," Finance and Economics Discussion Series, Divisions of Research & Statistics and Monetary Affairs, Federal Reserve Board, Washington, D.C., Working Paper 2007-20, (March 2007), pp. 20-21; and Press Release, Freddie Mac, "Record High Share of Borrowers Who Refinanced in Fourth Quarter Paid Down Principal Balance, Reducing Mortgage Debt," (Jan. 28, 2010).

[64]     *See e.g.,* Michael LaCour-Little, et al., "Follow the Money: A Close Look at Recent Southern California Foreclosures," Working Paper (March 5, 2009) (concluding homeowners in foreclosure had virtually all taken large amounts of equity out of their mortgaged properties); and Atif Mian and Amir Sufi, "House Prices, Home Equity-Based Borrowing, and the U.S. Household Leverage Crisis," *American Economic Review,* (April 2010), p. 101.

[65]     The long-term unemployment rate is the percentage of unemployed individuals who have been out of work for more than a specified length of time.  Several versions are commonly reported.  The two most prominent are based on those that have been unemployed for 15 weeks or longer and those that have been unemployed for 27 weeks or longer.  For more on the substantial increase in the long-term unemployment rate in recent years, *see* Sara Murray and Cameron McWhirter, "Long-Term Unemployment Ripples Through One Town," *Wall Street Journal,* (Jan. 18, 2012).

[66]     According to Freddie Mac, 58 percent of delinquencies among prime borrowers in 2009 were due to "unemployment or curtailment of income." Frank E. Nothaft, "What's Driving Mortgage Delinquencies," (March 22, 2010).

CONFIDENTIAL

59.    As a result of these changes in macroeconomic conditions, mortgage loan default rates increased.  **Exhibit 13** shows the increase in the nationwide mortgage loan delinquency rate as national home prices declined.  The serious delinquency rate for residential loans grew as home prices started to fall.  The serious delinquency rate peaked in December 2009, at which time home prices started to stabilize.

60.    The relations between macroeconomic conditions and loan performance are evident at the state level as well.  As shown in **Exhibit 14**, in states in which home prices fell the most, mortgage loan foreclosure rates were particularly high.  For example, in California, the state with the highest concentration of loans within the Supporting Loan Groups,[67] home prices fell approximately 42 percent between July 2006 and February 2012, and the weighted average quarterly rate of foreclosures for all mortgage loans in California (of all types and vintages including prime loans and early vintages) was among the highest in the United States.  This is true even across loans originated by the same originator, whose underwriting practices were presumably constant across states.

61.    I also examine the relation between macroeconomic conditions and loan performance among the At-Issue Loans.  **Exhibits 15A to 15K** show the default percentage of the At-Issue Loans by state compared to that state's change in home prices between July 2006 and February 2012, the peak and trough of national home prices, respectively.[68]  These exhibits show a clear correlation between the home price decline experienced in a state and the performance of the At-Issue Loans originated in that state.  For example, using the At-Issue Loans across all originators (*See* **Exhibit 15A**), Nevada home prices experienced the *greatest* state-wide decline between July 2006 and February 2012

---

[67]    *See* **Exhibit 18**.

[68]    **Exhibit 15A** displays results for all At-Issue Loans, while **Exhibits 15B to 15K** display results for the top 10 originators.

CONFIDENTIAL

(declining by 58.6 percent), while the weighted average DASD of the At-Issue Loans in Nevada was the *highest* among the At-Issue Loans (74.7 percent).  Conversely, North Dakota home prices experienced the *greatest* state-wide increase between July 2006 and February 2012, while the weighted average DASD of the At-Issue Loans in North Dakota was one of the *lowest* among the At-Issue Loans.  Furthermore, **Exhibits 15B to 15K** show that even among At-Issue Loans with the same originator, which would presumably have been originated according to similar underwriting practices, the performance of an At-Issue Loan is correlated with its corresponding state-wide declines in home prices.

62.    Similarly, as shown in **Exhibit 16**, in states in which the unemployment rate increased the most, mortgage loan foreclosure rates were particularly high.  For example, Arizona, California, Florida, and Nevada experienced large increases in both the unemployment rate and the foreclosure rate between July 2006 and February 2012.

63.    Unsurprisingly, the performance of RMBS reflected these changes in macroeconomic conditions and the resultant declining performance of the collateral underlying the securities.  The performance of other types of loans reflected these adverse changes in macroeconomic conditions too.  For example, according to data from the Federal Reserve and as shown in **Exhibit 17**, the delinquency rate on consumer loans (including credit cards) increased by 80 percent between Q4 2005 and Q2 2009.[69]

64.    In summary, the dramatic and rapid decline in home prices and deterioration in other macroeconomic factors had a significant impact on the performance of mortgage loans throughout the United States, particularly on the performance of loans originated in the run-up to the peak of home prices in July 2006.

---

[69]    Board of Governors of the Federal Reserve System, Charge-off and Delinquency Rates on Loans and Leases at Commercial Banks, http://www.federalreserve.gov/releases/chargeoff/delallsa.htm.

CONFIDENTIAL

## VI.   OVERVIEW OF THE FACTORS THAT MAY AFFECT THE VALUE OF MBS SUCH AS THE AT-ISSUE CERTIFICATES

65.   As discussed in detail in Section V, there were myriad factors that contributed to the decline in the housing market and mortgage industry that began in 2006 and which adversely impacted the value of MBS such as the At-Issue Certificates.  In this section, I discuss several of the factors that may affect the value of MBS such as the At-Issue Certificates.  I also discuss certain risk disclosures in the Offering Documents pertaining to such factors.

66.   The value of an MBS represents, among other things, investors' assessment of the value of the security's future cash flows.  Generally speaking, the underlying mortgages (and ultimately the real estate) serve as collateral for the security, and the stream of principal and interest payments from the borrowers on the mortgages are the source of the cash flow distributions that MBS investors receive.  The value of an MBS reflects future cash flows that are valued to the present (or "discounted") to account for the time value of money[70] as well as the risks associated with the expected future cash flows.

67.   Cash flows to MBS investors may fluctuate due to a variety of factors, including the performance of the loans underlying the security.  This performance is affected in part by market-wide phenomena that change the probability of default of the underlying loans (*i.e.,* default risk), as well as the dollar losses associated with loans in default (*i.e.,* loss severity).  As discussed above, credit enhancement features may protect investors to a degree from cash flow disruptions resulting from defaults.  Future cash flows to investors of MBS may also change due to prepayment activity (*i.e.,* prepayment risk).

---

[70]   The principle of time value of money is based on the premise that receiving a dollar today is preferable to receiving a dollar in the future; similarly, paying a dollar today is less preferable than paying a dollar in the future.  Discounting future cash flows allows one to assess the value today of cash flows that are to be received in the future. Bruce Tuckman, "Bond Prices, Discount Factors, and Arbitrage," *Fixed Income Securities*, John Wiley & Sons, Inc. 2d ed. (2002), pp. 3, 7.

CONFIDENTIAL

68.   The price of an MBS generally reflects, in part, the rate of return used to discount future cash flows.  The rate of return an investor demands may compensate the investor for bearing the MBS's risks, including market risk and liquidity risk,[71] among other market-wide phenomena.  Thus, the price movements of MBS, including the At-Issue Certificates, are impacted by general macroeconomic conditions that affect collateral performance as well as the discount rates used to value the cash flows from the collateral. I discuss these factors individually in greater detail below.

### A.   Loan Performance

69.   As mentioned above, the performance of loans underlying MBS such as the At-Issue Certificates affects cash flows to the trust which, in turn, may affect the value of MBS, subject to credit enhancement features that may protect certain investors.  In this section, I discuss in greater detail how defaults and recovery rates may affect MBS values; I also discuss the factors that may affect defaults and recovery rates.

#### 1.   Default and Recovery Rates

70.   The cash flows into an MBS trust that are distributed to the MBS investors are determined in part by the payment behavior of the borrowers whose loans collateralize the MBS.  As borrowers become delinquent and/or default on their loan obligations, cash flows (including future expected cash flows) to MBS investors may decline, ultimately reducing the value of the MBS.

71.   In the event of default, lenders may obtain legal possession of the property through the foreclosure process, with any net proceeds from the sale of the property going into the MBS trust to be distributed to the MBS investors.  The foreclosure process can be lengthy

---

[71]   As discussed in greater detail below, liquidity risk relates to the risk that the investor will not be able to liquidate the investment in a timely manner at a fair market value.

CONFIDENTIAL

and costly, however, and the resultant recovery rates can be low, particularly after large home price declines.  For example, the recovery of first liens at the time of foreclosure has historically averaged approximately two-thirds of the outstanding loan balance;[72] in more recent years, however, the recovery rate has declined to as low as 20 percent of the remaining loan balance, depending on the type of property.[73]  Thus, delinquencies and defaults may reduce the ultimate cash flows to the MBS investors, and may thereby reduce the value of MBS such as the At-Issue Certificates.

72.  While future loan defaults cannot be known with certainty at origination, as described below, the risk of default and severity of loss is generally related to prevailing macroeconomic conditions, including home prices and employment opportunities.  Other factors that may also affect default risk and/or loss severity include loan and borrower characteristics, usually including borrowers' FICO scores and loan type, and other factors, including state recourse laws, foreclosure costs, and mortgage insurers or servicers not performing their contractual obligations.  As described in greater detail below, these risks were disclosed to investors in the Offering Documents of the At-Issue Certificates.

### a)  Macroeconomic Conditions

#### (1)  Real Estate Prices

73.  As discussed in Section V, real estate prices are widely accepted as a key factor in loan performance.  Specifically, home values influence the performance of loans, and thus the

---

[72]  Thomas Zimmerman and Laurent Gauthier, "Mortgage Credit Quantified," *The Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed. (2006), p. 971.

[73]  *Residential Mortgage Market Index—U.S.A*, Fitch Ratings 4 (April 15, 2013). Second-lien loans typically recoup less than first-lien loans because they only receive payment after the first lien has been paid in full. As one author notes, on average, second-lien loans recover nothing in the event of default. Thomas Zimmerman and Laurent Gauthier, "Mortgage Credit Quantified," *The Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed. (2006), p. 971.

CONFIDENTIAL

probability of default, and therefore the value of an associated MBS.   Consider, for example, a borrower who is struggling to make payments on his mortgage.  If the value of the home has increased, the borrower can sell the home to ease the debt burden.  If the value of the home has declined to a level where the borrower has negative equity in the property, however, the borrower may be more inclined to default on the loan depending upon the cost of maintaining the mortgage versus the cost of the default.   And if the borrower does default in that situation, loss severity will rise because the value of the borrower's home is lower.

74.    Several of the Offering Documents of the At-Issue Certificates expressly disclosed the risks related to falling real estate prices.   For example, the Prospectus for an At-Issue Trust states:

> The value of the properties underlying the loans held in the issuing entity may decline over time. Among the factors that could adversely affect the value of the properties are:  an overall decline in the residential real estate market in the areas in which they are located, a decline in their general condition from the failure of borrowers to maintain their property adequately, and natural disasters that are not covered by insurance, such as earthquakes and floods. If property values decline, the actual rates of delinquencies, foreclosures, and losses on all underlying loans could be higher than those currently experienced in the mortgage lending industry in general.[74]

75.    As discussed in Section V, the risk of declining real estate prices that the Offering Documents warned of began to materialize in late 2006, and accelerated at an unprecedented pace.[75]

---

[74]    Indymac Indx Mortgage Loan Trust 2006-AR35, Prospectus p. 9 (Form 424B5) (Oct. 26, 2006).

[75]    It should be noted that the release of home price indices lags the actual real-time development of home price data by one or two months.  Moreover, whether housing prices have hit a "peak" is not observable until the high point is followed by several months of declining values, which are themselves not observable for several months due to data lag.  For example, the S&P/Case-Shiller Home Price Index through March 2014 was released publicly on May 27, 2014.  *See* Press Release, S&P Dow Jones Indices, "Home Prices Rise in March According to the S&P/Case-Shiller Home Price Indices," (May 27, 2014), https://www.spice-indices.com/idpfiles/spice-assets/resources/public/documents/93729_cshomeprice-

CONFIDENTIAL

76.     Additionally, empirical studies have shown that the decline in home prices was the most significant factor in the increase in mortgage defaults that began in 2007.[76] The loans underlying the At-Issue Certificates were primarily originated in 2005, 2006, and 2007, after most of the run-up to the peak and beginning of the decline of the housing market. As a result, the loans in the Supporting Loan Groups were severely impacted by the decline in home prices. As discussed in Section V, relative to other geographic regions, home price declines were more severe in Arizona, California, Florida, and Nevada. The At-Issue Certificates, which were backed by loans that were heavily concentrated in these states, were consequently adversely affected by the deterioration in these markets.

77.     **Exhibit 18** shows by state the number of loans within the Supporting Loan Groups, the percentage of all loans underlying the Supporting Loan Groups (based on original principal balance), and the percentage decline in home prices from July 2006 (the month in which national home prices peaked)[77] to February 2012.[78] Of the 132,618 loans within the Supporting Loan Groups, 58,171 loans (or 60 percent weighted by original principal balance) are secured by homes in states that experienced home price declines ranging from 42 percent to 59 percent (*i.e.,* Arizona, California, Florida, and Nevada).[79]

---

release-0527.pdf?force_download=true. Data lags of this magnitude, and greater, have existed for major indices like these since I began analyzing the residential housing market many years ago.

