# EXHIBIT 1

## FILED UNDER SEAL PURSUANT TO STIPULATION

*Highly Confidential*

## UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

-------------------------------------------------------------------x
:
NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of Western Corporate
Federal Credit Union,
:
:
              Plaintiff,
:
          Case No. CV 11-05887 GW(JEMx)
          v.
:
RBS Securities Inc., *et al.,*
:
:
              Defendants.
:
-------------------------------------------------------------------x

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

-------------------------------------------------------------------x
:
NATIONAL CREDIT UNION ADMINISTRATION
BOARD, as Liquidating Agent of U.S. Central Federal
Credit Union,
:
:
              Plaintiff,
:
          Case No. CV 11-02340 JWL-JPO
          v.
:
RBS Securities Inc., *et al.,*
:
:
              Defendants.
:
-------------------------------------------------------------------x

## REBUTTAL EXPERT REPORT OF ETHAN COHEN-COLE, PH.D.

## OCTOBER 16, 2015

CONTENTS

I.      Qualifications ................................................................................................................. 2

II.     Case Background and Assignment ............................................................................. 3

III.    Summary ........................................................................................................................ 5

IV.     The Butler and Sunshine Reports ............................................................................. 6

    A.   Butler Report ............................................................................................................. 6

    B.   Sunshine Report ........................................................................................................ 6

V.      Relevant Historical Background ............................................................................... 6

VI.     General RMBS Concepts and Application ............................................................... 7

    A.   RMBS Risks and Structure ...................................................................................... 7

    B.   RMBS Purchases Versus Whole Loan Purchases ................................................. 8

    C.   Prospectus Supplements and Use of Supporting Loan Group Stratifications ..... 9

    D.   RMBS Investment Decisions by Market Participants .......................................... 12

    E.   Structures Used to Mitigate Risk Inherent in RMBS Investments .................... 13

VII.    Empirical Analysis of Materiality ........................................................................... 15

    A.   Industry Standard Financial Models of RMBS Performance and Investor Returns .......... 15

    B.   Empirical Analysis of the Materiality of Alleged Differences in Loan-Level Characteristics .... 15

VIII.   Plaintiff's Loan Characteristic Claims Would Not Have Had a Material Impact on Investors' Decisions Regarding Whether to Invest in the Relevant Certificates ........................................ 19

    A.   For Fifty-Six of the Fifty-Eight Relevant Certificates Even if One Accepts Plaintiff's Loan Characteristic Claims as True, the Expected Risk of the Relevant Certificates at the Time of Issuance Falls Below the Maximum Risk Set Forth in the Supporting Loan Group Stratifications Disclosed in the Prospectus Supplements ................................. 20

    B.   Reasonable RMBS Investors Expected That Some of the Loans Associated With Their Certificates Would Default ....................................................... 20

IX.     Conclusion ................................................................................................................... 21

                                                                          HIGHLY CONFIDENTIAL

I.    QUALIFICATIONS

1.    I am a Managing Director and Financial Services Practice Lead at Econ One Research, a company that provides consulting services, including litigation support services on issues related to structured finance and the macroeconomy.

2.    I was previously a professor in the Department of Finance at the University of Maryland, College Park's Robert H. Smith School of Business. In addition, I served as a faculty participant at the Center for Financial Policy and on the steering committee of the Center for Social Value Creation. I taught courses on various topics including risk management, corporate finance and the regulation and management of financial institutions.

3.    Before teaching, I was a financial economist in the Supervision and Regulation function of the U.S. Federal Reserve System ("Federal Reserve"), where I provided technical and analytical direction to bank supervisors for many of the largest banks in the United States. At the Federal Reserve, I led quantitative reviews of large bank risk modeling efforts and was a designated system quantitative expert on risk management and Basel II.

4.    At various stages of my career, I have worked in the banking sector in roles related to mortgage securitization. In the mid-1990s, I worked as a technical risk management consultant. This job included helping clients build risk-based scoring systems for a range of loan types, including mortgages. At the Federal Reserve, I evaluated the mortgage credit risk models for many top-20 financial institutions. Also at the Federal Reserve, I worked closely with mortgage databases to develop internal evaluations of bank risk and to write papers on mortgage risk. As an academic at the University of Maryland, I continued to research and work in the mortgage area. I wrote papers both on consumer credit as well as commercial paper.

5.    I have experience evaluating financial risk within a range of contexts, including market risk, operational risk and credit risk. My client experience involves advising financial institutions in a variety of contexts including the measurement and management of credit risk, the creation and validation of loan scoring models and the evaluation of risk management systems for personal and corporate lending.

6.    I have experience evaluating structured financial products in a range of contexts. Recently, I have submitted expert reports on issues relating to numerous types of structured products. I have also served as an expert consultant on residential mortgage backed securities. Prior to my work at Econ One, I taught classes in risk management and financial institutions, during which I taught sections on structured products. At the Federal Reserve, I regularly reviewed industry risk management models that included a variety of structured financial products.

7.    I have published widely in economics and finance journals, including the Review of Economics and Statistics, the Journal of Macroeconomics, the American Law and Economic Review, the Journal of Health Economics, Economic Inquiry, Economics Letters and Applied Economics. I have also served as a referee for more than 20 academic journals, including the Review of Financial Studies, the Quarterly Journal of Economics, the American Economic Review, the Journal of Monetary Economics, the Review of Economic Studies, the Review of Economics and Statistics, American Economic Journal–Economic Policy, Journal of Financial Intermediation, Journal of Money Credit and Banking, Journal of Banking and Finance and the Journal of Financial Services Research.

                                        HIGHLY CONFIDENTIAL

8. I have delivered more than 75 lectures at universities and professional meetings. I have been a visiting scholar or professor at the University of California, Berkeley, the European Central Bank, the Bank of France, and the Federal Deposit Insurance Corporation's Center for Financial Research. I have received scholarly research grants from the National Science Foundation, the National Institutes of Health, the National Institute of Justice, the Department of Education, the European Central Bank and the MacArthur Foundation.

9. I have included a recent CV as **Appendix A**: *Curriculum Vitae*. My CV includes all of my publications for the last ten years and all of my expert witness testimony for the last four years.

10. For a list of Documents Considered, please reference **Appendix B**: *Documents Considered*.

11. For my work on this matter, I am being compensated at a rate of $875/hour. My compensation is not contingent upon my findings or the outcome of this matter. I reserve the right to express additional opinions or otherwise supplement my analysis or the opinions expressed herein.

## II. CASE BACKGROUND AND ASSIGNMENT

12. Plaintiff, National Credit Union Administration Board ("NCUA" or "Plaintiff") brought these actions in its capacity as Liquidating Agent of Western Corporate Federal Credit Union ("WesCorp") and U.S. Central Federal Credit Union ("U.S. Central") (collectively referred to as the "Credit Unions") against RBS Securities Inc. (f/k/a Greenwich Capital Markets, Inc.), the underwriter and seller of certain residential mortgage-backed securities ("RMBS") and RBS Acceptance Inc. (f/k/a Greenwich Capital Acceptance, Inc.), and in the Kansas action, Financial Asset Securities Corporation, the depositors on certain of these RMBS (collectively, "RBS").[1]

13. The NCUA states that between November 22, 2005 and June 26, 2007 (the "Relevant Time Period"),[2] the Credit Unions purchased fifty-eight RMBS certificates (the "Relevant Certificates")[3] from 31 securitizations (the "Relevant Securitizations").[4] The Complaints also name several other depositors who, with RBS, comprise the "Defendants."

---

[1] Second Amended Complaint. *National Credit Union Administration Board, as Liquidating Agent of Western Corporate Federal Credit Union v. RBS Securities Inc., et al.* (C.D. Cal. No. 11-cv-5887) (Dkt. # 350) (Nov. 14, 2014) ("Cal. Second Amended Complaint") at preface, ¶ 1, 3, 22; and Second Amended Complaint. *National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union v. RBS Securities Inc. et al.* (D. Kan. No. 11-cv-2340) (Dkt. # 435) (Nov. 17, 2014) ("Kan. Second Amended Complaint") at preface, ¶¶ 1, 3, 17-18.

[2] Cal. Second Amended Complaint at ¶ 12-13; Kan. Second Amended Complaint at ¶ 9-10.

