# EXHIBIT 3

# FILED UNDER SEAL PURSUANT TO STIPULATION

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
 2     NATIONAL CREDIT UNION        §
       ADMINISTRATION BOARD, AS     §
 3     LIQUIDATING AGENT OF         §
       WESTERN CORPORATE FEDERAL    §
 4     CREDIT UNION,                §   Case No. CV 11-05887 GW(JEMx)
            Plaintiff,              §
 5                                  §
       VS.                          §
 6                                  §
       RBS SECURITIES INC., ET AL.  §
 7              Defendants.         §
 8                             - and -
 9              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
10     NATIONAL CREDIT UNION        §
       ADMINISTRATION BOARD, AS     §
11     LIQUIDATING AGENT OF         §
       WESTERN CORPORATE FEDERAL    §
12     CREDIT UNION,                §
            Plaintiff,              §   Case No. CV 11-02340 JWL-JPO
13                                  §
       VS.                          §
14                                  §
       RBS SECURITIES INC., ET      §
15     AL.,                         §
                Defendants.         §
16
17              ORAL AND VIDEOTAPED DEPOSITION OF
                         JOHN K. WALD, PH.D.
18                       JANUARY 15, 2016
19              ORAL AND VIDEOTAPED DEPOSITION OF JOHN K.
       WALD, PH.D., produced as a witness at the
20     instance of the Credit Suisse Securities (USA)
       LLC and duly sworn, was taken in the above styled
21     and numbered cause on Friday, January 15, 2016,
       from 8:40 a.m. to 5:04 p.m., before Tamara
22     Chapman, CSR, RPR, CCR (LA) in and for the State
       of Texas, reported by computerized stenotype
23     machine, at the offices of Pulman, Cappuccio,
       Pullen & Benson LLP, 2161 N.W. Military Highway,
24     Suite 400, San Antonio, Texas.
25
```

Page 2

```
 1          A P P E A R A N C E S
 2
    REPRESENTING RBS DEFENDANTS:
 3    Mr  Gavin C P  Campbell
      KIRKLAND & ELLIS LLP
 4    333 South Hope Street
      Los Angeles, California  90071
 5    213 680 8153
      gavin.campbell@kirkland.com
 6
 7
    REPRESENTING NCUA:
 8    Mr  John C  Craig
      KOREIN TILLERY
 9    505 North 7th Street, Suite 3600
      St  Louis, Missouri  63101
10    314 241 4844
      jcraig@koreintillery.com
11
12
    REPRESENTING NOVASTAR MORTGAGE FUNDING CORP:
13    Mr  Martin M  Loring
      HUSCH BLACKWELL LLP
14    4801 Main Street, Suite 1000
      Kansas City, Missouri  64112
15    816 983 8142
      martin.loring@huschblackwell.com
16
17
    NOMURA HOME EQUITY LOANS AND NOURA ASSET
18  ACCEPTANCE CORP:
      Mr  Matthew J  Thomas
19    JENNER & BLOCK LLP
      353 North Clark Street
20    Chicago, Illinois  60654
      312 222 9350
21    mthomas@jenner.com
22
    ALSO PRESENT:
23    Mr  Jason Lemley - The Videographer
24
25
```

Page 3

```
 1          * * *
         EXAMINATION INDEX
 2
 3                      Page
    BY MR  CAMPBELL              6
 4
 5
 6
 7          * * *
         INDEX OF EXHIBITS
 8
 9                      Page
    Exhibit 1              6
10    Reply of John K  Wald, Ph D  to
    Rebuttal Expert Reports of Ethan
11  Cohen-Cole, Ph D  - 11/20/15
    (no Bates - 44 pages)
12
    Exhibit 2              7
13    Supplemental Reply of John K  Wald,
    Ph D  to Rebuttal Expert Reports of Ethan
14  Cohen-Cole Ph D  - 12/4/15
    (no Bates - 3 pages)
15
    Exhibit 3              127
16    "Taking the Lie Out of Liar Loans:
    The Effect of Reduced Documentation on
17  the Performance and Pricing of Alt-A and
    Subprime Mortgages" by Michael
18  La-Cour-Little and Jing Yang
    (no Bates - 46 pages)
19
    Exhibit 4              148
20    "The Rise in Mortgage Defaults" by
    Christopher Mayer, Karen Pence, and Shane
21  M  Sherlund
    (no Bates - 23 pages)
22
    Exhibit 5              209
23    "Mortgage Terminations, Heterogeneity
    and the Exercise of Mortgage Options" by
24  Yongheng Deng, John M  Quigley, and
    Robert Van Order
25  (no Bates - 32 pages)
```

Page 4

```
 1  Exhibit 6.............................  246
       Defendant John Wald's Affirmation in
 2  Opposition to Mr. Goldberg's Motion for
    Relief and Withdrawal, Horrigan against
 3  Pendleton Trading Systems, Inc.
    (no Bates - 6 pages)
 4
    Exhibit 7.............................  247
 5    Reply Affidavit by Ina R. Bort,
    Horrigan against Pendleton Trading
 6  Systems, Inc.
    (no Bates - 12 pages)
 7
    Exhibit 8.............................  248
 8    Voluntary Petition U.S. Bankruptcy
    Court for John Wald
 9  (no Bates - 40 pages)
10  Exhibit 9.............................  250
       Response to The Wald Family Trust's
11  Motion for Relief from Stay in U.S.
    Bankruptcy Court
12  (no Bates - 5 pages)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1          THE VIDEOGRAPHER:  Good morning.
 2  We are on the  record at 8:40 a.m. on
 3  January 15th, 2016.  This is the video-recorded
 4  deposition of John Wald.  My name is Jason Lemley
 5  here with our court reporter, Tamara Chapman.  We
 6  are here for Veritext Legal Solutions at the
 7  request of counsel for the defendant.
 8          This deposition is being held at
 9  2161 Northwest Military in San Antonio, Texas.
10  The caption of this case is Nash- -- National
11  Credit Union Administration Board versus RBS
12  Securities, et al.
13          At this time, will counsel and all
14  present identify themselves for record.
15          MR. CAMPBELL:  Gavin Campbell on
16  behalf of the RBS defendants.
17          MR. THOMAS:  Matthew Thomas on
18  behalf of Nomura defendants.
19          MR. LORING:  Martin Loring on
20  behalf of Novastar Mortgage Funding Corporation.
21          MR. CRAIG:  John Craig for NCUA.
22          THE VIDEOGRAPHER:  Thank you.  The
23  witness will be sworn in, and counsel may begin
24  the examination.
25          JOHN K. WALD, Ph.D.,
```

2 (Pages 2 - 5)

1    having been first duly sworn, testified as follows:
2            EXAMINATION
3    BY MR. CAMPBELL:
4        Q. Dr. Wald, when were you first retained in
5    this case?
6        A. I don't know the exact date, but I think
7    it was around October 26th.
8        Q. 2015?
9        A. 2015. That's correct.
10        Q. I'm going to hand you what I've marked as
11    Wald Exhibit 1.
12            (Exhibit 1 was marked.)
13        A. Yes.
14        Q. (BY MR. CAMPBELL) Do you recognize that
15    document?
16        A. Yes, I do.
17        Q. And what is that document?
18        A. This is my reply to -- it's a rebuttal
19    expert report. It's a reply to the rebuttal expert
20    report of Dr. Ethan Cohen-Cole.
21        Q. And if you could just flip to the back
22    pages and confirm that it also includes Exhibit 1
23    and 2 to your report and Appendices 1 and 2 to your
24    report.
25        A. Yes, I see that.

1            (Exhibit 2 was marked.)
2        Q. (BY MR. CAMPBELL) I'm going to hand you
3    what I've marked as Wald Exhibit 2. Do you recognize
4    that document?
5        A. Yes, I do.
6        Q. And what is that document?
7        A. It's a supplemental reply to the rebuttal
8    expert report of Dr. Ethan Cohen-Cole.
9        Q. And did the supplemental report alter any
10    of your opinions from your original November 20th
11    report other than the numbers that you've identified
12    in there?
13        A. No. The -- the supplemental report really
14    makes minor changes to the main rebuttal report.
15        Q. And those changes are just to the numbers.
16    You didn't change any of the substance of your
17    opinions. Is that --
18        A. That's correct.
19        Q. So turning back to Exhibit 1, does this
20    report contain a complete statement of all of your
21    opinions in this case?
22        A. I'm not sure I could say it contains a
23    complete statement of all my opinions. I mean, I
24    think I can definitely elaborate further on some of
25    these issues. I think it contains a summary of what

1    I thought, you know, at the time when I was writing
2    it were the main issues with Dr. Cohen-Cole's report.
3        Q. Have you formed opinions in this case that
4    are not contained in this report?
5        A. I mean, that's a pretty broad statement.
6    I have lots of opinions about various aspects of it.
7    So, in general, there's certainly stuff that I can
8    talk about the case and about the securities or about
9    the issues involved here that is not directly in this
10    report.
11        Q. Do you plan to testify at trial on -- and
12    give opinions that are not contained in this report?
13        A. I'm not sure exactly what the rules are
14    about what I'm going say or not going to say at
15    trial. But I think this report covers the basics of,
16    you know, my critiques of the Cohen-Cole report. I
17    think there are some things I can elaborate more, but
18    I think, you know, this is, you know, a basic outline
19    of -- of what my critiques are.
20        Q. Does this report contain the basis and
21    reasons for your opinions in this case?
22        A. I've tried to explain my opinions as far
23    as I can in the space and time I had available. I'm
24    not sure that I can say that it contains the basis.
25        For all of them. I mean, the basis

1    includes things like basic econometric theory which,
2    you know, I cite references to. And, you know, the
3    reasons -- I tried to explain my reasons in the space
4    and time I had available, but I can certainly
5    elaborate further if -- if called upon to do so.
6        Q. Are there any specific documents that you
7    have relied on in forming your opinions in this case
8    that are not identified in your Exhibit 2 to this
9    report?
10        A. I -- I think Exhibit 2 really covers
11    pretty much everything I -- I relied upon. I looked
12    at other documents as well, but I thought these were
13    the things that were most relevant.
14        I mean, there were a couple of working
15    papers that, for instance, I looked at that made
16    similar points and that, you know, I didn't cite for
17    a couple of different reasons. Things like, well,
18    they were works in progress and there were different
19    versions floating around. And, whenever possible, I
20    went with published papers because I thought that
21    would be clearer.
22        Q. Can you tell me all the documents that you
23    relied on in forming your opinions in this case that
24    are not listed on Exhibit 2?
25        A. I'm not sure that there's -- you know,

1  there's -- there's a working paper that I -- I
2  remember looking at that was relevant, but I didn't
3  think it was as relevant as the things that I cite.
4  So I -- I can't remember the -- the name of the
5  authors right off the top of my head.
6      Q. Do you remember the title of that paper?
7      A. No. I can try and find it for you if --
8  if given time. But I -- I can't remember it off the
9  top of my head.
10     Q. Besides that working paper, what other
11  documents did you cons- -- consider in forming your
12  opinions in this case that are not listed on
13  Exhibit 2 to your report?
14     A. I think that's about it.
15     Q. If you could turn to Paragraph 18 of your
16  report, Exhibit 1.
17     A. Yes.
18     Q. Is the statement of your task in
19  Paragraph 18 a complete and accurate summary of your
20  retention in this case?
21     A. I'm sorry. Paragraph 18.
22     Q. Yes. Paragraph.
23     A. I misheard you as Page 18.
24     Q. That's all right.
25         MR. CRAIG: Object to the form.

1      A. Can you repeat the question?
2      Q. (BY MR. CAMPBELL) Is the statement of
3  your task in Paragraph 18 a complete and accurate
4  summary of your retention in this case?
5         MR. CRAIG: Same objection.
6      A. Let me read over the paragraph just to
7  make sure that -- that I understand exactly what
8  you're asking.
9         (Reviewing document.)
10        I think in very broad terms, you know, I
11  was hired to -- to do as it says here, review and
12  opine on Dr. Cole's conclusions, yes.
13     Q. (BY MR. CAMPBELL) Were there other tasks
14  that you were retained to perform that are not listed
15  in Paragraph 18?
16     A. No. I think pretty much -- I mean, there
17  were -- so this is a very broad set of things that's
18  really included in that. Right? So I'm also hired
19  to come here and be deposed. I'm hired to, you know,
20  write this report and write the supplemental report,
21  to do all that analysis. There's lots of different
22  aspects of this task. But I think in general
23  that's -- that's a good explanation of it.
24     Q. You were not retained in this case to
25  offer an opinion on what is or is not material to a

1  reasonable investor. Correct?
2      A. No. I mean, my job is to provide a -- an
3  opinion on whether Dr. Cole -- Cohen-Cole's methods
4  in analyzing materiality and analyzing his
5  econometrics and his -- the way that he looks at what
6  investors do, whether that's reasonable and sort of
7  meets professional standards.
8         I mean, in general, I read the Butler and
9  Sunshine reports, and I think -- you know, I would
10  agree that there is -- that they -- with their
11  finding of materiality, but that's not my -- that's
12  not what I was hired for.
13     Q. So you are not offering an opinion on what
14  is or is not material to an investor. Correct?
15        MR. CRAIG: Object to the form.
16     A. I'm not sure that, you know, someplace in
17  here you're going to find something where I say --
18  and, you now, certainly in this deposition, I just
19  said, you know, I think these things are material,
20  but that's not the role of this report. The role of
21  this report is really to consider Dr. Cohen-Cole's
22  methodology in writing his report.
23     Q. (BY MR. CAMPBELL) And you didn't offer an
24  opinion on August 14th, 2015, when Mr. Butler and
25  Mr. Sunshine offered their reports. Correct?

1      A. I was not familiar with this case before
2  October of 2015.
3      Q. Okay. Now, you were deposed in another
4  NCUA case last week. Correct?
5      A. That's correct.
6      Q. Besides that deposition, have you ever
7  been deposed as an expert?
8      A. No.
9      Q. Prior to these NCUA cases, have you ever
10  submitted an expert report in any case?
11     A. Not to the Court. I've worked as an
12  expert before where a lawyer had asked me for a draft
13  summary of an opinion. I produced something rough,
14  and I -- and I think the case settled after that.
15     Q. What was the nature of that case?
16     A. That was a discrimination lawsuit at an
17  investment bank.
18     Q. Do you remember what investment bank?
19     A. Yes, I do.
20     Q. Which investment bank was that?
21     A. I'm not sure if there's some
22  confidentiality agreement that might prohibit me. I
23  doubt it. It's been some number of years ago. It
24  was at Merrill Lynch.
25     Q. And you've never offered trial testimony

4 (Pages 10 - 13)

Page 14

1  as an expert.  Right?
2      A.  That's correct.
3      Q.  You worked at Bear Stearns from 1986 to
4  1990.  Is that correct?
5      A.  That's correct.
6      Q.  What was your job at Bear Stearns from
7  1986 to 1990?
8      A.  So the job changed a little bit after the
9  first year.  So the first year I was in New York, and
10  I was the liaison between the sales force and the --
11  the research department.
12      So on that first year, I sat with the
13  research department, and I would look at different
14  questions posed by salesmen or posed by clients in
15  terms of analyzing their portfolios, analyzing
16  particular trades.  A lot of those had to do with
17  RMBS securities.
18      After '87 I moved to the Boston office,
19  and there I sat on the sales floor.  And while I had
20  some direct client contact in New York, in Boston I
21  had direct client contact day to day.  I would
22  recommend trades to clients.  I would analyze
23  particular trades for clients.  I would execute
24  trades for clients.  Those are sort of the main jobs
25  I had, and sometimes those included specific

Page 15

1  securities, sometimes they included portfolios of
2  securities.  And, again, a lot of the securities, in
3  sort of a growing percentage, was RMBS.
4      Q.  And did your job change between 1987 and
5  1990?
6      A.  No.  It was pretty similar throughout that
7  time.
8      I should also mention I did a short
9  consulting job for Bear Stearns in 1991, which was
10  restructuring -- restructuring a large RMBS portfolio
11  for one of their clients.
12      Q.  When you were a liaison in 1986, the New
13  York office, what kind of questions regarding RMBS
14  were you answering in a general sense?
15      A.  So the types of things that we'd look at
16  are sort of similar to, you know, part of my critique
17  of Dr. Cohen-Cole in that investors typically look at
18  a scenario analysis, and so the types of things that
19  they would look at would be, if I buy this security,
20  how is it going to do in the following scenarios?
21  How about if I change the repayment assumptions?  How
22  is that going to affect the scenarios?
23      And the scenarios would typically include
24  things that might include a difference in the way
25  prepayments work but would also include interest rate

Page 16

1  changes.
2      The types of RMBS securities that I looked
3  at -- let's see.  '86 to '87, there weren't, I think,
4  a lot of CMOs around, so it was a lot of what we'd
5  call plain-vanilla agency mortgage-backed securities.
6  But we also worked on the second IO/PO deal.  And so
7  IOPOs became a big portion of the analysis in '86 to
8  '87.
9      Q.  Which investors asked you questions about
10  RMBS in 1986?
11      A.  Boy, that's -- it's hard to remember the
12  specific ones.  But the types of investors that I had
13  that were looking at these, a lot of pension funds
14  were looking at them, insurance companies were
15  looking at them, banks were looking at them a great
16  deal.
17      The banks were prior to about '88, '89,
18  looking at them in slightly different terms, because
19  they were looking at them -- an accounting rather
20  than a scenario-based analysis, and sort of after
21  '88-'89, they started looking at them in terms of
22  scenario analysis as well, I would say.
23      So you have pension funds, insurance
24  companies.  You had some mutual funds looking at this
25  as well.  Those were the -- some of the ones.  I'm

Page 17

1  sure there are others.  You know, if I could remember
2  more exactly what -- which ones asked me questions in
3  '86, '87, I'd tell you, but it's been a while.
4      Q.  From 1987 to 1990 when you were on the
5  sales force, what type of clients were you
6  interacting with when you were dealing with RMBS?
7      A.  So I wasn't actually on the sales force,
8  just to correct you there.  I was still working as an
9  analyst; however, sitting with the sales force.  And
10  because of the way the desk worked, I would work with
11  the sales force.  However, I was not paid on
12  commission.  I was paid out of the general funds and
13  I was paid for, you know, providing analysis that the
14  clients appreciated in some ways, rather than
15  commissions from particular trades.
16      So I'm sorry.  Can you repeat your
17  question?
18      Q.  My question was, what type of clients were
19  you interacting with between 1987 and 1990?
20      A.  Okay.  So the types of clients were really
21  the gamut of fixed-income investors.  So banks,
22  savings and loans at the time, pension funds, mutual
23  funds, other money managers, insurance companies,
24  really anyone out there who was buying institu- --
25  anyone out there who's a fixed-income institutional

5 (Pages 14 - 17)

1  buyer I would interact with. And I also interacted
2  at that point a fair bit with the traders at the
3  desk.
4      Q. Between 1987 and 1990, were you making
5  recommendations about whether specific RMBS should be
6  purchased by a client?
7      A. I was coming up with particular trade
8  ideas for clients that they could then evaluate, and
9  I would look at scenario analyses for their
10  portfolio. Sometimes this would involve an idea
11  like, you know, "Here's a return profile if you sell
12  this security and buy this combination of
13  securities."
14      And sometimes it was generated by what I
15  saw in the marketplace. Sometimes it was generated
16  by securities that Bear Stearns was trying to sell
17  and I'd look at those in particular. And if they
18  looked attractive, then I could come up with
19  recommendations. If they didn't, I wouldn't.
20      But often it was generated by ideas from
21  the client. So the client would often call up and
22  say, you know, "I'm looking at this potential
23  tran- -- type of transaction. Can you give me an
24  analysis, give me some sort of scenario analysis on,
25  you know, how this looks, where my exposure is," and

1  so on.
2      Q. What kinds of scenario analyses were you
3  conducting between 1987 and 1990?
4      A. So the type of scenario analysis that
5  clients typically looked at involved interest rate
6  changes. So plus or minus 100, 200 basis points,
7  plus or minus 50 basis points, anything in that
8  range, and pretty often they would layer on top of
9  that other scenarios. So, you know, something like a
10  change in the way that prepayments work.
11      At the time they were largely -- a lot of
12  these securities were AAA-rated, so they're looking
13  at changes in interest rates and potentially tied to
14  changes in the macroeconomy and looking at the
15  duration and convexity of a particular security in
16  comparison to the duration and convexity of either
17  their liabilities or the portfolio securities that
18  they already own or some particular security that
19  they're matching.
20      Q. You mentioned changes to interest rates,
21  prepayments, macroeconomic factors, duration,
22  convexity. Are there any other factors that went
23  into the types of scenario analyses you were asked to
24  run between 1987 and 1990?
25      A. So I'm -- I'm trying to -- to think about

1  that. So things like changes in credit quality would
2  typically be a part of how they analyzed the
3  security, but typically the scenarios that they're
4  looking at are ones where they're thinking, okay, if
5  there is no change in the credit rating, this is how
6  it performs. So it's really given a particular set
7  of assumptions about the creditworthiness of the
8  security that you're looking at, the scenario.
9      Q. And when you say "creditworthiness," do
10  you mean the rating given to that security by a
11  ratings agency?
12      A. That's part of it. But in general the
13  relative spread of that security over Treasuries or
14  other ways to measure its risk. So they're really
15  thinking -- if they're looking at purchasing the
16  security, they're thinking it's not going to become
17  downgraded, and then they want to look at the
18  performance under different scenarios.
19      Q. Between 1987 and 1990, in your work, how
20  else were changes in credit quality measured in
21  scenario analyses, if at all?
22      A. Okay. So a -- a number of things to --
23  to -- to mention there. So when you're looking at
24  corporate bonds and you're thinking about potential
25  changes in credit quality, you're looking at call and

1  put features, and you're looking at how the
2  interaction between the rating of the corporate is
3  related to whether or not it's going to get called or
4  whether you're going to be allowed to put it. And I
5  think that was certainly a portion of it.
6      When you're talking, at this time, about
7  mortgage-backed securities, you're thinking about
8  potential defaults as implying changes in the way
9  that prepayments occur. And that's going to impact
10  the duration and convexity of the securities. And so
11  that's going to have an impact on the performance
12  under various scenarios.
13      So I -- I mean, I'm not sure exactly if
14  that's what you're asking because, you know, credit
15  quality is a relatively broad term, but in terms of
16  this case, you know, where you're talking about
17  defaults in mortgage-backed securities, that
18  certainly has an impact on the prepayment pattern.
19  It has an impact on the duration and return under,
20  you know, a variety of different scenarios.
21      Q. So between 1987 and 1990, specifically
22  relating to mortgage-backed securities, what inputs
23  into your scenario analyses were changed to account
24  for potential changes in credit quality?
25      MR. CRAIG: Object to form.

Page 22

1    A. So what do you mean by "credit quality" in
2  that question?
3    Q. (BY MR. CAMPBELL)  What did you mean when
4  you used the term "change in credit quality"?
5    A. So what I'm really thinking about is --
6  you know, I'm thinking about the issues that are in,
7  for instance, the Butler report, which is where
8  they're talking about particular sets of defaults,
9  the likelihood of default on -- on mortgages and
10  things of that nature.
11    However, you know, that's not really
12  credit quality because, I mean, there's different
13  issues involved here.  Right?  There is whether or
14  not a particular security -- how that particular
15  security is rated.  And there is what's going on in
16  terms of the underlying loans.  And I think, you
17  know, if you want to drill down into this issue a
18  little bit more, I think we need to be really careful
19  to specify that, you know, there are issues with
20  what's going on in terms of the defaults on the loans
21  and, you know, how that's related to, what have you,
22  the quality of the securities, the underwriting
23  guidelines, all these -- these things which are, you
24  know, part of the security, and the -- part of the
25  loan, rather, and then also the -- the security that

Page 23

1  they're buying, which is -- the security is
2  structured in such a way it's overcollateralized, it
3  has insurance and so on, so that the securities
4  were -- pretty much all of them rated AAA securities.
5    So, you know, we can talk about the -- the
6  details at the loan level, we could talk about the
7  details at the security level, and I'm just -- I'm
8  just trying to make sure that I clearly understand
9  the question and that I'm answering the right portion
10  of it.
11    Q. So between 1987 and 1990, in your role at
12  Bear Stearns --
13    A. Okay.
14    Q. -- when you were conducting scenario
15  analyses of mortgage-backed securities, would people
16  come to you and say, "What would the scenario be if
17  you changed the LTV, the FICO, the underlying
18  characteristics of the borrowers?"  Or did they just
19  say, "What would happen if I changed the overall
20  default rate or the overall prepayment rate?"
21    A. So it's the second.  So typically at the
22  time, and I think at the time of -- you know, the
23  investors bought these securities in the mid-2000s,
24  the -- the investors did not have a good
25  understanding of -- did not have any of the actual

Page 24

1  data of what the loans were like.  So they didn't
2  have the FICO scores.  So they weren't able to make
3  that -- to ask that question.  I mean, the only
4  question that they could ask is, you know, how
5  does -- how does the performance of the security, how
6  the duration of the convexity, the returns on different
7  scenarios, all that stuff, change when you have
8  changes in defaults.
9    Q. So you just responded about securities in
10  the mid-2000s, and I wanted to focus on your analyses
11  between 1987 and 1990.  Does the same answer apply?
12    A. Yes, it's the -- it's the same answer.  I
13  mean, I don't -- the -- at that time, in '87 to 1990,
14  investors did not have loan-level data for these --
15  the loans backing these securities.  And I think the
16  same was true in the mid-2000s.
17    Q. Investors did sometimes have access to
18  pool-level data.  Correct?
19    A. To pool-level data.  So they had the
20  descriptions in the prospectus supplements.
21    Q. Between 1978 and 1990 did you ever run a
22  scenario analysis that involved changing pool-level
23  characteristics in a prospectus supplement?
24    A. I'm trying to think.  That was quite a
25  while ago.  I think there were questions like --

Page 25

1  which are closely related to that, which are things
2  like, well, if the underlying coupon of -- sorry --
3  if the underlying rate that the -- of the loan is,
4  you know, slightly higher.  So maybe, you know, you
5  have a 9 percent mortgage-backed security, but the
6  underlying loan could be at 9-3/4 or it could be at
7  9-7/8, depending on the differences in servicing.
8    And so if you have slight differences in
9  the underlying mortgage rate, that's going to imply
10  somewhat different prepayment patterns, potentially.
11  And so that's the sort of thing that, you know, we
12  could look at on a -- on a scenario analysis, where
13  you have slight differences in the under- --
14  underlying loans.
15    Q. So is it fair to say that in your
16  experience, between 1987 and 1990, the scenario
17  analyses you were running involved changing overall
18  default rates rather than changing loan-level
19  characteristics or pool-level characteristics?
20    A. So I think, as I said -- I'm not sure
21  exactly what you mean by "pool characteristics," but
22  I think, you know, that was sort of one example,
23  which may have involved a slight change in pool
24  characteristics.  But primarily I would agree that it
25  had to do with the default characteristics and the

7 (Pages 22 - 25)

1  prepayment characteristics, rather than individual
2  loans.
3      Q. Between 1987 and 1990 what percentage of
4  your job, roughly, would you say was spent on
5  mortgage-backed securities?
6      A. I think it changed from time to time.
7  But -- and I have a hard time remembering exactly,
8  but I would -- so some of it included overall
9  portfolio analysis, and the portfolios would include
10  mortgage-backed securities. So if you include that
11  as well, I'd say definitely more than 50 percent.
12  Maybe as high as 75 percent.
13      Q. And was there any particular change over
14  time? Increasing, decreasing, stayed the same over
15  time?
16      A. In general it was increasing. The
17  mortgage-backed securities market was growing at the
18  time. The number and variety of different types of
19  securities was increasing. So investors wanted more
20  analysis, and I was there to provide it.
21      Q. Of the mortgage-backed securities that you
22  analyzed between 1987 and 1990, what percentage were
23  private-label mortgage-backed securities?
24      A. Almost -- so by private-label securities,
25  let's talk about that a little bit. Can you -- do

1  you want to define that term or do you want me to
2  define it?
3      Q. What's your definition of that term?
4      A. Okay. So I'm not sure if I have a
5  particular definition of that term, but I can tell
6  you sort of what the different types of securities
7  were in the marketplace, and then what we analyze.
8  So there -- almost all the securities that we
9  analyzed were either Fannie, Freddie Mac, or Ginnie
10  Mae backed. However, sometimes they would then be
11  put into a trust that was, for instance, a Bear
12  Stearns trust. Sometimes there were a Fannie Mae
13  trust, particularly later on, but in the early time
14  period there were more trusts from the investment
15  banks.
16      I'm not sure that that answers your
17  question, but, yeah, that's --
18      Q. Would a better distinction for you be the
19  distinction between agency and nonagency
20  mortgage-backed securities?
21      A. So you can have agency securities put into
22  a nonagency trust, which is kind of what I'm trying
23  to describe. Right? So -- but the fundamental
24  underlying securities at that time were still then
25  agency securities.

1      Q. So you talked about putting securities in
2  a trust. Do you mean loans? Are you talking about
3  Fannie and Freddie-backed loans being put into a
4  trust?
5      A. So there is Fannie and Freddie Mac-backed
6  loans that go into the trust, but -- so, for
7  instance, the way some of these CMOs could be
8  structured was they would buy, you know, the generic
9  Fannie Mae securities and then put those into the
10  trust backing the CMO, and then the CMO could be a
11  Bear Stearns-labeled CMO.
12      Q. Let me just -- I don't know what term
13  would be the best term for this, but to talk about
14  securities that do not have Fannie and Freddie as an
15  issuer, and don't have Fannie and Freddie-backed
16  loans, nonconforming loans?
17      A. Right. So in the '87 to 1990 period there
18  was very, very little of that around. I remember
19  very few deals of that -- of that type.
20      Q. Do you have any rough estimate of how many
21  deals of that type you analyzed between 1987 and
22  1990?
23      A. I don't remember exactly, but it was a
24  very small number.
25      Q. Would it be less than a dozen?

1      A. Yes.
2      Q. And in 1991 you mentioned you were a
3  consultant for Bear Stearns --
4      A. Very brief- --
5      Q. -- in the restructuring --
6      A. -- very briefly, yes.
7      Q. -- of a -- I apologize. In the
8  restructuring of an RMBS portfolio. Correct?
9      A. Yes.
10      Q. Whose RMBS portfolio was that?
11      A. It was a large life insurance company in
12  New England.
13      Q. And what did you do in your role as a
14  consultant?
15      A. So the insurance company was worried
16  that -- this was in 19- -- early 1991. They were
17  worried that Fannie Mae and Freddie Mac would go
18  bankrupt, and that the U.S. government would not step
19  in and fully guarantee those securities. So they
20  wanted to restructure a large part of their assets
21  away from Fannie and Freddie and into Ginnie Mae,
22  which were fully government-backed. It was
23  approximately a $1 billion up change in assets. And
24  I'd worked with that company before, and so it was
25  relatively easy for me to come in and figure out what

1 they want, look at those scenarios.
2       And I think that's sort of a good example
3 because they're looking at -- and they wanted to see
4 then, you know, at a variety of different scenarios,
5 and they wanted to see what would happen if -- they
6 were thinking about it in terms of, well, what
7 happens if the losses in the mortgage market become
8 bad enough that Fannie and Freddie Mac go under, but
9 they were also interested in seeing what happens if
10 that assumption is wrong.
11       So it's not that they thought it was
12 likely that this was going to happen, but, you know,
13 they were a buyer of AAA securities, they were
14 worried about low-probability events. And so they,
15 you know, put some -- enough positive probability as
16 a reasonable investor on this particular event
17 happening that they then wanted a full scenario
18 analysis, and doing, you know, this
19 very large trade based on that possibility.
20       Q. In your role as a consultant in 1991 were
21 you, again, in this restructuring job, just dealing
22 with Fannie, Freddie, and Ginnie securities?
23       A. As part of the restructuring it was
24 Fannie, Freddie, Ginnie. It was some other CMO and
25 IOPO securities that were structured off of

1 underlying Fannie, Freddie, and Ginnie securities.
2 It was also -- there was also some mix of Treasury
3 securities in the portfolio. I think there was also
4 a little bit of futures in that portfolio.
5       Q. And the portfolio didn't involve the
6 nonagency, nonconforming loans, the type of deals
7 that we just discussed you saw very few of? That
8 didn't -- those weren't involved in this portfolio.
9 Correct?
10       A. Those were not involved in this portfolio.
11       Q. Between 1987 and 1991, in all of your
12 roles at Bear Stearns, how frequently did you deal
13 with mortgage-backed securities that involved alt-A
14 collateral?
15       A. I can't remember at this point, but I --
16 probably not very often, but I can't remember at this
17 point.
18       Q. Would that probably also be less than a
19 dozen?
20       A. I'm not sure whether any of the agency --
21 no, I don't think any of the agency deals would have
22 had alt-A. So, yeah, probably less than a dozen.
23       Q. And between 1987 and 1991, in your roles
24 at Bear Stearns, did you deal with any
25 mortgage-backed securities that were backed by

1 subprime loans?
2       A. I don't think so.
3       Q. And in 1991 you left Bear Stearns to take
4 a Ph.D. Correct?
5       A. That's right. I started my Ph.D. program
6 in 1991.
7       Q. Since 1991 have you worked for any
8 investment bank?
