# EXHIBIT 2

# Filed Under Seal

HIGHLY CONFIDENTIAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | Case No. 11-cv-2340 JWL (JPO) |
| Plaintiff, | Judge John W. Lungstrum |
| v. | |
| RBS SECURITIES INC., *et al.,* | |
| Defendants. | |

**AMENDED REPLY EXPERT REPORT OF WALTER TOROUS, PH.D.**
**On behalf of Nomura Home Equity Loan, Inc.**

**January 26, 2016**

HIGHLY CONFIDENTIAL

# TABLE OF CONTENTS

I.  Background and Assignment .............................................................................. 1

    A.  Case Background ........................................................................................ 1

    B.  Assignment ................................................................................................. 3

II.  Summary of Opinions ..................................................................................... 4

III.  Dr. Barth Mischaracterizes the Factors that Contributed to the 'Housing Boom' Between 2000 and 2006 and the Ensuing 'Housing Bust' ................................... 6

    A.  Dr. Barth Presents Both Incorrect and Incomplete Evidence that the "Alleged Underwriting and Disclosure Defects" led to the Housing Price Bubble ..................... 6

    B.  Dr. Barth Incorrectly Asserts that the "Alleged Underwriting and Disclosure Defects" Facilitated Loans to Borrowers who were More Likely to Default ............. 10

IV.  Dr. Saunders Fails to Properly Evaluate the Loss Causation Analyses Conducted in my Initial Report .............................................................................................. 13

    A.  Dr. Saunders Asserts Without Evidence that the Industry and Reduced Industry Benchmarks Contained Defective Loans ..................................................... 13

        1.  Industry Benchmark ............................................................................. 13

        2.  Reduced Industry Benchmark ............................................................... 16

    B.  Dr. Saunders Does Not Properly Evaluate Statistical Significance ........................... 17

    C.  Dr. Saunders Incorrectly Applies the Default and Loss Severity Models from my Initial Report to the Loans Reviewed by Mr. Butler ............................................ 23

    D.  Dr. Saunders Incorrectly Asserts that the Loan and Borrower Characteristics "As Alleged" Would have led to a Higher Subordination Level of the At-Issue Certificate ......................................................................................... 24

    E.  Evaluation of the Performance of the At-Issue Loans Using Defendant Experts' Re-Underwriting Analyses Further Undermines Dr. Saunders's Rebuttal Report .......................................................................................... 25

Appendix A: Documents and Data Considered ..................................................... A-1

HIGHLY CONFIDENTIAL

## I.    BACKGROUND AND ASSIGNMENT

### A.    Case Background

1.    I have been retained by Nomura Home Equity Loan, Inc. ("Nomura" and collectively with other defendants in this matter, "Defendants") through Jenner & Block (counsel for Nomura) to provide expert testimony on loss causation and damages in the matter of *National Credit Union Administration Board v. RBS Securities Inc., et al.*[1]  In connection with this action, I previously submitted an expert report ("Initial Report")[2] in which I discussed, among other things, the factors affecting the performance of residential MBS including the NHELI 2007-1, I-A-4 certificate (the "At-Issue Certificate").  In addition, I previously submitted an expert rebuttal report ("Rebuttal Report")[3] in which I offered an opinion regarding, among other things, damages issues.  This included an evaluation of the calculation of damages for the At-Issue Certificate found in the expert report of Dr. John D. Finnerty,[4] the incorporation of loss causation into calculating damages, as well as an evaluation of certain of the claims in the re-underwriting report of Steven I. Butler.[5]

2.    Plaintiff submitted expert rebuttal reports by James R. Barth[6] and Anthony Saunders[7] on October 16, 2015.  Dr. Barth assessed "whether Defendants' experts have established that

---

[1]    Second Amended Complaint, *National Credit Union Administration Board v. RBS Securities, Inc. et al.*, No. 11-cv-2340 (ECF No. 435) (November 17, 2014) ("Second Amended Kansas Complaint").  For purposes of this report, I will refer to the National Credit Union Administration ("NCUA") as Plaintiff.

[2]    Expert Report of Walter Torous, Ph.D., August 14, 2015.  Unless noted otherwise, I will employ the same defined terms in this report as in my Initial Report.

[3]    Second Amended Rebuttal Report of Walter Torous, Ph.D., November 17, 2015.

[4]    Expert Report of John D. Finnerty, August 13, 2015 ("Finnerty Report").

[5]    Expert Report of Steven I. Butler on the Re-Underwriting of Sampled Loans, August 14, 2015 ("Butler Report").

[6]    Rebuttal Report of James R. Barth, October 16, 2015 ("Barth Report").

[7]    Rebuttal Report of Anthony Saunders, October 16, 2015 ("Saunders Report").

HIGHLY CONFIDENTIAL

changes in macroeconomic factors such as home prices and unemployment rates were unrelated to the Alleged Underwriting and Disclosure Defects."[8]  Dr. Barth concluded that they have not.  He asserted that the primary contributor to the rise in housing prices was the expansion of subprime lending and securitization of subprime mortgages, which he asserted was facilitated in part by purported underwriting and disclosure defects of the types NCUA alleges.[9]  Dr. Barth further asserted that the financial crisis and ensuing economic recession was primarily triggered by "the bursting of the housing bubble and increase in mortgage loan defaults."[10]

3.    Dr. Saunders's report reviewed and evaluated "the loss causation analyses performed and the conclusions reached by Dr. Torous, Professor Hausman and Dr. Cohen-Cole."[11]   In his report, Dr. Saunders critiqued a number of aspects of the loan benchmarking analyses I presented in my Initial Report.   Specifically, Dr. Saunders made the following assertions regarding my analyses:

- Both the Industry and Reduced Industry Benchmarks were flawed in part because they purportedly contained defective loans;

- In calculating whether there existed a statistically significant difference between the actual and expected performance of the Supporting Loan Group, my approach purportedly failed to use an appropriate and "recognized" method of determining statistical significance; and

---

[8]     Barth Report, ¶12.

[9]     Barth Report, ¶12.

[10]    Barth Report, ¶12.

[11]    Saunders Report, ¶14.  I understand that Professor Jerry Hausman and Dr. Ethan Cohen-Cole also filed reports on behalf of Defendants, neither of which I have reviewed.

HIGHLY CONFIDENTIAL

- Had the Offering Documents for the At-Issue Certificate disclosed the allegedly correct loan and borrower characteristics of the underlying collateral, the credit rating agencies would have purportedly required an increased level of subordination, which would have ultimately led to fewer losses on the securities.

4. Dr. Saunders also attempted to apply the Default and Loss Severity Models in my Initial Report to the sample of loans re-underwritten by Mr. Butler. He concludes that "(a) the loans Mr. Butler classified as Materially Misrepresented had significantly higher default rates than other Sampled Loans, (b) the At-Issue Loans had significantly higher default rates than would have been expected for otherwise comparable loans that were not Materially Misrepresented, and (c) the actual losses to date of the underperforming At-Issue SLGs exceed the losses that would have been expected to date if these SLG[s] did not contain Materially Misrepresented loans by $2,525.2 million."[12]

5. Finally, I understand that two experts for certain defendants have submitted expert re-underwriting reports in this matter: (1) Joel Spolin (for RBS Securities Inc., RBS Acceptance Inc., and Financial Asset Securities Corporation (collectively, "RBS"));[13] and (2) Michael Forester (for Nomura).[14]

### B.    Assignment

6. In this report ("Reply Expert Report"), counsel has asked me to review and respond to certain of the statements and opinions expressed in the expert reports of Drs. Barth and Saunders as they relate to the At-Issue Certificate. Specifically, counsel has asked me to:

---

[12]    Saunders Report, ¶14.

[13]    Rebuttal Expert Report of Joel B. Spolin, October 16, 2015 ("Spolin Report"), ¶¶2-4.

[14]    Expert Report of Michael Forester Submitted on behalf of Nomura Asset Acceptance Corporation, October 16, 2015 ("Forester CA Report"), ¶¶9-12; Expert Report of Michael Forester Submitted on behalf of Nomura Home Equity Loan, Inc., October 16, 2015 ("Forester KS Report"), ¶¶9-12.

HIGHLY CONFIDENTIAL

- Analyze and respond to Dr. Barth's assertions regarding the conditions in the U.S. residential real estate market, including the factors that contributed to the "housing boom" between 2000 and 2006 and the ensuing "housing bust";

- Analyze and respond to Dr. Saunders's criticisms of the loss causation analyses presented in my Initial Report, including his evaluation of my benchmarking analyses and his attempted application of the Default and Loss Severity Model to Mr. Butler's re-underwriting results; and

- Assess the validity of the loss causation conclusions of Dr. Saunders by using the loans re-underwritten by Defendants' experts, Messrs. Spolin and Forester, to further assess the impact, if any, that alleged underwriting defects had on the performance of the At-Issue Loans.

7.      In working on this assignment, I have considered the documents and data listed in **Appendix A** to this report, which supplement the materials I considered in forming the opinions contained in my Initial Report and Rebuttal Report. I reserve the right to review and respond to any additional reports or materials that are made available to me.

8.      I am being compensated in this matter at a rate of $800 per hour. I have been assisted by others working under my direction and supervision. I receive additional compensation based on their professional fees associated with my work on this matter. My compensation is not contingent upon the content of the opinions I form or the outcome of this case.

