# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

NATIONAL CREDIT UNION
ADMINISTRATION BOARD, as Liquidating
Agent of U.S. Central Federal Credit Union,

*Plaintiff*,

v.

RBS SECURITIES, INC., f/k/a
GREENWICH CAPITAL MARKETS, INC.,
RBS ACCEPTANCE, INC., f/k/a
GREENWICH CAPITAL ACCEPTANCE,
INC., FINANCIAL ASSET SECURITIES
CORP., NOVASTAR MORTGAGE FUNDING
CORP., and NOMURA HOME EQUITY
LOAN, INC.,

*Defendants.*

Case No. 11-cv-2340-JWL

**FILED UNDER SEAL**

---

**PLAINTIFF NCUA'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO
EXCLUDE THE EXPERT TESTIMONY OF WALTER TOROUS, PH.D.**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT ..............................................................................................................................3

    I.    Defendants Have Not Satisfied Their Burden of Demonstrating the Scientific Validity of Dr. Torous's Industry and Butler Benchmarks ............................3

    II.    Dr. Torous's Spolin and Forester Benchmark Cannot Remedy the Flaws in His Other Loan Benchmarks ..................................................................................7

    III.    Dr. Torous Improperly Attributes U.S. Central's Losses to Causes That Are Related to Defendants' Misconduct ...........................................................................9

    IV.    Dr. Torous's Untested Method for "Tuning" the ADCo Model Is Unreliable ..........12

    V.    Dr. Torous's DTI Opinions Should Be Excluded ..........................................................14

CONCLUSION ..........................................................................................................................15

# TABLE OF AUTHORITIES

## CASES

*Akerman v. Oryx Commc'ns, Inc.*,
  810 F.2d 336 (2d Cir. 1987) ...............................................................................11

*Apple, Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ..............................................................................3

*Asia Strategic Inv. Alliances Ltd. v. General Elec. Capital Servs., Inc.*,
  No. 95-2479-GTV, 1997 WL 122568 (D. Kan. Mar. 11, 1997) ..............................8-9

*AUSA Life Ins. Co. v. Ernst & Young*,
  206 F.3d 202 (2d Cir. 2000) ...................................................................................9

*Blotcher v. Stewart*,
  45 F. Supp. 3d 1274 (D. Colo. 2014).......................................................................4

*Bruschi v. Brown*,
  876 F.2d 1526 (11th Cir. 1989).............................................................................10

*Cason-Merenda v. Detroit Med. Ctr.*,
  No. 06-15601, 2013 WL 1721651 (E.D. Mich. Apr. 22, 2013) ...........................3, 4

*Corey v. Jones*,
  650 F.2d 803 (5th Cir. Unit B 1981) .....................................................................10

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ..............................................................................................12

*Federal Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  No. 11cv6201 (DLC), 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015).........3, 4, 5-6, 7-8

*Federal Hous. Fin. Agency v. Nomura Holding, Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015),
  *appeals docketed*, Nos. 15-1872 et al. (2d Cir. June 10, 2015)....................7, 9, 10, 11

*Financial Guar. Ins. Co. v. Putnam Advisory Co.*,
  783 F.3d 395 (2d Cir. 2015) ...................................................................................9

*Guerrero v. Meadows*,
  No. Civ-14-537-C, 2016 WL 1464635 (W.D. Okla. Apr. 13, 2016) .........................9

*Hebert v. Lisle Corp.*,
  99 F.3d 1109 (Fed. Cir. 1996) ...............................................................................12

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002)..................................................................................4

*Horstein v. General Motors Corp.*,
  391 F. Supp. 1274 (S.D.N.Y. 1975) .......................................................................10

*Jacobsen v. Deseret Book Co.*,
  287 F.3d 936 (10th Cir. 2002).................................................................................8

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ..............................................................................................12

*Leverette v. Louisville Ladder Co.*,
    183 F.3d 339 (5th Cir. 1999) ...........................................................................................12

*Marini v. Adamo*,
    995 F. Supp. 2d 155 (E.D.N.Y. 2014) ............................................................................10

*McCoy v. Augusta Fiberglass Coatings, Inc.*,
    593 F.3d 737 (8th Cir. 2010) ...........................................................................................10

*Mushroom Direct Purchaser Antitrust Litig., In re*,
    No. 06-0620, 2015 WL 6326427 (E.D. Pa. Aug. 11, 2015) ............................................4

*Resco Prods., Inc. v. Bosai Minerals Grp.*,
    No. 06-235, 2015 WL 5521768 (W.D. Pa. Sept. 18, 2015) ............................................4

*Sims v. Great Am. Life Ins. Co.*,
    469 F.3d 870 (10th Cir. 2006) ...........................................................................................8

*Sobel v. Yeshiva Univ.*,
    839 F.2d 18 (2d Cir. 1988) ................................................................................................4

*United Phosphorus, Ltd. v. Midland Fumigant, Inc.*,
    173 F.R.D. 675 (D. Kan. 1997) .........................................................................................9

*United States v. Giambro*,
    544 F.3d 26 (1st Cir. 2008) ..............................................................................................12

