IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NATIONAL CREDIT UNION               )
ADMINISTRATION BOARD,               )
                                    )
            Plaintiff,              )
                                    )
      v.                            )          Case No. 11-2340-JWL
                                    )
RBS SECURITIES INC., et al.,        )
                                    )
            Defendants.             )
                                    )
_____)

## MEMORANDUM AND ORDER

This matter comes before the Court on various motions for summary judgment: the motions by defendants RBS Securities Inc., RBS Acceptance Inc., and Financial Assets Securities Corp. (collectively "RBS") concerning the so-called NGN transactions (Doc. # 915) and the so-called Sandlot transactions (Doc. # 917); the motion by defendant Nomura Home Equity Loan, Inc. ("Nomura") concerning the Sandlot transactions (Doc. # 765); the motion by plaintiff (Doc. # 759) to the extent that it concerns the NGN transactions; and the motion by Nomura for an offset for settlement proceeds received by plaintiff (Doc. # 773). As more fully set forth below, the Court concludes that, for purposes of calculating possible damages under the relevant statutes, questions of fact remain concerning whether the Sandlot transactions or the NGN transactions involved "dispositions in the market." The Court further rejects plaintiff's proposed damage calculation in the event that the NGN transactions are found to be

dispositions.  Accordingly, with respect to the NGN transactions, plaintiff's motion is **denied**, and RBS's motion is **granted in part and denied in part**; and with respect to the Sandlot transactions, RBS's and Nomura's motions are **denied**.  Nomura's motion concerning an offset is also **denied**.

## I.    <u>Background</u>[1]

Plaintiff National Credit Union Administration Board brings this suit as conservator and liquidating agent of U.S. Central Federal Credit Union ("U.S. Central").  The suit relates to 20 offerings involving 29 different residential mortgage-backed securities ("RMBS" or "certificates") purchased by U.S. Central.  By the present suit, plaintiff brings claims under Sections 11 and 12 of the federal Securities Act of 1933 and under a Kansas statute, based on alleged untrue statements or omissions of material facts relating to each certificate.  Defendant RBS was the underwriter or seller for the certificates, while the other defendants issued particular certificates.  Plaintiff asserts only a claim under Section 11 against Nomura involving a single certificate.

<u>The Sandlot Transactions</u>

The Sandlot transactions involve five certificates: HVMLT 2006-11 A1A, LUM 2006-2 A1C, LUM 2007-1 1A1, NHELI 2007-1 1A4, and SVHE 2007-OPT1 IIA23.  The NHELI 2007-1 certificate is the only certificate on which plaintiff has based a claim

---

[1]These facts are undisputed.  Additional facts are discussed below in the context of the parties' arguments.

against Nomura.

U.S. Central arranged for the creation of Sandlot Funding LLC ("Sandlot") in 2007. Pursuant to contracts between U.S. Central and Sandlot, U.S. Central ran the operations of Sandlot, paid Sandlot's obligations, and received all income on certificates held by Sandlot. According to a memo to the file by Doug Hoelscher, U.S. Central Vice President of Finance, at the time of Sandlot's creation, U.S. Central intended that Sandlot and Sandlot's assets reside off of U.S. Central's balance sheet, and transactions involving Sandlot were structured to achieve that result. Thus, U.S. Central would hold less than 50 percent of expected losses of Sandlot. In addition, Sandlot would obtain its assets from "unrelated market counterparties," who would transfer assets to Sandlot "as normal securities transactions." Sandlot would have the unrestricted right to sell or pledge those assets, and there would be no provision requiring the return of the assets to a counterparty. Sandlot's initial portfolio of assets would be purchased from counterparties who had purchased those assets from U.S. Central. The memo described how the transfers from U.S. Central to the counterparties would work:

> There is no binding agreement, written or oral, with the unrelated market counterparty by which the unrelated market counterparty has agreed to sell assets purchased from U.S. Central to Sandlot and there is no agreement, written or oral, that would grant U.S. Central the unilateral ability to cause the return of the assets. The sales of securities from U.S. Central (transferor) to the unrelated market counterparty (transferee) are conducted as normal securities transactions. . . . The transferee has the unrestricted right to sell or pledge the securities purchased and there are no provisions that could require the securities to be returned to the transferor. Therefore, the criteria for sale accounting . . . have been met and the transactions are sales.

Mr. Hoelscher further stated in the memo that transactions between U.S. Central and the counterparties as intermediaries would be conducted at "fair market value;" that although it was anticipated that a counterparty would hold the assets only for one day, the counterparty would be responsible for all gains and losses with respect to the market value of the transferred assets while it held those assets, and that a significant risk of loss did exist for the counterparty; and that the counterparty would therefore *not* be acting as agent for U.S. Central, but would be acting as a principal.  At that time, U.S. Central's General Counsel also opined that, in the event that U.S. Central would become subject to receivership or conservatorship, the transactions between U.S. Central and an expected counterparty, J.P. Morgan, would be considered "true sales."

