# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union<br><br>                     Plaintiff,<br>v.<br><br>RBS SECURITIES, INC., et al.,<br><br>                     Defendants. | Case No. 11-CV-2340-JWL-JPO |

## NOMURA HOME EQUITY LOAN, INC.'S MEMORANDUM IN OPPOSITION TO NCUA'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF WALTER TOROUS, PH.D.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

GLOSSARY ............................................................................................................ vi

NATURE OF THE MATTER BEFORE THE COURT ............................................. 1

STATEMENT OF FACTS ........................................................................................ 3

    A.    Dr. Torous's Benchmark Analyses Confirmed That All, Or At Least A Substantial Portion, Of The Losses On The Nomura Certificate Were Caused By Factors Other Than The At-Issue Misrepresentations...........................4

    B.    Dr. Torous Confirmed That DTI Has An Insubstantial Effect On Loan Performance. .......................................................................................6

    C.    Dr. Torous Used The ADCo Model To Calculate The Maximum Amount Of Damages To Which NCUA Would Be Entitled Even Under NCUA's Theory Of The Case ................................................................................7

QUESTION PRESENTED ..................................................................................... 10

ARGUMENT ......................................................................................................... 10

I.    Legal Standard ............................................................................................ 10

II.    NCUA Cannot Exclude Dr. Torous's Benchmark Analyses By Simply Speculating That The Benchmarks May Be Tainted. ...................................... 12

    A.    NCUA Fails To Support Its Claim That The Industry And Reduced Industry Benchmarks Contain Any Defective Loans, Much Less Sufficient Defective Loans To Affect Dr. Torous's Results. ..................................12

    B.    NCUA Has Failed To Show Anything More Than A Theoretical Possibility That Dr. Torous's Butler Re-Underwriting Benchmark Is Tainted By Materially Defective Loans...............................................18

III.    NCUA Cannot Exclude Dr. Torous's Benchmark Analyses Based On Its Theory That The At-Issue Misrepresentations Themselves Impacted Housing Prices................. 22

IV.    NCUA's Other Criticisms Are Classic Examples Of Disputes Between Experts That Go, At Most, To Weight, Not Admissibility. ........................................... 25

    A.    Dr. Torous's DTI Conclusions Are Reliable. .......................................26

    B.    NCUA's Criticism Of Dr. Torous's "Tuning" Of The ADCo Model Is Incorrect And Not An Appropriate Ground For A *Daubert* Challenge................28

i

CONCLUSION ................................................................................................................................ 30

# TABLE OF AUTHORITIES

**CASES**

*Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) ............................................25

*Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ....................13

*Bazemore v. Friday*, 478 U.S. 385 (1986) ....................................................................24

*Blotcher v. Stewart*, 45 F. Supp. 3d 1274 (D. Colo. 2014) ............................................13

*Cason-Merenda v. Detroit Medical Center*, No. 06-15601, 2013 WL 1721651 (E.D. Mich. Apr. 22, 2013) ......................................................................................14

*Central States, Southeast & Southwest Areas Pension Fund v. Federal Home Loan Mortgage*, 543 F. App'x 72 (2d Cir. 2013) ....................................................11

*Collins v. Signetics Corp.*, 605 F.2d 110 (3d Cir. 1979), *overruled on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988) ....................................................11

*Cook v. Rockwell International Corp.*, 580 F. Supp. 2d 1071 (D. Colo. 2006) ............................24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ......................................2, 10

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ................................................11, 23

*Federal Housing Finance Agency v. Nomura Holding America, Inc.*, Opinion & Order, No. 11-cv-6201 (Feb. 10, 2015) ..............................................................12, 18, 19, 20

*In re Fortune Systems Securities Litigation*, 680 F. Supp. 1360 (N.D. Cal. 1987) ......................12

*Hemmings v. Tidyman's Inc.*, 285 F.3d 1174 (9th Cir. 2002) ............................................15

*Jahn v. Equine Services, PSC*, 233 F.3d 382 (6th Cir. 2000) ............................................25

*Kechi Township v. Freightliner, LLC*, Civ. No. 10-1051, 2011 WL 6845799 (D. Kan. Dec. 29, 2011) ......................................................................................10

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ............................................11

*Maitland v. University of Minnesota*, 155 F.3d 1013 (8th Cir. 1998) ....................................24

*Mehus v. Emporia State University*, 222 F.R.D. 455 (D. Kan. 2004) ....................................23

*In re Mushroom Direct Purchaser Antitrust Litigation*, No. 06-0620, 2015 WL 5775600 (E.D. Pa. Aug. 5, 2015) ......................................................................24

*In re Mushroom Direct Purchaser Antitrust Litigation*, No. 06-0620, 2015 WL 6326427 (E.D. Pa. Aug. 11, 2015) ...........................................................................14

*In re Processed Egg Products Antitrust Litigation*, 81 F. Supp. 3d 412 (E.D. Pa. 2015) ...............................................................................................................18

*Resco Products, Inc. v. Bosai Minerals Group*, No. CIV.A. 06-235, 2015 WL 5521768 (W.D. Pa. Sept. 18, 2015) ..............................................................13, 15

*RMD, LLC v. Nitto Americas, Inc.*, No. 09-2056-JAR-DJW, 2012 WL 5398345 (D. Kan. Nov. 5, 2012) ...............................................................................24, 25

*Sobel v. Yeshiva University*, 839 F.2d 18 (2d Cir. 1988) .......................................15

*Utility Trailer Sales of Kansas City, Inc. v. MAC Trailer Manufacturing, Inc.*, 267 F.R.D. 368 (D. Kan. 2010) .....................................................................24, 25

*In re Universal Service Fund Telephone Billing Practices Litigation*, No. 02-MD-1468-JWL, 2008 WL 4382141 (D. Kan. Sept. 26, 2008) ...............................14, 30

*In re Urethane Antitrust Litigation*, 768 F.3d 1245 (10th Cir. 2014) ...........................23

*In re Urethane Antitrust Litigation*, No. 04-1616-JWL, 2012 WL 6681783 (D. Kan. Dec. 21, 2012), *aff'd*, 768 F.3d 1245 (10th Cir. 2014) ...........................10, 14, 15, 25, 28

*In re Williams Securities Litigation-WCG Subclass*, 558 F.2d 1130 (10th Cir. 2009) ...............................................................................................................11

**STATUTES**

15 U.S.C. § 77k(e) .............................................................................................1, 10

15 U.S.C. § 77*l*(b) .............................................................................................1, 10

**OTHER AUTHORITIES**

W. Archer & B. Smith, *Residential Mortgage Default: The Roles of House Price Volatility, Euphoria and the Borrower's Put Option*, Fed. Reserve Bank of Richmond Working Paper No. 10-02 (Feb. 2010)...........................................27

Yuliya Demyanyk & Otto Van Hemert, *Understanding the Subprime Mortgage Crisis*, 24 The Rev. of Fin. Studies 1848 (2011) ..........................................18

Fed. R. Evid. 702 ...............................................................................................2, 10

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) .......................29

John M. Griffin & Gonzalo Maturana, *Who Facilitated Misreporting in Securitized Loans?* (Dec. 20, 2013), SSRN: http://ssrn.com/abstract=2256060 ....................17

Tomasz Piskorski, Amit Seru & James Witkin, *Asset Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market*, Colum. Bus. Sch. Research Paper No. 13-7 (Feb. 12, 2013) ................................................................17

Vectors Prepayment & Credit Models, Andrew Davidson & Co (last visited May 2, 2016), https://www.ad-co.com/prepayment_credit_models ................................................29

Vectors Support, Andrew Davidson & Co (last visited Apr. 8, 2016), https://www.ad-co.com/vectors_index ................................................29

# GLOSSARY

| | |
|---|---|
| DTI | Debt-to-income ratio |
| LTV | Loan-to-value ratio |
| NCUA | National Credit Union Administration Board |
| NCUA Mem. | Memorandum In Support Of NCUA's Motion To Exclude The Expert Testimony Of Walter Torous, Ph.D. (ECF No. 842) |
| Nomura | Nomura Home Equity Loan, Inc. |
| Nomura Barth Daubert | Nomura Home Equity Loan, Inc.'s Memorandum In Support Of Its Motion To Exclude Loss Causation Expert Testimony And Opinions Of James R. Barth (ECF No. 816) |
| Nomura Certificate or Certificate | CUSIP 65537KAY6 |
| Nomura Cohen-Cole Opposition | Nomura Home Equity Loan, Inc.'s Memorandum In Opposition To NCUA's Motion To Exclude The Expert Testimony Of Ethan Cohen-Cole, Ph.D On Loss Causation |
| Nomura Saunders Daubert | Nomura Home Equity Loan, Inc.'s Memorandum In Support Of Its Motion To Partially Exclude Loss Causation Expert Testimony And Opinions Of Anthony Saunders (ECF No. 830) |
| RBS | RBS Securities Inc. and RBS Acceptance Inc. |
| RMBS | Residential mortgage-backed securities |

vi

**NATURE OF THE MATTER BEFORE THE COURT**

Defendant Nomura respectfully submits this memorandum in opposition to Plaintiff NCUA's March 22, 2016, Motion to Exclude the Expert Testimony of Walter Torous, Ph.D.

