# Exhibit 3

HIGHLY CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | |
| | Case No. 13-cv-6726-DLC |
| v. | Case No. 13-cv-6719-DLC |
| RBS SECURITIES, INC., *et al.*, and WACHOVIA CAPITAL MARKETS, LLC. | |

**UNITED STATES DISTRICT COURT**
**DISTRIC OF KANSAS**

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | |
| | Case No. 11-cv-2340-JWL-JPO |
| v. | Case No. 11-cv-2649-JWL-JPO |
| RBS SECURITIES, INC., *et al.*, and WACHOVIA CAPITAL MARKETS, LLC, *et al.* | |

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, | |
| | Case No. 11-cv-05887-GHW |
| v. | |
| RBS SECURITIES, INC., *et al.* | |

---

**EXPERT REPORT OF STEVEN I. BUTLER**
**ON THE RE-UNDERWRITING OF SAMPLED LOANS**

**AUGUST 14, 2015**

---

HIGHLY CONFIDENTIAL

# TABLE OF CONTENTS

1. Summary of engagement and conclusions.................................................................................1

2. Qualifications. .........................................................................................................................4

    2.1  Overview of qualifications.................................................................................................4

    2.2  Mortgage lending experience. ...........................................................................................5

    2.3  Consulting and litigation experience. ................................................................................7

3.  Compensation. .......................................................................................................................11

4.  Materials considered. ............................................................................................................11

5.  Overview of residential mortgage loan underwriting. ..........................................................12

    5.1  Mortgage lending and underwriting generally. ...............................................................12

    5.2  The purpose and importance of underwriting guidelines................................................20

    5.3  The importance of loan files to assess the initial underwriting.......................................29

6.  The purpose, procedure, and scope of the re-underwriting review. ......................................31

    6.1  Purpose: testing the accuracy of representations in the offering documents. ...........31

    6.2  The re-underwriting process. ...........................................................................................33

    6.3  Scope of review: material guideline violations and quantitative misrepresentations. 40

7.  Overall conservative approach to re-underwriting. ...............................................................42

8.  Summary of our re-underwriting review. ..............................................................................49

    8.1  Evaluation of borrower ability to repay...........................................................................50

    8.2  Evaluation of credit information and history. ..................................................................56

    8.3  Evaluation of employment and income information. .......................................................61

    8.4  Evaluation of credit score, LTV/CLTV ratios, and DTI ratios. ..................................71

    8.5  Evaluation of owner occupancy status. ...........................................................................75

    8.6  Evaluation of hazard and title insurance. ........................................................................79

    8.7  Evaluation of approvals....................................................................................................81

HIGHLY CONFIDENTIAL

8.8  Evaluation of the adequacy of collateral. ...................................................................84

9.  My determination of when a Sampled Loan was Materially Misrepresented. ...................................87

10.  My conclusions based on my re-underwriting review........................................................89

10.1  A significant majority of the Sampled Loans were Materially Misrepresented.........89

10.2  The securitization loan tapes misrepresented the collateral characteristics of more than 25 percent of the Sampled Loans. ......................................................................92

HIGHLY CONFIDENTIAL

## 1.      Summary of engagement and conclusions.

1.      Counsel for the National Credit Union Administration Board, as liquidating agent of several failed corporate credit unions ("NCUA"), retained me to perform a re-underwriting review of samples of loans (the "Sampled Loans") randomly selected from the loan pools backing the 38 unique residential mortgage-backed securities ("RMBS") that are at issue in the above-captioned lawsuits.

2.      The Offering Documents[1] for each of the 38 RMBS contained representations about the loans having been originated in compliance with applicable underwriting guidelines, as well as separate representations about various quantitative loan characteristics. For reasons described throughout this report, both types of representations were material to an assessment of the credit risk associated with the loans.

3.      The purpose of my re-underwriting review was to identify those Sampled Loans for which the Offering Documents materially misrepresented—more specifically, materially understated—credit risk (the "Materially Misrepresented" loans). I define "credit risk" to mean the likelihood that a borrower would be unable to repay the loan according to its original terms, or in the event of borrower default, the underlying collateral value would be insufficient to repay the loan. Thus, Materially Misrepresented loans are those that had a materially greater likelihood of delinquency, default, or loss than was represented in the Offering Documents.

4.      I identified a Sampled Loan as Materially Misrepresented if it fell into one or both of the following categories: (1) the loan violated the applicable underwriting guidelines in a way that had a material and adverse effect on the credit risk of the loan; and (2) the loan's actual quantitative characteristics—as opposed to those listed in the Offering Documents, such as in the prospectus

---

[1] "Offering Documents" refers to the Registration Statement, the Prospectus and Prospectus Supplement that were filed as part of the Registration Statement with the Securities and Exchange Commission ("SEC"), and pre-closing loan tapes for each RMBS.

HIGHLY CONFIDENTIAL

supplement or the corresponding Mortgage Loan Schedule ("MLS")—meant that the loan had a materially greater credit risk than represented.

5.     In assessing whether the Sampled Loans I reviewed violated the applicable underwriting guidelines in a way that materially increased credit risk, I used a conservative approach that took into account documented compensating factors and gave the original underwriter the benefit of the doubt on "close calls." Similarly, when assessing whether a misrepresentation of a Sampled Loan's quantitative characteristics materially understated credit risk, I also used a conservative approach that took into account the magnitude of the discrepancy and whether the true characteristics were still within guideline parameters.

6.     While most of the Sampled Loans breached the applicable underwriting guidelines in at least one way, or had at least one inaccurate characteristic listed in the MLS, my assignment was not to report or opine on every guideline breach or MLS discrepancy for every loan. Rather, my task was to focus on Sampled Loans with guideline breaches and quantitative misrepresentations that materially increased credit risk, and to opine that a Sampled Loan was Materially Misrepresented only when I felt, based on the totality of the information available about that loan, that it had a materially greater risk of delinquency, default, or loss than what was represented.

7.     Random samples of roughly 100 loans were drawn from 45 supporting loan groups ("SLGs")[2] collateralizing the 38 unique RMBS at issue. After re-underwriting the Sampled Loans as briefly described above and detailed throughout this report, I have concluded to a reasonable degree of professional certainty that the number and percentage of Materially Misrepresented loans in each loan sample correspond to the figures in Table 1 below. The detailed loan-by-loan findings

---

[2] A supporting loan group is a subunit of the mortgage loans included in an RMBS. Each SLG backed one or more of the certificates purchased by the liquidated credit unions on whose behalf NCUA is bringing this lawsuit ("Certificates"). Each Certificate entitled its holder to a specified portion of the cash flows from the underlying mortgages in that SLG.

HIGHLY CONFIDENTIAL

supporting my opinion for each Materially Misrepresented loan can be found in the spreadsheet attached as Appendix 1 to this report.

## TABLE 1
### (Number and Percentage of Materially Misrepresented Loans Per Sample)

| RMBS (SLG) | Sampled Loans Reviewed | # of Materially Misrepresented Loans | % of Materially Misrepresented Loans |
|---|---|---|---|
| AHMA 2007-3 (Grp 1-2) | 100 | 65 | 65.0% |
| FFML 2005-FFH4 | 100 | 42 | 42.0% |
| FFML 2006-FF16 (All) | 100 | 38 | 38.0% |
| FFML 2006-FF16 (Grp 2) | 100 | 46 | 46.0% |
| FHLT 2006-3 | 100 | 61 | 61.0% |
| FHLT 2006-D (All) | 100 | 65 | 65.0% |
| FHLT 2006-D (Grp 2) | 100 | 59 | 59.0% |
| GMACM 2006-HE5 | 78 | 45 | 57.7% |
| HVMLT 2006-10 | 100 | 53 | 53.0% |
| HVMLT 2006-11 | 100 | 67 | 67.0% |
| HVMLT 2006-12 | 100 | 69 | 69.0% |
| HVMLT 2006-14 | 96 | 66 | 68.8% |
| HVMLT 2006-6 (Grp 2) | 93 | 51 | 54.8% |
| HVMLT 2006-6 (Grp 3) | 95 | 48 | 50.5% |
| HVMLT 2006-8 | 100 | 63 | 63.0% |
| HVMLT 2006-9 | 100 | 65 | 65.0% |
| HVMLT 2006-SB1 | 100 | 50 | 50.0% |
| HVMLT 2007-1 (All) | 99 | 64 | 64.6% |
| HVMLT 2007-1 (Grp 2) | 100 | 57 | 57.0% |
| HVMLT 2007-2 | 99 | 64 | 64.6% |
| HVMLT 2007-3 | 100 | 66 | 66.0% |
| HVMLT 2007-4 | 99 | 59 | 59.6% |
| HVMLT 2007-5 | 100 | 59 | 59.0% |
| INDX 2006-AR35 | 98 | 86 | 87.8% |
| INDX 2006-AR6 | 100 | 67 | 67.0% |

HIGHLY CONFIDENTIAL

**TABLE 1**

**(Number and Percentage of Materially Misrepresented Loans Per Sample)**

| RMBS (SLG) | Sampled Loans Reviewed | # of Materially Misrepresented Loans | % of Materially Misrepresented Loans |
|---|---|---|---|
| LBMLT 2006-2 | 97 | 49 | 50.5% |
| LBMLT 2006-8 | 96 | 50 | 52.1% |
| LUM 2006-2 | 100 | 69 | 69.0% |
| LUM 2007-1 (Grp 1) | 97 | 46 | 47.4% |
| MHL 2006-1 (Grp 2) | 100 | 67 | 67.0% |
| MHL 2006-1 (Grp 1-A2) | 100 | 75 | 75.0% |
| NAA 2006-AR4 | 96 | 61 | 63.5% |
| NHEL 2006-5 (All) | 100 | 53 | 53.0% |
| NHEL 2006-5 (Grp 2) | 95 | 67 | 70.5% |
| NHELI 2007-1 (Grp 1) | 98 | 61 | 62.2% |
| NHELI 2007-1 (Grp 2) | 100 | 55 | 55.0% |
| OOMLT 2007-2 | 100 | 51 | 51.0% |
| RFMS2 2007-HSA2 | 96 | 64 | 66.7% |
| SAST 2006-3 | 87 | 52 | 59.8% |
| SVHE 2005-OPT4 | 100 | 40 | 40.0% |
| SVHE 2006-WF1 | 99 | 42 | 42.4% |
| SVHE 2006-WF2 | 99 | 36 | 36.4% |
| SVHE 2007-OPT1 | 99 | 60 | 60.6% |
| WMLT 2006-ALT1 | 100 | 43 | 43.0% |
| WMLT 2006-AMN1 | 97 | 43 | 44.3% |
| **TOTAL** | **4,413** | **2,559** | **58.0%** |

2.      **Qualifications.**

2.1      **Overview of qualifications.**

8.      I have more than 44 years of experience in the financial services industry. For 17 of those years, I worked in banking institutions where I gained experience in management; operations; credit analysis; and consumer, mortgage, real estate, and commercial lending. For the remainder of

4

HIGHLY CONFIDENTIAL

those years (27 years), I have worked as a consultant in the banking industry and have advised businesses, financial institutions, law firms, and federal and state regulatory agencies on issues such as loan policy, loan review, loan loss analysis and reserve requirements, loan portfolio valuation, and loan portfolio due diligence, among others. I was recognized as the National Financial Services Advocate of the Year by the U.S. Small Business Administration in 1985, and I am a Certified Fraud Examiner.

9.      I have served as an expert witness in 20 cases in 11 jurisdictions regarding various aspects of banking and lending, including: bank management; bank operations; duties and standards of care for officers and directors of financial institutions; and lending, including loan underwriting, approval, monitoring, servicing, collections, foreclosure, and the sale of bank-owned properties. I have also testified on similar topics in mediations, arbitrations, and at public hearings.

10.     A copy of my curriculum vitae, which is not intended to be an exhaustive representation of my professional and educational experience, is attached as Exhibit 1. The summary below is intended to supplement my curriculum vitae to provide more details regarding my specific work experience with mortgage lending. The list of the publications I have authored is attached as an addendum to Exhibit 1. A list of the matters in which I have testified as an expert within the last four years is also attached as an addendum to Exhibit 1.

## 2.2    Mortgage lending experience.

11.     Since 1971, I have worked for several banking institutions that engaged in the business of residential mortgage lending, including Chittenden Trust Company of Vermont, Security Trust Company, Chemical Bank of New York, United Bank of Skyline, Seafirst Corporation (parent of Seattle First National Bank), Century Bank of Denver, and the Kipp Rich Group, which owned more than 20 banks in a four-state region. During my approximately 15 years of employment in total at these banks, I gained considerable experience in all stages of residential mortgage lending.

HIGHLY CONFIDENTIAL

12.     From 1971 to 1974, I worked at Chittenden Trust Company of Vermont, the largest bank holding company in Vermont at the time. There, I originated mortgage loans, accepted consumer loan applications (including mortgage loan applications), and interviewed borrowers about their applications. From 1974 to 1977, I served in various positions, including branch manager at Security Trust Company in Rochester, New York, where, in addition to my responsibility for the origination of new mortgage loans, I was in charge of the preliminary underwriting and closing of those loans. I performed similar mortgage origination tasks during my tenure at Chemical Bank of New York between 1977 and 1978.

13.     In addition to my lending experience, I have supervised and overseen large portfolios of residential mortgage loans. While at Security Trust Company, from 1976 to 1977, I served as a Regional Loan Administrator and managed the loan portfolios of 12 branch offices. During my tenure with the Kipp Rich Group from 1984 to 1985, I served as the Senior Vice President of Dominion National Bank and then President of Market National Bank, with responsibility for all aspects of the banks including operations, lending, loan servicing, employee supervision, and regulatory compliance.

14.     I have also helped several new banks commence operations. In 1978, I was recruited to assist in opening United Bank of Skyline in Denver, Colorado. As a unit of United Banks of Colorado—the largest bank holding company in Colorado—United Bank of Skyline offered a full line of consumer loans, including residential mortgage loans. As one of two senior loan officers, I specialized in approving new loans for origination. In 1980, I was recruited by Seafirst Corporation, the parent company of Seattle First National Bank, to open and serve as President of twelve banks in the Denver metropolitan area. One of my first duties was to hire staff members, including a residential mortgage loan officer for each of the first two bank branches. These residential mortgage loan officers reported directly to me, and we comprised a joint committee that was charged with

reviewing and approving all residential mortgage loan applications. This committee was responsible for the origination, underwriting, and closing of residential mortgage loans, as well as their servicing and collections. As President of these banks, I was involved in establishing the data processing requirements for a third-party vendor hired to process mortgage loans. I left Seafirst Corporation in 1982 to serve as Senior Vice President of Century Bank of Denver, where I remained until 1984. In this position, I established a mortgage loan department responsible for originating and closing residential mortgage loans. Some of the loans originated in this department were held on Century Bank's balance sheet, while others were sold to larger banks for securitization.

### 2.3    Consulting and litigation experience.

15.      I have 27 years of experience as a consultant in the banking industry. In 1986, I joined the international accounting firm of Laventhol & Horwath. I began my tenure as an audit specialist overseeing various financial institutions, and I later served as Director of Bank Consulting. During my employment with Laventhol & Horwath, I began testifying in court as an expert on banking and lending. In connection with this testimony, I reviewed residential mortgage loans to determine whether they (1) adhered to applicable underwriting guidelines and industry standards of reasonable underwriting; (2) complied with applicable federal, state, and local laws and regulations; and (3) were serviced in accordance with appropriate guidelines and industry standards. I also performed valuations of loan portfolios that were available for sale to other institutions as a result of regulatory oversight or liquidation.

16.      After Laventhol & Horwath ceased operations in 1990, I joined Peterson Consulting, which is now named Navigant Consulting. At Peterson Consulting, I continued to perform consulting assignments for financial institutions on regulatory matters, strategic planning, loan review, loan workouts, loan portfolio valuations, and due diligence for financial institution merger and acquisition transactions. Once again, this work involved reviewing mortgage loans, as well as

HIGHLY CONFIDENTIAL

other types of loans and loan portfolios, in order to determine whether the loans (1) adhered to applicable underwriting guidelines and industry standards of reasonable underwriting; (2) complied with applicable federal, state, and local laws and regulations; and (3) were serviced in accordance with appropriate guidelines and industry standards, including loss mitigation and foreclosure. Peterson Consulting was routinely retained by the Federal Savings and Loan Insurance Corporation ("FSLIC"), the Federal Deposit Insurance Corporation ("FDIC"), and the Resolution Trust Corporation ("RTC") to investigate failed or failing financial institutions to determine whether they were engaged in unsafe and unsound lending practices. I was assigned to lead and supervise many of these engagements. My responsibilities included reviewing the mortgage lending practices and portfolios of the various financial institutions. I also performed valuations of mortgage loan portfolios for purchase or sale. This task consisted of stratifying mortgage loan portfolios, determining compliance with underwriting guidelines, performing cash flow analyses, and assessing the adequacy of the financial institutions' allowances for loan losses. As part of these engagements, I also provided expert testimony related to claims of negligence, gross negligence, fraud, and professional malpractice on behalf of the FSLIC, the FDIC, and the RTC.