[76]     Kristopher Gerardi, et al., "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," Federal Reserve Bank of Atlanta, Working Paper 2009-25 (Sept. 2009), p. 1; Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2 (Feb. 2009), p. 1; Ronel Elul, et al., "What 'Triggers' Mortgage Default?" *American Economic Review*. (2010), pp. 490, 493; Christopher Palmer, "Why Did So Many Subprime Borrowers Default During the Crisis: Loose Credit or Plummeting Prices?" MIT Job Market Paper (Nov. 2013), p. 40-41.

[77]     REdex Square Index Library, provided by CoreLogic. *See* **Exhibit 3**.

[78]     February 2012 represents the lowest point in the national home price index during the relevant analysis period.

[79]     *See* **Exhibit 15 and Exhibit 18**.

CONFIDENTIAL

78.   **Exhibit 18** further shows that California has the highest concentration of loans within the Supporting Loan Groups.   Out of the 132,618 loans in the Supporting Loan Groups, 34,542 loans (or 44.0 percent weighted by original principal balance) are for properties located in California, which experienced large price declines statewide.   For example, the single-family home price index for the San Francisco-Oakland-Fremont MSA fell 34 percent from its peak in June 2006 to the trough in January 2012.   The San Francisco home price index has only recently returned to its previous peak level.[80]   Similarly, the single-family home price index for the Los Angeles-Long Beach-Santa Ana MSA fell 36 percent from its peak in July 2006 to the trough in January 2012.[81]   More broadly, the single-family home price index for the state of California fell nearly 42 percent between May 2006 (when California home prices peaked) and January 2012 (when California home prices bottomed out).[82]

79.   Florida, another state with a high concentration of At-Issue Loans, also experienced large price declines statewide.   For example, the single-family home price index for the Lakeland-Winter Haven MSA fell 54 percent from its peak in October 2006 to the trough in January 2012.[83]   Similarly, the single-family home price index for the Orlando-Kissimmee-Sanford MSA fell 53 percent from its peak in August 2006 to the trough in February 2012.[84]   More broadly, the single-family home price index for the state of

---

[80]   REdex home price index, available from CoreLogic (index code CAM_22M).   These values are not seasonally adjusted.

[81]   REdex home price index, available from CoreLogic (index code CAM_20M).   These values are not seasonally adjusted.

[82]   REdex home price index, available from CoreLogic (index code CAM_11M).   These values are not seasonally adjusted.

[83]   REdex home price index, available from CoreLogic (index code FLC105M).   These values are not seasonally adjusted.

[84]   REdex home price index, available from CoreLogic (index code FLM_02M).   These values are not seasonally adjusted.

CONFIDENTIAL

Florida fell nearly 48 percent between July 2006 (when Florida home prices peaked) and December 2011 (when Florida home prices bottomed out).[85]

*(2)      Unemployment*

80.    As discussed in Section V, rising unemployment is recognized as adversely impacting loan performance.  If homeowners lose their jobs, they may find themselves unable to afford mortgage payments.  Particularly in an environment of declining home prices, when it may be impossible to sell one's home and pay off the mortgage or to refinance the mortgage, defaults will rise.  Defaults are most likely to occur when solvency problems from job loss and marginal or negative equity coincide.[86]  As described in Section V, this combination of solvency problems and negative equity occurred on a national level after the housing boom ended, and the unprecedented decline in real estate prices combined with the contracting economy led to far more mortgage defaults and losses than expected.

81.    Several of the Offering Documents warned of the risk of unemployment and an economic downturn in general.  For example, the Prospectus Supplement for an At-Issue Trust states:

> Furthermore, the rate and timing of prepayments, defaults and liquidations on the mortgage loans will be affected by the general economic condition of the region of the country in which the related mortgaged properties are located. The risk of delinquencies and loss is greater and prepayments are less likely in regions where a weak or deteriorating economy exists, as

---

[85]    REdex home price index, available from CoreLogic (index code FLM_11M).  These values are not seasonally adjusted.

[86]    Neil Bhutta, et al., "The Depth of Negative Equity and Mortgage Default Decisions," Federal Reserve Board of Governors, Working Paper 2010-35, (May 2010), pp. 27-29, http://www.federalreserve.gov/PUBS/FEDS/2010/201035/.

CONFIDENTIAL

may be evidenced by, among other factors, increasing unemployment or falling property values.[87]

82.   The risks that the Offering Documents warned of became a reality starting in late 2006. As discussed in detail in Section V, the US economy experienced a significant economic downturn and then recession that contributed to the increase in unemployment which, in turn, contributed to an increase in the incidence of defaults.

### b)   Loan and Borrower Characteristics

83.   In addition to macroeconomic conditions, the risk of default may also be related to certain loan and borrower characteristics.

### (1)   Alt-A/Subprime

84.   All but one (RFMS2 2007-HSA2, total group) of the Supporting Loan Groups were classified as Alt-A or Subprime by ABSNet.[88]   As discussed in Section V, mortgage underwriters expanded their underwriting guidelines during the early 2000s, which was supported and encouraged by government agencies, and by Fannie Mae and Freddie Mac. Alt-A loans are generally underwritten to less stringent standards than Fannie or Freddie guidelines.

85.   Although there is no single definition of Alt-A loans, the term Alt-A generally refers to a mortgage risk category that falls below prime, because, for example, the borrower's income and assets are not fully documented or because the type of mortgage is

---

[87]   NovaStar Mortgage Funding Trust, Series 2006-5, Prospectus Supplement p. S-124 (Form 424B5) (Sept. 22, 2006).

[88]   ABSNet, provided by Lewtan, a firm specializing in data related to the asset-securitization industry, is a database that provides summary data on asset-backed securities.

considered riskier.[89] Several of the Offering Documents discussed the risks associated with Alt-A loans. For example, the Prospectus for an At-Issue Trust states the following:

> Although Alt- A loans are typically made to borrowers who have a strong credit history and can demonstrate a capacity to repay their loans, Alt-A mortgage loans may have some of the characteristics and risks of subprime mortgage loans described above. In particular, Alt-A mortgage loans (1) are often originated under underwriting guidelines with more limited and reduced documentation requirements, (2) have higher loan-to-value ratios than prime loans, (3) are more likely to be secured by properties not primarily occupied by the related borrower than prime loans and (4) often have prepayment penalties. You should consider the risks discussed above if the trust fund contains Alt-A mortgage loans.[90]

### (2)    Non-Full Documentation

86.    The lack of full documentation may also introduce additional risk into a loan. Full documentation loans require that a borrower provide proof of such things as income and assets. Loans with less than full documentation became increasingly available as far back as 1999.[91] These types of loans may be riskier than those with full documentation, with a greater statistical likelihood that the borrower becomes seriously delinquent or defaults, holding all other factors constant.[92] As shown in **Exhibit 2A**, based on information regarding loan documentation that was disclosed in the Offering Documents, 73 percent[93] of the loan balance underlying the Supporting Loan Groups was originated to borrowers pursuant to non-full documentation loan programs.

---

[89]    Alt-A generally refers to "a general mortgage risk categorization that falls below A, usually because the borrower's income and assets are not fully documented." Jack Guttentag, "The Mortgage Encyclopedia," McGraw Hill, 2d ed. (2010), p. 14.

[90]    HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2007-1, Prospectus p. 13 (Form 424B5) (Jan. 30, 2007).

[91]    Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2 (Feb. 2009), p. 11 and fig. 3.

[92]    Patrick Bajari, et al., "An Empirical Model of Subprime Mortgage Default from 2000 to 2007," Federal Reserve System, Paper, (March 11, 2011), p. 23; Geetesh Bhardwaj and Rajdeep Sengupta, "Where's the Smoking Gun? A Study of Underwriting Standards for US Subprime Mortgages," Federal Reserve Bank of St. Louis, Working Paper, (March 2010), p. 25.

[93]    Calculated as 100 percent less 27 percent.

CONFIDENTIAL

87.     Several of the Offering Documents discussed the risks associated with loans originated without full documentation.   For example, the Offering Documents for two At-Issue Trusts state the following:

> Certain of the Mortgage Loans have been originated under reduced documentation, no-documentation or no-ratio programs, which require less documentation and verification than do traditional full documentation programs.   Generally, under a reduced documentation program, verification of either a borrower's income or assets, but not both, is undertaken by the originator. Under a no-ratio program, certain borrowers with acceptable compensating factors will not be required to provide any information regarding income and no other investigation regarding the borrower's income will be undertaken. Under a no-documentation program, no verification of a borrower's income or assets is undertaken by the originator. The underwriting for such Mortgage Loans may be based primarily or entirely on an appraisal of the Mortgaged Property, the loan-to-value ratio at origination and/or the borrower's credit score.
>
> Investors should note that changes in the values of Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans included in the Mortgage Pool than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related Mortgaged Properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans.[94]
>
> and
>
> Most underwriting guidelines applied in the origination of mortgage loans have several different levels of documentation requirements applicable to prospective borrowers. There has recently been an increasing number of mortgage loans originated under "stated income" programs, which permit an applicant to qualify for a mortgage loan based upon monthly income as stated on the mortgage loan application, if the applicant meets certain criteria. Typically no verification of monthly income is required under stated income programs, which increases the risk that these borrowers have overstated their income and may not have sufficient income to make their monthly mortgage loan payments. You should consider the risk that a higher number of mortgage loans originated under stated income programs

---

[94]     Nomura Asset Acceptance Corporation Alternative Loan Trust, Series 2006-AR4, Prospectus Supplement [PDF p. 45] (Form 424B5) (Nov. 30, 2006).

CONFIDENTIAL

may result in increased delinquencies and defaults on the mortgage loans in the trust fund.[95]

### (3)  *Amortization Structure*

88.  The amortization structure of a loan refers to the manner in which the principal balance of the loan will change over the life of the loan assuming the borrower makes scheduled mortgage payments.  Some amortization structures require scheduled principal payments each month, so that the principal balance of the loan steadily decreases over time.  Conversely, some amortization structures result in the principal balance staying constant, or even increasing, for a period of time.  A higher principal balance, and thus a higher loan-to-value ratio, implies, other things being equal, a higher risk of default and greater losses should default occur.  This is discussed in more detail below.

### (a)  Adjustable Rate Mortgages ("ARMs")

89.  As shown in **Exhibit 2A**, 25 Supporting Loan Groups consisted of ARMs.  These loans often have low initial rates or allow the borrower to make only interest payments for a prolonged period of time; many borrowers hope to refinance these mortgages before the initial lower rate expires or the interest-only period terminates.  An inability to refinance may lead to an increased risk of default for such borrowers.  Rising or flat interest rates through 2006 and early 2007 together with tightening credit markets and falling housing prices made it difficult for many of these borrowers to obtain refinancing before the initial low rate expired.  Several of the Offering Documents disclosed these risks to investors.  For example, the Prospectus Supplement for an At-Issue Trust states the following:

---

[95]   HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2007-1, Prospectus p. 14 (Form 424B5) (Jan. 30, 2007).

CONFIDENTIAL

Another factor that may contribute to higher delinquency rates is the increase in monthly payments, after an initial fixed period, on adjustable rate mortgage loans. Borrowers with adjustable payment mortgage loans are being exposed to increased monthly payments when the related mortgage interest rates adjust upward from the initial fixed rate or a low introductory rate, as applicable, to the rate computed in accordance with the applicable index and margin. This increase in borrowers' monthly payments, together with any increase in prevailing market interest rates, may result in significantly increased monthly payments for borrowers with adjustable rate mortgage loans.[96]

(b)     Interest-Only Loans

90.     As shown in **Exhibit 2A**, 32 of the Supporting Loan Groups include interest-only loans, which range from two percent to 100 percent of the original principal balance of the Supporting Loan Groups.  Interest-only loans allow the borrower to make only interest payments for a period of time; when the interest-only period ends, the borrower's monthly payment will be recalculated so that both interest and principal for the loan will be paid in full by the loan's final maturity date.  Many borrowers hope to refinance these mortgages before the interest-only period terminates, and thus an inability to refinance would lead to an increased risk of default for such borrowers.  Since no scheduled principal payments are required during the interest-only period, cash flows from these loans to the trust would be less than a fully amortizing loan.  Additionally, the principal balance on interest-only loans will be higher than an equivalent fully amortizing loan.  As discussed below in "Loan-to-Value and Combined Loan-to-Value," a higher principal balance relative to the value of the property may translate into a greater loss severity upon default.

---

[96]     HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2007-1, Prospectus Supplement p. S-18 (Form 424B5) (March 7, 2007).

CONFIDENTIAL

91.     Where applicable, the Offering Documents of the At-Issue Certificates disclosed information about the risks associated with interest-only loans.  For example, the Prospectus Supplement for an At-Issue Trust states:

> After the initial interest-only period, the scheduled monthly payment on these mortgage loans will increase, which may result in increased delinquencies by the related mortgagors, particularly if interest rates have increased and the mortgagor is unable to refinance. In addition, losses may be greater on these mortgage loans as a result of the mortgage loan not amortizing during the early years of these mortgage loans. Although the amount of principal included in each scheduled monthly payment for a traditional mortgage loan is relatively small during the first few years after the origination of a mortgage loan, in the aggregate the amount can be significant. Any resulting delinquencies and losses, to the extent not covered by credit enhancement, will be allocated to the senior certificates and subordinate certificates.