[3] *See* **Exhibit 1**: *Relevant Certificates* for a detailed table of certificates at issue, including trust name, tranche, and consideration paid by Plaintiff. I understand that NCUA's claims in the California Action as to two of these certificates were dismissed with prejudice: WMLT 2006-ALT 1 A3 (CUSIP 92978GAC3) and LUM 2007-1 II-A-3 (CUSIP 55028CAE5). My report presents results pertaining to these certificates nonetheless, including in the exhibits and appendices, because (a) another certificate issued as part of the WMLT 2006-ALT1 offering is at issue in the Kansas litigation and (b) two other certificates from the LUM 2007-1 offering (although backed by a different Supporting Loan Group) are at issue in both the California and Kansas actions.

[4] The "Relevant Securitizations" referenced herein are: First Franklin Mortgage Loan Trust 2005-FFH4 ("FFML 2005-FFH4"); SoundView Home Loan Trust 2005-OPT4 ("SVHE 2005-OPT4"); HarborView Mortgage Loan Trust 2006-8 ("HVMLT 2006-8"); HarborView Mortgage Loan Trust 2006-9 ("HVMLT 2006-9"); MortgageIT Mortgage

HIGHLY CONFIDENTIAL

14. NCUA alleges RBS violated Sections 11 and/or 12(a)(2) of the Securities Act of 1933 ("Securities Act"), the California Corporate Securities Law, and the Kansas Uniform Securities Act[5] because material facts about certain characteristics of the loans underlying the Relevant Certificates were allegedly misstated in or omitted from the Offering Documents.[6] NCUA also alleges that originators' compliance with underwriting guidelines was misrepresented in the Offering Documents.[7]

15. I have been retained by RBS, through its counsel, Kirkland & Ellis LLP, to analyze the expert reports of Steven I. Butler and Mark A. Sunshine[8] and respond with my opinions regarding: (1) the risk set forth in the prospectus supplement disclosures concerning characteristics of the loans supporting the Relevant Certificates; (2) how, from an economic perspective, a reasonable investor would have assessed the risk of the Relevant Certificates when they were issued based on the information disclosed in the prospectus supplements; and (3) whether the purported differences in loan level characteristics alleged by Plaintiff's experts for loans underlying the Relevant Certificates (hereafter, the "Plaintiff's Loan Characteristic Claims")[9] as compared to the disclosed characteristics, materially affected the risk of the RMBS investment.

---

Loan Trust 2006-1 ("MHL 2006-1"); American Home Mortgage Assets Trust 2007-3 ("AHMA 2007-3"); HarborView Mortgage Loan Trust 2007-1 ("HVMLT 2007-1"); HarborView Mortgage Loan Trust 2007-2 ("HVMLT 2007-2"); HarborView Mortgage Loan Trust 2007-4 ("HVMLT 2007-4"); HarborView Mortgage Loan Trust 2007-5 ("HVMLT 2007-5"); Alternative Loan Trust 2006-AR4 ("NAA 2006-AR4") (California action); First Franklin Loan Trust 2006-FF16 ("FFML 2006-FF16"); Fremont Home Loan Trust 2006-3 ("FHLT 2006-3"); Fremont Home Loan Trust 2006-D ("FHLT 2006-D"); HarborView Mortgage Loan Trust 2006-6 ("HVMLT 2006-6"); HarborView Mortgage Loan Trust 2006-SB1 ("HVMLT 2006-SB1"); IndyMac INDX Mortgage Loan Trust 2006-AR6 ("INDX 2006-AR6"); Luminent Mortgage Trust 2006-2 ("LUM 2006-2"); NovaStar Mortgage Funding Trust, Series 2006-5 ("NHEL 2006-5"); Saxon Asset Securities Trust 2006-3 ("SAST 2006-3"); Soundview Home Loan Trust 2006-WF2 ("SVHE 2006-WF2"); Residential Funding Mortgage Securities II, Inc. ("RFMS2 2007-HSA2"); Soundview Home Loan Trust 2007-OPT1 ("SVHE 2007-OPT1") (Kansas action); HarborView Mortgage Loan Trust 2006-10 ("HVMLT 2006-10"); HarborView Mortgage Loan Trust 2006-11 ("HVMLT 2006-11"); HarborView Mortgage Loan Trust 2006-12 ("HVMLT 2006-12"); HarborView Mortgage Loan Trust 2006-14 ("HVMLT 2006-14"); IndyMac INDX Mortgage Loan Trust 2006-AR35 ("INDX 2006-AR35"); Luminent Mortgage Trust 2007-1 ("LUM 2007-1"); Nomura Home Equity Loan Trust, Series 2007-1 ("NHELI 2007-1"); Wachovia Mortgage Loan Trust, Series 2006-ALT1 ("WMLT 2006-ALT1") (California and Kansas Actions).

[5] Cal. Second Amended Complaint at ¶¶ 3, 425-573; Kan. Second Amended Complaint at ¶¶ 3, 388-509.

[6] Cal. Second Amended Complaint at ¶¶ 294-402; Kan. Second Amended Complaint at ¶¶ 264-376.

[7] Cal. Second Amended Complaint at ¶¶ 3, 10-11, 60 *et seq.*; Kan. Second Amended Complaint at ¶¶ 3, 7-8, 57 *et seq.*

[8] Butler, Steven I. Expert Report of Steven I. Butler on the Re-Underwriting of Sampled Loans, *National Credit Union Administration Board, as Liquidating Agent of Western Corporate Federal Credit Union v. RBS Securities Inc., et al.* (C.D. Cal. No. 11-cv-5887), and *National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union v. RBS Securities Inc. et al.* (D. Kan. No. 11-cv-2340) (Aug. 14, 2015) ("Butler Report"); and Sunshine, Mark A. Expert Report of Mark A. Sunshine, *National Credit Union Administration Board, as Liquidating Agent of Western Corporate Federal Credit Union v. RBS Securities Inc. et al.* (C.D. Cal. No. 11-cv-5887), and *National Credit Union Administration Board, as Liquidating Agent of U.S. Central Federal Credit Union v. RBS Securities Inc. et al.* (D. Kan. No. 11-cv-2340) (Aug. 14, 2015) ("Sunshine Report").

[9] Specifically, I consider Plaintiff's allegations set out in the Butler Report regarding the loan characteristics of a sample of the loans that collateralized the Relevant Certificates.

HIGHLY CONFIDENTIAL

## III.    SUMMARY

16.    In this report I use a model that measures the impact of Plaintiff's Loan Characteristic Claims on a reasonable investor's expectation of risk during the Relevant Time Period.

17.    My analysis considers the risk of default of the mortgage pools described in the prospectus supplements for the Relevant Securitizations. In this analysis, I use a model of loan performance similar to models used by investors during the Relevant Time Period. My model evaluates the materiality of Plaintiff's allegations with respect to the information concerning the loans supporting the Relevant Certificates provided in the prospectus supplements (the "Supporting Loan Group Stratifications").[10] The model does this by (i) calculating the maximum amount of risk disclosed in the Supporting Loan Group Stratifications in the prospectus supplements for the Relevant Certificates, (ii) calculating the amount of risk that would have been associated with the loans underlying the Relevant Certificates if Plaintiff's Loan Characteristic Claims are assumed to be true and applied at the supporting loan group level, and (iii) comparing the amount of risk resulting from Plaintiff's Loan Characteristic Claims to the amount of risk disclosed in the Supporting Loan Group Stratifications.

18.    In other words, in this analysis I assess whether Plaintiff's Loan Characteristic Claims, if assumed to be true, would have resulted in risk levels that an investor would not have reasonably expected at the time of the issuance of the Relevant Certificates based on the disclosures concerning the supporting loan group's characteristics in the prospectus supplements. If Plaintiff's Loan Characteristic Claims would result in higher expected risk levels than those disclosed in the prospectus supplements, I assess whether the additional expected risk would have been covered by credit enhancements provided to the investor.[11]

19.    For fifty-six of the fifty-eight Relevant Certificates even if one accepts Plaintiff's Loan Characteristic Claims as true, the expected risk of the Relevant Certificates at the time of issuance falls below the maximum risk set forth in the Supporting Loan Group Stratifications disclosed in the prospectus supplements.

20.    The two remaining Relevant Certificates, even if one accepts Plaintiff's Loan Characteristic Claims, the expected risk of the Relevant Certificates at the time of issuance would fall within, and not come close to exhausting, the credit enhancements afforded to the tranche.

21.    As a result, the Butler Report and Sunshine Report do not provide support for the premise that the purported misrepresentations and omissions in the relevant prospectus supplements were material to investors.