9       A. Not that I can recall, no. I've had some
10 of my students go to work at investment banks, but
11 no. Personally, no.
12       Q. Have you done any consulting work with
13 respect to mortgages or mortgage-backed securities
14 since 1991?
15       A. There -- when I worked at LECG in -- I
16 think it was 1995 -- I worked on -- it was a
17 litigation case, and I worked on the valuation of
18 some real estate. I don't think it was RMBS
19 securities, though, but it was a real estate
20 valuation case.
21       Q. You were valuing specific pieces of
22 property?
23       A. It was a set of pieces of property, yes.
24       Q. And LECG is Law and Economics Consulting
25 Group?

1       A. That's correct.
2       Q. And you didn't offer an expert report in
3 that case?
4       A. No, I did not. I was a -- I was an
5 assistant to someone who was offering an expert
6 report.
7       Q. Did the person who you were assisting
8 ultimately submit a report?
9       A. I don't know.
10       Q. And do you remember any of the parties to
11 that case?
12       A. I don't.
13       Q. Besides your work at LECG in 1995, have
14 you done any other work regarding -- any other
15 consulting work regarding mortgages or
16 mortgage-backed securities since 1991?
17       A. Not that I can recall, no.
18       Q. Have you published any papers on mortgages
19 or mortgage-backed securities since 1991?
20       A. No. I've published a variety of papers on
21 fixed-income markets. I have, I don't know, maybe
22 half a dozen papers that have to do with fixed-income
23 securities and fixed-income markets in general, but I
24 don't think I have any that specifically deal with
25 RMBS.

9 (Pages 30 - 33)

1    Q.  Have you done any modeling of mortgage
2  performance or of how an individual mortgage would
3  perform since 1991?
4    A.  Well, I mean, I teach about RMBS
5  securities in my class all the time.  And so, you
6  know, as part of that I give the basics of looking
7  at, you know, mortgages in the class.
8    Q.  But have you yourself modeled the
9  performance or been involved in modeling the
10  performance of an actual mortgage since 1991?
11    A.  I've had students ask me about particular
12  mortgages that they're looking at as part of their
13  jobs, and, you know, I've analyzed these as part of
14  class.  So I guess in some ways, yes.
15    Q.  How frequently have you analyzed mortgages
16  for your students?
17    A.  So, I mean, I can think of one or two
18  examples where that particular hap- -- particular
19  type of event happened, but I cover RMBS securities
20  in my corporate finance class, and I've taught, you
21  know, the undergraduate corporate finance class every
22  year except for this last year.
23    Q.  And I'll get to mortgage-backed securities
24  in a second, but just still sticking with an
25  individual mortgage.  Besides those one or two

1  instances you mentioned, you haven't had any other
2  situations where you've modeled the performance of an
3  individual mortgage.  Correct?
4    A.  I'm not sure about modeling the
5  performance.  I go over the details of how mortgages
6  are valued, again, in the corporate finance class
7  every year.
8    Q.  So when you are doing the valuation of
9  that mortgage, does that involve an evaluation of the
10  likelihood of prepayment or default?
11    A.  Not particularly, no.  And it's not
12  particularly similar to the type of detailed analysis
13  that a fixed-income investor would do.  It's just
14  giving the students the -- the tools so that they can
15  analyze the mortgage, and if they wanted to go do
16  something more complicated, they could do so.
17    Q.  So you haven't modeled the likelihood of
18  prepayment or default of an individual mortgage since
19  1991.  Correct?
20    A.  I'm trying to remember if there are, you
21  know, specific cases where I looked at modeling
22  prepayment or default.  You know, I, again, talk
23  about how prepayment affects mortgage performance,
24  mortgage security performance, in my class every
25  year.  So, you know, to some degree, yes.

1    Q.  What individual mortgages have you modeled
2  the likelihood of -- or prepayment -- the likelihood
3  of prepayment or default since 1991?
4    A.  So there is no particular one mortgage
5  that I model.  I take sort of an example mortgage,
6  and I look at how it performs under different
7  scenarios.  And that's sort of a very typical
8  analysis that I'll -- I'll do in class.
9    Q.  Have you been involved in modeling the
10  performance of an individual residential
11  mortgage-backed security since 1991?
12    A.  Other than what I do in class as examples,
13  no.
14    Q.  And in your class do any of those examples
15  involve actual mortgage-backed securities?
16    A.  They typically involve securities that I
17  see quoted in the paper.
18    Q.  And what type of securities are those?
19    A.  Typically, plain-vanilla agency
20  securities.
21    Q.  Have you done any research into the
22  factors taken into account by investors in
23  mortgage-backed securities since 1991?
24    A.  Yes.  I mean -- and for this case in
25  particular I've read, you know, the literature on

1  this issue.  I've certainly read the papers
2  Dr. Cohen-Cole cites, and I've read the papers that I
3  cite.
4    Q.  Besides the research you did for this
5  case, have you done any other research into the
6  factors taken into account by investors in evaluating
7  mortgage-backed securities since 1991?
8    A.  So I pretty often get papers to referee
9  for journals.  I get maybe two or three every month.
10  And pretty often those papers have to do with
11  mortgage-backed securities and real estate markets.
12  It's not particularly my expertise, but sometimes
13  they're related to my expertise.  So, for instance,
14  I've published papers about state law.  So, you know,
15  if there is something about state laws and
16  mortgage-backed securities, I might get that.  If
17  there is things about international investors and
18  mortgage-backed securities, I might get that.
19    And so, you know, as part of my regular
20  refereeing duties I see a number of papers related to
21  RMBS pretty much every year.  And that's either
22  refereeing for journals, where the journal editors
23  will send me something, or sometimes for conferences.
24  So sometimes I'll be on the program committee for a
25  conference and I may get, you know, six to ten papers

10 (Pages 34 - 37)

Page 38

1  to referee, and some of those might be
2  mortgage-backed security related.
3      Q.  But you yourself have not done any
4  research into the factors taken into account by
5  mortgage-backed securities investors since 1991.
6  Correct?
7      A.  So what do you mean by "research"?
8      Q.  Have you done any research into your own
9  papers?
10     A.  I have not written papers about RMBS
11  securities in particular.  I've written papers about
12  fixed-income markets, and I have sort of a fair
13  number of those, but not about RMBS securities.
14     Q.  And my question specifically is with
15  respect to the investment process, have you done
16  any re- -- you haven't published any papers or done
17  any research into the investment process of investors
18  in mortgage-backed securities since 1991.  Correct?
19     A.  Well, other than, you know -- a lot of
20  that is extremely straightforward.  I'm not sure that
21  there is, you know, a lot of research published.  I
22  mean, there is this -- for instance, when I talked
23  about -- in this report when I talk about the
24  scenario analysis, and I cite Fabozzi's, you know,
25  basic Fixed Income handbook.  That's -- that's a

Page 39

1  really basic book, and a really basic -- you know,
2  that's not something that you could do research on
3  because it's sort of the basis that everyone uses.
4  Everyone knows that you do this sort of scenario
5  analysis.  And in this introductory text, that's, you
6  know, exactly sort what Fabozzi describes.
7          And, again, there's, I think, one paper I
8  cited from Management Science which gave a more
9  technical view on scenario analysis, and that was the
10 paper -- if you just give me one second -- by Mulvey
11 and Zenios from 1994.  But, you know, that was quite
12 a long time ago.  And this sort of approach to
13 scenario analysis as being the basis of how
14 fixed-income investors analyze their purchase and
15 general trading decisions, you know, I think
16 that's -- that's really well-known at this point.
17     Q.  In any of your classes do you teach the
18 process of analyzing a mortgage-backed security?
19     A.  Not in any detail.  Just in terms of the
20 basics, in terms of these are the factors that drive
21 a mortgage-backed security, and this is how
22 you look at it with changing interest rates.
23         So in a basic way in the corporate
24 finance, yes.  However, it's not -- I don't teach the
25 fixed-income class that does a lot more detail on

Page 40

1  them.  I mean, I know that class quite well, but this
2  is really just to provide an -- an entry for -- for
3  the students into that topic.
4      Q.  In your classes what do you teach as the,
5  quote, "basic factors" that drive mortgage-backed
6  security performance?
7      A.  I mean, the types of things that I look at
8  are interest rates and prepayments.  I don't talk a
9  lot about the private-label stuff, so I don't talk a
10 lot about the -- the -- the default models.  I talk
11 about the things that matter for agency ones the
12 most, I would say, which are prepayments and interest
13 rate scenarios.
14     Q.  Since 1991 -- withdrawn.
15         Between 1991 and 2005, would you agree
16 that the mortgage-backed securities market changed
17 dramatically?
18         MR. CRAIG:  Object to the form.
19     A.  I think there were a number of changes in
20 the mortgage-backed security market.  Dramatically,
21 you know, I'd want more details as to what you mean.
22     Q.  (BY MR. CAMPBELL)  You would agree that
23 the proportion of private-label mortgage-backed
24 securities increased dramatically between 1991 and
25 2005.  Correct?

Page 41

1      A.  Yes, I would agree with that.
2      Q.  And you would agree that private-label
3  mortgage-backed securities are different than agency
4  securities?
5          MR. CRAIG:  Object to the form.
6      A.  So there is a lot of different private
7  label securities out there.  There is a lot of
8  different agency securities out there.  I guess I'd
9  want more details about which ones you mean and what
10 you mean by "different."
11     Q.  (BY MR. CAMPBELL)  You would agree that
12 the collateral backing private-label mortgage-backed
13 securities in 2005 to 2007 was very different from
14 the securities that you were analyzing in 1987 to
15 1990.  Right?
16     A.  So the collateral backing the 2005 to 2007
17 included a lot of subprimes, and beyond that a lot
18 these were nonagency-guaranteed.  So there were some
19 differences in how you analyze them.
20         However, there were also -- in terms of --
21 if you're looking at a portfolio, from a
22 portfolio inv- -- from a portfolio manager's point of
23 view, they're still going to care about the same
24 sorts of issues.  They're going to care about how
25 this security does under a variety of different

11 (Pages 38 - 41)

1  scenarios. They're going to care about the duration
2  and convexity of the security. They're going to want
3  to know how it performs under different interest
4  rates scenarios and how it performs under different
5  macroeconomic scenarios and in combination with
6  interest rates.
7      So there are some differences in how you
8  do the analysis, but there's also really broad
9  similarity in the types of issues that you consider
10  because, for a portfolio manager, they care about the
11  overall performance of the portfolio, they care about
12  the overall duration and convexity. They care about
13  these different scenarios.
14      So, I mean, I think there's more --
15  there's certainly details that are different, but
16  there's also broad similarities.
17      Q. What differences would you say there are
18  in the process of investors between analyzing the
19  mortgage-backed -- the private-label mortgage-backed
20  securities issued between 2005 and 2007 and the type
21  of analysis you were doing in 1987 and 1990?
22      A. So the impact of defaults is greater upon
23  the cash flows in the 2005 to 2007 period than it was
24  in the earlier period. Defaults also matter in the
25  earlier period because they impact -- even if you're

1  fully agency-guaranteed, they're going to impact the
2  duration and convexity of the security, but they're
3  not going to have as big a impact on the total cash
4  flows received.
5      So I guess modeling those defaults was
6  important both times, however, it's -- in a larger --
7  taken on larger significance in the private-label
8  world.
9      Q. Are there any other differences that you
10  can identify in the process of an investor between
11  analyzing a private-label mortgage-backed security in
12  2005 and 2007 and the type of analysis you did
13  between 1987 and 1990?
14      MR. CRAIG: Object to the form.
15      A. So there's a lot of potential things in --
16  in that question. Right?
17      So one of the things that you're going to
18  really care about is the degree of
19  overcollateralization when you're talking about a
20  private-label security versus the securities that are
21  there earlier. But, again, you know, these were
22  all -- or almost all AAA-rated securities, they were
23  structured in a way that investors thought they
24  didn't have to worry about these risks to that large
25  degree. They were relying upon these underwriting

1  guidelines.
2      And once you're dealing with a AAA-rated
3  security, investors typically do things like
4  stress-test it to see when the cash flows might
5  change and to make sure that, you know, given the
6  assumptions that they're making about it being
7  properly underwritten, that, you know, they're still
8  going to get their cash flows. But after that, I
9  think the -- the analysis of looking at different
10  types of scenarios and how it fits into their
11  portfolio, I think that's actually pretty similar.
12      Now, if you're looking at, you know, a
13  BB-rated portion of a private-label security, I think
14  there's going to be a different set of emphases put
15  on that. But I think if you're looking at AAA, the
16  amount that you're going to assume that it's really a
17  AAA and that it properly meets, you know, the
18  characteristics -- the defining characteristics of
19  that security, after that I think the -- the scenario
20  analysis is actually going to be pretty similar.
21      Q. (BY MR. CAMPBELL) What's your basis for
22  your opinions about what investors in mortgage-backed
23  securities did between 2005 and 2007?
24      A. So my basis is looking at the depositions
25  of the investors in this particular case. It's based

1  on reading through the practitioner books; for
2  instance, the Fabozzi book. It talks about, you
3  know, this is how investors analyze securities.
4      But really both of those are very
5  consistent and very similar to the process that I
6  used when I was at the investment bank, and so
7  there's -- you know, you know, I guess I'm -- I'm
8  thinking about, you know, all the -- all those things
9  as really being pretty much the same.
10      Q. Have you spoken to any investors in
11  mortgage-backed securities between 2005 and 2007?
12      MR. CRAIG: Object to the form.
13      A. Do you mean did I talk -- have I talked to
14  anyone who invested in securities in 2005 to 2007, or
15  do you mean in 2005 and 2007, did I talk to anyone?
16      Q. (BY MR. CAMPBELL) Have you talked to
17  anyone who invested in mortgage-backed securities
18  between 2005 and 2007?
19      A. Well, I mean, I -- I think I held some
20  mortgage-backed securities through, like, a mutual
21  fund, and something like that. I think, you know,
22  members of my family hold mortgage-backed securities
23  through, you know, mutual funds and pension funds
24  that they own. I think lots of people own
25  mortgage-backed securities indirectly through a

1  variety of different means.
2       So I -- I think you need to narrow the
3  question down a little bit.
4       Q. Have you talked to anyone who purchased an
5  individual mortgage-backed security between 2005 and
6  2007?
7       A. I'm trying to -- to think exactly.
8       So I have not had lots of conversations
9  with fixed-income institutional investors, and this
10 is really what we're talking about since these types
11 of securities trade in very large lots, so you're
12 typically investing a million dollars in order to buy
13 a -- a security, at least.
14      I've talked to people who worked at
15 investment banks and whose role, I believe, included
16 that to some degree, but I don't know exactly to what
17 degree or which ones they purchased or anything of
18 that sort.
19      Q. Who are those individuals?
20      A. So, for instance, you know, I have a
21 friend from Bear Stearns whose name is Eduardo Torres
22 who, you know, continues to be active in fixed-income
23 securities, and I don't know whether he's
24 particularly bought these securities or whether he's
25 recommended them, but I've had conversations with him

1  since 2007.
2       Q. Any other individuals?
3       A. Not that I can think of off the top of my
4  head.
5       Q. Did any of the conversations you have with
6  Mr. Torres regard the factors that he took into
7  account when purchasing a mortgage-backed security
8  between 2005 and 2007?
9       A. No.
10      Q. What factors did you look at before you
11 decided to purchase a mutual fund with
12 mortgage-backed securities?
13      A. I looked at the types of assets that they
14 held. I looked at the return on the portfolio. I
15 looked at what I thought was the duration of the
16 portfolio. Those were the -- and I looked at the --
17 the fee structure.
18      Q. Anything else?
19      A. Those are the main points that I recall.
20      Q. Did you read the prospectus supplements of
21 the underlying mortgage-backed securities?
22      A. I'm not sure that the mutual funds that I
23 invest in allow me to know exactly what securities
24 they're buying. So I don't think I was able to do
25 so.

1       Q. Did you read the prospectus supplement of
2  the mutual fund that you purchased?
3       A. I read at least part of it, yes.
4       Q. Do you remember what part of it you read?
5       A. No. I can't remember exactly what it was,
6  but I -- you know, I -- I -- if I purchased a mutual
7  fund, I do skim through the prospectus.
8       Q. Do you remember reading anything about the
9  underwriting guidelines used by the originators who
10 originated the loans backing the mortgage-backed
11 securities that were in your mutual fund?
12      A. No. But being familiar with that
13 marketplace, I know the types of securities and --
14 you know, I -- at the time I remember the types of
15 securities that they were buying, which I believe was
16 pretty much agencies, and so I know pretty well what
17 the underwriting guidelines were for the loans
18 backing those securities.
19      There's no particular reason to read the
20 underwriting guidelines if you know the definition of
21 the security, and the definition of the security
22 involves basic underwriting guidelines, and
23 I'm familiar with, you know, how that market works in
24 general.
25      Q. What do you mean by "basic underwriting

1  guidelines"?
2       A. I mean the underwriting guidelines that
3  are used in non-scratch-and-dent-type securities or
4  in agency securities.
5       Q. Are you familiar with the underwriting
6  guidelines of any specific originator?
7           MR. CRAIG: Object to form.
8       A. I'm familiar with primarily what
9  Mr. Butler describes in his report, and, you know,
10 I'm not an originator. I've never worked as an
11 underwriter, so I don't have any particular expertise
12 in this.
13      Hold on.
14      But, you know, I've read some OCC
15 documents that talk in general about underwriting
16 guidelines.
17      Q. (BY MR. CAMPBELL) Have you read anything
18 about a specific originator's guidelines outside of
19 your work for this case?
20      A. I can't recall.
21          MR. CAMPBELL: Should we take a
22 break here?
23          MR. CRAIG: Fine with me.
24          THE VIDEOGRAPHER: Going off the
25 record. The time is 9:44.

13 (Pages 46 - 49)

Page 50

1     (Break.)
2         THE VIDEOGRAPHER:  Back on the
3   record.  The time is 9:58.
4         Q.  (BY MR. CAMPBELL)  Dr. Wald, do you
5   believe that Ethan Cohen-Cole uses the wrong legal
6   standard to assess materiality?
7         A.  I was told to assume a different standard
8   in my critique of Dr. Cohen-Cole.
9         Q.  You don't have an independent basis to
10  know what the relevant legal standard is here.
11  Correct?
12        A.  I'm not a lawyer.  I'm an economist, and
13  I've worked in investment banking.  But I'm not a
14  lawyer.  I don't have opinions on these sort of legal
15  issues.
16        Q.  Would you agree that you don't have the
17  basis to assess whether or not Dr. Cohen-Cole's
18  report is consistent with any legal standard?
19        A.  No, I'm not sure I would go that far.  I
20  mean, I think Dr. Cohen-Cole's report doesn't make
21  sense given his standard.  But -- you know, and I --
22  and I think -- I would be hard-pressed to find a
23  standard in which it did make sense.
24        Q.  With respect to the legal standard,
25  though, you would agree that you don't have any basis

Page 51

1   to offer an opinion on whether or not
2   Dr. Cohens-Cole -- Dr. Cohen-Cole's report complies
3   or doesn't comply with any legal standard.  Right?
4         MR. CRAIG:  Object to form.
5         A.  I -- I don't understand the question.  I
6   don't understand the question relative to the other
7   two questions you just asked.
8         I mean, one question was whether I have an
9   opinion on legal standards, and I don't because I'm
10  not a lawyer.  But the other standard is whether I
11  have an opinion on Dr. Cohen-Cole's report, and I do.
12  I have lots of opinions on Dr. Cohen-Cole's report,
13  and I've given them here.
14        Q.  (BY MR. CAMPBELL)  I'll just tell you
15  don't worry about the order of my questions.  Just
16  respond to the question that I ask.
17        And the question right now is, would you
18  agree that you don't have any basis to offer an
19  opinion on whether Dr. Cohen-Cole's report complies
20  or doesn't comply with any legal standard?
21        MR. CRAIG:  Object to form.
22        A.  No, I don't think that -- I don't think
23  that's correct.  I think I have lots of basis for
24  thinking that Dr. Cohen-Cole's report doesn't make
25  sense, and I think therefore it would not make sense

Page 52

1   with respect to lots of different legal standards.
2         Q.  (BY MR. CAMPBELL)  What's your basis for
3   evaluating Dr. Cohen-Cole's report to the extent that
4   it relates to whether or not it complies or doesn't
5   comply with a legal standard?
6         A.  I'm not sure exactly --
7         MR. Craig:  Object --
8         A.  -- what you --
9         MR. CRAIG:  Object to form.
10        A.  I'm not sure exactly what you mean by
11  that, but, you know, in general, I -- my objections
12  to Cohen-Cole's report have to do with how he frames
13  the question, the question that he's asking.  I don't
14  think the question that he's asking really reflects
15  what investors looked at at the time and the types of
16  decisions that investors made.  I have issues with
17  the data that Dr. Cohen-Cole uses, I have issues with
18  the model specification that he uses for his Cox
19  proportional hazard model, I have issues with the way
20  he does his simulations, and I have a way -- I have
21  issues with the way he interprets those simulations.
22  And I think all of those apply regardless of what
23  particular legal standard you apply.
24        Q.  (BY MR. CAMPBELL)  And setting those
25  criticisms aside, though, you would agree that you

Page 53

1   can't offer an opinion on compliance or noncompliance
2   with any legal standard.  Right?
3         A.  I don't understand that.
4         MR. CRAIG:  Object to form.
5         A.  I don't understand that question.
6         Q.  (BY MR. CAMPBELL)  So could you take a
7   look at your report, Exhibit 1, Page 10.
8         A.  I'm sorry.  Page 10?
9         Q.  Page 10.  Not paragraph.  Page 10.
10        A.  Page 10.  Okay.
11        Q.  Heading 4 reads, "The methodology that
12  Dr. Cohen-Cole uses to assess materiality is
13  inconsistent with the applicable legal standard."
14        Did I read that correctly?
15        A.  Yes.
16        Q.  What is your basis for saying that
17  Dr. Cohen-Cole uses a standard to assess materiality
18  that is inconsistent with the applicable legal
19  standard?
20        A.  It's just what it says here under
21  Paragraph 20, that, "Counsel for NCUA have instructed
22  me to assume for the purpose of my analysis that a
23  misrepresentation is material if there is a
24  substantial likelihood that disclosure of the
25  misrepresented fact would have been viewed by a

14 (Pages 50 - 53)

Page 54

1  reasonable investor as having significantly altered
2  the 'total mix' of information made available."
3       And that's really -- you know, that's the
4  basis.
5       Q.  The basis is the assumption that you
6  received from counsel.  Correct?
7       A.  That's correct.  I've been told that, you
8  know, this is a different standard to use, and, you
9  know, I can think of ways that the standard that
10  Dr. Cohen-Cole uses is not consistent with the
11  standard that NCUA have instructed me to use.
12       Q.  Do you believe that opinion involves legal
13  analysis?
14       A.  No.  I think it's thinking about the
15  economics of the question.  So when -- I mean,
16  Dr. Cohen-Cole says that he's using some -- so let
17  me, you know, read a little bit from Paragraph 21
18  here.  He's saying "materiality... 'whether
19  Plaintiff's Loan Characteristics Claims, if assumed
20  to be true, would have resulted in risk levels that
21  investor would not have reasonably expected at the
22  time of the issuance of the Relevant Certificates
23  based on the disclosures concerning the supporting
24  loan group's characteristics in the prospectus
25  supplements.'"

Page 55

1       That's a much more restrictive definition
2  of materiality than the one that counsel asked me to
3  assume.  And I can think about, you know, securities
4  that are riskless, but where a particular type of
5  information determines something having to do with
6  the cash flows.  It's just that the cash flows are
7  determined by some -- some, you know, external
8  factor.  But there is no risk factors.  You know,
9  maybe they're all fully government-guaranteed or
10  something like that.
11       And so, you know, I can think of cases
12  where information is material to the purchase of the
13  security or for -- another example would be where,
14  you know, a security is riskless, but it's going to
15  be more or less liquid, depending on some particular
16  information.
17       So you have a government-issued security,
18  it has a very simple cash flow structure, but some
19  information that you have is going to determine its
20  liquidity in the marketplace.  So that's not going to
21  impact the sort of default risk that Dr. Cohen-Cole
22  analyzes, which is a very small portion might impact
23  the liquidity risk.
24       You know, so there's other examples that I
25  can think of that are much broader, where information

Page 56

1  affects the decision to purchase or the price at
2  which you're going to purchase the security and which
3  are outside Dr. Cohen-Cole's definition.
4       Q.  I just want to go back to my original
5  question, which was about whether your opinion that
6  Dr. Cohen-Cole's standard of materiality is
7  inconsistent with the applicable legal standard
8  involves legal analysis.  And your answer was no.
9  Correct?
10       MR. CRAIG:  Object to form.
11       A.  I'm not sure that I would say exactly
12  that.  I mean, it's assuming that -- I -- I mean, I
13  think there is some legal analysis that you could do,
14  but there is also some portion of it where you think
15  about the economics of the investment decision, and
16  you think about what Dr. Cohen-Cole was saying about
17  risk levels versus, you know, more broadly about the
18  information available in the purchase or pricing
19  decision.  I think -- I think Dr. Cohen-Cole's --
20  from an economic standpoint, Dr. Cohen-Cole's
21  definition is a subset of what reasonable investors
22  are going to think about.
23       Q.  (BY MR. CAMPBELL)  But you have no legal
24  opinion about Dr. Cohen-Cole's report.  Correct?
25       MR. CRAIG:  Stipulated.

Page 57

1       MR. CAMPBELL:  Okay.
2       MR. CRAIG:  Let's move on.
3       A.  Okay.
4       Q.  (BY MR. CAMPBELL)  Okay.  Is it your
5  belief that Dr. Cohen-Cole's model is inconsistent
6  with the models used by investors in mortgage-backed
7  securities between 2005 and 2007?
8       MR. CRAIG:  Object to form.
9       A.  So which -- what do you mean by
10  "Dr. Cohen-Cole's model"?  Do you mean the Cox
11  proportional hazard model he estimates?
12       Q.  (BY MR. CAMPBELL)  Yes.
13       A.  Okay.  So the Cox proportional hazard
14  model that he estimates -- estimates is different
15  from what investors used at the time.  Individual
16  investors -- individual institutional fixed-income
17  investors of the type represented by the credit
18  unions did not have access to loan-level data, and
19  therefore could not have looked at this sort of Cox
20  proportional hazard model in making their decision.
21       There are other problems in that the
22  particular model that he estimates leaves out many
23  variables that are standard in the literature and
24  that were used by other players in this marketplace.
25       So the example that I think of is, you

Page 58

1 know, it's my belief that Freddie Mac had a Cox
2 proportional hazard model that they used, but they're
3 not particularly an investor. And the model that
4 they used -- and, really, I think about this from the
5 Deng, Quigley, and Van Order paper -- is probably
6 similar to that -- what was used in that published
7 paper, and that published paper is -- uses a
8 specification for the Cox proportional hazard model
9 that's very different from the specification used by
10 Dr. Cohen-Cole.
11     Q. Do you believe that Freddie Mac was not an
12 investor in residential mortgage-backed securities
13 between 2005 and 2007?
14     A. So Freddie Mac is a government-sponsored
15 enterprise. Its primary role is to facilitate
16 mortgage lending in the U.S. As part of that they
17 incidentally wind up holding some mortgages and
18 pieces of mortgages, but they are not a fixed-income
19 investor in the way that the banks are. They play a
20 different role in the marketplace.
21     Q. So is it your belief that the GSEs did not
22 directly invest in mortgage-backed securities?
23     A. No, I -- I -- I wouldn't say that. I
24 mean, they buy mortgage-backed securities, they
25 resell the securities, they facilitate the packaging

Page 59

1 of the securities, they have a variety of different
2 functions in the marketplace. But their primary role
3 is not as an investor in the way that fixed-income
4 investors like pension funds, insurance companies, or
5 what have you, play in the -- in the -- in this
6 marketplace.
7     Q. Do you know whether or not any of the GSEs
8 purchased any of the mortgage-backed securities at
9 issue in this litigation?
10     A. I don't know.
11     Q. You suggested that one of the problems
12 with Dr. Cohen-Cole's model is that it relies on
13 individual loan-level data. Right?
14     A. Yes, that's correct.
15     Q. Is it your belief that Dr. Cohen-Cole's
16 proportional hazard model requires individual
17 loan-level data?
18     A. In order to estimate the model, yes, he
19 used individual loan-level data.
20     Q. And do you believe that investors did not
21 have access to the loan-level data that
22 Dr. Cohen-Cole used in his model at the -- in 2005 to
23 2007?
24     MR. CRAIG: Object to form.
25     A. I don't know what particular investors had

Page 60

1 access to what data, but the type of investors here
2 did not look at Cox proportional hazard models. I
3 mean, I think that's clear from the depositions.
4 There were some Cox proportional hazard models used
5 by some players in the marketplace. As I mentioned,
6 Freddie Mac was one of them. I believe Bear Stearns
7 also had a Cox proportional hazard model that they
8 used. And at some points they may have done some
9 analysis for some investors.
10     However, that was not part of the typical
11 purchase decision for this type of security, simply
12 because the individual loan-level data was not
13 available when -- as Dr. Cohen-Cole points out, when
14 the security was being issued.
15     Q. (BY MR. CAMPBELL) What do you know about
16 the Freddie Mac proportional hazard model?
17     A. I don't know anything about the Freddie
18 Mac one, per se, but my presumption is that it's
19 probably similar to the Deng, Quigley, and Van Order
20 model described in their "Econometrica" 2000 paper,
21 because Van Order was at Freddie Mac when that paper
22 came out. And that's often considered state of the
23 art at that time, and it includes a number of things,
24 like it includes time-varying housing prices. It
25 includes the option value for prepaying or defaulting

Page 61

1 on your mortgage. It includes variables like the
2 default rate. It estimates the prepayment and
3 default probabilities as part of the same likelihood
4 function.
5     And I point to these specific issues
6 because those are all differences between the Deng,
7 Quigley, and Van Order model and Dr. Cohen-Cole's
8 model. I mean, Dr. Cohen-Cole doesn't have this
9 option values for prepaying or walking away from your
10 house. He doesn't have time-varying macroeconomic
11 variables. He doesn't have the divorce rate. He
12 doesn't have nonlinearities in LTV which, you know,
13 is very standard across the literature. And he
14 estimates the prepayment and default likelihoods
15 separately.
16     So these are all issues -- these are all
17 things about the Den, Quigley, and Van Order paper
18 that really, you know, differentiated from what
19 Dr. Cohen-Cole does.
20     Q. I want to focus again on the Freddie Mac
21 model. What else do you know about the Freddie Mac
22 proportional hazard model?
23     MR. CRAIG: Object to form.
24     A. I -- I think I've answered that as well as
25 I could. I mean, all I know about -- I don't -- I

16 (Pages 58 - 61)

1  have never worked at Freddie Mac, and so I can't tell
2  you exactly what Freddie Mac does internally.  I can
3  tell you that one of the senior people at Freddie Mac
4  issued -- you know, published a paper with Deng and
5  Quigley in "Econometrica" in 2000, and the model that
6  they use there is very dissimilar from what
7  Dr. Cohen-Cole uses in the ways that I described.
8      Q.  (BY MR. CAMPBELL)  You've never used the
9  Freddie Mac proportional hazard model.  Right?
10     A.  As I said, I've never worked at Freddie
11 Mac.
12     Q.  So the answer is yes, you have never used
13 the Freddie Mac proportional hazard model?
14     A.  I don't know exactly what Freddie Mac has
15 in their proportional hazard model.  But because I've
16 read Deng, Quigley, and Van Order, I strongly suspect
17 it's similar to what they published in that paper.
18     Q.  What do you know about the Bear Stearns
19 proportional hazard model that you mentioned?
20     A.  The Bear Stearns proportional hazard model
21 is described in a chapter of one of Fabozzi's
22 handbooks.  I don't remember the details of that
23 model as well as I do the Deng, Quigley, and Van
24 Order one.  And they don't provide as much detail
25 because they're practitioners, and it's a

1  practitioner publication, as Deng, Quigley, and Van
2  Order do.
3          However, you know, some of the differences
4  are that they use different sets of variables.  I
5  think they talk about using time varying
6  macroeconomic variables, and they certainly use
7  nonlinearities in things like LTV, because everyone
8  knew that that was very important and standard.
9      Q.  Did you ever use the Bear Stearns
10 proportional hazard model when you worked at Bear
11 Stearns?
12     A.  No.  I believe the model was written after
13 I left.
14     Q.  And do you remember which of the Fabozzi
15 papers the Bear Stearns model is described in?
16     A.  I cite it in -- in -- I believe it's one
17 of the ones cited on Page 24 of my report, so it's
18 "The Handbook of Mortgage-Backed Securities, 6th
19 Edition."  I'm not sure if it's Page -- I think it's
20 the one on Page 541, but I'm not 100 percent sure.
21 But I believe it's in that volume.
22     Q.  Let's go to Paragraph -- excuse me --
23 Paragraph 35 of your report, Exhibit 1.
24     A.  Paragraph 35?
25     Q.  Right.

1      A.  On Page 16?
2      Q.  Yes.  So there you're suggesting that the
3  typical process that institutional fixed-income
4  investors used to make investment decisions was a
5  scenario analysis.  Correct?