## II.     SUMMARY OF OPINIONS

9.      In his characterization of the factors contributing to the rise and subsequent fall in U.S. home prices, Dr. Barth makes a number of unsupported assertions in his report and:

- Fails to explain how, if at all, alleged failures to adhere to underwriting standards in the broader industry are tied to the allegations in this matter or can reasonably be attributed to Nomura, the At-Issue Certificate or the At-Issue Loans;

- Ignores the primacy of the expansion of underwriting standards (rather than alleged non-compliance) and the introduction of new mortgage products amongst the factors contributing to the increased supply of credit;

- Fails to discuss or recognize the variety of well-documented reasons for the expansion of subprime mortgage lending and securitization, including: government policies, macroeconomic conditions prior to the home price peak, consumer confidence, and the availability of new loan products; and

- Ignores the plethora of evidence finding that the decline in home prices and other macroeconomic factors were the primary drivers of defaults and delinquencies.

10.    Dr. Saunders mischaracterizes the loss causation analyses conducted and described in my Initial Report and fails to provide evidence that supports his critiques of my methodology.  These include failing to appropriately:

- Assess the validity of relying on the Industry and Reduced Industry Benchmarks;

- Evaluate statistical significance;

- Apply the Default and Loss Severity Models from my Initial or Rebuttal Reports to the loans reviewed by Mr. Butler; and

- Provide sufficient evidence that the loan and borrower characteristics "as alleged" would have led to a higher subordination level of the At-Issue Certificate.

11.    Finally, to further demonstrate why Dr. Saunders's and Dr. Barth's criticisms of my conclusions regarding the impact that alleged underwriting defects had on the

HIGHLY CONFIDENTIAL

performance of the At-Issue Loans are without merit, I evaluated the loans as re-underwritten by Defendants' experts, Messrs. Spolin and Forester.  The performance of the At-Issue Loans relative to this benchmark (the "Spolin and Forester Re-Underwriting Benchmark") offers further support for the conclusions found in my Initial Report, and undermines those set forth in Drs. Saunders's and Barth's reports.

### III.   DR. BARTH MISCHARACTERIZES THE FACTORS THAT CONTRIBUTED TO THE 'HOUSING BOOM' BETWEEN 2000 AND 2006 AND THE ENSUING 'HOUSING BUST'

#### A.   Dr. Barth Presents Both Incorrect and Incomplete Evidence that the "Alleged Underwriting and Disclosure Defects" led to the Housing Price Bubble

12.   Dr. Barth asserts that the decline in macroeconomic conditions, including the decline in housing prices and subsequent increase in unemployment rates, were not exogenous causes of the performance of the At-Issue Certificate.[15]  In making this assertion, Dr. Barth attempts to link the unprecedented housing bubble that formed in the U.S. between 1995 and 2006 to Plaintiff's allegations regarding the alleged misrepresentations of loan and borrower characteristics of the At-Issue Loans (although Dr. Barth's analysis is not specific to the At-Issue Certificate or At-Issue Loans).[16]  In order to make this claim, it is necessary for Dr. Barth to make a number of assumptions about the causes of the housing bubble.  First, Dr. Barth asserts that the increased securitization of residential mortgage loans between 2000 and 2006 fueled the growth in mortgage originations, particularly for subprime loans.[17]  Specifically, he asserts that the expansion of subprime mortgage

---

[15]   Barth Report, ¶40.

[16]   Barth Report, ¶¶14, 23.

[17]   Barth Report, ¶17.

HIGHLY CONFIDENTIAL

lending was due in part to the approval of loans that did not comply with underwriting guidelines, as well as the securitization of loans which failed to disclose this non-compliance to investors.[18]   To support this assertion, Dr. Barth cites selected academic papers that he claims show that the loan and borrower characteristics of non-agency securitized loans were frequently misreported to investors.[19]   When doing so, he also references the re-underwriting analysis of Plaintiff's expert Mr. Butler, who he claims "found that most of [the At-Issue Loans] breached the applicable underwriting guidelines in at least one way, or had at least one inaccurate characteristic listed in the mortgage loan schedule…"[20]   Finally, Dr. Barth concludes that this expansion of subprime mortgage lending contributed to an expansion of the supply of credit to unqualified borrowers,[21] thereby contributing to the housing price increase.[22]

13.     Dr. Barth's assumptions regarding the causes of the housing bubble, however, are unfounded and incomplete.  Dr. Barth fails to provide any evidence that the "Alleged Underwriting and Disclosure Defects," let alone any alleged defects related to the At-Issue Certificate or At-Issue Loans, led to the housing price bubble.  Specifically, he misinterprets or draws faulty conclusions from the academic literature he cites, while also failing to examine or discuss the variety of evidence discussed in my Initial Report.  I describe these shortcomings in more detail below.

14.     First, when examining factors that contributed to the increased supply of credit (and the related increase in home prices), Dr. Barth ignores the primacy of the expansion of

---

[18]     Barth Report, ¶23.

[19]     Barth Report, ¶22.

[20]     Barth Report, ¶21.

[21]     Barth Report, ¶23.

[22]     Barth Report, ¶18.

underwriting standards (rather than any alleged non-compliance with such guidelines) and the introduction of new mortgage products.  As discussed in my Initial Report, among the changes that facilitated the increase in mortgage originations and the variety of product offerings was an industry-wide expansion of underwriting guidelines.[23]  The drivers of the change in underwriting standards, however, were unrelated to the allegations in this case, the At-Issue Certificate or the At-Issue Loans, and include: (1) a decline in lenders' perception of risk following an extended period of economic growth, home price appreciation, and historically low default rates; (2) RMBS investors' risk appetites;[24] and (3) government initiatives encouraging home ownership, which increased lenders' incentives to make riskier loans to previously underserved borrowers.[25]  Additionally, these changes in underwriting guidelines were pervasive and well-known, as Dr. Barth himself discussed in his more contemporaneous writings.[26]

15.  Second, Dr. Barth also fails to examine, discuss, or acknowledge the variety of well documented reasons for the expansion of mortgage lending and securitization.  As discussed in my Initial Report, these factors included: federal government policies, macroeconomic conditions that began before home prices peaked (*e.g.,* low unemployment), increased consumer confidence, and the availability of new loan

---

[23]   Initial Report, Section V.B.3.

[24]   *See e.g.,* Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1, Prospectus Supplement, p. S-42 ("The underwriting standards applicable to the Mortgage Loans… may or may not conform to Fannie Mae or Freddie Mac guidelines.  As a result, those Mortgage Loans may experience rates of delinquency, foreclosure and borrower bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in strict compliance with Fannie Mae or Freddie Mac guidelines.").  *See also,* other "Risk Factors" including inadequacy of credit enhancements (pp. S-36 to S-38), risks related to interest-only loans (pp. S-39 to S-40), and liquidity risk (pp. S-48 to S-49), among others.

[25]   Initial Report, Section V.B.3.

[26]   Initial Report, ¶52; *see also* discussion of Dr. Barth's publications in **Section III.B**.

HIGHLY CONFIDENTIAL

products to a wider spectrum of borrowers.[27]   These factors impacted the industry broadly and had the effect of expanding credit to the entire spectrum of mortgage borrowers.  It is notable that while these factors are absent from his expert report, Dr. Barth in fact does consider some of these and other reasons in his own prior publications on the topic of the housing crisis, none of which he cites.[28]  Indeed, in his pre-litigation publications, Dr. Barth generally does not cite any alleged misrepresentations as a cause, let alone an important cause, of the housing boom.[29]  Dr. Barth also fails to take into account that many market participants, including the Federal Reserve, other institutions, and homebuyers themselves, considered at various points in time a nationwide decline in home prices to be possible but unlikely—further driving the increase in home prices and demand in the RMBS market.

16.   Third, Dr. Barth does not explain how any alleged failure to adhere to underwriting standards in the broader industry (even assuming for the sake of argument that there was such a failure) is tied to the allegations in this action.  Dr. Barth implies that the

---

[27]   Initial Report, Section V.B.

[28]   *See e.g.,* James Barth, Tong Li, Triphon Phumiwasana, and Glenn Yago, "A Short History of the Subprime Mortgage Market Meltdown," *Government Housing Bank Journal*, Vol. 2, No. 2, January - March 2008 ("Barth et al. 2008a").  Here, Dr. Barth and his co-authors note that government-sponsored entities such as "the Government National Mortgage Association (GNMA or Ginnie Mae), the Federal National Mortgage Association (FNMA or Fannie Mae), and the Federal Home Loan Mortgage Corporation (FHLMC or Freddie Mac) became the primary securitizers of home mortgages." (p. 3).  Additionally, they note that "The financial innovations of securitization and adjustable-rate mortgages contributed to the development of the U.S. mortgage markets by providing more diverse sources of funding for residential home mortgages and more choices of mortgage products for consumers." (p. 4).