*United States v. Nacchio*,
    555 F.3d 1234 (10th Cir. 2009) ................................................................................. 3, 11

*Urethane Antitrust Litig., In re*,
    No. 04-1616-JWL, 2012 WL 6681783 (D. Kan. Dec. 21, 2012) ............................... 4, 5

**RULES**

Fed. R. Civ. P. 37 ...................................................................................................................8

**OTHER AUTHORITIES**

Letter from S. Musoff to the Courts, *NCUA v. Morgan Stanley & Co. Inc.*,
    No. 13cv6705 (DLC) (S.D.N.Y. June 17, 2015), ECF No. 335 ......................................6

Order, *NCUA v. UBS Sec., LLC*,
    No. 12-cv-2591-JWL (D. Kan. Feb. 25, 2016), ECF No. 375 ..................................... 8, 9

## INTRODUCTION

Defendants have failed to carry their burden of demonstrating that Dr. Walter Torous's loss causation opinions are admissible.[1]  At each step of their opposition, Defendants attempt to shift the burden to the National Credit Union Administration Board ("NCUA") to prove that the fundamental flaws in Dr. Torous's analysis would have necessarily changed his conclusions.  But that ignores settled law that it is Defendants' burden to establish in the first instance that Dr. Torous's methodologies are reliable—a burden which they fall well short of satisfying.  Accordingly, the Court should exclude Dr. Torous's loss causation opinions in their entirety.

*First*, Defendants offer no persuasive basis for departing from Judge Cote's holding that, in order to offer admissible loss causation testimony based the performance of a loan benchmark, Defendants were required to put forth an affirmative expert opinion that the loans in their benchmarks were free of defects.  Only with the benefit of such an affirmative opinion could Defendants have established the scientific validity of their proposed benchmarks.  Because Defendants never affirmatively offered any expert opinion that the loans in Dr. Torous's Industry, Reduced Industry, and Butler Benchmarks were free of defects, Dr. Torous's testimony based on those benchmarks should be excluded.  Furthermore, because nearly half of the loans in the Spolin and Forester Benchmark, like all of the loans in the other three benchmarks, lack affirmative representations of cleanliness, that benchmark is likewise invalid, and Dr. Torous's testimony based on that benchmark should also be excluded.

*Second*, the Spolin and Forester Benchmark should be stricken in any event because it was disclosed for the first time five months after this Court's deadline for disclosing affirmative loss causation opinions.  This Court's rulings have made clear that Defendants were not permitted to

---

[1] "Defendants" refers to Nomura Home Equity Loan, Inc. ("Nomura"); NovaStar Mortgage Funding Corporation ("NovaStar"); and RBS Securities, Inc., RBS Acceptance, Inc., and Financial Asset Securities Corp. (collectively, "RBS").  NovaStar and RBS joined in Nomura's opposition. *See* ECF Nos. 1018, 1021.

wait until the rebuttal round to disclose their experts' affirmative loss causation opinions under the guise of "supplementation." Yet, Defendants waited even longer—until the reply round—to unveil the Spolin and Forester Benchmark. The untimeliness of Defendants' disclosure independently warrants striking all of Dr. Torous's opinions based on the Spolin and Forester Benchmark.

*Third*, Dr. Torous never considered the relationship between the misrepresentations alleged by NCUA and the macroeconomic events that he blames for U.S. Central's losses; therefore, Dr. Torous never offered any opinion about whether those macroeconomic events were independent of Defendants' alleged misrepresentations. In the face of expert testimony from Dr. James Barth that Defendants' alleged misconduct contributed to the macroeconomic events Dr. Torous blames for NCUA's losses, Dr. Torous cannot simply assume the absence of any relationship between the two. Defendants have failed to show why Dr. Torous should be permitted to offer testimony blaming U.S. Central's losses on macroeconomic events that were themselves caused by Defendants' misconduct. Therefore, such testimony would be fundamentally unhelpful to the jury and should also be excluded.

*Fourth*, Defendants have failed to show how Dr. Torous's unique, made-for-litigation adjustments to the Andrew Davidson & Company ("ADCo") valuation model are reliable, testable, or generally accepted within the scientific community. Because Dr. Torous's adjustments to the baseline ADCo model lack any discernible scientific basis, this Court should not permit a jury to hear Dr. Torous's opinions based on those *ad hoc* adjustments.

*Finally*, Defendants do not attempt to defend Dr. Torous's flawed and misleading extrapolation of the debt-to-income ("DTI") ratio misrepresentations found by NCUA's re-underwriting expert, Steven Butler. Dr. Torous cannot fall back on other aspects of his analysis to support his opinion that Mr. Butler's DTI findings had no material impact on the performance of

the At-Issue Loans because those aspects of his analysis are tainted by the flaws in his benchmarks discussed elsewhere.  Dr. Torous's DTI opinions should be excluded.