In May and June of 2007, U.S. Central sold all or some portion of four certificates to J.P. Morgan, who then sold those assets to Sandlot within one day.  In June 2007, U.S. Central sold a portion of the NHELI 2007-1 certificate, comprising $49,000,000 of the original $50,000,000 face value of the certificate, to Deutsche Bank, for which U.S. Central received $49,213,132.99, which asset Deutsche Bank then sold to Sandlot within one day.

In January 2008, U.S. Central merged Sandlot back into itself, and Sandlot's assets returned to U.S. Central's balance sheets.  In June 2008, U.S. Central's auditors reversed its original conclusion from April 2007 regarding U.S. Central's off-balance-sheet treatment of Sandlot's assets, based on its new belief that Sandlot did not qualify for such treatment in the first place; as a result, the auditors changed certain past

4

accounting entries for U.S. Central.

The NGN Transactions

After U.S. Central was placed in liquidation in September 2010, plaintiff in its capacity as liquidator ("NCUA-Liq")—as distinguished from plaintiff acting as an agency in the executive branch of the federal government ("NCUA-Exec")—held U.S. Central's assets and placed them in a separate estate.  NCUA-Liq retained Barclays to help sell those assets.  Upon Barclay's advice, NCUA-Liq decided to sell the certificates by re-securitizing them through a structure called the NCUA Guaranteed Notes ("NGN") Program.  All 29 of the certificates involved in this action were re-securitized through the NGN Program.  Independent NGN trusts were created as legally separate entities with independent administrators.  The certificates were transferred by NCUA-Liq into the trusts.  NCUA-Liq then received senior NGN notes in fixed amounts, which notes were funded by income from the certificates.  NCUA-Liq in turn sold those notes for cash to underwriters, who then sold them into the market.  Moreover, the NGN notes were backed by a guarantee from NCUA-Exec, for which NCUA-Exec received a fee and the right to seek reimbursement from the NGN trusts for any payments made on the guarantee.  (NCUA-Liq did not pay NCUA-Exec anything for providing the guarantee.)  Finally, in addition to the NGN notes (which it then converted to cash proceeds), NCUA-Liq also received Owner Trust Certificates ("OTCs"), which entitled NCUA-Liq to any residual income from the original U.S. Central certificates once the NGN notes relating to those certificates were fully paid off.

NCUA-Liq and Barclays set the amounts of the NCUA notes (which NCUA-Liq received from the NGN trusts for the U.S. Central certificates) based on modeling by Barclays, in which Barclays sought to maximize the amounts that NCUA-Liq would receive while also minimizing the possibility of guarantee payments by NCUA-Exec. Barclays projected that sales of the U.S. Central securities by themselves would raise approximately $16.13 billion, which represented less than half of the $35.5 billion outstanding in principal on the certificates. With the guarantee, however, the NGN trusts received $28.3 billion in cash from sales of the NGN notes.

## II.    **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Burke v. Utah Transit Auth. & Local 382*, 462 F.3d 1253, 1258 (10th Cir. 2006). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Thom v.*

6

*Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon the pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  To accomplish this, sufficient evidence pertinent to the material issue  "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### III.   Sandlot Transactions

   A.   *Whether "Disposed of" Under Section 11*

Plaintiff has asserted claims against defendants under Section 11 of the Securities

7

Act, 15 U.S.C. § 77k.  Under Section 11, damages may be recovered in an amount representing the difference between, on the one hand, the amount paid for the security by the plaintiff; and, on the other hand, either (1) the value of the security at the time of suit or (2) "the price at which such security shall have been disposed of in the market before suit."  *See id.* § 77k(e).  The parties agree that, if plaintiff or U.S. Central "disposed of" certificates "in the market," any damages on plaintiff's Section 11 claims based on those certificates would be calculated by reference to the price received in those dispositions.  Defendants RBS and Nomura (hereafter "defendants") argue that U.S. Central disposed of particular certificates in the market in the Sandlot transactions, and by their summary judgment motions, they seek a ruling to that effect as a matter of law. Plaintiff argues that those transactions were not dispositions for purposes of calculating damages under Section 11.

Section 11 does not further define what it means to have "disposed of" a security, and the parties have been unable to identify any courts that have defined that term.[2] Thus, the Court gives the term "disposed of" its ordinary meaning.  *See Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning.").  *Webster's Third New*

---

[2]RBS cites *In re Broderbund/Learning Co. Securities Litigation*, 294 F.3d 1201 (9th Cir. 2002), as one of the few opinions to interpret this term.  In that case, however, the Ninth Circuit did not attempt to define the term; rather, it simply concluded that a disposition had occurred in that case for purposes of Section 11 where the security ceased to exist after a merger.  *See id.* at 1204.  Thus, the case is not particularly helpful in determining whether a disposition occurred in the present case.