Nomura retained Dr. Torous, a well-respected economist and Senior Lecturer at the Massachusetts Institute of Technology, to provide expert testimony on loss causation and rebuttal expert testimony on damages.  Section 11 provides that if a defendant shows that the plaintiff's damages were caused by something other than the alleged untrue statements or omissions in the defendant's registration statements, the plaintiff may not recover those damages. *See* 15 U.S.C. § 77k(e); *see also* § 77*l*(b) (similar principle under Section 12).  After performing several statistical tests designed to compare the performance of the loans at issue in this case against the performance of other, benchmark loans, Dr. Torous concluded that the misrepresentations alleged by NCUA in this case either did not exist or did not have a statistically significant effect on loan performance, and thus did not affect the value of the Nomura Certificate.  Dr. Torous's testimony is thus sufficient for Nomura to meet its burden under Section 11 to establish that NCUA's damages were caused by something other than those alleged misrepresentations.  Additionally, in response to NCUA's damages expert, Dr. Torous calculated the maximum possible damages to which NCUA could be entitled even assuming both liability and that the alleged misrepresentations impacted the Nomura Certificate's performance.

NCUA does not challenge Dr. Torous's qualifications or expertise in mortgage-backed securities, mortgage financing, and econometrics.  Indeed, it acknowledges that Dr. Torous is "well credentialed."  Instead, NCUA contends that Dr. Torous should have made different decisions when constructing his statistical models.  NCUA's criticisms are exactly the types of challenges that can be explored on cross-examination—but they do not provide a basis for a

motion to exclude under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).

NCUA first contends that several of Dr. Torous's benchmark analyses should be excluded because the benchmarks might contain defective loans, which NCUA asserts should not have been included. But this Court has held, in line with the weight of authority, that such challenges to an expert's benchmark or control group go to weight, not admissibility. Moreover, NCUA was required to demonstrate that its criticism might actually affect Dr. Torous's results. Yet NCUA's "evidence" of so-called defects in Dr. Torous's benchmarks do not show the existence of *any* defects, much less defects sufficient to impact Dr. Torous's regression results. Significantly, Dr. Torous checked his results by constructing and analyzing two additional benchmarks, with the first comprised of loans that NCUA's *own expert* re-underwrote and did not find materially defective, and the second comprised of those same loans, along with loans that Nomura's and RBS's experts re-underwrote and found not to be materially defective. His check confirmed the reliability of his initial analysis. NCUA's insistence that Dr. Torous had to do more rings hollow, particularly when NCUA has done nothing more than speculate that a material defect in those benchmarks is still theoretically possible and, if such a defect exists, that it might impact Dr. Torous's analysis. That double-conjecture is plainly insufficient to support exclusion of Dr. Torous's testimony under *Daubert*.

NCUA next contends that Dr. Torous's testimony should be excluded because his analysis did not isolate the immaterial effect (if any) that the loans backing the Nomura Certificate might have had on the macroeconomic trends to which Dr. Torous attributed the Nomura Certificate's poor performance. NCUA has entirely failed, however, to support its improbable claim that the loans backing the Nomura Certificate, which were but an infinitesimal

percentage of the residential mortgage market, had a material impact on those macroeconomic trends, much less on Dr. Torous's results. NCUA's argument also flies in the face of decades of precedent holding that a party's contention that an expert's regression analysis improperly omitted a variable generally goes, at most, to the weight of the expert's testimony, not its admissibility. Indeed, a court within this district has specifically held that a damages expert's testimony is not inadmissible merely because it does not disaggregate the effects of a defendant's own behavior from the effects of the recent economic recession. Again, NCUA's critique is insufficient to support exclusion under *Daubert*.

Getting even further into the weeds, NCUA also quibbles with some of the nuances of Dr. Torous's methodology. NCUA contends that Dr. Torous did not use NCUA's preferred method of applying certain findings from a sample of loans to an entire loan pool. And NCUA takes issue with the manner in which Dr. Torous calibrated a model that he used to value the Nomura Certificate, claiming it results in predictive errors. NCUA, however, has not shown that either of these criticisms (even if true—which Nomura disputes) would have any impact on Dr. Torous's findings. In any event, both criticisms—like the rest of NCUA's arguments—clearly go to the weight of Dr. Torous's analysis, and not its admissibility. NCUA's motion directed to Dr. Torous's opinions should be denied.

## STATEMENT OF FACTS

Dr. Torous is a Senior Lecturer at the Massachusetts Institute of Technology, with a joint position at the Center for Real Estate and the Sloan School of Management. *See* Expert Report of Walter Torous, Ph.D. ¶ 1 (Aug. 14, 2015) ("Torous Report") (Ex. 1). He previously served as the Director of the Richard S. Ziman Real Estate Center at the Anderson School of Management at the University of California at Los Angeles. *Id*. Dr. Torous has taught courses in securitization, managerial finance, and empirical methods in finance, and has published

numerous peer-reviewed articles and book chapters on the valuation and pricing of mortgage-backed securities and the effects of homeowner default decisions.  *See id*. ¶ 2.  He is also the editor or associate editor of several notable real estate finance and economics journals.  *See id*.

     **A.**    **Dr. Torous's Benchmark Analyses Confirmed That All, Or At Least A Substantial Portion, Of The Losses On The Nomura Certificate Were Caused By Factors Other Than The At-Issue Misrepresentations.**

In order to assess whether factors other than the alleged misrepresentations in this case affected the value of the Nomura Certificate, Dr. Torous ran several regression analyses to compare the actual performance of the loans backing the Certificate against the expected performance of those loans, as calculated using various "Benchmarks"—"groups of comparable loans"—that represented "a baseline level of loan performance."  *Id*. ¶ 15.[1]  Dr. Torous initially constructed two benchmarks:

- The Industry Benchmark, comprised of approximately 8.4 million comparable loans securitized between 2005 and 2007.  *See id*. ¶¶ 19-20, 121-23, 127.

- The Reduced Industry Benchmark, comprised of loans in the Industry Benchmark, but excluding all loans in offerings that were the subject of any known litigation.  *See id*.

After running these regression analyses, Dr. Torous concluded that, because the loans supporting the Nomura Certificate did not perform statistically significantly worse than expected using these benchmark samples, the At-Issue Misrepresentations either did not exist, or did not

---

[1] Specifically, Dr. Torous used each benchmark to perform a regression analysis to estimate the relationship between (i) loan and borrower characteristics and changes in macroeconomic factors, and (ii) loan performance.  Using the relations estimated from the benchmark, Dr. Torous calculated the expected performance for each loan backing the Nomura Certificate, based on its disclosed loan and borrower characteristics and actual changes in macroeconomic conditions.  He then compared the loans' actual performance to their expected performance to assess whether there was a statistically significant difference.  *See* Torous Report ¶¶ 108-120.

have a statistically significant effect on the performance of the loans in this case, and thus did not affect the value of the Certificate. *Id*. ¶ 135. Then, in response to criticisms from NCUA's experts, Dr. Torous confirmed the robustness of his results by running three additional regressions on new benchmarks he constructed to address those critiques (with which he disagreed):

- The updated Reduced Industry Benchmark, comprised of all loans in the Reduced Industry Benchmark except those in offerings identified by NCUA's expert, Dr. Anthony Saunders, as being subject to litigation. *See* Amended Reply Expert Report of Walter Torous, Ph.D. ¶ 25 (Jan. 26, 2016) ("Torous Reply Report") (Ex. 2).

- The Butler Re-Underwriting Benchmark, comprised of those loans at issue in this case that were re-underwritten by NCUA's expert, Steven I. Butler, and not found by Mr. Butler to be "materially misrepresented." *See* Third Amended Rebuttal Report of Walter Torous, Ph.D. ¶¶ 40-44 (Jan. 26, 2016) ("Torous Rebuttal Report") (Ex. 3).