17.     In 1994, twenty partners from Peterson Consulting and I formed the consulting firm Tucker Alan, Inc., and my duties remained substantially similar to those I performed at Peterson Consulting. After two years at Tucker Alan, I opened a litigation support practice for the accounting firm of Altschuler, Melvoin & Glasser. In addition to management duties, I designed and performed consulting and litigation assignments focused on banking and lending matters.

18.     In 1998, I was hired by Deloitte & Touche to create the firm's Dispute Consulting group in its Washington, DC office. While I was employed by Deloitte & Touche, the Federal Trade Commission ("FTC") retained me, as both a consulting and testifying expert, to investigate allegations of predatory lending against a residential mortgage loan company. This assignment

HIGHLY CONFIDENTIAL

entailed reviewing hundreds of mortgage loan files, payment histories, escrow accounts, and servicing records, all aimed at determining whether the mortgage loan company engaged in predatory lending practices when it originated, underwrote, and serviced mortgage loans. I then served as an expert witness in the case that was filed as a result of this investigation.

19.     In 1999, I left Deloitte & Touche and started my own consulting practice—at the time a sole proprietorship named Steven I. Butler Financial Institutions Consulting—where I continued to provide the same types of consulting and litigation services. For example, I was retained by a national consulting firm to assist with a review of a mortgage lender's servicing, loss mitigation, and foreclosure procedures and work flow. I worked with the mortgage lender to revise its internal policies and procedures governing its servicing practices as a result of my review.

20.     From March 2001 to April 2003, I left my consulting practice to work with Kroll, Inc., at the request of former colleagues working at Kroll. While at Kroll, I also worked on investigations, consulting engagements, and litigation relating to banking matters. For example, during this period, the FTC again retained me to assist it in another predatory mortgage lending case. I was responsible for reviewing the policies, procedures, and practices of the mortgage lender in question to determine if they were inconsistent with anti-predatory lending laws. I was also responsible for calculating the damages suffered by hundreds of borrowers due to unfair and deceptive mortgage lending and servicing practices.

21.     In April 2003, I returned to my consulting practice, then incorporated as Brittany Consulting LLC d/b/a ButlerBank Consulting. Since that time, I have continued to provide consulting services and expert witness services, including work related to the mortgage industry. Among my notable engagements are the following:

HIGHLY CONFIDENTIAL

- Served as a consulting expert in two re-underwriting reviews of residential mortgage loans to determine whether the mortgage loans violated the representations and warranties in the transaction documents governing the securitizations;

- Served and continue to serve as a testifying expert in litigation matters involving RMBS investors as well as monoline insurance companies, where I was asked to determine whether mortgage originators breached the contractual representations and warranties in the transaction documents for the governing securitizations, including whether the underlying mortgage loans complied with applicable underwriting guidelines and industry standards;

- Provided and continue to provide expert consulting to a government agency investigating mortgage fraud;

- From April 2006 through March 2008, I served as the interim CEO, Compliance Officer, and member of the Board of Directors of a federal savings bank (INA Trust, FSB), responsible for overseeing the bank's liquidation on behalf of its owner and the Office of Thrift Supervision;

- Assisted a large consulting firm with its review of a multi-billion-dollar mortgage loan portfolio of a large West Coast savings and loan that failed. The consulting firm was retained by the trustee of the bank's holding company that had filed for bankruptcy. The work involved reviewing the bank's mortgage loan portfolio to determine compliance with underwriting guidelines and calculating the allowance for loan losses related to the mortgage loan portfolio;

- Served as an expert consultant to the general counsel and outside counsel of a commercial bank in a dispute with the FDIC over the repurchase of a portfolio of residential mortgage loans valued at hundreds of millions of dollars;

- Assisted counsel to a company engaged in residential homebuilding in a case in which the company's mortgage origination subsidiary was accused of violating the U.S. Department of Housing and Urban Development ("HUD") guidelines and regulations;

- Performed a review of the exception loan process and loan loss reserve procedures of a national mortgage company on behalf of the parent bank;

- Assisted counsel to a residential real estate appraisal company accused of having committed criminal fraud in preparing appraisals utilized in underwriting federally insured residential mortgages; and

- Assisted a government agency to review the third-party due diligence procedures and results for residential mortgage-backed securities as part of a larger investigation into the bank's practices during the 2002 through 2007 time period.

22.     Since 1986, I have testified in state and federal courts across the country, including in

California, Colorado, Florida, Maryland, Massachusetts, Michigan, New Jersey, Pennsylvania, Rhode

HIGHLY CONFIDENTIAL

Island, Tennessee, and Virginia.[3] I have also testified as an expert in arbitrations, mediations, and public hearings. I have been qualified as an expert and have testified in various courts as an expert on banking and lending matters, including in the fields of mortgage loan origination, underwriting, and servicing. No court has ever determined that I am not qualified to testify as an expert.[4]

## 3.  Compensation.

23.     I am being compensated for my work on this engagement at the rate of $450 per hour for time expended, with the exception of travel time.[5] The payment of my fees is not contingent upon either the opinions I render in this case or the outcome of this case.

## 4.  Materials considered.

24.     The list of materials that I considered in forming the opinions expressed in this report can be found in Exhibit 2.

---

[3] A list of the matters in which I have testified as an expert within the last four years is attached as an addendum to Exhibit 1.

[4] In one of my recent expert engagements involving the review of mortgage loans underlying residential mortgage-backed securities, I served as the testifying expert on behalf of the plaintiff MBIA Insurance Corp. ("MBIA") against Countrywide Home Loans and Bank of America Corp. (*MBIA Insurance Corporation v. Countrywide Home Loans, Inc., et al.*, in the Supreme Court of the State of New York, County of New York). The re-underwriting review I undertook on behalf of MBIA was similar to the one I have undertaken in this case. In denying a motion to strike my report, the court concluded both that I was sufficiently experienced to opine on the underwriting of the mortgage loans and that my methods and analysis were sufficiently reliable to form the basis of an opinion about whether the mortgage loans adhered to various contractual representations and warranties, including compliance with underwriting guidelines and prudent and customary standards of underwriting.

[5] I am not compensated for my travel time, but I am reimbursed at cost for any out-of-pocket expenses incurred while traveling.

HIGHLY CONFIDENTIAL

**5.      Overview of residential mortgage loan underwriting.**

**5.1     Mortgage lending and underwriting generally.**

25.      Residential mortgage lending involves lending money in connection with a real-estate transaction—typically the purchase of a new home or a refinancing of an existing home. In exchange for receiving the loan, the borrower promises not only to pay back the principal amount of the loan, but also to make interest payments based on an agreed-to interest rate. It is these interest payments, in addition to the principal repayments, that provide the investment return to the beneficial owner of the loan, whether it be a lender or a group of RMBS investors.

26.      As a secondary source of repayment for the loan, the lender takes a lien on the mortgaged property, which serves as collateral. If the borrower defaults on the loan by failing to make timely principal and interest payments, the lender has the right to force a sale of the property (typically through a foreclosure proceeding) and to recover as much of the outstanding principal and accrued interest on the loan as possible.

27.      The goal of mortgage lending is simply to get paid back the loan amount with interest. Thus, consistent with reasonable, industry-standard lending practices, lenders should make mortgage loans only when they are comfortable, based on all available information, that they will get paid back the loan amount, even if the borrower defaults on the loan obligation and the lender is required to foreclose. Mortgage loan underwriting is the process by which a lender gains comfort that the loan will be paid back.

28.      More specifically, underwriting is the process by which a loan originator analyzes a prospective borrower's credit history, documentation submitted in support of the loan application, and the property's appraisal to determine whether a loan should be made to the borrower based on an assessment of (1) the borrower's willingness and ability to repay the mortgage loan, and (2) the value of the mortgaged property that acts as collateral for the loan. Mortgage underwriting is

designed to ascertain the credit risk associated with lending money to a specific borrower in connection with a specific property, which in turn permits the originator to make a reasoned lending decision.

29.      Consistent with reasonable, industry-standard underwriting practices, the underwriting of any mortgage loan should involve consideration of what are known as "The Five Cs of Credit," also referred to as "The Five Cs of Lending." The Five Cs are Character, Capacity, Collateral, Capital, and Conditions.[6] I describe each of the Five Cs below.

30.      **Character.** In the context of underwriting a mortgage loan, "character" is a term of art that refers to the indicia of the borrower's willingness to make mortgage payments on time.[7] A borrower's character is determined primarily by his or her credit score and credit history. Supporting information provided in a credit report is particularly important. Details found in a credit report allow the underwriter to test the accuracy and truthfulness of the borrower's loan application, which in turn bears on the lender's assessment of the borrower's character.

31.      A credit report contains a large amount of information about a borrower, including current and past residential street addresses, date of birth, Social Security number, discharged and

---

[6] I am aware that the considerations I describe as "The Five Cs of Credit" have also been referred to as "The Three Cs of Lending," in which the Three Cs refer to Credit, Capacity, and Collateral. Both The Five Cs and The Three Cs are frameworks used throughout the mortgage loan industry. Regardless of the precise form that an underwriter uses, both frameworks entail the same underwriting considerations. For example, both consider the amount of cash reserves that the borrower needs for the down payment and principal, interest, tax, and insurance payments on the subject property. The Five Cs address this consideration under "Capital," while The Three Cs address this consideration under "Capacity."

[7] For examples of guideline references to "character" issues, *see*



HIGHLY CONFIDENTIAL

open bankruptcies, judgments, liens, and credit history. The credit history component contains a series of reports from creditors, such as banks, mortgage companies, and credit card companies. These reports—referred to as "trade lines"—include the date on which the credit relationship commenced, account number, credit limit granted, greatest amount of credit the borrower has used on the account, current balance, current monthly payment, borrower's payment history and current payment status, number of late payments (if any), and the severity of any late payments.

32.    **Capacity.** "Capacity" refers to the borrower's ability to repay the mortgage loan.[8] A lender must inquire into the borrower's capacity, because the borrower's ability to repay the mortgage loan is the lender's primary source of repayment. This inquiry should take into consideration the borrower's continuing ability to repay the loan in the future, since all mortgage loans, including second-lien mortgage loans, are long-term commitments. A borrower's income, employment, assets, and debt-to-income ("DTI") ratio, as well as consideration of any payment shock embedded within the repayment schedule,[9] are the primary data points for evaluating a borrower's ability to repay.

---

[8] For examples of guideline references to "capacity" issues, *see* ████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
█ ██████████ █ ███████ █████████ ███████ █ ████ ███████ ████████ ███████████
██████████████████████████████████████████████████████████

[9] "Payment shock" refers to any substantial increase in the borrower's housing payments. ████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████ █████ ██████ █████ ███████ ██████ ███████ ████ ██████████
███████████████████████████████████████████████████████████████████████████████
██████████████████████████████████ █ ██████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████ ████ ███████ ████ ███████ ███████ ██████ ███████ ████████

HIGHLY CONFIDENTIAL

33.     If the borrower applies for a "full documentation" loan, which requires the borrower to provide documentation regarding income, employment, assets, and housing history, the application will provide the underwriter with documentary evidence concerning the borrower's ability to repay. In particular, the borrower's pay stubs and/or W-2 forms allow the underwriter to verify the borrower's income and evaluate his or her likelihood of future employment. Other information furnished as part of the loan application—including the length of time employed by a current employer or time worked in the current field or industry—further allows the underwriter to evaluate whether the borrower is likely to remain employed long enough to repay the mortgage.

34.     The lender must undertake a different process for evaluating a self-employed borrower, who may not have pay stubs or W-2 forms available. A self-employed borrower may provide the lender with tax returns and a letter from his or her accountant asserting the length of time spent in the borrower's current line of business. If the borrower submits such a letter, it is reasonable and customary for the underwriter to confirm that its author is, in fact, an accountant by, for example, requesting a copy of the accountant's license. The underwriter should also conduct independent research into the borrower's company prior to closing, such as searching the phone book and determining that the phone number is working, in order to confirm that the company remains in business.

35.     If the particular loan program requires less than full documentation from the borrower (such as a stated income loan program), the underwriter should use other sources of information to verify the borrower's income or, at a minimum, to assess the reasonableness of the borrower's stated income. In making this determination, the underwriter can supplement his or her experience and common sense by using third-party sources such as Salary.com, PayScale.com,

Theworkplace.com, and the Bureau of Labor Statistics ("BLS"), which provide a salary range based on occupation, job title, and the borrower's geographic location.[10] It is imperative that the loan underwriter determine whether the borrower's stated income is reasonable, as the underwriter's main objective is to review the application and ascertain the applicant's ability to repay the loan.

36.    **Collateral.** "Collateral" refers to the value of the property serving as collateral for the mortgage loan.[11] Specifically, the underwriter must evaluate whether the property is valuable enough to allow the lender to recover the value of the mortgage should the borrower default. In the case of a second-lien mortgage, the underwriter considers whether the collateral is valuable enough to allow for the repayment of both the first and second mortgages.

37.    Information regarding the value of the property typically comes from a qualified appraisal. An underwriter is required to assess an appraisal to ensure that it was completed consistent with industry standards. The underwriter should verify that the appraiser holds a license and has experience in appraising the type of property at issue. The underwriter should review the

---

[10] As I discuss in greater detail below, among third-party sources, BLS is the only database I am aware of that offers historical salary data. Therefore, although other sources, such as Salary.com, could have been used by originators during the 2005-2007 time period, in conducting the re-underwriting review, I relied on the BLS to ensure I was reviewing accurate salary information for the relevant time period.

[11] For examples of guideline references to "collateral" issues, *see*



appraisal report, ensuring that the appraiser recorded details about characteristics of the property that will affect its value.

38.     The underwriter should also make sure that the report includes information about "comparables," or properties recently sold in the same geographic area. The appraisal report should compare the subject property and the comparable properties according to several characteristics that significantly affect their value. For instance, the Uniform Residential Appraisal Report—the template widely used by appraisers to provide summary information for borrowers and originators to review—requires the appraiser to provide the following for comparable properties: the sales price; proximity to the subject property; physical design; construction quality; gross living area; and heating and cooling systems, among other things.[12] Based on the comparison between the subject and comparable properties with respect to each of these elements, the appraiser should note if the comparable properties are superior or inferior to the subject property, and make the appropriate adjustment for each significant difference. The appraiser should determine the value of the subject property only after making these adjustments.

39.     An accurate assessment of the subject property's market value is critical.[13] Thus, an underwriter's failure to scrutinize the appraisal report is a significant error. An originator should not lend the borrower a greater amount of money than the subject property is actually worth. Because

---

[12] *See* Uniform Residential Appraisal Report (INVESTOR Form 1004/INVESTOR Form 70), *available at* https://www.fanniemae.com/content/guide_form/1004.pdf.

[13] *See, e.g.,* ████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████

the value of the subject property represents an alternative source of repayment of the mortgage loan, the lender must be satisfied that the appraisal accurately reflects the amount of money that could be recovered in the event of default. The accuracy of the valuation becomes especially important on a second mortgage, where the lender takes a second-lien position and will therefore only recover residual proceeds after the holder of the first-lien position is reimbursed. An overstated appraisal increases the likelihood that the liquidated collateral value will be insufficient to cover the first and any second mortgage on the subject property, and therefore increases the credit risk of the mortgage loan.

40.     **Capital.** "Capital" refers to the sufficiency of the borrower's funds to pay the down payment and closing costs, and to hold funds in reserve for future mortgage payments.[14] The down payment is the borrower's initial cash contribution to the cost of the property; it is often referred to as "equity." Closing costs are those costs and fees imposed upon the borrower during origination. By way of example, closing costs include the appraiser's fee, the originator's cost to obtain the borrower's credit report, the cost of a title insurance policy, and the loan origination fee. The primary inquiry in verifying the borrower's available capital is whether the borrower has the means to pay for the aforementioned fees and to continue making mortgage payments—including

_____

[14] For examples of guideline references to "capital" issues, *see* ███████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████ █████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

principal, interest, taxes, and insurance payments—in the event that the borrower encounters financial difficulties, such as illness in the family or loss of employment.

41.     Given the importance of ensuring that the borrower has the required capital reserves, an underwriter must typically verify the borrower's assets. This inquiry often occurs alongside the verification of the borrower's income because there is often a correlation between a borrower's income and accumulation of assets. When verifying the borrower's assets, the underwriter should ensure that the borrower has sufficient cash to pay the loan closing fees and the down payment. Additionally, lenders usually require the borrower to fund a reserve account or escrow, which will fund tax payments and homeowner's insurance premium payments for three to six months after the loan is originated.