> Mortgage loans with an initial interest-only period are relatively new in the mortgage marketplace. The performance of these mortgage loans may be significantly different from mortgage loans that amortize from origination. In particular, there may be a higher expectation by these mortgagors of refinancing their mortgage loans with a new mortgage loan, in particular, one with an initial interest-only period, which may result in higher or lower prepayment speeds than would otherwise be the case. In addition, the failure by the related mortgagor to build equity in the property may affect the delinquency, loss and prepayment experience with respect to these mortgage loans.[97]

(c)     Negative Amortization

92.     As shown in **Exhibit 2A**, and disclosed in the Offering Documents, 14 of the Supporting Loan Groups were comprised entirely of NEG AM loans.  A NEG AM loan is a loan that permits the borrower to pay less than the monthly interest charge; when the borrower does not pay the entire monthly interest charge, the amount of unpaid interest is added to

---

[97]     Fremont Mortgage Home Loan Trust Mortgage-Backed Certificates, Series 2006-D, Prospectus Supplement p. 24 (Form 424B5) (Nov. 1, 2006).

CONFIDENTIAL

the principal balance.[98]  In addition to the characteristics discussed above related to interest-only loans, NEG AMs have an additional source of potential risk.  Given that the balance on NEG AM loans increases for portions of time over the term of the loan due to the deferment of accrued interest, the principal balance of the loan may exceed the value of the mortgaged property even in the absence of home price declines; the risk of default associated with NEG AM loans increases further when home prices are declining.

93.    The Offering Documents of the At-Issue Certificates disclosed information about the risk of increasing loan balances associated with NEG AM Loans.  For example, the Prospectus for an At-Issue Trust states:

> In the case of mortgage assets that are subject to negative amortization, their principal balances could be increased to an amount at or above the value of the underlying mortgaged properties. This would increase the likelihood of default. To the extent that losses are not covered by credit support, your issuing entity will bear the risk of loss resulting from default by obligors and will look primarily to the value of the mortgaged properties for recovery of the outstanding principal and unpaid interest on the defaulted mortgage assets.[99]

*(4)    Underwriting Guidelines*

94.    Loans may be assessed under various underwriting guidelines.  Underwriting guidelines frequently vary across originators, time, and product types (*e.g.,* Prime and Alt-A). These product types entailed various risks.  For example, the Prospectus Supplement for an At-Issue Trust states the following:

> Some of the mortgage loans have been originated using underwriting standards that are less stringent than the underwriting standards applied by certain other second lien mortgage loan purchase programs. Applying less

---

[98]    Frank J. Fabozzi, Anand K. Bhattacharya, and William S. Berliner, "Prepayment Behavior and Performance," *Mortgage-Backed Securities: Products, Structuring and Analytical Techniques*. John Wiley & Sons, Inc. (2007), p. 82.

[99]    Fremont Mortgage Home Loan Trust Mortgage-Backed Certificates, Series 2006-D, Prospectus p. 12 (Form 424B5) (July 11, 2006).

CONFIDENTIAL

stringent underwriting standards creates additional risks that losses on the mortgage loans will be allocated to certificateholders.[100]

> **(5)   Loan-to-Value ("LTV") and Combined Loan-to-Value ("CLTV")**

95.     The amount of equity a homeowner has in his or her home can be measured by the LTV and CLTV ratios; as disclosed in the Offering Documents, LTV ratios are measures of the ratio of the outstanding principal balance of the mortgage loan to either (a) for loans made in connection with a purchase, the lesser of the selling price of the mortgaged property and its appraised value at the time of sale, or (b) for loans refinancing an existing mortgage, the appraised value of the mortgaged property at the time of loan origination.[101]   The CLTV ratio accounts for the existence of any second or higher liens, and is the ratio of the sum of first and higher liens to the selling price or appraised value of the property.   The homeowner's equity is equal to one minus the CLTV ratio.[102] Property depreciation will increase the LTV and CLTV and can result in negative equity. Loans with higher initial CLTV ratios may have a greater risk of becoming underwater because there is relatively less equity in the home.   In addition, when a property is underwater, loss severity (if any) upon liquidation will generally increase because the property is worth less than the loan balance.   Therefore, highly leveraged loans (*i.e.,* loans with higher LTV or CLTV ratios) may be associated with higher expected rates of default and loss severity.[103]

---

[100]   Residential Funding Mortgage Securities II, Inc., Home Equity Loan Trust 2007-HSA2, Prospectus Supplement p. S-16 (Form 424B5) (April 25, 2007).

[101]   *See e.g.,* HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2007-5, Prospectus p. 46 (Form 424B5) (July 5, 2007).

[102]   For example, a homeowner who borrows $400,000 to buy a $500,000 house would have a loan with CLTV equal to 80 percent and equity would be equal to 20 percent.

[103]   Anand K. Bhattacharya, Frank J. Fabozzi, and William S. Berliner, "An Overview of Mortgages and the Mortgage Market," *The Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed. (2006), pp. 488, 500.

CONFIDENTIAL

96.     The Offering Documents of the At-Issue Certificates disclosed information about the LTV or CLTV ratios of the loans backing the At-Issue Certificates.  For example, the Prospectus Supplement for an At-Issue Trust states the following:

> Mortgage loans with higher loan-to-value ratios may present a greater risk of default and, in the case of defaults, an increase in the severity of losses.[104]

97.     As shown in **Exhibit 2A**, the average disclosed LTV and CLTV ratios (weighted by original principal balance) for loans underlying the Supporting Loans Groups were 75.0 and 84.0 percent, respectively.

### (6)     Other Loan and Borrower Characteristics

98.     As shown in **Exhibit 2A**, the Offering Documents of the At-Issue Certificates also disclosed other characteristics of the Supporting Loan Groups that may affect the risk of investing in the At-Issue Certificates, including a characteristic used as a metric to evaluate the creditworthiness of borrowers: FICO scores.[105]  These scores are developed using a borrower's payment history, level of indebtedness, types of credit used, and length of his or her credit history.  Loans made to borrowers with FICO scores of approximately 620 or less are generally considered to be subprime.[106]

### 2.     Prepayments

99.     As discussed above, certificate performance is also impacted by prepayment activity, which refers to borrowers' option to prepay their loans before they mature by either

---

[104]   Indymac Indx Mortgage Loan Trust 2006-AR35, Prospectus Supplement p. S-31 (Form 424B5) (Nov. 29, 2006).

[105]   John McElravey, "Residential Asset-Backed Securities," *The Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed. (2006), p. 368.

[106]   John McElravey, "Residential Asset-Backed Securities," *The Handbook of Mortgage-Backed Securities*, McGraw-Hill 6th ed. (2006), p. 368.

CONFIDENTIAL

selling the property or by refinancing the loan.[107]  For example, lower interest rates, and correspondingly lower mortgage rates, generally lead to greater borrower refinance activity.  Greater refinance activity in a mortgage pool underlying an MBS leads to faster principal repayments as the mortgages in the pool are paid off.  Conversely, rising interest rates and a decrease in real estate prices that prevent borrowers from refinancing result in slower principal repayments.

100.   Therefore, for MBS such as the At-Issue Certificates, prepayment activity affects cash flows to investors.  Increased prepayment activity in the underlying mortgage pool results in a shorter average life (*i.e.,* "weighted-average life," or "WAL") of the security while decreased prepayment activity lengthens the WAL of the security.   All else equal, a shorter WAL due to declining interest rates will result in the investor receiving interest for a shorter period than he expected and being required to reinvest proceeds at a less favorable rate.   On the other hand, a lengthening of the WAL extends the time period during which an investor can incur a loss of principal.  In addition, the lengthened WAL means that investors will receive expected cash flows later in time, which may reduce the present value of those cash flows—and hence, all else being equal, the value of an MBS.[108]

101.   Prepayment speeds slowed considerably during the relevant time period,[109] thereby extending the life of MBS such as the At-Issue Certificates.  As discussed in Section V,

---

[107]   Ravi F. Dattatreya and Frank J. Fabozzi, "Risks Associated with Investing in Fixed Income Securities," *The Handbook of Fixed Income Securities*, McGraw-Hill 7th ed. (2005), p. 24.

[108]   In certain cases, lower prepayment activity may increase excess spread available to investors to offset potential losses that may occur.  For example, performing loans that pay a rate of interest higher than the rate of interest paid to certificate holders generate excess interest spread to the corresponding securitization trust.  The longer such loans do not prepay, the more excess spread they make available to investors.

[109]   John Krainer and Elizabeth Laderman, "Prepayment and Delinquency in the Mortgage Crisis Period," Federal Reserve Bank of San Francisco, Working Paper 2011-25, (Sept. 2011), pp. 2-4.

CONFIDENTIAL

declining home prices reduced the equity that borrowers had in their homes, making refinancing difficult.   As home prices continued to decline—coupled with borrowers' inability to refinance their homes—defaults soared.   Default and prepayment activity during this time period were highly *negatively* correlated, indicating that the slowing of prepayments increased the risk of the default in the underlying mortgage pool.[110]   Thus, general market conditions that contributed to slower than expected prepayment activity adversely impacted the value of MBS such as the At-Issue Certificates.

102.   Several Offering Documents also disclose to investors that prepayment speeds may vary, for example:

> Loan prepayments or repurchases of the mortgage loans may adversely affect the average life of, and rate of return on, the offered certificates. The rate of prepayments on the mortgage loans will be sensitive to prevailing interest rates. Generally, if prevailing interest rates decline, prepayments may increase due to the availability of refinancing at lower interest rates. This could result in a faster return of principal to you at a time when you might not be able to reinvest those funds at an interest rate as high as the interest rate on the offered certificates. If prevailing interest rates rise, prepayments on the mortgage loans may decrease. This could result in a slower return of principal to you at a time when you might have been able to reinvest those funds at a rate of interest higher than the interest rate on the offered certificates. We cannot predict the rate at which borrowers will prepay their mortgage loans.[111]

### B.   Credit Enhancement

103.   The value of an MBS is also affected by the credit enhancement features of the security. As discussed in Section IV above, there exist various forms of internal and external credit enhancement features that shield MBS investors from losses on the underlying loans, including a particular security's position in the senior-subordinate structure.

---

[110]   John Krainer and Elizabeth Laderman, "Prepayment and Delinquency in the Mortgage Crisis Period," Federal Reserve Bank of San Francisco, Working Paper 2011-25, (Sept. 2011), pp. 2-4.

[111]   Luminent Mortgage Trust 2007-1, Prospectus Supplement p. S-16 (Form 424B5) (Jan. 24, 2007).

CONFIDENTIAL

104.  Generally speaking, credit enhancements affect a certificate's sensitivity to losses from the underlying collateral.  For example, losses from the underlying loans are first absorbed by the mezzanine certificates in the trust before they are allocated to senior certificates.  Thus, losses on underlying loans may not affect expected future cash flows to the senior certificate, and its value may not fluctuate due to the credit enhancement provided by the mezzanine and/or junior tranches of the trust.

105.  The extent to which a certificate's credit enhancements are sufficient to provide a cushion against changes in future cash flows also affects the certificate's value.  A security with credit enhancements that are insufficient to absorb incurred losses (or are insufficient to absorb anticipated future losses) will typically have its value be more sensitive to any increase in losses in the underlying loans, whereas a security with sufficient credit enhancements will typically have its value be less sensitive to underlying losses.

106.  Several Offering Documents disclosed that the risk that credit enhancement features of the At-Issue Certificates may not be sufficient to protect investors from losses, for example:

> Credit enhancement is intended to reduce the effect of delinquent payments or loan losses on those classes of securities that have the benefit of the credit enhancement. Nevertheless, the amount of any credit enhancement is subject to the limits described in the related prospectus supplement. Moreover, the amount of credit enhancement may decline or be depleted under certain circumstances before the securities are paid in full. As a result, securityholders may suffer losses. In addition, credit enhancement may not cover all potential sources of risk of loss, such as fraud or negligence by a loan originator or other parties.[112]

---

[112]  MortgageIT Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2006-1, Prospectus p. 7 (Form 424B5) (Sept. 26, 2005).

CONFIDENTIAL

### C.      Market, Liquidity, and Other Risks

107.  As discussed above, the value of an MBS reflects the future cash flows that investors expect to receive, discounted to the present to account for the time value of money as well as the risks associated with investors' receipt of these expected future cash flows. The concept of present value is instructive when considering the effects of market risk and the risk that the investor will not be able to liquidate an investment in a timely manner at fair market value, among other market-wide phenomena, on MBS values. I discuss these in greater detail below.

### 1.      Market Risk

108.  Market risk refers to the risk to investors of having funds invested in a particular market (*e.g.,* the MBS market) and reflects the losses that an investor may incur due to exposure to this market.[113]  The additional return or premium that investors demand for being exposed to market risk, the market risk premium (often measured as the "spread" between a risk-free rate for use of money—usually the Treasury rate—and the rate demanded by investors for the particular product), may increase during times of heightened economic uncertainty.  As the market risk premium increases, the rate at which future expected cash flows are discounted increases, thereby reducing the present value of the future cash flows and, in turn, the value of an MBS.  A price decline caused by an increase in the market risk premium does not necessarily mean that the expected cash flows from the security have decreased.  Rather, the price decline indicates that as of the date of valuation, investors demand higher returns given the increased market risk. Conversely, the market risk premium may decrease as market uncertainty dissipates.  A

---

[113]    While interest rate risk is one component of market risk, the risk posed to the holder of the At-Issue Certificates would likely have been minimal as most of the securities had a floating interest rate tied to the London Interbank Offered Rate ("LIBOR").