22.    Specifically, the Butler Report and Sunshine Report fail to show that the alleged misrepresentations are linked to a reasonable investor's expectation of economic loss. Mr. Butler also fails to quantify the alleged increased risk to the pool that led to his characterization of loans as "Materially Misrepresented."

---

[10] S*ee* **Exhibit 2**: *Summary of HVMLT 2006-10 (Group 2) Supporting Loan Group Stratifications* for an example.

[11] RMBS investors were exposed to additional risks beyond the characteristics of the loans underlying the Relevant Certificates, for example from macroeconomic factors. The maximum risk I calculate for the Relevant Certificates is conservative because it does not include those additional risks, which can only increase the maximum amount of risk a reasonable investor would have expected.

                                                    HIGHLY CONFIDENTIAL

## IV.     THE BUTLER AND SUNSHINE REPORTS

### A.  Butler Report

23.   For the alleged misrepresentations to be material from an economic perspective, the alleged misrepresentations must affect the expectation of economic loss associated with the Relevant Certificates. However, the Butler Report simply characterizes a given loan as "Materially Misrepresented"[12] or not, and gives the percentages of loans in each category. The Butler Report makes no attempt to quantify any alleged increased risk to the loan pool associated with any of the purported deviations. Butler's analysis makes no distinction between minor and major defects which "materially increased credit risk."[13]

24.   Moreover, despite arguing that he "opine[d] that a [s]ampled [l]oan was Materially Misrepresented only when [he] felt, based on the totality of the information available about that loan, that it had a materially greater risk of delinquency, default, or loss than what was represented,"[14] the Butler Report makes no conclusions regarding the impact of the purported underwriting deficiencies on the risks associated with the collateral underlying the Relevant Certificates.

25.   Rather than using Butler's binary treatment of loans as either Materially Misrepresented or not, my Model calculates the magnitude of the impact of the change in risk of the claimed misrepresentations for the entire loan pool and empirically determines whether an investor would have expected a higher rate of defaults and losses, as described below. Neither my Model, nor any model used during the Relevant Time Period that I am aware of, took account of the factors set out in the Butler Report in the binary way in which they are presented.

### B.  Sunshine Report

26.   NCUA also submitted the Sunshine Report in support of its claims. Mr. Sunshine opines that "it was critically important to investors assessing the risk of a mortgage-backed security…that representations concerning originator [u]nderwriting [g]uidelines, including representations that those [g]uidelines verified the ability of the borrower to repay and the adequacy of the collateral and representations that the mortgage loans at issue actually conformed to those [g]uidelines, were accurate, complete and not misleading."[15] However, Mr. Sunshine performed no economic analysis to support his conclusions, and failed to tie those conclusions to the securitizations at issue in this action. On the other hand, my Model, as described below, provides a quantitative economic analysis of materiality specific to the securitizations at issue.

## V.     RELEVANT HISTORICAL BACKGROUND

27.   In this section, I provide a brief historical background relevant to my analysis.

---

[12] Butler Report at ¶ 3, 4, 178.

[13] Butler Report at ¶ 5.

[14] Butler Report at ¶ 6.

[15] Sunshine Report at ¶ 145.

                                    HIGHLY CONFIDENTIAL

28. Historically, banks provided the funds for mortgages themselves and held those mortgages on their balance sheets.[16] However, the years preceding the financial crisis were characterized by a rise in homeownership and mortgage originators sought an alternative source of capital for funding these additional mortgages.[17] Originators obtained that funding from capital markets by securitizing pools of mortgages.[18]

29. Securitization allowed investors with distinct risk/return requirements to invest in RMBS by pooling mortgages into trusts made up of tranches with different risk profiles, thus giving investors the ability to choose vehicles based on their individual risk appetite.[19]

30. Frequent pre-closing changes to the mortgage pools influenced various aspects of the securitization process. Among other things, issuers provided investors with prospectus supplements that, rather than providing investors an exact catalog of loans, disclosed the aggregated characteristics of the loans within each pool.[20] Issuers also structured the securitizations to allow for post-closing changes in the composition of the loan groups supporting the securitization. The prospectus supplements thus disclosed ranges of risk, not a definitive statement as to the characteristics of each individual loan within the securitization.

## VI.    GENERAL RMBS CONCEPTS AND APPLICATION

31. This section introduces concepts and terminology associated with RMBS and explains their application to my analysis, and, more specifically, to my model (the "Model") which is based on models developed for use by investors during the Relevant Time Period. The Model quantifies the range of risk that a reasonable investor in the Relevant Certificates assumed, based on disclosures in the prospectus supplements.

### A.    RMBS Risks and Structure

32. Issuers of RMBS create a separate entity, a trust, which holds the residential mortgages. The trust issues RMBS certificates, which are sold to investors. Each purchaser of an RMBS certificate is typically entitled to a portion of the cash flows associated with principal and/or

---

[16] Fabozzi, Frank J., Anand K. Bhattacharya, and William S. Berliner. *Mortgage-Backed Securities: Products, Structuring, and Analytical Techniques.* 2nd ed. Hoboken, NJ: John Wiley & Sons, Inc. (2011) at 23.

[17] Shiller, Robert J. "Understanding Recent Trends in House Prices and Home Ownership." *National Bureau of Economic Research Working Paper* 13553 (Oct. 2007): 1-46 at 17; Fabozzi *supra* note 16, at 23.

[18] Green, Richard K., and Susan M. Wachter. "The American Mortgage in Historical and International Context." *Journal of Economic Perspectives* 19.4 (2005): 93-114 at 98-100.

[19] Fabozzi *supra* note 16, at 25.

[20] Lukach, David M., Yogesh Gupta, Thomas Knox, and John Gibson. "Understanding the Prospectus and Prospectus Supplement." *The Handbook of Mortgage-Backed Securities.* 6th ed. Ed. Frank J. Fabozzi. New York: McGraw-Hill (2006): 127-156 at 136-137.

    HIGHLY CONFIDENTIAL

interest payments made by the mortgagors over the life of the security.[21] A trustee is responsible for distributing to investors funds received from mortgagors.[22]

33.    The certificates are typically organized into different tranches, with each tranche supported by one or more loan pools, called supporting loan groups. Each of the tranches can have different degrees of risk and different entitlements to the payments made to the trust by the mortgagors.[23] This variety accommodates a wide range of investors, each of whom may have different objectives or risk tolerance.[24] Investors may choose to purchase senior tranches in order to receive some preference over cash flows, or junior tranches in order to maximize the potential return on the investment.[25]

34.    All RMBS investments, even investments in senior tranches, are subject to a variety of risks.[26] Of the risks associated with RMBS investments, two important ones are the risk of default and the risk of prepayment.[27] The risk of default is the risk that the borrower will stop repaying the mortgage loan. It is generally understood in the market, including during the Relevant Time Period, that at least some of the mortgage loans underlying the securitization will default over the life of the security.[28] In addition to default risk, RMBS are subject to prepayment risk, which occurs when some borrowers pay off the full amount owed on their mortgage early, *i.e.*, "prepay" their loan before the full term expires.[29] When a mortgage is prepaid, the duration of the income stream is shortened and the total income to the trust is reduced due to the elimination of the interest income expected from that prepaid mortgage. At the same time, the realization of prepayment risk also eliminates the risk of default for the prepaid mortgage. The risk of prepayment was generally understood in the market and was understood during the Relevant Time Period.

**B.  RMBS Purchases Versus Whole Loan Purchases**

35.    The purchase of RMBS is distinct from the purchase of specific loans. If an investor desires to invest in specific loans, it can make a "whole loan" purchase, *i.e.*, purchase specific loans with

---

[21] Fabozzi *supra* note 16, at 25.

[22] Cook, Karen, and F. Jim Della Sala. "The Role of the Trustee in Asset-Backed Securitization." *Handbook of Structured Financial Products*. Ed. Frank J. Fabozzi. New Hope, Pennsylvania: Frank J. Fabozzi Associates (1998): 67-78 at 73.

[23] Hu, Dapeng, and Robert Goldstein. "Nonagency Residential Mortgage-Backed Securities." *The Handbook of Fixed Income Securities*. 8th ed. Ed. Frank J. Fabozzi. New York: McGraw Hill (2012): 645-80 at 645.

[24] Fabozzi *supra* note 16, at 25.

[25] Hu *supra* note 23, at 666.