6      A.  Yes.
7      Q.  Do you believe that that modeling, that
8  type of modeling, is inconsistent with
9  Dr. Cohen-Cole's model?
10     A.  I believe Dr. Cohen-Cole's model doesn't
11 resemble what the process that individual investors
12 went through when purchasing securities, particularly
13 not this type of individual investors.
14     Q.  Do you believe that Dr. Cohen-Cole's model
15 is inconsistent with the type of scenario analysis
16 you're discussing in Paragraph 35 of your report?
17         MR. CRAIG:  Object to form.
18     A.  I'm not quite clear what you mean beyond
19 what I already said.  So I believe that
20 Dr. Cohen-Cole's model does not resemble what
21 individual investors did.  So I'm not sure what
22 you're asking.
23     Q.  (BY MR. CAMPBELL)  Do you understand
24 Dr. Cohen-Cole's model to project default and
25 prepayment performance of two different sets of loan

1  characteristics?
2      A.  No.  I mean -- so the Cox proportional
3  hazard that he models, he estimates one for each
4  trust, and it -- I mean, he estimates a prepayment
5  model and he estimates a default model separately,
6  and he has a bunch of parameters estimated for each
7  of those models.
8      Q.  I apologize.  Let me clarify.
9          In Dr. Cohen-Cole's report he runs his
10 proportional hazard model on two different sets of
11 loan characteristics for each relevant supporting
12 loan group.  Right?
13     A.  So he -- okay.  So he estimates the
14 parameters of the Cox proportional hazard model, and
15 then he looks at the fitted values and gets an
16 expected default at 85 months for his hypothetical
17 supporting loan groups, and for the -- what he calls
18 the Plaintiff's Claims Scenario, which is the actual
19 characteristics of the trust, plus the defects that
20 he decides to use from the full set of defects found
21 by Butler.
22     Q.  And he compares those two levels of
23 expected defaults.  Right?
24     A.  He compares what he -- what he calls the
25 Plaintiff Claims Scenario and the Disclosed Risk

Page 66

1  Scenario.
2      Q.  Because we'll be talking about it a lot
3  today, I want to make sure we're using, you know,
4  consistent language.  I -- I want to talk about --
5  how -- what language would be good for you in
6  describing when Dr. Cohen-Cole changes the underlying
7  characteristics of the loans and he compares the two
8  default rates he gets at the end of the day, how do
9  you want to describe the change in those loan
10  characteristics?  Changing the underlying loans,
11  plaintiff claims versus disclosed risk?
12      A.  Yeah.  So I think --
13          MR. CRAIG:  Object to form.
14      A.  -- I think it's just really important
15  to -- to -- to be clear about whether we're talking
16  about the actual modified ones, which are what he
17  calls the Plaintiff's Claims Scenario, and the
18  hypotheticals, which go into forming what he calls
19  the Disclosed Risk Scenario.
20          So as long as you say something about the
21  actual and the plaintiff's claims, I'll know what
22  you're talking about there, and as long as you say
23  hypotheticals, I'll -- I should know what you're
24  talking about there.
25      Q.  (BY MR. CAMPBELL)  Okay.  When investors

Page 67

1  perform the type of scenario analysis you're talking
2  about in Paragraph 35, were they changing underlying
3  loan characteristics in a manner similar to how
4  Dr. Cohen-Cole changes the loan characteristics from
5  the prospectus supplement, the disclosed claims to
6  the plaintiff's claims?
7      A.  No.
8      Q.  Does the scenario analysis that you're
9  talking about in Paragraph 35 talk about changing the
10  underlying loan characteristics of the pool in any
11  way?
12      A.  The scenario analysis typically involves
13  looking at changes in the macroeconomy, looking at
14  changes in interest rates, and looking at changes in
15  expected default rates.  So the default rates for
16  particularly these sort of AAA investors are going to
17  be an input into the cash flow analysis that they're
18  doing.
19      Q.  And the default rate would be changed in
20  the scenario analyses, but the loan characteristics
21  of the underlying pool would not?
22      A.  So they'd have no method for changing the
23  underlying characteristics of the loans.  What
24  they're looking at is they're looking at the cash
25  flows and they're looking to see when the cash flows

Page 68

1  break down, given a set of default assumptions.  So
2  they don't particularly have loan-level data, and
3  they aren't varying these loan characteristics.
4      Q.  Investors in mortgage-backed securities
5  between 2005 and 2007 had access to some level of
6  aggregated loan characteristic data for the
7  mortgage-backed securities they were investing in.
8  Right?
9      A.  That is correct.  From the prospectus
10  supplements you have some data on the details, and on
11  the prospectus overall you have a variety of things,
12  including -- and let me just mention it again, the
13  fact that these were, you know, issued according to
14  underwriting guidelines.  And that -- when they're
15  doing any sort of analysis, any sort of modeling,
16  they're looking at it, given the assumption that the
17  securities meet the underwriting guidelines that --
18  that they were told about in the prospectus.
19      Q.  Do you know of any investor in
20  mortgage-backed securities between 2005 and 2007 who
21  attempted to modify the loan characteristics
22  disclosed in the prospectus supplements in modeling
23  that -- the performance in that mortgage-backed
24  security?
25      A.  So I was not particularly active in the

Page 69

1  mortgage markets in 2005 and 2007, so I can't think
2  of anything in particular.  I mean, the -- so no,
3  not in particular.  I mean, you get some implications
4  from this when you look at things like the Bear
5  Stearns models.  And I believe those were in some
6  use.  However, I don't think that there is any
7  particular investor that I've talked to.
8      Q.  Are you aware of any investor in
9  mortgage-backed securities between 2005 and 2007 who
10  attempted to model a change in underwriting guideline
11  compliance in modeling the performance of that
12  security?
13      A.  I'm not particularly aware of anyone who
14  did that because I think the way that this was done
15  was that -- and you see a little bit of this in the
16  Fabozzi handbook description regarding Bear Stearns.
17  They talk about modeling different types of
18  underlying collateral separately.  So if they're
19  going to model all day, they're going to model --
20  have one model for that.  If they have a subprime
21  deal, they might model those separately as well.
22          They're not going to do what -- you know,
23  they're not going to include a scratch-and-dent deal
24  which doesn't meet underwriting guidelines as being
25  similar to these other types of deals, which

18 (Pages 66 - 69)

Page 70

1  effectively is what Dr. Cohen-Cole does.  You know,
2  he aggregates all these different types of loans
3  together in his data set.  He makes no effort to
4  specify whether some of these were scratch and dent
5  or not scratch and dent.
6         And so, you know, the -- the model that he
7  estimates -- and this goes back to my critique of his
8  data -- it's just -- it's just not reasonable because
9  it's aggregating based on all different types of -- a
10  whole bunch of different types of underlying
11  securities.
12     Q.  But you're not aware of any investor in
13  mortgage-backed securities between 2005 and 2007 who
14  attempted to model a certain percentage of compliance
15  with underwriting guidelines in projecting the
16  performance of a mortgage-backed security?
17     A.  I'm not sure that that would have been the
18  way that you went and modeled it.  I think if you
19  look -- I mean, from what I infer from that piece
20  about the Bear Stearns model, you try and model the
21  different types of securities separately.  So if you
22  believe you have a scratch and dent, you model that
23  separately.  And if you believe you have something
24  that properly meets underwriting guidelines, you
25  model that separately as well.

Page 71

1     Q.  So the answer is no, you're not aware of
2  any such model?
3         MR. CRAIG:  Object to form.
4     A.  I think I've answered that question as
5  best I can.
6     Q.  (BY MR. CAMPBELL)  Are you aware of any
7  investor in mortgage-backed securities between 2005
8  and 2007 who attempted to model a certain percentage
9  of compliance with underwriting guidelines in
10  projecting the performance of that mortgage-backed
11  security?
12         MR. CRAIG:  Object to form, asked
13  and answered.
14     A.  So as I said before, I think it doesn't
15  make sense to model these different types of
16  securities together, and then say, you know, how does
17  this one particular factor impact it.
18         I mean, when you look at the Bear
19  Stearns -- or the description of the Bear Stearns
20  model in the Fabozzi book, they look at modeling the
21  different types of underlying loans separately.  And
22  so what you're suggesting is that you somehow
23  aggregate them, and then you have some variable that
24  then measures underwriting guideline -- underwriting
25  guideline -- guideline compliance.  I'm not sure that

Page 72

1  that's impossible to do, but I'm not sure that it's
2  the most sensible thing to do.  I'd have to think
3  about what exactly you're trying to specify.  And,
4  no, I'm -- I -- I don't -- I don't think that's what
5  investors did.
6     Q.  (BY MR. CAMPBELL)  Are you aware of any
7  investors between 2005 and 2007, using the scenario
8  analysis you're talking about, to compare two
9  different possible performances of a single pool
10  depending on whether or not the loan characteristics
11  were changed?
12     A.  So I wasn't active in this marketplace in
13  2005 to 2007, so I can't give you a specific example
14  from that.
15     Q.  So I'd like to go back a few paragraphs in
16  your report to Page 11.  Heading 4.1.
17     A.  Yes, I see that.
18     Q.  It reads, "Dr. Cohen-Cole ignores almost
19  all of the numerous types of deficiencies and
20  inaccuracies that Butler found among the Sampled
21  Loans."
22         Correct?
23     A.  Yes.
24     Q.  Can you tell me all of the types of
25  deficiencies and inaccuracies that you believe

Page 73

1  Dr. Cohen-Cole omitted from his report?
2     A.  No.  I -- I can't specify all of them.
3  I'd really have to go back and look at the Butler
4  report.
5         On Page 12, there's some detail.  And so,
6  you know, just reading a little bit here, there are
7  "8,700 separate breaches (an average of approximately
8  3.4 breaches per loan),...'approximately 120
9  different kinds of guideline breaches, violations of
10  industry-standard underwriting practices, and
11  misrepresentations of loan characteristics;' the
12  most-common breaches he found included:
13         "underwriter error or negligence (1,331
14  findings); failure to determine reasonable ability to
15  repay on stated income or no-ratio loans (821
16  findings); misrepresentation of debt (605 findings);
17  excessive DTI (597 findings); failure to verify
18  employment (520 findings); improper calculation of
19  debts or income (454 findings); failure to verify
20  assets (221 findings); excessive LTV or CLTV (220
21  findings); misrepresentation of income (214
22  findings); incomplete income documentation (111
23  findings); and misrepresentation of owner-occupancy
24  status (100 findings)."
25         From those, Dr. Cohen-Cole looks at DTI

19 (Pages 70 - 73)

Page 74

1  for some issues, not all because some issues of DTI
2  was not in the prospectus supplements.  He also
3  ignored it in his model.  He looks at LTV or CLTV,
4  and he looks at misrepresentation of owner-occupancy
5  status.
6         Those are the main things that he looks
7  at.  He may look at one or two other things, but
8  really he's ignoring almost all of the other stuff.
9     Q.  And I don't need you to read the numbers
10  into the record, but those numbers did change
11  slightly in your supplemental report.  Correct?
12     A.  That's correct.
13     Q.  You didn't attempt to quantify a specific
14  number of the findings that you just listed that
15  Dr. Cohen-Cole didn't take into account in his
16  report.  Correct?
17     A.  No.  I think that's pretty much here.
18     Q.  Do you believe that Dr. Cohen-Cole did not
19  take into account all of these findings that are
20  listed in your Paragraph 25?
21     A.  No.  He -- as I said, he includes changes
22  to LTV or CLTV, he includes some changes to DTI, and
23  he includes some owner-occupancy status findings, and
24  maybe, you know, one or two other things here, but
25  most of these he ignores.

Page 75

1     Q.  Let's start with the first category that
2  you've listed here, "underwriter error or
3  negligence," which in this report says 1,331
4  findings?
5     A.  Yes.
6     Q.  Have you come up with a number of those
7  findings that you believe Dr. Cohen-Cole does not
8  take into account in his report?
9     A.  No, I don't have a particular number.  I
10  think if -- I mean, I'd have to review the Butler
11  report.  But I think, you know, there are examples
12  of, for instance, Butler talking about red flags.
13  And these are the types of things that Dr. Cohen-Cole
14  completely ignores.
15        So I think in terms of the things that did
16  not particularly impact LTV or CLTV or these other
17  variables that he uses in his model, those he --
18  Dr. Cohen-Cole completely ignored.
19     Q.  So you mentioned red flags that Butler
20  talked about.  Mr. Butler had the chance to
21  investigate each one of these loan files.  Right?
22     A.  Yes.
23     Q.  And he came up with adjusted loan
24  characteristics for these -- for many of these loans.
25  Right?

Page 76

1     A.  He came up with adjusted loan
2  characteristics, but he also identified other issues
3  with the underwriting process.
4     Q.  And do you believe that he identified red
5  flags that were not accompanied with a change to a
6  loan characteristic?
7     A.  Yes.
8     Q.  Do you have any examples?
9     A.  Yes.  So there was one in particular that
10  I remember where a par- -- an individual went out and
11  bought four houses at the same time, and so they
12  applied at -- for four mortgages at the same time.
13        And Mr. Butler says, you know, this is an
14  easy check, and within underwriting guidelines, it's
15  the sort of thing that you need to check for, that
16  they're not going off and changing their
17  creditworthiness and ability to repay and so on as --
18  during the part of -- of getting this loan.  And this
19  was something that should have been obvious, and
20  there was no effort to make that check.
21        So that's one example that I happen to
22  remember from the Butler report.  But, you know, the
23  Butler report is very long and it has detailed
24  examples for, you know, hundreds of -- of different
25  loans.  And if you want more examples, I think we

Page 77

1  could, you know, pull out the Butler report and take
2  a look.
3     Q.  So just sticking with the example that you
4  gave of a borrower applying for four mortgages at the
5  same time, you said -- right?
6     A.  Yes.
7     Q.  That type of allegation could affect DTI.
8  Right?
9     A.  Yes.
10     Q.  That type of allegation could affect loan
11  purpose.  Right?
12     A.  Yes.
13     Q.  And that type of allegation could affect
14  owner occupancy.  Right?
15     A.  Yes.
16     Q.  Dr. Cohen-Cole's model takes into account
17  DTI, loan purpose, and owner occupancy where those
18  characteristics are changed, doesn't it?
19     A.  Well, Dr. Cohen -- so for that example,
20  the DTI is calculated at sort of prior DTI, and it's
21  not clear that the DTI should capture the additional
22  debt from having purchased these additional houses
23  going forward.  I mean, I'm not sure whether that
24  calculation would or would not capture that.
25        So, yeah, I mean -- and even if they don't

20 (Pages 74 - 77)

1 actually go buy the houses, if they're sort of
2 spending all their time trying to buy houses, that's
3 potentially an issue as to, you know, what is this
4 person up to? Why are they doing this? I think
5 it's -- it is a -- it is a red flag in a -- in a
6 variety of ways.
7      And, by the way, I should say that, you
8 know, I'm not an underwriter. I don't have any
9 particular expertise in underwriting. So, you know,
10 a lot of these sort of loan-level-detail issues, it's
11 better to rely on Butler than it is to rely on my
12 memory.
13      Q. But going back to my question,
14 Dr. Cohen-Cole's model takes into account DTI, loan
15 purpose, and owner occupancy, where those
16 characteristics were changed by Mr. Butler, doesn't
17 it?
18      A. Dr. Cohen-Cole's model sometimes includes
19 DTI changes; sometimes it doesn't, depending on
20 what -- the prospectus supplement bothers to mention
21 DTI.
22      And the change that Mr. Butler identified
23 in this example, it's not clear that that would
24 necessarily mean a change in the historical DTI or
25 the DTI at the time the loan is issued. It's not

1 clear that it would mean a change in the
2 owner-occupancy status at that time, but it does say
3 something about these issues going forward.
4      So I'm not sure that Mr. Butler's
5 quantified -- you know, for this example, I don't
6 think he did. I don't think he quantified, you know,
7 saying, yes, if all these loans would have filled,
8 then this is what the DTI would have changed to or
9 this is what the owner-occupancy status would have
10 changed to. He might have, but he might not have.
11      So I'm not sure that, you know, even in
12 that case, to the limited degree that Dr. Cohen-Cole
13 measures these things, he's capturing these changes.
14      Q. If this was a -- if this mortgage was in a
15 security that did have a DTI disclosure in the
16 prospectus supplement --
17      A. Okay.
18      Q. -- and Mr. Butler changed the DTI,
19 Dr. Cohen-Cole would have taken that account into his
20 model. Correct?
21      A. Dr. Cohen-Cole would have captured part of
22 the issue, then. Right? So Dr. Cole -- Cohen-Cole
23 would have captured the fact that the DTI changed if
24 Mr. Butler reported the change, but he would not have
25 captured the fact that there was a potential

1 violation in underwriting guidelines. It would not
2 capture the basic fact that, you know, this person is
3 trying to go out and buy four houses at the same time
4 and they're doing something very strange, and that
5 there are other potential issues with this loan.
6 He's only capturing if Mr. Butler happens to have a
7 change in the DTI or LTV or owner-occupancy status,
8 you know, what Mr. Butler reported.
9      In my mind, that's a small subset of the
10 total defects that Mr. Butler finds.
11      Q. Is there a description of the variable
12 that you would use to describe the risk of, in the
13 example you gave, the borrower seeking four
14 mortgages, above and beyond an effect on DTI, loan
15 purpose, or owner occupancy?
16      MR. CRAIG: Object to the form.
17      A. Are you asking me how I would model that?
18      Q. (BY MR. CAMPBELL) Before I get to that
19 question, I want to understand how you would
20 describe, as a variable, this additional risk that
21 you're describing.
22      MR. CRAIG: Object to the form.
23      A. If you're looking at a particular defect
24 or set of defects, there's a number of ways that you
25 could model it, which would include, you know, dummy

1 variables for the different types of defects or
2 including a general dummy variable for whether there
3 were additional defects not captured by these
4 representation -- by these changes in the DTI, LTV,
5 owner occupancy, and so on. But I'm -- I'm not
6 completely sure if that answers your question.
7      Q. (BY MR. CAMPBELL) You mentioned using a
8 dummy variable test if there is a relationship, but
9 do you believe that there is, in fact, some level of
10 risk that's not quantified in the variable that you
11 think Cohen-Cole is modeling?
12      MR. CRAIG: Object to the form.
13      A. Yes, I think there is. I think there are
14 problems that -- that are material problems that are
15 not in the variables that Dr. Cohen-Cole quantifies.
16 And for that I would point to, for instance, the
17 Sunshine report.
18      And, you know, I have this nice quote
19 someplace from Sunshine where he talks about how
20 important it is that you have things that are
21 properly reported and that you take into account
22 whether or not the -- the person getting the loan was
23 lying.
24      Q. (BY MR. CAMPBELL) So are you aware of any
25 investor in mortgage-backed securities between 2005

1  and 2007 that used any kind of dummy variable to
2  model the possibility of noncompliance with
3  underwriting guidelines?
4      A. No. I think that's not -- I think it's
5  too simplistic a way to go. I think -- you know, as
6  I said earlier, if you're going to model
7  scratch-and-dent issues, you're going to want to do
8  that separately rather than just doing a dummy
9  variable. And I think that's sort of consistent with
10  what I read from the Bear Stearns model described in
11  the Fabozzi handbook.
12      Q. You've mentioned the possibility of
13  different models for different classes, let's say, of
14  collateral: scratch and dent, subprime, alt-A,
15  prime. Is that a fair description of possible
16  distinctions?
17      A. Yes.
18      Q. But you're not aware of any model that,
19  within a single class of collateral, models
20  differences in underwriting guidelines compliance
21  within that one class?
22      A. I think a fundamental underlying
23  characteristics -- characteristic of modeling a
24  particular class is whether it meets underwriting
25  guidelines.

1      I think if you're modeling agency
2  securities, that's a particular set of underwriting
3  guidelines that you're assuming. If it's a subprime,
4  that's another set of particular underwriting
5  guidelines you're assuming, and if you're modeling a
6  scratch-and-dent deal, that's a separate set of
7  underwriting guidelines that you're assuming.
8      So these are sort of fundamental defining
9  characteristics of the securities that you use when
10  you're writing your model.
11      Q. What's your basis for saying that that's a
12  fundamental assumption of writing your model?
13      MR. CRAIG: Object to the form.
14      A. Well, it's just part of what the
15  securities are defined by. You know, underwriting
16  guidelines is, you know -- it's prominent on the
17  prospectus. It's important to investors. It's part
18  of what the securities are.
19      Q. (BY MR. CAMPBELL) Is underwriting
20  guideline compliance fundamental to the expected
21  performance of a mortgage-backed security?
22      A. It's closely related to the performance,
23  to the risk of the security, to how you're going to
24  think about it and model it, whether it's something
25  that you're going to want to invest in. Sure.

1      Q. Can you tell me all the research or papers
2  that support your opinion that underwriting guideline
3  compliance is closely related to the performance of a
4  mortgage-backed security?
5      A. So if you're looking about underwriting
6  guidelines performance, papers in the academic
7  literature typically don't have the -- access to the
8  sort of data that we have for this particular case
9  where they're able to say this is really how much
10  they met or did not meet underwriting guidelines.
11      However, if you look at -- you know, there
12  are other securities -- there are other -- there are
13  papers out there that look at the performance of
14  different types of disclosure requirements for loans
15  and how those are related to mortgage performance.
16  So the Mayer, Pence, and Sherlund paper in Journal of
17  Economic Perspectives talks about different types of
18  securities, and the LaCour-Little and Yang paper is
19  another one that relates disclosures and performance.
20      But, as I said, the type of data that is
21  available here for discussion is not generally
22  available to academics.
23      Q. So you're not aware of any research or
24  papers that support your opinion that underwriting
25  guideline compliance is closely tied to performance

1  of a mortgage-backed security?
2      MR. CRAIG: Object to form,
3  misstates the testimony.
4      A. So as I said, I think the different types
5  of securities, different -- performed differently
6  over the mid-2000s, and Mayer, Pence, and Sherlund,
7  and LaCour-Little and Yang are two papers that talk
8  about how the disclosure requirements are related to
9  performance under different circumstances. And I
10  believe there are other papers on these issues as
11  well.
12      But Mayer, Pence, and Sherlund is largely
13  a survey paper, so they probably sort of quote a
14  bunch of other pieces, although the LaCour-Little and
15  Yang, for instance, is -- more recent, so
16  there's -- they probably cite more recent papers that
17  look at these issues as well.
18      MR. CAMPBELL: Okay. We have to
19  take a break to change the video.
20      THE WITNESS: Okay.
21      THE VIDEOGRAPHER: Going off the
22  record. The time is 10:50.
23      (Break.)
24      THE VIDEOGRAPHER: Back on the
25  record. This marks the beginning of Disc No. 2.

22 (Pages 82 - 85)

Page 86

1  The time is 11:07.
2      Q. (BY MR. CAMPBELL)  And, Dr. Wald, you just
3  mentioned the Mayer and LaCour-Little papers, but are
4  you aware of any research or papers that support your
5  contention that underwriting guideline compliance
6  itself is closely tied to the performance of a
7  mortgage-backed security?
8      A. I'm -- I can't think of anything off the
9  top of my head.  I think when you look at
10 scratch-and-dent deal pricing, and scratch-and-dent
11 deals were ones that were done without these
12 underwriting guideline performance, you see that
13 they're quoted at much higher spreads over Treasuries
14 and that, therefore, there is an expectation that
15 there's -- you know, you need to be compensated for
16 the additional risk that you're taking.  So that's
17 very much already in the marketplace.
18         And, really, any article or anything that
19 talks about the pricing or the performance of scratch
20 and dents would reflect the difference in how -- the
21 difference in how much underwriting guidelines
22 mattered.
23     Q. What do you mean by "scratch-and-dent
24 loans"?
25     A. So scratch-and-dent securities are ones

Page 87

1  where the underwriter says that at least some of the
2  underlying loan pools may not meet underwriting
3  guidelines.  If you look at the Sunshine report,
4  Footnote 72, he lists three different
5  scratch-and-dent deals, and those are examples of
6  deals where the investment bank -- unlike the deals
7  at question here, the investment bank said in the
8  prospectuses that some of these loans may not meet
9  underwriting guidelines.
10        And in contrast to these deals at question
11 here, there was the representation that I -- you
12 know, all loans complied with underwriting
13 guidelines.
14     Q. Do you believe that scratch-and-dent
15 offerings always included at least some loans that
16 didn't comply with underwriting guidelines?
17     A. I'd really want to see the prospectus in
18 order to get a better sense of that, but it's my
19 understanding that's typically part of why that
20 they were -- why they were scratch-and-dent deals.
21     Q. And I believe you just said along the
22 lines of that the difference in pricing between
23 scratch-and-dent offerings and non-scratch-and-dent
24 offerings reflects the different expectations that
25 investors had of the performance of those loans.  Is

Page 88

1  that right?
2      A. I think that's -- that's roughly correct.
3  You want to be compensated for the fact that you're
4  buying a non-scratch and dent.  You want to have
5  additional collateral underlying the security if
6  you're going to have the same sort of risk for a
7  particular tranche.  So it partly has to do with the
8  pricing of the security, and it partly has to do with
9  the way the securitization is structured.
10     Q. Do you know whether investors in 2005 to
11 2007 modeled scratch-and-dent offerings differently
12 than how they measured -- excuse me -- modeled
13 non-scratch-and-dent offerings?
14     A. It's my understanding that, yeah, there
15 were differences in how they -- they modeled them.
16     Q. What were those differences?
17     A. Well, I mean, they expected -- they
18 expected a higher potential rate of default on the
19 underlying loans because they would not meet
20 underlying guidelines.  Potentially they had -- those
21 loans would have a different timing to their cash
22 flows.  They might have a different duration in
23 convexity characteristics.  They may have different
24 performance during different macroeconomic scenarios.
25 I can't point to any particular models of that, but

Page 89

1  those are the issues that would be most relevant when
2  you're thinking about a scratch-and-dent deal versus
3  a regular deal.
4         The other thing I guess I should mention
5  besides pricing, duration, convexity, is liquidity.
6  The liquidity of those deals might be different as
7  well.
8      Q. Now, the scenario analyses that we've been
9  talking about and the modeling we've been talking
10 about, are you usually thinking of modeling cash
11 flows or modeling defaults?
12     A. In the scenarios I'm thinking about
13 modeling returns, which is fundamentally the same as
14 modeling cash flows, given a set of default.  That's
15 the typical model that these types of investors
16 looked at.
17     Q. And are you aware of any models in the
18 2005 to 2007 time frame that modeled defaults as an
19 output?
20     A. So as I said before, I'm familiar with the
21 model described by Deng, Quigley, and Van Order, and
22 I suspect -- I strongly suspect that something that
23 that model was in use at Freddie Mac.  And I'm
24 familiar with the model roughly described in the
25 Fabozzi handbook, which was used at Bear Stearns.

23 (Pages 86 - 89)

1   However, I don't think either one of them was the
2   tool that was used by this type of investor when
3   purchasing AAA-rated securities.
4       Q.  Would it be fair to say that institutional
5   investors, like the credit unions in this case, were
6   taking fixed levels of defaults and inputting them
7   into the cash flow models you're talking about,
8   rather than doing an independent modeling of default
9   levels?
10      A.  I think that's pretty fair to say.  I
11  think they were stress-testing the securities to see
12  how high a level of -- how high defaults had to go
13  before the cash flows changed.  So, yeah, I think
14  that's very similar.  And, you know, in looking at
15  those default probabilities, there again thinking
16  about the sort of fundamentals of how the security is
17  defined, including whether it met underwriting
18  guidelines.
19          (Discussion off the written
20  record.)
21      Q.  (BY MR. CAMPBELL)  So in attempting to
22  model the scratch-dent loans in the type of
23  scenario analysis you've described, you believe that
24  investors would have projected a different rate of
25  defaults.  Right?

1       A.  Yes.  I think that the underlying
2   assumption might have been quite different.  They
3   might have projected a different range of defaults.
4   Right?
5           So investors typically don't think about
6   one scenario that they're looking at.  They think
7   about, you know, a number of different types of
8   scenarios.  And the range of scenarios that they're
9   going to be concerned with in a scratch-and-dent deal
10  might be a lot wider than in a properly underwritten
11  one.
12      Q.  Are you aware of any models that investors
13  used to try and predict why a scratch-and-dent deal
14  might have a higher level of default or if it would
15  have a higher level of default?
16      A.  I'm not sure that I would think about
17  models to look at that.  I would think about what the
18  actual data said about these types of securities and
19  these types of loans.  And I just don't know what the
20  data availability was at this time period.  But
21  certainly this is going to be something that's going
22  to be a major concern for investors at that time.
23      Q.  Is there any way that you know of to
24  quantify the impact of possible underwriting
25  guideline noncompliance in a scratch-and-dent deal on

1   the level of defaults that investors projected
2   between 2005 and 2007?
3           MR. CRAIG:  Object to the form.
4       A.  So this is not a particularly easy
5   question, and not something that I was actually asked
6   to answer as part of the report.  If you want me to
7   try and take a stab at it, however, I can.  And I
8   would say that, you know, in general you want as much
9   data on the particular type of security and the
10  experience with that particular type of security as
11  you can get.
12          So if you're going to be comparing things
13  that are properly underwritten, you want to do --
14  compare that to a similar set.  And if you want to
15  compare things that are not properly underwritten,
16  you want to compare that to, you know, a similar set
17  of ascending loans and get a history for those.  I'm
18  not sure how much more I can -- I can tell you about
19  that.
20      Q.  (BY MR. CAMPBELL)  Do you know of any
21  model in the 2005 to 2007 time frame, used by an
22  investor in mortgage-backed securities, that would
23  give you a quantification of an increased expectation
24  of defaults due to underwriting guideline
25  noncompliance?

1       A.  Again, I'm not sure that, you know, this
2   is something that's an output for a model.  I think
3   of this as something that you're trying to compare a
4   particular performance for a particular set of loans
5   versus the performance for a separate set of loans
6   which are different in the sort of fundamental
7   characteristic that they don't meet underwriting
8   guidelines.
9           So I'm not sure about how to think of it
10  in terms of a model or how to think of it in terms
11  of, well, you know, what's been the performance under
12  this set of -- the last couple years.
13          That said, if you are going to model the
14  performance under different scenarios, you're also
15  going to be concerned with a scratch-and-dent deal
16  doing differently under a macroeconomic downturn
17  relative to one that's properly underwritten.
18      Q.  So you're not aware, though, of any model
19  used by an investor in 2005 and 2007 that had a
20  modeled relationship between underwriting guideline
21  compliance and default expectations?
22      A.  No.  And, again, it's just worth
23  mentioning that investors didn't have access to the
24  sort of data we have access to here.  They didn't
25  know which particular loans met underwriting

24 (Pages 90 - 93)

1  guidelines or did not meet underwriting guidelines.
2  They may be able to look at the performance of a
3  particular securitization where, you know,
4  potentially the bank disclosed that a particular
5  percentage did not meet underwriting guidelines. But
6  I'm not sure how else you could have done anything
7  different at that time.
8      Q.  So you mentioned that when an investor
9  modeled a scratch-and-dent offering, they would have
10  a higher expectation of defaults that they would put
11  into their scenario analysis.  Right?
12      A.  I think I said that they would definitely
13  consider a greater range of defaults.
14      Q.  And is there -- do you have a way to
15  quantify what that increased range was?  Was it we
16  have a, you know, ten times wider range of expected
17  defaults, five -- I mean, that's what I'm trying to
18  ask.
19          Is -- is there a quantification of how the
20  range of expected defaults would change based on the
21  fact that an offering was a scratch-and-dent
22  offering?
23      A.  I think different reasonable investors
24  would have had different ranges of expectations that
25  would have -- dependant on differences in

1  macroeconomic views and, you know, a variety of
2  different things, different views about these
3  securities and so on.
4          A lot of the types of investors that we're
5  talking about here, you know, they're buying
6  AAA-rated securities.  They want securities that --
7  where the cash flows don't change, even at relatively
8  low-probability macroeconomic events.  So if the
9  economy really does turn down and defaults increase
10  significantly, they still want to make sure that
11  they're getting their cash flows.
12          So it's my expectation that to a large
13  degree, the types of investors that we're talking
14  about here weren't big players in scratch-and-dent
15  securities.  However, you know, I -- I can't specify
16  that on average.  And -- and in general, different
17  investors have different reasonable ranges about what
18  macroeconomic conditions and what ranges of defaults
19  they would be interested in looking at.
20      Q.  And you don't believe that there is any
21  one model that's the reasonable model, and if you
22  don't use it, you're an unreasonable investor.
23  Right?
24      A.  No.  I'm -- I'm not sure that I would say
25  that.  I think that there are, you know, general

1  guidelines for how fixed-income investors model
2  securities.  And I think, you know, if you look at
3  the Fabozzi book, and he talks about the scenario
4  analysis, I think that's very standard for looking at
5  how fixed-income securities are modeled as part of
6  your asset and liabilities structure.  And -- and so
7  I think looking at scenarios, looking at interest
8  rate changes, looking at different macroeconomic
9  decisions in the way described by Fabozzi, I think
10  that's all part of what a reasonable investor needs
11  to do, and none of that is really what Cohen-Cole
12  does in his analysis.