[29]   In instances where Dr. Barth did cite fraud, he did so on the part of the homeowner: "…other individuals engaged in fraud (from property flipping with falsely inflated appraisals to lying on loan applications) to the detriment of lending institutions."  *See* James Barth, Tong Li, Wenling Lu, Tripon Phumiwasana, and Glenn Yago, "The Rise and Fall of the U.S. Mortgage and Credit Markets: A Comprehensive Analysis of the Meltdown," *Milken Institute Research Report*, January, 2009 ("Barth et al. 2009"), p. 21.  It is also notable that in this same paper Dr. Barth and his co-authors warn that: "Even in the absence of fraud, the housing bubble seemed to promise such quick, outsized profits that many market participants simply threw caution to the wind. Investors in securities backed by subprime loans—particularly in the more exotic types—must now more fully appreciate the fact that the marketplace is sometimes quite harsh in punishing those who do not properly evaluate risk." (p. 21).

HIGHLY CONFIDENTIAL

purportedly frequent misrepresentation of loan and borrower characteristics in other securitizations is part of the allegations made by Plaintiff in this matter.  In fact, he groups the loans in this matter together with all loans originated between 1995 and 2006 while making no effort to link the allegations in this case to the broader housing market.  And in regards to Dr. Barth's assertion that the allegations in this matter had an impact on U.S. home prices, it should be noted that, as mentioned in my Initial Report, the loans underlying the At-Issue Certificate (which was issued in 2007) were originated long after the climb in housing prices began, and the vast majority were originated at or around the peak in home prices.[30]  Thus, contrary to his assertion, the loans could not have contributed to creating the "housing bubble."  Furthermore, the original principal balance of the At-Issue Loans backing the At-Issue Certificate represents only approximately 0.005 percent of the aggregate principal balance of residential mortgage originations in the U.S. between 2005 and 2007.[31]  Given this, Dr. Barth's suggestion that the origination and securitization of the At-Issue Loans played a role in the run up in home prices between 2000 and 2006 is not supported by any evidence and is illogical.

**B.  Dr. Barth Incorrectly Asserts that the "Alleged Underwriting and Disclosure Defects" Facilitated Loans to Borrowers who were More Likely to Default**

17.  Dr. Barth also ignores that many economists have found that the decline in home prices and other macroeconomic factors were the primary drivers of defaults.  For example, Gerardi et al. find that "[home] prices have primacy" over underwriting in explaining the

---

[30]  99.7 percent of loans by original loan balance were originated in 2006, with the remaining 0.3 percent originated in 2005.

[31]  This percent is calculated by dividing the sum of the original principal balance of the At-Issue Loans by the aggregate value of residential mortgage loan originations from 2005 to 2007, found in Exhibit 4 to Dr. Barth's report.

HIGHLY CONFIDENTIAL

increase in foreclosures for both subprime and prime loans.[32]  In fact, one paper that Dr. Barth cites (Palmer 2015) concludes that "price declines unrelated to the credit expansion causally explain the majority of the disparity in [performance between loans originated in different years]."[33]  Moreover, this paper confirms the findings from the analysis in my Initial Report concluding that the timing of the decline in home prices explains 52.6 percent of expected defaults and serious delinquencies ("DASD").[34]  Palmer notes that "the differential impact of crashing property values (an average price decline of 37%) on later [origination year] cohorts **explains at least 60% of the rapid rise in default rates** across subprime borrower [origination year] cohorts.  Borrower and loan quality, especially observables such as whether the mortgage had an interest-only period or was not fully amortizing, are important as well and explain at most 40% of the default rate differences across [origination year] cohorts."[35] (emphasis added).

18.    Indeed, Dr. Barth has acknowledged this in his own publications.  In one paper titled "Surprise: Subprime Mortgage Products Are Not the Problem," Dr. Barth and his co-authors argued that subprime mortgage products were not the source of the problem in the housing market, but instead macro-economic factors and borrowers' financial conditions were the key factors contributing to the rise in foreclosures.[36]  Dr. Barth wrote:

---

[32]    Kristopher Gerardi, et al., "Decomposing the Foreclosure Crisis: House Price Depreciation versus Bad Underwriting," *Federal Reserve Bank of Atlanta*, Working Paper 2009-25, (Sept. 2009), p. 1.

[33]    Christopher Palmer, "Why Did So Many Subprime Borrowers Default During the Crisis: Loose Credit or Plummeting Prices?" *University of California at Berkeley*, September 2015 ("Palmer 2015"), p. 1.

[34]    Initial Report, Exhibit 21.

[35]    Palmer 2015, p. 40.

[36]    James Barth, Tong Li, Triphon Phumiwasana, and Glenn Yago, "Surprise: Subprime Mortgage Products Are Not the Problem," *Government Housing Bank Journal*, Vol. 2, No. 2, January - March 2008 ("Barth et al. 2008b").

HIGHLY CONFIDENTIAL

To argue that the product is the source of the problem is to ignore a fundamental truth: the ability or willingness of individuals to repay loans depends on financial factors. **The marketplace and a borrower's financial circumstances may deteriorate, leading to serious problems, including foreclosure.** In some parts of the country, for example, real estate prices have fallen so far that houses are worth less than the amount owed on them. In addition, borrowers lose their jobs, or suffer divorce or serious illness, or otherwise face severe financial straits. **It is well known that these factors, more than anything else, contribute to increases in foreclosures, regardless of the mortgage product**.[37] (emphasis added)

19.    Similarly, in another paper titled "A Short History of the Subprime Mortgage Market Meltdown," Dr. Barth and his co-authors argued that the main factors that caused defaults and foreclosures were not the mortgage product type, but the macro-economic factors and borrowers' financial conditions experienced after obtaining the mortgage loans.[38]  Dr. Barth wrote:

> **Most importantly, the factors that cause individuals to enter foreclosure are generally not based on the type of product they receive, but rather the financial circumstances they find themselves in subsequent to obtaining mortgage loans.** These factors include unemployment, divorce, health problems and, especially, **declines in home prices to the point at which homes are worth less than outstanding mortgage balances**.[39] (emphasis added)

20.    Indeed, Dr. Barth's conclusion in his prior publication (quoted above) that the most important factors impacting loan performance were the "financial circumstances [borrowers] find themselves in subsequent to obtaining mortgage loans," is best illustrated in Exhibit 22 of my Initial Report, "Origination LTV and Home Price-Adjusted LTV."  This analysis measured the impact of declining macroeconomic conditions subsequent to securitization on the stated LTV at origination.  Given that the

---

[37]    Barth et al. 2008b, p. 10.

[38]    Barth et al. 2008a.

[39]    Barth et al. 2008a, p. 5.

weighted average home price-adjusted LTV exceeds the weighted average origination LTV by as much as 73.4 percentage points, this analysis illustrated the overwhelming impact of home price declines on a given LTV ratio at origination.

21.     Overall, Dr. Barth ignores a plethora of evidence—and his own pre-litigation writings— finding that the decline in home prices and other macroeconomic factors were the primary drivers of defaults and delinquencies in the U.S. housing market.   In his characterization of the factors contributing to the fall in U.S. home prices, Dr. Barth in his rebuttal fails to cite research refuting his assertion that the decline in home prices was driven by an increased supply of credit to subprime borrowers.  This research includes (a) papers that I reviewed and cited in my Initial Report, (b) papers Dr. Barth himself cites in his report but selectively quotes, and (c) Dr. Barth's own writings.

## IV.     DR. SAUNDERS FAILS TO PROPERLY EVALUATE THE LOSS CAUSATION ANALYSES CONDUCTED IN MY INITIAL REPORT

### A.     Dr. Saunders Asserts Without Evidence that the Industry and Reduced Industry Benchmarks Contained Defective Loans

#### 1.     Industry Benchmark

22.     As discussed in my Initial Report, the Industry Benchmark did not exclude loans subject to litigation outside of actions related to the current matter because it was intended to represent the industry as a whole during the relevant time period.   The Industry Benchmark is comprised of comparable loans from non-agency securitizations that were issued between 2005 and 2007,[40] a period that includes the years of securitization of the At-Issue Loans.  This benchmark compares the At-Issue Loans to a comparable set of

---

[40]     *See* Appendix D to my Initial Report for further details on the criteria and process by which I identify comparable loans in the Industry Benchmark.

HIGHLY CONFIDENTIAL

loans that represent the industry during the relevant time period. The benchmark represents the spectrum of comparable loans originated during the relevant time period that experienced the same macroeconomic conditions as the At-Issue Loans; Dr. Saunders did not dispute that the loans in my benchmark are comparable to the At-Issue Loans. Moreover, Dr. Saunders presents no support for his assertion that defective loans taint the benchmark, much less provide any specific percentage of allegedly defective loans; he merely assumes it to be the case. The Industry Benchmark is an appropriate and informative benchmark to use.

23. Additionally, despite the fact that Plaintiff has not evaluated any of the loans in this benchmark to identify purported defects, I also undertook an even more conservative approach by removing loans from my Industry Benchmark that were or are currently involved in litigation (the Reduced Industry Benchmark). From this, however, Dr. Saunders draws a number of erroneous conclusions regarding the scope and magnitude of the number of loans in the Industry Benchmark potentially impacted by underwriting defects. First, none of Plaintiff's experts provided any evidence that the loans comprising the Industry Benchmarks contained any defects. There is no basis to assume that all loans involved in litigation are de facto tainted. Nor should my use of a Reduced Industry Benchmark suggest that my Industry Benchmark is flawed. Rather, my exclusion of loans subject to litigation in the Reduced Industry Benchmark was a conservative assumption made to demonstrate the robustness of both my analysis and conclusions. In reality, a legal complaint or settlement does not amount to a finding that all or any loans involved in that litigation are tainted. Plaintiff's own expert, Mr. Butler, purports to find evidence of alleged material misrepresentation in 58 percent of the total loans that he reviewed, even before the rebuttal reports provided by Messrs. Spolin and Forester are

HIGHLY CONFIDENTIAL

taken into account.  Therefore, even with respect to the At-Issue Certificate, Plaintiff is not alleging that all of the loans have material misrepresentations.