## ARGUMENT

### I.   Defendants Have Not Satisfied Their Burden of Demonstrating the Scientific Validity of Dr. Torous's Industry and Butler Benchmarks

Defendants do not quarrel with the settled principle that a control group tainted by defective mortgage loans is scientifically unsound and therefore unreliable.  Instead, Defendants contend (ECF No. 1012, at 15–18) that it is *NCUA's* burden to prove the scientific invalidity of Dr. Torous's benchmarks, rather than Defendants' burden to prove their validity.  That turns the applicable burden of proof on its head.  It is Defendants, as the "proponent[s] of" Dr. Torous's testimony that "bear[] the burden of showing [his] testimony is admissible." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).  To meet that burden here, Defendants "need[ed] to show that [Dr. Torous's] benchmarks provide adequately 'clean' control groups." *Federal Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11cv6201 (DLC), 2015 WL 539489, at *6 (S.D.N.Y. Feb. 10, 2015) ("*FHFA*").  Defendants have not only failed to carry that burden, they have thumbed their noses at it.

Defendants contend (ECF No. 1012, at 13-14) that the validity of Dr. Torous's Industry, Reduced Industry, and Butler Benchmarks is a matter of weight, rather than admissibility.  Not so; whether Dr. Torous's benchmarks are valid go to the very core of whether expert testimony based on those benchmarks is admissible, as Judge Cote has persuasively explained.  Defendants cite inapplicable precedents regarding materially different issues, such as whether a benchmark is sufficiently comparable to the subject being tested,[2] whether a control group is sufficiently large,[3] or

---

[2] *See Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1319 (Fed. Cir. 2014) (addressing whether a technological feature is sufficiently "comparable or similar" to feature at issue to provide reliable estimate of feature's value); *Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2013 WL 1721651, at

whether omitting an independent variable from a regression model is reliable.[4]  But Defendants have not cited a single case that says whether a "control group lacked the very variable requiring isolation," *FHFA*, 2015 WL 539489, at *5, is a proper question for the jury to weigh.  Indeed, because it is such a basic requirement, in the cases Defendants cite where that issue was present, it was clearly established or otherwise not in dispute.[5]

Defendants misplace reliance on cases involving significantly different circumstances, such as *In re Mushroom Direct Purchaser Antitrust Litigation*, No. 06-0620, 2015 WL 6326427 (E.D. Pa. Aug. 11, 2015), and *In re Urethane Antitrust Litigation*, No. 04-1616-JWL, 2012 WL 6681783 (D. Kan. Dec. 21, 2012).  *In re Mushroom* involved two experts.  The plaintiffs' expert used a regression model comparing "conduct and conduct free periods," but also identified periods during which he concluded "the level of actual anticompetitive conduct is 'murky,'" and therefore modeled those periods as both "conduct" periods and "agnostic" periods.  *See* 2015 WL 6326427, at *2–3 & n.2.  In rebuttal, defendant's expert conducted a "sensitivity analysis" on that regression model, intending to show how plaintiffs' damages estimate would change if one assumed the "murky" periods were in fact "conduct free" periods.  *Id.* at *2.  The court held that "[t]hese various permutations . . . are not unreasonable and together provide a valuable background" from which to assess the "disputed

---

*6–12 (E.D. Mich. Apr. 22, 2013) (addressing whether expert's wage benchmark was "sufficiently comparable" to wages that would be paid to plaintiffs in a free market).

[3] *See Blotcher v. Stewart*, 45 F. Supp. 3d 1274, 1282–83 (D. Colo. 2014) (addressing challenge that a control group "is too small to provide a reliable baseline comparison").

[4] *See Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (addressing challenge that expert's regression omitted some relevant variables); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988) (similar) *Resco Prods., Inc. v. Bosai Minerals Grp.*, No. 06-235, 2015 WL 5521768, at *5–6 (W.D. Pa. Sept. 18, 2015) (similar).

[5] *See Blotcher*, 45 F. Supp. 3d at 1282 (for control group testing for presence of blood flow abnormalities, doctor "screened potential subjects over a seven year period to eliminate known causes of blood flow abnormalities"); *Resco*, 2015 WL 5521768, at *3 (not in dispute that expert was comparing prices "from before the alleged conspiracy" to prices "that prevailed during the alleged conspiracy"); *Cason-Merenda*, 2013 WL 1721651, at *6–12 (not in dispute that benchmark wages were paid in "an actual free market").

'murky' periods." *Id.* at *3. In other words, it was not unreasonable for a *rebuttal* expert to challenge the affirmative expert's proffered model by using different assumptions. That offers no support for allowing Dr. Torous, as an affirmative expert, to use a model that relies on a critical assumption that he has not even tried to verify or validate as correct, and which at least one other Court held to be unfounded.

This Court's decision in *In re Urethane* also does not help Defendants. The plaintiffs' expert used 2004 to 2008 as "benchmark years" and 1999 to 2003 as "damages years," and the defendant challenged, *inter alia*, the expert's "reasoning in refusing to use 1994 to 1998 as part of the benchmark period." 2012 WL 6681783, at *6. This Court held that the expert's decision to exclude earlier years from the benchmark was "not without support," and indicated that the expert's reliance on "possible taint" as a basis to exclude "potential benchmark years go to the weight of his opinions and not their admissibility." *Id.* That decision squarely supports NCUA's arguments: it highlights the importance of using valid benchmarks free of tainted data. The challenge in *In re Urethane* was not that plaintiffs' expert had used a benchmark that contained tainted data; rather, it was that the benchmark had excluded clean data. Indeed, plaintiffs' expert conservatively declined to broaden his benchmark because doing so might have incorporated tainted data. That is the opposite of the situation here, where Dr. Torous has *included* tainted data in his benchmarks, not excluded it. *In re Urethane* does nothing to excuse Dr. Torous's reliance on potentially tainted benchmarks.