*International Dictionary* (1993) defines "[to] dispose of" as "to transfer into new hands or to the control of someone else (as by selling or bargaining away)," *see id.* at 654, while *Black's Law Dictionary* (8th ed. 2004) defines "disposition" to mean "[t]he act of transferring something to another's care or possession" or "the relinquishing of property," *see id.* at 505. *See also In re Luna*, 406 F.3d 1192, 1204 n.10 (10th Cir. 2005) (in applying a different statute, noting that "disposition" is defined as "the act or power of disposing . . . as in placing elsewhere, a giving over to the care or possession of another, or a relinquishing") (quoting *Webster's Third New International Dictionary* 1372 (2002)); *New Oxford American Dictionary* 502 (3d ed. 2010) (defining "dispose of" to mean "get rid of by throwing away or giving or selling to someone else"). The Court thus concludes that an owner of a security has "disposed of" it under Section 11 if it has transferred or relinquished that security to another.

The statute, however, also requires that the disposition have been "in the market." With respect to this requirement, the parties have cited *In re Broderbund/Learning Co. Securities Litigation*, 294 F.3d 1201 (9th Cir. 2002), in which the court stated that there is no justification for restricting compliance with this requirement to transactions on formal securities exchanges. *See id.* at 1204. The court concluded that the term "in the market" could also "refer to 'a sphere within which price-making forces operate.'" *See id.* (quoting *Webster's Third New International Dictionary* 1383 (1986)). The Court agrees that the requirement that the disposition be "in the market" requires, under its plain meaning, that the amount received for the security by the transferor plaintiff have

been set by reference to the market value for the security or in some manner in which market forces have operated. As noted above, the clear goal of this provision of Section 11 is to measure a plaintiff's actual damages, and if the plaintiff received value while disposing of the security, the calculation of its actual loss must account for that value. Fairness to the defendant, however, requires that the disposition have been at least for an amount set by reference to the fair market value; otherwise, the plaintiff will have, in essence, created additional damages by disposing of an asset and receiving less than its value in return. Thus, the Court applies the requirement that the disposition have been "in the market" with the goal of insuring that value received at least equaled (or exceeded) the fair value for the security transferred, as demonstrated by some reference to the market for that security.

The Court further concludes the "market" requirement also limits the interpretation of "disposed of" in the statute. As noted above, a disposition requires that the security be transferred or relinquished to another. The requirement that the disposition be in the market indicates that the transfer cannot merely be nominal or ceremonial or formulaic; rather, the owner of the security must actually have given up control, in a substantive way, by transferring the security to a independent party. In determining whether an owner has truly ceded control of a security, it makes sense in this context to view the transaction together with related transactions, to determine the economic reality of a series of related events—just as courts have done in other contexts. *See, e.g.*, *True v. United States*, 190 F.3d 1165, 1174 (10th Cir. 1999) (in tax context,

10

considering substance over form with respect to related transactions); *In re Joseph Kanner Hat Co.*, 482 F.2d 937, 940 (2d Cir. 1973) (in applying the Uniform Commercial Code, courts should determine "the true nature of a security transaction" and are not bound by the form of the words chosen by the parties to the transaction); *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 940 (S.D. Ohio 2009) (court must consider the entire transaction in determining whether a transfer was for value for purposes of whether the defendant sold a security in violation of registration requirements), *aff'd*, 712 F.3d 321 (6th Cir. 2013). Thus, the Court will not elevate form over substance to find a "disposition" for purposes of Section 11 where the transaction or transfer did not truly result in the owner's relinquishing control over the security.

The requirement that the disposition be "in the market" therefore requires not only a quantitative analysis (in the sense that the value received must be set by reference to the market price, as discussed above), but also a qualitative one. By its plain meaning, a transaction "in the market" is one that involves terms that might possibly apply with other potential purchasers. Thus, as an example, a prearranged sale to a related party on terms that would not be offered to an independent party would not constitute a disposition "in the market." The Court therefore interprets that language from Section 11 to requires a transfer to a separate and independent party, such that the original owner truly gives up control of the security. Such an interpretation is consistent with Section 11's clear purpose in determining the actual loss suffered by an aggrieved plaintiff. If, as a matter of economic reality, a plaintiff has not really received market value in a

11

transfer of the security to an independent party, but has instead retained effective control over the security (while perhaps moving money among related entities), use of the value received in that transfer would not most accurately determine the plaintiff's actual loss with respect to the securities violation by the defendant.

Defendants appear to argue that, in applying Section 11, the Court should not necessarily consider the economic reality of a series of related transactions, but should instead look solely at each step in the process (for instance, the transfers from U.S. Central to J.P. Morgan and Deutsche Bank (collectively "the banks")) to see whether a transfer occurred. Defendants rely on *Rubin v. United States*, 449 U.S. 424 (1981), in which the Supreme Court held that a pledge of a security as collateral for a loan did constitute a sale under Section 17(a) of the Securities Act. *See id.* In that case, however, the statute defined "sale" to include the disposition of a security "or interest in a security" for value, and the Court held that such a pledge did involve the disposition of an *interest* in a security. *See id.* at 428-29. Section 11, on the other hand, requires the disposition of a security, not merely an interest therein, and also requires a disposition "in the market." Thus, *Rubin* does not compel a conclusion that any transfer involving an interest in a security constitutes a disposition for purposes of Section 11. The Supreme Court certainly did not suggest in *Rubin* that the economic reality of a series of transactions should not be considered in this analysis.