- The Spolin and Forester Re-Underwriting Benchmark, comprised of those loans in the Butler Re-Underwriting Benchmark as well as loans re-underwritten by Nomura's or RBS's experts and found by those experts to comply with the relevant underwriting guidelines. *See* Torous Reply Report ¶¶ 37-38.

After running regressions on these new benchmarks, Dr. Torous concluded that they confirmed his initial results. *See* Torous Rebuttal Report ¶ 44; Torous Reply Report ¶¶ 25, 38. In other words, the loans backing the Nomura Certificate performed as would be expected based on each of Dr. Torous's five distinct benchmark analyses.

**B.     Dr. Torous Confirmed That DTI Has An Insubstantial Effect On Loan Performance.**

In his initial report, Dr. Torous did not analyze the effect of DTI on loan performance because he found "little evidence showing that DTI is an economically significant driver of loan performance in the academic literature," and because "a substantial portion of the loans" in the database he used "do not report DTI." Torous Rebuttal Report ¶ 35 n.47. But a large proportion of the alleged material misrepresentations found by Mr. Butler relate to DTI. *See id*. ¶ 35. To address those alleged DTI findings, Dr. Torous re-estimated the Industry Benchmark incorporating DTI as an explanatory variable. Because not all of the loans in the Industry Benchmark contained DTI data, this analysis provided yet a sixth distinct benchmark (the loans in the Industry Benchmark with reported DTI) from which Dr. Torous again derived the expected performance of the at-issue loans. Dr. Torous concluded that his "regression results [were] consistent with the model that does not include DTI," and that, as was the case with the other benchmarks, the loans backing the Nomura Certificate performed as expected based on the loans in the Industry Benchmark even when DTI is included as an explanatory variable in his regressions. *See id*. ¶¶ 36-37.

Solely to test that result, Dr. Torous conducted a second, separate statistical analysis. For this analysis, Dr. Torous assumed that Mr. Butler's DTI-misrepresentation findings were accurate, calculated the average increase in DTI that Mr. Butler found in the sample of loans he re-underwrote, and applied that average DTI increase to the entire loan pool backing the Nomura Certificate. *See id*. ¶ 38. Dr. Torous thereby assumed (in Mr. Butler's favor) that Mr. Butler's DTI findings, which were based on just a sample of loans, could be applied to the entire loan pool (even though none of NCUA's experts has attempted to extrapolate Mr. Butler's findings across the pool, and even though the Prospectus Supplement for the Nomura Certificate does not

include any table reflecting the DTI of the loans supporting the Certificate). *See id*. Dr. Torous then re-estimated the expected default rate for that loan pool using his Industry Benchmark (with DTI as an explanatory variable), and found that, yet again, DTI had only an economically immaterial impact on the expected default rates of the loan pool backing the Nomura Certificate—confirming his original conclusion that DTI has an insubstantial impact on loan performance. *See id*. ¶¶ 38-39.

### C. Dr. Torous Used The ADCo Model To Calculate The Maximum Amount Of Damages To Which NCUA Would Be Entitled Even Under NCUA's Theory Of The Case.

In response to NCUA's damages expert, Dr. John Finnerty, Dr. Torous also performed two loss causation-adjusted damages analyses—the "performance vectors" and "loan characteristics" analyses—to determine the maximum amount of damages to which NCUA would be entitled if it prevailed on liability and if certain damages assumptions were made in its favor. These analyses isolated the losses on the Nomura Certificate attributable to Nomura's alleged misrepresentations by subtracting from the Certificate's actual losses those losses that the Certificate would have incurred even without those alleged misrepresentations. Thus, both models required two calculations: one calculation of the Certificate's actual value, and another of the value to be expected without the purported misrepresentations.

For both analyses, Dr. Torous relied on Andrew Davidson & Co.'s ("ADCo") model for valuing RMBS, a well-recognized valuation tool which allows users to model the value of a RMBS given the characteristics of the underlying loans. *See Id*. ¶¶ 49-52. The ADCo model is widely used by mortgage market professionals and investors, including the Federal Reserve. *Id*. ¶ 49. One feature of the model is that it allows users to calibrate, or "tune," several model parameters to further refine the model and obtain more precise results. For both analyses here, Dr. Torous tuned, or calibrated, the model to match the historical performance of the Nomura

Certificate.  For example, if the Nomura Certificate's loan characteristics, when input into the ADCo model, produced a default rate 5% lower than the Certificate's historical default rate, the model's default parameter was adjusted upward by 5%.  *See id*. App'x C, at C-5-C-6.  The nature of the model is that a single adjustment of this kind generally cannot eliminate *all* errors in predicting performance rates.  For example, simply eliminating a 5% error with respect to the default rate parameter might increase the error associated with another parameter, such as the prepayment rate.  *See id*.  Thus, the calibration process was repeated so that the ADCo model closely predicted the historical performance of the Nomura Certificate across all performance metrics.  *See id*.

Dr. Torous first calculated damages using a "performance vectors" approach.  To calculate actual value, Dr. Torous calibrated the ADCo model to the Nomura Certificate's historical default, prepayment, and loss severity rates, and then calculated the Nomura Certificate's value based on that calibrated model.  *See id*. App'x C, at C-8.  To calculate expected value assuming no alleged misrepresentations had been present, Dr. Torous calibrated the ADCo model so that it best predicted the performance that would be expected if the loans underlying the Nomura Certificate had performed in line with the Industry Benchmark or the Butler Re-Underwriting Benchmark.  *See id*. App'x C, at C-8-C-9.  Dr. Torous then used the model to derive the expected value of the Nomura Certificate in those scenarios.  The difference between those two valuations ranged from between $0.1 million and $5.7 million for the Nomura Certificate, before any offsets and depending on certain assumptions.  *See id*. Ex. III-3.1.  Dr. Torous explained that those differences represent the maximum damages that NCUA incurred as a result of the alleged misrepresentations (assuming NCUA proves all of the alleged

misrepresentations), as opposed to the broader macroeconomic trends that drove the performance of the Industry Benchmark or Butler Re-underwriting Benchmark.  *See id.* ¶¶ 48-49, 58-63.

For Nomura (but not for RBS or NovaStar), Dr. Torous also calculated damages using an alternative "loan characteristics" approach.[2]  Significantly, unlike the "performance vectors" damages approach, the alternative "loan characteristics" approach does not rely on any benchmark analyses.  Rather, it compares the expected value of the Nomura Certificate assuming that the underlying loans had their disclosed characteristics, against the value of the Nomura Certificate assuming that the actual loan characteristics were consistent with what Mr. Butler opines in his re-underwriting analysis.

To calculate actual value under this "loan characteristics" approach, Dr. Torous adjusted the Nomura Certificate's disclosed loan characteristics to reflect Mr. Butler's re-underwriting findings.   That is, Dr. Torous assumed that Mr. Butler correctly identified material misrepresentations in the sample loans he re-underwrote, and that the remaining at-issue loans not re-underwritten by Mr. Butler had a similar incidence of alleged material misrepresentations. Dr. Torous then input those adjusted loan characteristics into the ADCo model, and calibrated the model so that when given Mr. Butler's alleged characteristics it produced the Nomura Certificate's actual historical performance.  *See id.* ¶¶ 54-57.  Dr. Torous then calculated the Certificate's actual value based on that calibrated model.  *See id.* ¶ 57.  To calculate the expected value of the Nomura Certificate, Dr. Torous input the loan characteristics disclosed by Nomura (rather than found by Mr. Butler) into the calibrated model.  *See id.*  Again, the difference

---

[2] NCUA is thus wrong when it claims that there are no substantive differences in the reports issued by Dr. Torous on behalf of Nomura, RBS, and NovaStar.  *See* NCUA Mem. 9 n.28.  Dr. Torous's "loan characteristics" analysis was included in his Nomura report, but not in his reports filed on behalf of RBS or NovaStar.

between the "actual" and "expected" valuations represents the amount of losses that can be attributed to the loan characteristics alleged by Mr. Butler and NCUA, instead of to the macroeconomic trends that would have affected the Certificate's performance even if there were no (alleged) misrepresentations and the disclosed loan characteristics were perfectly accurate.

## QUESTION PRESENTED

Whether NCUA's criticisms of the expert reports and testimony of Dr. Walter Torous go to weight rather than admissibility, and are insufficient to justify exclusion under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Federal Rule of Evidence 702?