42.     **Conditions.** "Conditions" refer to whether any information about the borrower or the collateral, or any information contained in the loan file, casts doubt on the borrower's ability to repay the loan or the status of the borrower's ownership interest in the property. For example, a particular borrower might have been employed in his current position only for a short time, or he might frequently change jobs. Such an employment record suggests that the borrower may not make enough income across the life of the loan to pay his mortgage obligations.[15] Or, the appraisal report might note an environmental problem in the collateral property's neighborhood, which could adversely affect the property's value or salability. The title might reveal an easement that permits

---

[15] *See, e.g.,* 

construction of a highway or commercial development near the property. Any of these characteristics of the subject property could potentially drive down the property's value.[16]

43.     Consistent with industry-standard practice, a reasonable underwriter should take note of these conditions, which may represent "red flags" that the borrower does not have the ability to repay the loan or that the value of the collateral is not adequate. The underwriter should take appropriate action by exploring the conditions and, as needed, obtain written explanation from the borrower or another relevant source. Regardless of the loan program for which the borrower is applying, the underwriter is responsible for identifying all conditions and ensuring that none of them will prevent the borrower from repaying the mortgage.

### 5.2     The purpose and importance of underwriting guidelines.

44.     Each lender typically has its own set of underwriting guidelines, which are, in essence, that lender's rules and instructions for applying the Five Cs of Credit to prospective lending decisions. Underwriting guidelines can include manuals, loan program guides, and loan matrices specific to a particular loan program offered by the lender. Underwriting guidelines define the credit-

---

[16] For guideline examples of such "conditions," *see* ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

HIGHLY CONFIDENTIAL

risk parameters within which a lender has determined that a mortgage loan may be approved and set forth the steps that must be taken to assess the credit risk associated with a prospective borrower.

45.    Underwriting guidelines exist to create a consistent, repeatable process for determining whether a loan should be made to a prospective borrower based on an assessment of (1) the borrower's willingness and ability to repay the mortgage loan, and (2) the value of the mortgaged property that acts as collateral for the loan.[17] While certain parameters in and nuances of underwriting guidelines may differ among lenders, within a particular product type, different lenders' guidelines share broad similarities.[18] And when a lender's underwriting guidelines are silent on some aspect of evaluating a prospective loan, both industry-standard underwriting practices (the Five Cs of Credit) and common sense should still guide the lending decision.

46.    Underwriting guidelines serve a number of related purposes, which collectively permit the lender to make a well-reasoned lending decision. First and foremost, underwriting guidelines provide the criteria for the underwriter to assess whether a given borrower's credit risk profile is acceptable to the lender for a particular type of loan. Second, the lender's adherence to its guidelines eliminates arbitrariness in the underwriting of borrower applications, which in turn reduces imprudent lending decisions and the opportunity for unfair lending practices. Third, underwriting guidelines help the lender adhere to mortgage lending regulatory and legal requirements. Finally, underwriting guidelines inform third parties—such as purchasers of mortgage

---

[17] *See, e.g.*, SVHE 2007-OPT1 Prospectus Supplement, at S-73 ("The Option One Mortgage Underwriting Guidelines require that mortgage loans be underwritten in a standardized procedure … . … Option One Mortgage Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan.").

[18] The Offering Documents for the RMBS at issue acknowledged this fact. *See, e.g.*, LUM 2006-2 Base Prospectus, at 35 ("[E]ach seller will represent and warrant that all the loans that it originated and/or sold to the depositor … will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans.").

HIGHLY CONFIDENTIAL

loans, purchasers of RMBS, and bond insurers—about the types of mortgage loans that the lender

originates, the credit quality of the borrowers to whom the loans have been made, the credit risk of

these loans, and the consistency of the lender's underwriting practices.

47.     Failure to adhere to underwriting guidelines results in a host of problems, including

the origination of loans with a greater credit risk, loans where the borrower is not able or willing to

repay, loans with a greater likelihood of default, fraudulent loans, or loans that do not meet the

investment criteria of lenders, investors, or insurers. Accordingly, for loans sold on the secondary

market during the 2005-2007 period, including loans securitized into RMBS, it was customary for

originators to represent and warranty that all loans they were selling were in fact originated in

accordance with applicable underwriting guidelines, which were consistent with the prevailing

industry-standard lending practices.[19] Indeed, investment banks such as RBS, Wachovia, and

Nomura, which purchased loans and packaged them into RMBS, including the ones at issue here,

insisted on such representations and warranties as a pre-condition to purchasing loans from a

particular originator.[20]

---

[19] *See, e.g.*, FFML 2005-FFH4 Mortgage Loan Purchase Agreement ("MLPA"), RBS-NCUA14268923, at p. 8 of native ("The origination, servicing and collection practices used by the Originator and any servicer of the Mortgage Loan … have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing industry."); at p. 9 of native ("The Mortgage Loan was underwritten in accordance with the underwriting standards of the Originator in effect at the time the Mortgage Loan was originated.").

[20] *See id.* For additional examples of such representations and warranties related to the Defendants or RMBS at issue here, *see* SVHE 2005-OPT4 MLPA, RBS-NCUA08959387, at 400 ("Each Mortgage loan was originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement."); NHEL 2006-5 MLPA, NMI00000001, at 10 ("[E]ach Subsequent Mortgage Loan shall be underwritten in accordance with the underwriting guidelines in place at the time of such Subsequent Mortgage Loan's origination."); Nomura and First National Bank of Nevada MLPA, NOM0001893272, at 306 ("Each Mortgage Loan was originated by or for the Seller pursuant to, and conforms with, the Seller's underwriting guidelines."); ███████ ███ ████████ ███████ ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL

48.     **Non-traditional loan programs.** During the 2005-2007 period, there was a proliferation of different mortgage programs geared towards borrowers with non-traditional credit profiles. A FICO score is a typical way to stratify borrowers into different categories of relative credit risk, such as prime, Alt-A, and subprime. Generally speaking, borrowers with relatively higher FICO scores in the 700s were considered prime, borrowers with FICO scores in the upper 600s were considered Alt-A, and borrowers with FICO scores in the lower 600s or below were considered subprime. During the same period, there was also a proliferation of non-traditional mortgage product types, such as interest-only loans and option ARMs (Pay Option Adjustable Rate Mortgages), as well as loan programs with different levels of required documentation, ranging from full-documentation loans, to low-documentation loans, all the way to no documentation and no ratio loans. Many of the new mortgage loans being issued during the 2005-2007 period were issued to relatively lower credit-quality borrowers (Alt-A or subprime) or under alternative documentation programs (low-doc or no-doc).

49.     These non-traditional mortgage products were governed by distinct sets of underwriting guidelines and matrices that were tailored to the unique features of the loan programs. As originators began issuing loans on the lower end of the credit-quality spectrum, it became even more important for them to accurately ascertain the true credit risk associated with any given loan. First, the interest rate charged to a borrower should reflect the credit risk associated with the loan, and identifying the true credit risk was thus critical to appropriate risk-based pricing. Second, most of the non-traditional mortgage products originated in the 2005-2007 period were securitized, and the RMBS structures were designed specifically to accommodate the lower credit-quality and non-traditional features of the loan pools. Thus, it was critical to accurately ascertain the true credit risk associated with non-traditional loans so that appropriate RMBS structures could be designed to create safe, AAA-rated bonds in the upper tiers of those structures so that they would be marketable

to conservative financial institutions such as the corporate credit unions that purchased the RMBS at issue in these lawsuits.

50.     In that sense, the underwriting guidelines for non-traditional loans were a proxy for the credit-risk parameters that were acceptable and expected for that type of borrower and that type of loan. And while it is true that those parameters were often on the lower end of the relative credit-quality spectrum, it was arguably even more important for originators to consistently adhere to the applicable underwriting guidelines to generate loans with a known credit risk. A known credit risk can be accounted for, but the margin for error at the lower end of the credit quality spectrum is lower than at the higher end. Even for non-traditional mortgage products, the ultimate goal of mortgage lending remained the same: to get the loan paid back with interest.

51.     **Compensating factors.** Although adherence to the applicable underwriting guidelines was critically important to properly evaluating a prospective borrower's ability to repay and staying within the credit-risk boundaries established by the guidelines, reasonable, industry-standard mortgage underwriting practices granted an underwriter the discretion, when supported by proper documentation and approval, to allow exceptions when there were "compensating factors." WMC's Underwriting Guidelines explained the concept:



[REDACTED]

53.     When a deviation from the applicable underwriting guidelines takes a loan outside the prescribed credit-risk boundaries, legitimate compensating factors can offset the increased credit risk resulting from the deviation, thus bringing the loan back within the guideline boundaries. For example, a borrower with a FICO score below the lender's established minimum for a particular loan program (increased credit risk) might still have qualified under the program based on compensating factors such as high income and low debt, or lower LTV as a result of a larger down payment (decreased credit risk).

54.     Most originators' underwriting guidelines explicitly permitted exceptions supported by compensating factors,[24] and many specifically enumerated what factors could be considered to be compensating or offsetting. For example, [REDACTED]

[REDACTED]



[22] [REDACTED]

[24] *See, e.g.,* [REDACTED]



55.     Even when guidelines did not address the use of compensating factors, however, it was consistent with reasonable, industry-standard underwriting practices to allow the use of compensating factors to offset exceptions to underwriting-guideline parameters. A factor could only be considered "compensating," however, if it provided objective indicia that the borrower had the ability and willingness to repay the loan. Accordingly, it was imperative that a compensating factor



HIGHLY CONFIDENTIAL

legitimately decreased credit risk and that it was actually documented in the loan file—e.g., a high income that was stated, but not verified, could not serve as a compensating factor.

56.     Indeed, it was required that the underwriter document the identified compensating factors in the loan file. For instance, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ ██   ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████ ██ ██████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████ ██ ██████████████████████████████████████████████████

████████████████████████████████████████████████ ██ ██████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ ██

[32] ████████████████████████████████████████████

██ ████████████████████████████████████

██ ████████████████████████████████████████████████

██ ██████████████████████████████████████

██ ████████████████████████████████████████████

57.    In many cases, use of compensating factors to approve loans outside of guidelines required explicit approval from a manager or supervisor. For instance, ████████████ ████████████████████████████████████████████████████████████ ████████████████████ █ ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ █ ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ █



58.    **Scratch-and-dent loans.** During the 2005-2007 period, as in all other periods that I am aware of, loans' material compliance with applicable underwriting guidelines was a fundamental expectation of participants in the secondary mortgage market. It was understood that, absent explicit disclosure to the contrary, when an originator was marketing a pool of loans, that pool would consist of loans originated in compliance with applicable underwriting guidelines, and that the originator would make representations and warranties to that effect.[40] Indeed, any loan pools

---

[37] ████████████████████████████████████████████████

█ ████████████████████████████████████████

█ ████████████████████████████████████████

[40] The base prospectuses for the RMBS at issue reflected that expectation when describing the loans that would back future issuances off the sponsor's registered shelf. *See, e.g.*, HVMLT 2006-9 Base Prospectus, at p. 62 ("The depositor will have purchased the loans, either directly or through affiliates, from sellers. The loans acquired by the depositor will have been originated in accordance with the underwriting criteria specified under the heading '—Underwriting Standards' below. … Each seller will represent and warrant that all the loans that it originated and/or sold to the depositor or one of the depositor's affiliates will have been underwritten in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans.").

containing loans that did not materially comply with applicable underwriting guidelines or prescribed documentation requirements, would explicitly be labeled "scratch-and-dent" pools, indicating their inferior credit quality and increased credit risk. Scratch-and-dent loans typically sold at a discount, sometimes even at a substantial loss, when compared to normal, performing loans.

### 5.3   The importance of loan files to assess the initial underwriting.

59.     In the process of underwriting a prospective mortgage loan, industry-standard underwriting practices in the 2005-2007 period required an originator to create and maintain a loan file that would contain all documentation relevant to an assessment of whether to grant that loan—in other words, all information and documents that the underwriter used to make the underwriting decision or approve the loan. These documents would include everything from the initial loan application and beyond: credit reports; all documents related to income, debt, assets, and employment; the appraisal; required legal and compliance documents; the note and the mortgage; as well as the closing documents such as the HUD-1 and documents evidencing the transfer of title and the existence of hazard insurance.

60.     Because a loan file tells the story of a loan from application to approval to closing, it was critical that originators maintain a complete loan file. As far as I am aware, all originators had document creation and retention policies designed to ensure that a complete version of the loan file was generated and kept. Indeed, state laws specifically required mortgage originators and brokers to keep a copy of the loan file for a certain number of years following origination.[41]

---

[41] *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 3, § 410(f) (requiring registrants to maintain books and records for minimum number of years); Cal. Bus. & Prof. Code § 10148(a) ("A licensed real estate broker shall retain for three years copies of all listings, deposit receipts, canceled checks, trust records, and other documents executed by him or her or obtained by him or her in connection with any transactions for which a real estate broker license is required."); Cal. Code Regs. tit. 10, § 1950.314.4(d) ("The following books and records shall be retained by the residential mortgage lender, residential mortgage lender and servicer, or residential mortgage loan servicer for a minimum

HIGHLY CONFIDENTIAL

61.    In addition to these legal requirements, there were other governance and compliance reasons for requiring that a complete version of the loan file be maintained. For example, maintaining a complete version of the loan file was necessary to allow internal quality control and audit processes to function properly, as those processes often involved a full review or re-underwriting of issued loans. Further, for lenders such as banks, which were regulated by state or federal regulators, the same rationale applied due to the possibility of a regulatory audit. Finally, for originators that sold loans in the secondary market, it was essential to maintain a complete version of the loan file in case a purchaser or investor ever demanded the repurchase of a loan for violation of a representation and warranty.

62.    In addition to compliance with underwriting guidelines, originators were typically required to represent and warranty compliance with all legal requirements, as well as the completeness and integrity of the underlying loan documentation.[42] To assess whether any of these representations and warranties was breached, both the originator and the purchaser would need the complete version of the loan file. And for loans that were securitized for the secondary market, loan files were required to be complete to allow for the proper review by third party due diligence firms hired by sponsors or underwriters of the security.

63.    During the 2005-2007 period, it was also industry-standard practice for loan originators to create a copy of a loan file and provide it to the servicer of the loan. For originators of loans that retained the servicing rights on those loans, the origination arm of the business would

---

of 36 months from the date of final entry: [listing documents, including] [a]ll other documents in or related to the loan file.").

[42] *See, e.g.*, NHEL 2006-5 MLPA, NMI00000001, at 23 ("For each Mortgage Loan, the related Mortgage File contains a true, accurate and correct copy of each of the documents and instruments required to be included therein."); Nomura and First National Bank of Nevada MLPA, NOM0001893272, at 305 ("For each Mortgage Loan, the related Mortgage File is complete and contains a true, accurate, and correct copy of each of the documents and instruments specified to be included therein.").

HIGHLY CONFIDENTIAL

typically create a copy and transfer a separate version of the loan file to its servicing arm, which would maintain the loan file on its servicing system. Originators that did not retain servicing rights would likewise create and transfer a separate version of the loan file to the appropriate servicer. After receiving a loan file, servicers often added to the file documents related to the loan's servicing history, such as borrower communications, notices of missed payments, bankruptcies, and foreclosures.

### 6. The purpose, procedure, and scope of the re-underwriting review.

#### 6.1 Purpose: testing the accuracy of representations in the offering documents.

64. Consistent with the fundamental, industry-wide understanding that the loans backing RMBS were originated in compliance with applicable underwriting guidelines, the prospectus supplements for each of the 38 RMBS at issue made representations that: (1) the loans in the pools were originated generally in compliance with the applicable underwriting guidelines; and (2) any deviations or exceptions from the applicable underwriting guidelines were supported by compensating factors. For the reasons explained above, these qualitative representations were material to an assessment of the credit risk associated with the loans backing the RMBS. Appendix 2 to this report sets out the relevant language from the prospectus supplements for each of the RMBS at issue.

65. The actual underwriting guidelines referenced in the prospectus supplements themselves stressed the importance of originating loans in accordance with the guidelines.

HIGHLY CONFIDENTIAL

████████ █████████████████████████████████████████████████

████████████████████████████████████████████ ██████████████████████

███████████████████████   In sum, the guidelines made it clear that they were not merely recommendations or advisory—they were meant to be followed.