CONFIDENTIAL

decrease in the market risk premium results in a decrease in the discount rate at which future cash flows of MBS are discounted, thereby increasing the value of an MBS. Several Offering Documents also disclosed the market risk exposure to investors of the At-Issue Certificates, for example:

> The offered certificates are not suitable investments for all investors. The offered certificates are complex financial instruments, so you should not purchase any offered certificates unless you or your financial advisor possess the necessary expertise to analyze the potential risks associated with an investment in mortgage backed securities. You should not purchase any offered certificates unless you understand, and are able to bear, the prepayment, credit, liquidity and market risks associated with those offered certificates.[114]

### 2.   Illiquidity

109.   The liquidity of an asset (in this case, the At-Issue Certificates) refers to the ability of market participants to sell that asset in a timely manner at a fair value without incurring undue transaction costs.[115]   As such, liquidity risk refers to the risk that an investor will have to sell a security for below the value that would be received in a competitive environment,[116] or will be unable to sell the security at all.   For example, in an environment of low market liquidity, it may be difficult for investors to locate counterparties who are willing and able to purchase a specified quantity of a certain security.   In such an environment, if and when counterparties are finally identified, the seller may need to negotiate prices for those securities in a less than perfectly competitive environment.   Because alternative counterparties may not exist, the value based on the negotiated price could be lower than the value of securities in a competitive

---

[114]   Wachovia Mortgage Loan Trust, Series 2006-ALT1, Prospectus Supplement p. S-14 (Form 424B5) (Dec. 19, 2006).

[115]   Zvi Bodie, et al., "The Capital Asset Pricing Model," *Investments*, McGraw-Hill 7th ed. (2008), p. 317.

[116]   Ravi F. Dattatreya and Frank J. Fabozzi, "Risks Associated with Investing in Fixed Income Securities," *The Handbook of Fixed Income Securities*, McGraw-Hill 7th ed. (2005), p. 26.

CONFIDENTIAL

environment.[117]   In such cases, investors demand a liquidity premium, thereby resulting in a lower price for an illiquid MBS.

110.    It is commonly accepted that beginning in 2007, the market for non-agency MBS such as the At-Issue Certificates began to experience increased illiquidity.  Specifically, by mid-2007, short-term financing among banks (commonly referred to as the "repurchase market" or "repo market") tightened for certain assets, including subprime MBS.[118]  As a result, the market for subprime MBS experienced massive deleveraging, resulting in an excess of supply relative to demand.[119]  In addition, banks stopped accepting subprime MBS as collateral for short-term lending, further evaporating liquidity.[120]  With a lack of funding to purchase these securities coupled with an excess supply with limited potential buyers, the market for subprime MBS froze.  As a result of this market dislocation, non-agency MBS issuance, including that of Alt-A and Subprime MBS, plummeted beginning in the third quarter of 2007.[121]

111.    By 2008, the liquidity crisis extended throughout the economy.   Concerned that counterparties may be exposed to subprime mortgages that were rapidly losing value, banks   stopped   lending   to   one   another;   thus,   money   markets   froze,   prompting

---

[117]   Yakov Amihud, et al., "Liquidity and Asset Prices," *Foundations and Trends in Finance*, Vol. 1, No. 4, (2005), pp. 269, 271.

[118]   Gary Gorton, "Information, Liquidity, and the (Ongoing) Panic of 2007," *American Economic Review*, Vol. 99, No. 2 (May 2009), pp. 567, 570-571.

[119]   Gary Gorton, "Information, Liquidity, and the (Ongoing) Panic of 2007," *American Economic Review*, Vol. 99, No. 2 (May 2009), p. 572.

[120]   Gary Gorton, "Information, Liquidity, and the (Ongoing) Panic of 2007," *American Economic Review*, Vol. 99, No. 2 (May 2009), pp. 569-72.

[121]   Paul Calem, Francisco Covas, and Jason Wu, "The Impact of a Liquidity Shock on Bank Lending: The Case of the 2007 Collapse of the Private-Label RMBS Market," Federal Reserve Board Division of Bank Supervision and Regulation, Working Paper, (2011), p. 6.  Inside Mortgage Finance, The Mortgage Market Statistical Annual CD-ROM, 2010 Edition, Volume IIB1, The Private- Label Mortgage Security Market, Prvt-Lbl MBS by type.

CONFIDENTIAL

governments to intervene to keep financial institutions solvent.[122]   In response to this credit crisis, on October 14, 2008, the U.S. government announced a series of initiatives commonly referred to as the Troubled Asset Relief Program ("TARP") with the stated goals of "strengthen[ing] market stability" and "enhanc[ing] market liquidity."[123]   Thus, the broader macroeconomic environment following the real estate market collapse was characterized by severe market illiquidity that required unprecedented government intervention.   As described aptly by Former Federal Reserve Chairman Alan Greenspan to the House Oversight and Reform Committee, this period was a "once-in-a-century credit tsunami."[124]

112.   The market for non-agency MBS such as the At-Issue Certificates has remained relatively illiquid since the housing crisis.   As noted by the Federal Reserve Bank of New York in a May 2013 *Economic Policy Review*, for example, "[o]nly a small number of non-agency residential MBS have been issued since mid-2007 and, during this period, secondary

---

[122]   For example, *The Wall Street Journal* reported the following on the day that Bear Stearns collapsed: "In an extraordinary move, the Federal Reserve and J.P. Morgan Chase & Co. stepped in to keep Bear afloat following a severe cash crunch…Yesterday's developments were the latest in a series of blows to the financial system that began in August. Then, banks became so wary of lending to each other that money markets seized up and the world's central banks had to intervene. The trigger was a surge in delinquencies on U.S. subprime mortgages and the end to a spectacular rise in home prices." Kate Kelly, et al., "Fed Races to Rescue Bear Stearns In Bid to Steady Financial System---Storied Firm Sees Stock Plunge 47%; J.P. Morgan Steps In," *Wall Street Journal*, (March 15, 2008).

[123]   Board of Governors of the Federal Reserve System, Troubled Asset Relief Program (TARP) Information, http://www.federalreserve.gov/bankinforeg/tarpinfo.htm.

[124]   Kara Scannell and Sudeep Reddy, "Greenspan Admits Errors to Hostile House Panel," *Wall Street Journal*, (Oct. 24, 2008). The TED spread, measured as the difference between interest rates that banks charge each other and the interest rate on short-term U.S. Treasury bills, is widely accepted as an indicator of market-wide liquidity risk.   The TED spread fluctuates over time, but historically had generally remained within the range of 10 to 50 basis points, until 2007. During 2007, the subprime mortgage crisis saw the TED spread expand to as high as 240 basis points. On August 15, 2008, the TED spread was 98 basis points, but it increased thereafter.   For example, on September 17, 2008, the TED spread exceeded 300 basis points, and on October 10, 2008, the TED spread reached a new high of 464 basis points. *See* TED Spread Data, Bloomberg.

CONFIDENTIAL

markets for trading non-agency MBS have been extremely illiquid."[125]   Thus, recent values for MBS such as the At-Issue Certificates may continue to reflect the liquidity risk discounts to cash flows the market has been demanding since 2007.

113.   Several Offering Documents disclosed the risk of illiquidity to investors, for example:

> No market will exist for the securities of any series before they are issued. In addition, even after the securities of a series have been issued and sold, there can be no assurance that a resale market for them will develop.[126]

114.   Thus, as discussed above, prices of MBS such as the At-Issue Certificates fluctuate based on prevailing market conditions to compensate investors for assuming risks in the marketplace.   Beginning in 2007, severe economic volatility and illiquidity in financial markets resulted in large reductions in the present value of anticipated cash flows of MBS such as the At-Issue Certificates.

## VII.   EVALUATION OF THE PERFORMANCE OF THE SUPPORTING LOAN GROUPS RELATIVE TO BENCHMARKS

115.   In this section, I evaluate NCUA's allegations regarding the impact of the alleged misrepresentations on the performance of the Supporting Loan Groups by comparing the performance of the At-Issue Loans to the performance of two Benchmarks.   First, I analyze the loans included in the Benchmarks using a regression analysis, which allows one to observe the relation, if any, between certain loan attributes and loan performance (*e.g.,* as a borrower's FICO score increases, that borrower is less likely to default) which is expressed as a coefficient.   I then apply those coefficients to the At-Issue Loans to

---

[125]   James Vickery and Joshua Wright, "TBA Trading and Liquidity in the Agency MBS Market," *FRBNY Economic Policy Review*, (May 2013), p. 3.

[126]   HarborView Mortgage Loan Trust Mortgage Loan Pass-Through Certificates, Series 2007-1, Prospectus p. 1 (Form 424B5) (Jan. 30, 2007).

CONFIDENTIAL

estimate how they should have performed based on the characteristics that were disclosed and compare that estimated performance to the actual performance of the At-Issue Loans.

116.   More specifically, I use a regression to analyze the loans underlying these Benchmarks (the "Default Model") and estimate the relation between loan performance (*i.e.,* DASD) and both (a) loan and borrower characteristics at origination, and (b) changes in macroeconomic conditions.   Using these relations estimated from the Benchmarks, I determine how each At-Issue Loan should have performed (its "expected performance") based on its loan and borrower characteristics at origination, as disclosed in the Offering Documents for the At-Issue Certificates, and changes in macroeconomic conditions.   I then aggregate the expected performance estimates for all of the At-Issue Loans to calculate the estimated DASD of the Supporting Loan Groups as a whole.   If the difference between actual and expected performance of the Supporting Loan Groups is not statistically significant, I conclude that the alleged failure of the loans to conform to the disclosed characteristics either did not exist, or did not affect the performance of the At-Issue Loans and, therefore, the performance of the At-Issue Certificates was due to macroeconomic conditions and loan and borrower characteristics that were disclosed to investors and unrelated to any alleged misrepresentations about the characteristics.

117.   I use two Benchmarks in my analysis: (1) comparable loans from non-agency securitizations issued between 2005 and 2007 (the "Industry Benchmark"); and (2) comparable loans from non-agency securitizations issued between 2005 and 2007 not subject to MBS litigation (the "Reduced Industry Benchmark").   After comparing the Supporting Loan Groups' actual performance with expected performance based on the two Benchmarks, I find that the disclosed loan and borrower characteristics and changes

CONFIDENTIAL

in macroeconomic factors explain the performance of the At-Issue Loans (*see* **Exhibits 19B and 20B**).

118.  In the discussion that follows, I provide further details regarding the source data and methodology for the selection of comparable loans in the Benchmarks, and the analysis of actual and expected DASD.

### A. Analysis of Actual and Expected DASD Using the Default Model

119.  In order to evaluate the performance of the Supporting Loan Groups, I compare their actual DASD to their expected DASD, which I calculate using my Default Model. The Default Model uses regression analysis, a widely used technique that quantifies the relation between an outcome (the "dependent" variable) and one or more explanatory factors (the "independent" variables). Regression analysis is particularly useful because it allows one to examine multiple explanatory factors that may affect the dependent variable at the same time. In this case, my analysis quantifies the extent to which variations in borrower and loan characteristics and macroeconomic conditions (*e.g.,* FICO scores and unemployment rates, respectively) impact the likelihood of default and serious delinquency in the loans underlying the Benchmark.[127]

120.  In the Default Model, the dependent variable is the status of the loan in a given month (*i.e.,* whether the loan is current, prepaid, or in default/serious delinquency).[128] The explanatory variables fall into two broad categories: (a) loan and borrower characteristics

---

[127]  As shown in **Exhibits 19A** and **20A**, the relation between each independent (or "control") variable and the likelihood of default and serious delinquency is expressed as the "estimated parameter" (also known as the "coefficient"). For example, **Exhibit 19A**, shows that an increase in a borrower's FICO score reduces the likelihood of default and serious delinquency (*i.e.,* its coefficient is negative).

[128]  For loans that are current, the Default Model calculates the probability that a loan will either prepay or enter into default/serious delinquency. Thus, the Default Model, in addition to calculating the likelihood of default and serious delinquency, also quantifies the relation between prepayment rates and the same explanatory factors that I discuss below (*i.e.,* loan and borrower characteristics and changes in macroeconomic conditions) in order to calculate the likelihood that a loan will prepay. *See* **Appendix D**.

CONFIDENTIAL

known at the time of origination, including those disclosed to investors, and (b) changes in macroeconomic conditions (*e.g.,* unemployment and housing prices in the home's geographic location). As discussed in Section VI, changes in macroeconomic conditions are important explanatory factors in determining the likelihood that a borrower of a mortgage loan will default or become seriously delinquent.[129]

121.    I use the following loan and borrower characteristics as explanatory variables in the Default Model:

- FICO score;

- CLTV ratio at origination;

- Documentation type (variable indicating whether the loan is fully documented);

- Residency (occupancy) type (variable indicating whether the home is the borrower's primary residence);

- Property type (variable indicating whether the home is a single-family residence);

- Loan purpose (variable indicating whether the loan is used to purchase a home rather than refinance an existing loan);

- Original loan balance;

- Year of securitization (variable indicating the year in which the loan was securitized);

- Year of origination (variable indicating the year in which the loan was originated);

- Pre-payment penalty (variable indicating whether a penalty is imposed for prepayments of the principal loan balance);

- Interest-only (variable indicating whether the borrower pays only the interest portion on the principal loan balance);

---

[129]    Kristopher Gerardi, et al., "Subprime Outcomes: Risky Mortgages, Homeownership Experiences, and Foreclosures," Federal Reserve Bank of Boston, Working Papers, No. 07-15 (May 4, 2008), p. 35; Christopher Foote, et al., "Reducing Foreclosures," Federal Reserve Bank of Boston, Public Policy Discussion Papers, No. 09-2 (April 8, 2009), p. 15.