[26] *Id.*

[27] Deng, Yongheng, John M. Quigley, and Robert Van Order. "Mortgage Terminations, Heterogeneity and the Exercise of Mortgage Options." *Econometrica* 68.2 (Mar. 2000): 275-307 at 276.

[28] Loan defaults may or may not result in less money being distributed to investors, because the collateral underlying the loan may be sold and the proceeds applied to the outstanding balance. As discussed more fully below, however, my analysis takes a conservative approach and assumes 100% severity—that is, I assume that no proceeds are recovered from a foreclosure sale of a property securing a loan that has defaulted.

[29] Fabozzi *supra* note 16, at 17.

                    HIGHLY CONFIDENTIAL

specific characteristics and invest in the risk of those particular loans and their associated characteristics.[30] This risk of investing in particular loans differs significantly from the range of risk incurred when an investor purchases an RMBS secured by a pool of loans.

36.     The return on investment for a whole loan purchase depends entirely on the performance of the specific loan or loans. With RMBS, the pooling effect is a key benefit to investors. By including many loans with diverse characteristics—such as geographic location—if certain collateral defaults or underperforms, the loss affects only a portion of the pool and it is spread out amongst investors in the supporting loan group. This pooling, along with credit enhancements built into RMBS, offers substantial benefits to investors over whole loan purchases.

37.     The risk inherent in the purchase of RMBS is also different from the risk of the purchase of whole loans. Whereas whole loan purchasers assume the specific risk of defaults in a known set of loans, RMBS investors assume a range of risk from defaults in a pool of loans without knowing the specific loans that will collateralize the RMBS certificates.

## C. Prospectus Supplements and Use of Supporting Loan Group Stratifications

38.     RMBS prospectus supplements outlined certain characteristics and risks of the supporting loan groups backing the certificates offered for investment, but did not disclose specific details for each loan within each supporting loan group.[31] As described below, prospectus supplements therefore disclosed defined ranges of risk that provided investors with a reasonable economic basis upon which to make financial decisions regarding RMBS purchases.[32]

---

[30] D'vari, Ron. "Overview of U.S. Single-Family Residential Investment Strategies." *Journal of Structured Finance* 19.2 (Summer 2013): 42-51 (discussing the tools required to evaluate whole loan purchases) at 43-48.

[31] *See* **Appendix E**: *Statements Regarding Information in Prospectus Supplements*.

[32] The prospectus supplements referenced herein are: American Home Mortgage Assets LLC, American Home Mortgage Assets Trust 2007-3, Prospectus Supplement to Prospectus dated February 27, 2007 (June 5, 2007) (RBS-NCUA 00140885 - RBS-NCUA 00141126) ("AHMA 2007-3 Prospectus Supplement"); Financial Asset Securities Corp., First Franklin Mortgage Loan Trust 2005-FFH4 Asset-Backed Certificates, Series 2005-FFH4, Prospectus Supplement to Prospectus dated September 26, 2005 (Nov. 30, 2005) (RBS-NCUA 00145209 - RBS-NCUA 00145342) ("FFML 2005-FFH4 Prospectus Supplement"); Financial Asset Securities Corp., First Franklin Mortgage Loan Trust 2006-FF16, Prospectus Supplement to Prospectus dated August 10, 2006 (Nov. 16, 2006) (RBS-NCUA 00096597 - RBS-NCUA 00096749) ("FFML 2006-FF16 Prospectus Supplement"); Financial Asset Securities Corp., Fremont Home Loan Trust 2006-3, Prospectus Supplement to Prospectus dated August 10, 2006 (Sept. 29, 2006) (RBS-NCUA 00098551 - RBS-NCUA 00098710) ("FHLT 2006-3 Prospectus Supplement"); Financial Asset Securities Corp., Soundview Home Loan Trust 2005-OPT4 Asset-Backed Certificates, Series 2005-OPT4, Prospectus Supplement to Prospectus dated September 26, 2005 (Nov. 22, 2005) (RBS-NCUA 00182657 - RBS-NCUA 00182783) ("SVHE 2005-OPT4 Prospectus Supplement"); Financial Asset Securities Corp., Soundview Home Loan Trust 2006-WF2, Prospectus Supplement to Prospectus dated August 10, 2006 (Dec. 12, 2006) (RBS-NCUA 00135010 - RBS-NCUA 00135137) ("SVHE 2006-WF2 Prospectus Supplement"); Financial Asset Securities Corp., Soundview Home Loan Trust 2007-OPT1, Prospectus Supplement to Prospectus dated March 26, 2007 (May 4, 2007) (RBS-NCUA 00136734 - RBS-NCUA 00136899) ("SVHE 2007-OPT1 Prospectus Supplement"); Fremont Mortgage Securities Corporation, Fremont Home Loan Trust 2006-D, Prospectus Supplement to Prospectus dated July 11, 2006 (Nov. 1, 2006) (RBS-NCUA 00094348 - RBS-NCUA 00094523) ("FHLT 2006-D Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2006-6, Prospectus Supplement to Prospectus dated April 26, 2006 (June 27, 2006) (RBS-NCUA 00109013 - RBS-NCUA 00109188) ("HVMLT 2006-6 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2006-8, Prospectus Supplement to Prospectus dated August 10, 2006 (Aug. 28, 2006) (RBS-NCUA 00156421 - RBS-NCUA 00156567) ("HVMLT 2006-8 Prospectus Supplement"); Greenwich Capital

39. Prospectus supplements typically disclosed the aggregated ranges of loan characteristics of loans within each supporting loan group, and displayed these characteristics in the form of stratifications (for the Relevant Certificates, the Supporting Loan Group Stratifications).[33] These characteristics included, for example, original LTV ratios, credit scores of borrowers (also