13      Q.  Do you -- do you believe it would be
14  unreasonable if an investor did not conduct the kind
15  of general analysis outlined in Fabozzi before
16  purchasing a mortgage-backed security?
17      A.  I think it would be unreasonable if a
18  fixed-income investor -- yes, I think a fixed-income
19  investor should do some type of scenario analysis.  I
20  think it's very standard.  You don't necessarily have
21  to look at returns under a particular set of
22  scenarios.  You don't have to have the same set of
23  scenarios.  And you can get at what performance might
24  have been if you have -- for instance, in a Treasury
25  security it's duration and convexity.  So those could

1  give you a shorthand way of determining what
2  performance would be in a variety of different
3  scenarios.
4          However, underneath that, when you have a
5  fixed-income portfolio manager, they have, I think,
6  certain, you know, basic duties as to, you know,
7  managing their asset liability structure and knowing
8  what those risks are.  So, yeah, I think -- I think
9  that's all included in -- in this.
10      Q.  And besides -- you mentioned duration and
11  convexity specifically.  What other aspects of this
12  process do you think any reasonable mortgage-backed
13  securities investor should have conducted?
14      A.  So a mortgage-backed security investor
15  buying this type of security typically looked at
16  stress-testing.  So they looked at what kind of
17  defaults implied changes in cash flows.  You see
18  that, I think, pretty often in the descriptions from
19  the depositions.  I think it's -- I'm not going to
20  say that every investor in particular needed to do
21  that, but I think it's -- it's mostly accepted
22  something like that was going to happen.
23      Q.  Do you think it's unreasonable if an
24  investor in a mortgage-backed security didn't conduct
25  any stress tests before purchasing a mortgage-backed

Page 98

1  security?
2      MR. CRAIG: Object to the form.
3      A. I think I've largely answered that
4  question already. I think if -- if they're not
5  stress-testing, then they're probably doing something
6  similar that gets at the same issues.
7      Q. (BY MR. CAMPBELL) And if someone
8  purchased -- if -- withdrawn.
9      If an investor purchased a mortgage-backed
10  security without conducting stress-testing or
11  something that also evaluated a range of
12  performances, would that be unreasonable?
13      MR. CRAIG: Object to form.
14      A. So, you know, as I said before, some type
15  of scenario testing is standard in this industry.
16  And you see that in Fabozzi, you see that in the
17  depositions. And so, yeah, these are all different
18  ranges of scenarios that they're looking at.
19      Q. (BY MR. CAMPBELL) I'd like to turn to
20  Paragraph 28 of your report, Exhibit 1.
21      A. Yes.
22      Q. You state that, "In not considering how a
23  reasonable investor's view of the 'total mix' of
24  information would have been altered by disclosure
25  that numerous loans had underwriting deficiencies

Page 99

1  that materially increased credit risk, Dr. Cohen-Cole
2  ignores discussion of the importance that every
3  participant in the RMBS market, including
4  originators, credit rating agencies, underwriters,
5  and investors, placed on compliance with underwriting
6  guidelines."
7      Did I read that correctly?
8      A. Yes, you did. And you could even add
9  insurance companies as another player in this market
10  that also relied on these underwriting guidelines.
11      Q. What's your basis for saying that every
12  participant in the RMBS market placed importance on
13  compliance with underwriting guidelines?
14      A. I think that's from my knowledge of how
15  this market works. It's from reading the Butler and
16  Sunshine reports. It's from looking at the
17  prospectuses and seeing how the securities are
18  described there. It's from knowing how credit rating
19  agencies make their decisions. It's from knowing how
20  investors make their decisions. It's from knowing
21  how insurance companies make their decisions. It's
22  from all those things.
23      Q. Now, you didn't provide any cites for this
24  paragraph. Right?
25      A. No. I think this is general knowledge

Page 100

1  that I have because I have worked in this particular
2  marketplace, but it's also something that you can get
3  more details about. I mean, this is not part of
4  my -- my area of greatest expertise, but this is
5  something that you can get more details about in, for
6  instance, the Sunshine report.
7      MR. CRAIG: By the way, Dr. Wald,
8  if you need to read previous or subsequent
9  paragraphs to answer these questions, feel free,
10  when you're asked about, "Did you cite anything
11  else?"
12      Q. (BY MR. CAMPBELL) But don't worry, there
13  is no question pending, Dr. Wald.
14      A. Right. And so, you know, in the previous
15  and subsequent I also cite Butler and Sunshine, so
16  there you go.
17      But you can also look at OCC guidelines,
18  and that gives you a sense of this as well.
19      Q. How did compliance with underwriting
20  guidelines play a part in your own decisions when
21  investing in mortgage-backed securities in 1987 to
22  1991?
23      A. So, I wasn't particularly investing in
24  securities by myself. I was -- as I said, I think I
25  bought a mutual fund and invested in mortgage-backed

Page 101

1  securities, and I looked at the types of securities
2  that they bought.
3      But are you asking what I did individually
4  or are you asking what I did when talking to
5  institutional fixed-income investors?
6      Q. Tell me all the conversations that you can
7  remember having with institutional investors about
8  the importance of compliance with underwriting
9  guidelines between 1987 and 1991.
10      MR. CRAIG: Object to the form.
11      A. So I can't remember specific conversations
12  that I had in '87 to '91 about underwriting
13  guidelines. In general, we discussed mortgage
14  characteristics, I talked to investors and traders
15  about different mortgage characteristics on a daily
16  basis, but I -- I can't remember anything specific
17  about underwriting guidelines.
18      Q. (BY MR. CAMPBELL) Have you talked to any
19  investors in mortgage-backed securities, who invested
20  in mortgage-backed securities from 2005 to 2007,
21  about the importance of underwriting guideline
22  compliance to them?
23      A. I have not been talking to fixed-income
24  institutional investors since I left the Street.
25  With, you know, small exceptions, I have not been

26 (Pages 98 - 101)

Page 102

1  doing that.
2          And this is not a -- a regular topic of
3  conversation because when you think about
4  underwriting guidelines, you think about the
5  definition of the security. Right? So if you talk
6  about a Fannie Mae deal, if it's Fannie Mae
7  underwriting guidelines, then it's guaranteed by
8  Fannie Mae. If you talk about a deal that's private
9  label but AAA-rated and meets underwriting
10  guidelines, that's part of -- the underwriting
11  guidelines are part of the definition of what that
12  security is all about. And if you talk about a
13  scratch-and-dent deal, then not meeting those
14  guidelines for each loan is how you define that
15  security.
16          So to some degree, it's -- it's not a
17  conversation that you need to have because it's part
18  of the definition of what that security's about.
19      Q. I want to go to the next sentence after
20  the one we just read in your Paragraph 28. And that
21  reads, "That is, all participants in the marketplace
22  believed it was important both that loans were
23  originated generally according to the applicable
24  underwriting guidelines and to have accurate
25  information about the loans' characteristics, not

Page 103

1  just the latter."
2          In that sentence -- first, did I read that
3  correctly?
4      A. Yes.
5      Q. In that sentence, what do you mean by
6  "originated generally according to the applicable
7  underwriting guidelines"?
8      A. I mean exactly what -- I mean, so, again,
9  I'm not a specialist in underwriting, and I think
10  Butler does a much better job of describing what it
11  means to comply or not comply with any particular set
12  of underwriting guidelines.
13          So I would just say, you know, there are
14  these guidelines, and, you know, I mean exactly
15  what -- what Butler means by this.
16      Q. So you have no independent opinion about
17  what it means to say something was originated
18  generally according to the applicable underwriting
19  guidelines?
20          MR. CRAIG: Object to form.
21      A. I'm -- I mean that I -- let me start
22  again.
23          I mean that I believe that the --
24  Mr. Butler's characterization of applicable
25  underwriting guidelines is correct. I have no issues

Page 104

1  to take with it. And that's about it. I -- I don't
2  think that -- that doesn't mean I -- I have no
3  opinions. I just believe that what Mr. Butler does
4  is correct.
5      Q. (BY MR. CAMPBELL) Did -- did you have
6  that opinion about the phrase "originated generally
7  according to the applicable underwriting guidelines"
8  before you read the Butler report?
9      A. Can you -- can you repeat the question
10  and -- and give me a little bit more sense of what
11  you mean by it?
12      Q. So your testimony is that when you use the
13  phrase "originated generally according to the
14  applicable underwriting guidelines," that's entirely
15  consistent with Mr. Butler's view of that -- what
16  that phrase means. Right?
17      A. Well, I -- I wrote this sentence after I
18  read Mr. Butler's report.
19      Q. So, yes, your view is that the phrase as
20  used in your report is entirely consistent with
21  what's in Mr. Butler's report. Right?
22      A. I believe I mean the same thing by
23  "applicable" -- excuse me -- "underwriting
24  guidelines" as -- as he does, yes.
25      Q. Had you ever formed an opinion as to what

Page 105

1  the phrase "originated generally according to the
2  applicable underwriting guidelines" meant prior to
3  your retention in this case?
4      A. I don't -- I can't recall ever hearing
5  that particular phrase prior to my retention in this
6  case.
7      Q. What -- what's your view of what
8  Mr. Butler's definition is of this phrase "originated
9  generally according to applicable underwriting
10  guidelines"?
11      A. I think for a detailed explanation, I'd
12  really want to go back to the Butler report because,
13  you know, he does a really good job of explaining
14  exactly what he means by that. But in general, in
15  terms of what the marketplace meant, you could look
16  at lots of different places to see that. You could
17  look at OCC reports. You could look at other
18  originators' guidelines.
19          And I think that, you know, the -- in
20  best -- reasonable investors in the marketplace had a
21  good sense of what underwriting guidelines were in
22  general. They may not have known, you know,
23  particular details from one particular underwriter.
24  However, these guidelines were broadly similar, and I
25  think reasonable investors had or could easily get a

27 (Pages 102 - 105)

Page 106

1  sense of what those guidelines were.
2      Q. Did you have an opinion as to how the
3  marketplace viewed the phrase "originated generally
4  according to the applicable underwriting guidelines"
5  until your retention in this case?
6      A. So, you know -- so there's sort of two
7  different questions in there potentially. One is
8  about the phrase "in particular" and whether I had
9  heard that -- or can I remember hearing that
10 particular phrase. And, you know, certainly that's
11 one particular phrase, and I don't remember
12 everything that I've heard in my life.
13     But, you know, can I think back prior to
14 my retention in this case and answer, what does
15 "originated generally according to the applicable
16 underwriting guidelines" mean, then I can say yes.
17 You know, in general -- in general, that phrase would
18 mean that there are these rules and there are these
19 rules that are published by the OCC, and the
20 marketplace in general has an understanding that if
21 these trusted investment banks specify in their
22 representations and warranties that these loans are
23 following underwriting guidelines, then -- then, yes,
24 they are issued in -- then these loans were issued in
25 such a way that they meet the belief that the --

Page 107

1  whoever's taking out the loan is going to be able to
2  repay the loan and that there's going to be enough
3  collateral, that the character of the person getting
4  the loan is appropriate, and that the cash flows of
5  the person getting the loan are appropriate. And,
6  you know, that sort of all meets the general
7  guideline principles.
8      Q. Do you have an opinion as to the meaning
9  of the specific word "generally" here?
10     MR. CRAIG: Objection; form.
11     A. "Generally" typically means something like
12 essentially.
13     Q. (BY MR. CAMPBELL) You mentioned rules
14 published by the OCC with respect to underwriting
15 guidelines. What rules are those?
16     A. I'd have to check the records. But
17 Butler, I believe, cites a number of descriptions of
18 guidelines by the OCC. I'm not sure if they're rules
19 so much as sort of general standards or that -- that
20 sort. I'd really want to check the Butler report to
21 get the -- the right language on that.
22     Q. I want to go back to the issue of whether
23 underwriting guideline noncompliance is associated
24 with performance.
25     You mentioned that you're not aware of any

Page 108

1  specific research or papers that establish a
2  relationship between underwriting guideline
3  nonperformance and negative performance -- negative
4  expected performance of a mortgage-backed security.
5  Right?
6      MR. CRAIG: Object to the form --
7      A. No, I wouldn't --
8      MR. CRAIG: -- misstates the
9  testimony.
10     A. No, I wouldn't agree with that statement.
11 I mean, I think what I said was I don't -- I'm not
12 familiar with academic literature, but I think, if
13 you look at the way the market prices these different
14 securities, the way it prices scratch and dent versus
15 securities that were properly underwritten, you see
16 this difference.
17     And so you don't need a particular
18 academic paper. You can just go and see what's
19 actually priced in the marketplace.
20     Q. (BY MR. CAMPBELL) Understanding your
21 pricing point, you're not aware of any academic
22 literature or research on the connection between
23 underwriting guideline compliance and performance.
24 Right?
25     A. I'm not aware of any, but that doesn't

Page 109

1  necessarily mean that there is none. And really, you
2  know, to answer that question, any piece of --
3  anything that states, "Here is the performance of
4  scratch and dents versus here is the performance in
5  the pricing of scratch and dents versus here is the
6  performance on pricing and structure too of regular
7  non-scratch-and-dent deals," would address this
8  issue.
9      So there's definitely stuff out there.
10 It's just I can't point to it at this moment while I
11 sit here because really anything that talks about the
12 pricing or structure of scratch and dent versus
13 properly underwritten deals would address this issue.
14     Q. Are you aware of any research or
15 literature that addresses specifically that
16 relationship you identified between the pricing of
17 scratch-and-dent offerings and the pricing of other
18 offerings?
19     A. Well, I would imagine that the
20 prospectuses for scratch-and-dent deals versus the
21 prospectuses for similar deals issued that were
22 non-scratch and dent at the same time would give you
23 an answer for that. And I think, besides the
24 prospectuses, any sort of documentation about those
25 pricing would, again, answer that question.

28 (Pages 106 - 109)

1    Q. But you're not aware of any literature or
2  research on that issue. Right?
3    A. I don't know. Are the prospectuses count
4  as literature or not?
5    Q. So the only literature or research would
6  be if it was in the prospectus?
7    A. No, that's not what I'm saying either.
8  I'm saying that anything that really talks about
9  scratch-and-dent deals, anything about the pricing --
10  and, you know, when these deals are priced, that's
11  all over the place. Right? There's prospectuses.
12  There's the term sheets. There's lots and lots of
13  things written up about them, and any of those things
14  would be sufficient to give you some sense of that.
15    Q. But you're still just talking about the
16  offering documents for those offerings, not other
17  external research. Right?
18    A. I'm talking about the offering documents.
19  I'm talking anything that talks about the state of
20  the market in this marketplace. You know, investment
21  banks often issue pricing sheets as to give some
22  sense of what -- how different markets are trading.
23  So anything that talked about scratch and dents
24  versus properly underwritten securities would have
25  made this point clearly.

1    Q. Do you believe that all of -- any
2  difference in pricing between scratch-and-dent and
3  non-scratch-and-dent securities is attributable to
4  underwriting guideline noncompliance?
5      MR. CRAIG: Object to the form.
6    A. So there's a number of different issues
7  when you're looking about the actual pricing of the
8  securities. When you're talking about the pricing of
9  the securities you're also looking at about how
10  they're collateralized, what they require in terms of
11  guarantees and so on.
12      So, you know, it's possible that a
13  scratch-and-dent and a non-scratch-and-dent deal were
14  priced similarly but that the scratch-and-dent deal
15  required, you know, 50 percent greater
16  overcollateralization.
17      That sort of example gives you the same
18  implication that the scratch-and-dent deals were
19  riskier and valued differently by the marketplace.
20  But you may not see it in terms of the price of the
21  security that's finally issued. It's, instead,
22  subsumed into the structuring of the security rather
23  than the final issuance price.
24    Q. (BY MR. CAMPBELL) Do you believe that all
25  of the difference in the structuring of the

1  security -- the structuring of a non-scratch-and-dent
2  security versus a scratch-and-dent security is
3  attributable to noncompliance with underwriting
4  guidelines?
5      MR. CRAIG: Object to the form.
6    A. So there's issues with structuring and
7  there's issue with pricing. But, you know, in order
8  to compare any two different securities, you really
9  want to see the prospectuses. And, you know, I'd
10  need a lot more details before I could, you know,
11  really quantify that -- that hypothetical.
12    Q. (BY MR. CAMPBELL) Are you aware of any
13  research or literature that quantifies either the
14  differences in pricing or the differences in
15  structuring between scratch-and-dent and
16  non-scratch-and-dent deals?
17    A. Again, other than prospectuses and term
18  sheets and everything else that may have been written
19  by these investment banks in the marketplace, I don't
20  know of any particular academic papers that look at
21  this particular issue. But, again, you know, all
22  these other things would have addressed this point.
23    Q. What other basis do you have for your
24  opinion that guideline noncompliance is associated
25  with a higher risk of default for a mortgage-backed

1  security?
2      MR. CRAIG: Object to form.
3    A. So there's a couple things that I look at.
4  I look at the Sunshine report. I look at the Butler
5  report. I think both of them make this point quite
6  clearly.
7      You can also look at some of the academic
8  literature, the Mayer, Pence, and Sherlund paper
9  again and the LaCour-Little and Yang paper, some of
10  the papers that they reference.
11      And those are papers that talk about how
12  loans with reduced documentation had greater default
13  risk. So that's not exactly the same as saying that
14  it's underwriting guidelines noncompliance, but it
15  does suggest that where there are misrepresentations,
16  you get greater defaults.
17      Again, that's consistent with the notion
18  that more underwriting guideline defects imply a
19  higher default risk. But I don't think that that's a
20  terribly controversial point. I think if you look at
21  the pricing again in the marketplace of these scratch
22  and dents versus non-scratch and dents, I think
23  that's, you know, clearly implied there.
24    Q. (BY MR. CAMPBELL) So you've cited
25  Sunshine, Butler, and then the papers from Mayer and

Page 114

1 LaCour. What other basis do you have for your
2 opinion that guideline noncompliance is associated
3 with a higher risk of default for a mortgage-backed
4 security?
5        MR. CRAIG: Object to the form,
6 mischaracterizes the testimony.
7        A. So, again, I've cited Butler, Sunshine.
8 I've cited some academic papers, and I've cited the
9 way the market reacted to the pricing of securities
10 based on ones that were properly underwritten and
11 ones that were not properly underwritten. I think
12 those are sort of the main issues.
13        But, again, I don't think this is a
14 terribly controversial point. I think, you know, if
15 you look at scratch-and-dent securities for a similar
16 structure, they would trade at higher spreads, and
17 I -- I don't think that's -- that's controversial.
18        Q. (BY MR. CAMPBELL) Have you now told me
19 all of the bases for your opinion that guideline
20 noncompliance is associated with a higher risk of
21 nonperformance for mortgage-backed securities?
22        MR. CRAIG: Including or not
23 including what he said in his report?
24        Object to the form.
25        A. So there are a number of answers that I've

Page 115

1 already given you. There's other things that I
2 men- -- mention in my report. So -- but I'm not
3 completely clear on what the question is. So can you
4 answer -- can you ask the question again, please?
5        Q. (BY MR. CAMPBELL) Have you now told me
6 all of the bases for your opinion that underwriting
7 guideline noncompliance is associated with a higher
8 risk of nonperformance for mortgage-backed
9 securities?
10        MR. CRAIG: Same objection.
11        A. So what do you mean by "nonperformance"?
12        Q. (BY MR. CAMPBELL) Let me change the
13 question to say, have you now told me all of the
14 bases for your opinion that guideline compliance is
15 associated with a higher risk of default for
16 mortgage-backed securities?
17        MR. CRAIG: Object to form.
18        A. So, again, I've mentioned some academic
19 papers. I've mentioned how the market perceived
20 these. I've mentioned the Butler and Sunshine
21 reports.
22        But you don't have to go further than
23 that. I mean, Cohen-Cole -- if you look at his
24 model, he finds that, you know, higher DTI implies
25 greater risk of default. And if the -- if the

Page 116

1 underwriting guideline means that there's a higher
2 DTI, then Cohen-Cole also says that that implies a
3 greater risk of default.
4        So it's implied in -- you know, everything
5 in this -- this -- in my report. It's implied by
6 Dr. Cohen-Cole's report that it imp- -- that, you
7 know, there's higher default risk associated with
8 underwriting guidelines. It's implied by how other
9 people have modeled default risk. So -- and it's --
10 you know, it's -- it's -- it's all really pretty
11 clear from all those issues.
12        Q. (BY MR. CAMPBELL) Do you believe that a
13 higher DTI is necessarily an underwriting guideline
14 violation?
15        A. Can you be more specific? I mean, if the
16 DTI is different than what was -- so, I mean, there
17 are different DTIs for different loans. Some loans
18 could have higher DTIs without violating guidelines.
19 But if, for a particular loan, as, you know, Butler
20 discusses, the DTI is not calculated properly, then I
21 think he usually considers that to be a violation.
22        Q. If you have -- take a given loan, pick a
23 DTI -- say 40 percent DTI -- is the risk of default
24 from that loan from the 40 percent DTI -- from the
25 DTI component specifically different if the

Page 117

1 underwriting guidelines associated with that loan
2 allow or don't allow a 40 percent DTI?
3        MR. CRAIG: Object to form.
4        A. Right. So the question doesn't completely
5 make sense because you're saying only from that
6 component, and then you're saying does that change.
7 So, you know, I can't really answer the question
8 as -- as stated.
9        Q. (BY MR. CAMPBELL) Why not?
10        A. Because you're saying, assuming that
11 there's no effect, is there an effect? That's how
12 I -- that's how I see your question. Right? I see
13 your question as saying, assuming that you're only
14 looking at this numerical impact of DTI, does that
15 matter?
16        And so let's -- let's talk about this a
17 little bit more broadly. I mean, if you think about
18 some violation of underwriting guidelines compliance
19 and that, in this particular case, means that the DTI
20 is misreported, then, as, you know, I say in the
21 report, there's a couple of problems with that. One
22 is that the DTI is -- is not correct. And that's
23 what Dr. Cohen-Cole points to.
24        But the other problem is that there's this
25 violation of D- -- of the underwriting guidelines.

30 (Pages 114 - 117)

Page 118

1  And that may be due to the borrower lying. And if
2  they're lying, then maybe that's not a loan that you
3  want included in the securities that you're buying.
4  It may be that the originator is -- has some poor
5  process in place and that, you know, they're
6  originating loans which they themselves don't think
7  that they should be originating.
8        You know, there's lots of reasons to be
9  extremely uncomfortable with purchasing a security
10 backed by a loan that's violating underwriting
11 guidelines, and that includes both the actual
12 numerical change in DTI, which, again, Dr. Cohen-Cole
13 captures in some of his analysis, not all, but there
14 are other things as well.
15       So, I mean, consider a case where you're
16 looking at a securitization where DTI isn't mentioned
17 in the prospectus supplements. Dr. Cohen-Cole
18 doesn't even include DTI then in the parameters that
19 he estimates.
20       But you could have a particular loan being
21 originated where, when you recalculate the DTI or
22 just calculate the DTI as Butler did for some of
23 these cases, you wind up with a DTI which makes it
24 clear that the loan is never going to get paid back
25 and that that loan is clearly violating underwriting

Page 119

1  guidelines.
2        You know, in that type of case, it's very
3  clear that Dr. Cohen-Cole's model is missing, you
4  know, this important aspect that if investors knew
5  about it, they certainly would not want to buy
6  securities backed by this type of loan.
7     Q.  In your example there, if there was no
8  information about DTI in the prospectus supplemental,
9  how would an investor know if there was a change in
10 DTI?
11    A.  So there's two different things there.
12 Even if there's nothing about DTI in the prospectus
13 supplement, there are still issues around DTI in the
14 underwriting guidelines. And the underwriting
15 guidelines are written -- and this is my
16 understanding -- and, again, I'm not an underwriting
17 specialist, but -- but, you know, given what
18 Mr. Butler says, they're written in such a way that
19 you're supposed to be able to see whether this
20 person's going to have some possibility of repaying
21 this loan.
22       If, as Mr. Butler calculated for some of
23 these, you wind up with DTIs over 100 percent, it's
24 clear that that person's not going to be able to pay
25 that loan.

Page 120

1        And so, you know, that's something that
2  investors should be made aware of and that's
3  something that investors thought that they were made
4  aware of because, in the prospectus itself, it says
5  that these are properly underwritten loans and that
6  they follow underwriting guidelines. And, as
7  Mr. Butler said, that's not the case.
8     Q.  How would an investor in mortgage-backed
9  securities between 2005 and 2007 in a deal that
10 doesn't describe DTI have taken into account a loan
11 that goes to 100 percent DTI when there are no DTI
12 figures in the prospectus supplement?
13       MR. CRAIG:  Object to form.
14    A.  So, you know, as we've talked about
15 earlier, investors didn't have loan-level data.
16 Right?  This is not something that they were -- had
17 access to.  This is only something that the
18 investment banks had access to and that they were
19 doing due diligence on checking.
20       So, you know, as we've said this before,
21 it's not possible for investors to look at this
22 specifically.  It's something that's part of the due
23 diligence when the investor bank says that it's --
24 that these loans are meeting underwriting guidelines.
25    Q.  (BY MR. CAMPBELL)  So are you aware of any

Page 121

1  way that an investor would have changed how they
2  modeled a security based on finding a DTI
3  misstatement when they weren't told about what the
4  DTI ratio was in the prospectus supplement?
5        MR. CRAIG:  Object to form.
6     A.  That question doesn't make a whole lot of
7  sense to me.  I'm sorry.
8        But, I mean, generally, again, they're
9  looking at DTI implied by just the fact that it
10 matches underwriting guidelines, and there's an
11 implicit statement about the ability of the
12 underwriter -- or the ability of the borrower to --
13 to make their payments there.
14       So, yes, there is information about DTI
15 even if there's not a particular number in the
16 prospectus supplement, and it's implied by
17 underwriting guidelines, which the investment banks
18 had access to and which -- that they could check that
19 were being properly met, and then investors believed,
20 when they were buying these securities, that these
21 were being followed because that's what it said in
22 the prospectus.
23    Q.  (BY MR. CAMPBELL)  If a prospectus
24 supplement says nothing about DTI but says that
25 there's compliance with underwriting guidelines, is

31 (Pages 118 - 121)

Page 122

1    there an implied DTI number?
2        A. So I think you have to look at Mr. Butler
3    exactly in order to say this. But I think pretty
4    much -- my memory is that many of these underwriting
5    guidelines had specific maximum DTIs. And so, yes,
6    there is a particular number that's implied by
7    meeting underwriting guidelines. And that's
8    certainly less than 100 percent or whatever it was
9    that Mr. Butler found in some of these cases.
10       Q. So going back to the example of an
11   individual loan with a fixed DTI, do you believe that
12   that loan has a greater risk of default if that fixed
13   DTI is not in compliance with guidelines or is in
14   compliance with guidelines?
15       MR. CRAIG: Object to form.
16       A. So, in general, as an investor, if I'm
17   told that a particular loan is going to meet
18   underwriting guidelines, I really want that to
19   happen. If it doesn't meet underwriting guidelines,
20   there's all sorts of problems that could occur. The
21   cash flows may not be sufficient. The collateral may
22   not be there. Maybe something about the paperwork is
23   wrong and you can't collect on the collateral later.
24       You know, I -- I would just be very
25   worried about purchasing something which is backed by

Page 123

1    loans where, you know, there's some misrepresentation
2    going on. And that varies all the -- you know, for
3    lots of different reasons.
4        Q. (BY MR. CAMPBELL) Regardless of your
5    personal view, do you believe that that loan has a
6    greater risk of default if the DTI doesn't comply
7    with guidelines?
8        MR. CRAIG: Objection to form.
9        A. So, first of all, I -- I don't think I'm
10   really characterizing this as my personal view.
11   Right? This is sort of a professional opinion based
12   upon having worked with investors and knowing
13   something about the way fixed-income markets work.
14       And then, for the second part of your
15   question, does it matter whether underwriting
16   compliance matters, yeah, I think, you know, I've
17   already answered that a couple of different ways.
18   And, you know, Sunshine gets to this point very well,
19   and I think this is something investors cared about.
20       Q. (BY MR. CAMPBELL) Do you believe that
21   the -- withdrawn.
22       Regardless of whether or not investors
23   cared about whether or not a DTI complied with a
24   guideline or not, do you believe that a loan has an
25   increased risk of default just due to the fact that

Page 124

1    the DTI doesn't comply with guidelines?
2        MR. CRAIG: Object to form.
3        A. I'm sorry. Can you repeat the question?
4        Q. (BY MR. CAMPBELL) Regardless of whether
5    or not investors cared about whether a DTI complied
6    with a guideline or not, do you believe that a loan
7    has an increased risk of default simply due to the
8    fact that the DTI ratio doesn't comply with
9    guidelines?
10       MR. CRAIG: Object to form.
11       A. So I think, you know, there is a couple of
12   things that are worth mentioning when you ask that
13   question. One is that in the report, around -- give
14   me one second here -- around Section 5.2, you know, I
15   talk about this issue at more length.
16       And Section 5.2 says, "Dr. Cohen-Cole
17   assumes that a loan for which the actual borrower or
18   loan characteristics were misrepresented and a loan
19   with identical borrower and loan characteristics that
20   were not misrepresented have the same credit risk."
21       And I think maybe this is sort of related
22   to what you're asking me. And, you know, here I talk
23   at length -- here is where I quote Sunshine about the
24   importance of the truthfulness. I cite, again, the
25   Mayer, Pence, Sherlund, and LaCour-Little and Yang

Page 125

1    papers.
2        And the basic point is that, you know, if
3    the DTI is misstated, first of all, that, in and of
4    itself, matters because if you have a higher DTI,
5    that's a higher risk of default. But second of all,
6    I read the literature, including the Sunshine and the
7    academic literature, as saying that has also other
8    implications for the risk of default.
9        And, you know, in terms of how I prepared
10   this report, the idea was to point out things that I
11   think Dr. Cohen-Cole should have looked at. And I
12   think, you know, throwing in a test of whether a
13   default -- a defect, sorry -- a defect matters in
14   defaults or whether the number of defects matters in
15   the defaults, I think that would have been part of
16   what the academic literature would have expected, and
17   part of what he should have done.
18       Q. (BY MR. CAMPBELL) So is it your view that
19   the academic literature would support the idea that
20   if you have a DTI misstatement, there is the
21   increased risk due to the higher DTI ratio, but there
22   is also a separate increased risk due to the fact
23   that you no longer comply with underwriting
24   guidelines?
25       A. The way I read the Mayer, Pence, Sherlund

32 (Pages 122 - 125)

1 and LaCour-Little and Yang papers, I think that's
2 consistent with that view. I don't think they test
3 this explicitly. And Dr. Cohen-Cole says everyone
4 knows this, and this is standard academic practice.
5 I've looked and looked, and I have not seen anyone
6 that tests this particular issue because the academic
7 literature doesn't have this sort of data. They
8 don't have re-underwritten loans.
9         However, the way I read the conclusions
10 from Mayer, Pence, Sherlund, and LaCour-Little and
11 Yang I think is consistent with the view that a
12 defect matters not just because of the change in
13 variables, but also because there is a defect and a
14 violation of underwriting guidelines.
15        (Discussion off the written
16 record.)
17        MR. CAMPBELL: Sure. We can take
18 a break right now.
19        THE VIDEOGRAPHER: Going off the
20 record. The time is 12:05.
21        (Break.)
22        THE VIDEOGRAPHER: Back on the
23 record. The time is 12:26.
24        Q. (BY MR. CAMPBELL) Dr. Wald, is it your
25 opinion that the LaCour-Little paper that you've

1 referred to supports the idea that underwriting
2 guideline compliance, in and of itself, increases the
3 risk of default for a loan?
4        MR. CRAIG: Object to the form.
5        A. No, I don't think that that's really what
6 the LaCour-Little and Yang paper says. I think it's
7 consistent with the view that there is an aspect to
8 defects, which is important for defaults beyond what
9 the stated numbers capture. So that's -- it is
10 somewhat different, but I think it's not particularly
11 consistent with Dr. Cohen-Cole's view that if you fix
12 the numerical portion of the defects for those ones
13 where he happens to have variables that fit, that
14 that's sufficient.
15        (Exhibit 3 was marked.)
16        Q. (BY MR. CAMPBELL) I'm going to hand you
17 what I've marked as Wald Exhibit 3.
18        A. Thank you.
19        Q. And is that the LaCour-Little paper that
20 you refer to in your report and that you've been
21 talking about today in your testimony?
22        A. Yes, it is. So one thing to mention,
23 the -- back in the beginning of the deposition you
24 asked me about a working paper that -- whose name I
25 couldn't remember, that's the Paley and Tzioumis

1 paper, and here it's cited as Paley and Tzioumis
2 2011, but there are other versions out there. So
3 that -- that was what I was thinking of.
4        And I didn't -- and, again, I didn't
5 include it in the exhibit on the papers that I
6 considered just because there were a variety of
7 different versions of the paper, and I thought the
8 points were already made in other published papers.
9        Q. Just so I can be clear here before we get
10 into the LaCour article then, can you turn back to
11 your report, Exhibit 1 -- Exhibit 2 to your report.
12 There is a Paley and Tzioumis paper cited there. Is
13 that --
14        A. Oh, maybe I did include it. My apologies,
15 then. Oh, yep, okay. Sorry. I take that back.