24.     Further, Dr. Saunders cites select academic papers, which he alleges "analyzed the performance of loans based on their reported characteristics and found that the actual performance of the loans was worse than would have been expected…"[41]  Dr. Saunders draws a number of faulty conclusions from these papers.  For example, Dr. Saunders asserts that the findings in the Demyanyk & Van Hemert (2011) paper[42] provide "indirect evidence of underwriting defects in [the Industry Benchmark]," as they showed that "reported loan and borrower characteristics cannot explain the poor performance of securitized loans originated in 2006 and 2007."[43]  But the authors themselves do not attribute poor loan quality[44] to *fraud or misrepresentations* in loan and borrower characteristics.  Nor is that a fair inference to draw from the paper, inasmuch as the authors' conclusion that there was *loan quality deterioration* from 2001 to 2007 is not necessarily evidence that there must have been loan *defects*; such deterioration could be the result of other factors unrelated to alleged loan defects.[45]  For example, the authors' model contains loan vintage dummy variables, which they contend measure the quality of the loans of each vintage.  These variables, however, may be capturing differences related

---

[41]     Saunders Report, ¶33.

[42]     Yuliya Demyanyk and Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," *The Review of Financial Studies*, Vol. 24, No. 6, 2011 ("Demyanyk and Van Hemert 2011").

[43]     Saunders Report, ¶¶39, 40.

[44]     The authors define loan quality as "the performance of loans, adjusted for differences in borrower characteristics (such as the credit score, level of indebtedness, an ability to provide documentation), loan characteristics (such as a product type, an amortization term, a loan amount, an mortgage interest rate), and macroeconomic conditions (such as house price appreciation, level of neighborhood income, and change in unemployment)."  *See* Demyanyk and Van Hemert 2011, p. 1875.

[45]     Demyanyk and Van Hemert 2011, p. 1875 ("In many respects, the subprime market experienced a classic lending boom-bust scenario with rapid market growth, loosening underwriting standards, deteriorating loan performance, and decreasing risk premiums.").

to macroeconomic conditions or borrower characteristics that are changing over time and are not sufficiently captured by the other variables in the model.  In other words, the deterioration in quality could be related to a disclosed expansion of underwriting standards that is not controlled for in their model.

### 2.      Reduced Industry Benchmark

25.     Dr. Saunders asserts that the Reduced Industry Benchmark is tainted despite my having conservatively removed the loans in the Industry Benchmark that are or were subject to known MBS litigation simply because he contends that other litigation was overlooked. Specifically, he asserts that his "team has identified MBS litigation concerning 244 of the securitizations in Dr. Torous's Reduced Industry Benchmark."[46]  First, it should be noted that three of the securitizations identified by Dr. Saunders are already not included in my Reduced Industry Benchmark.[47]   Second, I have undertaken the further exercise of removing the remaining securitizations identified by Dr. Saunders from the Reduced Industry Benchmark and again estimate the expected performance of the Supporting Loan Group.  After removing those loans and then re-running my model, I find that the results are consistent with my prior results.  Specifically, the At-Issue Loans performed in line with expectations from this updated Reduced Industry Benchmark (*see* **Exhibit 1**). This result, coupled with the fact that the Industry, Reduced Industry and Butler Benchmarks all yielded similar results regarding the performance of the Supporting Loan Group, attests to the robustness and correctness of my initial conclusions.

---

[46]     Saunders Report, ¶42.

[47]     These include the following securitizations: CMLTI 2007-SHL1; CCMFC 2005-1A; and CCMFC 2006-4A.

HIGHLY CONFIDENTIAL

26.     Furthermore, Dr. Saunders asserts that the Reduced Industry Benchmark contains tainted loans because "the same set of originators, by and large, originated both the loans that are included in the Reduced Industry Benchmark… and the Industry Benchmark…"[48]  Dr. Saunders implies that these originators were somehow tainted themselves and therefore all loans originated by them are materially misrepresented.  Dr. Saunders has provided no evidence of this allegation.  In fact, Plaintiff's own re-underwriting expert, Mr. Butler, identified instances where an originator originated both purportedly "defective" and "non-defective" loans.  None of the originators reviewed by Mr. Butler, for which there were at least ten loans in the Supporting Loan Group, had loans *solely* categorized as materially misrepresented.  Overall, there is no particular pattern that I can discern in the data available to me indicating some originators are "bad" and others are "good," and Dr. Saunders has identified no evidence to support such a proposition.

**B.     Dr. Saunders Does Not Properly Evaluate Statistical Significance**

27.     Dr. Saunders asserts that the conclusions I drew in my Initial Report concerning statistical significance were "improper" and were not founded in "any authoritative text."[49]  In the analyses he presents, Dr. Saunders identifies his own proposed method to calculate statistical significance.  Dr. Saunders purports to show that when statistical significance is evaluated using his method, most of the At-Issue SLGs[50] were found to have statistically significantly underperformed the benchmarks.[51]

---

[48]     Saunders Report, ¶43.

[49]     Saunders Report, ¶47.

[50]     Dr. Saunders submitted one report on behalf of NCUA evaluating the SLGs backing certificates where claims exist against various defendants, including RBS, Nomura and NovaStar. For the purposes of the analyses presented in this section, I refer to all of the SLGs evaluated by Dr. Saunders as the "At-Issue SLGs."

[51]     Saunders Report, ¶¶47, 52.

HIGHLY CONFIDENTIAL

28.    Dr. Saunders's method is unsound.  He misuses and misapplies the well-known and widely-used method called "bootstrapping"[52] when calculating statistical significance. As Dr. Saunders describes in his report, he relies on a parametric bootstrap, and simulates expected DASD by "repeatedly drawing observations on the regression coefficients… a large number of times… and then applying each draw to the actual data to generate an estimate of the item of interest – in this case, the expected default rate."[53]  However, in his simulation, Dr. Saunders only accounts for uncertainty in the regression coefficient estimates and fails to account for any effects at the SLG level.  These SLG-level effects are the effects on performance that are common to all loans within a given SLG, and imply that the performances of individual loans within a SLG are not unrelated (*i.e.,* not statistically independent).[54]  Any dependence between the performance of individual loans would result in a higher variability of performance at the SLG level than can be captured by Dr. Saunders's bootstrapping analysis.  An analysis that does not account for these SLG-level effects, such as Dr. Saunders's approach, will erroneously conclude that the unexplained defaults of an At-Issue SLG are statistically significant in cases in which the difference in performance (between actual and expected defaults) is due to random chance.[55]

---

[52]    Bootstrapping is "used to obtain a description of the sampling properties of empirical estimators using the sample data themselves." *See* William H. Greene, "Econometric Analysis" (Fifth Edition), *Prentice Hall*, 2002 ("Greene 2002"), pp. 924-925.

[53]    Saunders Report, ¶50.  Dr. Saunders also provides additional details describing his parametric bootstrap methodology in note 101 of his report.

[54]    There are several potential reasons for the presence of these pool effects unrelated to the defects alleged by the NCUA.  For example, these pool effects could be related to the relative proportions of loans that were originated in neighborhoods that experienced higher or lower housing price changes than implied by the MSA-level data.  Pools that were more heavily weighted toward such loans could have larger unexplained defaults than pools with loans whose home price changes mirrored the MSAs in which they were located.

[55]    Several econometric texts identify this issue and note that a failure to control for these common effects may lead to bias in estimation.  *See e.g.,* Peter Kennedy, "A Guide to Econometrics," *The MIT Press*, Fifth

HIGHLY CONFIDENTIAL

29.  The impact of Dr. Saunders's flawed approach is apparent in a number of ways.  First, his threshold for determining when an SLG statistically significantly underperforms is incorrect and, in many cases, nonsensical.  For example, in Exhibit F to his report, Dr. Saunders finds that the SLG HVMLT 2006-9 Group 2 statistically significantly underperforms at the five percent significance level even though the actual DASD is 50.0 percent and is just 0.19 percentage points higher than the expected DASD of 49.8 percent.[56]  Not surprisingly, Dr. Saunders also finds that any Supporting Loan Group having an unexplained DASD of at least 0.19 percentage points statistically significantly underperforms.  This leads him to conclude that out of the 23 At-Issue SLGs where the actual DASD is greater than the expected DASD, all but one are statistically significant under-performers at the five percent significance level.  Thus, according to Dr. Saunders's methodology, even the slightest underperformance (as little as 0.19 percentage points) warrants the conclusion that a given SLG is a statistically significant under-performer.  Moreover, when I apply Dr. Saunders's approach to the 18 At-Issue SLGs where the actual DASD is less than the expected DASD (*i.e.,* they outperformed the benchmark), I find that all but one are statistically significantly different at the five percent significance level.[57]  (*See* **Exhibit 2**).  Thus, Dr. Saunders's approach leads one

---

Edition, p. 302 ("Panel data can be used to deal with heterogeneity in the micro units. In any cross-section there is a myriad of unmeasured explanatory variables that affect the behavior of the people (firms, countries, etc.) being analyzed. (Heterogeneity means that these micro units are all different from one another in fundamental unmeasured ways.) Omitting these variables causes bias in estimation.").  *See also*, Greene 2002, p. 294 ("Consider, then, a reformulation of the model where there are K regressors including a constant and now the single constant term is the mean of the unobserved heterogeneity... The component $u_i$ is the random heterogeneity specific to the *i*th observation and is constant through time... For example, in an analysis of families, we can view $u_i$ as the collection of factors... not in the regression that are specific to that family.").