Noticeably absent from Defendants' opposition is any genuine attempt to distinguish Judge Cote's holdings in *FHFA*, 2015 WL 539489—the only case to have dealt with this exact issue. Nor do Defendants attempt to demonstrate that it was incorrectly decided, noting (ECF No. 1012, at 12 n.4) only that this Court should not follow *FHFA* because "Nomura respectfully disagrees with" it. In particular, Defendants do not directly challenge Judge Cote's holdings that "affirmative representations of cleanliness" are required to validate a loan benchmark, *FHFA*, 2015 WL 539489,

at *6, and that concluding "underwriting defects were not found for a given loan" (the only conclusion that Mr. Butler's re-underwriting expert report supports regarding the loans in the Butler Benchmark) is "not the same thing as affirmatively certifying that the loan was free of defects," *id.* at *9. Notably, on June 17, 2015, Defendants joined in a letter to this Court, in which they stated that their loss causation experts would use "a control group" of loans, and that "Defendants are preparing to offer affirmative evidence that NCUA sampled loans are *free of defects.*" Letter from S. Musoff to the Courts at 2 n.4, *NCUA v. Morgan Stanley & Co. Inc.*, No. 13cv6705 (DLC) (S.D.N.Y. June 17, 2015), ECF No. 335 (emphasis added). Despite knowing that such a control group was required under the reasoning of Judge Cote's persuasive opinion, and stating that they intended to show that their control group was "free of defects," Dr. Torous simply decided not to do so. That decision is fatal to the admissibility of Dr. Torous's testimony based on the Industry, Reduced Industry, and Butler Benchmarks.

Moreover, to the extent Defendants contend (ECF No. 1012, at 2) that the Butler Benchmark "confirmed the reliability of" the Industry and Reduced Industry Benchmarks, their argument is flawed. That two benchmarks produce consistent results does not "confirm the reliability" of *either* benchmark. Otherwise, two clocks that both stopped working at noon could each "confirm" that the other was still keeping accurate time. [6]

---

[6] Furthermore, Dr. Torous's analysis based on the Butler Benchmark was itself tainted by the Industry Benchmark because Dr. Torous uses a parameter derived from the Industry Benchmark when testing the statistical significance of Unexplained Defaults under the Butler Benchmark. *See* ECF No. 842-6 (Saunders Reply Report) ¶ 10. Specifically, Dr. Torous uses standard deviations of Unexplained Defaults from the Industry Benchmark to test whether Unexplained Defaults in At-Issue SLGs under the Butler Benchmark are statistically significant. Dr. Torous's analyses based on the Butler Benchmark thus depend on the reliability of his Industry Benchmark. But, as discussed above, Dr. Torous has not established that his Industry Benchmark is reliable, and accordingly has not established that his tests of the statistical significance of Unexplained Defaults under the Butler Benchmark are reliable.

## II.   Dr. Torous's Spolin and Forester Benchmark Cannot Remedy the Flaws in His Other Loan Benchmarks

Defendants contend (ECF No. 1012, at 21–22) that they can "dispatch NCUA's criticism" of the Industry, Reduced Industry, and Butler Benchmarks by relying on the Spolin and Forester Benchmark, which was disclosed for the first time in Dr. Torous's reply report.  NCUA did not raise the Spolin and Forester Benchmark in its opening brief because it had intended to file a separate motion *in limine* to preclude Defendants from relying on that untimely disclosed benchmark at trial.  As Defendants have raised those issues in their opposition, however, NCUA will briefly address why the Spolin and Forester Benchmark cannot remedy the flaws that require exclusion of Dr. Torous's three other benchmarks.

a.   The Spolin and Forester Benchmark does not resolve the problem that Dr. Torous is relying on benchmarks that contain loans that no expert has opined are clean.  Dr. Torous states that the Spolin and Forester Benchmark "is composed of 3,246 loans" from two categories:  (1) "loans within the Butler Benchmark," and (2) "all loans re-underwritten by Mr. Spolin or Forester which they found to be originated within the applicable guidelines."   ECF No. 842-8 (Torous Reply Report) ¶ 37.   Mr. Spolin found 1,635 loans to have been "originated within the applicable guidelines," Ex. A (Spolin Report) ¶ 56, and Mr. Forester found that 92 loans "complied with the applicable underwriting guidelines," ECF No. 1012-12 (Forester Report) ¶ 21.[7]  That leaves 1,519 loans in the Spolin and Forester Benchmark that lack "affirmative representations of cleanliness."