Defendants also rely on various cases in which courts have held that transactions involving repurchase agreements are subject to Section 10(b) of the Securities Exchange

Act.  *See, e.g.*, *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 19-20 (2d Cir. 1986).  Again, however, different statutory language was at issue in those cases.  Moreover, those courts determined that repurchase transactions involve sales of securities for purposes of the antifraud provisions of that statute.  *See, e.g.*, *id.*  Thus, as in *Rubin*, consideration of the particular steps of the transaction to determine that a sale occurred furthered the remedial purpose of the statute to combat fraud.  With respect to Section 11, on the other hand, the remedial purpose of fully compensating an aggrieved plaintiff for actual losses caused by a securities violation demands that a court consider the economic reality of a series of related transactions to determine whether a disposition in the market has occurred for purposes of calculating damages.

The Court then applies this construction to the particular Sandlot transactions. Defendants argue that for purposes of Section 11, U.S. Central "disposed of" the five certificates in the Sandlot transactions, based on the sales of those certificates from U.S. Central to the banks and subsequent sales from the banks to Sandlot.  Defendants note that Sandlot was a separate entity from U.S. Central, which administered Sandlot and assumed the income and obligations of Sandlot only through contracts.  As conceded by plaintiff, U.S. Central had no legal requirement to repurchase the certificates from Sandlot.  Plaintiff further concedes that U.S. Central's intent in creating Sandlot was to create a conduit whose assets would be considered off the books of U.S. Central.  The Hoelscher memo provides evidence that, in order to achieve that off-book treatment, U.S. Central would sell the certificates to the banks in "normal securities transactions;"

the banks would not be agents of U.S. Central; the sales were to be for fair market value; the banks would bear the risk of loss while they held the certificates; and the banks would be under no obligation to sell the certificates to Sandlot, and U.S. Central could not direct to whom the certificates were sold. Defendants argue that these facts show as a matter of law that U.S. Central ceded complete control of the certificates and thus disposed of them in the market.

The Court agrees with plaintiff, however, that a question of fact remains for trial concerning whether U.S. Central disposed of the certificates in the market, as interpreted above, in the Sandlot transactions. In short, a reasonable jury could find that U.S. Central engineered a series of transactions to achieve a certain accounting result, in which U.S. Central effectively routed the certificates to Sandlot, which U.S. Central would control, with U.S. Central receiving in return money that originally came from U.S. Central to fund Sandlot—and that therefore U.S. Central did not truly relinquish the certificates in the market. In is undisputed that, although U.S. Central did not own Sandlot, it did effect Sandlot's creation. One chart in a summary presentation of the Sandlot transactions depicts U.S. Central exchanging assets for money with Conduit Holding LLC, a company wholly owned by U.S. Central, which in turn is depicted exchanging assets for money with Sandlot. There is also evidence that U.S. Central provided Sandlot with a letter of credit. Thus, there is evidence that Sandlot effectively paid for the certificates with U.S. Central's own money. At the same time, contracts were executed to allow U.S. Central to assume Sandlot's income and obligations and to

14

give complete control of Sandlot's operations to U.S. Central.  Defendants argue that U.S. Central did not have the right to repurchase these five certificates under any repurchase agreement, and that U.S. Central was able to assume operations only by contract and not because it owned Sandlot.  Nevertheless, through this series of transactions, U.S. Central retained complete control over the certificates and continued to receive the income, which facts support the reasonable inference that U.S. Central did not actually relinquish the certificates.  Moreover, in operating Sandlot, U.S. Central controlled Sandlot's sale of the certificates and could therefore engineer sales back to U.S. Central.  Indeed, U.S. Central eventually received the certificates back when Sandlot and its assets were consolidated back into U.S. Central in 2008.

Defendants argue that, even if U.S. Central effectively controlled the certificates while they were owned by Sandlot, U.S. Central gave up all control over the certificates when it transferred them to the banks.  Defendants rely on the Hoelscher memo in arguing that the banks were not required to sell the certificates to Sandlot, that the banks could dispose of the certificates as they wished, and that the banks bore the entire risk of loss while they held the certificates.  Thus defendants dispute that the series of transactions insured that U.S. Central always controlled the certificates.  The Court concludes, however, that a question of fact remains concerning whether the banks were effectively obliged to sell to Sandlot and thus whether the transfers to the banks were indeed part of a prearranged series of transactions by which U.S. Central effectively retained the certificates.

First, there is evidence that the banks were effectively obliged to sell to Sandlot. Connie Loveless, U.S. Central's Chief Investment Officer, who oversaw the Sandlot transactions, testified that U.S. Central "had an agreement with JP Morgan that they were just to hold the securities for Sandlot . . . for a night and then transfer them on to Sandlot," and that U.S. Central transferred the certificates with the direction that J.P. Morgan would not "sell these out." Defendants note that Ms. Loveless in her deposition could not state the "mechanics" of the Sandlot transactions and that she identified Mr. Hoelscher as a person with such knowledge. Nevertheless, that testimony provides at least some evidence that the banks had agreed to sell only to Sandlot.[3] Other evidence supports the position that, in reality, the banks could be counted on to transfer the certificates to Sandlot. U.S. Central clearly intended and expected that the assets would make their way to Sandlot, as it created Sandlot specifically to be a "conduit" that would allow assets to reside off-book. Without exception, the banks did in fact transfer each of the 107 certificates involved in this program to Sandlot within one day of receiving the  certificate from U.S. Central, which fact provides evidence that the banks were indeed effectively obligated to sell them on to Sandlot. Documents relating to the sales to the banks by U.S. Central referred to Sandlot, suggesting that the ultimate destination of the certificates was a given. The banks received a "bid-ask" spread as compensation