## ARGUMENT

### I.    Legal Standard

**A. Expert Testimony.**  Under Rule 702 and *Daubert*, the testimony of a qualified expert is admissible if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *In re Urethane Antitrust Litig.*, No. 04-1616-JWL, 2012 WL 6681783, at *1 (D. Kan. Dec. 21, 2012) (quoting Fed. R. Evid. 702), *aff'd*, 768 F.3d 1245 (10th Cir. 2014).  "The rejection of expert testimony is the exception rather than the rule." *Id*.  Simply stated, *Daubert* motions "are not legitimate substitutes for cross-examination" at trial.  *Kechi Tp. v. Freightliner, LLC*, Civ. No. 10-1051, 2011 WL 6845799, at *3 (D. Kan. Dec. 29, 2011).

**B. Section 11 Loss Causation.**  Under Section 11, NCUA is not entitled to recover damages that Nomura has shown did not "result[] from such part of the registration statement" that NCUA alleges is untrue or misleading.  15 U.S.C. § 77k(e); *see also* § 77l(b) (similar principle under Section 12).  The securities laws permit plaintiffs to bring private actions "not to provide investors with broad insurance against market losses, but to protect them against those

economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Thus, when a plaintiff in a securities action claims losses that "coincide[] with a marketwide phenomenon causing comparable losses to other investors"—such as the unprecedented decline in housing prices—the chances the decline was caused by alleged misstatements or omissions decreases.  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005); *see also Central States, Southeast & Southwest Areas Pension Fund v. Federal Home Loan Mortgage*, 543 F. App'x 72, 74 (2d Cir. 2013) (summary order) ("Where, as here, the plaintiff's stock purchases and losses coincided with a marketwide phenomenon—the housing bubble burst—'the prospect that the plaintiff's loss was caused by the fraud decreases.'") (quoting *Lentell*, 396 F.3d at 175).

Nomura is not required to "disaggregate" the precise "ascertainable portion" of the decline in the value of the Nomura Certificate that was caused by declining home prices.  NCUA Mem. 2.  As NCUA concedes, the "loss causation defenses under Sections 11 and 12 . . . are mirror images of the loss causation showing required of plaintiffs in Section 10(b) cases." NCUA Mem. 15 (internal quotation marks omitted).  Thus, as under Section 10(b), the party bearing the burden of proof on loss causation must present such evidence that "would allow a factfinder to ascribe some *rough proportion* of the whole loss to [the defendant's] misstatements," with the remaining loss attributed to other causes.  *In re Williams Securities Litig.-WCG Subclass*, 558 F.2d 1130, 1142 (10th Cir. 2009) (emphasis added) (quoting *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007)).

A defendant must prove this affirmative defense by a preponderance of the evidence; expert testimony alone is frequently sufficient to carry this burden. *See, e.g., Collins v. Signetics Corp.*, 605 F.2d 110, 115 (3d Cir. 1979) (defendant carried Section 11 burden through expert

who "testified with specificity as to the various economic and political factors that caused" decline in price of the plaintiff's security), *overruled on other grounds by Pinter v. Dahl*, 486 U.S. 622 (1988).  Once a defendant has presented evidence establishing that something other than the alleged misrepresentations caused all or a portion of the plaintiff's claimed damages, the plaintiff cannot rebut that evidence through "speculation, unfounded opinions, and misleading comparisons," even if dressed in the guise of its "expert's conclusions."  *In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1368 (N.D. Cal. 1987).

## II.    NCUA Cannot Exclude Dr. Torous's Benchmark Analyses By Simply Speculating That The Benchmarks May Be Tainted.

### A.    NCUA Fails To Support Its Claim That The Industry And Reduced Industry Benchmarks Contain Any Defective Loans, Much Less Sufficient Defective Loans To Affect Dr. Torous's Results.

NCUA contends that Dr. Torous's "comparative analyses are based on tainted benchmarks."[3]  NCUA Mem. 16.[4]  NCUA cannot argue that the alleged misrepresentations in *this* case tainted Dr. Torous's benchmarks, however, because Dr. Torous excluded all of these loans from those benchmarks.  *See* Torous Report ¶ 122 n.131.  Instead, NCUA is left arguing that misrepresentations completely unrelated to the allegations in this case may have infected Dr.

---

[3] While this criticism is directed to Dr. Torous's use of his benchmarks in his "performance vectors" approach to calculating loss causation damages, NCUA ignores that Dr. Torous performed a separate "loan characteristics" analysis for Nomura that does not rely on any benchmarks (and thus is not subject to this criticism).  As previously explained, Dr. Torous obtained similar damages results under that approach—*i.e.*, whether or not he used benchmarks.  *See supra* at 7-10; *infra* at 30.

[4] NCUA relies heavily on Judge Cote's ruling in *Federal Housing Finance Agency v. Nomura Holding America, Inc.*, which excluded the expert benchmark analysis of Dr. Kerry Vandell on the ground that Dr. Vandell's benchmarks might have contained defective loans.  *See* Opinion & Order 14-19, No. 11-cv-6201 (Feb. 10, 2015).  Nomura respectfully disagrees with Judge Cote's ruling, which, among other things, did not grapple with this Court's precedents discussed below.  In any event, as described in greater detail below, Dr. Torous's analysis differs in material respects from that of Dr. Vandell.  *See infra* at 18 n.11.

Torous's benchmarks, and that Dr. Torous's testimony is therefore inadmissible because he has not "ensured" that his benchmarks do not contain even a single "defective" loan.  NCUA Mem. 16-18.  That is not so, for two reasons.

First, it is well-established that challenges to an expert's construction of a control sample, or benchmark, generally go to the weight of the expert's conclusions, not their admissibility. *See, e.g.*, *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1319 (Fed. Cir. 2014) (rejecting challenge to expert's damages benchmark, and stating that if it is "not an accurate benchmark," that "goes to evidentiary weight, not admissibility"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *Blotcher v. Stewart*, 45 F. Supp. 3d 1274, 1282-83 (D. Colo. 2014) ("Defendants can use cross-examination and their own experts to challenge the control group or the comparison, but . . . that goes to the weight, not to the admissibility, of the evidence."); *Resco Products, Inc. v. Bosai Minerals Grp.*, No. CIV.A. 06-235, 2015 WL 5521768, at *5 (W.D. Pa. Sept. 18, 2015) ("It is only the rare case where . . . the expert's decisions regarding control variables are the basis to exclude the analysis." (internal quotation marks omitted)).

For example, in the antitrust context, experts regularly construct "benchmark" periods in order to compare prices during an alleged conspiracy with the prices that prevailed when the conspiracy did not exist.  When ruling on *Daubert* challenges to the admissibility of those benchmarks, courts do not require that the expert *prove* that prices during the benchmark period were completely unaffected by the alleged antitrust conspiracy (much less that they were unaffected by any other price distortions *not* alleged in the case).  Courts instead regularly conclude that critiques suggesting a benchmark may be affected by the phenomenon being tested, like other critiques of the benchmark, go to the weight of the expert's opinion, not its

admissibility.  *See, e.g.*, *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 6326427, at *3 (E.D. Pa. Aug. 11, 2015) (rejecting *Daubert* challenge that expert's benchmark included data that might have been "[]affected by anticompetitive conduct" as one going to weight, not admissibility); *Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2013 WL 1721651, at *6-12 (E.D. Mich. Apr. 22, 2013) (denying *Daubert* challenge to expert's selection of benchmark because cross-examination is available to identify any benchmark deficiencies).

Indeed, this Court has specifically rejected a *Daubert* challenge almost identical to that raised by NCUA.  In *In re Urethane Antitrust Litig.*, 2012 WL 6681783 (Lungstrum, J.), an antitrust case, the defendant challenged the plaintiffs' expert's benchmark period on the same ground raised by NCUA here:  that that benchmark was not a proper control sample because it included years tainted by the illegal behavior alleged in that case.  *See id.* at *5-6.  The defendant even had a plausible basis for its critique, because the plaintiffs had originally alleged that the conspiracy extended into one of the years that the plaintiffs' expert had included in his *non*-conspiracy benchmark.  *See id.*  Nonetheless, this Court rejected the defendant's *Daubert* challenge on the ground that its "criticisms of [the expert's] consideration of possible taint from a conspiracy of potential benchmark years go to the weight of his opinions and not their admissibility."  *Id.* at *6.

That holding is on all fours here.  NCUA acknowledges, as it must, that Dr. Torous, to be conservative, addressed the possibility of tainted loans in his benchmarks in several ways.[5]  *See*

---

[5] That is more than Dr. Torous was required to do.  An expert is not required to predict criticisms of his analysis that might be raised by an opposing party and, assuming those criticisms to be correct, preemptively insulate his conclusions from those criticisms.  *See, e.g.*, *In re Universal Serv. Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 WL 4382141, at *9 (D.