66.     The prospectus supplements for each of the RMBS at issue also contained detailed quantitative information about various characteristics of the loans in the loan pools that are material to an assessment of credit risk, such as FICO, LTV/CLTV, DTI, property occupancy type (e.g., primary residence vs. investment property), and documentation type. This data was contained within collateral tables that listed, for example, the weighted-average values of these characteristics for specific SLGs; the distribution of loans across various stratifications within a particular category (e.g., the number of loans with an LTV between 80 and 90, 90 and 95, 95 and 100, etc.); and the actual number of loans falling into a particular category (e.g., documentation type and occupancy type).[46] The data found in a prospectus supplement's collateral tables came from a detailed, loan-level spreadsheet commonly referred to as the securitization loan tape or Mortgage Loan Schedule ("MLS").

67.     To test the accuracy of both the qualitative and quantitative representations material to an assessment of credit risk, NCUA hired a statistician—Dr. Charles Cowan—to select a random sample of loans from each of the 45 relevant SLGs in the 38 RMBS at issue that collateralized the

---



[43] ████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████

██ ██ ███ █████ ████ ██████ ██████ █████ █████ ██████ ██████

██████████████████████████████████

[46] *See, e.g.*, HVMLT 2006-9 Prospectus Supplement, at S-27 – S-60; WMLT 2006-ALT1 Prospectus Supplement, at Annex I, I-1 – I-9; NHELI 2007-1 Prospectus Supplement, at S-54 – S-101.

HIGHLY CONFIDENTIAL

specific Certificates purchased by the liquidated corporate credit unions. My understanding is that each sample was designed so that it would be representative of all the loans in the SLGs from which it was drawn. After these samples were drawn, counsel for NCUA then tried to obtain the loan files for, and underwriting guidelines applicable to, each Sampled Loan. My team then performed a full re-underwriting of each Sampled Loan for which a loan file was obtained and matched to the applicable underwriting guidelines.

### 6.2    The re-underwriting process.

68.    **My team.** My re-underwriting team consisted of a group of re-underwriters from Opus Capital Markets LLC, a group of quality control specialists from the Barrent Group, three independent re-underwriting contractors affiliated with ButlerBank Consulting, and me. I have worked with Opus and the Barrent Group on multiple occasions over the past six years, and they are two of the most highly regarded, industry-leading firms for providing quality re-underwriting and due diligence work. Before starting this re-underwriting review, I met personally with the staff at both firms, reviewed their professional qualifications, and provided detailed instruction and training related to this project. I have worked closely with each of my independent contractors for many years, and I am likewise very comfortable with their qualifications and training.

69.    I served as the leader of this re-underwriting team and actively oversaw and managed all aspects of the re-underwriting project from start to finish. I made on-site visits to both Opus and the Barrent Group during the course of the project, and I communicated with them on the phone at least once a week—sometimes more often—to review their progress and provide guidance. On the more detail-oriented aspects of the re-underwriting project, I communicated with members of my team by email on a near daily basis, and often multiple times each day during periods of heavy activity. I feel very confident in the quality and accuracy of the work that the team has done under my leadership and supervision.

HIGHLY CONFIDENTIAL

70.    **Guideline matching.** The first step in our re-underwriting review was to identify the loan files for the Sampled Loans and the applicable underwriting guidelines that would be used in the re-underwriting. My understanding is that, to account for potential problems in locating certain loan files or underwriting guidelines, Dr. Cowan drew a random sample of 200 loans from each relevant population of loans, even though a sample of roughly 90-100 loans would be sufficient to reach the level of statistical significance desired for purposes of extrapolating my findings. As loan files and guidelines were produced by various third parties to NCUA, we identified those loan files corresponding to the initial 100 loans in the random sample. Once we had roughly the desired number of loans in the appropriate random sample order, we began the second step of matching loan files to the applicable underwriting guidelines.

71.    In identifying the applicable underwriting guidelines, we generally used the following methodology, subject to common-sense adjustments based on the availability of certain documents. First, we identified the originator, channel, and the loan program type for each Sampled Loan so that we would know which guidelines to look for. We also reviewed the language in the relevant prospectus supplement to see whether it made any representations about which underwriting guidelines were applicable to the loans (sometimes loans were represented to be underwritten to the sponsor's, rather than the originator's, guidelines).

72.    Second, we identified the date appearing on the earliest credit report located in the loan file, and used that date as the presumptive "as of" date for the applicable guideline, but only if it preceded the date on the loan's promissory note by 30 to 90 days (the assumption being that, when the first credit report is pulled following an application, the underwriter has chosen a program that the application will be underwritten to). If the date of the earliest credit report did not precede the date on the promissory note by 30 to 90 days, or if no credit report was available, then we used the date preceding the mortgage note by 30 days as the presumptive "as of" date for the applicable

guideline. If, for some reason, we were only able to identify a guideline with an "as of" date shortly before or after our target date, we looked for other indicia that the guideline was the one actually used for underwriting, including by examining in detail the underwriting-related portions of the loan file, examining our database of all available guidelines for a particular originator, and relying on the team's broad-based knowledge of the mortgage industry during the relevant time period. We then matched each Sampled Loan to the applicable underwriting guideline by searching the large database of underwriting guidelines that had been produced by Defendants and third parties.

73.     **Loan substitution.** For various reasons, we were not always able to re-underwrite the initial 100 loans in Dr. Cowan's random samples, but were instead forced to resort to loans in the supplemental 100-loan sample to reach the desired number of re-underwritten loans. After consultation with Dr. Cowan to ensure that our substitution methodology preserved the randomness and representativeness of his samples, we generally substituted Sampled Loans in the following circumstances: (1) NCUA's counsel did not receive the loan file for the Sampled Loan despite seeking it in discovery; (2) NCUA's counsel received what appeared to be only a partial or incomplete version of the loan file for the Sampled Loan (our rough guide was a loan file with fewer than 100 pages), with numerous critical documents missing; (3) we could not determine, based on the available information, the loan's product type or channel, and thus could not identify applicable underwriting guidelines; or (4) we could not re-underwrite a Sampled Loan because the applicable underwriting guidelines were not available, whether for a particular originator, a particular product type, or a particular date range.

74.     In these instances, we removed a Sampled Loan from our re-underwriting queue and replaced it with the next loan in the random sample order, consistent with Dr. Cowan's instructions on the appropriate order for substitution. We continued this process until we got to Dr. Cowan's

HIGHLY CONFIDENTIAL

desired sample size of 90-100 loans that could be re-underwritten.[47] For each sampled SLG, Table 2 below lists the number of loans we ultimately re-underwrote and the number of loans that had to be substituted to get to our number of re-underwritten loans.

**TABLE 2**

**(Number of Substituted Loans)**

| RMBS (SLG) | Loans Re-underwritten | Loans Substituted |
|---|---|---|
| AHMA 2007-3 (Grp 1-2) | 100 | 5 |
| FFML 2005-FFH4 | 100 | 0 |
| FFML 2006-FF16 (All) | 100 | 0 |
| FFML 2006-FF16 (Grp 2) | 100 | 0 |
| FHLT 2006-3 | 100 | 1 |
| FHLT 2006-D (All) | 100 | 0 |
| FHLT 2006-D (Grp 2) | 100 | 1 |
| GMACM 2006-HE5 | 78 | 50 |
| HVMLT 2006-10 | 100 | 82 |
| HVMLT 2006-11 | 100 | 0 |
| HVMLT 2006-12 | 100 | 0 |
| HVMLT 2006-14 | 96 | 15 |
| HVMLT 2006-6 (Grp 2) | 93 | 8 |
| HVMLT 2006-6 (Grp 3) | 95 | 15 |

---

[47] For two of the RMBS at issue—GMAC 2006-HE5 (78 loans) and SAST 2006-3 (87 loans)—we were ultimately not able to obtain and re-underwrite the roughly 90-100 loan we initially intended. In both securitizations, there were a number of loans that passed our initial 100-page test for a potentially incomplete file, but we subsequently discovered during the re-underwriting process that all of most the relevant credit package was missing. Consistent with the conservative approach described in this report, we chose not to re-underwrite those loans, rather than deeming them Materially Misrepresented. Due to the timing of third-party productions in relation to the August 14 disclosure deadline, as well as certain parties' inability to locate and produce Sampled Loans, we either did not have the time or the loan files necessary to substitute loans from the back-up sample for additional re-underwriting. My understanding is that these slightly lower sample sizes have no material impact on the extrapolation margin of error that Dr. Cowan was aiming for with his sample design.

HIGHLY CONFIDENTIAL

**TABLE 2**

**(Number of Substituted Loans)**

| RMBS (SLG) | Loans Re-underwritten | Loans Substituted |
|---|---|---|
| HVMLT 2006-8 | 100 | 51 |
| HVMLT 2006-9 | 100 | 0 |
| HVMLT 2006-SB1 | 100 | 35 |
| HVMLT 2007-1 (All) | 99 | 1 |
| HVMLT 2007-1 (Grp 2) | 100 | 0 |
| HVMLT 2007-2 | 99 | 52 |
| HVMLT 2007-3 | 100 | 22 |
| HVMLT 2007-4 | 99 | 51 |
| HVMLT 2007-5 | 100 | 0 |
| INDX 2006-AR35 | 98 | 2 |
| INDX 2006-AR6 | 100 | 6 |
| LBMLT 2006-2 | 97 | 3 |
| LBMLT 2006-8 | 96 | 4 |
| LUM 2006-2 | 100 | 8 |
| LUM 2007-1 (Grp 1) | 97 | 19 |
| MHL 2006-1 (Grp 2) | 100 | 0 |
| MHL 2006-1 (Grp 1-A2) | 100 | 0 |
| NAA 2006-AR4 | 96 | 4 |
| NHEL 2006-5 (All) | 100 | 99 |
| NHEL 2006-5 (Grp 2) | 95 | 105 |
| NHELI 2007-1 (Grp 1) | 98 | 2 |
| NHELI 2007-1 (Grp 2) | 100 | 11 |
| OOMLT 2007-2 | 100 | 9 |
| RFMS2 2007-HSA2 | 96 | 4 |
| SAST 2006-3 | 87 | 21 |
| SVHE 2005-OPT4 | 100 | 2 |
| SVHE 2006-WF1 | 99 | 1 |
| SVHE 2006-WF2 | 99 | 8 |
| SVHE 2007-OPT1 | 99 | 10 |

HIGHLY CONFIDENTIAL

**TABLE 2**

**(Number of Substituted Loans)**

| RMBS (SLG) | Loans Re-underwritten | Loans Substituted |
|---|---|---|
| WMLT 2006-ALT1 | 100 | 0 |
| WMLT 2006-AMN1 | 97 | 3 |
| **TOTAL** | **4,413** | **710** |

75.     **Stipulation process.** After identifying the correct loan file for each Sampled Loan and the underwriting guidelines applicable to that loan, we provided a spreadsheet to NCUA's counsel listing the bates-ranges of the relevant documents so that they could forward those spreadsheets to opposing counsel in the form of a requested stipulation. My understanding is that, by order of the Courts, Defendants were required to respond to NCUA's proposed stipulations on the best available versions of the loan files and the applicable underwriting guidelines by either agreeing to NCUA's proposals, or disagreeing and specifically identifying alternative proposals that their experts believed were more appropriate. When we received stipulation responses from the Defendants, we reviewed them, and assessed whether any of the counterproposals were in fact more appropriate. We then replied accordingly, standing on our original proposals, updating our proposals, or agreeing to Defendants' counterproposals.

76.     **Re-underwriting workflow.** After identifying the correct loan files and applicable underwriting guidelines for a sample from a particular SLG, we developed a review plan specific to that SLG. Review plans were tied to the nuances of the applicable underwriting guidelines, the representations about underwriting found in the relevant prospectus supplements, and, where underwriting guidelines were silent on some aspect of underwriting, industry-standard underwriting practices for evaluating borrower ability to repay and the sufficiency of collateral. I personally

HIGHLY CONFIDENTIAL

approved each review plan. We then began the first-level re-underwriting review, which was spearheaded by Opus re-underwriters under my supervision.

77.     As Opus completed its re-underwriting review for a sample from a particular SLG, the preliminary findings went through Opus's internal quality control ("QC") and audit process before being delivered to me. I then put Opus's preliminary findings through my own QC process, which was spearheaded by my independent contractors, with support from senior quality control members from the Barrent Group working at my direction.

78.     My QC process had several layers. First, a randomly selected 10% of loans re-underwritten by Opus were re-underwritten from scratch again by my QC staff, who left detailed comments and feedback for me on their findings. Second, my QC staff looked through all of Opus's preliminary findings to ensure clarity, internal consistency, and proper reliance on supporting documents. Third, I reviewed and checked the work of my QC staff, including by reviewing relevant loan files, and gave feedback on how I wanted certain issues dealt with and resolved. Fourth, my comments and those of my QC staff were sent to Opus with feedback and instructions to make changes to preliminary findings or resolve any inconsistencies, as necessary.

79.     Next, based on my comments and guidance, my QC staff re-underwrote from scratch another 10% of the loans, this time focusing on loans with findings that I believed materially increased credit risk. After further input and comments from me based on this additional full re-underwriting, Opus received the comprehensive list again with instructions to make any necessary changes. At the end of that process, I re-reviewed all Sampled Loans that I flagged as potentially material and made a loan-by-loan determination whether the combined exceptions, taking into account legitimate and documented compensating factors, made the actual credit risk associated with each loan materially greater than what was represented in the prospectus supplement/MLS. For

those Sampled Loans that crossed the materiality threshold, my team then finalized the findings, which appear in Appendix 1 to this report.

### 6.3 Scope of review: material guideline violations and quantitative misrepresentations.

80. The principal focus of my team's re-underwriting review was whether the Sampled Loans were originated in compliance with applicable underwriting guidelines and, where guidelines were silent, industry-standard underwriting practices. We did not separately verify compliance with legal requirements (e.g., anti-predatory lending laws, Truth in Lending Act, etc.) or compliance with the Uniform Standards of Professional Appraisal Practice ("USPAP"), and did not obtain retrospective valuations of the collateral. In the course of re-underwriting each Sampled Loan, we also reviewed the corresponding data for that loan in the securitization's MLS, which was used to generate the collateral tables in the prospectus supplements and to create ratings and credit enhancement levels for the various certificates for each RMBS.[48]

81. To assess compliance with applicable underwriting guidelines, we performed a detailed review and analysis of the loan file for each Sampled Loan, page by page, as well as a

---

[48] During the relevant time-period, it was industry standard practice for originators of loans that were being securitized to make representations and warranties that the data in the MLS was complete and accurate. *See, e.g.*, SVHE 2005-OPT4 MLPA, RBS-NCUA08959387, at 396 ("The information set forth on each Schedule is true and correct in all material respects as of the Cut-off Date or such other date as may be indicated in such schedule."); FFML 2005-FFH4 MLPA, RBS-NCUA14268923, at p. 5 of native ("The information set forth in the mortgage loan schedule delivered to the Seller by the Originator is complete, true and correct as of the Cut-off Date."); FHLT 2006-D MLPA, RBS-NCUA 01335763, at 782 ("The information set forth in the Mortgage Loan Schedule is complete, true, and correct in all material respects as of the Cut-off Date."). The Offering Documents for the RMBS at issue likewise represented, implicitly if not explicitly, that the data in the securitization loan tapes was complete and accurate by assuring investors that such representations and warranties had been made. *See, e.g.*, FFMLT 2006-FF16 Base Prospectus, at 65-66 ("Each seller will have made representations and warranties in respect of the loans sold by that seller … [including that] [t]he information set forth in the mortgage loan schedule provided by the seller is true and correct in all material respects and the information provided to the Rating Agencies, including the mortgage loan level detail, is true and correct according to the Rating Agency requirements.").

detailed review and analysis of the applicable underwriting guidelines. As we performed the initial re-underwriting review, we noted all potential violations of the applicable underwriting guidelines and MLS discrepancies. Where the applicable underwriting guidelines did not specifically address a particular aspect of underwriting, I relied on my knowledge of industry-standard underwriting practices (the Five Cs of Credit) to determine whether some element of the loan cast doubt on the borrower's ability to repay or the sufficiency of the collateral—as should have been done by the original underwriter.[49] Where the applicable underwriting guidelines did specifically address a component of underwriting, I always deferred to the guidelines.