CONFIDENTIAL

- Pool or loan classification (variables indicating whether the loan pool was classified as Prime or Alt-A, or the loan was classified as Prime or Alt-A);[130]

- Amortization period or original loan term (variables indicating whether the amortization period or original term of the loan is less than or equal to 20 years or more than 30 years);[131]

- Age of the loan since origination;[132] and

- State laws regarding lender recourse and the default process.[133]

122.  I also use the following changes in macroeconomic conditions as explanatory variables:

- Change in market interest rates for 30 year conventional mortgages from the origination date;

- Homeowner's equity;[134] and

- Change in unemployment rate within the home's geographic area.

123.  I estimate separate regressions of the Default Model on the Benchmarks for each type of collateral (FRMs, ARM/Hybrids, NEG AMs, and CESLs) to allow for variation in the estimated relations across different loan product types.[135]  The regression results on only the type of collateral relevant to the At-Issue Loans are then used.

---

[130]  LoanPerformance provides data on whether a loan pool was classified as Prime, Subprime, or Alt-A. Therefore, pool classification is used as an explanatory variable with the Industry Benchmarks.

[131]  Amortization period is equal to original loan term for all loans except for balloon payment loans, which do not fully amortize over the term of the loan, leaving a "balloon payment" at maturity.

[132]  In the Default Model based on the Industry Benchmarks, the age of the loan is accounted for by individual month indicator variables.

[133]  I include a variable that identifies states in which courts are involved in the foreclosure process and a variable that identifies states in which lenders may pursue borrowers in default or delinquency to recoup losses.

[134]  Homeowner's equity initially equals one minus the reported CLTV.  It is adjusted over time for the change in home prices observed in the local geographic area where the property is located.  As home prices decline, home equity declines.  Thus, the homeowner's equity variable captures local changes in home prices.

[135]  The inclusion of these explanatory factors in my analyses depends on the availability of collateral types with these characteristics.  For example, if there are no, or very few, comparable CESLs in subprime loan pools, the explanatory factor indicating loans from subprime loan pools is excluded from the analysis of CESLs.

CONFIDENTIAL

124.   I provide further details regarding the explanatory variables used in the Default Model, my accounting for layered risk,[136] and the varying likelihood of default and serious delinquency across different collateral types in **Appendix D**.  In addition, **Appendix D** also contains details regarding the specifications of the Default Model.

125.   The Default Model uses the relation between the performance of the loans underlying the Benchmark and the explanatory factors to calculate the expected likelihood of default and serious delinquency for each At-Issue Loan given the original disclosed loan and borrower characteristics and changes in macroeconomic conditions.[137]  In other words, the relations observed in the loans underlying the Benchmark are first used to calibrate the Default Model, then the Default Model is used to calculate the expected likelihood of default and serious delinquency for the At-Issue Loans.

126.   The expected likelihood of default and serious delinquency for each At-Issue Loan is, in turn, used to calculate the expected DASD of the Supporting Loan Groups.[138]  The resulting expected DASD of the Supporting Loan Groups represents the performance of the At-Issue Loans, assuming that they performed like the loans underlying the Benchmark after controlling for the disclosed loan and borrower characteristics and changes in macroeconomic conditions.   In other words, the expected DASD is the

---

[136]   To effectively estimate default, modelers must account for "layered risk", *i.e.,* the additional impact of *combining* loan and borrower risks.  For example, if a borrower does not occupy the home, has a high LTV, and has a low FICO score, the cumulative effect of all these aspects yields higher risk.  So regardless of the absolute value of each individual characteristic, the combination of characteristics results in an elevated rate of expected default.  I account for layered risk by estimating my model at the loan level rather than pool level.  *See, e.g.,* Roger Stein, et al., "Mortgage Portfolio Analyzer: A Quasi-Structural Model of Mortgage Portfolio Losses," Moody's Research Labs, (March 4, 2011), p. 75.

[137]   The expected likelihood of default and serious delinquency of each At-Issue Loan is the sum of the expected monthly likelihoods of default and serious delinquency across all months from the date of securitization to January 2015 (the latest housing price data available to me during the preparation of this report).

[138]   The expected DASD for the Supporting Loan Groups is the average of the expected likelihoods of default and serious delinquency for the At-Issue Loans in the Supporting Loan Groups, weighted by the original principal loan balance of each At-Issue Loan.

CONFIDENTIAL

performance that one would expect given the disclosed information regarding the At-Issue Loans.

127.    Once I have calculated the expected DASD for a Supporting Loan Group, I compare it to the actual DASD in order to evaluate the relative performance of each Supporting Loan Group.   If the actual DASD of a Supporting Loan Group is *statistically significantly higher* than the expected DASD,[139] I conclude that the Supporting Loan Group performed *worse* than expected, taking into account the disclosed loan and borrower characteristics and changes in macroeconomic conditions.[140]   In that case, any difference between the actual and expected DASD is the performance that is not attributable to the factors represented in the Default Model.   However, if the actual DASD of a Supporting Loan Group is *not statistically significantly different than* the expected DASD, I conclude that the Supporting Loan Group performed *in line with* expectations.[141]   In that case, the Supporting Loan Group's performance falls in line with the performance predicted by the Benchmark, given the Supporting Loan Group's disclosed loan and borrower

---

[139]    I determine that the expected DASD are statistically significantly different from actual DASD if the absolute value of the difference between expected and actual DASD is greater than 1.96 standard deviations, where the standard deviation of the differences calculated for comparable loan pool sizes and range of expected DASD from the Benchmark.   If the absolute value of the difference between actual and expected DASD is less than 1.96 standard deviations, I find that the difference is not statistically significant and that the Supporting Loan Group did not under- or over-perform the Benchmarks in a meaningful way.   1.96 standard deviations is the threshold used to determine statistical significance at the 95 percent confidence level, which is the most commonly used level of statistical significance. *See* Roy J. Epstein, "An Econometrics Primer for Lawyers," *Antitrust*, Vol. 25, No. 3 (Summer 2011), pp. 29-30; *see also* **Appendix D**.

[140]    I rely on statistical significance to conclude whether the Supporting Loan Groups under- or over-performed expectations.   Statistical significance is a commonly used and widely accepted statistical measure for determining whether a particular finding (*e.g.,* whether actual DASD are higher than expected DASD) is likely or unlikely to have occurred by chance.   Thus, to draw any statistical inferences from my analysis of DASD, I use statistical significance as an appropriate means for testing the difference between actual and expected DASD in order to conclude whether the difference is likely or unlikely to be attributable to chance.   *See* Roy J. Epstein, "An Econometrics Primer for Lawyers," *Antitrust*, Vol. 25, No. 3 (Summer 2011), pp. 29-30.

[141]    In cases where the actual DASD of a Supporting Loan Group is *lower* than the expected DASD, I do not examine statistical significance of this over performance and conclude that the Supporting Loan Group performed *in line with, or better than,* expected DASD.

characteristics and changes in macroeconomic conditions. If a Supporting Loan Group performed in line with expectations, I then conclude that either the purported misrepresentations NCUA alleges to have existed did not exist, or did not affect the performance of the At-Issue Loans.

**B.      Analysis of Actual and Expected Losses Using the Loss Severity Model**

128.   While the Default Model assesses the relation of disclosed loan and borrower characteristics and macroeconomic factors to the probability that a loan will default, I further analyze the severity of losses that an investor incurs in the event that a loan actually defaults (*i.e.,* loss severity). Loss severity models are often used by market participants to analyze the credit risk associated with RMBS.[142] These models allow one to predict the losses that will result when a loan defaults and the associated property is liquidated. Predictions from loss severity models can be used in combination with models of mortgage default to calculate expected losses of the At-Issue Loans.[143]

129.   The Loss Severity Model is consistent with models commonly used by market participants and found in the academic literature.[144] It quantifies the relations of the disclosed loan and borrower characteristics and macroeconomic conditions discussed in

---

[142]   *See e.g.,* Roger Stein, et al., "Mortgage Portfolio Analyzer: A Quasi-Structural Model of Mortgage Portfolio Losses," *Journal of the American Real Estate and Urban Economics Association*, Vol. 21, 4 (1993); Clauretie, T. and Herzog, T., "The Effect of State Foreclosure Laws on Loan Losses: Evidence from the Mortgage Insurance Industry," *Journal of Money, Credit, and Banking*, 22:2 (1990); Min Qi and Xiaolong Yang, "Loss Given Default of High Loan-to-Value Residential Mortgages," *Journal of Banking & Finance*, Vol. 33, (2009); Zhang, Ji, and Liu, "Local Housing Market Cycle and Loss Given Default: Evidence from Sub-Prime Residential Mortgages," International Monetary Fund, (2010).

CONFIDENTIAL

**Appendix E** to the loss severity of loans that have defaulted.  The dependent variable is the percentage of the original loan balance that is lost when a loan is liquidated.  I use the following disclosed loan and borrower characteristics as explanatory variables in the Loss Severity Model:

- FICO score;

- CLTV ratio at origination;

- Original loan balance;

- Age of the loan since origination;[145]

- Documentation type (variable indicating whether the loan is fully documented);

- Geographic information (variables indicating whether a property is located in a state with lender recourse or judicial foreclosure processes);[146]

- Residency (occupancy) type (variable indicating whether the house is the borrower's primary residence);

- Loan purpose (variable indicating whether the loan is used to purchase a house rather than refinance an existing loan);

- Property type (variable indicating whether the house is a single-family residence);

- Pool classification (variables indicating whether the loan pool was classified as prime or Alt-A);

- Year of origination (variables indicating the year in which the loan was originated); and

---

[145]   The age of the loan is measured as the number of months following origination.

[146]   I include a variable that identifies states in which courts are involved in the foreclosure process and a variable that identifies states in which lenders may pursue borrowers in default or delinquency to recoup losses.

CONFIDENTIAL

- Year of securitization (variables indicating the year in which the loan was securitized).

130.   I also use the following changes in macroeconomic conditions as explanatory variables:

- Homeowner's equity losses;[147] and

- Change in unemployment rate over the prior three months.

131.   As with the Default Model, I estimate separate regressions of the Loss Severity Model on the Benchmark loans for each type of collateral (FRMs, ARM/Hybrids, NEG AMs, and CESLs) to allow for variation in the estimated relations across different loan product types.[148]

132.   I then use the relations observed in the loans composing the Benchmarks to calculate the expected loss severity for the At-Issue Loans underlying the Supporting Loan Groups that underperformed using the DASD analysis.  This expected loss severity is then multiplied by both the At-Issue Loans' expected DASD and original principal balance to calculate the dollar amount of expected losses.  Finally, the expected losses for each At-Issue Loan are, in turn, used to calculate the expected total losses of the Supporting Loan Groups.[149] The resulting expected total loss of the Supporting Loan Groups represents the performance of the At-Issue Loans assuming that they performed like the loans in the

---

[147]   Homeowner's equity losses are the percentage of the loan balance that exceeds the value of the house, adjusted over time for the change in home prices observed in the local geographic area where the property is located. As home prices decline, homeowner's equity losses increase.  Thus, the homeowner's equity loss variable captures local changes in home prices.

[148]   The inclusion of these explanatory factors in my analyses depends on the availability of collateral types with these characteristics.  For example, if there are no, or very few, comparable CESLs in subprime loan pools, the explanatory factor indicating loans from subprime loan pools is excluded from the analysis of CESLs.

[149]   As before, the expected total loss for the Supporting Loan Groups is the average of the expected total loss for the At-Issue Loans in the Supporting Loan Groups, weighted by the original principal loan balance of each At-Issue Loan.

CONFIDENTIAL

Benchmark (controlling for the disclosed loan and borrower characteristics and changes in macroeconomic conditions).

133.    As before, once I have calculated the expected total loss for a Supporting Loan Group, I compare it to the actual total loss in order to evaluate the relative performance of each Supporting Loan Group.   Again, this analysis is performed on those Supporting Loan Groups where the actual DASD is *statistically significantly higher* than the expected DASD.   I conduct this analysis to calculate the extent to which losses experienced on the Supporting Loan Groups can be explained by factors other than the alleged misrepresentations.

### C.    Results of Analysis of Actual and Expected Performance Using the Default Model

#### 1.    Industry Benchmark

134.    The Industry Benchmark comprises comparable loans from non-agency securitizations that were issued between 2005 and 2007, a period that includes the years of securitization of the At-Issue Loans.   To construct the Industry Benchmark, I identify comparable loans in LoanPerformance, a database of non-agency MBS provided by third-party data vendor CoreLogic.   LoanPerformance contains loan-level data on millions of non-agency loans that have been securitized.   The data include loan and borrower characteristics known at the time of origination as well as the subsequent monthly performance of each loan (*i.e.,* whether the loan is current, prepaid, or if it is not performing, the number of days it is delinquent, or whether it is in foreclosure, REO, written-off, etc.).