Acceptance, Inc., HarborView Mortgage Loan Trust 2006-9, Prospectus Supplement to Prospectus dated August 10, 2006 (Oct. 3, 2006) (RBS-NCUA 00158200 - RBS-NCUA 00158356) ("HVMLT 2006-9 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2006-10, Prospectus Supplement to Prospectus dated August 10, 2006 (Nov. 10, 2006) (RBS-NCUA 00092572 - RBS-NCUA 00092866) ("HVMLT 2006-10 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2006-11, Prospectus Supplement to Prospectus dated August 10, 2006 (Nov. 10, 2006) (RBS-NCUA 00102844 - RBS-NCUA 00102959) ("HVMLT 2006-11 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2006-12, Prospectus Supplement to Prospectus dated August 10, 2006 (Dec. 11, 2006) (RBS-NCUA 00104552 - RBS-NCUA 00104733) ("HVMLT 2006-12 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2006-14, Prospectus Supplement to Prospectus dated August 10, 2006 (Dec. 20, 2006) (RBS-NCUA 00106876 - RBS-NCUA 00107054) ("HVMLT 2006-14 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2006-SB1, Prospectus Supplement to Prospectus dated August 10, 2006 (Oct. 30, 2006) (RBS-NCUA 00110583 - RBS-NCUA 00110698) ("HVMLT 2006-SB1 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2007-1, Prospectus Supplement to Prospectus dated January 30, 2007 (Mar. 7, 2007) (RBS-NCUA 00074399 - RBS-NCUA 00074564) ("HVMLT 2007-1 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2007-2, Prospectus Supplement to Prospectus dated March 26, 2007 (Mar. 29, 2007) (RBS-NCUA 00066790 - RBS-NCUA 00066979) ("HVMLT 2007-2 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2007-4, Prospectus Supplement to Prospectus dated March 26, 2007 (June 13, 2007) (RBS-NCUA 00164900 - RBS-NCUA 00165083) ("HVMLT 2007-4 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., HarborView Mortgage Loan Trust 2007-5, Prospectus Supplement to Prospectus dated July 5, 2007 (July 11, 2007) (RBS-NCUA 00114055 - RBS-NCUA 00114188) ("HVMLT 2007-5 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., Luminent Mortgage Trust 2006-2, Prospectus Supplement to Prospectus dated September 26, 2006 (Feb. 14, 2006) (RBS-NCUA 00119272 - RBS-NCUA 00119384) ("LUM 2006-2 Prospectus Supplement"); Greenwich Capital Acceptance, Inc., MortgageIT Mortgage Loan Trust 2006-1, Prospectus Supplement to Prospectus dated September 26, 2005 (Feb. 17, 2006) (RBS-NCUA 00082807 - RBS-NCUA 00082960) ("MHL 2006-1 Prospectus Supplement"); INDYMAC MBS, INC., IndyMac INDX Mortgage Loan Trust 2006-AR6, Prospectus Supplement to Prospectus dated April 25, 2006 (Apr. 27, 2006) (RBS-NCUA 00117990 - RBS-NCUA 00118104) ("INDX 2006-AR6 Prospectus Supplement"); IndyMac MBS, Inc., IndyMac INDX Mortgage Loan Trust 2006-AR35, Prospectus Supplement to Prospectus dated October 26, 2006 (Nov. 29, 2006) (RBS-NCUA 00116541 - RBS-NCUA 00116685) ("INDX 2006-AR35 Prospectus Supplement"); Lares Asset Securitization, Inc., Luminent Mortgage Trust 2007-1, Prospectus Supplement to Prospectus dated July 20, 2006 (Jan. 24, 2007) (RBS-NCUA 00120754 - RBS-NCUA 00121298) ("LUM 2007-1 Prospectus Supplement"); Nomura Asset Corporation, Nomura Asset Acceptance Corporation, Alternative Loan Trust, Series 2006-AR4, Prospectus Supplement to Prospectus dated November 17, 2006 (Nov. 30, 2006) (RBS-NCUA 0006903 - RBS-NCUA 00069758) ("NAA 2006-AR4 Prospectus Supplement"); Nomura Home Equity Loan, Inc., Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1, Prospectus Supplement to Prospectus dated April 18, 2006 (Jan. 29, 2007) (RBS-NCUA 00126341 - RBS-NCUA 00126612) ("NHELI 2007-1 Prospectus Supplement"); NovaStar Mortgage Funding Corporation, NovaStar Mortgage Funding Trust, Series 2006-5, Prospectus Supplement to Prospectus dated June 16, 2006 (Sept. 22, 2006) (RBS-NCUA 00130068 - RBS-NCUA 00130244) ("NHEL 2006-5 Prospectus Supplement"); Residential Funding Mortgage Securities II., Inc., Home Equity Loan Trust 2007-HSA2, Prospectus Supplement to Prospectus dated April 23, 2007 (Apr. 25, 2007) (RBS-NCUA 00115573 - RBS-NCUA 00115677) ("RFMS2 2007-HSA2 Prospectus Supplement"); Saxon Asset Securities Company, Saxon Asset Securities Trust 2006-3, Prospectus Supplement to Prospectus dated April 26, 2006 (Oct. 5, 2006) (RBS-NCUA 00132901 - RBS-NCUA 00133043) ("SAST 2006-3 Prospectus Supplement"); Wachovia Mortgage Loan Trust, LLC, Wachovia Mortgage Loan Trust, Series 2006-ALT1, Prospectus Supplement to Prospectus dated May 23, 2006 (Dec. 19, 2006) (RBS-NCUA 00138197 - RBS-NCUA 00138315) ("WMLT 2006-ALT1 Prospectus Supplement").

[33] Lukach *supra* note 20, at 136-137.

HIGHLY CONFIDENTIAL

known as "FICO" scores), and original loan balances, as shown in the examples set forth in **Exhibit 2**: *Summary of HVMLT 2006-10 (Group 2) Supporting Loan Group Stratifications*. In addition, other supporting loan group characteristics, like occupancy status, were described with distributional information, such as the number of loans that were owner occupied.

40.   The prospectus supplements did not provide details on specific loans.[34] For example, the prospectus supplements do not state that a particular loan in the supporting loan group had a credit score of 600 and an LTV of 90%. Rather, the prospectus supplements generally state that a specific number and/or specific percentage of loans would have a given credit-score range, and that a specific number and/or specific percentage of loans would have a given LTV range.

41.   When structuring an RMBS offering, the issuer and the investor typically did not have complete knowledge of the final identity of the specific loans to be securitized or the specific characteristics those loans would possess.[35] This occurred in part because loans that had already been underwritten at the time of deal structuring may have been sold, may have defaulted or may have been prepaid by the time the deal closed and would potentially have been replaced with other loans with characteristics consistent with the stratifications in the prospectus supplements. Issuers also could, and often did, continue to search for loans to be included in a securitization throughout the offering period, through closing, and sometimes after the deal closed. Investors understood that the loans underlying a given securitization could change, as long as the loans underlying the securitization remained consistent with the stratifications in the prospectus supplement.[36]

42.   Accordingly, the stratifications in the prospectus supplements disclosed ranges of a variety of metrics for the anticipated supporting loan groups, rather than loan specific information. This enabled disclosures in prospectus supplements to be accurate as of the cut-off date even as the identity of the specific loans in the supporting loan groups was being finalized. Reasonable investors could use the information in the stratifications to make assessments of the risk associated with a supporting loan group and thus the range of risk associated with the investment. Indeed, investors such as the Credit Unions referred to stratifications in their pre-purchase process.[37]

43.   Referring to stratifications of loan characteristics, and not to the characteristics of each individual loan, is appropriate from an economic perspective as information regarding the distribution of characteristics in a supporting loan group can be used to assess the range of risk

---

[34] *Id.*

[35] *See*, *e.g.,* references to supporting loan group composition variance in **Appendix F**: *Statements Regarding Variation in Prospectuses and Prospectus Supplements.*

[36] "Q. And -- and you were agreeing to purchase this deal or an approve this deal as long as the STRATS, as given as of November 28th in the e-mail from Kathy Gensler to you, were within plus or minus 20 percent. A. That's what it says." Eberhardt, William. Deposition Vol. 2. *Western Corporate Federal Credit Union* (June 10, 2015) at 430:12-16; and "But you were comfortable with the 5 to 10 percent variance on each of these; is that right?" A. "Correct." at 432:11-13.

[37] "Q. Now, we touched on this earlier, but we just want to get a complete list of the factors that you looked at in deciding whether to pursue a transaction during this time period. So can you list them for me? A. Well, definitely would review the collateral strats." French, Barrie. Deposition. *Western Corporate Federal Credit Union* (May 19, 2015) at 99:13-22.

                    HIGHLY CONFIDENTIAL

associated with the supporting loan group and thus the range of risk associated with the investment.

44. In fact, an enormous number of different possible loan combinations could be consistent with the stratifications disclosed in the prospectus supplements. Here, the smallest supporting loan group, as reported in the applicable prospectus supplement as of the stated cut-off date, included approximately 395 loans and the largest supporting loan group included approximately 24,092 loans.[38] With respect to the smallest supporting loan group, there are millions of different possible combinations of loan characteristics that are consistent with the information disclosed in the Supporting Loan Group Stratifications.

45. Prospectus supplements made clear to investors that loans within a supporting loan group could have a variety of possible combinations of characteristics and that the offering was for a group of loans subject to change up to, and indeed after, the time of closing.[39] For this reason, prospectus supplements provided information about supporting loan groups as a whole and not specific loans in each supporting loan group.

46. The market accepted this practice because, as discussed, an RMBS entitles an investor to a payment from a trust that owns one or more groups of unspecified loans, not any specific loans. Thus, the ranges of risk represented by disclosures allowed an underlying loan portfolio consisting of possibly thousands of residential mortgages to be adjusted with considerable flexibility while remaining entirely consistent with disclosed stratifications.

47. The prospectus supplements at issue in this case followed the typical approach in the industry at that time, using stratifications to present information regarding the distribution of loan characteristics in the supporting loan group.

### D. RMBS Investment Decisions by Market Participants

48. As described above, when making investment decisions, investors or potential investors could use the stratifications in the prospectus supplements to aid in predicting the probable performance of supporting loan groups. Prospectus supplements disclosed the range of possible compositions of the final supporting loan group and conveyed a picture of the risks associated with the supporting loan groups—without providing specific information about individual loans. They also disclosed that the composition of the supporting loan group could change after closing of the securitization. As a result, so long as the stratifications remained the same, the specific loans within a supporting loan group could change without affecting a reasonable investor's investment decisions.

49. From an economic perspective, disclosures in the prospectus supplement concerning the composition of the supporting loan groups define the group's general characteristics and provide investors with an overview of the supporting loan group's characteristics and information to evaluate the risk of investment.

---

[38] HVMLT 2006-6 Prospectus Supplement (RBS-NCUA 00109013, at RBS-NCUA 00109021); RFMS2 2007-HSA2 Prospectus Supplement (RBS-NCUA 00115573, at RBS-NCUA 00115603).

[39] *See* **Appendix F**: *Statements Regarding Variation in Prospectuses and Prospectus Supplements*.