16        Q. So that's --
17        A. There is a -- there is a -- there is a
18 more recent version of that paper out there. There's
19 a 2014 or '15 paper -- version of that paper as well,
20 and I looked at that as well.
21        Q. Okay. Okay. So turning back to
22 Exhibit 3, the LaCour-Little paper, is there a
23 specific paragraph or section of this paper that you
24 believe supports your opinion that there is something
25 beyond just a numeric component to an underwriting

1 guideline violation?
2        A. So there's a variety of things here that I
3 could point to that are consistent with that view.
4 Should I go through the paper?
5        Q. Just the portions that are responsive to
6 my question.
7        A. Okay. So the first thing that's sort of
8 important to point out is the name of the paper,
9 which is "Taking the Lie Out of Liar Loans: The
10 Effect of Reduced Documentation on the Performance
11 and Pricing of Alt-A and Subprime Mortgages."
12        So the fact that these are called liar
13 loans -- and, really, the point here is looking at
14 loans where -- which are called liar loans -- where
15 the -- their documentation does not have to be
16 verified to the same degree, and the fact that these
17 liar loans have greater default rates as
18 similarly -- than similar loans with similar stated
19 characteristics but where verification occurs.
20        And on page 508 there is discussion about
21 the types of loans that they look at in particular,
22 and they look -- towards the bottom of page 508, the
23 second-to-last paragraph, they focus on loans which
24 are characterized as SIVA and SISA, which are stated
25 income verified assets versus stated income stated

Page 130

1  assets.
2      If you then go on to there -- so there's
3  portions of this paper that I don't remember that
4  well, but I'll try and guide you through this as well
5  as I can.
6      And if you look then onto Page 514
7  and look at their hypotheses, they say that --
8  "Hypothesis 1:  low documentation creates
9  additional default risk."  And then "Hypothesis
10 2:  Overall, low documentation combined with
11 income overstatement leads to more pronounced
12 default risk increase."  And then Hypothesis 3 is
13 that "Overall, low documentation risk and income
14 overstatement risk are priced, but risk premiums
15 are small."
16     So I think the portion that's most
17 relevant is probably Hypothesis 2, and they're
18 saying that this combination of low documentation
19 with overstatement leads to more pronounced
20 default risk, and I think that's consistent with
21 the view that -- at least the way that it's
22 stated there, that if you have a loan where
23 there's a misstatement, it's not just the
24 misstatements, it's also something about the --
25 the -- it's not just the -- the numeric

Page 131

1  difference that Dr. Cohen-Cole considers.  It's
2  other things that -- that are important as well.
3      Just other things to point out
4  since -- let's see.  Then I guess the next thing
5  you should find is the evidence for Hypothesis 2,
6  which if I remember correctly they find evidence
7  supporting their hypothesis.  I'm not completely
8  sure where that is.
9      When you look at this model, they
10 also estimate a model with some nonlinearities in
11 CLTV, which, again, Cohen-Cole does not do.  And,
12 again, they talk about layered risk, which is
13 when you have multiple risks sort of combined,
14 which, again, Dr. Cohen-Cole does not --
15     Q.  Is there --
16     A.  -- consider.
17     Q.  -- a place you saw layered risk?
18     A.  Yeah, there is.  I just don't remember
19 where.  Let me see if I can find it.  Give me one
20 second, please.
21     (Reviewing document.)
22     If you look at Page 526, they're looking
23 at this a couple ways.  So they look at it with LTV,
24 but then they also look at it with LTV dummy.  So
25 they're trying to capture something about

Page 132

1  nonlinearities in LTV.
2      If you look at the description about
3  Hypothesis 2 on Page 529, sort of in that section
4  below the bold "Hypothesis 2," they say, "Across all
5  specifications, the second-stage results support
6  Hypothesis 2, with the coefficient of the natural
7  logarithm of the income ratio positive for the
8  stated-doc loan subsample, while insignificant for
9  the full-doc loan sample, with the difference
10 consistently significant at a 1 percent level."
11     One more second.  There's more stuff.
12     (Reviewing document.)
13     Right.  So, I mean, if you go to the
14 conclusion, "Simulation based on our default
15 regression models suggests roughly a 10 percent
16 increase in default risk when a loan with average
17 characteristics switches from full documentation to
18 stated documentation, after controlling other
19 observable risk factors.  This is almost surely a
20 lower bound estimate, as we have eliminated loans
21 with piggyback seconds and overall default rates are
22 high in our data even for full documentation loans."
23     So I -- I'm having trouble finding the
24 exact place that they talk about layered risk.  I
25 remember seeing it here the other day, but I think

Page 133

1  the easiest way to find it would be just to do a
2  textual search for "layer," and I think that would
3  probably point it out because I -- I do think -- they
4  talk about the importance of layered risk as well.
5      They also have -- and I want to point this
6  out too -- you know, on Page 533, this section where
7  they do a bunch of robustness checks, and that's
8  really typical in the academic literature, and it's
9  typical that you want to show the robustness of your
10 results to, you know, a variety of different
11 assumptions.
12     And really there's none of that in
13 Cohen-Cole.  Right?  I mean, he, you know, really has
14 a number of assumptions which are far outside of, I
15 think, the standard in the literature that looks at
16 this, whether you look at the academic or the
17 practitioner literature, and he has no attempt to add
18 any sort of robustness checks.
19     Q.  I'd like to go back to the conclusion that
20 you had just referenced on Page 541.
21     A.  Yes.
22     Q.  So in the second full paragraph, the first
23 sentence says, "We find that reduced documentation
24 does increase the likelihood of loan default after
25 controlling for other risk factors."

34 (Pages 130 - 133)

1    Right?
2      A.  Yes.
3      Q.  Dr. Cohen-Cole's model does take into
4  account different documentation types.  Right?
5      A.  He has some variables on documentation
6  type, if I remember correctly.
7      Q.  So do you have any basis to think that
8  Dr. Cohen-Cole's model does not take into account any
9  increased risk from having a lower type of
10  documentation?
11      A.  No.  That's not my criticism.  My
12  criticism is that where there are defects, he only
13  considers a small proportion of those defects, and he
14  ignores the fact that they violate underwriting
15  guidelines.  And if you have an originator that's
16  violating your underwriting guidelines, that could be
17  a big problem.
18      I mean, that's saying that they are
19  issuing loans which, in their opinion, in their own
20  opinion, they are not qualified to do so.
21      So, I mean, I think that has a potential
22  impact on default, and the findings in LaCour-Little
23  and Yang -- I mean, as I said before, they don't have
24  actual defects.  However, I read their findings as
25  being consistent with the notion that after

1  correcting for other characteristics, whether or not
2  there are these defects, whether there are
3  misstatements or misrepresentations in the loan
4  documents, that that has additional impact on default
5  risk.
6      Q.  And are you referring there to
7  LaCour-Little's attempt to include income
8  exaggeration in their model?
9      A.  I'm referring there to the finding that
10  when you have things that they believe are
11  mischaracterized as well as when you have less
12  verification, that implies higher default risk.  And
13  so I think, again, that's consistent with the view
14  that these defects matter even if you control for the
15  change in the variables as Dr. Cohen-Cole did for
16  some of the variables.
17      Q.  Now, you would agree that less
18  verification doesn't mean a violation of underwriting
19  guidelines, per se.  Right?
20      A.  I would agree with that.
21      Q.  So you were trying to refer to some
22  additional effect from the possibility that having a
23  lower standard of documentation might allow someone
24  to get away with misstatements about some other
25  aspect of the their risk profile.  Is that fair?

1      A.  Well, I mean, really I'm criticizing
2  Dr. Cohen-Cole for his unproven assertion that the
3  only thing that matters are these particular numbers
4  and that the fact there's a change in the --
5  that these numbers violate underwriting guidelines,
6  as well as, you know, for -- places LTV changes or
7  DTI changes, that there -- he captures that change.
8  He misses, you know, the -- these other problems.
9      I'm sorry.  I -- I think I've lost the
10  thread of your question.
11      Q.  What additional risks that are modeled and
12  quantified in the LaCour-Little paper does
13  Dr. Cohen-Cole's model not take account of?
14      A.  Well, he doesn't take into account the
15  fact that the underwriters are violating their own
16  guidelines.
17      Q.  Is that something that's modeled in the
18  LaCour-Little paper?
19      A.  No, it's not something that's explicitly
20  modeled in the LaCour-Little paper because, as I said
21  before, they did not have access to -- to, you know,
22  re-underwriting loans.  However, their findings, I
23  believe, are consistent with the view that having a
24  defect increases default risk beyond what these
25  numbers that Dr. Cohen-Cole finds suggest.

1      And, again, that's only consistent with
2  the view.  It's not something that is proven
3  concretely, but it's something that Dr. Cohen-Cole, I
4  think, could have and should have examined as part of
5  his analysis.
6      And, in particular, you know, throwing in
7  an extra variable in there, like the number of
8  defects, that's something that, you know, would have
9  and could have -- and should have addressed --
10  addressed this issue.
11      Q.  Now, you're not aware of any investor
12  model in 2005 to 2007 that had a variable for
13  underwriting defects.  Right?
14      A.  No.  I think when investors were buying
15  securities, they believed what was in the prospectus,
16  that the -- and the prospectuses say quite clearly
17  that these securities are not violating underwriting
18  guidelines, at least if they're buying ones that are
19  non-scratch and dent.  If they're buying scratch and
20  dent, that's a different story.
21      Q.  So I'd like to stick with LaCour-Little.
22  Is there a sentence you can point me to here that
23  identifies the additional risk that you believe
24  Dr. Cohen-Cole didn't model, the sentence that shows
25  that LaCour-Little is consistent with your assertion

35 (Pages 134 - 137)

1  that there's an additional risk that Dr. Cohen-Cole
2  didn't model?
3      A. I think I've done that.
4      Q. Which sentence was that?
5      A. I think that's the -- that's everything
6  I've pointed to so far. I think that the title, the
7  Hypothesis 2, the Hy- -- part of the Hypothesis 1. I
8  think that's something in the conclusion. I think
9  those are all consistent with the view that
10  Dr. Cohen-Cole is missing this additional risk.
11      Q. What in the tile of this article do you
12  believe Dr. Cohen-Cole should have taken into account
13  in his model?
14      A. Well, I think the fact that these loans
15  are called liar loans, and that when you have someone
16  who is potentially lying, that may matter.
17      And Dr. Cohen-Cole ignores the fact -- and
18  Sunshine is very clear on this, you know. And you
19  read Page 20 of my report, there's a long quote from
20  Sunshine where they say, look, if you have someone
21  who's taking out a loan and they're lying in the
22  process of taking out the loan, that is something
23  that is important for anyone who's evaluating the
24  value of any security based on that loan.
25      Q. If Mr. Butler had found that a borrower

1  lied about their income, Dr. Cohen-Cole would have
2  adjusted the income and the DTI ratio in his model.
3  Correct?
4      A. I'm sorry. Say again.
5      Q. If Mr. Butler had found that a borrower
6  lied about their income, Dr. Cohen-Cole would have
7  adjusted the income and the DTI ratio in his model.
8  Correct?
9      A. Well, for the deals where the DTI is taken
10  into account by Dr. Cohen-Cole. He completely
11  ignores it for some of the deals. But for those
12  deals where Mr. Butler adjusts the DTI,
13  Dr. Cohen-Cole does make an adjustment.
14      Now, the adjustment that he makes is
15  another problem. Right? Because he's adjusting it
16  in a way that, you know, is completely inconsistent
17  with anything in the academic literature. However,
18  that's -- that's -- that's a separate problem. He is
19  making an adjustment. I don't think it's the right
20  one, but he is making an adjustment.
21      Q. So if a borrower following the phenomenon
22  that LaCour-Little is sort of discussing -- if a
23  borrower uses a low-documentation product to lie
24  about their income, Dr. Cohen-Cole would take into
25  account the effect of that change on income.

1  Correct?
2      A. He would take into account the effect of
3  that change in income -- not in the right way, but he
4  would take it into account -- if it happens to be one
5  of the deals where DTI is in the prospectus
6  supplements, but he would have ignored the fact that
7  there's then evidence that the borrower is lying.
8  And I think that's potentially important evidence.
9  And he would also, you know, miss the fact that
10  underwriting guidelines are violated, which I think
11  is also potentially important.
12      Q. Do you believe that LaCour-Little
13  identifies any additional quantitative impact from
14  lying?
15      A. I think that's what Hypothesis 2 says. I
16  mean, look, if you look at Hypothesis 2 --
17      MR. CRAIG: Object to the form, by
18  the way.
19      A. I mean, again, they don't look at -- at --
20  they don't have the re-underwriting results
21  themselves. But what they say is that...
22      Let's look at Hypothesis 2 again.
23      "Low documentation combined with income
24  overstatement leads to a more pronounced default risk
25  increase."

1      That's their Hypothesis 2. I think
2  that's, again, consistent with the view that if you
3  have an error in the documentation, you know, there's
4  a problem with that, and that problem can go beyond
5  something that's easily fixed by, you know, a numeric
6  adjustment for a detail where Dr. Cohen-Cole adjusts
7  those.
8      Q. (BY MR. CAMPBELL) Are you aware of the
9  variable that LaCour-Little uses to model income
10  exaggeration?
11      A. I don't remember at this point.
12      Q. Okay. Would it surprise you if that
13  variable was the difference between a borrower's
14  inferred income and the median household income in
15  the area where that borrower lived?
16      A. I don't remember at this point. I'd
17  really need to read the paper closely at this point
18  to have a better sense of that. And their model
19  takes a while to read through. I have tried before,
20  so it -- it would take me a while.
21      Q. Could you take look at Page 550,
22  Footnote 17.
23      A. Yes.
24      Q. And that footnote says that their proxy
25  for income exaggeration is the ratio between the

36 (Pages 138 - 141)

1  inferred borrower income and the MSA median household
2  income. Right?
3      A. Okay. Yes, it does say that.
4      Q. So that's what LaCour-Little is using when
5  they say that there's an effect to, quote, income
6  exaggeration. Right?
7      A. I can only say -- I mean, I don't remember
8  the paper -- that detail of the paper well enough,
9  but that's what it -- that's consistent with what it
10  says in this sentence.
11      Q. So you don't have any other memory of how
12  LaCour-Little measures income exaggeration?
13      A. I don't. I'm sorry. It's a lengthy paper
14  and relatively technical, and I did not read it
15  straight before coming here.
16      Q. So do you have any reason to think that
17  Dr. Cohen-Cole's model, when he adjusts for changes
18  in income and DTI, doesn't take into account the
19  possibility of income exaggeration that LaCour-Little
20  is trying to measure?
21      A. I'm sorry. Can you say that again?
22      Q. Do you have any reason to think that
23  Dr. Cohen-Cole's model, when he changes income and
24  DTI, doesn't take into account the possibility of
25  income exaggeration that LaCour-Little is trying to

1  measure?
2      A. Yes.
3      Q. Why?
4      A. Well, because this is a different set of
5  variables that would capture something different than
6  the particular set of variables that Dr. Cohen-Cole
7  uses. And in general, given the Sunshine statement
8  and everything else, it's my prior that the defect
9  matters beyond the change in those particular
10  numbers. So if you have some other proxy for whether
11  defects occurred, that could capture something
12  additional.
13      Q. Doesn't Dr. Cohen-Cole, instead of using a
14  proxy, take the actual alleged exaggerations that
15  Dr. Butler found?
16      A. Yes. But he does not include whether or
17  not there was a defect, and, again, he's only
18  considering a small portion of the defects that
19  Mr. Butler found. And, you know, again, the way that
20  he applies these defects to those variables is also
21  very strange.
22      But so -- so -- so he's really doing it in
23  a very limited way. And anytime you add an
24  additional variable that could capture that defect,
25  that could potentially add additional information.

1      Q. How --
2      A. And here there's evidence that that could
3  matter, and that's why I say that, again, this is
4  consistent with my view that, you know, there's
5  additional information that Dr. Cohen-Cole should
6  have included. For instance, he could have included
7  the number of defects in his estimation.
8      Q. If Dr. Cohen-Cole takes into account the
9  actual exaggeration in income that Mr. Butler finds,
10  how is he not taking into account whether or not
11  there's a defect?
12      MR. CRAIG: Objection; asked and
13  answered.
14      THE WITNESS: I think I have
15  answered that one a couple of times already.
16      A. Yeah. I mean, that -- you know, if you
17  violate underwriting guidelines and you're lying,
18  that matters because I don't want to purchase a
19  security where -- which is backed by collateral where
20  the borrower lied on their form. That's something
21  that's important to me in choosing to purchase a
22  particular security.
23      And if the defect is because the
24  underwriter -- the originator was violating their own
25  underwriting guidelines, that's also a big problem.

1  That's a big problem. And just changing the number,
2  I have no evidence that that's sufficient. I have
3  some evidence that it's not sufficient, but I have no
4  evidence -- evidence that it is sufficient.
5      And -- no. And, again, the numbers that
6  Dr. Cohen-Cole bothers to adjust, those are only the
7  variables that he looks at. That's a small subset of
8  the defects that Dr. -- that Mr. Butler found
9  overall. And if you look at the way he applies those
10  defects, you know, by spreading them out over the
11  whole pool, that's really, again, inconsistent with
12  anything in the literature.
13      Q. (BY MR. CAMPBELL) Do you believe that
14  Dr. Cohen-Cole's model is insufficient because no
15  investor would ever buy a security that contained a
16  loan that had an underwriting guideline violation?
17      MR. CRAIG: Object to the form.
18      A. No. I believe his model is insufficient
19  for many, many reasons, and I know that investors did
20  buy securities that were based on loans that had
21  underwriting guideline violations. So for both those
22  reasons, no.
23      Q. (BY MR. CAMPBELL) Do you believe that
24  investors purchased mortgage-backed securities that
25  they knew had a chance of containing loans that

1 didn't comply with underwriting guidelines?
2          MR. CRAIG: Object to the form and
3 foundation.
4      A. So it's my understanding that the
5 scratch-and-dent issues that we've talked about at
6 length today included loans that were originated
7 potentially not in compliance with originating
8 guidelines. However, they were priced at a different
9 level, and certain investors chose to buy them and
10 other investors chose not to buy them.
11     Q. (BY MR. CAMPBELL) Do you believe that no
12 investor would have purchased a non-scratch-and-dent
13 mortgage-backed security if there was a single loan
14 in that pool with an underwriting guideline
15 violation?
16         MR. CRAIG: Object to the form,
17 foundation.
18     A. I think investors are ready to buy
19 securities at the right price. So I think
20 underwriting guidelines are really important to
21 investors, and, you know, they're part of the
22 definition, fundamental definition of the security,
23 and they relied on the investment banks when they
24 were buying them.
25         However, you know, after additional

1 information came out that some of these underwriting
2 guidelines were violated, you know, at the right
3 pli- -- price, I'm sure there are some investors that
4 will buy those securities regardless.
5         However, these things do impact price and
6 they impact the decision by particular investors to
7 purchase the security. And those may be investors
8 that are looking for, you know, high BBB securities
9 that rather AAA securities, which is -- which was
10 the -- the description of -- of the investors in --
11 in this particular case, for the most part.
12     Q. (BY MR. CAMPBELL) Are you aware of any
13 model that existed in 2005 to 2007 that would be used
14 by an investor to tell the price they should pay for
15 a loan -- for a mortgage-backed security based on the
16 number of loans in that security that didn't comply
17 with underwriting guidelines?
18         MR. CRAIG: Objection; asked and
19 answered.
20     A. So, you know, when you're talking about
21 the models that were available again, the models were
22 largely based on the cash flow models, and those had
23 different assumptions, a particular structure and a
24 particular rate of default.
25         And you could certainly apply any of these

1 sort of cash flow models to securities that did not
2 meet underwriting guidelines to securities where the
3 underlying loans did not meet underlying
4 guidelines -- underwriting guidelines. Sorry.
5 However, you needed to have that information to model
6 those properly.
7         (Exhibit 4 was marked.)
8     Q. (BY MR. CAMPBELL) Let me hand you what's
9 been marked as Wald Exhibit 4. And is this the
10 Mayer, Pence, and Sherlund article that you reference
11 in your report and that we've been discussing in your
12 testimony today?
13     A. Yes, it is.
14     Q. Can you show me the sentence or paragraphs
15 in this report -- in this article that support the
16 idea that there is a risk associated with the
17 violation of underwriting guidelines that
18 Dr. Cohen-Cole did not take into account?
19     A. So it's not specifically about
20 underwriting guidelines. But if you turn to Page 43
21 and you look at the paragraph about no- and
22 low-documentation loans -- let me just read through
23 this one more time to see what I can point to that is
24 most relevant here.
25         So I think what I'd like to read into the

1 record is where -- where they write, "No- and low-doc
2 loans were originally devised as a solution for
3 borrowers, such as self-employed workers, who have
4 income that is variable or difficult to document.
5 However, over time these loans may have provided a
6 mechanism for borrowers or lenders to mask the fact
7 that the borrowers might not have the resources to
8 repay the loans."
9         And then they go on to discuss the higher
10 rate of delinquencies associated with these loans.
11         So, again, this is not specifically --
12 they don't have the data here, and this is not a --
13 an analysis paper anyway. This is largely a survey
14 paper. And they don't have the data for, you know,
15 how many defects there were or what they were in
16 detail.
17         However, the point that they're making
18 here, I think, is consistent with the view that if
19 you have borrowers or lenders which mask the
20 resources, which are lying, then you're going to
21 high- -- get higher rates of default. I think this
22 is -- I think this sentence is consistent with that
23 view.
24     Q. Do you believe that Mayer and -- Pence?
25 Spence?

38 (Pages 146 - 149)

Page 150

1    A. Mayer, Pence, and Sherlund.
2    Q. -- Mayer, Pence, and Sherlund here are
3    suggesting that masking is in and of itself a cause
4    of default, or masking is the hypothesis for why
5    lower-documentation loans default at higher rate?
6    A. I would say that this masking which occurs
7    more frequently in no- or low-doc loans is associated
8    with a higher default rate, yeah.
9    Q. So you would agree that it's a hypothesis
10    for why there's this finding that lower-documentation
11    loans have a higher default rate?
12    A. I guess I'm -- I'm just -- I'm most
13    comfortable -- I'm not completely sure I'm
14    understanding what -- the distinction you're drawing.
15    I guess I would go back to what they say, which is
16    that over time these loans may have provided a
17    mechanism for borrowers or lenders to mask the fact
18    that the borrowers might not have the resources to
19    repay the loans.
20        And then they go on to say that these
21    types of loans had higher delinquencies. I think
22    that's -- that's all I'm trying to say.
23    Q. So to the extent that masking explains the
24    higher rates of defaults for low-documentation loans,
25    Dr. Cohen-Cole's model takes that into account by

Page 151

1    modeling documentation type. Right?
2    A. No.
3    Q. Why not?
4    A. Because Dr. Cohen-Cole makes the explicit
5    assumption that the only impact of a defect for those
6    defects that -- well, first of all, he, again,
7    ignores most of the defects, but laying that aside,
8    for the defects that he -- that happened to fit his
9    variables, the only impact of that defect is what's
10    captured in that particular variable. And I don't
11    think that's correct. I think what this paper, the
12    LaCour-Little and Yang paper, and Sunshine state -- 1
13    think their views are all consistent with the fact
14    that whether or not a borrower is lying matters, and
15    it matters to the default risk of the loan. And I
16    don't think anything that Dr. Cohen-Cole does
17    captures that.
18    Q. Is there an additional cause of default
19    identified in this paragraph that you pointed to me
20    here in this Mayer, Pence, and Sherlund article that
21    he didn't take into account?
22    A. Yes. What I'm saying is that he doesn't
23    take into account the fact that misstatements, in and
24    of themselves, may matter.
25    Q. Where in this paragraph does it say that?

Page 152

1    A. Well, I think that's what I get from what
2    he says about masking, and then in the next paragraph
3    where he says about the higher delinquencies. So if
4    they're masking, they're misstating their loan
5    characteristics. And, again, that's important to
6    mischaracterizations or these defects mattering,
7    other than just in the way that Dr. Cohen-Cole
8    captures it.
9        If you look at the paragraph above as
10    well, there they talk about manipulation of credit
11    scores, and they say, "Manipulation of
12    credit scores is hard to observe directly. Our best
13    evidence against credit score manipulation being a
14    major factor in the rise of defaults is indirect:
15    Sherlund (2008) reports that credit scores continue
16    to be an important factor in predicting defaults for
17    subprime loans, even for the most recent vintages
18    where credit score manipulation was reputedly more
19    widespread."
20        So, you know, here where they're talking
21    about manipulation of credit scores, or below where
22    they're talking about masking the resources, you
23    know, I think here they're characterizing these loans
24    as having some mischaracterization associated with
25    them.

Page 153

1        Again, I'm not saying that this exactly
2    shows that a mischaracterization has a particular
3    numerical impact on the risk of default. I'm saying
4    that the academic literature is consistent with the
5    view that these things matter, and that
6    Dr. Cohen-Cole should have captured it in his
7    analysis.
8        Besides the fact that, you know, again, he
9    ignores most of the defects, and that the way he
10    applies the defects to the variables in question is
11    completely outside anything I've seen in the
12    literature.
13    Q. Are you drawing a distinction between your
14    critique that Dr. Cohen-Cole doesn't take into
15    account certain findings, and your critique that
16    Dr. Cohen-Cole only takes on part of the impact of a
17    given misstatement? Are those two separate
18    critiques?
19    A. Yes, they are. They're in different
20    portions of the -- of my report. So one is on
21    Section 5.2. And the other is in Section -- the
22    earlier section, where we were talking about --
23    Q. 4.1.
24    A. 4.1. Thank you.
25    Q. So turning to 4.1, Paragraph 25, on

Page 154

1  Page 12 of your report.
2      A. Yes.
3      Q. So if -- if Dr. Cohen-Cole adjusted the
4  DTI of a borrower because Mr. Butler said that income
5  was misrepresented, are you saying that he missed
6  both the impact due to underwriter error for which
7  there's 1,331 findings, and he missed the impact of
8  excessive DTI, 597, or just one?
9      A. I would have to go back to the Butler
10  report to see exactly what -- under what times
11  excessive DTI also had to do with underwriter error.
12  But those could be two separate things. And so, I
13  mean, there's -- there's several points there. One
14  is that he could be missing the underwriter error.
15  In fact, he's always pretty much ignoring that
16  particular issue that Mr. Butler found.
17      And in the way that he's measuring
18  excessive DTI, he's only measuring one portion of
19  that. He's measuring the fact that there may be an
20  increase, but he's also missing the fact that that
21  increase may be due to, for instance, misstatement by
22  the borrower, or poor underwriting, or -- or what
23  have you, and he's missing that issue as well.
24      Q. So if Mr. Butler has identified an income
25  misstatement and that results in a DTI that violates

Page 155

1  guidelines, let's say it's a loan that had a
2  disclosed DTI of 40, the max guideline's 40,
3  Mr. Butler says, "Actually, it's 45."
4      A. Okay.
5      Q. Okay. You would agree that Dr. Cohen-Cole
6  would change the DTI from 40 to 45 if it's one of the
7  deals where he's modeling DTI. Right?
8      A. No. Actually, he doesn't do that. Right?
9  I mean, what he does is for the percentage of the
10  deal where it goes from 40 to 45, he spreads it
11  around. So let's say, you know, in a fifth of the
12  deal it went from 40 to 45. He would increase it by
13  1 percent for the whole deal. A very strange
14  procedure, but --
15      Q. But he would take into account that
16  increase from 40 to 45. You agree with that point?
17      A. I -- I would agree that he would take into
18  account incorrectly that numerical change in that
19  variable and that he would ignore the other aspect of
20  it, which is that there is a violation of
21  underwriting guidelines, which can be due to the
22  person lying or due to the originator just not
23  bothering to follow their own guideline.
24      Q. Right. So there is the additional risk
25  due to the violation of underwriting guidelines you

Page 156

1  just mentioned. And then is it also the case that
2  there is an additional error he's not including,
3  which is this underwriter error or negligence?
4      A. If Mr. Butler has that as a separate
5  point, then I would say yes. If there is -- but --
6  but then I'm really relying upon Mr. Butler.
7      (Discussion off the written
8  record.)
9      Q. (BY MR. CAMPBELL) So are you aware of any
10  literature that separates out the differences between
11  those three possible sets of risks that you just
12  described?
13      A. Other than the papers I've cited, which I
14  think have some relation to them, and the other paper
15  that's also relevant was the -- the Paley and
16  Tzioumis paper is also, I think, relevant to this
17  issue.
18      But, I mean, for the most detailed fact,
19  the -- the -- the -- the portion of this that
20  really -- the thing that most addresses -- most
21  directly addresses this is, you know, Sunshine's
22  report because Sunshine talks about how this is
23  really important. And Butler's report also talks
24  about how each of these is important, so that's, I
25  think, the most direct. As I said before, the

Page 157

1  academic literature here, they don't have access to
2  the sort of data that's, you know, available in -- in
3  this litigation.
4      Q. So you would agree that the Butler report
5  and the Sunshine report more directly support your
6  opinions than the academic literature you cite?
7      A. No, I wouldn't put it that way. I would
8  say that the academic literature supports my
9  opinions, but that the Butler and Sunshine reports
10  are more directly relevant. But I think it all
11  supports my opinion.
12      Q. What, in your mind, is the difference in
13  the increase in risk due to the violation of an
14  underwriting guideline versus the increase in risk
15  due to underwriter error?
16      A. Can you repeat the question, please?
17      Q. What, in your mind, is the difference
18  between the increase in risk due to the violation of
19  an underwriting guideline versus the increase in risk
20  due to an underwriter error?
21      MR. CRAIG: Object to the form.
22      A. So I'm not sure how you're distinguishing
23  between the two, and I'm not sure what types of risks
24  you're talking about here. So there is lots of
25  different types of risk associated with purchasing

40 (Pages 154 - 157)

1    these securities. There is default risk, there is
2    liquidity risk, there is prepayment risk. All those
3    things matter to investors. There's, you know, an
4    error that could then lead to a guideline violation.
5    I'm just not sure how you're distinguishing between
6    those.
7        Q. So when we were talking about default
8    risk, default risk of an individual loan --
9        A. Okay.
10       Q. -- you suggested that there was a
11   difference in the increase, if there was a DTI
12   misstatement and an underwriting guideline violation.
13   There was one component of increased default risk due
14   to the increase from DTI, one component of increase
15   of default risk from the violation of an underwriting
16   guideline, and another increase in default risk due
17   to underwriter error?
18       MR. CRAIG: Object to the form,
19   misstates his testimony.
20       A. I don't think that's exactly what I said.
21       Q. So in your view then is it the case that
22   there is only one additional measure of risk besides
23   the numerical change from -- in DTI when there's a
24   DTI misstatement?
25       MR. CRAIG: Object to the form.

1        A. No. I think I've answered this already.
2    I think what I said was that if you have a particular
3    error in DTI, it can be also associated with a
4    violation of underwriting guideline. And if in a
5    particular -- and, again, I'm not an underwriter.
6    Right? So when we're talking about underwriting
7    guideline violations, I'm really relying upon
8    Mr. Butler, who then says in this case this may be
9    due to underwriter error or negligence, and these are
10   the particular findings that he points to.
11           And then there may be some -- an issue
12   associated with the DTI itself. And then there may
13   be the fact that the DTI -- that the way
14   Dr. Cohen-Cole captures the change in DTI is really
15   limited. Right? So he only captures -- for those
16   cases where he even bothers to look at DTI. There is
17   a whole bunch where he doesn't bother to look at DTI.
18           So for the ones where he looks at DTI, he
19   only captures the numerical change. He doesn't
20   capture the fact that this change may be due to
21   something that's also important.
22       Q. (BY MR. CAMPBELL) Now, going back to
23   Page 20 of your report, Paragraph 42.
24       A. Got it.
25       THE WITNESS: Maybe we could do

1    lunch soon?
2        MR. CAMPBELL: Let me just
3    finish on this paragraph.
4        Q. (BY MR. CAMPBELL) In the last sentence of
5    Paragraph 42 is where you cite the Mayer, Pence, and
6    Sherlund article and the LaCour-Little and Yang
7    article. Right?
8        A. That's correct.
9        Q. And that footnote is to a sentence that
10   says, "This assumption is not consistent with the
11   literature, which typically considers that loans
12   where either the borrower or the underwriter lied or
13   was sloppy are significantly more likely to default
14   than other loans." Right?
15       A. Yes.
16       Q. You mention that that's the literature
17   statement. Is that also your personal opinion, or
18   your expert opinion in this case, I should say?
19       A. My expert opinion in this case is that
20   Dr. Cohen-Cole could have and should have tested
21   this, but he does not. And I don't think I have an
22   expert opinion beyond what Sunshine and this
23   literature gives.
24       Q. You don't have an expert opinion on the
25   question of whether or not a loan where the borrower

1    or the underwriter lied or were sloppy is
2    significantly more likely to default than another
3    loan?
4        A. I --
5        MR. CRAIG: Objection to form.
6        A. I think my -- you know, my expert opinion
7    is that Dr. Cohen-Cole should have tested this and --
8    and that when this literature and Sunshine and Butler
9    say things that make me think that these loans are
10   more likely to default, then they are, in fact, more
11   likely to default.