[56]     *See* Saunders Report, Exhibit F.

[57]     Dr. Saunders chose not to present in his report or backup the implications of his approach for evaluating statistical significance with respect to the over-performing At-Issue SLGs.

HIGHLY CONFIDENTIAL

to conclude that, when compared to the Industry Benchmark, 39 out of 41 At-Issue SLGs either statistically significantly under- or over-perform at the five percent significance level. Similarly, in the case of the Reduced Industry Benchmark, I find that Dr. Saunders's approach leads one to conclude that 38 out of 41 At-Issue SLGs either statistically significantly under- or over-perform at the five percent significance level. (*See* **Exhibit 3**). Thus it seems that no matter the degree of unexplained performance found within an SLG, Dr. Saunders's approach will almost always conclude that the difference between actual and expected performance using my Benchmarking Model is statistically significant.

30.    Due to Dr. Saunders's misapplication of the bootstrapping approach, his method for determining statistical significance also gives nonsensical results when applied to actual SLGs found in the Industry and Reduced Industry Benchmarks. In **Exhibit 4**, I apply Dr. Saunders's approach to the 5,634 SLGs in the Industry Benchmark, and I find that Dr. Saunders's approach identifies 93.0 percent as statistically significantly under- or over-performing.[58] Similarly, I find that Dr. Saunders's approach identifies 62.7 percent out of the 743 SLGs in the Reduced Industry Benchmark as statistically significantly under- or over-performing. Statistical tests are intended to describe a difference as significant if

---

[58]    I take the following steps to apply Dr. Saunders's approach to evaluate the statistical significance of SLGs in the Industry Benchmark at the five percent significance level. First, I use Dr. Saunders's backup to calculate for each At-Issue SLG the standard deviation of the difference between actual and expected DASD across the 500 iterations of his bootstrap based on the Industry Benchmark. I find that the maximum standard deviation of the difference between actual and expected DASD across the At-Issue SLGs is 0.20 percentage points. Using this information, I apply a threshold of 0.39 percentage points (= 0.20 percentage points x 1.96, which is the corresponding critical value from the standard normal distribution) to all of the SLGs in the Industry Benchmark and conclude that a given SLG statistically significantly under- or over-performs if the difference between its actual and expected DASD exceeds this 0.39 percentage point threshold. Similarly, for the Reduced Industry Benchmark, I find using Dr. Saunders's approach that the maximum standard deviation of the difference between actual and expected DASD across the At-Issue SLGs is 1.09 percentage points. As in the approach for the Industry Benchmark, I calculate a threshold of 2.14 percentage points (= 1.09 x 1.96), and apply this threshold to all of the SLGs in the Reduced Industry Benchmark to determine which statistically significantly under- or over-perform.

HIGHLY CONFIDENTIAL

it exceeds what might reasonably be explained by random fluctuations.   In the case of statistical significance at the five percent level, one expects to find statistically significant under- or over-performance five percent of the time.   However, Dr. Saunders's approach leads one to conclude that a randomly chosen SLG in the Industry or Reduced Industry Benchmark has a probability of at least 62.7 percent to statistically significantly under- or over-perform—a finding that directly contradicts his chosen five percent statistical significance level.

31.   My approach for determining statistical significance is correct and does not suffer from the flaws inherent in Dr. Saunders's misapplication of bootstrapping.   My methodology for determining statistical significance accounts for the previously discussed SLG-level effects because it is based on evaluating the difference between the expected and actual DASD at the SLG level (across the SLGs in the Industry or Reduced Industry Benchmark).   Therefore, unlike Dr. Saunders, I do not incorrectly assume that the performances of individual loans within a SLG are independent.   As a result, when I apply my methodology to evaluate statistical significance of SLGs in the Industry and Reduced Industry Benchmarks, I find that 6.6 and 8.5 percent of SLGs statistically significantly under- or over-perform in the Industry and Reduced Industry Benchmarks, respectively, which is very much consistent with the notion of statistical significance at the five percent significance level (*see* **Exhibit** 4).

32.   As discussed in my Initial Report, my approach for determining statistical significance is based on empirically evaluating the distribution of the differences between actual and

HIGHLY CONFIDENTIAL

expected DASD,[59] and using this distribution to calculate the appropriate threshold for evaluating statistical significance at the five percent significance level.  In the case of the Industry Benchmark, I first calculate for each comparable SLG the difference between actual and expected DASD.[60]  Then, I calculate the standard deviation of this difference across the SLGs, thus capturing any SLG-level effects.[61]  I calculate the threshold for determining statistical significance at the five percent significance level by multiplying the standard deviation calculated above by 1.96, the corresponding critical value from the standard normal distribution.  To evaluate statistical significance for a given SLG at the five percent significance level, I compare the difference between actual and expected DASD for the given SLG to the threshold calculated in the previous step—and I determine that a given SLG has performed statistically significantly worse than expected if the amount of under-performance is greater than my calculated threshold.  I follow similar steps when determining statistical significance using the Reduced Industry Benchmark.

33.     As discussed above, Dr. Saunders's approach for evaluating statistical significance is incorrect.  His approach does not take into account SLG-level effects and as a result he

---

[59]     As previously mentioned, SLG-level effects can be captured using random effect models.  In a standard linear regression, such models can be estimated using approaches including Feasible Generalized Least Squares (FGLS).  *See* Greene 2002, pp. 296-298. However, given the very large number of observations (millions of loans) in this non-linear benchmarking model, this is not computationally practical. To account for the SLG-level effects when evaluating statistical significance, I use the methodology discussed above.

[60]     Dr. Saunders also contradicts himself when on the one hand he claims that my Default Model does not "explain the variation of actual default rates across these pools," while at the same time he ignores any variation due to SLG-level effects when determining statistically significantly underperforming SLGs.  *See* Saunders Report, ¶49.  As Dr. Saunders points out, my Benchmarking Model does not directly include SLG-level effects, but unlike Dr. Saunders, I capture any SLG-level effects when evaluating statistical significance using the approach discussed above.

[61]     When determining statistical significance, I also allocate the Industry Benchmark loan pools to "buckets" based on their number of loans and their expected DASD, and this allows me to also take into account these factors when evaluating statistical significance for each At-Issue SLG.  For additional details about my methodology for evaluating statistical significance, *see* **Appendix D** to my Initial Report.

HIGHLY CONFIDENTIAL

drastically overestimates the number of statistically significantly under- or over-performing SLGs—both for At-Issue SLGs and comparable SLGs in the Reduced and Industry Benchmarks.  In particular, his approach identifies more than 60 percent of SLGs in the Benchmarks as statistically significantly under- or over-performing, which is vastly more than one would expect when evaluating significance at the five percent significance level.  In contrast, my approach for evaluating statistical significance is correct and captures SLG-level effects.  It is thus not surprising that when my approach is applied to the Industry and Reduced Industry Benchmarks, I find that between 6.6 and 8.5 percent of SLGs statistically significantly under- or over-perform, depending on the benchmark, which unlike Dr. Saunders's approach is much more consistent with a significance test at the five percent significance level.

### C.    Dr. Saunders Incorrectly Applies the Default and Loss Severity Models from my Initial Report to the Loans Reviewed by Mr. Butler

34.    Dr. Saunders attempts to apply the default and loss severity models from my Initial Report in order to "(i) analyze whether loans that Mr. Butler classified as Materially Misrepresented had significantly higher default rates than other Sampled Loans, (ii) analyze whether Materially Misrepresented Loans had greater loss severity, and (iii) estimate what the losses of the At-Issue Loans would have been if the At-Issue Loans had not included loans that had been Materially Misrepresented."[62]  In light of the critical mistakes made in Dr. Saunders's approach to statistical significance discussed above, however, Dr. Saunders's analysis fails to properly apply my methodology to the Butler Benchmark.  Correcting for his mistakes, his results are not inconsistent with my "overall finding… that the performance of the At-Issue Loans is consistent with expected

---

[62]    Saunders Report, ¶78.

HIGHLY CONFIDENTIAL

performance as calculated using the disclosed loan and borrower characteristics and changes in macroeconomic conditions."[63]   In fact, when Dr. Saunders's approach is corrected to properly estimate statistical significance, he would find only eight statistically significant underperforming SLGs.[64]   Significantly, if Dr. Saunders's approach is corrected to properly estimate statistical significance, both he and I arrive at the same conclusion for the At-Issue Certificate:   it does not underperform by a statistically significant amount the sample loans that Butler found were not materially misrepresented.