---

[7] Mr. Forester reached two alternative conclusions using two alternative methodologies, one of which "considers only information available at the time of origination," and one of which "considers post-closing information," as Mr. Butler did. ECF No. 1012-12 (Forester Report) ¶¶ 21–22.  Dr. Torous based his Spolin and Forester Benchmark "on the scenarios that do not rely on post-origination information."  ECF No. 842-8 (Torous Reply Report) ¶ 37 n.73.  The use of this scenario provides yet another independent reason why this Benchmark is tainted.  *See Federal Hous. Fin. Agency v. Nomura Holding, Am., Inc.*, 104 F. Supp. 3d 441, 520 (S.D.N.Y. 2015), *appeals docketed*, Nos. 15-1872 et al. (2d Cir. June 10, 2015) (finding that RBS and Nomura made false statements about underwriting based in part on post-origination evidence that "[b]orrowers misrepresented their income, credit history and assets, and their relationship to the property").

*FHFA*, 2015 WL 539489, at *6.  Therefore, Dr. Torous's opinions based on the Spolin and Forester Benchmark are invalid and should be excluded for the same reasons as the Butler Benchmark, discussed above.

      **b.**      Dr. Torous's opinions based on the Spolin and Forester Benchmark should also be stricken as untimely. This Court has made clear that because "[l]oss causation is an affirmative defense for which defendants bear the burden, . . . any loss causation expert reports [we]re due on August 14[, 2015]." *See* ECF No. 589, at 3; *see also* Order at 6–7, *NCUA v. UBS Sec., LLC*, No. 12-cv-2591-JWL (D. Kan. Feb. 25, 2016), ECF No. 375 ("February 25 Order") (confirming, for the third time, that defendant may not "submit, after the deadline for filing opening expert reports, new expert opinions on an issue on which they bear the burden of proof" under the guise of "'supplementation'").  Those orders demonstrate that Dr. Torous's opinions based on the Spolin and Forester Benchmark, which were offered for the first time in his reply report, cannot be used to support the affirmative defense of loss causation because they are untimely and should be excluded under 37(c)(1). *See, e.g., Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 895 (10th Cir. 2006) (holding district court "properly excluded" defendant's expert "as untimely disclosed" where defendant "did not comply with the court's scheduling order"); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953–54 (10th Cir. 2002) (reversing district court's refusal to strike untimely expert opinions, holding that "[p]rejudice results because the expert reports did not reveal what the experts will testify to at trial").

      The Defendants' untimeliness is not excused merely because the Spolin and Forester Benchmark is based on re-underwriting opinions disclosed in Defendants' rebuttal expert reports.[8]

---

[8] RBS suggests, in a footnote to its summary judgment opposition brief, that NCUA has "waived" the argument that any of RBS's loss causation experts' opinions are untimely.  *See* ECF No. 1026, at 495 n.1525. This argument is meritless.  This Court's scheduling orders did not set any deadline for filing motions under Rule 37(c), and such relief can be, and often is, properly sought through a motion *in limine*. *See Asia Strategic Inv. Alliances Ltd. v. Gen. Elec. Capital Servs., Inc.*, No. 95-2479-GTV, 1997 WL 122568, at *2 (D. Kan. Mar. 11, 1997) ("The applicable deadline for moving for sanctions under Rule 37(c)(1) is the deadline for filing motions in limine."); *see also Guerrero v.*

NCUA identified the sampled loans that it intended to re-underwrite in this case 16 months before Defendants' opening expert reports were due. *See* Ex. B (April 18, 2014 Letter from M. Klenov to D. Horowitz). Therefore, if Defendants wanted to "ask their experts to perform their own re-underwriting prior to the deadline for opening expert reports," they could have done so—and were required to do so under the scheduling orders in this case—in time to incorporate those affirmative re-underwriting opinions into Dr. Torous's opening report. February 25 Order at 6. Defendants made the conscious decision not to do so, and instead waited until five months after this Court's deadline for disclosing loss causation opinions to unveil the Spolin and Forester Benchmark that they now say is the answer to all of NCUA's criticisms. Defendants cannot now escape the consequences of that choice.

## III. Dr. Torous Improperly Attributes U.S. Central's Losses to Causes That Are Related to Defendants' Misconduct

"The affirmative defense of loss causation requires a defendant to prove that the loss in the value of the security was proximately caused by events unrelated to the phenomena underlying the alleged misrepresentations." *FHFA v. Nomura Holding, Am., Inc.*, 104 F. Supp. 3d 441, 589 (S.D.N.Y. 2015), *appeals docketed*, Nos. 15-1872 et al. (2d Cir. June 10, 2015). Defendants cannot satisfy that burden by blaming an "intervening" macroeconomic event for a plaintiff's losses "if defendants' misrepresentations, and the underlying facts they concealed, were part and parcel of it." *Id.* at 592; *see also Financial Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 404 n.2 (2d Cir. 2015). This rule is rooted in the common law tort principles of proximate causation from which loss causation is derived. *See, e.g., AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 211 (2d Cir. 2000) (noting "the requirement of loss causation 'derives from the common law tort concept of proximate causation'").