_____

[3]Although Ms. Loveless mentioned only J.P. Morgan in her testimony, evidence of an agreement by that bank and the other evidence cited here give rise to the reasonable inference that Deutsche Bank was also effectively obliged to sell the certificate at issue here to Sandlot.

for effecting the two sets of transfers, which was intended to cover any likely risk of loss to the certificates' value in the one day the banks would hold them.  The banks would also jeopardize the receipt of certain fees if they did not transfer the certificates to Sandlot.

Finally, plaintiff has provided evidence that in 2008, after the consolidation of Sandlot with U.S. Central, U.S. Central's auditors changed their original opinion and concluded that Sandlot did not qualify for off-balance-sheet treatment in the first place.  Both sides here agree that the accounting treatment of the transaction (either the original treatment as a sale or the later contrary treatment) is not dispositive with respect whether the transaction involved a disposition in the market under Section 11.  Nevertheless, the ultimate decision not to treat the Sandlot transactions as sufficient to allow for the intended off-book accounting (which had required a truly independent sale of the certificates) provides evidence that U.S. Central did not in fact effectively relinquish the certificates to independent parties.  Accordingly, because a question of fact remains, the Court denies defendants' motions for summary judgment with respect to the consideration of the Sandlot transactions for purposes of calculating damages under Section 11.

### B.    *Section 12 and Kansas Law*

RBS makes a similar request for summary judgment with respect to plaintiff's claims under Section 12 of the Securities Act and under Kansas law based on the certificates involved in the Sandlot transactions. Under Section 12, a successful plaintiff

is entitled either to rescission (with recovery of the amount paid for the security less income received thereon, upon tender of the security) or to "damages if he no longer owns the security." *See* 15 U.S.C. § 77*l*(a).  Similarly, under the applicable Kansas statute, the aggrieved purchaser of a security may recover either a rescissionary amount upon tender of the security or actual damages. *See* K.S.A. § 17-12a509(b).  The parties agree that the question of whether a plaintiff "owns" a security under Section 12 turns on whether it has retained sufficient control or authority over the security to tender it back to the defendant. *See Monetary Mgmt. Group of St. Louis, Inc. v. Kidder, Peabody & Co., Inc.*, 604 F. Supp. 764, 768 (E.D. Mo. 1985) (applying such a definition of ownership under Section 12 to achieve the remedial purpose of the statute).

RBS and plaintiff have not really addressed this issue separately from whether there was a disposition under Section 11, and the Court sees no basis for applying a different measure of damages for plaintiff's Section 12 and Kansas claims than for plaintiff's Section 11 claim.  If U.S. Central is found not to have disposed of the certificates in the market in the Sandlot transactions, then it effectively retained control over the certificates, including the ability to tender them as necessary.  Conversely, if the jury finds that U.S. Central did dispose of the certificates in the market in the Sandlot transactions, then the rescissionary measure of damages may not be used under Section 12 and Kansas law.  In that event, the original purchaser will have disposed of the security and later gained the ability to tender the security only because of a repurchase or reacquisition.  Otherwise, a plaintiff might receive a windfall if it bought the security

back for less than it the price at which it sold the security. Thus, if the value received by U.S. Central in the Sandlot transactions is considered in calculating damages under Section 11 (because of a disposition), that value should also be considered in calculating damages under Section 12 and Kansas law; if that value is not considered under Section 11 (because of no disposition), it should not be considered under Section 12 and Kansas law. Because a question of fact remains with respect to the treatment of the Sandlot transactions in calculating damages under Section 11, a question of fact also remains with respect to the treatment of those transactions in calculating damages under the other statutes, and the Court therefore denies RBS's motion to that extent.

C.     <u>Use of the Repurchase Prices</u>

Plaintiff argues in its opposition brief that, if the Sandlot transactions are found to have involved dispositions for purposes of Section 11, it should be permitted to calculate damages under Section 11 by reference to the prices at which U.S. Central reacquired the certificates from Sandlot in 2008, and not by reference to U.S. Central's original purchase prices. The Court rejects that argument, however, as it agrees with defendants that plaintiff has not asserted or preserved any such claim based on any 2008 purchases from Sandlot. Plaintiff argues that its complaint and its contentions in the pretrial order do not explicitly exclude the possibility of a claim based on the repurchases from Sandlot. The complaint and pretrial order do effectively deny such a claim, however, as plaintiff asserted claims based on purchases on specific dates and from specific sellers without asserting a claim based on the repurchases from Sandlot in 2008.