NCUA Mem. 3-4.  But NCUA contends that Dr. Torous did not do enough to disprove the possibility that his benchmark samples *might* contain defective loans.  NCUA's "criticisms" of how Dr. Torous dealt with "possible taint" in his benchmarks "go to the weight of his opinions and not their admissibility."  *In re Urethane Antitrust*, 2012 WL 6681783, at *6.

Second, NCUA has failed to offer anything other than rank speculation in support of its criticism.  If NCUA seeks to exclude Dr. Torous's opinions altogether (rather than raise its challenges through cross-examination), it bears the burden of affirmatively showing, based on credible evidence, that its posited defects among the benchmark loans both exist and would actually affect Dr. Torous's results.  *See, e.g.*, *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (a party "may not rest an attack on an 'unsubstantiated assertion of error'" and instead must "produce credible evidence that curing the alleged flaws" would change the expert's analysis); *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988) (a party "challenging the validity of a multiple regression analysis [must] make a showing that the factors it contends ought to have been included would weaken the showing . . . made by the analysis"); *Resco Products*, 2015 WL 5521768, at *5 (collecting cases for proposition that "[u]nless the party challenging a regression [analysis] proffers evidence that an omitted variable . . . is likely to affect the result of the regression analysis, the [court] will not find that omission of the variable implicates the reliability of the model.").

Rather than meet its burden, NCUA misstates what it must show.  It claims that the "lynchpin" of Dr. Torous's analysis "is that the benchmarks do not contain defective loans." NCUA Mem. 16.  It thus asserts that *every loan* within Dr. Torous's benchmark must

---

Kan. Sept. 26, 2008) (Lungstrum, J.) (citing *McCoy v. Whirlpool Corp.*, 258 F. App'x 189, 196 (10th Cir. 2007), for the proposition that "expert testimony should not have been excluded for failure" to "adequately" "address alternative arguments" raised by another expert).

affirmatively be proven to be "clean" in order for Dr. Torous to use that benchmark reliably. *Id.* at 3. Not so. Instead, in order for a loan with an underwriting defect to be relevant to Dr. Torous's analysis, at the least it would have to be *materially* defective—*i.e.*, defective in a way that could actually impact that loan's performance. Moreover, given that Dr. Torous's Industry and Reduced Industry Benchmarks were comprised of millions of loans, only a very significant number of materially defective loans could have had any impact on Dr. Torous's results. NCUA does not proffer evidence that such a significant number of such loans exists, only *ipse dixit*.

Indeed, NCUA has not identified a *single defective loan* (much less a significant number of materially defective ones) in the benchmarks. Instead, NCUA relies on the fact that some of the loans in Dr. Torous's Industry Benchmark have been the subject of litigation. NCUA Mem. 17. Setting aside the obvious fact that a pool of loans being subject to litigation does not mean that any of the loans *actually* was misrepresented, Dr. Torous neutralized this criticism by removing all loans—found by him, his team, or NCUA's expert's team—to be subject to litigation, and re-running his tests on the remaining loans in the benchmark. Removing those loans did not affect Dr. Torous's results. NCUA has no response to this point.

NCUA also "suspect[s]" that there may be misrepresented loans even in that further reduced benchmark because the loans in that benchmark were originated by lenders that have been sued on at least one occasion. NCUA Mem. 18. NCUA would thus assume, without any support, not only that every originator that has ever been sued in RMBS litigation—meaning, virtually every originator in the country—was guilty as charged, regardless of how those cases came out, but also that those originators must have misrepresented *other* loans that were not the subject of any litigation. That is exactly the type of speculative critique that courts, including

this one, regularly hold goes at most to weight, and not admissibility.  *See supra* at 11-12, 15; *infra* at 23-24.[6]

Finally, NCUA relies on a trio of academic articles that it contends provide "evidence" that Dr. Torous's benchmarks are tainted.  In moving to exclude the testimony of NCUA's rebuttal expert, Dr. Anthony Saunders, Nomura explained why those articles fail to support NCUA's conclusion.  *See* Nomura Saunders Daubert at 7-8, 13-16.  As Dr. Saunders's report itself concedes, two of the articles use a completely different source of loan data than Dr. Torous uses.  *See* Amended Rebuttal Report of Anthony Saunders ¶ 34 (Dec. 4, 2015) ("Saunders Report") (Ex. 5) (conceding that Piskorski, Seru & Witkin (2013)[7] "used a different source of data" than Dr. Torous used); *compare id*. ¶ 37 n.78 (describing data set of Griffin & Maturana (2013)[8]), *with id*. ¶ 27 n.58 (describing Dr. Torous's data set).  At his deposition, Dr. Saunders made clear that he had "presum[ed]" that there was some overlap between the data sets, but that he had not "studied that," and therefore could not state whether the assumed overlap was 50%, 25%, 10% or 0.1%.  Saunders Dep. Tr. at 276:19-277:3, 309:16-311:8 (Jan. 29, 2016) (Ex. 8). The third article simply does not say *anything at all* about whether there are misrepresentations or fraud in the loans that it examined; NCUA apparently agrees, given its careful phrasing of that

---

[6] This criticism is also flatly contradicted by Mr. Butler's own findings in this case.  In several instances where a given originator issued multiple loans in the sample, Mr. Butler concluded that only some, but not all, of those loans were materially misrepresented.  *Compare, e.g*., Expert Report of Steven I. Butler on the Re-Underwriting of Sampled Loans App'x 3 (Aug. 14, 2015) ("Butler Report") (Ex. 4) (showing 24 securitizations for which single originator originated 100% of loans), *with* Butler Report 90-91 & tbl. 1 (not finding 100% of loans misrepresented for any of those 24 securitizations).

[7] Tomasz Piskorski, Amit Seru & James Witkin, *Asset Quality Misrepresentation by Financial Intermediaries: Evidence from RMBS Market*, Colum. Bus. Sch. Research Paper No. 13-7 (Feb. 12, 2013) (Ex. 6).

[8] John M. Griffin & Gonzalo Maturana, *Who Facilitated Misreporting in Securitized Loans?* (Dec. 20, 2013), SSRN: http://ssrn.com/abstract=2256060 (Ex. 7).

article's conclusion.[9]   *See* NCUA Mem. 17 (noting that this article concludes that "loan characteristics and macroeconomic conditions" alone cannot explain the poor performance of loans from 2006 and 2007, but not asserting that the article ties that poor performance—or the poor performance of any other loans—to misrepresentations or fraud, because it does not).  Thus, even assuming NCUA has raised the theoretical possibility of defective loans in Dr. Torous's benchmarks, it has not even attempted to show, as it must, that such loans would affect Dr. Torous's results.[10]

> **B.     NCUA Has Failed To Show Anything More Than A Theoretical Possibility That Dr. Torous's Butler Re-Underwriting Benchmark Is Tainted By Materially Defective Loans.**

Dr. Torous also tested his model using the Butler Re-Underwriting Benchmark, which was comprised of loans that NCUA's *own expert* re-underwrote but did not label materially defective.  NCUA does not contest that Dr. Torous again obtained the same results when using the Butler Re-Underwriting Benchmark.  Instead, NCUA asserts that Dr. Torous cannot rely on NCUA's own re-underwriting results.[11]

---

[9] Yuliya Demyanyk & Otto Van Hemert, *Understanding the Subprime Mortgage Crisis*, 24 The Rev. of Fin. Studies 1848 (2011) (Ex. 9).

[10] Further, NCUA does not dispute that Dr. Torous re-estimated his model several times over on: 1) loans not subject to litigation; 2) loans re-underwritten by Mr. Butler and not found "materially misrepresented"; and 3) loans not found "materially misrepresented" by Mr. Butler or Nomura's and RBS's experts.  *See supra* at 4-5.  He confirmed his results each time.  Unless every single benchmark is fatally flawed, that analysis is sufficient to defeat NCUA's *Daubert* challenge.  *In re Processed Egg Products Antitrust Litig.*, 81 F. Supp. 3d 412, 434-35 (E.D. Pa. 2015) (rejecting challenge to reliability of expert's benchmark when expert conducted additional tests that "confirmed" the results using that benchmark).