82.    Once all preliminary findings had been documented, I personally reviewed all of those findings for each loan and made a preliminary determination about the impact those findings had on credit risk. I then revisited those preliminary determinations after the Sampled Loans went through additional QC. If, after reviewing all of the findings and any supporting documentation, I felt that a loan violated the applicable guidelines in a way that materially increased the credit risk

---

[49] My approach was consistent with both the way that originators described their own underwriting practices, and the way that Defendants' Offering Documents described the originators' underwriting practices. *See, e.g.* HVMLT 2007-5 Base Prospectus, at 62 ("Each seller will represent and warrant that all the loans that it originated and/or sold … will have been underwritten generally in accordance with standards consistent with those utilized by institutional lenders generally during the period of origination for similar types of loans."); Prospectus Supplement, at S-29 – S-30 ("American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file … . Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision."); FFML 2005-FFH4 MLPA, RBS-NCUA14268923, at 8 ("The origination, servicing and collection practices used by the Originator and any servicer of the Mortgage Loan … have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing industry."); NHEL 2006-5 MLPA, NMI00000001, at 26 ("The [underwriting] methodology employed objective criteria such as the borrower's income, assets and liabilities, to the proposed mortgage payment and, based on such methodology, the mortgage loan's originator made a reasonable determination that at the time of origination the borrower had the ability to make timely payments on the mortgage loan.");

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
█████████████████████████████████████████

permissible under those guidelines, or if the marginal impact of a quantitative misrepresentation was to materially increase the credit risk associated with the loan, I deemed a loan to be Materially Misrepresented. In making that determination, I used a conservative approach that took into account all documented compensating factors and gave the original underwriter the benefit of the doubt on any "close calls."

83.      When looking at quantitative misrepresentations of loan characteristics in the MLS, we utilized all available evidence—including audit credit reports, post-closing bankruptcy filings, property tax records, etc.—even if that evidence was not available to the original underwriter of the loan at the time of origination. We combined this evidence with evidence from the loan file itself to recalculate the various loan characteristics. For example, if we discovered that a borrower had undisclosed debt at the time of the original underwriting, we recalculated the DTI including the undisclosed debt. If we discovered that a borrower listed as taking out a loan on a primary residence actually used the property as a second home or investment property, we noted the correct loan type in our breach findings.

### 7.      Overall conservative approach to re-underwriting.

84.      Overall, I took a very conservative approach to identifying violations of underwriting guidelines and to evaluating whether those violations materially increased credit risk, as explained in the paragraphs below.

85.      **Short files.** We generally avoided re-underwriting loan files that appeared to be missing a significant number of documents, which would have triggered a large number of missing document breaches. Most loan files are at least several hundred pages long. When identifying the correct loan files corresponding to NCUA's Sampled Loans, we flagged loans with fewer than 100 pages as potential "short files"—i.e., files for which completeness and document integrity might be questioned. If, upon further review, it appeared that all or a majority of the borrower's "credit

package" was not in the loan file (e.g., credit report, income, asset, and employment documentation), and it was the kind of loan for which you would expect to see the entire credit package, I instructed our re-underwriting team to forgo a full review and the many missing document (and other) breaches it would surely yield, and to instead substitute a different loan from the supplemental portion of the random sample. Had we not taken this conservative approach, every substituted short file would have necessarily been deemed Materially Misrepresented because the loan file would not contain evidence of the borrower's ability to repay or that the borrower satisfied the applicable underwriting criteria for ability to repay.

86.     **Fraudulent loans.** To detect instances of fraud, I instructed my re-underwriting team to use all available information and resources, including post-closing information that was not available to the original underwriter. For example, we reviewed post-closing audit credit reports, bankruptcy filings, and servicing records for evidence of borrower or originator fraud. However, in order to be conservative and give the original underwriter the benefit of the doubt, I also instructed my team not to use such post-closing evidence as a basis to claim violation of underwriting guidelines unless there was a "red flag" in the loan file that should have prompted the original underwriter to investigate the potential fraud.

87.     Instead, my re-underwriting team would note what impact, if any, the fraud had on the accuracy of the loan's quantitative characteristics disclosed in the prospectus supplement or MLS. If that was the only finding associated with a Sampled Loan, I would then analyze whether the marginal impact of that quantitative misrepresentation resulted in a material increase in the credit risk associated with that Sampled Loan, taking into account whether the true quantitative characteristics of the loan would have taken it outside the parameters of the applicable underwriting guidelines.

HIGHLY CONFIDENTIAL

88.     For example, if an audit credit report revealed that, at the time of origination, the borrower failed to disclose a recently opened revolving line of credit (e.g., a credit card), my team would look for evidence in the loan file that should have put the original underwriter on notice of the potential undisclosed debt, such as a recent credit inquiry on the borrower's credit report that the original underwriter failed to investigate or obtain a letter of explanation (LOE) for. If there was such a red flag that should have triggered inquiry, we would identify that as a violation of underwriting guidelines or industry-standard underwriting practice. But I would generally not consider that finding to be a breach of underwriting guidelines that, standing alone, would increase the loan's credit risk sufficiently to label it Materially Misrepresented. That finding in conjunction with others, however, could be used to deem a loan Materially Misrepresented.

89.     As another example, if a tax return submitted to the servicer in loss mitigation revealed that the borrower had misrepresented his income on a stated income loan, we would take a similar approach to determine whether any red flags in the loan file should have alerted the original underwriter of the misrepresentation—e.g., the borrower's stated income was unreasonable for the listed occupation and there was no evidence that the underwriter performed any sort of reasonableness test. If there were no such red flags, my team would not issue a finding for an underwriting guideline violation, but would recalculate the borrower's true DTI at the time of loan origination. I would then review the true DTI, compare it to the misrepresented DTI, and weigh the magnitude of the disparity in light of factors such as whether the true DTI was still within applicable guideline parameters. If the misrepresented DTI was the only finding for a Sampled Loan, I would determine whether the marginal impact of the misrepresented DTI materially increased the credit risk associated with the loan.

90.     Consistent with my overall conservative approach, if a Sampled Loan had only a finding of misrepresented DTI, and the true DTI was still within applicable guideline parameters, I

HIGHLY CONFIDENTIAL

generally deemed the loan to be Materially Misrepresented only if the DTI discrepancy was roughly 10 or more percentage points. I used the same rough guide of 10 percentage points for LTV/CLTV misrepresentations that were still within guidelines, and a rough guide of 25 points for FICO misrepresentations within guidelines. For any misrepresentations where the true loan characteristics were outside of applicable guideline parameters but not significant standing alone, my opinion on materiality was influenced by the presence or absence of potential compensating factors, as described below.

91.    **Compensating factors.** Generally, one of four situations will arise when a loan was issued outside the applicable underwriting guidelines: (1) the underwriter did not identify potential compensating factors and the loan file does not contain documents validating the existence of potential compensating factors; (2) the underwriter did not identify potential compensating factors, but the loan file contains documents validating the existence of one or more potential compensating factors; (3) the underwriter identified potential compensating factors, but the loan file does not contain documents validating the existence of those potential compensating factors (e.g., stated assets used as a potential compensating factor); and (4) the underwriter identified potential compensating factors, and the documents in the loan file validate the existence of the identified potential compensating factors.

92.    According to industry-standard underwriting practices for loans with deviations from prescribed guideline parameters, the original underwriter should have identified the compensating factors relied on to approve the loan. During the course of their review, I instructed my team to look for and identify potential compensating factors on loans where exceptions were specifically approved and certain compensating factors were specifically cited. However, in the course of issuing my opinion on loans that were Materially Misrepresented, I did not limit myself to considering only

those compensating factors identified in the loan file; rather, I considered all valid and supported potential compensating factors.

93.     While some underwriting guidelines specifically enumerate permissible compensating factors, there are also industry-standard practices for what compensating factors may potentially be used to support exceptions (e.g., low LTV, low DTI, high verified reserves). In an effort to be conservative and give the original underwriter the benefit of the doubt in approving exception loans, I considered as potentially compensating both the factors enumerated in the applicable guidelines, and, to the extent they were broader, the factors considered potentially compensating in the industry (unless specifically prohibited by the guidelines). In other words, with respect to compensating factors, I was consistent in my general approach of using industry-standard underwriting practices to fill in gaps not specifically addressed by certain underwriting guidelines—even if that approach led to fewer Materially Misrepresented loans.

94.     For example, I would generally consider the following as potential compensating factors, whether the original underwriter did so or not, and whether the guidelines specifically permitted them or not (except where expressly prohibited): LTV/CLTV at least 10% points below guideline maximum (unless the appraisal is suspect); DTI at least 5% points below guideline maximum (unless income is stated);[50] FICO score at least 25 points above guideline minimum (excluding unauthorized user accounts); verified reserves at least two months above guideline minimum; and at least one year of documented timely housing payments. That is not to suggest that these potential compensating factors were in fact compensating (standing alone, each of them likely would not be), but I wanted to have the benefit of these data-points in considering whether there were any legitimate compensating factors offsetting the increased credit risk associated with

---

[50] Where the maximum guideline DTI was 50 percent or greater, a loan's DTI would generally have to be more than 5 percentage points below that maximum to be considered compensating because a DTI above 40 still presents significant credit risk.

guideline violations. I ultimately made the decision on whether the potential compensating factors documented in a Sampled Loan justified the deviations from guideline parameters. If they did not, and the guideline deviations materially increased the credit risk associated with a loan, only then did I deem a loan to be Materially Misrepresented.

95.     **Stated income.** Reasonable, industry-standard underwriting practices require an underwriter to assess the reasonableness of the stated income to determine the borrower's ability to repay the loan in light of the information provided by the borrower—a requirement documented in all or virtually all underwriting guidelines for stated income loans. Here, too, I took a conservative approach. I instructed my team to follow specific guideline instructions when they were provided, but in the absence of specific instructions, to find a stated income unreasonable only if all three of the following were true: (1) the borrower was not self-employed; (2) there was no valid reasonableness test documented in the origination file that verified the reasonableness of the borrower's stated income; and (3) the borrower's stated income was above the 90th percentile provided by the Bureau of Labor Statistics ("BLS") for the borrower's occupation, position, and geographic location, as reflected on the original verification of employment (verbal or written "VOE") or stated on the final application or "1003," and retroactive to the year of income tested. If the borrower's occupation matched multiple BLS occupations, I instructed my team to use the relevant BLS occupation with the highest salary. This conservative approach invariably led to fewer findings of unreasonable stated income than should have been determined by the original underwriter under normal circumstances—and thus to fewer Materially Misrepresented loans.

96.     **Compliance violations.** Both industry-standard underwriting practices and most underwriting guidelines require a loan to comply with all applicable laws and regulations. While I have typically found significant compliance violations in previous re-underwriting reviews, and such violations may properly be designated as material exceptions to the applicable underwriting

HIGHLY CONFIDENTIAL

guidelines, I did not identify compliance violations as exceptions. Instead, taking a conservative approach, I tried to narrow the focus of the review to exceptions that are more directly tied to the credit risk associated with a loan—exceptions that bear on the borrower's ability to repay and the sufficiency of the collateral. This decision, too, invariably led to fewer Materially Misrepresented loans.

97.     **Appraisal/Valuation reviews.** Consistent with industry-standard practice, the prospectus supplements for the RMBS at issue represented that the collateral properties for the loans backing them had been appraised using USPAP compliant appraisals.[51] In my other re-underwriting projects, I have occasionally evaluated appraisals for USPAP compliance or, in conjunction with other experts, tested the reasonableness of appraised values using Automated Valuation Models ("AVMs"). For this project, I focused our efforts on underwriting guideline compliance and borrower ability to repay, and have identified only those appraisal-related breaches that should have been apparent to any reasonable underwriter. Our review of appraisals was generally limited to the following: whether an appraisal was in the loan file; whether the appraiser was licensed; whether the comparable properties used to support the appraised value were properly documented (e.g., whether they were identified and accompanied by photographs); and whether any appraisal conditions or contingencies were satisfied before closing (e.g., remediation, inspection, completion of repairs or construction). We did not use AVMs or any other tools to test the reasonableness of appraised values. Again, that decision, consistent with my overall conservative approach, invariably led to fewer Materially Misrepresented loans.

---

[51] *See, e.g.*, SVHE 2007-OPT1 Prospectus Supplement, at S-73 ("All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac."); NAAC 2006-AR4 Prospectus Supplement, at S-49 (same).

HIGHLY CONFIDENTIAL

**8.      Summary of our re-underwriting review.**

98.      Our re-underwriting review focused heavily on the credit component of the lending decision, where we analyzed whether the loan adhered to the applicable underwriting guidelines and, where guidelines were silent, industry-standing lending practices with regard to borrower ability and willingness to repay the loan. To a lesser extent, the review also focused on collateral issues related to appraisals and owner-occupancy. Our re-underwriting review included the following components, among others:

- Review of employment verification documentation found in the loan file to confirm employment represented in the application and to determine whether the borrower met employment stability and documentation requirements.

- Review of the application and all supporting documentation to determine the accuracy of the information and to expose any discrepancies or "red flags."

- Review of any successive loan applications found in the loan file to expose any discrepancies or red flags.

- Review of the credit report found in the loan file and comparison of the content of that report to information in the borrower's application to evaluate the borrower's ability and willingness to repay debt.

- Review of bankruptcy filings by the borrower and comparison of such filings to information in the loan file to evaluate the borrower's ability and willingness to repay debt.

- Recalculation of LTV and CLTV ratios using information in the loan origination file.

- In the case of stated income loans for non-self-employed borrowers, consideration of the following factors in assessing the reasonableness of the income stated by the borrower: (1) credit profile; (2) type of employment; (3) length of employment; (4) housing expenses; (5) assets; (6) geographic location of employment; (7) education level; and (8) information obtained from the BLS.

- In the case of stated income loans for self-employed borrowers, comparison of stated information to the borrower's credit profile and other information contained in the loan origination file.

HIGHLY CONFIDENTIAL

- To determine whether requirements set forth in the underwriting guidelines had been observed, as well as to test the accuracy of loan characteristics in the prospectus supplements and MLSs, recalculation of the borrower's DTI ratio using figures for debt and income supported by information contained in the loan origination file or obtained from third-party sources.

- Calculation of the borrower's available assets using information the originator knew or should have known at the time of origination.

- Review of the loan origination file for any red flags indicating fraud that would require further investigation or raise questions about the validity of any documentation.

- Review of the loan origination file and third-party sources, along with occupancy requirements in the note and mortgage documents, to determine if there were any misrepresentations as to the occupancy status of the subject property.

- Determination of whether the property was subject to additional liens and mortgages that were not noted in the loan application or loan origination file.

- Review of the title report for judgments or other liens that may have existed at time of origination, and determination of the validity and priority of any liens.

- Review of the appraisal in the loan origination file to determine whether it was valid and reliable on its face.

99.     Our review was guided by the applicable underwriting guidelines: in instances where the applicable guidelines provided specific instructions or prohibited certain actions or the consideration of certain factors, we always deferred to the applicable underwriting guidelines. Where the applicable underwriting guidelines did not specifically address certain aspects of re-underwriting that are customary to take into account when making lending decisions, we used conservative, industry-standard practices for reasonable underwriters during the 2005-2007 period.

### 8.1     Evaluation of borrower ability to repay.

100.     The prospectus supplements for all of the RMBS at issue made representations that the underwriting guidelines applicable to the loans in the loans pools were designed or intended to

HIGHLY CONFIDENTIAL

evaluate a borrower's ability to repay the loan.[52] Consistently, the underwriting guidelines for all originators of the Sampled Loans (the "Originators")[53] contained directions and requirements for evaluating a borrower's ability to repay a loan. Conducting such an evaluation was important since a borrower's monthly payments are an originator's primary source of repayment for a loan.



101.    To evaluate a borrower's ability and willingness to repay a loan, an underwriter should investigate any red flags suggesting that the borrower does not have the ability to repay the

---

[52]  *See, e.g.*, NAAC 2006-AR4 Prospectus Supplement, at S-49 ("FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral."); WMLT 2006-ALT1 Prospectus Supplement at S-34 ("National City Mortgage's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."); HVMLT 2006-12 Prospectus Supplement at S-68 ("Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral."). Appendix 2 attached to this report has a listing of similar representations in the Offering Documents of all 38 RMBS at issue.

[53] Appendix 3 to this report identifies all those Originators that were specifically disclosed in the prospectus supplements for the RMBS at issue.

[54]

loan, in addition to requiring borrower representations and/or documentation regarding a borrower's income, employment, and assets. Additionally, an underwriter should ensure that the loan benefits the borrower and that any payment shock from the borrower's previous housing payments will not negatively affect the borrower's repayment ability.

102.    **Red flags.** According to industry-standard underwriting practices, a reasonable underwriter should be alert to the possibility that a borrower may misrepresent information on the loan application in order to increase the chances of obtaining a mortgage. For instance, a borrower who earns insufficient income to obtain a mortgage might apply for a stated income mortgage with an inflated income figure. Or, a borrower seeking a mortgage loan for an investment property might state on the mortgage application that he planned to reside in the property in order to take advantage of the reduced rates and fees charged for loans on owner-occupied properties due to the lower credit risk associated with them.[56]

103.    The use of a generic job title, a lack of credit history, discrepancies in the loan application, and handwritten pay stubs are examples of red flags that should be taken as signs that an unqualified borrower may have misrepresented information on the loan application. A borrower's misrepresentations about his employment, income, debt obligations, and/or the property's occupancy status are particularly damaging because those characteristics are critical in determining whether the borrower is able and willing to repay the mortgage. Simply put, misrepresentations about these characteristics result in a lender's inability to rely on accurate data to determine borrower eligibility and the resulting credit risk of a loan.