135.    I use several criteria to identify comparable loans in the LoanPerformance database.   As mentioned earlier, I select loans that were securitized between 2005 and 2007.[150]

---

[150]    I also excluded loans backing the offerings at issue in the following actions: *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, Case No. CV 11-05887 GW(JEMx); *National Credit*

CONFIDENTIAL

**Appendix D** contains further details on the criteria and process by which I identify comparable loans in the Industry Benchmark.

136.   Based on the above criteria, the Industry Benchmark comprises approximately 8.4 million comparable loans that were securitized across approximately 2,600 offerings. By collateral type, there are approximately 3.8 million ARM loans, 1.9 million fixed rate loans, 0.9 million NEG AM loans, and 1.8 million CESL loans in the Industry Benchmark.

137.   As discussed earlier, the Default Model allows me to compare the actual DASD of each Supporting Loan Group to its expected DASD based on comparable loans (the Industry Benchmark). I first use regression analysis to determine how the likelihood of default and serious delinquency for loans in the Industry Benchmark varies with loan and borrower characteristics and changes in macroeconomic conditions. **Exhibit 19A** displays the results of the regression model that I estimate for each collateral type (Fixed, ARM, NEG AM, and CESL) using the Industry Benchmark. The regression demonstrates that borrowers with higher creditworthiness, as indicated by higher FICO scores, are less likely to default. Similarly, borrowers who experienced larger declines in home prices are more likely to default as shown by the negative coefficient (*i.e.,* negative relation) for "Homeowner's Equity," providing further evidence that home prices play a significant role in loan performance, as discussed above.

138.   Next, I calculate the expected DASD of the At-Issue Loans by applying their disclosed characteristics and the macroeconomic conditions to the Default Model that I estimated

---

*Union Administration Board v. RBS Securities, Inc. et al.*, Case No. 11-cv-2340-JWL-JPO;  *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, Case No. 13-cv-6726 (DLC). Second Amended Kansas Complaint; Second Amended California Complaint; First Amended Complaint, *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, November 14, 2014 ("First Amended New York Complaint").

CONFIDENTIAL

using the Industry Benchmark.  The resulting expected DASD is the performance that one would expect of the At-Issue Loans, assuming that they performed like the Industry Benchmark, controlling for borrower and loan characteristics and changes in macroeconomic conditions.

139. **Exhibit 19B** provides a side-by-side comparison of actual and expected DASD for the Supporting Loan Groups based on the Industry Benchmark.  I find that 39 out of 41 Supporting Loan Groups (associated with 96.3 percent of the original principal balance of all the Supporting Loan Groups) performed in line with the Industry Benchmark.  While there may exist a difference between actual performance and expected performance for these Supporting Loan Groups, this difference is not statistically significant.  This result supports the conclusion that the performance of the Supporting Loan Groups is explained by factors captured by the Default Model and disclosed in the Offering Documents (*i.e.,* disclosed loan and borrower characteristics and macroeconomic conditions), and not alleged misstatements.

140. For those Supporting Loan Groups that statistically significantly underperformed the benchmark, **Exhibit 19D** provides a side-by-side comparison of actual and expected total losses.  I find that of those statistically significantly underperforming Supporting Loan Groups, the losses that are not explained by disclosed loan and borrower characteristics and macroeconomic conditions are relatively limited, and comprise just 7.4 percent of the original loan balance.

### 2.    Reduced Industry Benchmark

141. The Industry Benchmark does not exclude loans subject to litigation outside of actions related to the current matter because it is intended to represent the industry as a whole during the relevant time period.  However, in anticipation that NCUA may argue that

CONFIDENTIAL

certain loans in the Industry Benchmark were potentially impacted by underwriting defects, I produce an alternative Benchmark. The "**Reduced Industry Benchmark**" comprises loans included in the Industry Benchmark but excluding all loans in offerings that are or were subject to known MBS litigation.[151]

142.     The analysis of DASD using the Reduced Industry Benchmark results in findings that are consistent with the Industry Benchmark findings. I report the results of my regression model using the Reduced Industry Benchmark in **Exhibit 20A**. I find that 37 of 41 Supporting Loan Groups (associated with 93.5 percent of the original principal balance of all the Supporting Loan Groups) performed in line with the Reduced Industry Benchmark (*see* **Exhibit 20B**). That is, for these Supporting Loan Groups, the actual DASD is not statistically significantly different from the expected DASD based on the Reduced Industry Benchmark. Only four Supporting Loan Groups (associated with 6.5 percent of the original principal balance of all the Supporting Loan Groups) had actual DASD that were statistically significantly higher than expected.

143.     For those Supporting Loan Groups that statistically significantly underperformed the benchmark, **Exhibit 20D** provides a side-by-side comparison of actual and expected total losses. I find that of those statistically significantly underperforming Supporting Loan Groups, the losses that are not explained by disclosed loan and borrower characteristics and macroeconomic conditions are relatively limited and comprise just 7.1 percent of the original loan balance.

---

[151]     The list of offerings and the corresponding litigation used for purposes of the Reduced Industry Benchmark are set forth in **Appendix F**.

CONFIDENTIAL

## VIII.   EVALUATION OF THE IMPACT OF MACROECONOMIC CONDITIONS ON THE SUPPORTING LOAN GROUPS

144.   As discussed in Section V, the US economy experienced a significant economic downturn that contributed to, among other things, a steep decline in real estate prices and an increase in unemployment.   These declining macroeconomic conditions, in turn, contributed to an increase in the incidence of mortgage defaults and losses.  As discussed in Section VI, the risk of these conditions—namely market risk, changing home prices or unemployment status, etc.—was disclosed to NCUA in the Offering Documents.  In this section, I evaluate empirically the impact of certain of these declining macroeconomic conditions on the performance of the Supporting Loan Groups in two ways.

145.   First, I isolate the impact of the decline in home prices since 2007 on the results of my benchmarking analysis described above.  As discussed above, because the At-Issue Loans were originated at or near the peak of home prices, they had little opportunity to accumulate an equity "cushion" (*i.e.,* the increase in home equity that results from an increase in home values) before home prices began to decline in 2006 and 2007. Consequently, the At-Issue Loans were more vulnerable to housing market declines than loans that, for example, had been originated in 2002 and generally had experienced four years of home price increases (and accumulated equity cushions) before the market declined.

146.   Specifically, I re-calculate the expected performance of the At-Issue Loans, replacing the actual home price experience of each At-Issue Loan with the home price experience it would have had, had it been originated in the same month in 2002—the commencement of a period of relative home price appreciation.  For example, for a loan originated in 2006, I recalculated its expected performance by replacing the actual home price

CONFIDENTIAL

experience for the period 2006 through 2015 with the home price experience for the period 2002 through 2011.  For each loan, this has the effect of simulating what expected performance would be if home prices had followed the path experienced by loans originated in 2002—increasing for approximately four years before declining.  As such, the substantial drop in home prices experienced starting in 2006 is still captured in this simulation, but at a point in time further away from the loans' origination.  I leave all other characteristics of the loan and macroeconomic conditions, including interest rates, unemployment rates, and disclosed loan and borrower characteristics, unchanged.  By comparing this expected DASD calculated using the home price experience starting in 2002 against the expected DASD calculated using the actual home price experience, I am able to compare the impacts of the decline in home prices based on the timing of the decline.  **Exhibit 21** compares these two expected performances.  As shown in **Exhibit 21**, the expected DASD across all Supporting Loan Groups using the home price experience starting in 2002 is 57.6 percent lower than the expected DASD using actual housing prices.  This shows that if the At-Issue Loans had experienced a few years of housing price growth prior to the housing market decline, rather than experiencing a price decline relatively shortly after origination, the expected DASD would be reduced by 57.6 percent.  That is, the timing of the decline in home prices explains 57.6 percent of expected DASD.

147.    Next, I analyze the impact that the change in home prices had on one of the loan and borrower characteristics alleged by NCUA to have been misrepresented at the time of

CONFIDENTIAL

purchase, the LTV ratio.[152]  I do so to quantify the impact that declining macroeconomic conditions had on LTV.

148.  Specifically, for each month I estimate the LTV ratio of the At-Issue Loans in default/serious delinquency by adjusting the LTV ratio at origination by the change in home prices in that loan's MSA (or state, if MSA information is unavailable) from the month of origination to the month the loan enters default/serious delinquency.  **Exhibit 22** shows this weighted average home price-adjusted LTV for At-Issue Loans in default/serious delinquency in each month compared with their weighted average LTV at origination.  The weighted average home price-adjusted LTV exceeds the weighted average origination LTV by as much as 48.8 percentage points, and exceeded 100 percent (indicating the borrowers were underwater) for 64 months between November 2005 (date of the first default/serious delinquency) and January 2015.  Again, the result of this analysis shows the overwhelming impact of declining macroeconomic conditions on the LTVs of the At-Issue Loans.

## IX.  CONCLUSIONS

149.  The Credit Unions purchased the At-Issue Certificates shortly before or during a time period of deteriorating macroeconomic conditions that left many borrowers across the country unable to make payments on their mortgages.  Based on my analysis, I conclude that these conditions impacted the performance of the At-Issue Loans as well as loans in other trusts securitized at about the same time.  In particular, these factors, and specifically the decline in state-wide home prices, negatively impacted the performance of At-Issue Loans.  Specifically, in states where home prices experienced the greatest

---

[152]     Second Amended Kansas Complaint, ¶7; Second Amended California Complaint, ¶7.

CONFIDENTIAL

decline between July 2006 and February 2012 (the peak and trough of national home prices), the weighted average DASD for the At-Issue Loans was highest.

150.   Based on the results of my Benchmarking analyses, I further conclude that the purported misrepresentations NCUA alleges to have existed in the At-Issue Loans either did not exist, or did not affect the performance of the At-Issue Loans.

151.   I also find that if the At-Issue Loans had experienced a few years of housing price growth prior to the housing market decline, rather than experiencing a price decline relatively shortly after origination, it would eliminate over half of the expected DASD that the At-Issue Loans experienced.

152.   Finally, I find an overwhelming impact (as much as 48.8 percentage points) of declining home prices on the LTV of the At-Issue Loans (*see* **Exhibit 22**).

August 14, 2015

_____

Walter Torous, Ph.D.

CONFIDENTIAL

## Appendix D

### I.        Explanatory Factors Impacting Default and Serious Delinquency Rates

I describe below those loan and borrower characteristics, changes in economic conditions, and collateral types that are used as explanatory factors in the Default Model to estimate the likelihood of default and serious delinquency of the At-Issue Loans.  These are variables that academic researchers and participants in the mortgage market typically discuss in explaining the default behavior of mortgage borrowers. Additional details regarding data sources and variable calculations are included in Section II.

### *Loan and Borrower Characteristics*

*FICO Score*

The FICO score is a commonly used credit score assigned by an independent credit bureau which offers one measure of a borrower's riskiness.[1]  Holding other factors constant, borrowers with a higher FICO score generally are considered by market participants and researchers to be more creditworthy and at a lower risk of becoming seriously delinquent or defaulting on their loan.[2]

*Combined Loan to Value Ratio*

The combined loan to value ratio ("CLTV") is the combined amount of liens on the property divided by the value of the property.  A borrower with a higher CLTV at origination of a mortgage has less equity in the property and, holding other factors constant, may be at a higher risk of default, particularly in the event of a decline in the value of the home.[3]

*Documentation Type*

Full documentation loans require that a borrower provide proof of such things as income and assets. Loans with less than full documentation, which became increasingly available starting in 1999,[4] do not require the same level of documentation and are often used by borrowers who are self-employed.  These types of loans may be riskier than those with full documentation, holding all other factors constant.[5]

---

[1]     "FICO Score," FICO, http://www.fico.com/en/products/fico-score.

[2]     "FICO Score," FICO, http://www.fico.com/en/products/fico-score; Patrick Bajari, et al., "An Empirical Model of Subprime Mortgage Default from 2000 to 2007," Federal Reserve System, (March 11, 2011), pp. 4-5.

[3]     Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2, (Feb. 2009), pp. 14-15.

[4]     Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2, (Feb. 2009), pp. 9-12.

[5]     Patrick Bajari, et al., "An Empirical Model of Subprime Mortgage Default from 2000 to 2007," Federal Reserve System, (March 11, 2011), p. 23; Geetesh Bhardwaj and Rajdeep Sengupta, "Where's the Smoking Gun? A Study of Underwriting Standards for US Subprime Mortgages," Federal Reserve Bank of Saint Louis, Working Paper, (March 2010), p. 25.

CONFIDENTIAL

*Residency (Occupancy) Type*

Holding other factors constant, owner occupants may be less likely to become seriously delinquent or default than investors or owners for whom the home is a second home.[6]

*Property Type*

Loans on residential properties can be taken out for single-family homes or other types of property such as condominiums and multiple-family homes.  The literature finds that the riskiness of single-family homes relative to other property types varies across loan samples from different time periods.[7]

*Loan Purpose*

Loans taken out for the purchase of a home may have a different level of risk than those taken out to refinance an existing mortgage.  Certain literature finds that cash-out refinance loans are more likely to default relative to purchase loans,[8] while other literature finds that purchase loans may have a higher probability of default than refinance loans.[9]

*Original Loan Balance*

A larger loan balance represents a greater financial obligation for the borrower.  If house prices decrease, the value of the property may fall below the value of the mortgage loan by a larger amount, increasing the likelihood of default and serious delinquency.