                                       HIGHLY CONFIDENTIAL

**E.  Structures Used to Mitigate Risk Inherent in RMBS Investments**

50.  Even very high credit quality loans default. Alt-A and subprime loans, including those at issue in this action, were expected to default more frequently than prime loans,[40] and in fact, did so.[41] Default rates on prime loans also increased rapidly during the mid-2000s.[42]

51.  Because defaults in the underlying loans were expected in all RMBS, RMBS issuers often incorporated credit enhancements into the RMBS. These credit enhancements included the structure of the RMBS itself, such as the prioritization of payments, and also certain external mechanisms. These credit enhancements managed default risk by providing investors with additional protection against losses in the event that the loan default rate over the life of the RMBS was in fact higher than predicted.

52.  As demonstrated in **Exhibit 3**: *Credit Enhancements*, RMBS investors (including the Credit Unions)[43] benefited from certain credit enhancements, discussed in further detail below:

    a. Subordination, a typical credit enhancement, "is the most direct approach to generate credit enhancements for senior tranches."[44] With a subordinated structure, senior tranches have one or more supporting tranches. These supporting tranches act as a cushion to the senior tranches when losses on the underlying collateral occur. That is, losses are typically absorbed in a "bottom-up" fashion, with the junior-most tranche absorbing initial losses and increasingly senior tranches absorbing losses afterward.[45] The senior-most investors typically suffer losses only if losses penetrate through all other subordinate tranches.[46]

    b. Overcollateralization is a credit enhancement common to asset-backed securities, including RMBS. In the case of overcollateralization, the face value of the collateral is greater than the face value of the certificates backed by that collateral.[47] For example, an RMBS may be issued for $100 million while the loans collateralizing the RMBS may have a total face value of $105 million. In this example, the certificates are

---

[40] Gerardi, Kristopher, Adam Hale Shapiro, and Paul S. Willen. "Subprime Outcomes: Risky Mortgages, Homeownership Experiences, and Foreclosures." *Federal Reserve Bank of Boston Working Papers* 07-15 (Dec. 3, 2007): 1-57 at 6.

[41] *Id.* at 1.

[42] Schelkle, Thomas. "Mortgage Default During the U.S. Mortgage Crisis." *University of Cologne Working Paper Series in Economics* 72 (May 16, 2014): 1-48 at 2.

[43] "Q. So why as a credit analyst would you approve buying bonds with weak collateral?" A. "Because they're a substantial credit enhancement. Q. And is it that substantial credit enhancement that is the motivating factor in you deciding to purchase a subprime mortgage-backed security? A. It's the compensating factor for buying a weaker pool." Hatfield, Kirk. Deposition. *U.S. Central Federal Credit Union* (May 18, 2015) at 137:13-24.

[44] Hu *supra* note 23, at 664.

[45] *Id.* at 666.

[46] *Id.*

[47] *Id.* at 666-7.

                    HIGHLY CONFIDENTIAL

overcollateralized by $5 million, or 5%. Such overcollateralization can act as a buffer to absorb losses on the underlying collateral.

   c. Excess spread (or "excess interest") is the amount of interest collected above and beyond the amount needed to pay interest to bondholders and pay the ongoing expenses of the RMBS trust.[48]

   d. A shifting interest structure is often referred to as a credit enhancement. Shifting interest structures allocate all prepayment to the senior tranche(s) during a given period of time. [49] By paying down the senior tranches faster than the more junior ones, this type of structure reduces the default risk exposure of the senior tranches. It also has the effect of increasing the level of applicable subordination for that tranche over time as the relative share of the deal owned by the AAA tranche decreases with each prepayment.[50]

   e. Insurance provided by bond insurers (such as MBIA and Assured Guaranty) also serves as a form of credit enhancement. For securities with bond insurance "wraps," bond insurers guarantee some portion of the principal and/or interest payments owed to investors in certain (typically senior) tranches. By guaranteeing some degree of payment to investors irrespective of the cash flows from the underlying mortgages, investors in those tranches are insulated to some degree from the effects of losses on the underlying collateral.

   f. Other credit enhancements include derivatives and guarantees structured to ensure that investor cash flows are protected against certain types of interest rate movements. While these take various forms, they function to mitigate potential differences between interest payments made into an RMBS trust and the payments from the trust to investors.

53.   Credit enhancements are typically measured as a percentage of the total principal value of the mortgages in the supporting loan group so that an investor can withstand in losses before the cash flows associated with its certificate declines. Investors at the time generally would have assessed the impact of expected losses by applying a tradeoff between the maximum expected level of cumulative default losses and credit enhancement provided.

54.   The market understood that no RMBS was designed or intended to be completely risk-free. There was always a possibility that an investment of this type would incur losses. Reasonable investors understood that if housing prices fell or unemployment rose, more loans would default. They also understood that if housing prices fell enough and/or unemployment rose enough, losses could be greater than the credit enhancements built into the certificates that they purchased.

55.   Consequently, the fact that a security failed to generate anticipated cash flows does not indicate that it had defects or that any purported defects were significant (or, more importantly, that risk of any defects had not been properly disclosed). Rather, one must assess whether Plaintiff's Loan Characteristic Claims—if known at the time of issuance of the Relevant Certificates—

---

[48] Fabozzi *supra* note 16, at 104.

[49] Hu *supra* note 23, at 666.

[50] *Id.*

       HIGHLY CONFIDENTIAL

would have altered *expectations* about the probability of loss. Plaintiff's Loan Characteristic Claims[51] would have been important to reasonable investors only if they: (1) would have caused a reasonable investor to expect a greater volume of defaults than would have been expected for loans that were consistent with the characteristics disclosed in the stratifications in the prospectus supplements; and (2) would have altered a reasonable investor's expectations about whether the volume of defaults would have been sufficiently high as to threaten to exhaust the available credit enhancement and lead to losses above such enhancements.

## VII.    EMPIRICAL ANALYSIS OF MATERIALITY

### A.    Industry Standard Financial Models of RMBS Performance and Investor Returns

56.    Payments made by borrowers on the underlying mortgage loans are the source of cash flow to investors through a securitization's trust. That cash flow can change over time as loans are either paid off or default. Statistical models were developed by the financial services industry during the Relevant Time Period to predict the likelihood that borrowers would default or prepay over time. Prospective investors used those models to estimate the performance of hypothetical supporting loan groups to assess how the structure of the securitization could impact performance of a particular security.

57.    Both default and prepayment assumptions are necessary for estimating loan performance. An increased likelihood of default could adversely impact the expected cash flow from an RMBS. Prepayment is also critical to loan performance because a prepayment event (which, in the case of a mortgage, is generally due to the sale of the property or refinancing) removes the loans from the supporting loan group. Therefore, as prepayments occur and supporting loan groups decrease in size, the number of underlying loans at risk of default decreases.[52] Prepayment revenues are often first allocated to senior note holders, reducing their exposure to loss more quickly than that of more junior note holders.

58.    An RMBS investor can only evaluate information that is available at the time of the investment. Accordingly, an analysis of expected RMBS performance should only include market information that was available to investors at the time of the investment, and not any information that became available after that date.

### B.    Empirical Analysis of the Materiality of Alleged Differences in Loan-Level Characteristics

59.    To determine whether the purported underwriting defects identified by Plaintiff's experts, if taken as true, had a material impact on the risk of the Relevant Certificates, I use an industry standard Cox proportional hazards model to estimate the prepayment and default hazards of a loan.[53] These "hazards" show the predicted month-specific prepayment and default rates for a

---

[51] *See* description of Plaintiff's Loan Characteristic Claims *supra* note 9.

[52] To illustrate this point, consider a supporting loan group that is composed of equally sized loans. In the first period, half of the loans prepay; while, in the second period, 100% of the surviving loans default. Because half of the loan group prepaid in the first period, the default losses to the group are only 50%. Prepayment must therefore be considered in a model of supporting loan group performance.

[53] Elul, Ronel. "Residential Mortgage Default." *Philadelphia Fed. Bus. Review* (Q3 2006): 21-30 at 25; Fuster, Andreas, and Paul S. Willen. "Payment Size, Negative Equity, and Mortgage Default." *Federal Reserve Bank NY.*

HIGHLY CONFIDENTIAL

loan given a set of characteristics. The Model estimates prepayment and default using information on loan characteristics including: LTV/CLTV, FICO, property type, document type, lien position, and prepayment penalty. The Model also accounts for geographic differences in loan-level performance.