12           However, I have no, you know, underwriting
13   expertise upon which to rely on. That is not my
14   expertise. I'm here as an economist and I'm here as
15   someone who's worked with investors, not as someone
16   who ex- -- who specializes in underwriting.
17       MR. CAMPBELL: We can take lunch
18   now.
19       THE VIDEOGRAPHER: Going off the
20   record. The time is 1:16.
21           (Break.)
22       THE VIDEOGRAPHER: Back on the
23   record. This marks the beginning of Disk No. 3.
24   The time is 2:13.
25       Q. (BY MR. CAMPBELL) Dr. Wald, I'd like to

41 (Pages 158 - 161)

1 talk about the portion of your opinion where you talk
2 about clean loans, which is 5.1 of your report. If
3 you could flip to that section, please.
4      A. Yes.
5      Q. In Paragraph 38 of this section, you say,
6 "Dr. Cohen-Cole's use in his model of loans from
7 other securitizations that have been subject to
8 similar litigation indisputably undercuts the
9 conclusions that Dr. Cohen-Cole drew based on these
10 potentially-tainted (and certainly not shown to have
11 been untainted) loans."
12      Right?
13      A. Yes. And if I may, I can even extend that
14 a little bit because I checked recently, and there's
15 also a number of scratch-and-dent deals that
16 Dr. Cohen-Cole included in the ABSNet data that he
17 used for his model estimation. So, again, this is
18 deals that clearly do not have the same
19 characteristics.
20      And let me just explain a little bit about
21 why this is so important. Because if you have a
22 model that's estimated on data where the
23 characteristics don't -- the described
24 characteristics don't match the actual
25 characteristics -- so the LTV is misstated or the DTI

1 is misstated or what have you -- and you estimate
2 defects based upon that, you're going to have what's
3 known as a measurement error.
4      And the measurement error on the
5 right-hand side in the analysis is going to imply
6 that the coefficients that Dr. Cohen-Cole estimates
7 will be biased towards zero. They'll be inconsistent
8 and biased towards zero, so that the estimated
9 coefficients he gets in his model are going to be too
10 small relative to the true impact of these values.
11      Then, when he goes to his second stage and
12 he looks at how much the defects are going to affect
13 the Plaintiff's Claims Scenario, he's going
14 understate the impact of the defects because the
15 coefficients are going to be too small.
16      Q. So you are suggesting that there is an
17 impact both in the first stage of Dr. Cohen-Cole's
18 analysis that involves his calibration set and then a
19 second issue when he compares the Plaintiff's Claims
20 Scenarios to the Disclosed Risk Scenario?
21      A. So I would say that the problem -- I
22 wouldn't call -- I wouldn't use the word
23 "calibration." I would use the word "estimation."
24      So I would say that there's a problem with
25 the way -- that using this data, you don't get the

1 correct estimates in the first portion of the
2 analysis. They're biased and inconsistent, "biased"
3 meaning that their expected values are not equal to
4 the correct expected values and "inconsistent"
5 meaning that, regardless of how big a data set you
6 get, they're not going to get closer to the true
7 values. And they're specifically biased towards
8 zero.
9      And so you get the wrong model in the
10 first stage. And then, when he goes to a second
11 stage to see how much these defects matter, the fact
12 that you have these biased, inconsistent estimate --
13 estimates means that the impact of the defect is
14 smaller than it should be.
15      Q. Do you have any basis to believe that the
16 allegations in the litigation involving this 225
17 securitizations that you identify in your report are
18 true?
19      A. No. I don't know anything about any of
20 those litigations. But I do know that, you know,
21 Judge Cote in her ruling says basically that there's
22 enough problems with these loans that they don't make
23 a clean sample, and, you know, having checked and
24 seen that there are scratch-and-dent deals included
25 in Dr. Cohen-Cole's data, then I know that some of

1 the data does have misstatements and does not create
2 a clean sample and does cause measurement error in
3 that estimation.
4      Q. So you don't believe that Judge Cote's
5 ruling covers any of the 225 securitizations that you
6 identified, does it?
7      A. Hold on. Let me just look at what Judge
8 Cote says because I don't want to misquote her.
9      What she says is that "Excluding loans" --
10 and this is the last sentence from the portion that I
11 included -- "Excluding loans that have been the
12 subject of lawsuits may be a good start for creating
13 a clean benchmark, but it does little to ensure the
14 quality of the loans remaining in the group."
15      So, I mean, what she's saying is that even
16 if you exclude loans where there is litigation, even
17 that's not sufficient. And what I'm saying is, well,
18 look, first of all, he didn't exclude loans where
19 there was litigation. And, second of all, he doesn't
20 even exclude loans which were in scratch-and-dent
21 deals and which therefore had, according to the
22 banks, potential violations of underwriting
23 guidelines. And, again, this creates a measurement
24 error bias.
25      Q. Are you aware whether or not the opinion

42 (Pages 162 - 165)

1  that you cite from Judge Cote in Footnote 44 concerns
2  materiality?
3      A.  No.  I -- I'm -- I'm not a lawyer.  This
4  is -- I'm using this in terms of its economic and
5  factual content.
6          And in terms of the economic and factual
7  content, I think the issue of creating a clean
8  benchmark, that's something that she gets
9  right here, and that's why I cite it.  And I think
10 that's -- that's a sort of a basic point of any good
11 analysis, is that you want a clean benchmark if
12 you're going to see the impact of something like, you
13 know, an additional defect.
14     Q.  But you have no reason to believe that the
15 loans that Dr. Cohen-Cole uses are not clean, do you?
16     A.  Actually, I have lots of reasons.  So
17 besides the fact that 225 of -- of them are subject
18 to litigation in other cases and besides Dr. --
19 besides Judge Cote's statement that she doesn't think
20 that they're a good, clean sample, I have examples of
21 scratch-and-dent deals.  And, in particular, there
22 were three scratch-and-dent deals listed in
23 Footnote 72 from the Sunshine report, and we checked
24 whether those deals are included in the ABSNet data
25 that Dr. Cohen-Cole uses, and -- and they are.  And

1  he doesn't bother excluding those.
2          So we know that in the data that he's
3  using to estimate his Cox proportional hazard model,
4  there's -- there -- there are deals where there are
5  violations of underwriting guidelines.  And, again,
6  this implies that there's measurement error, known
7  measurement error, and this implies, again, that the
8  coefficients are going to be biased towards zero in
9  his estimation.
10     Q.  Does the fact that the 225 securitizations
11 are subject to litigation tell you anything about
12 whether or not these loans are clean?
13     A.  It suggests that they're not clean.
14 However, there are other reasons to believe that
15 there are unclean -- there are loans which are not,
16 you know, properly underwritten and have no
17 measurement error in that data set.
18     Q.  How does the fact that 225 securitizations
19 are subject to litigation suggest that they're not
20 clean?
21     A.  Well, if someone is bothering to litigate
22 on those issues, that suggests that -- and if those
23 litigations are at all related to the one here about
24 underwriting guidelines, that, again, suggests that
25 there may be factual misstatements in how some of

1  these variables are coded in the ABSNet data.
2      Q.  Does the mere fact that a purchaser of a
3  mortgage-backed security has brought litigation
4  suggest to you that that mortgage-backed security had
5  underwriting guideline violations?
6      A.  No.  There might have been a number of
7  different reasons.  However, given the litigation
8  that has occurred around this time period, I also
9  have reason to believe that it may involve that.  And
10 certainly Judge Cote had reason to believe that,
11 given her statement here.
12     Q.  Was Judge Cote talking about the 225
13 securitizations you reference here?
14     A.  No.  She was talking about the fact that
15 all the loans, in fact, during this time period have
16 this potential problem.
17          I mean, let me read this first clause
18 again.
19     Q.  No.  You --
20     A.  "Excluding loans that have been the
21 subject of losses may be a good start for creating a
22 clean benchmark, but it does little to ensure the
23 quality of the loans remaining in the group."
24          I don't think you can be more explicit
25 than that.

1      Q.  Do you know whether or not there was any
2  factual basis in the case that you were quoting from
3  to say anything about the 225 securitizations you're
4  referring to in your report?
5      A.  I know almost nothing about that case in
6  particular.  I read this particular opinion by Judge
7  Cote, and the only thing that I thought was relevant
8  was this portion, which I think is very relevant.
9      Q.  Did you read any other opinions from that
10 case?
11     A.  I did not.
12     Q.  Did you read any other opinions written by
13 any other judge in these cases?
14     A.  Not that I can recall.
15     Q.  Have you read any other opinion by any
16 other judge in any other case regarding materiality?
17     A.  I think I cite something about materiality
18 here at the beginning.  So let's see.
19          When I talk about materiality, there's
20 this portion here where there's a footnote, and I
21 think in that footnote some portion of it is from
22 some other case.
23     Q.  Do you believe that the fact that these
24 225 securitizations are subject to litigation
25 suggests they might not be clean because allegations

43 (Pages 166 - 169)

Page 170

1  in lawsuits are necessarily true?
2      A. No.
3      Q. Are you aware about whether or not the
4  litigation involving these 225 securitizations is
5  ongoing or has concluded?
6      A. I don't know.
7      Q. Are you aware about whether any factual
8  finding has been made about the underwriting
9  guideline compliance of the loans in those 225
10 securitizations?
11     A. No. That's not the point I'm making at
12 all. The point I'm making is that there's good
13 reason to believe that there's potential misstatement
14 in some of the data. The reasons for that
15 misstatement include the litigation around it. I
16 think that's -- suggests that there may be
17 misstatements. It includes this statement by Judge
18 Cote, and it includes the fact that Dr. Cohen-Cole
19 included these scratch-and-dent deals, which the
20 investment -- the underwriting investment banks
21 themselves said did not meet underwriting guidelines.
22     So those are all good reasons to think
23 that, in fact, this is not a good, clean data set on
24 which to run this particular estimation.
25     Q. Have you identified in your report these

Page 171

1  scratch-and-dent loans that you're referring to that
2  Dr. Cohen-Cole allegedly included in his model?
3      A. No. Those are in, as I mentioned, the --
4  I think we looked at four deals. Three of them are
5  from Footnote 72 of Sunshine, and the other one I
6  just found using Google search.
7      Q. So four deals, to your knowledge, are
8  scratch and dent?
9      A. There -- we've only looked at four deals,
10 and those were all so far in the data. So I don't
11 know how many scratch-and-dent deals were done. I
12 don't know, you know, how large a proportion of the
13 data set that is. However, the fact that
14 Dr. Cohen-Cole makes no effort to produce a clean
15 data set without measurement error is, I think, a
16 significant problem.
17     Q. Why do you believe that the burden is on
18 Dr. Cohen-Cole to prove that all of his loans are
19 clean?
20         MR. CRAIG: Object to the form.
21     A. I'm not sure that I believe that it's up
22 to him. But I think it's sensible, whenever you do
23 any sort of econometric estimation, to think about
24 what the data set is made up of and if there is
25 significant measurement error in that data.

Page 172

1      And here there's clearly a significant
2  measurement error in that data. And, moreover,
3  Dr. Cohen-Cole himself, you know, tried to exclude
4  some deals that were the subject of litigation
5  because he thought it was a problem as well in his
6  report. It's just he missed a lot of deals, and
7  Judge Cote says it's not sufficient, and he doesn't
8  even bother removing scratch-and-dent deals.
9      So I think there's lots of reasons again
10 to believe that there's measurement error. The bias
11 is a coefficient towards zero and, therefore,
12 understates the impact of the defects when he's doing
13 that portion of the analysis.
14     Q. (BY MR. CAMPBELL) Are you aware whether
15 or not Dr. Cohen-Cole excludes any deals from his
16 analysis other than the ones that are actually the
17 subject of this lawsuit and the other lawsuits
18 brought by the NCUA?
19     A. If you have his report, we can take a look
20 at that and see what -- what exactly -- I don't
21 recall exactly what he states, to which deals he
22 excludes and which ones he does not.
23     Q. Did you attempt to quantify the impact of
24 possibly removing the 225 securitizations subject to
25 litigation from Dr. Cohen-Cole's model?

Page 173

1      A. No. I don't think that would have been
2  sufficient. I mean, given Judge Cote's decision and
3  given these scratch and dents, I think -- I don't
4  know how to put together the right data set for this
5  particular analysis, and I don't think that was, you
6  know, my job here.
7      I was not here to, you know, fix this
8  model. I didn't think it was fixable. I don't think
9  he's running the right estimation procedure. I don't
10 think he's -- you know, there's so many problems
11 along the way of what he's doing. So, no, I didn't
12 try and quantify that.
13     But the other thing to mention is that the
14 problem of measurement error and the fact that it
15 biases your coefficients towards zero, that's really
16 well known. That's in any econometric textbook.
17 And, you know, you can check Greene or Wooldridge,
18 and they'll say that, you know, if you have
19 significant measurement error, that's going to bias
20 your coefficients towards zero.
21     Q. So you just said that it wouldn't have
22 been sufficient to just remove the 225
23 securitizations. What else would have to have been
24 done to make Dr. Cohen-Cole's use of the ABSNet data
25 that he used acceptable in your mind?

44 (Pages 170 - 173)

Page 174

1    MR. CRAIG: Objection; asked and
2 answered.
3    A. I -- I can't answer that. I mean, he has
4 lots of problems with -- with his model. Right? He
5 has -- he's asking the wrong question. He's
6 estimating a model that doesn't include the right
7 variables. He's not using a good data set. His --
8 large aspects of his simulation don't make sense.
9 The way he interprets his results don't make sense.
10 You know, it's hard to know where to start.
11    Q. (BY MR. CAMPBELL) I just want to focus on
12 the effects to the -- removing the 225
13 securitizations separate and apart from whether or
14 not he's asking the wrong question, in your opinion,
15 or using the right variables.
16    What else would he have had to do besides
17 removing 225 securitizations to address this issue
18 that you're raising here about whether or not he used
19 a clean set of loans to estimate loan performance?
20    A. Well, I mean, what he could have done, I
21 guess, is he could have looked at -- I mean, again,
22 this is not what, you know, I was asked to opine
23 upon. But if you want an opinion, if he had a set of
24 loans that was issued during the comparable time
25 period and which they had checked the re-underwriting

Page 175

1 and made sure that there were no defects, then you
2 could estimate a consistent, unbiased model from -- I
3 mean, hopefully you'd use one of the better
4 specifications than Dr. Cohen-Cole used, but you
5 could -- you know, again, ignoring all the other
6 problems, you could estimate a reasonable model.
7    Q. So do you believe that you would need to
8 re-underwrite every loan in your data set before you
9 could offer a reliable model of underwriting
10 guideline compliance's impact on the expectation of
11 default?
12    A. Well, I mean, in this case Dr. Cohen-Cole
13 had a data set. It wasn't a tremendously large data
14 set, but he has, you know, a hundred from each deal,
15 or thereabouts, where there -- there -- there is
16 re-underwriting going on. And he could have used the
17 ones without defects and estimated a model from
18 those.
19    Q. The data set that you're referring to is
20 Butler's re-underwriting results. Right?
21    A. That's correct.
22    Q. That wouldn't have been available to an
23 investor in 2005 to 2007. Right?
24    A. Right. But, you know, for the most part,
25 investors did not run this type of analysis, and

Page 176

1 certainly this type of investor did not run this type
2 of analysis when making purchasing decisions because
3 investors, as Dr. Cohen-Cole says, did not have the
4 details on the -- on the loans in these
5 securitizations. This was not the type of analysis
6 that they were doing.
7    And in terms of, you know, what
8 information investors had in 2005, they have to rely
9 on the investment banks, but even in relying on the
10 investment banks, if they want to put together any
11 sort of analysis, they're going to analyze deals
12 which they believe are properly underwritten relative
13 to other properly underwritten deals, and they're
14 going to analyze scratch-and-dent deals relative to
15 other scratch-and-dent deals.
16    And here, you know, because he's trying to
17 estimate something that should apply to properly
18 underwritten deals, but he's also including
19 scratch-and-dent deals, you're getting coefficients
20 that are biased towards zero and, again, you're --
21 that's causing a bias in -- in -- in your final
22 result.
23    Q. And you didn't test the impact of those
24 four scratch-and-dent deals on Dr. Cohen-Cole's
25 results, did you?

Page 177

1    A. No. And I didn't for, you know, the
2 reasons that I've already stated. First of all, you
3 know, it's not part of my job to redo his model. His
4 model is not something that I want to try and attempt
5 to redo in this way because there is so many problems
6 with it. And I don't want to, you know, create a
7 model that uses some proportion of incorrect data and
8 try and -- and because I'm -- I'm nervous that that
9 would give the impression that you could do this, and
10 you should not be doing this. This is not good
11 methodology.
12    Q. Are you aware of any investor in
13 mortgage-backed securities in the 2005 to 2007 time
14 frame excluding deals that they thought might be
15 subject to litigation or might have underwriting
16 guideline compliance issues from their modeling of
17 loan performance?
18    MR. CRAIG: Object to the form.
19    A. You know, I think of investors at that
20 time of trying to compare securities against similar
21 securities, and I think of them as avoiding
22 securities where there was the possibility that the
23 deal was not properly underwritten, and yet it --
24 they claim that it was underwritten properly. I
25 think that's -- that did occur.

45 (Pages 174 - 177)

Page 178

1    Q. (BY MR. CAMPBELL) When investors in
2  mortgage-backed securities in 2005 to 2007, if they
3  did conduct the type of scenario analysis that you
4  state they did conduct, did that analysis rely in any
5  way on the past performance of other mortgage-backed
6  securities?
7    A. Yes. They may have looked at the past
8  performance of other securities. I mean, one of my
9  critiques of Dr. Cohen-Cole is that he looks at a
10  very short time period for looking at what default
11  rates -- for looking at the data. So he's looking at
12  January '98 until the beginning of the trust.
13      And if you're going to do a scenario
14  analysis and you're going to consider something about
15  defaults, I think it's reasonable for investors, in
16  particular AAA investors who care a lot about
17  low-probability events, to look at a longer time
18  series, to go back to some time period where defaults
19  were higher.
20    Q. Are you aware of any investor in
21  mortgage-backed securities in 2005 to 2007 removing
22  individual securities from the -- the universe of
23  past performance that they were looking at because
24  they thought that security included
25  misrepresentations or a violation of underwriting

Page 179

1  guidelines?
2    A. No. I can't point at a particular
3  investor doing exactly that. But I think when you
4  look at the market for scratch and dents relative to
5  the market for these securities which were supposed
6  to be properly underwritten, you see that they're
7  priced differently and they're structured
8  differently. And that implies to me that investors
9  are expecting a different level of performance from
10  the underlying loans.
11    Q. If a mortgage -- if an investor in
12  mortgage-backed securities in 2005 to 2007 was using
13  a model that included the past performance of other
14  mortgage-backed securities, are you aware of an
15  investor who would remove scratch-and-dent loans from
16  the universe of past performance that they were
17  examining?
18    A. You know, I was not that active in the
19  market at this time, so I can't point to a particular
20  investor. But I think when you compare different
21  types of mortgage securities, you need to compare
22  apples to apples and not apples to oranges.
23    Q. When an investor is conducting the type of
24  scenario analysis you discussed before, are there
25  assumptions embedded into the types of models that

Page 180

1  investors use that in some way rely on the past
2  performance of a universe of mortgage-backed
3  securities?
4    A. I think --
5      MR. CRAIG: Object to form.
6    A. I -- I think investors consider past
7  performance of loans when they're trying to think
8  about how their loans might perform, but I think -- I
9  think of that in relatively broad terms. Right? So
10  particularly when you're looking at a security that's
11  relatively new to the marketplace.
12      So if you think about securities with a
13  shorter time history, you still want to make sure
14  that you've -- you're capturing potential
15  macroeconomic events that may not have happened in
16  the last two years. I don't think it's reasonable to
17  think that just because housing prices have gone up
18  in the last two years, they're going to continue to
19  do so in the future. If you're a AAA investor and
20  you're worried about small-probability events, you
21  want to think about what kind of economic scenarios
22  have occurred over a much longer time period.
23    Q. (BY MR. CAMPBELL) Do you believe that
24  every investor in mortgage-backed securities in 2005
25  to 2007, when investing in non-scratch-and-dent

Page 181

1  loans, always used tools and models that entirely
2  excluded in any way a scratch-and-dent loan or a
3  scratch-and-dent offering?
4    A. I can't make statements about all
5  investors at that period, certainly. That's way too
6  broad a statement. And I'm sure you could find
7  someone who did something different. I'm trying to,
8  you know, convey a sense of what I thought reasonable
9  investors did at the time.
10    Q. Are you aware of any investor in
11  mortgage-backed securities between 2005 and 2007 who
12  intentionally excluded any scratch-and-dent loans or
13  scratch-and-dent offerings from any -- having any
14  role in their models or analysis?
15      MR. CRAIG: Objection to form.
16    A. So, again, I was not actively -- active in
17  the markets at this point in time. However, you
18  know, I know what the standard is for care when
19  you're doing this type of analysis. And if you're
20  running a model where there are things which are
21  wildly different than what you're comparing, and if
22  you're running a model where you have significant
23  measurement error, then you're not going to get
24  results that are sensible. And that's why I think
25  that these results are also not sensible.

46 (Pages 178 - 181)

Page 182

1    And excluding scratch and dents from a
2    model where you're looking at properly underwritten
3    securities, that's a standard of care that -- that is
4    well within what I would expect from an investor in
5    that time period. However, I can't -- as I said, I
6    wasn't active in the market, and I can't point to
7    individual investments -- investors at that time.
8        Q. (BY MR. CAMPBELL) Do you remember the
9    names of the scratch-and-dent offerings that you
10   believe Dr. Cohen-Cole included in his model?
11       A. If you look at Sunshine, Footnote 72,
12   they're listed there.
13       Q. And was there an additional one that you
14   had found, you said?
15       A. Yes. And I don't remember the name.
16       Q. Do you remember the issuer or the
17   underwriter?
18       A. It was a Bear Stearns issue, but I don't
19   remember anything else about it.
20       Q. Do you remember the number of loans
21   involved in those four scratch-and-dent offerings?
22       A. I don't. And I suspect that there are
23   other scratch-and-dent deals out there that are also
24   included in the ABSNet data. However, again, I don't
25   have -- you know, that's -- that's -- my role is not

Page 183

1    to find all these possible scratch-and-dent deals,
2    and that was -- that was not the idea here. The idea
3    here was to see whether, in fact, Dr. Cohen-Cole had
4    bothered to remove scratch-and-dent deals from his
5    data set. And I found no evidence that he did. All
6    the loans -- all the scratch and dents that I
7    happened to look at were in his data.
8        Q. So you don't have any knowledge, sitting
9    here right now, of the proportion of the total ABSNet
10   database that Ethan Cohen-Cole was using that was
11   these four scratch-and-dent loans -- offerings?
12       A. I -- I mean, more relevantly I can't tell
13   you what proportion of ABSNet data includes scratch
14   and -- scratch-and-dent loan deals in general. No,
15   I -- I -- I can't answer that without the data.
16       However, measurement error is a problem.
17   And, you know, that's one of several issues. Another
18   issue is this -- deals found in litigation. Another
19   issue is that Judge Cote's opinion that, you know,
20   all the -- of the deals from this time period are
21   suspect.
22       Q. Did you first read Judge Cote's opinion in
23   connection with this litigation?
24       A. Yes.
25       Q. Before this litigation, were you aware of

Page 184

1    any su- -- any research or publication that supported
2    the idea that you would need to certify that your
3    entire loan database is clean before you used it to
4    model future loan performance?
5        A. That was not a question that I was
6    addressing prior to this litigation. However, the
7    general issue of avoiding measurement error and
8    having a clean data set, those are issues that, you
9    know, everyone learns from graduate school on, and
10   that I teach to my Ph.D. students.
11       Q. Are you saying that you teach to your
12   Ph.D. students that before modeling the performance
13   of any loan they need to certify that it was
14   underwritten in accordance with underwriting
15   guidelines?
16       A. No. I'm saying that if you want to do an
17   analysis, you have to be careful about measurement
18   error, and you have to be careful that you have a
19   clean data set. If you have a treatment effect, and
20   you're testing the impact of that treatment effect,
21   however the clean -- supposedly clean data that
22   you're using is already treated in some random
23   fashion, you're not going to properly estimate the
24   result of the treatment. You're going to understate
25   the result of that treatment. And that's basic

Page 185

1    econometric methodology.
2        Q. Could you explain what you mean by
3    "treatment effect"?
4        A. Yeah. So in this case the treatment that
5    you're thinking -- I'm thinking of is a defect. But
6    you can think about treatments for lots of different
7    types of experiments. If you're looking at a medical
8    experiment, you're giving someone some medicine.
9    That's the treatment. So a lot of this originally
10   dates from, you know, the medical literature.
11       But you can think about policy
12   experiments, where some people are subject to a law
13   and other people are not. Again, you need a clean
14   control group if you want to properly estimate the
15   impact of a treatment.
16       Q. Do you believe that any attempt to model
17   the impact of an underwriting guideline violation is
18   fundamentally flawed if it doesn't involve a
19   certification of which loans are in accordance with
20   underwriting guidelines and which ones are not in
21   accordance with underwriting guidelines?
22       MR. CRAIG: Object to form.
23       A. That question is so broad it's just very
24   hard for me to answer.
25       Q. (BY MR. CAMPBELL) Are there any

47 (Pages 182 - 185)

1  circumstances under which not excluding loans that
2  are subject to litigation or that you otherwise might
3  have doubts about would be acceptable?
4      A. I'm not sure. Again, it's -- you're --
5  you're asking really broad questions about what kind
6  of analyses I could think of, and I just don't know.
7  There's lots of different types of analyses out
8  there. I just don't know. I can opine about this
9  particular analysis, and I thought -- think I've done
10 that.
11      But, you know, can I think of some other
12 analysis? You know, maybe.
13     Q. You're aware that LaCour and Little don't
14 certify whether or not any loans in -- in their
15 samples are clean. Right?
16     A. That's correct.
17     Q. You're aware that the Mayer, Pence, and
18 Sherlund article doesn't certify whether or not any
19 of the loans in that study were clean either. Right?
20     A. That's correct. But they're addressing
21 different questions.
22     Q. And they're both purporting to establish
23 something about the relationship between underwriting
24 guidelines and performance. Is that right?
25     A. No.

1      Q. Okay. Why is it that you don't have a
2  problem with the fact that LaCour and Mayer do not
3  remove nonclean loans from their samples?
4      A. They're not asking the question here that
5  Dr. Cohen-Cole is asking. Right? That's not the --
6  the -- that's not the variable of interest to them.
7  They're not saying how big an impact does a defect
8  have upon the probability of default. But that's
9  exactly the question that Dr. Cohen-Cole is asking.
10 So for Dr. Cohen-Cole, it's particularly important
11 that he has a -- a sample which is clean with respect
12 to that variable.
13     Look, some measurement happens all the --
14 measurement error happens all the time. That's, you
15 know, part of any sort of analysis. However, if you
16 knowingly don't bother creating -- don't bother
17 creating a clean sample, you're going to get
18 significant measurement error. And in this case it's
19 going to be on those variables where the defects
20 occur, and then in the second stage of his analysis
21 Dr. Cohen-Cole is going to wind up with a biased,
22 too-small estimate of the impact of these defects.
23     Q. If Dr. Cohen-Cole removed the -- for
24 example, the 225 securitizations subject to
25 litigation, that would have an impact on both his

1  Disclosed Risk Scenario and his Plaintiff's Claims
2  Scenario. Right?
3      A. Yes.
4      Q. And those would both shift in the same
5  direction. Right?
6      A. Yes. However, I would expect the impact
7  would be larger for the Plaintiff's Claims Scenario
8  for a couple reasons. First, the way he constructs
9  his Disclosed Risks Scenario, he can have increases
10 or decreases in these variables, whereas the
11 Plaintiff's Claims Scenario, the defects all are --
12 you know, move in the direction of greater default
13 risk.
14     And the second issue is that the
15 Plaintiff's -- the Disclosed Risks Scenario is drawn
16 from a relatively small range on the prospectus
17 supplement. Another issue, of course, is that he's
18 drawing from the uniform distribution and -- and all
19 that stuff. We can go into that later. However,
20 it's drawn from this small range.
21     For the Plaintiff's Claims Scenario, the
22 size of the defects can be much larger than that
23 range. So I expect that the impact is going to --
24 the impact of having too small a coefficient on the
25 Cox proportional hazard parameters is going to be

1  larger for the Plaintiff's Claims Scenario than the
2  Disclosed Risks Scenario.
3      And so I think in terms of the direction
4  of the result, I think he's likely to miss -- you
5  know, the fact that he's asking the wrong question
6  aside, even with this asking the wrong question, this
7  is something that makes me think that he's missing
8  the true impact of the defects, which is, I believe,
9  understated in his analysis.
10     Q. So when you say that the -- removing these
11 subject-to-litigation securitizations will result in
12 too small of a coefficient, why do you use the phrase
13 "too small"? What do you mean by that?
14     A. I'm sorry. So whenever you have -- I'm
15 not sure exactly what you're reading off of there.
16 But whenever you have this measurement error, which
17 is associated with these 225 securitizations --
18 securitizations subject to litigation, whenever you
19 have this measurement error due to having an unclean
20 sample, whether it's due to scratch and dents or the
21 fact that in general this is not a clean benchmark,
22 whenever you have measurement error, that biases your
23 estimated coefficients towards zero.
24     Q. What I'm trying to get at is removing the
25 securitizations. So removing the bias.

Page 190

1    A. Okay. So I'm not sure how -- so you're
2  going to -- how are you proposing to do that?
3    Q. You exclude the 225 securitizations from
4  the ABSNet database that Dr. Cohen-Cole uses. How
5  would you expect that to change his results?
6    A. Okay. So if you exclude these 225, and
7  you exclude any other deals that you think are --
8  have measurement error and the scratch and dents and
9  so on, I would expect to get larger coefficients in
10  the Cox proportional hazard model for the
11  coefficients of in- -- interest. And by "larger," I
12  mean larger in terms of absolute value; further away
13  from zero.
14       And, again, you want to think about it
15  from this point of view. If you have larger
16  coefficients, then when you add the defect in, it's
17  going to increase the expected probability of
18  default, and therefore have a bigger impact on how
19  much it matters.
20    Q. Did you test to see whether or not that
21  was the case?
22    A. So how would you recommend I test that?
23    Q. Removing the 225 securitizations, the four
24  scratch and dents, and the other securitizations that
25  you suggest might not be clean.

Page 191

1    A. Okay. So there is lots there that, you
2  know, doesn't provide for a -- there is lots of
3  reasons that I don't think that that's sufficient for
4  creating the right sample. And, no, I mean, I didn't
5  do that because, again, I thought that this would be
6  more misleading than enlightening. I mean, you're
7  still estimating the wrong model, even if you go
8  to -- I think which was the best thing, which is
9  looking at just the clean, re-underwritten deals,
10  there you're going to have a better model.
11       However, you know, there you're looking at
12  a time period that involves the great recession. And
13  if I had done that, then you'd come back to me and
14  say, "Well, you can't do that because you're using
15  information that's from a later date." And I -- you
16  know, there is some validity to that argument. Maybe
17  not as much as -- as you would grant, but I'm sure
18  that you would be making that argument.
19       So, you know, I just don't see the point
20  of running the wrong regression on the wrong data.
21  And, you know, really, I was not hired to fix this
22  model that I think is not fixable.
23       The other thing to mention is that, you
24  know, I -- I approached this -- this task the way I
25  approach writing a referee report, which I do all the

Page 192

1  time. And when you write a referee report, you point
2  out issues and problems with the paper. You don't
3  try and rewrite the paper because that's not your
4  job. And I didn't think that that was my job here.
5    Q. Not the next section of your report, but
6  the one after that, 5.3.
7    A. Uh-huh.
8    Q. Your opinion is that, "Dr. Cohen-Cole
9  picks periods for his analysis with low default
10  rates, thus biasing overall rates down as well as
11  biasing estimated parameters." Right?
12    A. Can you show me where you're reading --
13    Q. From the heading, 5.3.
14    A. Oh, from the -- oh, yes. Okay. Yes.
15  Yes.
16    Q. Did I read that accurately?
17    A. Yes.
18    Q. Are you aware of any investor in
19  mortgage-backed securities between 2005 and 2007 who
20  excluded the housing data from 1998 to 2003 in
21  modeling the future performance of a mortgage-backed
22  security?
23    A. No. As I said, I wasn't particularly
24  active in the mortgage markets at this time, so I
25  can't really speak to what individual investors did.

Page 193

1  But if -- I mean, there is a couple different
2  problems here. Right?
3       One problem is that they're looking
4  potentially at a set of securities issued in
5  2005-2007 which have largely subprime loans, and they
6  want to be comparing it against other properly
7  underwritten subprime loans.
8       And the other problem is that when they're
9  looking at macroeconomic changes, and specifically
10  the overall default rates associated with different
11  macroeconomic changes, they want to look at a time
12  period which is not just the last six or seven years,
13  but which potentially captures a greater variety of
14  different macroeconomic scenarios.