**D.      Dr. Saunders Incorrectly Asserts that the Loan and Borrower Characteristics "As Alleged" Would have led to a Higher Subordination Level of the At-Issue Certificate**

35.      Dr. Saunders makes a number of hypothetical assertions concerning the subordination of the At-Issue Certificate.  In short, Dr. Saunders claims that the subordination level of the At-Issue Certificate would have "likely" been higher had the alleged misrepresentations not been made.  In drawing this conclusion, it should be noted that Dr. Saunders's claim is not supported with any empirical analysis.  Moreover, Dr. Saunders does nothing to move his analysis from a mere hypothetical exercise and ground it in the facts of this case.  Specifically, Dr. Saunders does not conduct an analysis evaluating the quantifiable impact that the alleged but-for loan and borrower characteristics would have had on the level of subordination of the At-Issue Certificate.  Dr. Saunders instead simply cites a series of papers studying loans not at issue in this matter and purportedly linking the loan

---

[63]      Initial Report, Section III.

[64]      Using the correct method for calculating statistical significance, Dr. Saunders's method finds the following SLGs to be statistically significant underperformers: AHMA 2007-3, I-2; FFML 2006-FF16, II; FHLT 2006-3, II; FHLT 2006-D, 2; HVMLT 2006-14, 2; HVMLT 2007-2, 2; NHELI 2007-1, II-2, RFMS2 2007-HSA2, Total Group..

HIGHLY CONFIDENTIAL

and borrower characteristics (*e.g.,* owner occupancy, FICO, LTV, and DTI ratio) of those unrelated loans with mortgage credit risk[65] and subordination levels.[66]

36.    The flaw of Dr. Saunders's hypothetical analysis—and the erroneous conclusions he draws from it—are demonstrated by the empirical analyses conducted in my Initial and Rebuttal Reports, which showed that, as it relates to this case, the alleged misrepresentations either do not exist or do not affect the performance of the At-Issue Loans.  Because any alleged misrepresentations did not affect loan performance, there is no basis to conclude that the alleged misrepresentations, if they existed and were known, would have resulted in a different subordination level.  Thus, Dr. Saunders's opinion regarding subordination is merely unfounded speculation that is rebutted by my analyses.

### E.    Evaluation of the Performance of the At-Issue Loans Using Defendant Experts' Re-Underwriting Analyses Further Undermines Dr. Saunders's Rebuttal Report

37.    As discussed above, I have demonstrated that Dr. Saunders's critique of my Industry and Reduced Industry Benchmarks—*i.e.,* that they are flawed because they purportedly contain defective loans—is incorrect because I also obtained consistent results using my Butler Benchmark, which contains only loans that Mr. Butler found not to be materially defective.  As another means of rebutting Dr. Saunders's criticism of my analyses, and to further show the incorrectness of his loss causation conclusions as well as Plaintiff's assertion that the alleged material misrepresentations resulted in materially increased credit risk, I have also utilized the re-underwriting results of Defendants' re-underwriting experts Messrs. Spolin and Forester to create the Spolin and Forester Re-Underwriting

---

[65]    Saunders Report, ¶19.

[66]    Saunders Report, ¶20.

HIGHLY CONFIDENTIAL

Benchmark.[67]   As part of his assignment, for the SLGs that Mr. Spolin reviewed, he reviewed the loans found by Mr. Butler to have material misrepresentations,[68] while for the SLGs Mr. Forester reviewed, he reviewed all of the loans Mr. Butler reviewed.[69]  The Spolin and Forester Re-Underwriting Benchmark is composed of 3,246 loans, consisting of: (1) loans found by Mr. Butler to not have material defects (*i.e.*, loans within the Butler Benchmark); plus (2) all loans re-underwritten by Mr. Spolin or Forester which they found to be originated within the applicable guidelines.[70]  **Exhibit 5** displays the results of the regression model that I estimate using the Spolin and Forester Re-Underwriting Benchmark.  I then use this benchmark to estimate the performance of the At-Issue SLG.

38.   As shown in **Exhibit 6**, I find that the Supporting Loan Group again performed in line with its expected performance using the Spolin and Forester Re-Underwriting Benchmark.  As before, the At-Issue Loans did not have statistically significantly higher defaults than expected.  For the At-Issue Loans, the expected default rate based on loan and borrower characteristics and macroeconomic conditions was 50.1 percent, while the actual default rate was 51.7 percent.  The performance of the At-Issue Loans relative to the Spolin and Forester Re-Underwriting Benchmark offers further support for the conclusion that any non-compliance with underwriting guidelines among the At-Issue Loans either did not exist, or was not material to the performance of the At-Issue Loans.

---

[67]   I also understand that NovaStar has submitted a report from a separate re-underwriting expert who has reviewed a subset of the loans reviewed by Mr. Spolin.  For simplicity I have only constructed this benchmark using the results of Messrs. Spolin and Forester.  I note, however, that including NovaStar's expert's conclusions would only add six loans to the benchmark, and is thus unlikely to materially change my conclusions.  *See* Expert Report of Shannon Millard, October 16, 2015 ("Millard Report").

[68]   Spolin Report, ¶¶3-4, p. 30.

[69]   Forester CA Report, ¶¶9-10; Forester KS Report, ¶9-¶10.

[70]   Spolin Report, ¶56; Forester CA Report, ¶139; Forester KS Report, ¶137.  This is based on the scenarios that do not rely on post-origination information found in Messrs. Spolin or Forester's analyses.

HIGHLY CONFIDENTIAL

January 26, 2016

_____

Walter Torous, Ph.D.

HIGHLY CONFIDENTIAL

**Exhibit 1**
**Actual versus Expected Default and Serious Delinquency Rates**
**Updated Reduced Industry Benchmark**

| At-Issue Securitization | Supporting Loan Group | DASD | | |
| --- | --- | --- | --- | --- |
| | | Actual | Expected | Unexplained Pct. Points |
| NHELI 2007-1 | I | 51.7% | 46.1% | 5.66 |

**Notes:**

[1] Calculations weighted by original loan balance.

[2] Unexplained Percentage Points are the difference between Actual and Expected DASD.

[3] * Indicates that Actual DASD is different from Expected DASD at the five percent significance level. That is, Actual DASD is far enough away from Expected DASD that there is only a five percent probability (or less) that the difference between them is due to random chance.  The absence of * indicates that there is no statistically significant difference between Actual DASD and Expected DASD at the five percent significance level.

[4] The end of the analysis period is January 2015, the date of the last housing price data available to me during the preparation of my Initial Report.

[5] Supporting Loan Group information is based on information from the prospectus supplement.

**Sources:**

[1] CoreLogic (LoanPerformance, REdex Square Home Price Index).

[2] Bureau of Labor Statistics.

[3] Federal Reserve.

[4] Fannie Mae 2010 Servicing Guide Update Part VII and Part VIII.

[5] Ghent and Kudlyak (2011).

[6] Nomura Asset Acceptance Corporation Alternative Loan Trust 2006-AR4 prospectus supplement dated November 30, 2006.

HIGHLY CONFIDENTIAL

**Exhibit 2**

**Saunders Report, Exhibit F Including Statistically Significantly Over-performing SLGs Using Saunders's Statistical Significance Approach Based on the Industry Benchmark**