---

*Meadows*, No. Civ-14-537-C, 2016 WL 1464635, at *2–3 (W.D. Okla. Apr. 13, 2016) (granting motion *in limine* to exclude expert testimony under Rule 37(c)(1) due to untimely disclosure); *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 173 F.R.D. 675, 677–78 (D. Kan. 1997) (same). RBS cites no authority to the contrary.

Although an "intervening" cause can sometimes absolve a wrongdoer of liability, "[i]f such intervening cause were set in motion by the original wrongdoer, he . . . must answer for all consequences which may ensue in the ordinary course of events, even though such consequences are immediately and directly brought about by an intervening cause." *Horstein v. Gen. Motors Corp.*, 391 F. Supp. 1274, 1277 (S.D.N.Y. 1975).[9]

Defendants' opposition does not contest these principles. Nor does it dispute Judge Cote's findings after trial in *FHFA* that Defendants' loan origination practices were "part and parcel" of the macroeconomic events Dr. Torous blames for U.S. Central's losses:

> To support the defense, defendants offered evidence regarding the rise and decline in housing prices and other economic conditions at the beginning of this century, and it is to that chapter of American history that this Opinion now turns. The evidence at trial, including expert testimony, as well as common sense drive a single conclusion. Shoddy origination practices that are at the heart of this lawsuit were part and parcel of the story of the housing bubble and the economic collapse that followed when that bubble burst. While that history is complex, and there were several contributing factors to the decline in housing prices and the recession, it is impossible to disentangle the origination practices that are at the heart of the misrepresentations at issue here from these events. Shoddily underwritten loans were more likely to default, which contributed to the collapse of the housing market, which in turn led to the default of even more shoddily underwritten loans. Thus, the origination and securitization of these defective loans not only contributed to the collapse of the housing market, the very macroeconomic factor that defendants say caused the losses, but once that collapse started, improperly underwritten loans were hit hardest and drove the collapse even further. The evidence at trial confirms the obvious: Badly written loans perform badly. In short, defendants could not propound a cause unrelated to the alleged misrepresentations.

104 F. Supp. 3d at 537.

---

[9] *See also, e.g.*, *McCoy v. Augusta Fiberglass Coatings, Inc.*, 593 F.3d 737, 744 (8th Cir. 2010) ("[A]n intervening proximate cause is an event that occurs after the defendant's act or omission that, in itself, causes damage completely independent of the defendant's conduct."); *Bruschi v. Brown*, 876 F.2d 1526, 1530 (11th Cir. 1989) (only losses "brought about by business conditions or other factors in no way related to the representations" are not recoverable); *Corey v. Jones*, 650 F.2d 803, 806 (5th Cir. 1981) ("The chain of causation is not broken by an intervening act which is a normal reaction to the stimulus of a situation created by negligence."); *Marini v. Adamo*, 995 F. Supp. 2d 155, 196 (E.D.N.Y. 2014) ("[A] court must determine whether the drop in a stock's price is attributable to a misrepresentation or to unrelated intervening factors that would have caused the drop in price even in the absence of a misrepresentation.").

Instead, they again attempt to shift their burden to NCUA, contending (ECF No. 1012, at 22–23) that unless NCUA can demonstrate that Defendants' alleged misrepresentations had "a material impact on the national macroeconomic trends" that Dr. Torous blames for U.S. Central's losses, any role that those misrepresentations played in bringing about those trends "is not even relevant to [Defendants'] negative loss causation defense." That argument is unpersuasive.

As an initial matter, Defendants do not even attempt to argue that, contrary to Judge Cote's findings, their misrepresentations were unrelated or independent of the macroeconomic events that Dr. Torous blames for U.S. Central's losses. Rather, they contend (ECF No. 1012, at 22) that their misrepresentations "did not, standing alone, have a material impact" on the macroeconomic events. But Defendants ask the wrong question in order to arrive at a legally irrelevant answer. Defendants must show a "fundamental unrelatedness" between U.S. Central's losses and the macroeconomic events they blame; it is not enough for Defendants to say that they played a relatively small role in causing the global financial catastrophe. As Judge Cote has persuasively explained, "[t]he fact that defendants, along with many others, took part in th[is] phenomena, is not a defense." *FHFA*, 104 F. Supp. 3d at 589.

Defendants also continue to misapprehend the applicable burden of proof for their affirmative defense. Defendants—and not NCUA—bear the "heavy burden" of "disproving causation" at trial. *See Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987). They likewise bear the burden of demonstrating that Dr. Torous's testimony is admissible to support that affirmative defense. *See Nacchio*, 555 F.3d at 1241. NCUA has properly offered the expert testimony of Dr. James Barth to "call into question" whether Dr. Torous relies on "a cause of loss independent of the material misrepresentations." *FHFA*, 104 F. Supp. 3d at 589. Defendants' attempt to require NCUA to "quantify the precise extent to which the loans at issue . . . contributed to the oversupply of credit in the housing market . . . turns the burden on its head." *Id.*