19

Thus, the present suit does not involve any such claim, and plaintiff therefore may not seek damages based on the repurchases. *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1161 (10th Cir. 2000) (in affirming district's court's ruling that the plaintiff failed to preserve a damage theory in the pretrial order, the court rejected the argument that the theory had been discussed in the expert's report); *Hullman v. Board of Trustees of Pratt Community College*, 950 F.2d 665, 667 (10th Cir. 1991) ("The pretrial order supersedes the pleadings and controls the subsequent course of litigation;" district court may exclude issues not preserved in the pretrial order).

Plaintiff has not explicitly requested that the pretrial order be amended to assert such a claim at this time, but the Court rejects any such implicit request, as plaintiff has not demonstrated the necessary good cause for an amendment after the applicable deadline has expired. *See Sprint Communications Co. L.P. v. Time Warner Cable, Inc.*, 2015 WL 5999216, at *1 (D. Kan. Oct. 6, 2015) (Lungstrum, J.) (party seeking leave to amend after the scheduling order deadline must show good cause under Fed. R. Civ. P. 16(b)); *see also* Fed. R. Civ. P. 16(e) (court may modify pretrial order "only to prevent manifest injustice").  In particular, plaintiff has not shown that it could not have asserted such a claim long ago, before the amendment deadline and the end of discovery. Plaintiff argues that the need for such an alternative claim did not arise until defendants argued after the close of discovery that the Sandlot transactions involved dispositions under Section 11.  The Court agrees with defendants, however, that plaintiff was obliged to support its own damage theory and to assert any necessary alternative claims if its

theory was rejected.  Moreover, defendants would suffer prejudice from an amendment at this time, as they had no reason to conduct relevant discovery on such an alternative claim.  Plaintiff argues that defendants received all possible discovery on the Sandlot transactions; but the Court agrees with defendants that they may have sought different discovery (for example, relating to materiality and U.S. Central's knowledge) if they had known that plaintiff was asserting a separate claim based not on the original purchase of the certificates by U.S. Central, but instead on the subsequent repurchase from Sandlot. Accordingly, if the jury determines that the Sandlot transactions involved dispositions in the market under Section 11, plaintiff may not base its damage calculations on the repurchases from Sandlot.

## IV.    NGN Transactions

Both plaintiff and RBS seek summary judgment on the proper measure of damages for plaintiff's claims based on all certificates in light of the NGN transactions. Plaintiff seeks a ruling that a rescissionary measure is not appropriate under Section 11, Section 12, or Kansas law because plaintiff "disposed of" the certificates in the NGN transactions and because it no longer owned and could not tender the certificates after the transactions.  RBS seeks a ruling that plaintiff did not dispose of the certificates in the NGN transactions and that the rescissionary measure should therefore be used to calculate any damages.  Thus, the parties have switched sides from the positions they took with respect to the Sandlot transactions, with the result that the parties have made

21

somewhat contradictory arguments.

A.   *Whether "Disposed of" Under Section 11*

Plaintiff argues that, as shown by the contracts and contemporaneous documents, the NGN transactions involved ordinary sales of the certificates in which title, custody, and control passed to the NGN trusts and plaintiff received consideration. The NGN trusts were controlled by independent trustees and received all income from the certificates after the sales. Thus, plaintiff argues that it "disposed of" the certificates "in the market" for purposes of Section 11 in those transactions. Such evidence, viewed in the light most favorable to plaintiff, is sufficient to support a finding that such a disposition did occur here under the Court's interpretation of this provision of Section 11. Therefore, the Court denies RBS's motion for summary judgment on that issue.

The Court further concludes that if the totality of the evidence is viewed in RBS's favor, a reasonable jury could also find based on that evidence that no such disposition occurred here, and therefore plaintiff too has failed to show entitlement to summary judgment on this issue. First, the jury could conclude based on the structure of the transactions that, in reality, plaintiff did not truly relinquish the certificates to an independent third party. Plaintiff created the NGN Trusts. Although the trusts were run by independent trustees, the transactions were structured in such a manner that plaintiff (as NCUA-Liq) retained any possible upside from the performance of the certificates, through receipt of the OTCs that allowed it to reclaim the certificates and receive any remaining income in certain circumstances. Moreover, any downside risk of poor

performance was also retained, as plaintiff (as NCUA-Exec) could be liable on the guarantee. RBS further notes that the transactions were structured and priced not merely to maximize the return for the certificates, but also to minimize the risk on the guarantee—thus serving plaintiff in both capacities.[4]

RBS also cites evidence that in financial statements over the last six years plaintiff listed some or all of the assets collateralizing the NGN notes (the certificates) as assets of plaintiff and not of the NGN trusts. Although plaintiff's expert witness conceded that such accounting was inaccurate and should be corrected, plaintiff has not taken any action to correct those financial statements.[5] Thus, there is evidence that plaintiff itself did not view the NGN transactions as true sales to an independent party, which in turn supports the inference that no disposition in the market occurred here.

Together this evidence, taken in the light most favorable to RBS, supports the reasonable inference that plaintiff did not truly relinquish control of the certificates such

---

[4]Plaintiff insists that the separate identities of NCUA-Exec and NCUA-Liq must be respected, and the Court agrees that those entities should be considered separately in calculating NCUA-Liq's damages in this case. The fact that plaintiff was acting simultaneously in both roles, however, should be considered in determining whether plaintiff relinquished the certificates in such a way as to constitute dispositions in the market under Section 11.