[11] In *Federal Housing Finance Agency*, Judge Cote excluded Dr. Vandell's analysis even though it included a benchmark of loans constructed from the plaintiff's re-underwriting expert's results. *See* Opinion & Order 21-26, No. 11-cv-6201 (Feb. 10, 2015).  But there are three significant differences between Dr. Vandell's analysis in that case and Dr. Torous's analysis based on the Butler Re-Underwriting Benchmark here.  First, Judge Cote found it "[n]otabl[e]" that Dr. Vandell "did not populate his Reunderwriting Benchmark" with loans that had been re-

NCUA begins by attacking a straw man: it claims that "Torous implicitly assumes" the loans in the Butler Re-Underwriting Benchmark are altogether "free from defects," and then argues that purported assumption is wrong because Mr. Butler could have found non-material defects even in loans that were not "materially" defective (and were thus included within the Butler Re-Underwriting Benchmark).  NCUA Mem. 21-22.  But NCUA is simply wrong that Dr. Torous's analysis in any way relied on there being *no* defects in the Butler Re-Underwriting Benchmark.  As NCUA's own citation for this point shows, Dr. Torous instead assumed "that any alleged misrepresentations in these loans *are not material* and therefore [that] they will not bias the result of my loan benchmarking analysis."  NCUA Mem. 21 n.61 (emphasis added) (quoting Torous Rebuttal Report ¶ 48).  Thus, Dr. Torous never assumed the loans in the Butler Re-Underwriting Benchmark were free from defects—only that they were free from *material* defects.  By definition, only a materially defective loan could impact loan performance in a material way—and only a substantial aggregation of such materially defective loans could impact benchmark performance.  Thus, NCUA's entire discussion of potential non-material defects in the Butler Re-Underwriting Benchmark is simply irrelevant.  Any such defects would not have affected Dr. Torous's results.

---

underwritten in that case, instead relying on expert reports from other cases.  *Id*. at 26 n.11.  Here, by contrast, Dr. Torous's Re-Underwriting Benchmark consists only of loans that Mr. Butler re-underwrote in this action.  Second, Dr. Vandell's analysis was "doom[ed]" by the fact that the expert reports on which it relied "constitute[d] inadmissible hearsay" because those experts would not testify at trial regarding those reports.  *Id*. at 25-26.  Again, by contrast, if Mr. Butler testifies at trial, it will be about his re-underwriting of the very loans that comprise the Butler Re-Underwriting Benchmark.  Third, in this case, Nomura directed its own expert to re-underwrite the same sample of loans backing the Nomura Certificate that Mr. Butler did not find materially misrepresented.  As is explained in greater detail below, Nomura's expert concluded that not one of the sample of loans from the Butler Re-Underwriting Benchmark that he reviewed was materially misrepresented.  *See infra* at 21-22.

NCUA therefore shifts to arguing that Mr. Butler took a "conservative" approach to finding defects, implying that NCUA's own expert might have failed to find even material defects during his purportedly comprehensive loan review. There are at least three problems with that claim.

First, as discussed above, to exclude Dr. Torous's opinions under *Daubert*, NCUA was required to *show* that there are material defects in the Butler Re-Underwriting Benchmark, not merely to speculate as to how the existence of such defects is theoretically possible. *See supra* at 11-12, 15. Yet NCUA has not explained how likely it is that Mr. Butler would have missed a material defect—especially when NCUA had every incentive to find as many loans materially defective as possible—or how likely it is that any such missed defects would have impacted the performance of the Butler Re-Underwriting Benchmark. Or, to put the point another way: although NCUA questions whether the loans in the Butler Re-Underwriting Benchmark *might* have material defects, NCUA's own expert (Mr. Butler) reviewed every single loan in that benchmark and concluded that he could not say that a single one had material defects.[12]  That should end the matter, particularly for admissibility purposes.[13]

---

[12] NCUA asserts that Mr. Butler's opinions were "solely based on the documents available to him," attempting to imply that he did not have full loan data for some of the loans he found not to be materially misrepresented.  NCUA Mem. 22.  But in fact, Mr. Butler only re-underwrote loans for which he concluded he had adequate loan files. *See* Butler Report ¶¶ 73-74.

[13] In *Federal Housing Finance Agency v. Nomura Holding America, Inc., et al.,* Judge Cote stated: "Stating that, based on the information provided, underwriting defects were not found for a given loan is not the same thing as affirmatively certifying the loan was free of defects."  *See* Opinion & Order 21-26, No. 11-cv-6201 (Feb. 10, 2015).  Judge Cote's observation flips the burden of proof.  What matters under *Daubert* is that NCUA is attempting to exclude Dr. Torous's conclusions on the ground that the Butler Re-Underwriting Benchmark contains materially defective loans, but NCUA's own expert underwrote every loan within that Benchmark and was unable to say that a single one was materially defective. *That* is what dooms NCUA's *Daubert* challenge.

Second, NCUA's "conservative" argument is belied by Mr. Butler's liberal interpretation of what constitutes a "material" defect.  Mr. Butler found a "defect"—and found loans with such defects to be "Materially Misrepresented"—when loan characteristics were off by mere hundredths of a percentage point.  *See, e.g.*, Expert Report of Steven I. Butler on the Re-Underwriting of Sampled Loans App'x 1, at 1233 (Aug. 14, 2015) ("Butler Report") (Mr. Butler finding that Loan No. ██████ allegedly was reported to have an LTV of 63.00%, rather than the actual 63.22%), 1226 (Mr. Butler finding that Loan No. ██████ allegedly was reported to have an LTV/CLTV of 84.00%, rather than the actual 84.08%).  It is difficult to fathom what "material" defect Mr. Butler could have missed using such a fine-toothed comb.[14]

Third, NCUA admits that Nomura could address its critique of the Butler Re-Underwriting Benchmark "by engaging . . . reunderwriters to establish a clean set of benchmark loans."  NCUA Mem. 22.  That is precisely what Nomura did.  First, Dr. Torous analyzed yet another benchmark of loans that confirmed the results of his original benchmark analysis yet again.  This time, he constructed the Spolin and Forester Re-Underwriting Benchmark, which included all loans within the Butler Re-Underwriting Benchmark, plus those loans that Nomura and RBS's experts re-underwrote and affirmatively concluded were free from material defects.  *See* Torous Reply Report ¶¶ 37-38.  Again he observed the same results.

Then, Nomura's re-underwriting expert, Michael Forester, re-underwrote *every loan* within NCUA's sample of loans backing the Nomura Certificate that Mr. Butler did not find materially misrepresented.  Each of those loans was in Dr. Torous's Butler Re-Underwriting

---

[14] Mr. Butler's aggressive approach to seeking "material" defects also undercuts NCUA's suggestion that he chose to willfully ignore entire "types of defects" despite the possibility that they were material.  NCUA Mem. 22.  Instead, as Mr. Butler explained, he chose to ignore certain criteria in order to "focus" his review on criteria "that are more directly tied to the credit risk associated with a loan."  Butler Report ¶ 96.

Benchmark. Mr. Forester concluded, like Mr. Butler, that those loans were not materially misrepresented. *See* Expert Report of Michael Forester ¶ 96 (Oct. 16, 2015) (Ex. 10). That was true whether Mr. Forester applied his own re-underwriting criteria or Mr. Butler's. *Compare id*. App'x 1, *with* Butler Report App'x 1. In other words, Nomura's expert re-underwrote what NCUA contends was a representative sample of loans—those loans backing the Nomura Certificate that were reviewed by Mr. Butler—and concluded that every loan from that sample that is within the Butler Re-Underwriting Benchmark complied with underwriting guidelines. That dispatches NCUA's criticism.

### III.   NCUA Cannot Exclude Dr. Torous's Benchmark Analyses Based On Its Theory That The At-Issue Misrepresentations Themselves Impacted Housing Prices.

The loans backing the Nomura Certificate made up "0.005 percent of the aggregate principal balance of residential mortgage originations in the US" in the period "between 2005 and 2007." Torous Reply Report ¶ 16. Given this tiny percentage, as well as the undisputed fact that loan origination was but one of several factors driving housing prices during the relevant time period, *see id*. ¶¶ 36-45; Barth Dep. Tr. 33:21-35:12, 126:3-132:23 (Feb. 5, 2016) (Ex. 11), Dr. Torous's benchmark analyses reasonably assume that the alleged misrepresentations at issue in this case did not, standing alone, have a material impact on the national macroeconomic trends that he identified as having caused the vast majority of the Nomura Certificate's losses.