---

[56] The Offering Documents for the RMBS at issue made representations about the Originators' underwriting practices that were consistent with the obligation to investigate potential red flags. *See, e.g.,* MHL 2006-1 Prospectus Supplement, at S-64 ("MortgageIT's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. Because each loan is different, MortgageIT expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.").

104.    A number of the Originators' guidelines specifically addressed the investigation of red flags.



105.    **Payment shock.** Payment shock refers to the increase in the borrower's housing obligation from the borrower's previous mortgage or rent payment. Payment shock should be calculated when (1) the borrower purchased a home for the first time; (2) the borrower, while paying one mortgage, purchased a new and more expensive home imposing a larger mortgage obligation; or (3) the borrower took out a second mortgage on the same home.



HIGHLY CONFIDENTIAL

106. According to industry-standard underwriting practice, a reasonable underwriter should analyze whether the borrower can afford to pay the post-shock monthly obligation. The underwriter should do so by calculating the payment shock to the borrower and scrutinizing the borrower's overall financial circumstances in light of the payment increase. While factors in the borrower's application may lead the underwriter to reasonably conclude that the borrower is capable of meeting the new, increased mortgage obligation, all else being equal, a greater payment shock correlates with a greater risk that the borrower will not be able to make payments and will, in turn, default on the mortgage.

107. Many Originators' underwriting guidelines explicitly required underwriters to consider payment shock. For example, 



108.

Some Originators imposed a guideline maximum payment shock of 100% for

---

[62]

first time homebuyers applying through a no documentation program.[64] Others similarly cautioned that █████████████████████████████████████████████████████████████████████████████████████████████████████

109.    **Benefit to the borrower.** A refinance mortgage that did not offer a benefit to the borrower was riskier than a mortgage that did because a borrower who had received no benefit from the refinancing was more likely to stop making payments. A lack of borrower benefit is also a red flag for potential predatory lending. Thus, for refinance mortgages, it was industry-standard practice during the 2005-2007 period to require that every loan provide a benefit to the borrower. The benefit to the borrower could take many forms, such as a reduced monthly mortgage payment, a lower interest rate, or a cash payment made to the borrower for use on home improvements. The benefit that the mortgage provided to the borrower stood as proof that the lender did not originate the mortgage purely to obtain fees from the borrower or that the mortgage was not the result of predatory lending.

110.



---

[64] ████████████████████████████████████████████████████████████████████
████████████████████████

██████████████████████████████████████████████████████████████████████
███████

████████████████████████████████████████████████████████████████



111.    Other Originators either explicitly required a tangible or material benefit to the borrower or, conversely, prohibited loans that provided no economic benefit to the borrower.[68]



### 8.2    Evaluation of credit information and history.

112.    The prospectus supplements for the RMBS at issue contained representations about the specific types of credit information that was reviewed by underwriters to determine a borrower's ability to repay the mortgage loan.[70] Such information included, but was not limited to: (1) a loan application; (2) a credit report/history; (3) some or all of federal tax returns, paystubs, and W-2 forms; and (4) verifications of assets (or deposits).

---

[67] ████████████████████████████████████████████████████████
████
█ ████████████████████████████████████████████████████████
███████
█ █████████████████████████████████████████████████████████
████

[70] *See, e.g.*, SVHE 2006-WF2 Prospectus Supplement, at S-47 ("Under the full documentation program, loans to borrowers who are salaried employees generally must be supported by current employment information in the form of one current pay-stub with year-to-date information and W-2 tax forms for the last year (a complete verification of employment may be substituted for W-2 forms)."); HVMLT 2006-12 Prospectus Supplement, at S-68 (explaining that Countrywide's guidelines may require a borrower to submit "recent pay stub and/or W-2 forms for the most recent two years," or "their federal tax returns for the past two years").

113.    **Credit reports.** A credit report helps to establish a borrower's ability and willingness to repay a mortgage. It identifies a borrower's past and present creditors, lists any public records or filings or derogatory credit history, provides known addresses and other names (if any), confirms the borrower's Social Security number, and lists the borrower's credit score. A credit report may also verify other information the borrower included on his or her loan application. Owing to the importance of a borrower's credit report, each of the Originators' underwriting guidelines required a final credit report within a discrete period prior to the loan's closing, generally ranging between 60 and 90 days.[71] If an underwriter did not obtain a credit report pulled no more than 180 days before the funding date, then that would be a violation of reasonable, industry-standard underwriting practices, because a lot of adverse credit events can happen within 180 days that could significantly impact borrower ability to repay.

114.    One of the important and telling aspects of a borrower's credit report is the length and depth of his credit experience, which is why many Originator guidelines require a minimum number of credit or trade lines for a borrower, usually at least two or three.[72] What these trade lines represent is the borrower's previous credit experience and the fact that other creditors or lenders have experience with the borrower and, assuming the credit report lists satisfactory credit experience, that experience demonstrates the borrower's willingness and ability to repay debt.

115.    **Recent credit inquiries.** Credit reports identify recent credit inquiries that other entities have made regarding the borrower. Recent, unexplained credit inquiries prior to a mortgage

---

[71] ███████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[72] ████████████████████████████████████████████████ The Defendants' Offering Documents likewise described the use of trade lines in underwriting. *See, e.g.*, SVHE 2006-WF2 Prospectus Supplement at S-45 ("For purposes of determining credit level, if a borrower's credit report reports a credit score between 300 and 780 and there is credit appearing on the report, then Wells Fargo considers the credit score valid for purposes of determining the borrower's credit level. If there is no credit or 'trade-line' appearing on the report, then the credit score is not valid.").

loan's origination could cast doubt on the borrower's ability or willingness to repay the mortgage, as each inquiry represents the potential for new debt taken on by the borrower. A borrower's decision to take on debt obligations in addition to the mortgage may increase the borrower's DTI ratio to a prohibitively high level. For that reason, it was industry-standard underwriting practice for an underwriter to review and investigate any recent credit inquiries on a borrower's credit report before closing. That industry-standard practice was memorialized in many of the Originators' underwriting guidelines.

116.    By way of example,



Failing to investigate unexplained credit inquiries within 90 days of loan closing would be a violation of reasonable, industry-standard underwriting practices.

117.    **Loan applications.** According to reasonable, industry-standard underwriting practices, every borrower should have completed, and the loan file for every approved loan should have contained, a final loan application.

Other Originators simply required that borrowers include certain information in the loan application, thereby implying

that the application was a required document.[76] A loan application contained information the underwriter relied on in underwriting the loan and assessing a borrower's eligibility, including the requested loan amount, current and past employment, income, housing history, assets, and liabilities.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

118.    **Mortgage and rental history.** A borrower's history of making mortgage or rental payments sheds light on the borrower's willingness and capacity to pay the new mortgage, and assists in evaluating payment shock, which is discussed above. Consistent with industry-standard underwriting practices, an underwriter should have verified a borrower's housing history for the 12 months preceding the loan closing.[78] Accordingly, many Originators' underwriting guidelines required the borrower to provide documentation of previous mortgage or rental obligations and payments, typically for the previous 12 months.[79] For example, ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████  ██  ████████████████████████████████████████████

---

[76] ██████████████████████████████████████████████████████
██  ████  ██  ████████  ████████  ██████████  ████  ██████████  ████████  ████████
██████  ████  ██████████

[77] ██████████████████████████████████████████████

[78] Such verification could have come from the borrower's credit report, 12 months of canceled checks, or a letter from the borrower's landlord.

[79] ██████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████

[80] ██████████████████████████████████████████████



119. **Verification of assets.** Reasonable, industry-standard underwriting practices required underwriters to verify that a borrower had sufficient assets to cover, at a minimum, closing costs and the down payment. There were a number of reasons to verify assets. First, the borrower's assets, if sufficient, could help to establish the borrower's capacity to repay the mortgage. Second, because these assets were used as proceeds for a down payment, verification was necessary to confirm the borrower's ability to close on the loan. Also, where the underwriting guidelines required that the borrower demonstrate adequate payment reserves, verification of assets confirmed the borrower's short-term ability to meet the monthly mortgage obligation should any income be lost. Third, verification of assets helped to determine whether the borrower was using his or her own funds for the transaction, and not funds that were borrowed or gifted, either of which would call into question the borrower's ability to independently repay the mortgage. Finally, verification of the borrower's assets rooted out the problem of a "straw borrower"—an individual who obtained a mortgage on behalf of another person unable to qualify for the mortgage. Accordingly, with the

---

[81]

exception of reduced documentation loan programs that permitted income or assets to be stated, the Originators' underwriting guidelines required verification of the borrower's assets.

120.     The Originators' underwriting guidelines allowed multiple forms of documentation for the borrower to establish his or her assets, such as a "Verification of Deposit" ("VOD") form reflecting the borrower's current balance, or a copy of the current statement for the borrower's bank account or retirement accounts, such as a borrower's 401K or IRA.[84] In order to ensure that the borrower's verified assets were his or her own and not simply borrowed, certain Originators' guidelines required the borrower's assets to be "sourced," meaning the borrower had to establish where the assets came from and confirm that they did not come from a loan or some other special, unsustainable source.[85] Other Originators' guidelines required that the borrower's assets be "seasoned," meaning in the borrower's possession for a period of time, such as 30 or 60 days.[86] The Originators' sourcing and seasoning requirements ensured that the borrower's verified assets actually served as proof of repayment capacity.

### 8.3     Evaluation of employment and income information.

121.     **Full or reduced documentation loans.** The Originators' underwriting guidelines recognized the obvious significance of the borrower's income to the repayment of a mortgage loan.[87]



HIGHLY CONFIDENTIAL

Thus, when a prospective borrower applied for a mortgage under a program that required income or employment documentation, depending on the program, the guidelines generally required verification of one or both of income and employment status.[88] Under most guidelines, verifying the borrower's employment entailed checking the borrower's occupation, employer, position, and length of employment.[89] Verifying the borrower's income entailed establishing that the borrower received, and would continue to receive, a reliable stream of income sufficient to meet the mortgage obligation.[90] ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ ▆

122.    That a borrower has been employed in recent years, and is likely to remain employed in the foreseeable future, is the primary means of proving the borrower's capacity to repay a mortgage loan. Indeed, most borrowers rely on their employment status to prove their creditworthiness. Originators typically offered multiple programs under which the borrower could establish income and employment, including full documentation, reduced documentation, or related variations. Different guidelines for verifying income and employment applied to each of these documentation programs.



HIGHLY CONFIDENTIAL

123.    With respect to full documentation loan programs, Originators usually required a salaried employee to submit a current paycheck or pay stub, in combination with a W-2 statement from the previous year or years, tax returns, bank statements, or a written Verification of Employment ("VOE") form from the employer.[92] In the case of reduced or limited documentation programs, a salaried employee could generally submit bank statements from the previous 12 to 24 months, and the underwriter would obtain a verbal VOE from his or her employer as well.[93] Also, the Originators' guidelines usually required verification that the borrower remained employed until the date of the funding of the loan, by requiring, for example, that a final verification of employment be conducted within several days of the loan's closing.[94]

124.    Originators provided alternative means for self-employed borrowers to prove their income and employment. Self-employed individuals were required to prove the existence of their business with verification from a neutral third party, typically in the form of a business license, tax returns, or a CPA letter (meaning a letter from the borrower's accountant confirming the borrower's income and/or employment information).[95] Originators' guidelines for full-documentation programs generally required a self-employed borrower to provide some combination of current and consecutive bank statements, tax returns from the previous 12 or 24 months, and a year to date P&L



[92] *See, e.g.,* ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[93] *See, e.g.,* ████████████████████████████████████████████████████████████

[94] *Id.*

[95] *See, e.g.,* ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

statement.[96] Guidelines for alternative or reduced documentation programs generally required a self-employed borrower to provide bank statements, an IRS Form 1099 or Form 1040, or a profit and loss statement from the previous six or 12 months.[97]

125.   In addition, many Originators' guidelines, including those for Alt-A and subprime programs, generally required a borrower to show two years of steady employment and income.[98] Some Originators' guidelines emphasized the importance of the stability of the stream of income regardless of its source.[99]

126.   According to industry-standard underwriting practices for both full and reduced documentation programs, a reasonable underwriter should have verified a salaried borrower's employment for the 12 months preceding the loan application by, at a minimum, obtaining a verbal VOE or a written VOE signed by the borrower's employer certifying the borrower's date, place, and status of employment. To verify employment for a self-employed borrower, an underwriter was required, at a minimum, to review documentation establishing a borrower's self-employment. Under either a full or reduced documentation program, a self-employed borrower had to establish that his or her business had existed for 12 months, which could be done with a CPA letter, business license, or tax return from the previous year.[100]



127.   **Stated income loans.** Between 2005 and 2007, many lenders offered reduced documentation programs in which the borrower's income was stated on the loan application but not verified by the lender. Stated income mortgages were designed for borrowers who received sufficiently stable income to meet their monthly mortgage obligations but who lacked the documentation available to traditional wage earners. This category of borrowers included self-employed borrowers who operated a stable business, as well as borrowers who had seasonal income. Other borrowers who had multiple stable sources of income that were difficult to verify were also appropriate candidates for a stated income documentation program.

128.   The relaxed documentation requirements under a stated income program were not, however, a basis for a relaxed approach to assessing the borrower's ability to repay the loan. To the contrary, a stated income loan required the underwriter to use heightened care to assess the reliability of the borrower's stated employment and income. Without such care, stated income loans were susceptible to overstatement of the borrower's income or outright fraud in the origination process. A borrower's purposeful misstatement of income obviously casts doubt on his or her capacity to repay the mortgage, as it is likely that the income actually earned by the borrower is less than stated. Moreover, such a misstatement casts doubt on the borrower's character and increases the credit risk of the loan, as a borrower who is willing to claim an inflated income to obtain a loan is typically less able and willing to repay the mortgage than a borrower who states his or her income honestly.

129.   For stated income loans, most of the Originators' underwriting guidelines required verification of the borrower's continuous employment for at least one or two years prior to the loan application.[101] Some Originators required a written or verbal VOE from an employer prior to

---

[101] ████████████████████████████████████████████████████
████ ██████ ██████ ████████ ██████ ██████ ██████

HIGHLY CONFIDENTIAL

closing, and the inability to obtain such verification should have rendered the borrower ineligible for the loan.[102] A self-employed borrower was generally required to prove employment with a CPA letter or a business license, or similarly reliable third party evidence.[103]

130.    In addition to verification of employment, the Originators' underwriting guidelines required underwriters to determine whether the income stated on the borrower's loan application was reasonable.[104] If the borrower's stated income was greater than the typical range of income for the stated employment profile, that overstatement was a red flag that needed to be investigated.





131.    This reasonableness assessment necessitated a comparison of the borrower's stated income to other borrower characteristics, such as the borrower's geographic location, occupation, length of experience, or asset base.[107] Some Originators also recommended that underwriters review third-party sources to make this determination. ████████████████████████████████

████████████████████████████████████████████████████

132.    Additionally, some Originators' guidelines required a full loan application for stated income loans, complete with statements of assets, liabilities, all sources of income, and the sources of liquid closing funds.[109] Consistent with industry-standard underwriting practices, a reasonable underwriter should have reviewed this application for inconsistencies with the borrower's stated income, line of work, or assets.[110] Also, a borrower's initial and final loan application should have been reviewed for any inconsistencies, and any red flags should have been investigated.[111]

133.    For stated income loans, some of the Originators' guidelines specifically required verification of any assets that the borrower planned to rely on for closing or reserves.[112] For certain Originators, this requirement also served as a means of assessing the reasonableness of the

---

[107] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████

[108] ██████████████████████████████████████

[109] ████████████████████████████████████████████

[110] ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

[111] ████████████████████████████████████████████
████████████████████████████████

[112] ████████████████████████████████████████████
██████████████████████████████████

HIGHLY CONFIDENTIAL

borrower's income, the rationale being that the asset base should be consistent with that of a person who makes the borrower's stated income.[113] Finally, the Originators' underwriting guidelines stated that the borrower's credit profile, including the amount of liabilities and repayment history, should be commensurate with the income stated on the loan application.[114]

134.    According to industry-standard underwriting practices, any reasonable underwriter of a stated income loan should have assessed the reasonableness of the stated income.[115] This assessment entailed several steps. First, the underwriter should have verified that the borrower was employed prior to the loan closing by obtaining either a verbal or written verification of the borrower's employment.[116] If a self-employed borrower's profession was of the sort that would require a license—such as a doctor or a hair stylist—then the underwriter should have verified that license.[117]

---

[113] 

[115] Indeed, the Defendants' Offering Documents explained that stated income must be reasonable. *See, e.g.*, LBMLT 2006-2 Prospectus Supplement, at "Underwriting of the Mortgage Loans" ("Under the limited documentation and stated income documentation residential loan programs, the prospective borrower's employment and income sources must be stated on the prospective borrower's application. The prospective borrower's income as stated must be reasonable for the related occupation and such determination as to reasonableness is subject to the loan underwriter's discretion."); SVHE 2006-WF2 Prospectus Supplement, at S-47 ("The applicant's income as stated must be reasonable and consistent for the applicant's occupation and reflect an overall ability of the applicant to repay all its debt as determined in the discretion of the loan underwriter.").