*Year of Securitization*

The year in which a loan is securitized refers to the year when the securitization was issued.  In this matter, the At-Issue Securitizations were issued in 2005, 2006, and 2007.

*Year of Origination*

The loan origination year refers to the year in which a particular loan was made to a borrower.  Indicator variables for origination year are likely to pick up changes in the disclosed underwriting standards over time, which may impact the performance of the loan.[10]

---

[6]     Geetesh Bhardwaj and Rajdeep Sengupta, "Where's the Smoking Gun? A Study of Underwriting Standards for US Subprime Mortgages," Federal Reserve Bank of Saint Louis, Working Paper, (March 2010), p. 25.

[7]     Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2, (Feb. 2009), p. 30.

[8]     Yuliya Demyanyk and Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," *The Review of Financial Studies*, Vol. 24, No. 6, (2011), pp. 1849, 1862.

[9]     Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2, (Feb. 2009), pp. 8-12, 16.

[10]    Yuliya Demyanyk and Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," *The Review of Financial Studies*, Vol. 24, No. 6, (2011).

CONFIDENTIAL

*Pre-Payment Penalty*

Loans that impose a penalty for paying off the balance prior to the end of the loan's term may generally make it less likely that a borrower will prepay during the prepayment penalty period. The direct effect of a prepayment penalty on default/serious delinquency is expected to be small. However, it is an important control for prepayment behavior, and is included to help the model as it estimates both prepayment and default behavior. *See* Section II for further details.

*Interest-Only*

Loans with an interest-only period allow borrowers to pay only interest for a portion of the loan's duration. During that time, no payments are made toward the loan balance, so borrowers do not build equity in the property. This may, in turn, impact DASD when the interest-only period ends.[11]

*Pool Classification*

The LoanPerformance database provides a variable that indicates the type of pool in which each loan is securitized: Prime, Alt-A, or Subprime.

*Amortization Period*

The original term over which the loan is amortized will impact the size of a borrower's monthly payments and the interest rates that lenders will charge. This may, therefore, impact the likelihood of default or serious delinquency. Borrowers who select mortgages with shorter amortization periods may have greater financial resources and build equity faster than borrowers who select mortgages with longer amortization periods, thereby decreasing the likelihood of default or serious delinquency.

*Age of Loan Since Origination*

The age of a loan has been shown to be important in determining the likelihood of default, serious delinquency, and prepayment.[12] After initially increasing, the likelihood of default is likely to decline as the loan ages.[13]

*State Lender Recourse and Judicial Foreclosure Laws*

State recourse laws are intended to allow lenders to recoup some of their losses by suing the borrower for the difference between the home's fair market value and the remaining loan balance. While the

---

[11]   Shane Sherlund, "The Past, Present, and Future of Subprime Mortgages," Federal Reserve Board, Washington, D.C., (Nov. 2008), p. 10.

[12]   Yuliya Demyanyk and Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," *The Review of Financial Studies*, Vol. 24, No. 6, (2011), pp. 1864-1866.

[13]   Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2, (Feb. 2009), pp. 30-31.

CONFIDENTIAL

particulars of these laws vary by state,[14] borrowers may be less likely to strategically default in states which allow this type of recovery,[15] holding other factors constant.

In states which require a judicial foreclosure, the lender must file a complaint with the court requesting permission to foreclose on the property.[16]   While timelines vary from state to state, foreclosures in judicial foreclosure states[17] generally take longer to complete.[18]   Given the lengthened timeline in judicial foreclosure states, borrowers are able to stay in their homes longer after default, which may make it more likely for them to become seriously delinquent and default, holding other factors constant.

---

[14]     In some states, for example, substantial personal property or wages are exempt from collection on the deficiency.   Andra C. Ghent and Marianna Kudlyak, "Recourse and Residential Mortgage Default: Evidence from US States," *The Review of Financial Studies*, Vol. 24, No. 9, (2011), pp. 3140-3144.

[15]     States with non-recourse classification include: Alaska, Arizona, California, Iowa, Minnesota, Montana, North Carolina (for purchase mortgages), North Dakota, Oregon, Washington, and Wisconsin.   Andra C. Ghent and Marianna Kudlyak, "Recourse and Residential Mortgage Default: Evidence from US States," *The Review of Financial Studies*, Vol. 24, No. 9, (2011), pp. 3140-3144.

[16]     Mortgage Bankers Association, "Judicial Versus Non-Judicial Foreclosure," https://web.archive.org/web/20131127163012/http://www.mbaa.org/files/ResourceCenter/ForeclosureProcess/JudicialVersusNon-JudicialForeclosure.pdf.

[17]     States with judicial foreclosure classification include: Connecticut, Delaware, Florida, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, New Jersey, New York, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Vermont, and Wisconsin.   Arkansas, Iowa, and New Mexico have both.   The remaining states have non-judicial foreclosure procedures.   Fannie Mae, *Fannie Mae 2010 Servicing Guide Update Part VII and Part VIII*, https://www.fanniemae.com/content/guide/svc042810.pdf.

[18]     Andra C. Ghent and Marianna Kudlyak, "Recourse and Residential Mortgage Default: Evidence from US States," *The Review of Financial Studies*, Vol. 24, No. 9, (2011), pp. 3142-3144.

CONFIDENTIAL

### *Changes in Macroeconomic Conditions*

*Change in Interest Rate Since Origination*

For an adjustable-rate mortgage (ARM), a decrease in the loan's interest rate may reduce the monthly mortgage payments and may therefore reduce the risk of default.  A change in the interest rate may also capture the impact of unobserved macroeconomic conditions which may affect the estimated impact on default and prepayment.

*Homeowner's Equity*

As home prices increase (decrease) a borrower's current equity will increase (decrease).  With positive equity, a borrower is more able to refinance or sell the property to pay off the loan.  Negative equity, on the other hand, makes exercising these options difficult or impossible.[19]  Higher equity, therefore, may make it less likely that a borrower becomes seriously delinquent or defaults, holding other factors constant.

*Change in Unemployment Rate Over the Prior Three Months*

Loss of a job will decrease a borrower's income, which may affect the borrower's ability to continue making payments, holding all other factors constant.[20]  I use the change in the unemployment rate over the prior three months as a proxy for overall macroeconomic conditions.

### *Type of Collateral*

Borrower behavior may be different depending on the type of loan product they select.  For example, the default risk associated with borrowers with ARM/Hybrid loans may be more sensitive to changes in interest rates than borrowers with fixed-rate mortgages.  If an ARM/Hybrid loan borrower's interest rate adjusts upward, increasing monthly payments, that borrower may be at a higher risk of becoming seriously delinquent or defaulting, holding other factors constant.  This may not be the case for those borrowers with fixed-rate mortgages.  Likewise, borrowers who select a negatively amortizing loan will not initially build any equity in the home, which may make them more susceptible to becoming seriously delinquent or defaulting in the event of a housing price decline.  The prepayment behavior of borrowers can also be influenced by the product type, as a borrower with a fixed rate loan is more likely to refinance in the event that mortgage interest rates fall.

---

[19]     Christopher Foote, et al., "Reducing Foreclosures: No Easy Answers," NBER Macroeconomics Annual 2009, Vol. 24, (April 2010), pp. 89-91, 101-111; Kristopher Gerardi, et al., "Making Sense of the Subprime Crisis," Federal Reserve Bank of Atlanta, Working Paper 2009-2, (Feb. 2009), pp. 18-19; Shane Sherlund, "The Past, Present, and Future of Subprime Mortgages," Federal Reserve Board, Washington, D.C., (Nov. 2008), p. 2.

[20]     Yuliya Demyanyk, et al., "Determinants and Consequences of Mortgage Default," The Federal Reserve Bank of Cleveland, Working Paper, (Jan. 2011), p. 16; Christopher Foote, et al., "Reducing Foreclosures: No Easy Answers," NBER Macroeconomics Annual 2009, Vol. 24, (April 2010), pp. 89-91, 101-111.

CONFIDENTIAL

## II.     Default Model

I describe below the regression models I use to estimate the expected default/serious delinquency and prepayment rates for the At-Issue Loans, which I in turn use to evaluate the performance of the Supporting Loan Groups. The regression model is estimated separately on the Industry Benchmark and the Reduced Industry Benchmark. For each Benchmark, I describe how comparable loans were selected, the data sources I drew upon, and the variables used in the regression models.

### II.1    Description of Default Model

The Default Model is a multinomial panel logistic regression model. The model is referred to as a panel regression because each benchmark loan is included in my estimation dataset for each month of its life until it defaults, prepays, or reaches the end of the analysis period.[21]  The dependent variable is a categorical variable, Loan Status, which indicates the state of the loan at the end of each month. The model is referred to as multinomial because there are three possible states for each loan in each month: (1) a loan could be current, (2) a loan could be prepaid, or (3) a loan could be in default or serious delinquency.[22]  A logistic regression used in this framework (often referred to as a discrete time duration model) allows me to calculate the expected probability that a loan will be in any of these three states in any given month until the end of the analysis period. The sum of those expected probabilities will equal one. The independent variables used in each benchmark are described in Section I. Additional details regarding these variables are discussed in Sections II.3 and II.4 below.

I estimate my benchmarks on loans of the same collateral type as the At-Issue loans, whose selection criteria are described in Section II.2 below.

1. First lien, non-negatively amortizing, fixed rate mortgages ("FIXED"),
2. First lien, non-negatively amortizing, adjustable rate/hybrid mortgages ("ARMs"),[23]
3. First lien, negatively amortizing mortgages ("NEG AMs"),
4. Second lien, fixed rate mortgages ("CESLs").

For each benchmark and collateral type, I estimate a Default Model with a set of comparable loans. Each benchmark loan is included in the estimation dataset for each month of its life until it defaults, prepays, or reaches the end of the analysis period. My regression model estimates the relation between the independent variables and the probabilities of default/serious delinquency and prepayment in each month *conditional* on the loan being current in the previous month.[24]  The estimated parameters allow me to predict the conditional probabilities that each At-Issue Loan is in each state in each month. To calculate the probability that a given loan defaults/becomes seriously delinquent or prepays in a given month, I need to calculate the *unconditional* probability that the loan defaults or prepays in a given month. Letting

---

[21]     The end of the analysis period is January 2015, the latest housing price data available to me during the preparation of this report.

[22]     Default and prepayment status are assigned when a loan enters default/serious delinquency or prepayment and does not change from that status before the end of my analysis period. Consequently, loans assigned default or prepayment statuses do not recover by definition.

[23]     Hybrid mortgages refer to loans with an initial fixed teaser interest rate period after which the rate will reset at regular intervals. Hybrid mortgages make up the bulk of this category.

[24]     The probability of default/serious delinquency or prepayment conditional on being current in the previous month is often referred to as the hazard of default/serious delinquency or hazard of prepayment, respectively.

CONFIDENTIAL

*Default*$_{i,t}$ indicate the event that loan *i* defaults in month *t*, the *unconditional* default probability is given by:

$$\text{P}(Default_{i,t}) = \text{P}(Default_{i,t}/Current_{i,t-1}) \times \text{P}(Current_{i,t-1}),$$

where P(*Default*$_{i,t}$/*Current*$_{i,t-1}$) is the *conditional* default probability of loan *i* in month *t*. Similar equations hold for the unconditional probability that a loan prepays in month *t* and the unconditional probability that a loan is current in month *t*.

For each At-Issue Loan, I then apply the estimated parameters from my Default Model to calculate the expected probabilities that the given At-Issue Loan defaults/becomes seriously delinquent or prepays in a given month based on that loan's specific loan and borrower characteristics and changes in economic factors. The expected cumulative probability that loan *i* defaults or becomes seriously delinquent by the end of the analysis period is the sum of the expected unconditional default/serious delinquency probabilities, P(*Default*$_{i,t}$), over all months *t*. The expected DASD of a Supporting Loan Group is the average expected cumulative default and serious delinquency probabilities of the At-Issue Loans in the Supporting Loan Group, weighted by their original principal balance.

I test whether the difference between the actual and expected DASD of each Supporting Loan Group is statistically significant. First, I calculate a pool-level standard error based on the Industry Benchmark loan pools. I allocate the Industry Benchmark loan pools to buckets based on the number of loans and their expected DASD. For each pool, I then calculate the difference between the actual DASD and the DASD predicted by the benchmark.[25] Next, I calculate the standard deviation of the difference within each bucket. The estimate of the standard error of the difference for a given Supporting Loan Group is the standard deviation within its corresponding bucket. If the difference between actual and expected DASD for a Supporting Loan Group is higher than the standard deviation times 1.96, the corresponding critical value from the standard normal distribution, I determine that the Supporting Loan Group has performed worse than expected. Conversely, if the difference between actual and expected DASD for a Supporting Loan Group is less than the standard deviation times -1.96, I determine that the Supporting Loan Group has performed better than expected. If the difference is greater than the standard deviation times -1.96 and less than the standard deviation times 1.96, I determine that the Supporting Loan Group has performed as well as expected.

---

[25]   This procedure is applied separately for the Industry Benchmark and Reduced Industry Benchmark benchmarks. To assess the statistical significance of the difference between the actual and expected DASD from each benchmark, I used the corresponding coefficients from that benchmark (shown in **Exhibits 19A** and **20A**) to predict the DASD of loan pools in that Benchmark.