60. I model the risk associated with the Relevant Certificates that the Credit Unions purchased. To do so, I model the supporting loan groups that collateralize the Relevant Certificate and assess the risk of losses for that certificate.

61. *First*, the Model determines the relationship between a given set of loan characteristics and the expected probability of prepayment. It does this by estimating the relationship between certain loan and economic characteristics (such as, LTV/CLTV, FICO, property type, document type, lien position, prepayment penalty, and local unemployment) and prepayment using prepayment and loan characteristics information on approximately 20 million loans from ABSNet, a commercially available database. The prepayment estimation of the proportional hazards model is carried out using only data available to an investor at the time of certificate issuance (*i.e.*, historical loan prepayment data from 1998 to the time of issuance).

62. *Second*, the Model determines the relationship between a set of loan characteristics and the expected probability of default. It does this by estimating the relationship between certain loan and economic characteristics (such as, LTV/CLTV, FICO, property type, document type, lien position, prepayment penalty, and local unemployment) and default using default and loan characteristics information on approximately 20 million loans from ABSNet. The default estimation of the proportional hazards model is carried out only using data available to investors at the time period of certificate issuance (*i.e.*, historical loan delinquency data from 1998 to the time of issuance).

63. *Third*, with the statistical relationship between certain loan characteristics and expected loan performance (default and prepayment) established, I run two scenarios that allow me to empirically determine whether Plaintiff's allegations regarding loan characteristics would have had a material impact on the risk of loss for the Relevant Certificates at the time of issuance. In each scenario the expectation of default for each loan in each group is calculated using the loan's characteristics and the default and prepayment relationships described above.[54] The individual expectations of the level of default for each loan are aggregated together to form an expectation of cumulative default loss (*e.g.*, cumulative default loss, which is the expected cumulative losses arising from defaulted loans under the assumption of 100% severity, expressed as a percentage of the principal balance of the supporting loan group) for a supporting loan group. To be conservative, my analysis assumes 100% losses in the event of default,[55] meaning that I assume that no proceeds are recovered from a foreclosure sale of a property

Staff Report No. 582 (Aug. 2013): 1-67 at 16; and Ding, Yufeng. "Decomposing Mortgage Portfolio Risk: Default, Prepayment, and Severity." *Moody's Research Labs* (Nov. 19, 2010): 1-27 at 6. Additional detail on my Model is available in **Appendix C**: *Technical Appendix*.

[54] For a Supporting Loan Group, I modeled characteristics that were disclosed in the prospectus supplement and could have been modeled by investors at the time of issuance. Those characteristics include characteristics that are the subject of Plaintiff's Loan Characteristic Claims. A full description is available in **Appendix C**: *Technical Appendix*.

[55] This is also known as 100% loss "severity."

HIGHLY CONFIDENTIAL

securing a defaulted loan. This cumulative default loss is expressed as a percentage of the total balance associated with a supporting loan group.

64. As further analysis, I consider the impact of certain credit enhancements for the Relevant Certificates.

65. The two scenarios that I run are:

> a. *Plaintiff's claims scenario (reflecting Plaintiff's Loan Characteristic Claims);* and

> b. the *disclosed risk scenario*.

66. In the *Plaintiff's claims scenario*, I take as true the Plaintiff's Loan Characteristic Claims and apply these findings to the loan tapes provided to me by Counsel. For example, if Plaintiff's reunderwriting expert's findings lead to a 12% increase in the aggregate LTV ratio of a certificate's supporting loan group, then I increase the LTV of each loan in the supporting loan group by 12%. I use this approach for modeling purposes only, and do not suggest that Mr. Butler's results could properly be extrapolated to the rest of the supporting loan group. For additional description of this calculation, *see* **Appendix C**: *Technical Appendix*.[56]

67. Based on the loan characteristics derived from Plaintiff's Loan Characteristic Claims,[57] I calculate the predicted default rate for the group, which I call the *Plaintiff's claims scenario*.

68. In the *disclosed risk scenario*, I created hypothetical supporting loan groups that are consistent with the stratifications disclosed in the prospectus supplements, and which therefore could have been a supporting loan group for the Relevant Certificates. For each of those hypothetical groups, I ran the same model for the same loan characteristics used to calculate the *Plaintiff's claims scenario* to calculate the predicted default rates for each hypothetical supporting loan group. As any of those hypothetical supporting loan groups could have collateralized the RMBS at issue, all of those predicted default rates were possible. The *disclosed risk scenario* is the risk associated with the hypothetical supporting loan group that had the greatest expected risk of default.

69. The process for the creation of those hypothetical pools and the calculation of the expected risk of default is as follows:

> a. *First,* I identified Supporting Loan Group Stratifications that were disclosed in the prospectus supplements. I then tabulated the information that was provided for each characteristic in order to model the range of risk that was disclosed in the prospectus supplement.

>> i. As discussed above, the Supporting Loan Group Stratifications in the prospectus supplements provided ranges of values for various supporting loan group characteristics. For most characteristics, the Supporting Loan Group Stratifications provided the approximate

---

[56] As more fully described in **Appendix C**: *Technical Appendix*, my method of calculating increases in supporting loan group level characteristics is conservative.

[57] *See* **Exhibit 4**: *Supporting Loan Group Statistics (Plaintiff's Claims Scenario)* for detailed information regarding each supporting loan group in the tapes used in calculating Plaintiff's claims scenario.

                                    HIGHLY CONFIDENTIAL

distribution of loans for each characteristic, presented as a stratification range and associated number of loans for each characteristic. For example, an investor would have known that approximately 299 loans out of approximately 2,035 had an CLTV between 75.00 and 79.99%.[58] In addition, the prospectus supplement may have stated the percentage of loans that fell into certain categories, *e.g.,* what percentage of loans were "full-documentation" loans.

b. *Second,* I generated 300 groups of loans by drawing from the distribution of loan characteristics determined in paragraph (a).[59] The loan stratifications for each of the groups were consistent with the Supporting Loan Group Stratifications for the Relevant Certificates. For example, the HVMLT 2006-10 (Group 2) supporting loan group contains 2,035 loans. For this trust, I created 2,035 hypothetical loans, which collectively have characteristics (*e.g.*, CLTV, credit score) consistent with the stratifications disclosed in the prospectus supplement. I then repeat this process of creating 2,035 loans 299 times.[60]

   i. Continuing with HVMLT 2006-10 (Group 2) as an example, in the end, I created 610,500 possible loans in a total of 300 groups. Every one of the groups is drawn from the distribution of characteristics detailed in the prospectus supplements and thus, is a group that could have backed the Credit Unions certificate based on the prospectus supplement.

c. *Third,* I calculated the expected cumulative default loss for each of the 300 groups, based on historical data from ABSNet. The expected cumulative default losses associated with these groups are representative of the range of risk disclosed to an investor in the prospectus supplement. The largest expected cumulative default loss among the 300 groups is considered the maximum risk disclosed to an investor for that certificate.

70. I provided the maximum expected cumulative default loss for each supporting loan group backing the Relevant Certificates using the Supporting Loan Group Stratifications in **Exhibit 5**: *RMBS Model Results (Plaintiff's Claims Scenario v. Disclosed Risk Scenario).*

71. In the *disclosed risk scenario*, to be conservative, I chose not to include additional variation that could have been faced by an investor and was generally disclosed in the prospectus supplements.[61] Had this additional disclosed variation been included in my analysis, it would

---

[58] HVMLT 2006-10 Prospectus Supplement (RBS-NCUA 00092572, at RBS-NCUA 00092669).

[59] *See* **Appendix D**: *Results Summary* for trust-specific counts. There are millions of possible loan pool combinations based on the stratifications provided. Additional pools can only increase the maximum risk number, as such, generating fewer pools is a conservative approach.

[60] I draw each loan characteristic randomly to reflect the loan characteristics stated in the prospectus supplements. For example, if a prospectus supplement indicated that approximately 80% of loans in a supporting loan group were full documentation loans approximately 80% of the loans in every group I create will be full-documentation loans. Minor variations may exist.

[61] Statements regarding changes in the macroeconomy are one example of an additional variation that (i) could have been faced by an investor and (ii) was disclosed in prospectus supplements. These statements of variation, while reflected in the prospectus supplement, are not accounted for in my disclosed risk scenario. This exclusion results in a more conservative calculation of disclosed risk because additional variation could only increase the maximum

-18-                                    HIGHLY CONFIDENTIAL

have uniformly increased the range of risk and thus the maximum risk that an investor could have faced.