15       And, you know, just to give you the
16  example, I mean, going back to the insurance company
17  that I worked with in 1991, they were worried that
18  there was going to be a sufficient housing crash,
19  that Fannie and Freddie would go bankrupt, and the
20  U.S. government would not step in to bail them out.
21       So, you know, that did not happen in those
22  years, but, you know, if you're looking at AAA
23  investors and you're wondering what kind of scenarios
24  they look at, they look at low-probability events
25  based on, I believe, longer time periods, where lots

49 (Pages 190 - 193)

1    of different things can happen. And not just the '98
2    to 2005 or 2006 period, because even if you go to
3    '96, there is a little bit more variation in
4    defaults. And if you go back to 1990, you have a
5    fair bit more variation in defaults.
6        Q. Do you believe that including any other --
7    going back to any set time earlier than 1998 would
8    have changed whether or not in Dr. Cohen-Cole's model
9    the Plaintiff's Claim or the Disclosed Risk was the
10   higher number?
11       A. I can't speak to that in particular, but,
12   you know, whenever it appears that anyone has done an
13   analysis where they've chosen their data set based
14   partly upon the dependent variable, and in this case,
15   you know, maybe it's -- happens to be an accident
16   that this is the particular data set that
17   Dr. Cohen-Cole had.
18       But, you know, this made me very nervous
19   because if you choose your data set based upon the
20   dependent variable, you're introducing a significant
21   selection bias, and, therefore, again, biasing your
22   coefficients on your estimated parameters. If you
23   bias them towards zero, that, again, implies that you
24   understate the impact of the defects.
25       Q. By saying that Dr. Cohen-Cole chose his

1    data set based partly upon the dependent variable,
2    are you referring to loan defaults there?
3        A. Yes.
4        Q. Do you believe that Dr. Cohen-Cole used
5    his period -- started the period at 1998 and ended in
6    2003 to select a certain pattern of defaults?
7        A. I mean, if you look at Chart 1 on
8    Page 22 -- and, actually, he goes up to the opening
9    of the trusts for each of the Cox proportional hazard
10   models that he estimates. So in the 2006 to 2007
11   or -- period or thereabouts. You know, he's choosing
12   a time period with relatively low -- here this is
13   delinquencies, but that's closely related to
14   defaults, with relatively low defaults.
15       I don't think that that's -- that looking
16   at just that time period where you've got rising
17   housing prices and a relatively rosy economy, I don't
18   think that's consistent with what a careful,
19   reasonable investor who -- who put their money into
20   AAA securities would have done. I think they would
21   have looked at a longer time period. I think they
22   would have looked at a wider variety of potential
23   default scenarios. And I think by picking this
24   particular time period, you know, Dr. Cohen-Cole can
25   potentially bias the -- the results.

1        Q. Do you believe that if an investor in
2    mortgage-backed securities in 2005 to 2007 didn't
3    look back at mortgage performance further in the past
4    than 1998, that that would have been unreasonable?
5        A. I think AAA investors typically looked at
6    a wide variety of macroeconomic scenarios, not just
7    ones where housing prices are increasing. And, you
8    know, the -- the way that Dr. Cohen-Cole uses the
9    data for this analysis misses that potential fact.
10       Q. Now, you don't have any indication that
11   Dr. Cohen-Cole chose his time frame to somehow bias
12   his model. Right?
13       A. Other than, you know, looking at what
14   actually happened in a model like this, no. I -- you
15   know, I don't know that he ran lots of different
16   models starting at 1990, then 1992, and then 1998,
17   and said, "Oh, this is the one that works, let's go
18   with this one." No, I don't know that he did that.
19   He may have, but I don't know.
20       Q. So it wouldn't be accurate to say that he
21   chose his data set based on the dependent variable,
22   then?
23       A. I don't know whether he did or didn't.
24   That's the problem. And the appearance, given the --
25   the data, makes me nervous. It suggests that he's

1    chosen the data in order to get a particular result.
2        Q. Do you have an opinion as to how far back
3    Dr. Cohen-Cole would have to go for his ABSNet data
4    to get a -- what you would deem a reasonable time
5    frame?
6        A. I don't have a particular sample. I mean,
7    I just want to say again that this type of loan-level
8    analysis was not what typical investors did. Right?
9    They looked at this cash flow analysis and --
10   scenario analysis, and they used de- -- defaults as
11   an input into that. And I think reasonable investors
12   would have looked not just at the sort of '98 to 2005
13   period. They'd have gone back to 1990 or even
14   earlier to think about what kind of scenarios would
15   have -- would be reasonable as a worst case for what
16   could happen in the macroeconomy.
17       Q. How would historical default rates have
18   been incorporated in the kinds of scenario analyses
19   you're talking about?
20       A. So if you're looking -- so the first thing
21   that, you know, these investors did often enough was
22   that they would stress-test the model to see what
23   kind of default rates make the cash flows change for
24   these AAA securities. And then they see whether
25   historical default rates are consistent with that

1   kind of performance.
2        But in order to do that, you really need
3   to know that you're looking at the same sort of
4   mortgage. And there's a bunch of problems with that.
5   One is that, you know, these are subprime loan ARMs,
6   largely, and there's not a lot of historical
7   experience on those.
8        And the other problem is that the
9   investors are looking at the default rates with
10  the -- with the presumption that, in fact, the
11  prospectus is telling them stuff that's true and, in
12  particular, that they're following underwriting
13  guidelines.
14       And when they're trying to figure out what
15  the right default rates need to be, they need to have
16  some sense of what these securities are and whether
17  they're then properly underwritten or not.
18       Q. So these historical default rates would
19  have been incorporated in the sense that an inventor
20  would have looked at them for consistency with what
21  they were seeing in their projections going forward,
22  or was it a more methodological -- methodical
23  approach to using those historical default rates?
24       A. I don't think -- I'm not familiar with one
25  particular set of methods for using historical

1   default rates when creating scenarios. But, in
2   general, in order to think about what reasonable
3   investors assume, I would think that they are partly
4   guided by historical experience.
5        Q. Do you have any reason to think that
6   extending out the period of time that
7   Dr. Cohen-Cole's model looks at would change the
8   relationship between the Plaintiff's Claims and the
9   Disclosed Risk claims?
10       A. Yes. Let me say that again. So if you
11  choose your data based partly on the dependent
12  variable and you do it so as to minimize the value of
13  the dependent variable, then that has a tendency to
14  bias your coefficients towards zero.
15       If you looked at a longer time period with
16  a larger variation in defaults, then it's likely that
17  the coefficients would be larger. And if you have
18  larger coefficient -- coefficients, then that's going
19  to mean that the Plaintiff's Claims Scenario could
20  have a bigger impact than the Disclosed Risks
21  Scenario.
22       Q. The coefficients that Dr. Cohen-Cole
23  calculates are used -- they're the same whether he
24  then inputs the plaintiff's claims or he inputs the
25  disclosed risk. Correct?

1        A. Yes. For each deal, he calculates a
2   separate Cox proportional hazard model, and he inputs
3   both of those, the hypotheticals and the actual in --
4        Q. So if the coefficients in that model are
5   the same for both the plaintiff's claims and the
6   disclosed risks claims, why do you think that
7   changing those coefficients would change whether the
8   plaintiff's claim is higher than the disclosed risk
9   or the disclosed risk is higher than the plaintiff's
10  claim?
11       A. So two things. First of all, I don't like
12  making inferences from models that are biased and
13  inconsistent.
14       Dr. Cohen-Cole draws strong inferences
15  from a model that I believe is biased and
16  inconsistent, and I think that's a methodological
17  problem.
18       The second thing is that, as I explained
19  earlier, if you have larger coefficients on these
20  parameters of interest and that's where the defects
21  are, then I think it's likely that that's going to
22  have a bigger impact on the Plaintiff's Claims
23  Scenario than the hypothetical SLGs, because the
24  hypothetical SLGs could be bigger or smaller, and
25  there's a limited range as to how much those

1   variables can increase.
2        However, you know, as -- as you've pointed
3   out, I have not run that particular analysis, but, as
4   I said before, I don't think running the wrong
5   analysis is a good idea.
6        Q. Moving to the next section of your report,
7   5.4, your heading there is that "Dr. Cohen-Cole
8   misses any interaction between macroeconomic
9   variables and loan variables that would exacerbate
10  defaults."
11       A. Yes.
12       Q. Wouldn't the impact of incorporating
13  macroeconomic variables into Dr. Cohen-Cole's
14  materiality model result in a level shift where both
15  the plaintiff's claims and the disclosed risk claims
16  shift to the same extent?
17       A. Not if you included interactions between
18  the macroeconomic variables and the defects, which
19  is, I think, what I'm suggesting here. Right?
20       So if you include interaction terms
21  between macroeconomic variables and loan variables,
22  then that's not going to be a proportional shift for
23  both. I would expect that it would be a bigger shift
24  on the Plaintiff's Claims Scenario.
25       And, I mean, the intuition for this is all

51 (Pages 198 - 201)

1  relatively straightforward. It's that if the economy
2  turns down, then problems with these loans might
3  become more visible. It might become a bigger deal,
4  which it might be missed in the good times.
5          So I don't think that, you know, such an
6  interaction is, from an intuitive standpoint,
7  particularly complicated or novel. It's -- you know,
8  there's some theoretical basis for this type of
9  interaction in things like the Jarrow and Turnbull
10  paper, and this is something that investors, if they
11  had known about the defects, could have considered in
12  their decision-making.
13      Q.  What specific loan characteristics do you
14  believe are exacerbated by macroeconomic -- a
15  macroeconomic downturn?
16      A.  So if you look at the --
17          MR. CRAIG:  Object to the --
18  object to the form.
19      A.  If you look at the Deng, Quigley, and
20  Van Order paper, what they do is they look at call
21  value and put value for the mortgage holder, and they
22  think about the value of the house and the value --
23  relative to the value of the mortgage. And the
24  things that they show are particularly important are,
25  therefore, things like LTV, because if you have a

1  high LTV and the macroeconomy gets worse, then you
2  have a much higher incentive to walk away from your
3  mortgage and default.
4          So, again, this is sort of well
5  established in the literature on -- on this.
6      Q.  (BY MR. CAMPBELL)  Dr. Cohen-Cole's model
7  would take into account an increase in LTV if
8  Mr. Butler alleged that there was a misstated LTV.
9  Right?
10      A.  Dr. Cohen-Cole's model includes, you know,
11  this weird way that he spreads out the defects across
12  all the loans, and it doesn't include anything about
13  interactions between things like LTV and
14  macroeconomic variables. And it doesn't include any
15  nonlinearities in things like LTV.
16          And, you know, even the papers -- you
17  know, this paper that you gave me here, the
18  LaCour-Little and Yang paper, the other papers that
19  Dr. Cohen-Cole cites, the Deng, Quigley, and
20  Van Order paper, they all consider nonlinearities in
21  LTV as being important in determining default.
22          So, you know -- I'm sorry. I've lost
23  what's the question.
24      Q.  Going to your point that you just
25  mentioned about nonlinearities, do you know whether

1  Dr. Cohen-Cole's model has a nonlinear -- withdrawn.
2          Do you know whether increases in loan
3  characteristics, such as LTV and DTI, have a
4  nonlinear relationship in Dr. Cohen-Cole's model?
5          MR. CRAIG:  Object to form.
6      A.  In Dr. Cohen-Cole's Cox proportional
7  hazard model, he only estimates a linear relationship
8  between DTI and default or LTV and default, whereas
9  in pretty much every other paper that I've seen that
10  looks at LTV at least, including the Deng, Quigley,
11  and Van Order paper that he cites, several other
12  papers that he cite -- that he cites, there's --
13  there are either dummy variables for different levels
14  of LTV or CLTV in order to capture these nonlinear
15  effects or there are quadratic terms or something,
16  even quadratic and cubic terms for LTV or CLTV.
17          And, you know, the literature is very
18  unanimous in -- from what I could find, that this
19  always matters. You know, I found a 1974 paper that
20  looks at a related issue, and they also use these
21  nonlinearities. So this is really well established.
22          And, you know, on Paragraph 56, I have
23  this quote from Deng, Quigley, and Van Order in 2000
24  where they describe how important these
25  nonlinearities are in modeling LTV.

1      Q.  (BY MR. CAMPBELL)  Do you know whether --
2  let me go back.
3          Paragraph 55 of your report, you give an
4  example in the first sentence. "An increase in DTI
5  from 34 to 35 percent does not have the same expected
6  effect on default probability as an increase in DTI
7  from 54 percent to 55 percent."
8          Right?
9      A.  Yes.
10      Q.  Have you tested to see whether or not
11  Dr. Cohen-Cole's model matches this statement?
12      A.  What do you mean by "matches"?
13      Q.  Have you tested to see whether in
14  Dr. Cohen-Cole's model for any of the given
15  supporting loan groups, whether in any of his models
16  a DTI increase from 34 to 35 percent is the same as a
17  DTI increase from 54 to 55 percent?
18          MR. CRAIG:  Object to the form.
19      A.  So a marginal increase of 1 percent in
20  Dr. Cohen-Cole's model is going to have the same
21  effect regardless of where you are on the DTI because
22  he's only estimating a linear specification with
23  respect to DTI.
24          So, sort of by definition, because he's
25  only got this linear effect, he has the same impact

52 (Pages 202 - 205)

1   from an increase from 34 to 35 as he has from 54 to
2   55.
3       Q. (BY MR. CAMPBELL) Did you test that?
4       A. That doesn't make sense. It has to be
5   because it's -- that's what the model is. That's --
6   that's what -- that's what this model says. He says
7   that in his model. That's what that parameter
8   estimate means on DTI. That's not something you can
9   test. That's just what his model says.
10      Q. So if that wasn't the case, your criticism
11  would be wrong?
12      MR. CRAIG: Object to form.
13      A. I don't understand what that means. I
14  mean, if you have a linear specification in a model,
15  that means that a 1 percent increase has the same
16  effect. And that's the model that he runs. If he
17  ran a nonlinear model, then I would withdraw all of
18  this. But he didn't run a nonlinear model. He ran a
19  linear model. That's why I wrote this Paragraph 55.
20      Q. (BY MR. CAMPBELL) When you're talking
21  about linear model, are -- do you mean the same thing
22  as a linear variable?
23      A. No. I mean that there's a linear
24  specification between a right-hand side variable in
25  his Cox proportional hazard model. So in this case,

1   DTI -- he's including DTI and not DTI squared. Or
2   the other way to do it would be to have bins for DTI
3   and have different variables that capture the
4   different bins for DTI. It's very, you know,
5   straightforward methodology.
6      MR. CAMPBELL: Should we take a
7   break?
8      THE WITNESS: Sure.
9      THE VIDEOGRAPHER: Going off the
10  record. The time is 3:18.
11      (Break.)
12      THE VIDEOGRAPHER: Back on the
13  record. The time is 3:38.
14      Q. (BY MR. CAMPBELL) Dr. Wald, if
15  Dr. Cohen-Cole applied some kind of transformation to
16  make his model nonlinear, would that at least address
17  the concerns that you've raised in Section 5.5 of
18  your report?
19      A. I don't know what you mean by a
20  "transformation."
21      Q. The application of some mathematical
22  function to make his model nonlinear.
23      A. No, that's not what I mean here. What I
24  mean here is that these types of models, if X is a
25  particular independent variable, they are usually

1   modeled with X, X squared, and maybe X cubed. If you
2   look at -- that's one way of doing it.
3      If you look at the Deng, Quigley, and
4   Van Order paper, what they do is they use bins. So
5   they use, you know, LTV less than 70, 70 to 80, 80 to
6   90, 90 to 100, maybe. Those -- they'll have separate
7   variables for each of those. You can't transform one
8   variable and then get this larger array of possible
9   coefficients to estimate and this full set of
10  problems. And that's not the way that these models
11  are estimated.
12      Pretty much every paper that I've looked
13  at in this literature either uses, you know,
14  quadratic terms, and maybe even cubic, or they use
15  bins when they're using -- when they're looking at
16  LTV. And so it's very standard to use nonlinearities
17  in these types of models. And it's important because
18  the nonlinear terms are highly significant.
19      And let me just say one more thing on
20  that. If you're worried that your defects are too
21  small, and these nonlinearities imply that -- let's
22  say a larger LTV implies a larger probability of
23  default, and that's it quadratic, so it's -- the
24  quadratic term is positive as well, then, again, if
25  you don't include the quadratic term, you're more

1   likely to understate the impact of the defect. So,
2   again, the -- the direction of the bias here is
3   against finding materiality as Dr. Cohen-Cole defines
4   it.
5      (Exhibit 5 was marked.)
6      Q. (BY MR. CAMPBELL) I'm going to hand you
7   what I've marked as Wald Exhibit 5.
8      A. Thank you.
9      Q. And is this the Deng and Quigley paper
10  that you reference in your report and which you've
11  been testifying about today?
12      A. Yes, it is.
13      Q. I just want to have you turn to Page 289
14  of Exhibit 5.
15      A. Yes.
16      Q. And in the far left column of Table III on
17  Exhibit 5, if you go down four -- five rows, are the
18  LTV between 0.6, 0.75, and the other figures there,
19  the type of LTV bins you're talking about?
20      A. Yes, that's correct.
21      Q. So in Model 2 on Table III here in
22  Exhibit 5, those binned variables -- is that fair to
23  call them binned variables?
24      A. Sure.
25      Q. Those binned variables have coefficients.

53 (Pages 206 - 209)

Page 210

1  Right?
2      A. That's correct.
3      Q. And in Model 1 there is no coefficient for
4  those binned variables. Right?
5      A. That's correct.
6      Q. Do you believe that affects the validity
7  of Model 1, relative to Model 2, in Deng and Quigley
8  here?
9      A. Well, I think there's a couple things to
10 point out. First of all, the LTV is partly modeled
11 here on these bins, but it's also modeled in the
12 value of the put option. So if you look at the
13 definition of the put option used in Model 1 -- I'm
14 trying to find the exact way it's modeled. I don't
15 remember the exact statement, but it's the
16 probability of negative equity. So it's a function
17 also of LTV.
18      And you'll notice that he already uses put
19 option, and that put option is itself calculated as a
20 nonlinear function of LTV. And then he also -- they
21 also include the squared term of the put option. So
22 there is already a lot of nonlinearity built in with
23 respect to LTV, even in Model 1.
24      But that said, you know, when they test
25 whether Model 1 or Model 2 is better, and they look

Page 211

1  at the default model in particular, they find that
2  the Model 2 is better.
3      Q. And if you could just direct my attention,
4  I apologize. Where do they say that Model 2 is
5  better than Model 1?
6      A. Let me try and find it. This is going to
7  take me a little while.
8      (Reviewing document.)
9      So they don't use those words in
10 particular, but let me show you where, as an
11 econometrician, you get that out of this. "Model 2
12 in Table III extends the 'ruthless' model by adding
13 asymmetric information and the trigger event
14 variables, such as original LTV category,
15 unemployment, and divorce."
16      And, again, divorce is another variable
17 that is significant here that Dr. Cohen-Cole does not
18 bother to use.
19      "The results show that financial
20 motivation is still of paramount importance governing
21 the prepayment and default behavior. In addition,
22 the results suggest that borrowers' willingness to
23 exercise financial options may be triggered or
24 hindered by other events. For example, it suggests
25 that higher default risks are associated with higher

Page 212

1  original LTVs."
2      So that, I say, is saying that these
3  higher LTVs matter. And as an econometrician, you
4  can see that in the coefficients and the T statistics
5  reported on Model 2.
6      So, for instance, if you look at the LTV
7  associated in default under Model 2, for, let's say,
8  LTV greater than .9, the T statistic there is 5.98.
9  And 5.98 is going to be significant at the 1 percent
10 level for -- all the time, yeah. So 5.98 is
11 significant for -- at the 1 percent level.
12      Similarly, above that, the coefficient
13 estimated for LTV between .8 and .9 they estimate at
14 3.146 coefficient, with a T statistic of 5.36.
15 Again, highly significant; significant at the
16 1 percent level. The coefficient above that, with a
17 T statistic of 3.75, is also significant at the
18 1 percent level. The coefficient above that, with a
19 T statistic of 2.16, that one is significant at the
20 5 percent level, but not at the 1 percent level.
21      Additionally, you could look at the log
22 likelihoods that they report at the bottom of
23 Table 3, and the difference of two times the log
24 likelihoods. So if you take the difference in log
25 likelihoods and multiply it by 2, you'll get

Page 213

1  roughly -- what is that? 170 or thereabouts, a
2  little less. If you take two of that, it will be
3  340, and that will be distributed with a chi-squared
4  distribution with the number of additional parameters
5  in Model 2 over Model 1. Since there is both
6  prepayment and default parameters, that's roughly 1,
7  2, 3, 4, 5, 6 -- 12 additional parameters.
8      I don't remember the chi-squared
9  distribution for 12 degrees of freedom, but I can
10 tell you that 341 is going to be significant at the
11 1 percent level for that distribution.
12      So that's telling you that Model 2 has
13 additional explanatory power over Model 1, and that
14 these variables belong both individually, since most
15 of them are significant, and jointly since that
16 chi-squared tell -- tells you that it's jointly
17 significant.
18      Q. Besides the use of binned variables, or
19 squared or otherwise exponentially increased
20 variables, what other ways are there to make a model
21 nonlinear?
22      A. So another way that this model is -- is
23 nonlinear is that rather than using just LTV, they
24 also use this variable called the put option,
25 which -- you know, I wish I knew exactly where they

54 (Pages 210 - 213)

Page 214

1   define it because I -- I don't want to do that from
2   memory, but it's the value of the -- it's basically
3   how much they gain if they default.
4        So, let's see, going back to Page 284, I
5   think. "In particular the variable 'Put_Option'
6   measures the probability that homeowner equity is
7   negative, i.e., the probability that the put option
8   is in the money."
9        So that could also be a nonlinear
10  variable.  So some of these right-hand side variables
11  may themselves be constructed nonlinearly, as well as
12  then including squares of those -- of those
13  variables.  Or using bins.  Those are all different
14  ways to -- to handle some of -- a portion of this
15  situation.
16       And as I said before, this is all very
17  standard, long history in this literature of using
18  nonlinear terms, and Dr. Cohen-Cole yes did not do that.
19  And, moreover, not doing it because the impact of the
20  defects is potentially nonlinear can understate
21  the -- how much those defects matter and bias his
22  results against finding materiality, as he defines
23  it.
24       Q.  If Dr. Cohen-Cole applied one of the
25  methods of introducing nonlinearity that you just

Page 215

1   discussed to his model, would that address the
2   criticism set forth in your Section 5.5 of your
3   report?
4        A.  I think if he had done what I suggested,
5   then that would certainly have helped.  I think, you
6   know, he could have just tested for it and shut --
7   and looked and see whether these nonlinear terms were
8   significant.  And I saw no evidence that he did that
9   as well.  And that's really pretty standard for, you
10  know, doing any sort of analysis like this, that you
11  at least examine whether these nonlinear terms are
12  significant.  And, you know, in this case, where
13  there is a big literature which says that they are
14  significant, that's what you want to do.
15       Q.  And you haven't tested any potential
16  nonlinear variables yourself.  Right?
17       A.  I -- what I did instead is I looked at
18  Deng, Quigley, and Van Order, and I saw how
19  significant the nonlinearities were here, and I read
20  their description, and I put part of that in the
21  report, and I went back to, you know, a paper from
22  1974 that also looked at some nonlinear terms, and I
23  thought, wow, that's really, you know, more than
24  enough evidence to think that nonlinearities are
25  important, and that this is an important point to

Page 216

1   make when discussing Dr. Cohen-Cole's report.
2        Q.  So you didn't feel the need to test any
3   potential nonlinear variables themselves here?
4        A.  No.  I think the literature had already
5   done that for me.
6        Q.  I'd like to go to the next section in your
7   report, 5.6.  The heading there is "Dr. Cohen-Cole
8   does not consider any layered risk from multiple
9   defects."
10       Right?
11       A.  Yes.
12       Q.  How -- did you test to see whether or not
13  Dr. Cohen-Cole's model exhibits the kind of results
14  you would expect from layered risks?
15            MR. CRAIG:  Object to the form.
16       Q.  (BY MR. CAMPBELL)  I can put it in more
17  concrete terms, if you'd like.
18       A.  Yes.  If you --
19       Q.  Sure.
20       A.  -- if you could.  I'm having a little
21  trouble.  It's late in the day.
22       Q.  On Paragraph 58, your first sentence,
23  "Research has shown that loans with multiple risky
24  characteristics have a probability of default greater
25  than the sum of the probabilities associated with

Page 217

1   each characteristic individually."
2        A.  Yes.
3        Q.  Did you test Dr. Cohen-Cole's model to see
4   whether a loan that had multiple risky
5   characteristics had a probability of default greater
6   than the sum of the probabilities associated with
7   each characteristic individually?
8        A.  No.  Again, I relied upon the literature,
9   which is pretty unanimous on this, that this happens.
10  And in this case the "Journal of Economics"
11  prospectus paper, the Mayer, Pence, and Sherlund on
12  page 44 discusses this issue, and Sunshine also
13  discusses this issue.
14       Q.  But do you know if Dr. Cohen-Cole's model
15  reflects that same relationship?
16       A.  So Dr. Cohen-Cole has no way to capture
17  layered risk.  So the way that he could do this was
18  he could look at -- and, really, what I'm thinking
19  about here is the risk of multiple defects.  So he
20  could have had a variable in there that said what's
21  the number of defects overall.  He could have had
22  interactions between the change in DTI and the change
23  in LTV that would have captured the interaction terms
24  between these.
25       So there is a number of ways that he could

1    have captured this, and he doesn't do any of it.  And
2    yet the literature, as again from what I can tell,
3    where they -- they discuss this, they -- they're
4    pretty unanimous that layered risk matters.
5         Q.  If I'm understanding your point about
6    layered risk here correctly, it's that if you have a
7    loan with, let's say, a 95 percent LTV and a
8    50 percent DTI, the -- the likelihood of default of
9    that loan is higher than the sum of the default
10   probability of a 50 percent DTI loan, plus the
11   probability of a 95 percent LTV loan on their own.
12   Is that right?
13        A.  I'm not sure I can think about those
14   things on their own.  I think the way I think about
15   it is that if you increase one variable that's
16   associated with higher risk, let's say LTV, and
17   increase another variable that's associated with
18   higher risk, say DTI, the impact of increasing both
19   of those for the same loan simultaneously is bigger
20   than the impact of increasing either one for one loan
21   and one for the other loan.
22        Q.  And how would you test that?
23        A.  So as I mentioned, you could throw in
24   another variable in there that captures the number of
25   defects.  You could look at a variable that looks at

1    the interaction between the amount of defect on DTI
2    and the amount of defect on LTV.
3         Q.  The idea of using a variable that's the
4    number of defects, would that imply that every type
5    of alleged defect has the same propensity to increase
6    default risk?
7         A.  If you just did it in the sort of simple
8    way that I suggest, it might.  So you could have more
9    complicated ways of doing it.  You could have a dummy
10   variable for each defect and interactions between
11   these dummy variables, something of that nature.
12        You can get more complicated than -- than
13   my suggestion.  But, you know, again, I'm not trying
14   to fix this problem.  I think that's sort of beyond
15   what I can do.  I am trying to say that these are
16   really things that, you know, are standard in the
17   literature to address, and there should have been
18   some effort to address it.
19        Q.  And you, in this case, again, did not try
20   to test an actual dummy variable to capture layered
21   risk?
22        A.  No.  Again, I relied upon the literature,
23   including, you know, this description on page 44 of
24   Mayer, Pence, and Sherlund, that, you know, when
25   there are multiple dimensions of risk, that increases

1    the -- the default rate overall.
2         Q.  Let's go to the next section of your
3    report, Section 6.1.  And the heading there is,
4    "Dr. Cohen-Cole reduces the effects of defects by
5    spreading them across the loan pool equally."
6         Right?
7         A.  Yes.
8         Q.  Your criticism here is that averaging the
9    increase in loan characteristics that Mr. Butler
10   finds dilutes the impact of those characteristics on
11   the risk of default.  Right?
12        A.  Effectively.  I mean, he's spreading out a
13   particular defect over the entire pool by, you know,
14   applying a -- a fraction of the total defect to all
15   the loans rather than the full defect to some of the
16   loans.
17        It's a very strange procedure, and not --
18   and -- and in my mind it really does damage to the
19   data.  It -- it's not something that I've ever seen
20   done.  I can't think of anything that -- that -- that
21   is similar in any analysis that I've ever seen.
22   And -- and because it really changes the size of the
23   treatment, I can't imagine anyone would -- that it's
24   something anyone would want to apply.
25        Q.  Do you have any basis to believe that

1    averaging the increases in loan characteristics
2    across the whole loan pool necessarily results in a
3    lower overall default risk for that pool as a whole
4    than just using a higher increase for a select number
5    of loans?
6         A.  Right.  So -- I -- I mean, the description
7    that I give here is that if there are nonlinearities
8    in particular, then it's clear that if you're
9    shrinking the size of any particular defect, then the
10   average of these smaller defects is going to be
11   smaller -- sorry -- the sum of these smaller impacts
12   of the defects is going to be smaller than the sum of
13   the larger defects.  And with nonlinearities, that's
14   clear.
15        Now, the Cox proportional hazard model has
16   a nonlinear component to it in some ways, in that
17   you're taking an exponential of the X betas.  So
18   already there, there is some nonlinear component.
19   And I think that in and of itself suggests to me that
20   it's likely that this particular process minimizes
21   the overall risk.
22        But, again, this is a very strange
23   procedure, and I can't think of, you know, any other
24   papers that have done something like this.  And there
25   are other procedures that he could have used.  He

1  could have -- that -- you know, I would have taken
2  much less issue with, including things like randomly
3  assigning the defects across all the loans. I
4  think -- and just seeing what happens. I think that
5  would have been a very reasonable robustness test. I
6  think he could have boot-strapped off the
7  distribution of loans where he knew exactly what was
8  underwritten properly or not underwritten properly
9  and gotten a sample that way.
10      I think there is a number of different
11  ways he could have gone about this that would not
12  have drawn this particular criticism and that I think
13  would have been better.
14      Q. Do you think that if he -- if
15  Dr. Cohen-Cole had randomly imply -- randomly applied
16  the increases that Mr. Butler found, that that would
17  have necessarily increased the default risk of the
18  pool in a way that was higher than the increase in
19  the default risk of the pool from averaging the
20  increases across the whole pool?
21      A. I don't know, but I think it's a procedure
22  that makes more sense. And if he had done that
23  procedure a couple times to see what different random
24  outcomes imply, on average, I would put more faith in
25  that procedure than in this particular procedure.

1      Q. Why?
2      A. Because you're not changing the size of
3  the defects, whereas -- in that procedure. You're
4  still applying the same defects that Butler found.
5      Here Dr. Cohen-Cole actually changes the
6  size of the defects that Butler found, and he says
7  that now, instead of a 10 percent defect, I'm going
8  to use a 2 percent defect or what have you, something
9  smaller. That just seems like you're making an
10  assumption about the data that's, you know -- for an
11  econometrician, for me, that's -- that's difficult to
12  swallow.
13      Q. Dr. Cohen-Cole also makes an assumption
14  that increases the characteristics for certain loans
15  that Mr. Butler actually didn't increase, though.
16  Right?
17      A. You mean that he -- oh, so you mean
18  that -- well, I mean, those are loans that -- that --
19  I'm not sure what you mean. I mean, I guess -- I
20  think I know what you mean, but I think you need to
21  say it a little bit more clear before I can really
22  comment.
23      Q. So when Dr. Cohen-Cole creates his
24  Plaintiff's Claims Scenarios, he starts with a sample
25  that was re-underwritten by Mr. Butler. Right?

1      A. He -- part of the analysis involves a
2  sample that was re-underwritten, yes.
3      Q. And he takes some of Mr. Butler's changes
4  to loan characteristics and applies some of those to
5  other loans throughout the pool. Right?
6      A. To other loans that were not
7  re-underwritten.
8      Q. Right.
9      A. So we don't really know what the right
10  thing is for those loans. Right?
11      Q. Right. And Mr. Butler, for those other
12  loans, has never re-underwritten them, so he's never
13  increased their loan characteristics. Right?
14      A. That's correct.
15      Q. Let's go to the next section of your
16  report, 6.2. So heading 6.2 is, "Dr. Cohen-Cole's
17  simulation analysis draws independent random
18  variables from uniform distributions."
19      Right?
20      A. Yes.
21      Q. In your criticism in this section -- how
22  would you describe your criticism in this section in
23  general terms?
24      A. So in general terms, I would say that the
25  hypothetical SLGs that Dr. Cohen-Cole creates don't

1  look anything like real loans. They don't have the
2  correlation structure that real loans do. They don't
3  fit in the bins like real loans do. They don't look
4  like loans in the earlier part of the ABSNet data.
5  They don't look like the actual subprime loans.
6      If you look at Table 1A, for instance --
7  and it shows the average correlations of loan
8  characteristics for the hypothetical SLGs -- this is
9  an average of the correlations for the hypothetical
10  loans that Dr. Cohen-Cole puts together.
11      You'll see that, for instance, the
12  correlation between CLTV and LTV is zero, and, in
13  fact, some of the CLTVs that Dr. Cohen-Cole creates
14  are less than some of the LTVs that he creates.
15      Now, he doesn't use both of those in the
16  same model. So if the prospectus has both of them,
17  he only takes the CLTV. But that's sort of an
18  indication of how much these things don't look like
19  loans. Right? If CLTV can be less than LTV, that
20  doesn't look like a loan.