| At-Issue Securitizations | Supporting Loan Group(s) | Actual | Expected | DASD Unexplained Pct. Points | Statistically Significantly Different[1] |
|---|---|---|---|---|---|
| AHMA 2007-3 | I-2 | 74.8% | 59.8% | 14.96 *** | ✓ |
| FFML 2005-FFH4 | I | 41.4% | 40.5% | 0.84 *** | ✓ |
| FFML 2005-FFH4 | II | 47.9% | 44.1% | 3.82 *** | ✓ |
| FFML 2006-FF16 | I | 52.0% | 48.8% | 3.22 *** | ✓ |
| FFML 2006-FF16 | II | 66.0% | 59.0% | 7.01 *** | ✓ |
| FHLT 2006-3 | I | 50.6% | 47.4% | 3.21 *** | ✓ |
| FHLT 2006-3 | II | 65.8% | 57.1% | 8.66 *** | ✓ |
| FHLT 2006-D | 1 | 44.8% | 47.0% | -2.20 +++ | ✓ |
| FHLT 2006-D | 2 | 61.6% | 58.7% | 2.90 *** | ✓ |
| HVMLT 2006-10 | 2 | 48.4% | 51.2% | -2.75 +++ | ✓ |
| HVMLT 2006-11 | Total Group | 44.7% | 44.8% | -0.09 + | |
| HVMLT 2006-12 | 2 | 49.9% | 50.9% | -1.08 +++ | ✓ |
| HVMLT 2006-14 | 2 | 59.6% | 55.3% | 4.37 *** | ✓ |
| HVMLT 2006-6 | 2 | 43.5% | 34.3% | 9.20 *** | ✓ |
| HVMLT 2006-6 | 3 | 34.9% | 28.6% | 6.24 *** | ✓ |
| HVMLT 2006-8 | 2 | 45.7% | 41.7% | 4.09 *** | ✓ |
| HVMLT 2006-9 | 2 | 50.0% | 49.8% | 0.19 ** | ✓ |
| HVMLT 2006-SB1 | Total Group | 38.3% | 44.2% | -5.87 +++ | ✓ |
| HVMLT 2007-1 | 1 | 50.5% | 55.0% | -4.52 +++ | ✓ |
| HVMLT 2007-1 | 2 | 48.7% | 53.9% | -5.19 +++ | ✓ |
| HVMLT 2007-2 | 2 | 67.4% | 62.2% | 5.22 *** | ✓ |
| HVMLT 2007-4 | 2 | 56.5% | 54.4% | 2.04 *** | ✓ |
| HVMLT 2007-5 | Total Group | 55.2% | 54.7% | 0.48 *** | ✓ |
| INDX 2006-AR35 | 2 | 46.9% | 49.6% | -2.76 +++ | ✓ |
| INDX 2006-AR6 | 2 | 45.3% | 43.0% | 2.36 *** | ✓ |
| LUM 2006-2 | Total Group | 42.7% | 43.2% | -0.55 +++ | ✓ |
| LUM 2007-1 | I | 34.9% | 39.1% | -4.15 +++ | ✓ |
| LUM 2007-1 | II | 53.5% | 55.1% | -1.69 +++ | ✓ |
| MHL 2006-1 | 2 | 32.8% | 32.7% | 0.10 | |
| NAA 2006-AR4 | Total Group | 62.0% | 58.3% | 3.72 *** | ✓ |
| NHEL 2006-5 | I | 45.5% | 48.3% | -2.85 +++ | ✓ |
| NHEL 2006-5 | II | 59.6% | 55.2% | 4.38 *** | ✓ |
| NHELI 2007-1 | I | 51.7% | 47.6% | 4.10 *** | ✓ |
| NHELI 2007-1 | II-2 | 71.0% | 64.0% | 7.05 *** | ✓ |
| RFMS2 2007-HSA2 | Total Group | 59.0% | 61.9% | -2.88 +++ | ✓ |
| SAST 2006-3 | Total Group | 47.5% | 51.0% | -3.47 +++ | ✓ |
| SVHE 2005-OPT4 | I | 29.3% | 32.2% | -2.90 +++ | ✓ |
| SVHE 2005-OPT4 | II | 35.7% | 34.6% | 1.10 *** | ✓ |
| SVHE 2006-WF2 | Total Group | 43.2% | 47.4% | -4.23 +++ | ✓ |
| SVHE 2007-OPT1 | II | 56.2% | 60.0% | -3.85 +++ | ✓ |
| WMLT 2006-ALT1 | Total Group | 42.0% | 44.6% | -2.59 +++ | ✓ |
| **Total** | | 51.1% | 50.7% | 0.40 | |

**Notes:**

[1] Indicates a statistically significant difference at the five percent significance level using Saunders's approach.

[2] ***, **, and * indicate the Actual DASD is statistically significantly higher than Expected DASD at the 1, 5, and 10 percent significance level, respectively, using Saunders's approach. +++, ++, and + indicate the Actual DASD is statistically significantly lower than Expected DASD at the 1, 5, and 10 percent significance level, respectively, using Saunders's approach.

[3] Supporting Loan Group information is based on information from the Prospectus Supplements. "Total Group" indicates that the At-Issue Securitization only has one supporting loan group.

**Sources:**

[1] Saunders Report.

[2] Prospectus Supplements.

HIGHLY CONFIDENTIAL

**Exhibit 3**

**Saunders Report, Exhibit G Including Statistically Significantly Over-performing SLGs Using Saunders's Statistical Significance Approach Based on the Reduced Industry Benchmark**

| At-Issue Securitizations | Supporting Loan Group(s) | Actual | Expected | Unexplained Pct. Points | Statistically Significantly Different[1] |
|---|---|---|---|---|---|
| | | | DASD | | |
| AHMA 2007-3 | I-2 | 74.8% | 59.5% | 15.31 *** | ✓ |
| FFML 2005-FFH4 | I | 41.4% | 38.3% | 3.07 *** | ✓ |
| FFML 2005-FFH4 | II | 47.9% | 40.9% | 6.97 *** | ✓ |
| FFML 2006-FF16 | I | 52.0% | 47.1% | 4.92 *** | ✓ |
| FFML 2006-FF16 | II | 66.0% | 56.7% | 9.26 *** | ✓ |
| FHLT 2006-3 | I | 50.6% | 45.1% | 5.46 *** | ✓ |
| FHLT 2006-3 | II | 65.8% | 54.4% | 11.39 *** | ✓ |
| FHLT 2006-D | 1 | 44.8% | 45.1% | -0.33 + | |
| FHLT 2006-D | 2 | 61.6% | 56.1% | 5.52 *** | ✓ |
| HVMLT 2006-10 | 2 | 48.4% | 53.4% | -4.95 +++ | ✓ |
| HVMLT 2006-11 | Total Group | 44.7% | 40.1% | 4.63 *** | ✓ |
| HVMLT 2006-12 | 2 | 49.9% | 53.1% | -3.22 +++ | ✓ |
| HVMLT 2006-14 | 2 | 59.6% | 57.1% | 2.50 *** | ✓ |
| HVMLT 2006-6 | 2 | 43.5% | 31.9% | 11.62 *** | ✓ |
| HVMLT 2006-6 | 3 | 34.9% | 25.5% | 9.32 *** | ✓ |
| HVMLT 2006-8 | 2 | 45.7% | 43.4% | 2.34 *** | ✓ |
| HVMLT 2006-9 | 2 | 50.0% | 52.4% | -2.36 +++ | ✓ |
| HVMLT 2006-SB1 | Total Group | 38.3% | 46.3% | -8.01 +++ | ✓ |
| HVMLT 2007-1 | 1 | 50.5% | 61.2% | -10.73 +++ | ✓ |
| HVMLT 2007-1 | 2 | 48.7% | 61.5% | -12.80 +++ | ✓ |
| HVMLT 2007-2 | 2 | 67.4% | 68.1% | -0.69 | |
| HVMLT 2007-4 | 2 | 56.5% | 57.9% | -1.41 ++ | ✓ |
| HVMLT 2007-5 | Total Group | 55.2% | 58.6% | -3.39 +++ | ✓ |
| INDX 2006-AR35 | 2 | 46.9% | 44.9% | 1.94 *** | ✓ |
| INDX 2006-AR6 | 2 | 45.3% | 44.9% | 0.42 * | |
| LUM 2006-2 | Total Group | 42.7% | 45.2% | -2.59 +++ | ✓ |
| LUM 2007-1 | I | 34.9% | 39.9% | -5.02 +++ | ✓ |
| LUM 2007-1 | II | 53.5% | 62.4% | -8.96 +++ | ✓ |
| MHL 2006-1 | 2 | 32.8% | 33.9% | -1.10 +++ | ✓ |
| NAA 2006-AR4 | Total Group | 62.0% | 53.7% | 8.32 *** | ✓ |
| NHEL 2006-5 | I | 45.5% | 46.5% | -1.02 +++ | ✓ |
| NHEL 2006-5 | II | 59.6% | 52.9% | 6.68 *** | ✓ |
| NHELI 2007-1 | I | 51.7% | 47.7% | 4.05 *** | ✓ |
| NHELI 2007-1 | II-2 | 71.0% | 65.1% | 5.98 *** | ✓ |
| RFMS2 2007-HSA2 | Total Group | 59.0% | 60.9% | -1.94 +++ | ✓ |
| SAST 2006-3 | Total Group | 47.5% | 48.8% | -1.30 +++ | ✓ |
| SVHE 2005-OPT4 | I | 29.3% | 30.1% | -0.79 +++ | ✓ |
| SVHE 2005-OPT4 | II | 35.7% | 31.6% | 4.06 *** | ✓ |
| SVHE 2006-WF2 | Total Group | 43.2% | 45.6% | -2.43 +++ | ✓ |
| SVHE 2007-OPT1 | II | 56.2% | 58.0% | -1.82 +++ | ✓ |
| WMLT 2006-ALT1 | Total Group | 42.0% | 40.7% | 1.34 *** | ✓ |
| **Total** | | 51.1% | 51.1% | -0.02 | |

**Notes:**

[1] Indicates a statistically significant difference at the five percent significance level using Saunders's approach.

[2] ***, **, and * indicate the Actual DASD is statistically significantly higher than Expected DASD at the 1, 5, and 10 percent significance level, respectively, using Saunders's approach. +++, ++, and + indicate the Actual DASD is statistically significantly lower than Expected DASD at the 1, 5, and 10 percent significance level, respectively, using Saunders's approach.

[3] Supporting Loan Group information is based on information from the Prospectus Supplements. "Total Group" indicates that the At-Issue Securitization only has one supporting loan group.

**Sources:**

[1] Saunders Report.

[2] Prospectus Supplements.