Because Defendants have failed to show that the macroeconomics conditions Dr. Torous blames for U.S. Central's losses are "unrelated" to their misrepresentations, *see id.*, his opinions have no "valid scientific connection to the pertinent inquiry" and are therefore inadmissible, *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591–92 (1993); *see also Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341 (5th Cir. 1999) (per curiam) (excluding expert opinion that was inconsistent with and disregarded applicable legal standards governing liability); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories.").[10]

## IV.   Dr. Torous's Untested Method for "Tuning" the ADCo Model Is Unreliable

NCUA does not dispute Defendants' contention (ECF No. 1012, at 28) that the ADCo model in general is a widely used valuation method.  Defendants fail, however, to rebut NCUA's objection that Dr. Torous's "particular use of the [model] to reach his conclusion did not present sufficient indicia of reliability."  *United States v. Giambro*, 544 F.3d 26, 33 (1st Cir. 2008).  In particular, Defendants ignore NCUA's argument that Dr. Torous's unique "tuning" of the ADCo model for purposes of this litigation was arbitrary and has not been shown, other than on Dr. Torous's say-so, to produce reliable results.  Dr. Torous's failure to explain how his specific modifications to the ADCo model are testable, reliable, or accepted in the relevant scientific community renders his opinions based on his version of the ADCo model inadmissible.  *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156–57 (1999) ("Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate [the expert]'s approach. . . .  Of course, [the expert] himself claimed that his method was accurate, but . . . nothing in either *Daubert* or the Federal Rules of Evidence

---

[10] It bears noting that Defendants mischaracterize NCUA's objection regarding exogeneity, framing it (ECF No. 1012, at 23–25) as an assertion about the robustness of Dr. Torous's regression model.  Dr. Torous's failure to demonstrate the exogeneity of the macroeconomic events he relies upon does not merely call into question the technical soundness of his methodology.  It renders his opinions fundamentally "non-helpful."  *Daubert*, 509 U.S. at 591.

requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

Furthermore, this objection is not, as Defendants frame it (ECF No. 1012, at 29), a mere "quibble" that Dr. Torous "does not eliminate all estimation errors." Defendants contend (ECF No. 1012, at 29) that Dr. John Finnerty "manipulates the numbers" by measuring Dr. Torous's error rate by the deviation between the "tuned" balances and the actual balances of the Certificates, rather than by the "tuned" *decline* in each Certificate's balance with the actual decline. Even assuming that these different methods of measuring error rates are, as Defendants assert, "a matter of dispute between experts," some of Dr. Torous's "tuning" errors would have been much larger had Defendants' preferred error method been applied. For example, one of the Certificates (CUSIP 35729VAF4) had an original face value of $74,132,000, *see* ECF No. 1012-19 (Finnerty Backup Spreadsheet) at PDF p. 2, and Dr. Torous's "tuning" model predicted that Certificate's balance would not decline at all, *see id.* at 4, but in reality it declined in value by $20,642,000, *see id.* Using Dr. Finnerty's error method, that error rate is 38.6% ((74.132-53.49)/53.49), *see id.*, but using Defendants' preferred method, the error rate would be 100% ((0 − 20,642,000)/20,642,000). Therefore, no matter which way Dr. Torous's error rates are calculated, his "tuning" results in significant, unexplained forecasting errors that require exclusion of his opinions based on that "tuning."

The unreliability of Dr. Torous's ADCo model also manifests in other ways. Most notably, Dr. Torous's "tuned" cash flow forecasts resulted in implied option-adjusted spreads ("OAS") that are either facially implausible or impossible. Dr. Torous's implied OAS reflects the spread above a standard benchmark interest rate (*e.g.*, LIBOR) that would need to be added to discount the future cash flows of a security, as calculated by the "tuned" ADCo model, in order for the expected value of those "tuned" cash flows to equal the values calculated contemporaneously by Barclays or IDC.

*See*, *e.g.*, ECF No. 842-5 (Torous Rebuttal Report) at B-1, B-7; ECF No. 842-7 (Finnerty Reply Report) ¶ 97.  For certain Certificates, Dr. Torous's model could not generate an implied OAS at all because his "tuned" cash flows were so unrealistically small that they could never generate the contemporaneously calculated value of the Certificates.  *See* ECF No. 842-7 (Finnerty Reply Report) ¶ 100a.  In other instances, Dr. Torous's implied OAS for certain Certificates varied wildly within a two to three-month timeframe, sometimes by hundreds of percentage points, demonstrating that Dr. Torous's "tuned" cash flows fluctuated in ways that are "essentially impossible."  *Id.* ¶ 100b. These results confirm the unreliability of Dr. Torous's unexplained "tuning" of the ADCo model and further support excluding his opinions based on that tuning.

## V.  Dr. Torous's DTI Opinions Should Be Excluded

Dr. Torous's opinion that the DTI misrepresentations alleged by NCUA had no material effect on loan performance, *see* ECF No. 842-5 (Torous Rebuttal Report) ¶ 46, should be excluded because his analysis fails to accurately or reliably incorporate those misrepresentations.  Defendants have not shown otherwise.

*First*, Dr. Torous cannot support his DTI opinions by incorporating DTI as an explanatory variable in his Industry Benchmark regression analysis because, as explained above, he used a tainted benchmark, which renders his regression analysis fundamentally unreliable.  *See supra* Part I.