[5]The expert's testimony that the financial statements improperly failed to characterize the NGN transactions as true sales actually supports plaintiff's position that the transaction were independent dispositions. The fact that plaintiff has not corrected the financial statements, however, provides evidence to support RBS's position that plaintiff actually retained control of the certificates.

that it disposed of the them in the market under the Court's construction of that term.[6]

RBS also argues that any such dispositions were not "in the market" as a matter of law based on the fact that the prices for these transactions were not set by reference to the market, but instead were based on modeling by Barclays to achieve the twin goals discussed above. RBS does not dispute, however, that the proceeds received by NCUA-Liq for the certificates (consisting of the $28 billion in proceeds and the OTCs) exceeded the fair market value of the certificates by themselves (without the guarantee). As ruled by the Court below—and as argued by RBS—if a disposition is found here under Section 11, the entirety of the proceeds and the OTC must be considered as the value received by NCUA-Liq for the certificates, without allocation of some amount of the proceeds as consideration for the guarantee from NCUA-Exec. Thus, because NCUA-Liq received more than market value in disposing of the certificates, the Court cannot conclude as a matter of law that any disposition in the NGN transactions was not "in the market."

---

[6]RBS's other arguments are not persuasive. The Court does not agree, based on the evidence cited by RBS, that representatives of plaintiff actually stated to credit union representatives that plaintiff was not disposing of the certificates; in the cited statements, plaintiff's representatives made clear that plaintiff was re-securitizing the certificates instead of offering them for direct sale. Nor does the Court agree that, by asserting standing in derivative suits as a beneficial owner of the certificates through the OTCs, plaintiff somehow represented that it did not relinquish the certificates (although the *fact* that it retained a beneficial interest in the certificates through the OTCs *is* relevant, as discussed above). Finally, the Court does not agree that plaintiff's decision to choose this structure over alternative structures while at the same time preparing to file the instant suit compels a ruling that plaintiff may seek only rescissionary-type damages, as a plaintiff is always free to choose whether to dispose of a security (and any subsequent damage calculation will account for that disposition).

B.    *Section 12 and Kansas Law*

As discussed above with respect to the Sandlot transactions, there is no basis to apply a different damage measure under Section 12 and Kansas law than under Section 11. Because the issue of the proper measure under Section 11 presents an issue of fact for the jury, the issue of the proper measure under Section 12 and Kansas also cannot be decided as a matter of law at this time. Accordingly, the Court denies both plaintiff's and RBS's motions for summary judgment with respect to the choice of the proper measure under all three statutory provisions as it relates to the NGN transactions.

C.    *Calculation of Damages in Light of the NGN Dispostions*

Plaintiff and RBS also dispute the proper calculation of damages if the NGN transactions are deemed to be dispositions in the market, and each party seeks a ruling on the issue as a matter of law. The parties agree that the proper damage calculation must account for the amounts received by NCUA-Liq for the certificates in those transactions. It is also undisputed that, in these transactions, NCUA-Liq gave up the certificates; NCUA-Exec contributed the guarantee; NCUA-Liq received the "net proceeds" (as denominated by the parties), consisting of the NGN notes that were then turned into cash; NCUA-Liq also received the OTCs; and NCUA-Exec received a percentage fee for the guarantee, as well as the right to seek reimbursement from the NGN trusts for any payments on the guarantee. In addition, NCUA-Exec did not receive anything from NCUA-Liq for providing the guarantee.

In calculating damages, plaintiff has used only the "net proceeds" to represent the

25

value that NCUA-Liq received for the certificates in the NGN transactions.  Plaintiff justifies that method as follows: because the net proceeds exceeded the fair market value of the certificates alone, some portion of the price paid by the NGN trusts must have been for the guarantee; according to plaintiff's expert, the value of the guarantee greatly exceeds the value of the OTCs received by NCUA-Liq; thus, the amount of the net proceeds exceeds the total value of the portion of the net proceeds paid for the certificates and the OTCs; thus, plaintiff's damage calculation is a sufficient and conservative "proxy" for the value received by NCUA-Liq for the certificates.  Plaintiff seeks a ruling as a matter of law that its method of calculating that value is reasonable and appropriate.

First, in light of RBS's competing calculation of damages, a question of fact would remain concerning whether plaintiff's expert's "proxy" for the value received by NCUA-Liq properly accounts for plaintiff's actual damages in the event of a finding of a disposition—even setting aside the fact the plaintiff's expert did not attempt to ascertain the value of the guarantee alone or the value of the OTCs alone (which two values he nonetheless compared).  Thus, plaintiff is not entitled to summary judgment as requested.