Yet NCUA theorizes that the alleged misrepresentations in this case must have had a material effect on housing prices—and it asserts that Dr. Torous's opinions must be excluded because he has not disproven that hypothesis. NCUA's hypothesis, however, is just that. As explained in more detail in Nomura's memorandum in support of its motion to exclude the testimony of NCUA's expert, Dr. James Barth, NCUA has presented *no credible evidence* that the loans backing the Nomura Certificate had any impact whatsoever on housing prices. *See*

Nomura Barth Daubert at 12-20.  Indeed, Dr. Barth himself could not say whether that impact (assuming it exists) was material or immaterial.  *See* Barth Tr. 188:6-192:2.  That is unsurprising. Given that (1) the relevant loans were a minuscule portion of loan originations, (2) loan origination was but one of several drivers of housing prices, and (3) housing prices were but one of several macroeconomic factors analyzed by Dr. Torous, it simply is implausible that the alleged misrepresentations as found by Mr. Butler would have had any impact on the losses Dr. Torous attributes to macroeconomic factors.[15]  Moreover, any *immaterial* impact that the alleged misrepresentations may have had on housing prices is not even relevant to Nomura's negative loss causation defense.  *Dura*, 544 U.S. at 343 ("To 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires." (emphasis added)).

NCUA's argument is also at odds with the relevant legal standard under *Daubert*.  It is well-established that a party "cannot exclude a regression analysis . . . simply by pointing to variables not taken into account."  *Mehus v. Emporia State Univ.*, 222 F.R.D. 455, 462 (D. Kan. 2004); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1261 (10th Cir. 2014) ("[A] defendant cannot undermine a regression analysis simply by pointing to variables not taken into account that might conceivably have pulled the analysis's sting." (quoting *Koger v. Reno*, 98 F.3d 631, 637 (D.C. Cir. 1996))).  The Supreme Court has explained as much quite clearly:

> While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors "must be considered unacceptable as evidence . . . ."  *Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.*

---

[15] In addition, as Nomura explains in greater detail in opposing NCUA's Motion to Exclude the Expert Testimony of Ethan Cohen-Dole, Ph.D., Dr. Cohen-Cole actually tested for and refuted Dr. Barth's hypothesis.  *See* Nomura Cohen-Cole Opposition 22-23

*Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part, writing for the full Court) (citation omitted) (emphasis added). That is because, in a civil case, the party with the burden of proof "need not prove [its case] with scientific certainty; rather his or her burden is to prove [his or her case] by a preponderance of the evidence." *Id*. As a result, a party challenging statistical evidence cannot simply "declare" that "many factors" could have affected the observed statistical trend, without "demonstrat[ing]" that there would have been an effect had these factors been "accounted for." *Id*. at 403 n.14.

Courts within (and without) this Circuit have repeatedly followed the Supreme Court's direction.[16] For example, applying these principles, Magistrate Judge O'Hara held in an analogous case that a damages expert's testimony predicting future lost profits was not inadmissible merely because he "failed to disaggregate lost profits caused by [the] dispute and lost profits caused by the current economic recession" that struck the market after 2007. *Util. Trailer Sales of Kansas City, Inc. v. MAC Trailer Mfg., Inc.*, 267 F.R.D. 368, 372 (D. Kan. 2010). Those "concerns" were "better addressed in cross-examination than in determining the admissibility of expert testimony"; given the "difficult job" facing the expert in predicting lost

---

[16] *See, e.g., RMD, LLC v. Nitto Americas, Inc.*, No. 09-2056-JAR-DJW, 2012 WL 5398345, at *10 (D. Kan. Nov. 5, 2012) (argument that expert failed to consider "product characteristics or quantities sold" in regression analysis went "to the weight and not the admissibility" of expert's opinions); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1112-13 (D. Colo. 2006) (rejecting *Daubert* argument that experts needed to have "determine[d] whether some or all of the diminution in value they report might be the product of" something other than the defendant's behavior, and pointing out that isolating the difference might not even be "possible"); *Maitland v. Univ. of Minnesota*, 155 F.3d 1013, 1017 (8th Cir. 1998) ("[A] regression analysis does not become inadmissible as evidence simply because it does not include every variable that is quantifiable and may be relevant to the question presented."); *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5775600, at *4 (E.D. Pa. Aug. 5, 2015) ("[T]he challenging party must introduce evidence to support its contention that the failure to include [an omitted] variabl[e] would actually change the outcome of the analysis." (quoting *In re Indus. Silicon Antitrust Litig.*, No. 95–1131, 1998 WL 1031507, at *9 (W.D. Pa. Oct. 13, 1998)).

profits, it was enough that the expert had estimated the lost profits caused by that case and "considered the state of the economy in doing so." *Id*.

Here, Dr. Torous's expert opinions are similarly not inadmissible merely because NCUA asserts that he "failed to disaggregate" any effect of the alleged misrepresentations in this case on the economic recession—particularly where there is no basis for believing that those alleged misrepresentations even had an effect. *See also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 390 (6th Cir. 2000) ("In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury."); *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996) (same).

## IV.    NCUA's Other Criticisms Are Classic Examples Of Disputes Between Experts That Go, At Most, To Weight, Not Admissibility.

NCUA raises two further challenges, which go—at most—to the nuances of Dr. Torous's chosen methodology. But this Court has repeatedly held that "the choices [an expert] made with respect to his methodology and calculations formulas . . . go to weight not admissibility, and are proper subjects for cross-examination." *RMD, LLC*, 2012 WL 5398345, at *9. Thus, to exclude expert testimony, a party must establish that the expert's methods are improper or unsound—not simply that the expert "fail[ed] to use what [the challenging party] consider[s] to be the best methodology to arrive at his opinion." *Id.*; *see also Util. Trailer Sales*, 267 F.R.D. at 371 (admitting expert opinion that "perhaps . . . did not use the 'best' method," because "the standard for admissibility is reliability, not superiority"); *In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *9 (rejecting *Daubert* challenge because challenging party had "not provided any evidence or other basis for concluding that sound econometrics would *require* the use of" its preferred dataset (emphasis added)). Because NCUA does not and cannot make that showing, its remaining challenges fail.

A.      **Dr. Torous's DTI Conclusions Are Reliable.**

Dr. Torous performed two separate analyses that showed that DTI did not have an economically significant impact on loan performance.   First, Dr. Torous re-estimated his Industry Benchmark incorporating DTI as an explanatory variable, and determined that those regression results were consistent with the results he obtained by using the Industry Benchmark without a DTI variable.   Torous Rebuttal Report ¶¶ 35-37, Exs. II-1A and II-1C.   Second, as an additional check on that conclusion, Dr. Torous ran a separate analysis whereby he assessed, using his benchmark model, whether Mr. Butler's DTI findings, if true, would have had any impact on the expected default rate of the loans underlying the Nomura Certificate.   *Id.* ¶¶ 38-39. To do so, Dr. Torous applied Mr. Butler's DTI findings (including those where Mr. Butler had calculated a DTI for a loan for which no DTI was calculated at the time of origination) across the entire loan pool backing the Nomura Certificate (assuming *arguendo* that those findings could be extrapolated in that way) by applying an average increase of DTI to each loan.   *Id.*   Dr. Torous then determined that Mr. Butler's DTI findings, if true and applied to the entire pool, would have impacted the expected default rates of the at-issue loans only by a small, economically immaterial amount. *Id.* ¶¶ 38-39 and Ex. II-2.

NCUA claims that Dr. Torous's "DTI models are independently unreliable" because, according to NCUA, he should have chosen a different method of applying Mr. Butler's sample DTI findings to the entire loan pool for purposes of the second DTI analysis:  applying a large DTI increase to some loans and no DTI increase to others, rather than an average DTI increase to all. *See* NCUA Mem. 25.  That criticism has no bearing on Dr. Torous's first (and primary) DTI analysis.  And the choice between those two extrapolation techniques is clearly one over which experts can disagree.  For example, when asked about his selection at his deposition, Dr. Torous explained that because DTI is a statistically insignificant explanatory variable for default rates

(as shown by his first DTI analysis), it does not matter which of those two extrapolation techniques is used for purposes of his second analysis. *See* Torous Dep. Tr. 73:18-74:10 (Feb. 11, 2016) (Ex. 12).

NCUA ignores this empirical evidence and, citing one article, claims that the relationship between DTI and default rates is not linear, and that it might therefore matter whether the DTI for many loans is increased by a little or the DTI for a few loans is increased by a lot. *See* NCUA Mem. 25. But the cited article clearly states that as a *hypothesis*, not a conclusion. *See* W. Archer & B. Smith, *Residential Mortgage Default: The Roles of House Price Volatility, Euphoria and the Borrower's Put Option*, Fed. Reserve Bank of Richmond Working Paper No. 10-02, at 10 (Feb. 2010) (Ex. 13). Indeed, the article goes on to remark that "original debt to income ratio . . . show[s] little behavioral significance." *Id.* at 24. Interpreting this article, and its relevance to Dr. Torous's method, is precisely the type of dispute between experts that is for the jury to decide.

In any event, NCUA has not attempted to show that, contrary to Dr. Torous's findings, DTI has a material impact on default rates. After all, Dr. Torous only extrapolated Mr. Butler's DTI findings as a *backup* means of confirming the results he obtained in his primary DTI regression analysis: that including DTI as an explanatory variable had no impact on his conclusion that the loans backing the Nomura Certificate performed in line with those in the Industry Benchmark. Torous Rebuttal Report ¶¶ 36-37. Even if NCUA could show that Dr. Torous's backup method of verification was invalid, that would not call into question the reliability of Dr. Torous's primary method of determining that DTI had an insubstantial effect on loan performance.

**B.** **NCUA's Criticism Of Dr. Torous's "Tuning" Of The ADCo Model Is Incorrect And Not An Appropriate Ground For A *Daubert* Challenge.**

As explained above, as part of his "performance vectors" approach, Dr. Torous used the ADCo model to calculate the *maximum* possible damages that could (in theory) have been caused by the alleged misrepresentations in this case, if several relevant assumptions favorable to NCUA were true. NCUA asserts that Dr. Torous has not established the reliability of this approach because he "tuned" the ADCo model and was unable to predict with 100% accuracy the historical performance of the certificates in this case.[17] These challenges to Dr. Torous's methodology are plainly insufficient.

First, contrary to NCUA's claim (NCUA Mem. 23), tuning the ADCo model is a well-accepted method of valuation. As Dr. Torous explained, the ADCo model is "widely-used," including by "mortgage market professionals" and "regulators" such as the Federal Reserve. Torous Rebuttal Report ¶ 49. NCUA's damages expert, Dr. John Finnerty, agreed at his deposition. *See* Finnerty Dep. Tr. 295:14-296:14 (Jan. 20, 2016) (Ex. 14) (stating that the model is "pretty widely used" and that he has "no reason to think that the model, if used correctly, would not be able to achieve accurate valuations," and that "the fact that it's used as widely as it is would support that"). Tuning is one aspect of that well-accepted model. As ADCo's website

---

[17] NCUA also complains that Dr. Torous "does not explain precisely his method for" tuning the ADCo model, and that he does not "explain how his method of calibrating the ADCo model can be tested or is reliable." NCUA Mem. at 12. That is simply not true. Dr. Torous clearly described his methodology in his opening report, and included a 13-page appendix describing the ADCo model and the tuning process. Torous Rebuttal Report App'x C. "[A]ny objection that his disclosure regarding that opinion was incomplete should have been raised at that time." *In re Urethane Antitrust Litig.*, 2012 WL 6681783, at *6 (Lungstrum, J.). Moreover, NCUA "had every opportunity at [Dr. Torous's] deposition to explore fully the bases for" his tuning of the ADCo model, but did not do so. *Id.* NCUA therefore cannot show that it was prejudiced in any way by any purported failure on Dr. Torous's part to explain how he tuned the ADCo model. *See id.*

states: "The ability to tune the models is one of the benefits of using AD&Co models." *See* Vectors Support, Andrew Davidson & Co (last visited April 26, 2016), https://www.ad-co.com/vectors_index (Ex. 15). The ADCo user guide similarly provides that tuning is "available to allow the user to customize model output to a specific portfolio's performance," just as Dr. Torous did. *See* Vectors Prepayment & Credit Models, Andrew Davidson & Co (last visited May 2, 2016), https://www.ad-co.com/prepayment_credit_models (Ex. 16).

Second, NCUA's lone quibble with Dr. Torous's tuning of the ADCo model is that it allegedly does not eliminate all estimation errors. But that criticism is misguided. For one thing, Dr. Finnerty's insistence that a model should have "zero" forecasting error simply defies reality. *See* Finnerty Tr. 293:20-22. Any model that attempts to predict real-world results will have an error component; that is why, for example, regression models seek the "best" fit rather than a "perfect" fit, which in many cases is mathematically impossible to achieve. *See, e.g.*, Federal Judicial Center, *Reference Manual on Scientific Evidence* 334-35, 345 (3d ed. 2011).

Besides, NCUA's assertion that Dr. Torous's model deviated from actual performance by huge percentages is not correct: NCUA arrived at those percentages by sleight of hand, *i.e.* it incorrectly (and intentionally) manipulates the numbers. To use but one example, one certificate (CUSIP 41161UAF9) had an original face value of $22.68 million, according to Dr. Finnerty. *See* Torous Tuned Model Differentials.xlsx, at 1 (Ex. 17). Dr. Torous's model predicted that that balance would decline by $21.43 million over a five-year period (to $1.25 million); the balance actually declined by $22.19 million (to $0.49 million). *See id*. at 3. Dr. Torous's forecasted decline was thus just 3% less than the actual decline ((21.43-22.19)/22.19). But Dr. Finnerty claims an error rate of *154*% for that certificate, because the actual remaining balance of $1.25 million is 154% higher than the predicted remaining balance of $0.49 million ((1.25-0.49)/0.49).

*See id*.; Rebuttal Expert Report of John D. Finnerty Ex. G1, at 1 (Dec. 4 2015) (Ex. 18).  Dr. Finnerty conceded at his deposition that he could have calculated the forecasting error using the method that would produce an error rate of 3% in this example.  *See* Finnerty Tr. 203:14-207:25. NCUA's claims of massive predictive errors are therefore deceptive (and incorrect); at best, they are a matter of dispute between experts.  And as this Court has explained in other cases, such a "dispute among the experts . . . must be left for the jury."  *In re Universal Serv. Fund*, 2008 WL 4382141, at *9 (Lungstrum, J.).

Third, NCUA has again failed to show that its criticism would actually impact Dr. Torous's conclusions.  Because Dr. Torous uses his calibrated ADCo model to estimate the *difference* between actual and expected performance, any error in predicting actual performance is irrelevant so long as the same predictive error is present when predicting expected performance.  NCUA does not contend otherwise.  More fundamentally, NCUA does not challenge—or even acknowledge—Dr. Torous's "loan characteristics" approach to calculating damages, which confirmed the results of Dr. Torous's "performance vectors" approach and, indeed, yielded *lower* damages.  *See* Torous Rebuttal Report ¶ 64.  NCUA has not demonstrated that its critiques will have any impact on Dr. Torous's damages conclusions.

* * *

In sum, NCUA's quibbles with Dr. Torous's testimony are unpersuasive and at most amount to a subject for cross-examination, rather than a *Daubert* motion.

## CONCLUSION

For the foregoing reasons, Nomura respectfully asks that the Court deny NCUA's motion to exclude the expert testimony of Walter Torous, Ph.D.

Dated: May 6, 2016                   Respectfully Submitted,

                                     NOMURA HOME EQUITY LOAN, INC.,

                                     By:   /s/ Martin M. Loring
                                           One of its Attorneys

                                     By:   /s/ Christina M. Pyle
                                           One of its Attorneys

                                     Martin M. Loring, KS #20840
                                     martin.loring@huschblackwell.com
                                     Christina M. Pyle, KS #25019
                                     christina.pyle@huschblackwell.com
                                     HUSCH BLACKWELL LLP
                                     4801 Main Street, Suite 1000
                                     Kansas City, MO 64112
                                     Phone: 816-983-8000
                                     Fax: 816-983-8080

                                     Barbara S. Steiner (*pro hac vice*)
                                     Matthew J. Thomas (*pro hac vice*)
                                     Casey T. Grabenstein (*pro hac vice*)
                                     JENNER & BLOCK LLP
                                     353 N. Clark Street
                                     Chicago, IL 60654
                                     Phone: 312-222-9350
                                     Fax: 312-527-0484
                                     Email: bsteiner@jenner.com

                                     Matthew S. Hellman (*pro hac vice*)
                                     JENNER & BLOCK LLP
                                     1099 New York Avenue, NW
                                     Washington, DC 20001
                                     Phone: 202-639-6000
                                     Fax: 202-639-6066
                                     Email: mhellman@jenner.com

                                     *Attorneys for Defendant Nomura Home Equity
                                     Loan, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

/s/ Martin M. Loring

Martin M. Loring

/s/ Christina M. Pyle

Christina M. Pyle