HIGHLY CONFIDENTIAL

135.    Second, in addition to verifying the borrower's employment, the underwriter should have considered whether the borrower's stated income fell within the range of typical incomes for a person of the borrower's stated profession, position within the borrower's company (if the borrower was a salaried worker), geographic location, and length of experience.[118] The underwriter also could have used audit and income verification tools aimed at assessing the reasonableness of the borrower's stated income, such as Salary.com.[119]

136.    Third, the underwriter should have compared the borrower's asset base to the stated income.[120] A borrower's statement of a high income coupled with only minimal verified assets cast doubt on the accuracy of the borrower's stated income. Moreover, the underwriter should have ensured that the borrower's reported assets came from a verifiable source and were "seasoned." If, for example, the borrower sought to make a down payment with a large sum of money that the

---

[118] 

[119] In my re-underwriting review, to assess the reasonableness of a borrower's stated income I directed my teams to use salary data provided by the BLS. Given the historical nature of my review, some of the ways that an underwriter could have assessed a borrower's income between 2002 and 2007—such as consulting the borrower's verified employment—would be complicated and unreliable to use while reviewing the loan file years after the borrower applied for the mortgage. Therefore, it was sometimes necessary to use third-party salary data. And among third-party sources, BLS is the only database I am aware of that offers historical salary data. I considered a borrower's stated income to be unreasonable when it exceeded the 90th percentile of the BLS's index for the borrower's occupation, position, and geographic location. I view this assumption to be generous because using the 90th percentile gave the borrower considerable benefit of the doubt in my analysis.

[120]

borrower recently received as a gift, then the borrower's ability to make that down payment did not necessarily signify the borrower's ability to meet the monthly mortgage obligations.

137.    Finally, the underwriter should have compared the borrower's credit profile—namely the borrower's credit report, credit score, and assets—to the stated income.[121] In undertaking this comparison, the underwriter should have ensured that the borrower's credit history and verified assets were consistent with an individual who made the income that the borrower stated. If, for example, the borrower stated a high income but had a credit history checkered with late payments and highly utilized credit lines, then common sense would have indicated to the underwriter that the borrower may not have accurately stated his or her income. ███████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████ ██

138.    Further buttressing the fact that the common-sense steps outlined in the preceding paragraphs were both industry-standard and expected of underwriters, when selling loans on the secondary market for securitization, the Originators routinely made representations and warranties that they were not aware of any fraud or misstatements in the loan application, and that they had not been negligent in approving the loan. For example, when selling loans to be securitized into the NHEL 2006-5 trust, Originator NovaStar represented and warranted as follows: "No error, omission, negligence, misrepresentation, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Sponsor, its affiliates or employees or any other person

---

[121] ███████████████████████████████████████████
████████████████████████████████████
[122] ██████████████████████████

involved in the origination of the Mortgage Loan."[123] Similar representations and warranties were commonplace.[124]

### 8.4    Evaluation of credit score, LTV/CLTV ratios, and DTI ratios.

139.    **Overview.** A borrower's credit score, particularly a FICO score, measures the risk that a particular borrower presents to a creditor. Credit agencies arrive at the borrower's credit score by using proprietary formulas that consider multiple factors in the borrower's credit history, including payment history, length of credit history, use of credit, any derogatory credit information, and the frequency and number of recent credit inquiries. All else being equal, a lower FICO score indicates that the borrower has a weaker credit history and presents a greater risk of defaulting on a mortgage obligation.

140.    The loan's LTV ratio is an important factor in assessing the borrower's willingness to repay the mortgage.[125] The LTV ratio compares the outstanding balance of the mortgage loan with

---

[123] NHEL 2006-5 MLPA, NMI00000001 at 26-27.

[124] *See, e.g.*, FFML 2005-FFH4 MLPA, RBS-NCUA14268923 at p. 10 of native ("To the best of the Seller's knowledge, no error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination, modification or amendment of the Mortgage Loan."); Nomura and First National Bank of Nevada MLPA, NOM0001893272 at 305 ("The Seller has no knowledge of any circumstances or condition with respect to the Mortgaged Property, the Mortgagor, the Mortgagor's credit standing or the Mortgage that case the Mortgage Loan to become delinquent, or adversely affect the value of the Mortgage Loan. … No fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including without limitation the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan."); ██████████████

[125] The Originators included LTV/CLTV ratio requirements in their guidelines and/or matrices. ████

the value of the mortgaged property at the time the loan was made. The value of the mortgaged property was generally measured as the lesser of the property's appraised value or purchase price for a purchase loan.[126] A higher LTV ratio indicates that the borrower has less equity in the home and, all else being equal, therefore indicates a greater likelihood of default on the mortgage.

141.    If a borrower obtains a second-lien mortgage on the property, the CLTV ratio compares the combined balance of the first- and second-lien mortgages against the lesser of the property's appraised value or (for a purchase loan) purchase price.[127] As with the LTV ratio, all else being equal, a higher CLTV ratio is indicative of a higher risk of delinquency and default.

142.    The borrower's DTI ratio or "back-end debt ratio," is a very important factor in assessing the borrower's capacity to repay the loan.[128] The borrower's DTI ratio reveals the share of the borrower's gross monthly income devoted to paying the borrower's liabilities, including monthly mortgage payments. It is expressed as a percentage and is calculated by dividing the borrower's total monthly debts—including such items as all housing-related payments, installment and revolving debt, and maintenance payments—by the borrower's gross monthly income.[129] All else being equal,



[128] The Originators' guidelines set maximum DTI ratios, often linked to other loan characteristics such as LTV ratio, loan amount, and loan program. For example, ██████████████████████ ████████████████████████.

[129] It should be noted that the DTI ratio is calculated based on the borrower's gross monthly income, which does not take into effect typical payroll deductions such as taxes, health insurance premiums, retirement plan contributions, etc. Nor does the DTI ratio consider all of a borrower's on-going obligations. Expenses such as car insurance, gas and maintenance are not included, nor is food expense, clothing expense, etc. This is particularly important when considering the DTI ratio in assessing the borrower's risk profile.

the higher the borrower's DTI ratio, the more difficult it is for the borrower to meet his or her monthly mortgage payments in addition to other obligations, and the greater the credit risk associated with the loan.

143.     These three factors are critical to determining a borrower's ability and willingness to repay a loan. Accordingly, all three factors were prominently disclosed or discussed in the prospectus supplements and other offering documents for the RMBS at issue. My understanding is that these factors were also used by credit rating agencies to predict the performance of a pool of loans and to assign appropriate credit ratings.

144.     **Underwriting criteria.** All of the Originators' underwriting guidelines contained numerical limits on these three main underwriting attributes: FICO score, LTV/CLTV ratios, and DTI ratio. Originators used FICO scores, LTV and CLTV ratios, and DTI ratios in relation to one another to set the parameters of borrower eligibility. For example, ███████████████████ ███████████████████████████████████████████████████████████████ ███████████████████ ██ ████████████████████████████████████████ ██████████████████████████████████████████ ██ Other Originators had similar cutoffs and restrictions for subprime loans.[132] Guidelines for Alt-A mortgages also took a multi-factored approach when setting minimum FICO scores. For example, ██████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

---

[130] ████████████████████████████████████████████████████

██ ████████

██ ████████████████████████████████████████████

 Other Originators also linked FICO scores for Alt-A loans to other requirements, such as LTV ratios, loan amounts, occupancy, lien position, and payment shock.[134]

145.   With respect to DTI ratios, while most of the Originators limited eligible borrowers to those with a DTI ratio of 50% or lower, some lenders originated mortgages to borrowers with DTI ratios up to 55%. In those cases, however, a borrower who obtained a mortgage with the maximum qualifying ratio was typically approved with conditions. For example, 

146.   With respect to LTV ratios, many of the Originators limited the maximum permissible LTV ratio for a subprime or Alt-A mortgage to 95%, depending on factors such as the borrower's credit score and level of income documentation.[137] However, it was not unusual for the underwriting guidelines of some subprime or Alt-A lenders to permit approval of mortgages with CLTV ratios of 100%[138] or LTV ratios of 100%.[139] A mortgage with a LTV or CLTV ratio of 100%

---

[133] 

could generally be approved only with conditions. For instance, ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████ ██ ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████ ██

### 8.5    Evaluation of owner occupancy status.

147.    Owner occupancy refers to the borrower's intended use of a property. Typically, the prospectus supplements and underwriting guidelines provided three categories of occupancy: (1) owner-occupied, meaning the borrower intended to use the mortgaged property as a primary residence; (2) second home, meaning the borrower intended to use the mortgaged property as a part-time or vacation home; and (3) investment, meaning the borrower intended to use the mortgaged property to earn income by, for example, renting the property out. The occupancy status of a mortgaged home was also a critically important indicator of credit risk because borrowers living in a mortgaged property had more incentive to make payments and care for the home than borrowers purchasing second homes or investment properties. Moreover, lenders would typically charge higher interest rates and sometime higher up-front fees for non-owner occupied properties;

---



hence, there was an incentive for potential borrowers to misrepresent the occupancy of the property being offered as collateral.

148.    Due to the increased credit risk associated with non-owner-occupied homes, most Originators imposed tighter credit requirements on investment properties than on owner-occupied properties. For example, ███████████████████████████████████████

███████████████████████████████████████

██████ Similarly, ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

149.    The underwriting guidelines of certain Originators expressly instructed underwriters to classify a loan as "owner-occupied" only if information in the loan file supported such a classification. For example, ███████████████████



HIGHLY CONFIDENTIAL

150.    Indeed, ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

151.    ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████



HIGHLY CONFIDENTIAL

████████████████████████████████████████████████████████████

████████████████     ████████████████████████████████████

████████████████████████████████████████████████     ██

152.    Industry-standard underwriting practices required reasonable underwriters to investigate potential misrepresentations of occupancy, using information either in the loan file itself or information obtained through public records. Accordingly, in addition to evaluating compliance with underwriting-guideline requirements for owner occupancy, our review focused on whether the original underwriter failed to address red flags presented in the underwriting process. The owner-occupancy review entailed several steps.

153.    First, the re-underwriting team reviewed the loan files for red flags suggesting that the borrower did not occupy the subject property, and made related factual findings. For example, the re-underwriting team considered whether the borrower listed a primary address that was different from the subject property or described the subject property as an investment property. We also considered instances in which, despite the lack of an obvious reason (such as recent divorce or downgrading for an empty nest), the subject property was significantly smaller in size or value than the borrower's current owner-occupied property. In addition, the re-underwriting team considered the distance between the borrower's place of employment and the subject property to determine whether it was reasonable to believe that the borrower lived at the subject property.

154.    Second, the re-underwriting team reviewed the servicing records, where available, to determine whether there was evidence that the borrower did not, in fact, occupy the subject property after closing. For example, the team reviewed information furnished by borrowers seeking

---

[151] ████████████████████████████████████████████████████████

██████

██ ████

modification of their loan terms after closing, such as pay stubs, to determine whether the borrowers furnished a different address than the address for the subject property.

155.     Third, the re-underwriting team reviewed borrower and property records, including a combination of public records, bankruptcy filings, and consumer credit reports, to see if the borrower's primary address on these records differed from the subject property's address during the relevant time period, or if the borrower's address had changed from the subject property within 12 months after the origination of the loan. I chose 12 months as the relevant time period because the vast majority of the loan files contained mortgage instruments and occupancy agreements executed by the borrower in which the borrower certified that the property would be occupied within sixty days of origination and for at least one year after origination. Even where a loan file or mortgage documents did not explicitly contain a 12-month occupancy requirement, I made a defect finding if the property was not owner-occupied within 12 months after closing. I adopted this approach because the incorrect occupancy status resulted in the loans being originated with more relaxed guideline requirements, such as higher maximum LTV and DTI ratios, which increased the credit risk of the loans.

156.     While the re-underwriting team made factual findings relating to the borrower's occupancy status, I made the ultimate judgment about whether each property was, in fact, owner-occupied either at the time of underwriting or for 12 months following origination, as appropriate. If I found the evidence derived from the above review compelling, I considered that a misrepresentation of owner-occupancy status.

### 8.6    Evaluation of hazard and title insurance.

157.     Industry-standard underwriting practice required an underwriter to obtain evidence of hazard and title insurance before closing. Hazard and title insurance are important because failure to insure the subject property increases the risk presented by the mortgage. Hazard insurance is

essential because the collateral property serves as a secondary source of repayment for a mortgage loan, and should a fire or other hazard destroy the property, the property would lose some or all of its value as collateral or as a source of repayment. In addition, insufficient insurance coverage could preclude the borrower from repairing or rebuilding the collateral property, thus likewise reducing the collateral's value.

158.    Title insurance protects the borrower and the lender against the possibility of a defect in the property's title. If a previously unknown lien on the property or other title defect is found to exist after closing, it could cause the property to lose value or could frustrate the foreclosure process, which in turn could frustrate the ability to monetize the collateral. Title insurance buffers the property against such a reduction in value. Title insurance guarantees that the lender's lien position is first or second as expected, even if the title company erred in reporting the lien position at or before the mortgage loan closed. Originating a mortgage loan without requiring title insurance protection risks forfeiture of a significant source of repayment.

159.    Many of the Originators' guidelines made explicit the requirement that a mortgaged property be covered by hazard insurance to protect against events such as fire.[153] For example, ███



███ In addition, many Originators' underwriting guidelines required title insurance coverage for the mortgaged property.[155]

---

HIGHLY CONFIDENTIAL

### 8.7    Evaluation of approvals.

160.    As a general matter, when a loan file contained an approval that imposed more restrictive requirements than the applicable underwriting guidelines, my team used the approval requirement to re-underwrite the loan. For stated income loans, if the loan approval used a lower income than what the borrower stated on his application, my team used the lower income in the approval to conduct the income reasonableness tests described above. If the loan approval imposed conditions that had to be satisfied before closing, my team identified failure to satisfy those conditions as breaches.

161.    **AUS approvals.** Originators at times used an automated underwriting system ("AUS") in lieu of or in conjunction with manual underwriting, either when conducting initial underwriting, or when purchasing loans from smaller brokers or lenders and re-underwriting the loans to the originator's own guidelines. An AUS is a computer program that receives information from a borrower's loan application, along with other information such as the borrower's credit score and credit history, and renders an immediate recommendation about whether the loan complies with the originator's underwriting guidelines. Generally, an AUS would render one of the following recommendations: the loan (1) fit within the program that the borrower applied for; (2) provisionally complied with the originator's underwriting guidelines upon the fulfillment of one or more conditions; (3) was ineligible for the particular loan program; or (4) was referred for manual underwriting as an exception loan or for verification of a particular issue(s) that the computer system could not resolve. Accordingly, the use of an AUS did not relieve the lender of the need to review and approve the loan, or, in certain circumstances, to manually underwrite the loan entirely. For instance, the AUS report might show that the loan provisionally complied with the guidelines upon

the borrower's ability to meet a particular condition, such as providing an explanation for a recent credit inquiry.

162.    Certain of the Originators used a proprietary AUS to underwrite loan applications. For instance, ████████████████████████████████████████



163.    To ensure data accuracy, ████████████████████████████████████████

164.


165.     When encountering a loan that was approved via an AUS, my team re-underwrote the loan to the terms of the AUS approval if the AUS was that of the loan originator, or a different set of guidelines/AUSs if the relevant prospectus supplement disclosed that the originator's loans were underwritten to a different set. If the AUS approval contained a condition, including compliance with a guideline requirement, my team verified whether the condition was met. If other findings invalidated the data input into the AUS to gain approval, my team would trigger a finding that there is no valid approval in the loan file. We would then re-underwrite the loan to the applicable underwriting guidelines and issue findings based on the guidelines.

---



### 8.8    Evaluation of the adequacy of collateral.

166.    The prospectus supplements for all of the RMBS at issue made representations that the underwriting guidelines applicable to the loans in the loans pools were also designed or intended to evaluate the sufficiency of the mortgaged property's value as collateral for the loan.[164] Consistently, the Originators' underwriting guidelines contained directions and requirements regarding the evaluation of the adequacy of the underlying mortgage collateral, including through the use of appraisals or automated valuation models ("AVMs").

167.    **Appraisal reports.** Consistent with industry-standard underwriting practices, a reasonable underwriter should evaluate a property's appraisal report and not just accept the appraisal at face value. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Generally speaking, an underwriter should review the appraisal report to determine if the appraiser used reasonable methods and techniques to arrive at the estimated value of the mortgaged property.

168.    When reviewing the appraisal report, an underwriter should confirm that the appraiser was licensed, qualified, and experienced in appraising residential properties, as required by

---

[164] *See* Appendix 2.

[165] ████████████████████████████████████████████████████████████
████
██ ████████████████████████████████████████████████████████

many of the Originators' underwriting guidelines.[167] State licensing boards implemented minimum levels of education and experience required for those seeking to obtain an appraiser's license and set continuing education and other requirements for existing license-holders. An inactive or canceled license may indicate that an appraiser had not complied with licensing requirements or had been disciplined.

169.    Additionally, the underwriter should confirm that the appraisal was conducted consistent with USPAP, as required by many of the Originators' underwriting guidelines.[168] USPAP is a body of standards developed by the Appraisal Standards Board of the Appraisal Foundation for the purpose of establishing requirements for professional appraisers and, in turn, promoting and maintaining public trust in the appraisal practice. USPAP mandates competence, impartiality, objectivity, and independence on the part of the appraiser.

170.    Most of the Originators' guidelines provided other requirements for the subject property's appraisal. For example, the mortgage loan file had to include an appraisal report on the Uniform Residential Appraisal Report form, which provided a summary of the subject property, neighborhood, and comparable properties, among other items.[169] The appraisal had to include an effective date and had to be signed by the inspecting appraiser.[170] The appraisal also had to be



completed within a certain period before the loan's closing, typically within 120 days to six months of closing.[171]

171.    According to industry-standard underwriting practices, a reasonable underwriter should have reviewed the appraisal report to identify any red flags, such as possible property flipping,[172] to confirm that the appraisal conformed to the USPAP requirements, and to confirm that the appraisal was no more than six months old as of the closing date.[173] If the appraisal report contained any of these defects or otherwise failed to support the assessed value, then the underwriter should not have approved the loan based on that report. Instead, the underwriter should have taken additional steps to investigate or correct the problem, such as following up with the appraiser to rectify problems or ordering a new appraisal.

172.    **Comparable properties.** The review of comparable properties, along with the adjustments made to those properties to harmonize their different values, was a critical part of the subject property's appraisal. In other words, the value of the subject property was not solely a function of the characteristics of the property itself; rather, its value should have been assessed relative to other recent sales of properties with similar characteristics to, and in the same area as, the subject property.

---

[171] ███ ██ ███ ██████ ██████ ████████ ██████ ████████ ██████ ████████
██████████████████████████████████████

[172] Property flipping refers to a borrower's intent to purchase a property then quickly sell it for a profit, typically through renovating and improving the property. This can become fraudulent, and therefore risky for an originator, if the purchaser artificially inflates the value of the property without actually making substantive improvements. For an example of guidelines warning of such behavior,
███████████████████████████████████████████████

[173] ███ ███ ██████ ███████ ████████ ██████ ████████ ██████ ████████ ██████
██████ ███████████ ██████ █ ███ ██████ ██████ █ ████ ██████ ████████ ██████
██████ ████████ ███

173. Many of the Originators' underwriting guidelines specified requirements for comparable properties used to generate or support the subject property's appraisal value, such as the minimum number of comparable properties to be considered.[174] Additionally, some of the Originators' guidelines specified that the comparable properties had to have sales activity within a particular time period of the appraisal report.[175] Most Originators' underwriting guidelines further required the appraisal report to include photographs of the comparable properties.[176] Finally, most Originators' underwriting guidelines also required that any conditions or contingencies identified in an appraisal—such as completion of improvements or necessary repairs—be satisfied before closing in order for the appraised value to be valid.[177]

**9. My determination of when a Sampled Loan was Materially Misrepresented.**

174. When re-underwriting each of the Sampled Loans, my team documented every instance of a guideline violation, failure to follow up on red flags in the loan file, borrower

174

misrepresentation, MLS misrepresentation, and (where guidelines were silent) violation of industry-standard underwriting practices. Virtually all of the loan files that we reviewed contained some evidence of a guideline violation, underwriter negligence, deviation from reasonable underwriting practice, or misrepresentation of a loan characteristic in the prospectus supplement/MLS.

175.    As part of the re-underwriting process described throughout this report, I carefully reviewed all of the above breach findings and potential compensating factors for each Sampled Loan, which included reviewing the loan file and applicable underwriting guideline where I felt it helpful or necessary. Applying the conservative approach described above, I concluded that a Sampled Loan was Materially Misrepresented only when, based on a totality of the circumstances, I believed that the findings materially increased the credit risk of the loan beyond what was permissible under the guidelines.

176.    In the case of Sampled Loans where the only findings were misrepresentations of loan characteristics in the prospectus supplements/MLSs—whether based on borrower fraud or simple discrepancies between the data in the MLS and the data in the loan file—I generally adopted the following approach. For a misrepresentation of DTI or LTV/CLTV where the true value was still within the applicable guideline parameters, I generally found the misrepresentation to not be material unless the difference between the true and represented value was roughly 10 percentage points or greater.[178] For a misrepresentation of DTI or LTV/CLTV where the true value was

---

[178] For Originators whose underwriting guidelines permitted maximum DTI ratios above 40 percent—some permitted DTIs of 50 or even 55—I would generally consider a DTI discrepancy of 5-10 percentage points to be material if the misrepresented DTI was already above 40. If there were findings of undisclosed debt on no ratio loans where there was no DTI, I made my materiality decision based on the size of the undisclosed debt in relation to the overall credit profile of the borrower. I used the same 5-10 percentage point benchmark for LTV misrepresentations in the 80-100 percent range, when underwriting guidelines permitted maximum LTV ratios above 80 percent. For example, if the guidelines permitted LTVs of up to 100 percent, the misrepresented LTV was 90, but the actual LTV was 97, I would generally consider such a discrepancy material, subject to case-specific exceptions based on the overall credit profile of the borrower.

outside the applicable guideline parameters, I generally found the misrepresentation to be material unless the deviation from guideline parameters was small and there were valid, documented compensating factors that could have led to the loan being approved using the true value. I always found a Sampled Loan to be Materially Misrepresented when there was a misrepresentation of owner occupancy. I similarly found a Sampled Loan to be Materially Misrepresented when the prospectus supplement/MLS listed it as a full-document loan, but the loan was actually a reduced document or stated income or asset loan.

177.     For purposes of this report and the detailed re-underwriting Appendix 1 attached to it, I have focused only on those Sampled Loans that I believe to be Materially Misrepresented. I offer no opinion on the other Sampled Loans other than to say that I could not conclude, based on a totality of the circumstances, that the findings associated with those loans establish a materially increased credit risk above what was represented.

## 10.     My conclusions based on my re-underwriting review.

### 10.1     A significant majority of the Sampled Loans were Materially Misrepresented.

178.     Based on my re-underwriting review, I can confidently conclude to a reasonable degree of professional certainty that a significant majority of the Sampled Loans from the SLGs collateralizing the 38 RMBS at issue were Materially Misrepresented, as I have defined that term through this report. Below, I have reproduced Table 1, which identifies the number and percentage of Materially Misrepresented loans in each sample drawn from the 45 unique SLG combinations.

HIGHLY CONFIDENTIAL

**TABLE 1**

**(Number and Percentage of Materially Misrepresented Loans Per Sample)**

| RMBS (SLG) | Sampled Loans Reviewed | # of Materially Misrepresented Loans | % of Materially Misrepresented Loans |
|---|---|---|---|
| AHMA 2007-3 (Grp 1-2) | 100 | 65 | 65.0% |
| FFML 2005-FFH4 | 100 | 42 | 42.0% |
| FFML 2006-FF16 (All) | 100 | 38 | 38.0% |
| FFML 2006-FF16 (Grp 2) | 100 | 46 | 46.0% |
| FHLT 2006-3 | 100 | 61 | 61.0% |
| FHLT 2006-D (All) | 100 | 65 | 65.0% |
| FHLT 2006-D (Grp 2) | 100 | 59 | 59.0% |
| GMACM 2006-HE5 | 78 | 45 | 57.7% |
| HVMLT 2006-10 | 100 | 53 | 53.0% |
| HVMLT 2006-11 | 100 | 67 | 67.0% |
| HVMLT 2006-12 | 100 | 69 | 69.0% |
| HVMLT 2006-14 | 96 | 66 | 68.8% |
| HVMLT 2006-6 (Grp 2) | 93 | 51 | 54.8% |
| HVMLT 2006-6 (Grp 3) | 95 | 48 | 50.5% |
| HVMLT 2006-8 | 100 | 63 | 63.0% |
| HVMLT 2006-9 | 100 | 65 | 65.0% |
| HVMLT 2006-SB1 | 100 | 50 | 50.0% |
| HVMLT 2007-1 (All) | 99 | 64 | 64.6% |
| HVMLT 2007-1 (Grp 2) | 100 | 57 | 57.0% |
| HVMLT 2007-2 | 99 | 64 | 64.6% |
| HVMLT 2007-3 | 100 | 66 | 66.0% |
| HVMLT 2007-4 | 99 | 59 | 59.6% |
| HVMLT 2007-5 | 100 | 59 | 59.0% |
| INDX 2006-AR35 | 98 | 86 | 87.8% |
| INDX 2006-AR6 | 100 | 67 | 67.0% |
| LBMLT 2006-2 | 97 | 49 | 50.5% |
| LBMLT 2006-8 | 96 | 50 | 52.1% |
| LUM 2006-2 | 100 | 69 | 69.0% |
| LUM 2007-1 (Grp 1) | 97 | 46 | 47.4% |

HIGHLY CONFIDENTIAL

**TABLE 1**

**(Number and Percentage of Materially Misrepresented Loans Per Sample)**

| RMBS (SLG) | Sampled Loans Reviewed | # of Materially Misrepresented Loans | % of Materially Misrepresented Loans |
|---|---|---|---|
| MHL 2006-1 (Grp 2) | 100 | 67 | 67.0% |
| MHL 2006-1 (Grp 1-A2) | 100 | 75 | 75.0% |
| NAA 2006-AR4 | 96 | 61 | 63.5% |
| NHEL 2006-5 (All) | 100 | 53 | 53.0% |
| NHEL 2006-5 (Grp 2) | 95 | 67 | 70.5% |
| NHELI 2007-1 (Grp 1) | 98 | 61 | 62.2% |
| NHELI 2007-1 (Grp 2) | 100 | 55 | 55.0% |
| OOMLT 2007-2 | 100 | 51 | 51.0% |
| RFMS2 2007-HSA2 | 96 | 64 | 66.7% |
| SAST 2006-3 | 87 | 52 | 59.8% |
| SVHE 2005-OPT4 | 100 | 40 | 40.0% |
| SVHE 2006-WF1 | 99 | 42 | 42.4% |
| SVHE 2006-WF2 | 99 | 36 | 36.4% |
| SVHE 2007-OPT1 | 99 | 60 | 60.6% |
| WMLT 2006-ALT1 | 100 | 43 | 43.0% |
| WMLT 2006-AMN1 | 97 | 43 | 44.3% |
| **TOTAL** | **4,413** | **2,559** | **58.0%** |

179.    Across the Materially Misrepresented loans that we re-underwrote, there were approximately 120 different kinds of guideline breaches, violations of industry-standard underwriting practices, and misrepresentations of loan characteristics. The details for each of these findings can be found in Appendix 1.

180.    Overall, there were over 8,700 separate breach findings across the 2,559 Materially Misrepresented loans—an average of roughly 3.4 breach findings per Materially Misrepresented loan. Some of our most frequent findings for Materially Misrepresented loans were underwriter error

or negligence (1,331 findings);[179] failure to determine reasonable ability to repay on stated income or

no-ratio loans (821 findings); misrepresentation of debt (605 findings); excessive DTI (597 findings);

failure to verify employment (520 findings); improper calculation of debts or income (454 findings);

failure to verify assets (221 findings); excessive LTV or CLTV (220 findings); misrepresentation of

income (214 findings); incomplete income documentation (111 findings); and misrepresentation of

owner-occupancy status (100 findings).

**10.2    The securitization loan tapes misrepresented the collateral characteristics of more than 25 percent of the Sampled Loans.**

181.    In the course of my re-underwriting review, I also discovered that the securitization

loan tapes/MLSs were riddled with inaccurate data concerning the collateral characteristics of the

Sampled Loans. These were presumably the same loan tapes used to generate the collateral data that

appeared in the Offering Documents. They were also presumably the same loan tapes used by credit

rating agencies to model the performance of the loan pools backing the RMBS at issue, to create

appropriate credit enhancement levels for the various tranches of the RMBS at issue, and ultimately

to provide the investment-grade credit ratings to the Certificates purchased by the liquidated credit

unions.[180] Table 3 below shows the number of loan tape inaccuracies that I identified during the

course of my re-underwriting review.

---

[179] These findings principally included failure to investigate or obtain a letter of explanation for unexplained recent credit inquiries, but also included using the wrong FICO score to qualify a borrower, failing to adequately verify a borrower's identity, and simply failing to take into account documentation that was in the loan file or loan application.

[180] *See, e.g.*, Marjan Riggi & Navneet Agarwal, *US Subprime-Overview of Recent Refinements to Moody's Methodology*, MOODY'S, July 2007, at 2 (explaining that Moody's considered LTV ratio, CLTV ratio, FICO score, and occupancy type in calculating its risk assumptions for loans); Bill Hunt, *ResiLogic: U.S. Residential Mortgage Loss Model Technical Document*, FITCH RATINGS, January 18, 2007, at 3, 8 (listing the closing balance of the mortgage loan, CLTV ratio, occupancy, and FICO score as several of the loss severity data factors); *RMBS: U.S. Residential Subprime Mortgage Criteria: Credit Analysis for Subprime Loan Transactions*, S&P, September 1, 2004, at 3 (explaining that "[t]he base foreclosure

HIGHLY CONFIDENTIAL

**TABLE 3**

**(Sampled Loans with MLS Misrepresentations)**

| Sampled Loans Reviewed | # of Loans w/ MLS Misrepresentation | % of Loans w/ MLS Misrepresentation |
|---|---|---|
| 4,413 | 1,177 | 26.7% |

182.    The figures above likely understate the true number and percentage of Sampled Loans that are misrepresented in the securitization loan tapes, because they include only the Materially Misrepresented loans for which I identified an MLS discrepancy. The figures above do not include any preliminary findings of MLS discrepancies for loans that I did not conclude to be Materially Defective.

183.    There was a variety of Sampled Loan collateral data that was misrepresented in the securitization loan tapes, including DTI, LTV/CLTV, owner-occupancy status, documentation type, property type, and loan purpose. The data points most frequently misrepresented were DTI (929 findings); LTV/CLTV (119 findings); and owner-occupancy status (103 findings). For each of these misrepresentations, the securitization loan tapes understated the credit risk associated with a Sampled Loan—i.e., the actual DTI was higher than represented, the actual LTV/CLTV was higher than represented, and the property identified as a primary residence was actually a second home or an investment property.

184.    The magnitude of the DTI misrepresentations in the securitization loan tapes was particularly striking. Excluding no-ratio loans for which no DTI was listed on the securitization loan tapes, as well as the few rare loan tapes that did not disclose DTI data at all, there were 910 Sampled

---

frequency of a prime pool for each rating category is affected by changes in loan characteristics such as . . . [l]oan to value (LTV) ratios, . . . [o]ccupancy status, . . . [and] [l]oan size"), at 10 (describing that "[t]he base loss severity assumptions for each rating category are affected by factors such as . . . [l]oan to value (LTV) ratios, . . . [l]oan balance, . . . [and] [p]roperty type and occupancy").

HIGHLY CONFIDENTIAL

Loans for which I found a DTI misrepresentation. The average DTI listed in the loan tapes for those Sampled Loans was 37.4 percent. After I recalculated DTI for those Sampled Loans using the true debt and income information discovered during the re-underwriting review, the actual average DTI turned out to be over 75 percent—twice what was represented, and significantly higher than the maximum DTI permitted under any of the Originators' guidelines.[181]

---

[181] In making this calculation, I was once again conservative by excluding four Materially Misrepresented loans for which the re-calculated DTI was over 1,000 percent, because I did not want those outlier figures to skew the average. I also excluded the loans for which the DTI could not be recalculated, and was thus assumed to be 0. After excluding those loans, there were 880 Sampled Loans remaining.

HIGHLY CONFIDENTIAL

August 14, 2015

Steven I. Butler