CONFIDENTIAL

### II.2   Identification of Comparable Loans

#### a.   Industry Benchmark

I selected the sample of comparable loans for my Industry Benchmark from the LoanPerformance database using the following criteria:

1.  Select loans with the same collateral types as the At-Issue Loans:

    a.  First lien, non-negatively amortizing, fixed rate loans – A loan is categorized in this group if it is a first lien (*LIEN* equals "1"), non-negatively amortized (*NEGAM* equals "0"), fixed rate loan (*PROD_TYPE* does not equal any of the following: "20" through "29", "2A", "2B", "2C", "2D", "2I", "50", "5A", "60" through "64", "6Z", "70", "ZZ", or is missing).

    b.  First lien, non-negatively amortizing, hybrid/ARM loans - A loan is categorized in this group if it is a first lien (*LIEN* equals "1"), non-negatively amortized (*NEGAM* equals "0"), ARM or Hybrid loan (*PROD_TYPE* equals any of the following: "20" through "29," "2A," "2B," "2C," "2D," "2I," "5A," or "70").

    c.  First lien, negatively amortizing, hybrid/ARM loans - A loan is categorized in this group if it is a first lien (*LIEN* equals "1"), negatively amortized (*NEGAM* equals "1"), ARM or Hybrid loan (*PROD_TYPE* equals any of the following: "20" through "29," "2A," "2B," "2C," "2D," "2I," "5A," or "70").

    d.  Second lien, fixed rate loans – A loan is categorized in this group if it is not a first lien loan (*LIEN* is greater than "1"), fixed rate loan (*PROD_TYPE* does not equal any of the following: "20" through "29", "2A", "2B", "2C", "2D", "2I", "50", "5A", "60" through "64", "6Z", "70", "ZZ", or is missing).[26]

2.  Limit comparable loans to loans that were securitized between 2005 and 2007 (year of *CLOSE_DATE* equals "2005" through "2007").

3.  Exclude all loans from offerings at issue in the actions in this matter. [27, 28]

---

[26]   Among the At-Issue Loans, there is a single second lien loan that is an adjustable rate mortgage instead of a fixed rate mortgage.  I compare the performance of this loan with the second lien, fixed rate industry loans because I believe it is the most appropriate comparison of the collateral groups available.

[27]   These include: *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, Case No. CV 11-05887 GW(JEMx); *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, Case No. 11-cv-2340-JWL-JPO;  *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, Case No. 13-cv-6726 (DLC).

[28]   There are 37 such offerings: AHMA 2007-3, FFML 2005-FFH4, FFML 2006-FF16, FHLT 2006-3, FHLT 2006-D, GMACM 2006-HE5, HVMLT 2006-10, HVMLT 2006-11, HVMLT 2006-12, HVMLT 2006-14, HVMLT 2006-6, HVMLT 2006-8, HVMLT 2006-9, HVMLT 2006-SB1, HVMLT 2007-1, HVMLT 2007-2, HVMLT 2007-3, HVMLT 2007-4, HVMLT 2007-5, INDX 2006-AR35, INDX 2006-AR6, LBMLT 2006-2, LBMLT 2006-8, LUM 2006-2, LUM 2007-1, MHL 2006-1, NAA 2006-AR4, NHEL 2006-5, NHELI 2007-1, OOMLT 2007-2, RFMS2 2007-HSA2, SAST 2006-3, SVHE 2005-OPT4, SVHE 2006-WF1, SVHE 2006-WF2, SVHE 2007-OPT1, and WMLT 2006-ALT1.  *See* Second Amended Kansas Complaint, Second Amended California Complaint, and First Amended New York Complaint.

CONFIDENTIAL

4.  Exclude all loans missing information for any of the variables included in my Default Model.

### b.  Reduced Industry Benchmark

My Reduced Industry Benchmark comprises loans from my Industry Benchmark, and thus loans that are subject to the same selection requirements listed above, with the additional criteria that they do not come from securities that were or are subject to known litigation.[29]

### II.3    Data Sources and Calculation of Variables

I use data from LoanPerformance database for my two benchmarks to determine borrower characteristics, loan characteristics, and the status of the loan (current, prepaid, or in default/seriously delinquent) as of the end of the analysis period.  In addition, I use certain data from other sources for key macroeconomic characteristics such as home price levels and unemployment.  Below I detail how I determine the status of each loan, calculate equity over time, and calculate the change in the unemployment rate over time.  The remaining independent variables are discussed in more detail in Section II.4 below.

- *Loan Status*

    The dependent variable of the Default Model, Loan Status, is a categorical variable that indicates whether a loan entered default/serious delinquency, prepayment, or neither in a given month.  It captures the final status of the loan in the month in which it entered that status.

    To calculate the status of a given loan, I use the variables *OTS_STAT*, *EXCEPTION,* and *LOSS_AMT*.  In each month for which performance data is available up through the end of the analysis period, I employ the following algorithm to assign Loan Status:

    - Monthly values of *OTS_STAT* and *EXCEPTION* are translated into a preliminary monthly loan status.

        ▪  If *OTS_STAT* is equal to "9", "F", or "R" ("91+ days delinq", "Foreclosure", or "REO") or *EXCEPTION* is equal to "2", "3", "4", or "5" ("Foreclosure", "REO", "Bankruptcy", or "Bankruptcy and FC") then the loan is determined to be in default/seriously delinquent in that month.

        ▪  If *OTS_STAT* is equal to "C", "3", or "6" ("Current", "31-60 days delinq", or "61-90 days delinq") then the loan is determined to be current (*i.e.,* neither prepaid nor in default/seriously delinquent).

        ▪  If *OTS_STAT* is equal to "0" ("Paid Off") or *OTS_STAT* is missing and *EXCEPTION* is equal to "6" ("Paid Off") then the loan may be either prepaid (*i.e.,* paid off voluntarily) or in default (*i.e.,* the loan was liquidated).  To distinguish between the two, I first consider losses sustained by the loan (determined using the most recently available value of *LOSS_AMT*).  If the loan had at least $100 in losses then I determine that the loan was liquidated and therefore in default/serious delinquency.  If the loan did not have losses of at least $100, I consider the status of the loan in the previous month.  If, in the previous month, the loan was not in default/serious delinquency, then I determine

---

[29]    The list of loans subject to MBS litigation was provided to me by counsel.

CONFIDENTIAL

that the loan was paid off voluntarily (*i.e.,* the loan prepaid). Otherwise, I determine that the loan was in default/serious delinquency.

- I then assign monthly loan status using the preliminary monthly loan status as follows:

  - The most recent preliminary monthly status associated with a loan is identified as that loan's *final status*.

  - If the loan's final status is either in default/seriously delinquent or prepaid, I identify the first month in which the loan entered this final status without changing prior to the end of the analysis period. This is referred to as the loan's *exit date*. If the loan's final status is current, then the loan's exit date is assumed to be the last month of the analysis period.[30]

  - Loan Status is equal to the loan's final status in the month in which it entered that status (*i.e.,* in the month of its exit date). The loan is considered to be current in all months prior to its exit date.

- *Homeowner's Equity*

  Homeowner's Equity measures the percent of a house's value that exceeds the amount of any liens on the house; that is, it is equal to the current value of the house less the combined amount of loans taken out against the house, divided by the current value of the house. I calculate equity as one minus the CLTV at origination adjusted for changes in house prices. To adjust the CLTV for the change in house prices since origination, I divide the CLTV by one plus the percent change in house prices between the observed month and the month of origination calculated according to the REdex Square Home Price Index.[31] A loan-month is matched to its corresponding monthly REdex Square Home Price Index value at the Metropolitan Statistical Area (MSA)-level when such data are available and at the average state-level when MSA-level data are not available.

- *Change in Unemployment Rate Over the Prior Three Months*

  The Change in Unemployment Rate Over the Prior Three Months is equal to the unemployment rate in the observed month minus the unemployment rate from three months prior. A loan-month is matched to its corresponding monthly unemployment rate at the MSA-level when such data are available and to the average state-level unemployment rate when MSA-level data are not available. Monthly unemployment data are available from the Bureau of Labor Statistics.[32]

Section II.4 below further explains the control variables that I use in my Default Model.

---

[30]   If a loan's history ends before the end of our analysis period and it ends as current, then I consider the loan current and assume its exit date to be the last month that it appears in the data. In this instance, the exit date serves mostly to limit the number of panel observations where this loan can be used for estimation.

[31]   Based on the REdex Square Index Library. For regions where Case-Shiller indices are not available, the REdex Square Index Library uses FHFA home price indices. REdex Library Information, available from CoreLogic, (Oct. 8, 2013).

[32]   "Table & Calculators by Subject: Unemployment," Bureau of Labor Statistics, Databases, http://data.bls.gov/cgi-bin/dsrv?la.

CONFIDENTIAL

### II.4   Control Variables Used in Default Model

| Variable | LoanPerformance Variables (Industry and Reduced Industry Benchmarks) |
|---|---|
| FICO Score | *FICO* |
| CLTV Ratio at Origination | *COMB_LTV* (if *COMB_LTV* is missing and *LIEN* = "1" then *LTV* is used instead) |
| Full Documentation Indicator | 1 if *DOCUMENT* = "1" and 0 otherwise |
| Primary Residence Indicator | 1 if *OCCUPANCY* = "1" and 0 otherwise |
| Single-Family Indicator | 1 if *PROP_TYPE* = "1" and 0 otherwise |
| Purchase Indicator | 1 if *PURPOSE* = "1" and 0 otherwise |
| Original Loan Balance (Log, $10,000s) | *Log*(*ORIG_AMT*/10,000) |
| Securitized in 2006 Indicator | 1 if year of *CLOSE_DATE* = "2006" and 0 otherwise |
| Securitized in 2007 Indicator | 1 if year of *CLOSE_DATE* = "2007" and 0 otherwise |
| Originated in 2005 Indicator | 1 if year of *ORIG_DATE* = "2005" and 0 otherwise |
| Originated in 2006 Indicator | 1 if year of *ORIG_DATE* = "2006" and 0 otherwise |
| Originated in 2007 Indicator | 1 if year of *ORIG_DATE* = "2007" and 0 otherwise |
| Change in Interest Rates[33] | Change in the 30-year conventional mortgage rate since the month of origination |
| Prepayment Penalty Indicator | 1 if *PP_PEN* = "1" and 0 otherwise |
| Homeowner's Equity[34] | 1 – CLTV/(1+percent change in MSA- or state-level REdex Square Home Price Index) |
| Change in Unemployment (3-Month)[35] | Change in the MSA- or state-level unemployment rate over the previous three months |
| Interest-Only Indicator | 1 if *PROD_TYPE* begins with "1", "2" or "64" and does not equal "10" or "20" and "0" otherwise |
| Prime Pool Indicator | 1 if *POOLTYPE* = "MBS" and 0 otherwise |
| Alt-A Pool Indicator | 1 if *POOLTYPE* = "ALT A" and 0 otherwise |
| Judicial Foreclosure State Indicator[36] | 1 if *STATE* in "AR", "CT", "DE", "FL", "IL", "IN", "IA", "KS", "KY", "LA", "MA," "ME", "NJ", "NM", "NY", "ND", "OH", "OK", "PA", "SC", "SD", "VT", "WI" and 0 otherwise |
| Recourse State Indicator[37] | 1 if *STATE* in "AL", "AR", "CO", "CT", "DE", "DC", "FL", "GA", "HI", "ID", "IL", "IN", "KS", "KY", "LA", "ME", "MD", "MA", "MI", "MS", "MO", "NE", "NV", "NH", "NJ", "NM", "NY", "OH", "OK", "PA", "RI", "SC", "SD" "TN", "TX", "UT", "VT", "VA", "WV", "WY", or *STATE* = "NC" and *PURPOSE* is not equal to "1" and 0 otherwise |

---

[33]    Federal Reserve, http://www.federalreserve.gov/releases/h15/data.htm.

[34]    REdex Square Index Library.

[35]    "Table & Calculators by Subject: Unemployment," Bureau of Labor Statistics, Databases, http://data.bls.gov/cgi-bin/dsrv?la.

[36]    Fannie Mae, *Fannie Mae 2010 Servicing Guide Update Part VII and Part VIII*, https://www.fanniemae.com/content/guide/svc042810.pdf.

CONFIDENTIAL

| | |
|---|---|
| **Original Amortization Period ≤ 20 Years** | 1 if *AMORT_TERM* ≤ "240" and 0 otherwise<br>(if *AMORT_TERM* is missing and *PROD_TYPE* does not begin with "5", "6", and does not equal "ZZ" or " ", then *TERM* is used instead of *AMORT_TERM*; if *AMORT_TERM* is missing and *PROD_TYPE* = "54" or "55" then *AMORT_TERM* is set to "360" or "480", respectively) |
| **Original Amortization Period > 30 Years** | 1 if *AMORT_TERM* > "360" and 0 otherwise<br>(if *AMORT_TERM* is missing and *PROD_TYPE* does not begin with "5" , "6", and does not equal "22" or " ", then *TERM* is used instead of *AMORT_TERM;* if *AMORT_TERM* is missing and *PROD_TYPE* = "54" or "55" then *AMORT_TERM* is set to "360" or "480", respectively) |
| **Months Since Origination Indicators** | Separate indicators for each number of months since *ORIG_DATE,* starting at month 8 (or month 15 for NEG AM models) |

---

[37]   Andra C. Ghent and Marianna Kudlyak, "Recourse and Residential Mortgage Default: Evidence from US States," *The Review of Financial Studies*, Vol. 24, No. 9, (2011), pp. 3140-3144.