72. I then compared the cumulative default loss under each scenario. When the *disclosed risk scenario's* maximum cumulative default loss is greater than the *Plaintiff's claims scenario's* cumulative expected default loss, the additional risk resulting from Plaintiff's Loan Characteristic Claims was encompassed in the disclosures in the prospectus supplements. In other words, even if the Plaintiff's Loan Characteristic Claims were true, the performance expectations for the adjusted loans would have been within the range of performance that would have been expected based on the Supporting Loan Group Stratifications as disclosed in the prospectus supplements. As a result, the impact of Plaintiff's Loan Characteristic Claims is empirically immaterial.

73. In the event that the *Plaintiff's claims scenario* does not fall below the maximum risk in the *disclosed risk scenario* (without, as noted above, taking into account other disclosures), I incorporated the impact of credit enhancements disclosed in the prospectus supplements.[62]

74. To incorporate credit enhancements into my analysis, I would identify the supporting loan groups for which the cumulative expected default loss for the *Plaintiff's claims scenario* is higher than it is for the *disclosed risk scenario* and compare the expected cumulative default loss estimate to the credit enhancement disclosed in the prospectus supplements.

## VIII.  PLAINTIFF'S LOAN CHARACTERISTIC CLAIMS WOULD NOT HAVE HAD A MATERIAL IMPACT ON INVESTORS' DECISIONS REGARDING WHETHER TO INVEST IN THE RELEVANT CERTIFICATES

75. Plaintiff alleges that the underwriting of the loans supporting the Relevant Securitizations deviated from the statements in the prospectus supplements.[63] Plaintiff's reunderwriting expert reviewed certain loans and has asserted that the characteristics of certain of the reviewed loans differ from the characteristics disclosed in the offering materials (Plaintiff's Loan Characteristic Claims).[64, 65]

---

disclosed risk. *See*, *e.g.*, American Home Mortgage Assets LLC, Mortgage Pass-Through Certificates Mortgage-Backed Notes, Prospectus (Feb. 27, 2007) (RBS-NCUA 00141127, at RBS-NCUA 00141196). ("Furthermore, the rate and timing of prepayments, defaults and liquidations on the mortgage loans will be affected by the general economic condition of the region of the country in which the related mortgaged properties are located. The risk of delinquencies and loss is greater and prepayments are less likely in regions where a weak or deteriorating economy exists, as may be evidenced by, among other factors, increasing unemployment or falling property values.").

[62] My calculations of credit enhancements do not take into account the effects of bond insurance wraps. This exclusion results in a more conservative calculation of the credit enhancement supporting any "wrapped" certificates.

[63] Cal. Second Amended Complaint at ¶¶ 3, 10-11, 60 *et seq.*; Kan. Second Amended Complaint at ¶¶ 3, 7-8, 57 *et seq.*

[64] *See* description of Plaintiff's Loan Characteristic Claims *supra* note 9.

[65] Plaintiff's loan characteristic changes are summarized in **Exhibit 4**: *Supporting Loan Group Statistics (Plaintiff's Claims Scenario)*.

                                   HIGHLY CONFIDENTIAL

76.  For the purposes of forming an opinion regarding whether Plaintiff's Loan Characteristic Claims are material, I assume the accuracy of Plaintiff's Loan Characteristic Claims.

77.  I modeled the characteristics that investors modeled during the Relevant Time Period to predict prepayment and default rates, including LTV/CLTV, FICO, property type, document type, lien position, and prepayment penalty.[66] For an exhaustive list of variables used in modeling each trust, *see* **Appendix D**: *Results Summary*.

   A.  **For Fifty-Six of the Fifty-Eight Relevant Certificates[67] Even if One Accepts Plaintiff's Loan Characteristic Claims as True, the Expected Risk of the Relevant Certificates at the Time of Issuance Falls Below the Maximum Risk Set Forth in the Supporting Loan Group Stratifications Disclosed in the Prospectus Supplements**

78.  For each supporting loan group of the Relevant Certificates, I calculated the maximum cumulative expected default loss that a reasonable investor would have expected, based on the Supporting Loan Group Stratifications. *See* **Appendix D**: *Results Summary*.

79.  My analysis is conservative because it is limited to the Supporting Loan Group Stratifications and, as noted above, I have not considered other disclosures in the prospectus supplements detailing additional risk factors. Analysis of such information would be likely to increase the range of risk accepted by an investor when purchasing a certificate and would not decrease the range of risk.

80.  My conservative analysis shows that for fifty-six of the fifty-eight Relevant Certificates even when accepting Plaintiff's Loan Characteristic Claims as true, the expected default losses lie below the maximum default losses disclosed in the Supporting Loan Group Stratifications at the time of issuance. *See* **Exhibit 5**: *RMBS Model Results (Plaintiff's Claims Scenario v. Disclosed Risk Scenario)*. Therefore, Plaintiff's Loan Characteristic Claims with respect to the Relevant Certificates would have been immaterial to a reasonable investor during the Relevant Time Period.

81.  With respect to the remaining Relevant Certificates, all of them included certain credit enhancements. For those certificates, even if one accepts Plaintiff's Loan Characteristic Claims as true, I find that (based on my conservative assumptions), while the expected risk of default loss for those certificates is higher than the maximum risk of default loss set forth in the Supporting Loan Group Stratifications, the expected risk of default did not threaten to exhaust the credit enhancement afforded to the certificates. *See* **Exhibit 5**: *RMBS Model Results (Plaintiff's Claims Scenario v. Disclosed Risk Scenario)*.

   B.  **Reasonable RMBS Investors Expected That Some of the Loans Associated With Their Certificates Would Default**

82.  Even very high quality loans default on occasion. Alt-A and subprime loans, including those at issue in this case, were expected to default more frequently than prime loans, and in fact did

---

[66] The characteristics used for my Model differ depending on the information available in each prospectus supplement for the Relevant Securitizations. **Appendix D**: *Results Summary*, lists every supporting loan group level characteristic that was incorporated into the model for the Relevant Securitizations.

[67] My analysis counts each certificate purchase separately.

HIGHLY CONFIDENTIAL

so.[68] This fact was well understood in the market. As discussed above, RMBS were designed in part to mitigate this type of default risk.

83. One cannot claim that a given level of expected default probability of a loan or a set of loans would have been material to investors without: (1) identifying whether such level of expected risk was disclosed; and, if that level of expected risk was not disclosed, (2) assessing how the expected default probability would have been absorbed by the structure of the deal. If the level of expected risk was disclosed or the level of expected default loss would have been absorbed by credit enhancement afforded the tranche, then the alleged defects in loans would not have been material to a reasonable investor in connection with a contemplated RMBS transaction.

84. Reasonable investors understood that models of loan default and prepayment included macroeconomic factors such as housing prices, unemployment rates, and indicators of home location by state.[69]

85. Reasonable investors understood that if housing prices fell or unemployment rose, more loans would default. They also understood that if housing prices fell enough and/or unemployment rose enough, losses could be greater than the protections built into their certificates.


## IX.   CONCLUSION

86. For fifty-eight out of the fifty-eight Relevant Certificates, Plaintiff's Loan Characteristic Claims would not have had any impact on a reasonable investor's expected investment risk and, therefore, would not have been material to a reasonable investor at the time of issuance. For fifty-six of the fifty-eight Relevant Certificates even if one accepts Plaintiff's Loan Characteristic Claims as true, the expected risk of loss at the time of issuance falls below the maximum risk of loss set forth in the Supporting Loan Group Stratifications. For the remaining Relevant Certificates, even if one accepts Plaintiff's Loan Characteristic Claims as true, the expected risk of loss for those Relevant Certificates would fall within, and not come close to exhausting, the credit enhancements afforded to those certificates.

87. The Butler Report and the Sunshine Report do not provide support for the premise that the purported misrepresentations and omissions in the relevant prospectus supplements would, if true, have been material to investors at the time of issuance.

---

[68] Gerardi *supra* note 40, at 6.

[69] Deng *supra* note 27, at 282-3.

                    HIGHLY CONFIDENTIAL

88.  I reserve my right to amend or supplement this report should additional documents or information become available to me.


Dated: October 16, 2015


Ethan Cohen-Cole, Ph.D.

                                              HIGHLY CONFIDENTIAL