21      And, moreover, it's not just that they
22  don't look like loans. They don't look like what's
23  described in the prospectus because some of these
24  prospectuses have these cross-tabs which give you a
25  fraction of, for instance, FICO for a given -- what's

1 the example I use -- FICO and LTV.  So they use a
2 two-way sort between LTV and FICO, for instance.
3 This is in Paragraph 62.
4       And so there's a correlation structure
5 implied by the prospectuses which does not exist in
6 the hypothetical SLGs created by Dr. Cohen-Cole.  So,
7 you know, in those ways, these hypothetical SLGs
8 don't really look like loans.
9       Another way that they don't look like
10 loans is that if you look at the particular bins --
11 so Dr. Cohen-Cole first draws a uniform variable to
12 see which bin the particular draw comes in.
13       So if you're looking at things like LTV,
14 for instance, and let's say there are six different
15 bins described in the prospectus supplement, the
16 first uniform variable will tell you which bin it
17 falls in, and then he's going to draw a second
18 uniform variable to give you the distribution within
19 the bin.
20       So let's say one bin is LTV between 90 and
21 95.  And so for the hypothetical SLGs, the -- there's
22 going to be roughly an equal number of every
23 observation; there will be a flat distribution for
24 all the different LTVs within that bin.
25       In contrast, if you look at what they look

1 at for the actual data, there's usually a spike in
2 the data right -- maybe around 90 and maybe another
3 one around 95, but they don't look anything like a
4 normal distribution.
5       And so, you know, one thing that we did
6 just to try and clarify this was we tested whether
7 the -- for LTV, the distribution within the bins fit
8 the uniform distribution, and we were able to reject
9 that hypothesis at -- I can't remember if it's the
10 5 percent or the 1 percent level -- for 61 percent of
11 the data.
12       Now, partly we can't reject it for a
13 greater portion of the data because some of those
14 bins are, in fact, one point.  So sometimes the bins
15 will be like, you know, less than 80, greater than
16 80, and just 80.  And when you're in that bin where
17 it's just 80, well, there's only one number there,
18 and the uniform looks like the actual distribution
19 because it's really just one number.
20       But still, for most of the bins, are
21 able to reject the hypothesis that the distribution
22 looks like the distribution of the hypothetical SLGs,
23 the actual distribution looks like the hypothetical
24 distribution.
25       So, you know, in general, these things

1 that he's created, these hypothetical SLGs, they
2 don't look like loans.  They don't have the same
3 correlation structure.  They don't have the
4 correlation structure described by the prospectuses.
5 They don't have the correlation structure described
6 for loans in the data or the actual data, and within
7 the bins, they don't like look they're uniform.  And
8 that makes, you know, drawing conclusions where --
9 where Dr. Cohen-Cole says, you know, therefore, you
10 know, this was consistent with the prospectuses and
11 we can draw proper inferences from this, I don't
12 think that's a -- that's a valid point.
13       Q.  Can you tell me more about the tests you
14 conducted to see -- what was it?  The -- that the LTV
15 distribution within the bins matched a uniform
16 distribution?  What was that testing?
17       A.  That's a Kolmo- -- Kolmogorov KS,
18 Kolmogorov-Smirnov test.  It's a standard test for --
19 to see whether two distributions are similar.  So we
20 look at the empirical distribution versus a
21 hypothetical uniform distribution.
22       Q.  And you did that for which variables?
23       A.  We just did that for LTV at this point.
24       Q.  And did you do that for all SLGs?
25       A.  No, we didn't do that for SLGs.  We don't

1 need to do that for SLGs.  Right.  The SLGs are drawn
2 from uniform distributions, and, therefore, for
3 95 percent of the time, you're not going to reject it
4 at the 5 percent level.  That's sort of a given
5 because, you know, that's drawn from a uniform
6 distribution.
7       What we did was we looked at -- at it for
8 the actual data to see whether it matched the uniform
9 distribution that Dr. Cohen-Cole was using to create
10 his hypotheticals.  Right?
11       I mean, so Dr. Cohen-Cole's procedure is
12 to create these hypothetical SLGs and say that you
13 can draw inferences from them as if these were things
14 like the loans that the investors could have
15 expected.  But what this does is it says no.  In
16 fact, they weren't like loans that investors could
17 have expected because they don't fit in the bins the
18 way that loans expect things to fit in bins and they
19 don't have correlation structures the way that
20 investors would and should expect these variables to
21 have correlation structures.
22       Q.  I guess I'm a little confused in how this
23 test works.  Is this a test that you ran across all
24 the loans in the model, or is it a test that you
25 conduct deal by deal, SLG by SLG?

Page 230

1      A. So what we did was we looked just at LTV
2  at this point.
3      Q. Right.
4      A. And we looked at all the RBS deals, and we
5  looked at all the bins for LTV described in all the
6  different prospectus supplements.
7      Q. Were they aggregated somehow?
8      A. No. For each deal we --
9      Q. For each deal?
10     A. For each deal.
11     Q. And then --
12     A. And then for each bin of each deal, we
13  test whether the actual distribution of the loans
14  within that bin for that deal lies along a uniform
15  distribution, which is an assumption that
16  Dr. Cohen-Cole makes. And 61 percent of the time, we
17  reject that in our hypothesis, and for some of the
18  times we don't reject it, it's really, you know, just
19  a point. So we don't expect to reject it there.
20     Q. Where is this testing disclosed in your
21  report?
22     A. This was additional stuff that, you know,
23  we did in order to further explain what we mean when
24  we're talking about the problems with the uniform
25  distribution --

Page 231

1      Q. When --
2      A. -- so so --
3      Q. When did you conduct this testing?
4      A. Last week.
5      Q. So you didn't rely on this testing in
6  forming the opinions in -- that are expressed in this
7  report?
8      A. So the opinions expressed in this report
9  are based on what I knew about the methodology that
10  Dr. Cohen-Cole uses.
11        So I knew that these tests would come out
12  this way because I know something about the way
13  mort- -- mortgages are underwritten, but I didn't
14  have the specific number yet. So, you know, in the
15  last week, we put together that number.
16     Q. Is this testing ongoing?
17     A. For this LTV for RBS, well, that's done
18  already. Am I going to be asked to put something
19  else together? I don't know.
20     Q. Which bins -- which LTV bins from the
21  prospectus supplements specifically are you
22  selecting? Is there a specific cross-tab that you
23  were focusing on for these tests?
24     A. For this, this was not a cross-tab. This
25  was just a description of the LTVs for each deal. So

Page 232

1  this is, you know, how big a proportion lies in each
2  bin for each deal. And, again, that was just one
3  variable we looked at because a lot of the LTVs are
4  there and it was convenient to look at it.
5      Q. So are you saying that the results of your
6  testing suggest that Dr. Cohen-Cole's LTV
7  distribution in his hypothetical SLGs does not match
8  the prospectus supplements?
9      A. Well, it doesn't match the prospectus
10  supplements because the correlations implied by the
11  cross-tabs are nonzero. So in that way it does not
12  match the prospectus supplements. But for what I've
13  just described, it doesn't match the actual data or
14  what investors would have expected actual data to
15  look like.
16     Q. So, for example, if a prospectus
17  supplement said 5 percent of the loans were in a
18  certain LTV band, are you saying that your testing is
19  showing that 5 percent of the loans in a given
20  hypothetical SLG created by Dr. Cohen-Cole were not
21  in that band?
22     A. No, that's not what I'm saying.
23     Q. Okay. Can you explain more? I'm not
24  understanding.
25     A. Okay. So within the bin,

Page 233

1  Dr. Cohen-Cole's, you know, roughly matches the
2  proportion disclosed in the prospectus. However,
3  within the bin, there's some distribution for how
4  they're going to lie.
5        So let's say we're talking about, you
6  know, 90 to 95 percent. That's the bin. And
7  Dr. Cohen-Cole says it's going to be uniformly
8  distributed. So it's going to be equal probability
9  that it's between 90 and 91; 91; 92; 92, 93; 93, 94;
10  94, 95. Right?
11        It's going to be exactly equally
12  distributed depending -- regardless of how finely you
13  want to cut it, just because it's drawn from a
14  uniform distribution.
15        What we did was we looked at what the
16  actual loans -- loan distribution was like within the
17  bins, and within the bins they're not uniformly
18  distributed. They're usually pressed up against one
19  border or the other border or both or -- but they're
20  not nor- -- they're not uniformly distributed.
21        And so, you know -- and investors know
22  roughly how mortgages are underwritten. If you have
23  a bin that's -- I don't know -- about 90 to 95 -- it
24  may be 80 to 85 or maybe 90 to 95 -- I think you're
25  much more likely to be right at 90 than you are at

Page 234

1  93.28 simply because that may be a particular maximum
2  for an underwriting guideline. It may be something
3  that, you know, investors and underwriters are -- are
4  focused on.
5         So that particular outcome is much more
6  likely than some other random outcome inside that
7  bin.
8         Q. Would investors in 2005 to 2007 have known
9  the distribution of values within a given bin?
10        A. Roughly, yes.
11        Q. How would they have known that?
12        A. Because they know -- they can look at
13  other bins from other deals. They can look at how
14  mortgages are generally written. And, in general, if
15  you have mortgages that lie in 90 to 95 percent and
16  you're told that this particular set of mortgages is
17  in that area, I think you could look at actual
18  mortgages that were exis- -- in existence of similar
19  type and see how they -- they lay within that bin,
20  or -- I mean, I don't even know if you have to go
21  that far because it really -- you know, you're more
22  likely to be at 90 than you are at 92.38 or whatever.
23        Q. What's your basis for saying that
24  investors would have expected a nonuniform
25  distribution within a given bin that had no other

Page 235

1  information about it in the prospectus supplement?
2         A. My belief that mortgages are written in
3  ways that are similar over -- you know, within a
4  particular time period and that you're much more
5  likely to get a borrower borrowing at exactly
6  90 percent than you are at, you know, some other
7  level within that range. And I think that's
8  something that investors could have seen in existing
9  mortgages or could have simply known.
10        Q. Are you aware of any model used by
11  investors in mortgage-backed securities between 2005
12  and 2007 that used the -- or presumed that there was
13  a nonuniform distribution of loans within a given
14  bin?
15        A. I think for any reasonable model that
16  you're going to talk about, that distribution within
17  the bin, I -- I'm just -- I'm not clear -- I'm not
18  clear how -- I'm sorry. Can you repeat the question?
19        Q. Are you aware of any model used by
20  investors in mortgage-backed securities between 2005
21  and 2007 that presumed that there was a nonuniform
22  distribution of loans within a given bin for a given
23  loan characteristic?
24        A. I'm not sure that those models presumed
25  one thing or another. I think, when you're talking

Page 236

1  about these loans, you're more interested in knowing
2  what the characteristics -- what investors thought
3  the characteristics were more likely to be. I don't
4  think that's necessarily a modeling question. And I
5  think for that question, investors could have
6  inferred the likely distribution within a bin based
7  on what they saw out there in reality.
8         Q. So do you think it would be the case that
9  if an inventor saw a bin that said there's 40 loans
10  between 90 and 95 percent LTV, that they'd say that's
11  40 loans at 90 or 40 loans at 95?
12        A. I think that they're more likely to say
13  that if they knew something about that particular
14  bin, maybe they're going to say that means 30 loans
15  at 90 and ten loans at 95 rather than, you know, one
16  loan at 90, one loan at 90.25, or whatever it is, in
17  order to get an exactly even distribution across that
18  bin.
19        So, I mean, the criticism here is just
20  that, you know, what Dr. Cohen-Cole creates in his
21  hypothetical SLGs is not consistent with what actual
22  loans look like, it's not consistent with, I think,
23  what investors would have expected loans to look like
24  in the SLGs at the time, and it's not consistent with
25  the correlations across variables. And because of

Page 237

1  that, it's also not consistent with the prospectuses
2  which provides some cross-tabs on these variables.
3         Q. What do you think a reasonable investor,
4  seeing a bin of 40 loans from 90 to 95 percent LTV,
5  would have taken that to mean if not the possibility
6  of a uniform distribution of 40 loans between 90 and
7  95?
8         MR. CRAIG: Objection; asked and
9  answered.
10        A. So I think the way to do this properly,
11  the way to make this -- to do this part of the
12  analysis properly and to address a lot of the issues
13  in the way a reasonable investor might approach this
14  sort of analysis, if they're doing this sort of
15  analysis, is to, again, bootstrap from the empirical
16  distribution.
17        So if you want things that look like loans
18  that have a 90 to 95 percent LTV, then look at
19  existing loans that have 90 to 95 percent LTV and
20  draw a sample of those repeatedly until you have a
21  bunch of loans that have the characteristics desired
22  and they're much more likely to have the distribution
23  within the bin that matches the actual distribution
24  and they're much more likely to have the correlation
25  structure across variables that you see in the actual

60 (Pages 234 - 237)

Page 238

1    data. Those would have looked like actual loans
2    because you would have started with using actual
3    loans. And this sort of methodology of drawing from
4    the empirical distribution bootstrapping for this
5    type of simulation problem I think is pretty well
6    known.
7        Q. (BY MR. CAMPBELL) The broader question of
8    materiality requires a comparison of the statements
9    in the offering documents to the alleged
10    misstatements alleged by the plaintiff. Is that your
11    understanding in general terms of the materiality
12    analysis?
13        A. In terms of the materiality analysis in
14    broad terms, it's whether the information was
15    something that would have affected the decision to
16    purchase or the price at which investors would have
17    purchased the security.
18        Q. But that analysis is ultimately tied to a
19    statement that's being challenged in this case by
20    NCUA. Right?
21        A. I'm sorry. What do you mean exactly?
22    What statement do you mean exactly?
23        Q. Your statement -- your answer to my
24    previous question was anything that would have
25    affected an investor's decision. We're talking in

Page 239

1    this case about specific misstatements. Right?
2        A. Specific misstatements having to do with
3    underwriting guidelines, the fact that investors
4    would have relied upon underwriting guidelines, and
5    the importance of those underwriting guidelines in
6    the prospectuses to investors' decision-making, yes.
7        Q. I just wanted to confirm that you have not
8    run any model, whether a stress test model, a
9    scenario analysis model, or any other type of model,
10    that attempts to compare the results of that model
11    using the statements challenged by NCUA as compared
12    to the misstatements -- the effect of those
13    misstatements as alleged by NCUA?
14        A. I'm not sure what you're proposing
15    specifically. That's -- of -- if you have some
16    specific proposal for a model that I should have run,
17    please let me know. I was not hired to run a
18    specific model here. I was hired to opine upon
19    Dr. Cohen-Cole's analysis, and whether that made
20    sense. And I think, you know, we've gone through
21    that to some degree, and I've pointed out lots and
22    lots of ways in which that analysis does not make
23    sense.
24        I've also mentioned that, you
25    know, Dr. Cohen-Cole is rebutting the Butler

Page 240

1    report, and the Butler report makes a lot of
2    sense to me. Those are all things that -- that
3    I've said.
4        But if -- if you have, you know,
5    some other model that you think I should have
6    run to -- I'm not sure whether you're suggesting
7    I should have shown or not shown something, so
8    no, I -- you know, I've -- I've done what I've
9    described so far.
10        MR. CAMPBELL: Let's take a break.
11        MR. CRAIG: Yeah. I mean -- off
12    the record.
13        THE VIDEOGRAPHER: Going off the
14    record. The time is 4:28.
15        (Break.)
16        THE VIDEOGRAPHER: Back on the
17    record. This marks the beginning of Disc No. 4.
18    The time is 4:46.
19        Q. (BY MR. CAMPBELL) Dr. Wald, do you have
20    any experience analyzing scratch-and-dent
21    mortgage-backed securities?
22        A. Practical experience? No.
23        Q. Are you aware of the specifics of any
24    individual originator's underwriting guidelines
25    between 2005 and 2007?

Page 241

1        A. Can you repeat the question? I'm sorry.
2        Q. Are you aware of the specifics of any
3    individual originator's underwriting guidelines
4    between 2005 and 2007?
5        A. Not off the top of my head. I've seen a
6    number of things about particular originator's
7    guidelines in the Butler report, maybe in the
8    Sunshine report as well, and potentially in some OCC
9    documents as well, but nothing that I can list off
10    the top of my head.
11        Q. Are you aware that there can be
12    differences between different originators'
13    underwriting guidelines?
14        A. I'm aware that there are some differences,
15    but it's my understanding that the guidelines are
16    more similar than they are different.
17        Q. And what is that understanding based on?
18        A. It's under-- it's based upon the
19    knowledge I have from reading Butler, Sunshine, and
20    OCC documents.
21        Q. And which OCC documents specifically?
22        A. I don't remember which OCC documents I've
23    read. I've read a bunch of stuff. I read a couple
24    things that I cite in the report, but I looked at
25    other OCC annual reports and so on over my life.

61 (Pages 238 - 241)

1     Q. Do you believe that investors were aware
2  of the increased default risk due to low
3  documentation and income exaggeration that was
4  identified in the LaCour paper we talked about
5  earlier?
6     A. I believe that they were aware to it --
7  aware of it to some degree, but I also believe that
8  at the same time they were then relying potentially
9  more strongly on actually complying with underwriting
10  guidelines.
11     So if there -- I mean, you know, for
12  instance, I've read some of these prospectuses that
13  talk about these low-documentation loans. And when
14  they say that they're going to provide less
15  documentation or less verification, that there are
16  then reasons to believe that those loans are still
17  going to be paid off and that they're still being
18  underwritten properly.
19     So the prospectuses are, at least from
20  what I recall, careful to then point out that, you
21  know, these are still good loans that expect -- are
22  expected to be paid, and that are still meeting a
23  particular set of reasonable underwriting guidelines.
24     Q. But you believe that investors were aware,
25  at least to some extent, of an increased risk of

1  default due to low documentation?
2     A. I think there was probably some awareness
3  of that. But, you know, these low-documentation
4  loans were largely only available to particularly
5  good investors. So they may have had a higher risk
6  than other loans for those good investors, but
7  they -- that doesn't necessarily mean that they were
8  riskier overall. Or at least that they expected them
9  to be riskier overall.
10     Q. And what's your basis for the statement
11  that low documentations were largely only available
12  to particularly good investors?
13     A. That's based on what I remember from the
14  prospectuses, where they say that -- who they're
15  going to make these -- these available for. But, you
16  know, different programs may have been available to
17  different borrowers at different points in time.
18  But -- and I think Mayer, Pence, and Sherlund may
19  also mention something like this, that when you're
20  making a loan, which is a low-documentation loan,
21  they're primarily targeting, you know, particularly
22  high-FICO-score individuals or something of that
23  sort.
24     Q. Do you consider yourself an expert in
25  mortgage-backed securities?

1     A. So there are aspects of mortgage-backed
2  securities that I consider myself an expert on. For
3  instance, how they fit into the investment process, I
4  think, is something that I have a great deal of
5  information upon. I don't have a lot of knowledge
6  about the underwriting process or how they're
7  securi- -- securitized or other aspects of it.
8     So there are different portions of that
9  process, and some of them I'm very knowledgeable
10  about, and others I'm not.
11     Q. Wh-- what do you mean by "how they fit
12  into the investment process"?
13     A. How particular investors analyzed RMBS
14  securities within their portfolios. Those are
15  something -- those are things that I did for years,
16  and I think I have a good understanding of how that
17  process works.
18     Q. Do you consider yourself an expert in the
19  process of how investors analyzed subprime or alt-A
20  mortgage-backed securities from 2005 to 2007?
21     A. I don't think I have as much expertise in
22  it, but I think I still have a fair bit of expertise
23  because I don't think the process was that different.
24  And I base that upon what I've read, and I base that
25  upon the depositions that I've read, and my general

1  knowledge about how this marketplace worked.
2     Q. In 2004 did you sue a company called
3  Investment Technology Group?
4     A. Yes.
5     Q. And what was that lawsuit about?
6     A. Patent infringement.
7     Q. Did you ultimately reach a settlement in
8  that case?
9     A. Yes.
10     Q. And were you, in 2005, sued by an
11  individual named Holly Horrigan?
12     A. Yes.
13     Q. And what was that lawsuit about?
14     A. She had a number of claims. You would
15  want to refer specifically to the claims. I don't
16  remember them all off the top.
17     Q. Did Ms. Horrigan win that case?
18     A. There was a partial summary judgment in
19  her favor on one contract claim.
20     Q. Do you remember that you were accused of
21  engaging in an elaborate judgment-proofing scheme?
22     A. No, I don't remember that.
23     Q. Would it surprise you if that was the
24  case?
25     A. That doesn't sound familiar.

**62 (Pages 242 - 245)**

Page 246

1    (Exhibit 6 was marked.)
2    Q. (BY MR. CAMPBELL) I'll hand you what I've
3 marked as Wald Exhibit 6. And this is a declaration
4 that you submitted in the case that Ms. Horrigan
5 brought against you. Right?
6    A. It looks like it. I don't particularly
7 remember this one, but okay.
8    Q. If you turn to -- let's see. It looks
9 like there is a page that was omitted from this ECF
10 entry. Do you have any reason to doubt that this is
11 a declaration that you submitted in that case?
12    A. I don't really remember this particular,
13 but okay.
14    Q. And if you turn to Page 3, the first full
15 paragraph, it says, "Mr. Goldberg also accuses me of
16 having an 'elaborate judgment-proofing scheme....'
17 However, I would not characterize running out of
18 money after six years of litigation as an elaborate
19 scheme."
20    Do you remember what this was referring
21 to?
22    A. No, I don't.
23    Q. Were you engaging in an elaborate
24 judgment-proofing scheme at this time?
25    A. No.

Page 247

1    Q. And you don't remember what that was
2 referring to at all?
3    A. No. I -- I really don't remember at this
4 point.
5    Q. Okay. At some point your counsel in this
6 case, brought by Ms. Horrigan, withdrew. Correct?
7    A. That's correct.
8    Q. Why did they withdraw?
9    MR. CRAIG: Objection;
10 attorney-client privilege.
11    THE WITNESS: Should I answer?
12    MR. CRAIG: If the reason was
13 stated on the record in pleadings in court, you
14 can answer. Don't answer based on any
15 discussions you had with that attorney.
16    A. I don't remember what -- what she stated
17 in court. So, I mean, I think it's safer if you
18 simply see what she stated in court.
19    Q. (BY MR. CAMPBELL) Was your attorney in
20 that case Ira -- Ina Bort?
21    A. Ina.
22    Q. Ina Bort.
23    (Exhibit 7 was marked.)
24    Q. (BY MR. CAMPBELL) I hand you what's
25 marked as Exhibit 7. I'd like you to turn to the

Page 248

1 second page, Paragraph 5, of Exhibit 7. It reads,
2 "But even taking these discounted fees into account
3 (the January/February bill for $7,500 actually came
4 to over $10,000), defendants have said that they can
5 no longer pay us."
6    A. Yes.
7    Q. Did that refresh your recollection as to
8 why your counsel withdrew in this case?
9    A. Well, I think this whole section says this
10 firm cannot afford to work without being paid. So I
11 think if this is what is said, I think that's --
12 that's correct.
13    Q. Do you remember why you weren't able to
14 pay your attorneys in that case?
15    A. Yes, because I have been sued for many
16 years, and litigation is expensive.
17    Q. You filed for bankruptcy in 2011. Right?
18    A. That sounds right. Yes.
19    (Exhibit 8 was marked.)
20    Q. (BY MR. CAMPBELL) I'm going to hand you
21 what I've marked as Wald Exhibit 8.
22    A. Yes.
23    Q. So if you could flip through to Page -- I
24 apologize -- it's Page 21 of 40, if you look at the
25 numbers in the right-hand top column.

Page 249

1    A. Yes, I see that.
2    Q. So this is the "Summary of Schedules."
3 Correct?
4    A. Yes.
5    Q. If you go down to the bottom row that says
6 "Total," you list assets of $715,076.10. Right?
7    A. That's what it says.
8    Q. And you list liabilities of 437,000
9 dollars, 500 and -- excuse me -- $437,504.54. Right?
10    A. That's what it says there, yes.
11    Q. So your assets exceeded your liabilities.
12 Correct?
13    A. I have very little understanding of how
14 these forms work, and which assets are properties
15 that can be claimed against and which ones are not.
16 So I think what's most covered in the personal
17 property is my pension funds. But, again, I'm
18 definitely not a bankruptcy attorney.
19    Q. Why did you file for bankruptcy?
20    A. It was the advice of my counsel here. And
21 I should also mention that there was a follow-up
22 litigation where I filed suit against him for
23 malpractice.
24    Q. Which -- which attorney was that?
25    A. That was the attorney who handled this

63 (Pages 246 - 249)

Page 250

1  bankruptcy.
2      Q. Do you happen to remember the name?
3      A. Rob Eichelbaum at the Davis Law Firm.
4          (Exhibit 9 was marked.)
5      Q. (BY MR. CAMPBELL) I hand you what I've
6  marked as Wald Exhibit 9.
7      A. Yes.
8      Q. If you turn to the third page of this
9  document --
10     A. Yes.
11     Q. -- it's signed by Elliott Cappuccio?
12     A. Yes.
13     Q. That's the Cappuccio of Pulman, Cappuccio,
14 which is where we are today. Right?
15     A. Yes.
16     Q. And they represented the trustee in your
17 bankruptcy case?
18     A. Yes.
19     Q. If you turn to this Page 2, Paragraph 7,
20 the first sentence reads, "The Wald Trust is a sham
21 perpetrated by the Debtor and others to hinder, delay
22 and defraud creditors and therefore invalid and
23 subject to inclusion in the Bankruptcy Estate."
24         The debtor there is referring to you.
25 Right?

Page 251

1      A. That's what it says.
2      Q. Do you know why you -- the Wald Trust
3  was -- claimed to be a sham in this paper?
4      A. I don't think I can answer that without
5  violating a confidentiality agreement.
6      Q. Was the Wald Trust a sham?
7      A. No.
8      Q. What was the Wald Trust?
9      A. The Wald Trust here refers to, if I
10 remember correctly, my mom's estate and what her
11 lawyer created. So leave very little involvement by
12 me in any of that.
13     Q. Why did you join Analytic Focus?
14     A. A lot of my students work there, and they
15 had a need for someone for this particular expert
16 witness work.
17     Q. Are you paid a retainer as part of your
18 agreement with Analytic Focus?
19     A. I'm not quite sure what you mean by
20 "retainer." But no. I'm paid an hourly rate.
21     Q. And that's through Analytic Focus?
22     A. That's correct.
23         MR. CAMPBELL: That's all the
24 questions that I have, Dr. Wald. I'll note,
25 while we're still on the record, that we're going

Page 252

1  to reserve all our rights with respect to these
2  additional tests that have been run last week and
3  their use/reference to them. But that's all I
4  the questions that I have for the RBS defendants.
5          MR. CRAIG: I can tell you that we
6  don't have any intention to use that at trial.
7  It wasn't disclosed. It may be part of a Daubert
8  motion, but that would be the only rea- -- the
9  only use we would put it to.
10         MR. CAMPBELL: Well, we'll reserve
11 all of our rights.
12         MR. THOMAS: No questions on
13 behalf of Nomura.
14         MR. LORING: No questions on
15 behalf of Novastar Mortgage Funding Corporation.
16         MR. CRAIG: No questions from me.
17         THE VIDEOGRAPHER: This concludes
18 the deposition of John Wald. Going off the
19 record. The time is 5:04.
20         (DEPOSITION CONCLUDED AT 5:04 P.M.)
21
22
23
24
25

Page 253

1      IN THE UNITED STATES DISTRICT COURT
   FOR THE CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2
   NATIONAL CREDIT UNION   §
3  ADMINISTRATION BOARD, AS §
   LIQUIDATING AGENT OF    §
4  WESTERN CORPORATE FEDERAL §
   CREDIT UNION,           §  Case No. CV 11-05887 GW(JEMx)
5      Plaintiff,          §
                           §
6  VS                      §
                           §
7  RBS SECURITIES INC., ET AL §
       Defendants.         §
8
                   - and -
9
       IN THE UNITED STATES DISTRICT COURT
10        FOR THE DISTRICT OF KANSAS
   NATIONAL CREDIT UNION   §
11 ADMINISTRATION BOARD, AS §
   LIQUIDATING AGENT OF    §
12 WESTERN CORPORATE FEDERAL §
   CREDIT UNION,           §
13     Plaintiff,          §  Case No. CV 11-02340 JWL-JPO
                           §
14 VS                      §
                           §
15 RBS SECURITIES INC., ET §
   AL.,                    §
16     Defendants.         §
17
18     REPORTER'S CERTIFICATION
       DEPOSITION OF JOHN K. WALD, Ph.D.
19     TAKEN JANUARY 15, 2016
20
21     I, Tamara Chapman, Certified Shorthand
22 Reporter in and for the State of Texas, hereby
23 certify to the following:
24     That the witness, JOHN K. WALD, Ph.D., was
25 duly sworn by the officer and that the transcript

64 (Pages 250 - 253)

Page 254

1  of the oral deposition is a true record of the
2  testimony given by the witness;
3      That the original deposition was delivered
4  to Mr. Gavin C.P. Campbell;
5   That a copy of this certificate was served on
6  all parties and/or the witness shown herein on
7  _____.
8      I further certify that pursuant to FRCP
9  No. 30(f)(i) that the signature of the deponent:
10  _____ was requested by the deponent or a party
11  before the completion of the deposition and that
12  the signature is to be returned within 30 days
13  from date of receipt of the transcript. If
14  returned, the attached Changes and Signature Page
15  contains any changes and the reasons therefor;
16   _X_ was not requested by the deponent or a
17  party before the completion of the deposition.
18      I further certify that I am neither
19  counsel for, related to, nor employed by any of
20  the parties in the action in which this
21  proceeding was taken, and further that I am not
22  financially or otherwise interested in the
23  outcome of the action.
24
25

Page 255

1      Certified to by me this 20th day of January, 2016.
2
3
4      TumCL
       _____
5      Tamara Chapman, CSR, RPR, CCR (LA)
       CSR NO. 7248; Expiration Date: 12-31-16
6      Veritext Legal Solutions
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

65 (Pages 254 - 255)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

***ERRATA SHEET***

NAME OF CASE:        NCUA V RBS (KS 11-2340)(CA 11-5887)
DATE OF DEPOSITION:  January 15, 2016
NAME OF DEPONENT:    John K. Wald, Ph.D.

John K. Wald declares as follows:

I have read the transcript of my deposition taken on January 15, 2016.  The contents thereof are an accurate transcription of the deposition, subject to the following corrections or changes:

| Page | Line(s) | Original | Corrected | Reason |
|------|---------|----------|-----------|--------|
| 15 | 2-3 | "a lot of the securities, in sort of a growing percentage, was RMBS." | "a lot of the securities, in fact a growing percentage, was RMBS." | Transcription Error |
| 16 | 7 | "IOPOs" | "IO/POs" | Transcription Error |
| 24 | 21 | "Between 1978 and 1990" | "Between 1987 and 1990…" | Transcription Error |
| 30 | 25 | "IOPO" | "IO/PO" | Transcription Error |
| 37 | 14 | "I've published papers about state law." | "I've published papers about state laws." | Transcription Error |
| 39 | 6 | "know, exactly sort what Fabozzi describes." | "know, exactly what Fabozzi describes." | Transcription Error |
| 47 | 23 | "invest in allow me to know exactly what securities" | "invested in allowed me to know exactly what securities…" | Transcription Error |
| 61 | 8 | "I mean, Dr. Cohen-Cole doesn't have this option values" | "Dr. Cohen-Cole doesn't have the option values…" | Transcription Error |
| 61 | 17 | "Den, Quigley, and Van Order paper" | "Deng, Quigley, and van Order paper…" | Transcription Error |
| 69 | 19 | "So if they're going to model all day, they're going to model -- have one model for that." | "So if they're going to model one deal, they're going to model— have one model for that." | Transcription Error |
| 74 | 1 | "for some issues, not all because some issues of DTI was not in the prospectus supplements. He also ignored it in his model." | "Dr. Cohen-Cole looks at DTI for some issues, not all, because for some issues DTI was not in the prospectus supplements.  He then also ignored it in his model." | Transcription Error |
| 88 | 4 | "buying a non-scratch and dent." | "buying a scratch-and-dent." | Transcription Error |

| 90 | 15 | "those default probabilities, there again thinking" | "those default probabilities, they are again thinking…" | Transcription Error |
|----|----|----|----|----|
| 92 | 17 | "a similar set of ascending loans and get a history for those." | "a similar set of scratch-and-dent loans and get a history for those." | Transcription Error |
| 147 | 8-9 | "high BBB securities that rather AAA securities," | "high BBB securities rather than AAA securities,…" | Transcription Error |
| 215 | 7 | "and looked and see whether these" | "and looked and seen whether these…" | Transcription Error |
| 228 | 7 | "they don't like look they're uniform" | "they don't look like they're uniform." | Transcription Error |
| 246 | 12 | "this particular," | "this in particular,…" | Transcription Error |
| 251 | 11 | "created. So leave very little involvement by" | "created. So that leaves very little involvement by…" | Transcription Error |

Pursuant to 28 U.S. Code § 1476, I declare under penalty of perjury that the foregoing is true and correct.

_John K. Wald_

John K. Wald, Ph.D.

Executed on: _2/4/16_

Date