HIGHLY CONFIDENTIAL

# Exhibit 4
# Comparison of Saunders's and Torous's Statistical Significance Approaches Applied to SLGs in the Industry and Reduced Industry Benchmarks

| Benchmark | Number of Supporting Loan Groups | Percent of SLGs Significant at the Five Percent Significance Level | |
|---|---|---|---|
| | | Saunders's Approach | Torous's Approach |
| Industry | 5,634 | 93.0% | 6.6% |
| Reduced Industry | 743 | 62.7% | 8.5% |

**Notes:**

[1] I take the following steps to apply Dr. Saunders's approach to evaluate the statistical significance of SLGs in the Industry Benchmark at the five percent significance level. First, I use Dr. Saunders's backup to calculate for each At-Issue SLG the standard deviation of the difference between actual and expected DASD across the 500 iterations of his bootstrap based on the Industry Benchmark. I find that the maximum standard deviation of the difference between actual and expected DASD across the At-Issue SLGs is 0.20 percentage points. Using this information, I apply a threshold of 0.39 percentage points (= 0.20 percentage points x 1.96, which is the corresponding critical value from the standard normal distribution) to all of the SLGs in the Industry Benchmark and conclude that a given SLG statistically significantly under- or over-performs if the difference between its actual and expected DASD exceeds this 0.39 percentage point threshold. Similarly, for the Reduced Industry Benchmark, I find using Dr. Saunders's approach that the maximum standard deviation of the difference between actual and expected DASD across the At-Issue SLGs is 1.09 percentage points. As in the approach for the Industry Benchmark, I calculate a threshold of 2.14 percentage points (= 1.09 x 1.96) and apply this threshold to all of the SLGs in the Reduced Industry Benchmark to determine which statistically significantly under- or over-perform.

[2] For additional detail describing my methodology for evaluating statistical significance, *see* Appendix D to my Initial Report.

[3] Statistical significance is evaluated based on the Industry Benchmark and Reduced Industry Benchmark in my Initial Report.

[4] The results above are reported based on a two-sided statistical significance test, which identifies both statistically significant under- and over-performers. In his Report, Dr. Saunders uses a one-sided test and identifies only statistically significant under-performers.

**Sources:**

[1] Saunders Report.

[2] Exhibit 19B and Exhibit 20B to my Initial Report.

[3] CoreLogic (LoanPerformance, REdex Square Home Price Index).

[4] Bureau of Labor Statistics.

[5] Federal Reserve.

[6] Fannie Mae 2010 Servicing Guide Update Part VII and Part VIII.

[7] Ghent and Kudlyak (2011).

[8] Prospectus Supplements.

HIGHLY CONFIDENTIAL

**Exhibit 5**
**Default Model**
**Regression Results**
**Spolin and Forester Re-Underwriting Benchmark**

| Explanatory Variables | Estimated Parameter | | SE |
|---|---|---|---|
| FICO Score | -0.003 | * | 0.001 |
| CLTV Ratio | 0.027 | * | 0.003 |
| Full Documentation Indicator | -0.537 | * | 0.067 |
| Primary Residence Indicator | -0.208 | * | 0.075 |
| Single-Family Indicator | -0.138 | * | 0.055 |
| Purchase Indicator | 0.085 | | 0.062 |
| Original Loan Balance (Log, $10,000s) | 0.172 | * | 0.048 |
| Securitized in 2006 | 0.235 | | 0.169 |
| Securitized in 2007 | 0.173 | | 0.189 |
| Originated in 2006 | 0.182 | | 0.110 |
| Originated in 2007 | 0.401 | * | 0.148 |
| Change in Interest Rates | 0.159 | * | 0.069 |
| Pre-Payment Penalty Indicator | 0.112 | | 0.061 |
| Homeowner's Equity | -0.009 | * | 0.001 |
| Change in Unemployment (3-Month) | 0.068 | * | 0.027 |
| Interest-Only Indicator | 0.026 | | 0.078 |
| Alt-A Pool Indicator | -0.088 | | 0.103 |
| Judicial State | 0.188 | * | 0.069 |
| Recourse State | -0.157 | * | 0.069 |
| Amortization Period ≤ 20 Years | -0.038 | | 0.289 |
| Amortization Period > 30 Years | -0.006 | | 0.079 |
| ARM/Hybrid Indicator | 0.134 | | 0.104 |
| NEG AM Indicator | 0.119 | | 0.123 |
| CESL Indicator | 0.578 | * | 0.142 |
| Constant | -7.449 | * | 0.546 |
| Number of Observations Used: | 140,333 | | |
| Number of Comparable Loans: | 3,246 | | |

**Notes:**

[1] Explanatory variables are described in more detail in Appendix D to my Initial Report.

[2] Due to the small sample size, I estimate a single regression with collateral type dummy variables (ARM/Hybrid, NEG AM and CESL indicator variables).

[3] * Indicates that the coefficient ("Estimated Parameter") is statistically significant at the five percent level.

[4] A fourth order polynomial term is included in the regression to allow the likelihood of default and serious delinquency to vary with loan age.

[5] The number of observations used is based on the total number of monthly observations for all comparable loans.

[6] The end of the analysis period is January 2015, the date of the last housing price data available to me during the preparation of my Initial Report.

[7] The number of comparable loans is based on the total number of loans that Spolin identifies as "Within Guidelines," Forester identifies as "Not Materially Non-Compliant," and Butler identifies as "Not Materially Misrepresented."

**Sources:**

[1] CoreLogic (LoanPerformance, REdex Square Home Price Index).

[2] Bureau of Labor Statistics.

[3] Federal Reserve.

[4] Fannie Mae 2010 Servicing Guide Update Part VII and Part VIII.

[5] Ghent and Kudlyak (2011).

[6] Spolin Report.

[7] Forester CA Report and Forester KS Report.

[8] Expert Report of Charles D. Cowan, Ph.D. on Statistical Sampling and Extrapolation, August 14, 2015 ("Cowan Report").

HIGHLY CONFIDENTIAL

**Exhibit 6**
**Actual versus Expected Default and Serious Delinquency Rates**
**Spolin and Forester Re-Underwriting Benchmark**

| At-Issue Securitization | Supporting Loan Group | DASD | | |
| --- | --- | --- | --- | --- |
| | | Actual | Expected | Unexplained Pct. Points |
| NHELI 2007-1 | I | 51.7% | 50.1% | 1.58 |

**Notes:**

[1] Calculations weighted by original loan balance.

[2] Unexplained Percentage Points is the difference between Actual and Expected DASD.

[3] * Indicates that Actual DASD is different from Expected DASD at the five percent significance level. That is, Actual DASD is far enough away from Expected DASD that there is only a five percent probability (or less) that the difference between them is due to random chance.  The absence of * indicates that there is no statistically significant difference between Actual DASD and Expected DASD at the five percent significance level.

[4] The end of the analysis period is January 2015, the date of the last housing price data available to me during the preparation of my Initial Report.

[5] Supporting Loan Group information is based on information from the prospectus supplement.

**Sources:**

[1] CoreLogic (LoanPerformance, REdex Square Home Price Index).

[2] Bureau of Labor Statistics.

[3] Federal Reserve.

[4] Fannie Mae 2010 Servicing Guide Update Part VII and Part VIII.

[5] Ghent and Kudlyak (2011).

[6] Nomura Home Equity Loan Trust 2007-1 prospectus supplement dated January 29, 2007.

[7] Spolin Report.

[8] Forester CA Report and Forester KS Report.

[9] Cowan Report.

HIGHLY CONFIDENTIAL

# Appendix A
# Documents and Data Considered

**Expert Reports and Relevant Exhibits & Backup Materials**

Expert Report of Michael Forester Submitted on behalf of Nomura Asset Acceptance Corporation, October 16, 2015

Expert Report of Michael Forester Submitted on behalf of Nomura Home Equity Loan, Inc., October 16, 2015

Expert Report of Shannon Millard, October 16, 2015

Rebuttal Report of Anthony Saunders, October 16, 2015

Amended Rebuttal Report of Anthony Saunders, December 4, 2015

Rebuttal Report of James R. Barth, October 16, 2015

Rebuttal Report of Joel B. Spolin, October 16, 2015

Second Amended Rebuttal Report of Walter Torous, Ph.D., November 17, 2015

Third Amended Rebuttal Report of Walter Torous, Ph.D., January 26, 2016

**News Articles, Academic Publications, and Other Publicly-Available Documents**

Christopher Palmer, "Why Did So Many Subprime Borrowers Default During the Crisis: Loose Credit or Plummeting Prices?" University of California at Berkeley, (September 2015)

James Barth, Tong Li, Triphon Phumiwasana, and Glenn Yago, "A Short History of the Subprime Mortgage Market Meltdown," *Government Housing Bank Journal*, Vol. 2, No. 2, (January - March 2008)

James Barth, Tong Li, Wenling Lu, Tripon Phumiwasana, and Glenn Yago, "The Rise and Fall of the U.S. Mortgage and Credit Markets: A Comprehensive Analysis of the Meltdown," *Milken Institute Research Report*, (January 16, 2009)

James Barth, Triphon Phumiwasana, Tong Li, and Glenn Yago, "Surprise: Subprime Mortgage Products Are Not the Problem," *Government Housing Bank Journal*, Vol. 2, No. 2, (January - March 2008)

Peter Kennedy, "A Guide to Econometrics," (Fifth Edition), *The MIT Press*, (2003)

William H. Greene, "Econometric Analysis" (Fifth Edition), *Prentice Hall,* (2002)

Yuliya Demyanyk and Otto Van Hemert, "Understanding the Subprime Mortgage Crisis," *The Review of Financial Studies*, Vol. 24, No. 6, (2011)