*Second*, when Dr. Torous attempted to quantify the effect of those DTI misrepresentations, he used an invalid method for doing so.  Defendants essentially concede this point in their opposition, all but abandoning what they now call (ECF No. 1012, at 27) Dr. Torous's "*backup* means of confirming the results he obtained in his primary DTI regression analysis."  This is for good reason.  As explained in NCUA's opening brief, Dr. Torous's averaging, or smoothing, of DTI across the entire loan pool dramatically understates the misrepresented DTI's effect on loan performance.  *See* ECF No. 842, at 25–26.  Defendants do not dispute this point.  Instead, they

attempt to yet again flip the burden of proof, claiming (ECF No. 1012, at 27) that it is NCUA's duty to show that DTI misrepresentations caused the At-Issue Loans to default, rather than the other way around.  Defendants have failed to carry their burden of demonstrating that Dr. Torous has a valid scientific basis for opining that the DTI misrepresentations found by Mr. Butler had no material effect on loan performance.  Therefore, that opinion should be excluded.[11]

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Torous's loss causation opinions in their entirety as irrelevant, unreliable, and ultimately unhelpful to a jury.

---

[11] Defendants' criticism of the Archer & Smith article cited in NCUA's opening brief is unavailing.  That article found that "higher debt-to-income ratio raises the probability of default," *see* ECF No. 1012-15 (W. Archer and B. Smith, *Residential Mortgage Default: The Roles of House Price Volatility, Euphoria and the Borrower's Put Option*, Federal Reserve Bank of Richmond Working Paper No. 10-02 (Feb. 2010)) at 22, and the authors' expectation that DTI has a "nonlinear in relation to default," *id.* at 10, has been observed by other empirical research.  For example, a case study that evaluated 675,000 mortgage loans originated between 1999 and 2012 found "a higher relative frequency of default beyond a 40 debt to income ratio," which "is likely due to the lower overall financial flexibility of the borrower."  Ex. C, GLENN M. SCHULTZ, INVESTING IN MORTGAGE BACKED AND ASSET-BACKED SECURITIES: FINANCIAL MODELING WITH R AND OPEN SOURCE ANALYTICS 316, 327 (2016).  Defendants have not cited any empirical research to the contrary.  Because there is an uncontroverted evidentiary basis to believe that Dr. Torous's method of extrapolating DTI masked the effect of the DTI misrepresentations, his DTI opinions should be excluded as unreliable.

Dated: June 3, 2016                    Respectfully submitted,


                                       /s/ Steven M. Berezney
Norman E. Siegel (D. Kan. # 70354)     Stephen M. Tillery, *pro hac vice*
Rachel E. Schwartz (Kan. # 21782)      Steven M. Berezney (D. Kan. # 78424)
STUEVE SIEGEL HANSON LLP               Michael E. Klenov, *pro hac vice*
460 Nichols Road, Suite 200            John C. Craig, *pro hac vice*
Kansas City, MO 64112                  Randall P. Ewing, Jr., *pro hac vice*
Phone: (816) 714-7100                  KOREIN TILLERY LLC
Fax: (816) 714-7101                    505 North Seventh Street, Suite 3600
siegel@stuevesiegel.com                St. Louis, Missouri 63101-1625
schwartz@stuevesiegel.com              Phone: (314) 241-4844
                                       Fax: (314) 241-3525
                                       stillery@koreintillery.com
David C. Frederick, *pro hac vice*     sberezney@koreintillery.com
Wan J. Kim, *pro hac vice*             mklenov@koreintillery.com
Gregory G. Rapawy, *pro hac vice*      jcraig@koreintillery.com
Andrew C. Shen, *pro hac vice*         rewing@koreintillery.com
KELLOGG, HUBER, HANSEN, TODD,
    EVANS & FIGEL, P.L.L.C.
Sumner Square                          George A. Zelcs, *pro hac vice*
1615 M Street, N.W.                    KOREIN TILLERY LLC
Suite 400                              205 North Michigan Avenue, Ste. 1950
Washington, D.C. 20036                 Chicago, IL 60601
Phone: (202) 326-7900                  Phone: (312) 641-9760
Fax: (202) 326-7999                    Fax: (312) 641-9751
dfrederick@khhte.com                   gzelcs@koreintillery.com
wkim@khhte.com
grapawy@khhte.com
ashen@khhte.com                        Greg G. Gutzler (D. Kan. # 78425)
                                       Tamara M. Spicer (D. Kan. # 78426)
                                       ELIAS GUTZLER SPICER LLC
                                       1924 Chouteau Ave., Ste W
                                       St. Louis, MO 63103
                                       Phone: (314) 833-6645
                                       Fax: (314) 621-7607
                                       ggutzler@egslitigation.com
                                       tspicer@egslitigation.com


                *Attorneys for Plaintiff NCUA*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 3, 2016, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record. I also certify that a copy of the foregoing is being delivered on today's date to all counsel of record via electronic mail.

/s/ Steven M. Berezney
*Attorney for Plaintiff NCUA*