Moreover, the Court concludes as a matter of law that plaintiff's method of calculating the value received by NCUA-Liq in the event of a disposition is *not* proper. In its briefs, plaintiff has repeatedly stressed the separate roles and capacities of NCUA-Exec and NCUA-Liq (for instance, in opposing RBS's argument that the NGN

transactions did not involve a disposition because plaintiff maintained both benefits and risks associated with the certificates).  The Court agrees that such distinction must be respected in determining any damages suffered by NCUA-Liq.  In the NGN transactions, NCUA-Exec provided the guarantee, and in return, it received only a fee and the right to reimbursement of payments on that guarantee.  NCUA-Liq gave up the certificates, and it received the net proceeds and the OTCs.  Plaintiff argues that because the net proceeds exceeded the value of the certificates alone, part of the net proceeds must have been paid for the guarantee and not for the certificates, and only the part paid for the certificates should be included in the calculation.  If a plaintiff received more than market value in disposing of an asset, however—if the plaintiff made an especially good deal—then the total amount received in the disposition should be used in the calculation of the plaintiff's actual damages.  Plaintiff has not cited any authority suggesting that an above-value amount received for the security should not be used.  In this case, NCUA-Liq gave up only the certificates, and it received the net proceeds and the OTCs.  Thus, any calculation of damages should be based on the receipt of the entirety of the net proceeds and the OTCs, without any reduction for some value attributed to the guarantee.  Otherwise, NCUA-Liq would receive a windfall in the form of payment for the guarantee, for which it paid NCUA-Exec nothing.[7]

_____

[7]Although plaintiff has emphasized its separate capacities, one could argue that the Court, as it did above with respect to the disposition issue, should consider both capacities of plaintiff in order to appreciate the economic reality of the transaction, to

(continued...)

Plaintiff cites *Randall v. Loftsgaarden*, 478 U.S. 647 (1986), but that case is inapposite. There the Supreme Court held that an investor's rescissionary damages under Section 12 were not subject to an offset for tax benefits that the investor received while holding the investment. *See id.* The present case does not involve such an indirect benefit received by plaintiff from another party for which RBS seeks credit; rather, in this case, NCUA-Liq actually received the entirety of the net proceeds from the buyer when it sold the certificates. Thus, as a matter of law, in the event of a finding that the NGN transactions involved a disposition under Section 11, any calculation of plaintiff's damages must account for all of the assets (the entirety of the net proceeds and the OTCs) received by NCUA-Liq, and RBS's motion is granted to that extent.

## V.      Nomura's Motion for Recognition of a Minimum Offset

By separate motion for summary judgment, Nomura argues that it should receive a setoff of the amount paid by J.P. Morgan to settle claims by plaintiff based on the NHELI 2007-1 certificate (the only certificate underlying plaintiff's claim against

---

[7](...continued)

which both NCUA-Exec and NCUA-Liq contributed. The NGN trusts did not purchase two sets of assets from plaintiff, however; rather, the trusts purchased a single set of assets (the certificates) whose value had been enhanced by the act of NCUA-Exec. Thus, as concluded above, the value of the entire proceeds received by NCUA-Liq for the certificates, even though in excess of the market value, must be used in the calculation. In a holistic sense, plaintiff's true economic condition at the end of the day might depend not only on the value received for the certificates (the net proceeds and the OTCs), but also on any amounts plaintiff had to pay on the guarantee—but plaintiff has not made such an argument or preserved any such damage theory.

Nomura).  Specifically, Nomura seeks a ruling that it is entitled to a setoff in the minimum amount of $14,465,025.46, which represents the amount that plaintiff internally has allocated to that certificate from the total settlement paid by J.P. Morgan to settle claims based on multiple certificates.  Nomura notes that plaintiff and other settling parties have sought and received contribution bar orders in this case that provide for a minimum offset of specific settlement amounts related to the particular certificates at issue in this case.  In the cases of the bar orders, however, the particular settlement agreements allocated the settlement amounts among certificates, while here the settlement agreement contained no such allocation.  Plaintiff argues that, although defendants will be entitled to an offset here, it would be premature to rule at this time on the amount of that offset, as plaintiff's internal allocation is not dispositive and the proper allocation to this certificate must be litigated as necessary after trial.  Although plaintiff's own allocation will no doubt provide strong evidence as to the proper allocation amount, the Court agrees with plaintiff that the specific amount of the offset (or even just a minimum amount) cannot be decided at this time as a matter of law, and it therefore denies Nomura's motion for such a ruling.

IT IS THEREFORE ORDERED BY THE COURT THAT plaintiff's motion for summary judgment (Doc. # 759) is **denied** as it relates to the treatment of the NGN transactions in the calculation of damages.  The motion otherwise remains pending.

IT IS FURTHER ORDERED BY THE COURT THAT the RBS defendants' motion for summary judgment concerning the NGN transactions (Doc. # 915) is **granted in part and denied in part**, as set forth herein.

IT IS FURTHER ORDERED THAT the motions for summary judgment by the RBS defendants (Doc. # 917) and by Nomura (Doc. # 765) relating to the measure of damages for certificates involved in the Sandlot transactions are **denied**.

IT IS FURTHER ORDERED THAT Nomura's motion for summary judgment relating to an offset for settlement proceeds (Doc. # 773) is hereby **denied**.

IT IS SO ORDERED.

Dated this 12th day of July, 2016, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge